IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re Testosterone Replacement Therapy Products Liability Litigation Coordinated Pretrial Proceedings | ) ) ) ) | No. 14 C 1748 MDL No. 2545 |
| _____ | ) | _____ |
| MEDICAL MUTUAL OF OHIO, Plaintiff, v. ABBVIE INC., ABBOTT LABORATORIES, ABBOTT PRODUCTS, INC., SOLVAY AMERICA, INC., SOLVAY PHARMACEUTICALS, INC., SOLVAY S.A., UNIMED PHARMACEUTICALS, LLC, BESINS INC., BESINS S.A., AUXILIUM, INC., GLAXOSMITHKLINE LLC, OSCIENT PHARMACEUTICALS, INC., ELI LILLY AND COMPANY, LILLY USA, INC., ACRUX COMMERCIAL PARTY LTD., ACRUX DDS PARTY LTD., ACTAVIS PLC, ACTAVIS, INC., ACTAVIS PHARMA, INC., WATSON PHARMACEUTICALS, INC., WATSON LABORATORIES, INC., ANDA, INC., and ENDO PHARMACEUTICALS, INC., Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | No. 14 C 8857 |

## MEMORANDUM OPINION AND ORDER (CORRECTED)

MATTHEW F. KENNELLY, District Judge:

Defendants in this MDL proceeding are manufacturers, sellers, and promoters of

testosterone replacement therapy drugs (TRTs). Nearly all of the plaintiffs have brought

lawsuits claiming personal injuries they claim were caused by TRTs. The Court has

already ruled on a motion to dismiss many of those personal injury claims. *See In re*

*Testosterone Replacement Therapy Products Liab. Litig. ("In Re TRT")*, No. 14 C 1748,

2014 WL 7365872 (N.D. Ill. Dec. 23, 2014) (denying motions to dismiss as to personal injury fraud, misrepresentation, and failure-to-warn claims).

In the case now before the Court, plaintiff Medical Mutual of Ohio (MMO), an Ohio mutual insurance company, purports to represent a class of third-party payors (TPPs) who allege that they suffered economic injuries when—as the result of defendants' fraudulent marketing schemes—they made reimbursement payments for medically inappropriate TRT prescriptions. In its complaint, MMO sorts the twenty-three named defendants into seven separate groups: (1) Solvay S.A., Solvay America, Inc., Solvay Pharmaceuticals, Inc., Unimed Pharmaceuticals, LLC, Besins Inc., Besins Healthcare, S.A., Abbott Products, Inc., AbbVie Inc., and Abbott Laboratories (collectively, AbbVie or AbbVie defendants); (2) Auxilium Pharmaceuticals, Inc. (Auxilium); (3) GlaxoSmithKline LLC (GSK); (4) Oscient Pharmaceuticals Corp. (Oscient); (5) Eli Lilly and Company, Lilly USA, Inc., Acrux Commercial Pty Ltd., Acrux DDS Pty Ltd. (collectively, Lilly or Lilly defendants); (6) Actavis plc, Actavis Pharma, Inc., Actavis, Inc., Watson Pharmaceuticals, Inc., Watson Laboratories, Inc., Anda, Inc. (collectively, Actavis or Actavis defendants); and (7) Endo Pharmaceuticals, Inc. (Endo).

MMO alleges that defendants participated in a fraudulent marketing scheme that mischaracterized TRT drugs as a safe and effective treatment for various "off label" conditions. As a result, MMO and other TPPs allegedly paid for numerous off-label TRT prescriptions that were unnecessary and unsafe for their insureds and for which they would have never paid but for defendants' fraudulent scheme. In its complaint, MMO asserts claims for mail and wire fraud in violation of the federal RICO Act, 18 U.S.C. § 1962(c), as well as for conspiracy to violate the Act, 18 U.S.C. § 1962(d), against

AbbVie, Auxilium, Lilly, Actavis, and Endo (the RICO defendants). MMO also asserts

claims against AbbVie, Auxilium, Lilly, Actavis, and Endo under the consumer protection

statutes of all fifty states and the insurance fraud statutes of the states in which they are

headquartered. In addition, MMO asserts claims against "all defendants" for common

law fraud, negligent misrepresentation, and unjust enrichment. Plaintiff has already

amended its complaint twice: one substantive amendment in response to defendants'

motion to dismiss and a technical, non-substantive amendment. All defendants except

Besins Inc., Besins Healthcare, S.A., and Oscient have moved to dismiss this second

amended complaint for lack of standing and for failure to state a claim.[1] Solvay, S.A.

and Solvay America, Inc. have also moved to dismiss for lack of personal jurisdiction.

For the reasons stated below, the Court grants defendants' motion in part and denies it

in part.

**Background**

The Court takes the following facts from the allegations in plaintiff's 434-page

complaint, which describes a number of nationwide schemes orchestrated by

defendants with the intention to boost TRT sales by deceiving patients, primary care

physicians, and TPPs about the drugs' safety and efficacy for treating certain conditions.

The United States Food and Drug Administration (FDA) has approved TRT drugs for the

treatment of a single rare condition, called "classical hypogonadism," which is

characterized by insufficient secretion of the testosterone necessary for the body to

---

[1] None of the attorney signatories to the motion to dismiss purported to
represent Unimed Pharmaceuticals, LLC. Unimed's name was included, however, in
the signature sections of defendants' accompanying joint memoranda and in the AbbVie
defendants' supplemental memoranda. The Court, therefore, will treat Unimed as
having moved for dismissal along with the other AbbVie defendants.

perform normal functions. Though the FDA has not approved TRT drugs for the treatment of conditions other than classical hypogonadism, plaintiff alleges that defendants have marketed the drugs as being safe and effective for the treatment of other "off label" conditions and symptoms, such as erectile dysfunction, diabetes, AIDS, cancer, depression, and obesity. Defendant's off-label marketing scheme allegedly included a "disease awareness" campaign that promoted the existence of a false disease, called "Andropause" or "Low T," which they had invented and for which they claimed TRT drugs were a safe and effective treatment.

According to plaintiff, however, off-label TRT drug use—for "Low T" or otherwise—is neither safe nor effective. Plaintiff asserts that no competent medical evidence demonstrates that TRT drugs are effective at treating off-label conditions but that medical evidence *does* show that off-label TRT use is associated with increased incidence of adverse cardiovascular events, including myocardial infarction (heart attack), stroke, pulmonary embolism, and other thromboembolic (blood clotting) adverse events. As one doctor allegedly commented regarding TRT drugs' effectiveness, for the millions of patients that do not have truly low testosterone levels, TRT drugs are "in the same category as snake oil." Compl. ¶ 21. In addition, plaintiff alleges that the safety risks are particularly high for aging men, who are most likely to experience symptoms of "Low T" and at whom defendants' marketing scheme was primarily aimed. According to plaintiff, in certain patient populations, "TRT drugs may increase the incidence of adverse events and death by over 500%." *Id.* ¶ 93. Though increased off-label marketing coincided with an "astronomical spike" in TRT drug prescriptions and sales, those sales have begun to decrease, despite "continued rampant promotion," in

response to recent revelations of the drugs' safety risks. *Id.* ¶¶ 18–20.

Plaintiff alleges that defendants' own research put them in a position to be aware of the risks TRT use poses. For example, in 2009, a safety review board halted a study of frail and aging men using Testim (Auxilium's TRT drug) after 23 of 106 patients in the Testim group suffered adverse cardiovascular events, compared to 5 of the 103 placebo group patients.

Plaintiff asserts that despite defendants' alleged knowledge (or obligation to know) of their products' dangers and ineffectiveness, defendants targeted TPPs, physicians, and consumers with fraudulent marketing schemes that affirmatively promoted the drugs' safety and effectiveness for off-label use and actively concealed unfavorable evidence. According to plaintiff, each group of RICO defendants engaged in respective marketing schemes by forming four "complementary and mutually reinforcing" fraudulent enterprises: a TPP "formulary access" enterprise, which targeted TPPs directly; "peer selling" and "publication" enterprises, which targeted prescribing physicians; and a "direct-to-consumer" enterprise, which targeted consumers. *Id.* ¶¶ 140–144. Totaling the alleged enterprises formed by AbbVie, Auxilium, Lilly, Actavis, and Endo, plaintiff asserts the existence of twenty complementary and mutually reinforcing fraudulent marketing enterprises. Plaintiff alleges that the planning and coordinating of each fraudulent enterprise "required extensive use of the wires and mails" and that the RICO defendants conducted the affairs of the enterprises through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c). In addition, plaintiff alleges that the RICO defendants conspired with third parties and with each other to carry out their fraudulent enterprises, thus violating 18 U.S.C. 1962(d). Though plaintiff

does not allege that GSK or Oscient themselves formed illegal enterprises in violation of the RICO Act, it does allege that they participated in Auxilium's peer selling enterprise.

## A.    TPP formulary access enterprises

Because, as plaintiff alleges, TPPs are the entities "directly reimbursing most, if not all, of the cost of TRT Drug prescriptions," TPPs were the primary and intended victims of the RICO defendants' marketing schemes.  *Id.* ¶ 30.  Typically, if a TPP provides drug benefit coverage for a patient's TRT drug prescription, the TPP will pay approximately 80–90% of the prescription's cost, and the patient will pay a co-payment for the remainder.  Plaintiff asserts that it reimbursed for "one or more of Defendants' drug products" and that it paid a total of $38,962.566.73 in TRT reimbursements from November 2001 through April 2015.  *Id.* ¶ 37–38.

Whether a TPP will cover the cost of a particular drug depends on the "formulary status" the TPP has assigned to that drug.  According to plaintiff, the goal of TPPs' prescription drug benefit programs is to provide "appropriate, affordable and accessible coverage" for patients, and TPPs' "managed care" benefit programs use a variety of tools to manage and contain prescription drug costs.  *Id.* ¶ 169.  Formularies are one such cost-containment tool.  Plaintiff explains that if a TPP places a drug "'on formulary,' it will be covered when prescribed."  *Id.* ¶ 172.  TPPs can thus use formularies to give patients incentives to make more economical prescription choices.  For example, where an expensive brand-name drug has a cheaper, medically equivalent alternative, TPPs can place the cheaper drug "on formulary," guaranteeing its coverage and giving patients incentives to choose that drug over the more expensive alternative.  To determine the appropriate formulary status for various prescription drugs, TPPs typically

establish committees of experts, called "pharmacy and therapeutics committees" (P&T committees), to review clinical evidence and evaluate the drug products under consideration for formulary placement.

According to plaintiff, to ensure favorable formulary status for their respective TRT drugs, the RICO defendants each formed fraudulent marketing enterprises that engaged TPPs and their P&T committees directly through deliberate in-person misrepresentations of their respective TRT drugs' safety and efficacy, the submission of false and misleading materials, and the concealing of unfavorable medical evidence. The AbbVie defendants, for example, listed plaintiff as one of its "focus accounts" and allegedly sought to find a local doctor to "champion [their TRT drug]" and encourage plaintiff to give the drug preferred formulary status. *Id.* ¶ 302.

Plaintiff alleges that it and other TPPs placed TRT drugs on their formulary tiers and paid for unnecessary and unsafe TRT prescriptions. The complaint, however, contains some arguable ambiguity about the causal role that defendants' misrepresentations played in plaintiff's decision to place the TRT drugs on formulary. On one hand, plaintiff acknowledges the seriousness of classical hypogonadism and states that it is precisely because of the "seriousness of this disease state" that TPPs have "widely accepted" TRT drugs on their formularies and have refrained from "creat[ing] barriers that would prevent access to the TRT drugs on their formularies." *Id.* ¶ 175. On the other hand, plaintiff alleges that TPPs were "deceive[d] . . . into placing their respective TRT drugs on their formularies," *id.* ¶ 180, and that they "relied on Defendants' fraudulent, deceptive and misleading representations" when placing the TRT drugs on their formulary tiers and paying for off-label TRT prescriptions, *id.* ¶ 145.

Similarly, the complaint is arguably somewhat ambiguous regarding how plaintiff and other TPPs would have restricted reimbursement for TRT drugs had they known the truth about the risks and ineffectiveness of off-label use. According to plaintiff, TPPs lack access to a patient's diagnosis when they make a prescription reimbursement, and thus it was impossible for them to know why a given TRT drug was prescribed (for example, whether to treat classical hypogonadism or mere "Low T"). Plaintiff asserts, therefore, that defendants "knew that it would be difficult (if not impossible) for [plaintiff] to limit coverage for TRT drugs except to place the drugs on a different formulary tier." *Id.* ¶ 179. Given that TPPs placed TRT drugs on formulary to cover prescriptions for patients with classical hypogonadism, plaintiff's own allegations appear to suggest that even had TPPs known about the dangers and ineffectiveness of off-label TRT use, it would have been "difficult (if not impossible)" for them to avoid paying for off-label prescriptions. Certain allegations in the complaint, however, can be read to indicate that TPPs could restrict coverage to on-label uses even if a drug were placed on formulary. Plaintiff alleges, for example, that TPPs could not "*easily* . . . restrict utilization to on-label uses" because they lacked patients' diagnostic information, and where they did "request diagnostic information (such as, for example, by requiring prior authorization or a letter of medical necessity . . .)," defendants themselves provided the forms and disguised the fact that the prescriptions were for off-label uses. *Id.* ¶ 32 (emphasis added). Thus one may infer that had TPPs known about the risks of off-label use and had defendants refrained from disguising patients' true diagnoses, TPPs could have placed TRT drugs on formulary but required prior authorization to ensure that they paid only for on-label uses.

**B.     Peer selling enterprises**

Plaintiff alleges that once the defendants had assurances that they would receive reimbursement through their access to TPP formularies, they sought to "pull through" (that is, "cash in") on that access by fraudulently marketing the drugs to physicians and consumers in order to boost prescription totals.   One way each RICO defendant attempted to deceive prescribing physicians was by establishing a so-called "peer selling" enterprise, through which physicians could educate their peers about the purported benefits (and safety) of defendants' TRT drugs.  The peer selling enterprises' primary method by which physicians could market their defendants' drugs to other physicians was the hosting of numerous educational events at which physicians could present to their peers about defendants' TRT drugs.  Because defendants could not legally produce and host such events directly, they created peer selling enterprises composed of medical marketing firms and several dozen physician participants.  The physicians presenting at the events were trained or approved by defendants and were expected to use their presentations to promote false information about the safety and effectiveness of off-label TRT use.  At these functions—which were often billed as continuing medical education events—defendants, medical marketing vendors, and participating physicians allegedly instructed doctors about how to use TRT drugs for unapproved and unsafe indications and omitted information about studies showing TRT drugs' risks and ineffectiveness for off-label use.  Defendants allegedly paid participating physicians substantial sums in the form of research grants or direct payments for their provision of "consulting" or "advisory board" services, and defendants refused to allow doctors to speak at events if they expressed unwillingness to act as

"promotional mouthpieces" for defendants. *Id.* ¶ 201.

In addition to hosting educational events, the peer selling enterprises also involved direct "details" or sales calls to physicians' offices. On these calls, defendants' sales representatives allegedly "detailed" (that is, educated) physicians about the benefits of off-label TRT use. The complaint's only mentions of defendants GSK and Oscient is in connection with direct marketing to physicians of this sort, as participants in Auxilium's peer selling enterprise.

Plaintiff alleges that the peer selling enterprises were highly successful and produced "highly favorable" returns on investment. *Id.* ¶ 215. The enterprises allegedly created the perception among prescribing physicians that other physician specialists were seeing positive clinical results with off-label TRT use. As a result of the peer selling enterprises and physicians' reliance on the misrepresentations they produced, plaintiff alleges, unapproved use of TRT drugs increased significantly.

**C.      Publication enterprises**

According to plaintiff, the RICO defendants' promotion of their TRT drugs to prescribing physicians was not limited to hosting educational events and making direct sales calls to physicians' offices. Plaintiff asserts that to create the perception that the medical literature supported their claims about the safety and efficacy of their TRT drugs, the RICO defendants formed enterprises—comprised of each RICO defendant, medical marketing companies, and participating physicians—to generate favorable publications that would appear to have been produced by neutral, independent physicians and researchers.

According to plaintiff, the RICO defendants' publication enterprises employed a

variety of methods to distribute defendants' allegedly misleading marketing messages through the guise of objective scientific publications. These methods allegedly included designing studies in ways most likely to produce favorable results, hand picking specialists to act as the study investigators, hiring non-physician "ghostwriters" to produce the articles' content and then paying physicians to "lend" their names as the articles' authors, concealing or refusing to publish unfavorable results their studies occasionally produced, and distributing "reprints" of favorable publications by the thousands. In addition, defendants allegedly paid some physicians large sums of money, often in the form of research grants, to publish favorable journal articles and letters to the editor supporting off-label TRT use. Plaintiff alleges generally that defendants' publication enterprises caused TPPs to pay millions of dollars in reimbursements for defendants' TRT drugs that they would not have made but for the fraudulent activities engaged in through the enterprises.

**D.     Direct-to-consumer enterprises**

In addition to its allegations about defendants' fraudulent marketing aimed at TPPs and prescribing physicians, plaintiff also asserts that the RICO defendants formed enterprises to make fraudulent representations about TRT drug use directly to consumers. According to plaintiff, these direct-to-consumer (DTC) enterprises involved the use of misleading print, internet, and television advertisements, which "redefined and expanded the definition of hypogonadism" and promoted TRT drugs as safe and effective for off-label uses. *Id.* ¶ 255. The alleged goal of these advertising campaigns was to drive patients to ask their physicians for prescriptions for TRT drugs. Thus on plaintiff's account, at the same time that prescribing physicians were hearing from their

peers, from "respected thought leaders," and from the medical literature that they should prescribe defendants' TRT drugs, they were also receiving requests for such drugs from their patients who had viewed defendants' DTC advertising.

Defendants' DTC advertising campaigns were often "unbranded"—that is, they advertised TRT drugs and promoted the existence of "Low T" generally, rather than marketing any particular brand-name TRT drug—and were primarily aimed at men over the age of 45. The campaigns' alleged goal was to convince consumers that they suffered from "Low T" or otherwise had symptoms which TRT drugs could safely and effectively treat, and that they should request the drugs from their physicians. Defendants' descriptions of "Low T" were allegedly so vague and general that consumers might conclude that TRT drugs could effectively treat the symptoms of any man undergoing the natural aging process. According to a critic of the advertising campaigns, if a man were to encounter defendants' advertisements and take one of the self-diagnosing "Low T" quizzes found on defendants' websites, it would be "hard for any man not to determine he must be suffering from low testosterone." *Id.* ¶ 274. Throughout defendants' DTC marketing, plaintiff alleges, each defendant failed to provide adequate warnings about the cardiovascular health risks associated with its TRT drugs.

**E.    Conspiracy among the RICO defendants**

In addition to bringing claims against each RICO defendant for allegedly violating 18 U.S.C. § 1962(c) by forming their respective marketing enterprises, plaintiff also alleges that the RICO defendants violated 18 U.S.C. § 1962(d) by conspiring with others to participate in the enterprises. Plaintiff alleges that the RICO defendants conspired

both with third parties—namely, the physicians, marketing firms, and other vendors with whom they worked to carry out their respective enterprises—and with each other.

Plaintiff's allegations regarding the RICO defendants' conspiracies with each other focus primarily on their alleged unbranded DTC marketing campaign. According to plaintiff, the RICO defendants adopted the strategy of marketing their drugs through an unbranded or "disease awareness" campaign, rather than through brand-specific campaigns, because they believed such a campaign would allow them to skirt FDA regulations which prohibit off-label marketing. Plaintiff alleges that the RICO defendants "knowingly conspired" to exploit this perceived regulatory loophole to create belief in a new "curable disease state" ("Low T") and to boost TRT drug sales. Compl. ¶ 761. In participating in the unbranded campaigns, each defendant "jointly adopted the philosophy of 'making a bigger pie,'" recognizing that increased overall sales of TRT drugs would likely lead to increase sales of their individual drugs. *Id.* ¶ 796. To make the pie bigger, according to plaintiff, defendants "cooperatively agreed and worked to inflate the hypogonadism prevalence numbers by grossly exaggerating what they characterized as a low testosterone epidemic." *Id.* ¶ 775. In carrying out the campaign, defendants allegedly acted "in concert" in their communications to TPPs, physicians, and patients, and they also acted "in concert" in choosing their messengers. *Id.* ¶¶ 778–79. For example, plaintiff alleges that AbbVie, Auxilium, Endo, GSK, and Lilly conspired with Men's Health Network—a non-profit organization that provides men with "health awareness and disease prevention messages and tools, screening programs, educational materials, advocacy opportunities, and patient navigation—to advertise TRT drug use as part of an unbranded campaign. *Id.* ¶ 785. Plaintiff alleges that AbbVie

gave Men's Health Network hundreds of thousands of dollars in the form of "unrestricted educational grants" to promote TRT drug use and that AbbVie, Auxilium, Endo, GSK, and Lilly "repeatedly referenced [Men's Health Network] on their promotional materials." *Id.* ¶¶ 785–86.

Defendants' "common deceptive marketing strategy," according to plaintiff, "created an explosion in the prescribing of the TRT Drugs by creating the perception that the TRT Drugs were effective and safe for myriad conditions and symptoms." *Id.* ¶ 799.

## Discussion

In reviewing a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), a court accepts all well-pleaded facts as true and views them in a light most favorable to the plaintiff. *Doe v. Vill. of Arlington Heights*, 782 F.3d 911, 915 (7th Cir. 2015). Allegations that amount to "no more than conclusions," however, are not entitled to the same assumption of truth. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). To determine whether a plaintiff has adequately stated a claim for relief, a court must assess whether the complaint's well-pleaded factual allegations "plausibly give rise to an entitlement of relief." *Id.* at 679. A court should use this same "plausibility" standard in evaluating facial challenges to a plaintiff's standing under Article III of the Constitution. *Silha v. ACT, Inc.*, 807 F.3d 169, 174 (7th Cir. 2015).

In addition to alleging facts that lend facial plausibility to their claims, plaintiffs who allege fraud or mistake "must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Allegations of fraud in a civil RICO complaint are thus subject to this heightened pleading standard under Rule 9(b). *Slaney v. The*

*Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 597 (7th Cir. 2001).

## I.      Article III standing

Plaintiff asserts four RICO claims (one for each alleged marketing enterprise) and a RICO conspiracy claim against each of the RICO defendants; it also asserts state insurance-fraud and consumer-protection statutory claims, as well as state common law claims for fraud, negligent misrepresentation, and unjust enrichment.  In their briefing on the federal claims, the parties primarily focus on whether plaintiff has "statutory standing" under the RICO Act and devote relatively little space to discussing MMO's standing under Article III of the Constitution.  Defendants point to a number of cases in which district courts from other circuits have ruled that TPPs lacked Article III standing to bring their RICO and state law claims against prescription drug manufacturers. Plaintiff does not attempt to distinguish these cases but instead argues that because it satisfies the more stringent standing requirements of the RICO Act, it necessarily has standing under Article III.  Because plaintiff must have standing under Article III for the Court to exercise its jurisdiction over defendants for any of plaintiff's claims, the Court addresses the Article III question first.  *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) (rejecting practice of assuming jurisdiction for purpose of deciding the merits).

To have standing to sue under Article III, a plaintiff must have (1) suffered a concrete "injury in fact," (2) that is "fairly traceable" to the defendant's conduct and not "the result of the independent action of some third party," and (3) that is likely to be "redressed by a favorable decision."  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).  "At the pleading stage, general factual allegations of injury resulting from the

defendant's conduct may suffice . . . ."  *Id.* at 561.  In this case, plaintiff's general

allegations are sufficient to satisfy *Lujan*'s three requirements for Article III standing.

Plaintiff has alleged that it paid for TRT drugs that it would not have paid for absent

defendants' fraudulent marketing; this economic loss constitutes a concrete injury in

fact.  Plaintiff also alleges that defendants specifically targeted TPPs with their

fraudulent schemes and made direct misrepresentations to plaintiff and other TPPs,

which caused injury.  The Court thus concludes that plaintiff's injury is "fairly traceable"

to defendants' conduct for Article III purposes.  Finally, because plaintiff allegedly

suffered an identifiable economic loss, a favorable decision could redress its injury.

The district court opinions on which defendants rely for their Article III argument

are not authoritative, and each is distinguishable nevertheless.  In both *Southern Illinois

Laborers' & Employers Health & Welfare Fund v. Pfizer Inc.*, No. 08 CV 5175KMW,

2009 WL 3151807, at *7 (S.D.N.Y. Sept. 30, 2009), and *Plumbers & Pipefitters Local

572 Health & Welfare Fund v. Merck & Co*, No. 12-1379 MAS LHG, 2013 WL 1819263,

*7 (D.N.J. Apr. 29, 2013), the courts ruled that TPPs lacked standing because, unlike in

this case, they had not alleged that the defendant drug manufacturers had made any

misrepresentations to the TPPs directly.  Because plaintiff's complaint contains

allegations of that sort, those cases are distinguishable.  So, too, is *In re Schering

Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235 (3d Cir. 2012).  In

that case, the court ruled that the TPP plaintiff had failed to show the required

connection between its injury and defendant's conduct because, unlike in this case, the

TPP attempted to rely exclusively on factual allegations concerning drugs other than the

ones for which *it* paid.  *Id.* at 247–48.  In the present case, plaintiff claims to be injured

through the purchase of the same TRT drugs about which defendants allegedly made misrepresentations. In *New England Carpenters Health & Welfare Fund v. GlaxoSmithKilne, LLC*, No. Civ. A. 12-1191, 2014 WL 4119410, at *1 (E.D Pa. Aug., 8, 2014), the court ruled, in a considerably different factual situation, that the plaintiffs had failed to allege that defendant's alleged misconduct actually caused their injuries. In that case, plaintiffs did not assert injuries resulting from a deceptive marketing but rather from a purportedly illegal prescription coupon program. *Id.* The causation problems presented by a coupon program intended to alter doctors' prescribing incentives are simply not at issue in this case. Also unlike this case, in *Travelers Indemnity Co. v. Cephalon, Inc.*, 32 F. Supp. 3d 538, 547–549 (E.D. Pa. 2014), the plaintiffs had failed to allege any facts demonstrating why the drugs at issue were unsafe or ineffective and also failed to allege any particular false statement the defendants had made regarding the drugs' safety and efficacy. In the present case, plaintiff's complaint contains numerous examples of studies indicating that TRT drugs are unsafe or ineffective for particular uses, as well as particular allegedly misleading statements made by defendants. The decision in *In re Actimmune Marketing Litigation*, No. C 08-02376 MHP, 2010 WL 3463491, at *10 (N.D. Cal. Sept. 1, 2010), is also distinguishable. In that case, the court ruled that the plaintiff had failed to allege that doctors prescribed the drugs at issue "as a result of" defendants' allegedly deceptive marketing and had otherwise failed to provide any allegations to link the off-label marketing with doctors' decisions to prescribe the drugs. *Id.* In this case, however, plaintiff has alleged adequate facts regarding defendants' off-label marketing and its efforts to create a new "disease state" that appeared to have scholarly support, such that the link between the

alleged off-label marketing and doctors' prescriptions of TRT drugs is sufficiently plausible for Article III purposes.

## II.    RICO claims

Plaintiff asserts that the RICO defendants have violated 18 U.S.C. § 1962(c) by orchestrating their fraudulent marketing schemes through patterns of racketeering activity.  The RICO Act authorizes "[a]ny person injured in his business or property by reason of a violation of section 1962" to bring a private cause of action.  18 U.S.C. § 1964(c).  To state a viable civil RICO claim, a plaintiff must allege that it was (1) "injur[ed] in its business or property (2) by reason of (3) the defendants' violation of section 1962."  *DeGuelle v. Camilli*, 664 F.3d 192, 198 (7th Cir. 2011).  The Supreme Court has also interpreted the Act to require a civil RICO plaintiff to show that defendants' section 1962 violations proximately caused the plaintiff's injury.  *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 9 (2010).  For RICO purposes, proximate cause "requires 'some direct relation between the injury asserted and the injurious conduct alleged.'"  *Id.* (quoting *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 268 (1992)).

As a threshold matter, defendants argue that plaintiff's civil RICO claims are untimely.  In addition, they contend that their alleged conduct could not have been the but-for cause of any injury plaintiff suffered; even if the alleged conduct was a but-for cause it was not a proximate cause of plaintiff's injury; and plaintiff has failed to identify any injury to business or property at all that is cognizable under the RICO Act. Defendants also fault plaintiff for failing to plead the circumstances of the alleged fraudulent marketing enterprises with the particularity required by Rule 9(b).  The Court addresses each of these arguments in turn.

### A.     Timeliness

Defendants argue that plaintiff's claims against AbbVie, Auxilium, and Actavis are time-barred because plaintiff failed to bring its claims within the RICO statute's four-year limitation period once it had notice of its injuries.  As for plaintiff's claims against Endo and Lilly, both of whom entered the TRT market within four years of this lawsuit's filing, defendants insist that neither defendant could have actually deceived plaintiff because by the time Endo and Lilly entered the market, a diligent TPP already would have knowledge of the facts about TRT drugs that defendants are alleged to have concealed or misrepresented.

In support of their arguments, defendants ask the Court to take judicial notice of numerous press releases, news reports, studies, and other publications, which they have attached as exhibits to their motion to dismiss.  They argue that these publications, which discuss off-label promotion of TRT drugs and those drugs' alleged risks and inefficacy, demonstrate that plaintiff either should have been aware of its alleged injuries (in the case of AbbVie, Auxilium, and Actavis) more than four years before filing this suit or should have had knowledge (in the case of Endo and Lilly) that would make it impossible to be deceived by defendants' alleged fraud.  Plaintiff responds that it is premature to decide these questions at this stage and requests that the Court strike defendants' exhibits containing the publications for which they seek judicial notice, as well as defendants' references in their briefs to the publications.

The Court agrees with plaintiff that it would be premature to decide these issues at the motion-to-dismiss stage.  As the Seventh Circuit has recently reaffirmed, "[d]ismissing a complaint as untimely at the pleading stage is an unusual step . . . ."

*Sidney Hillman Health Ctr. of Rochester v. Abbott Labs., Inc.*, 782 F.3d 922, 928 (7th Cir. 2015) (internal quotation marks omitted).  The relevant facts in *Sidney Hillman* were nearly identical to those at issue here.  In that case, TPPs had brought a putative class action civil RICO suit against drug manufacturers alleging that the defendants had promoted their drug off-label for ineffective and unsafe uses.  *Id.* at 924.  The district court dismissed the claims as barred by RICO's statute of limitations because reasonable TPPs would have discovered their injuries more than four years before the plaintiffs brought suit.  *Id.* at 925.  The Seventh Circuit reversed, concluding that the district court's "departure from orthodoxy was not justified . . . ."  *Id.* at 928.  The district court's conclusion about when TPPs should have discovered their injuries was "not clear from the complaint and require[d] factual determinations not appropriately made at the pleadings stage."

The Court is not persuaded by defendants' attempts to distinguish *Sidney Hillman* from this case.  They note that although the court in *Sidney Hillman* took judicial notice of only 6 articles, here they have offered over seventy articles, including stories in major national publications.  Defendants insist that these articles provide more concrete information than that provided in *Sidney Hillman* about the specific safety risks their drugs pose and about the specific wrongdoing defendants are alleged to have engaged in.  Even were the Court to accept these distinctions, the allegations in plaintiff's complaint and the defendants' articles still do not provide the Court with enough information to dismiss the claims as untimely at this stage.   The Court cannot yet determine, for example, when plaintiff "actually became aware that [it] was paying for off-label use."  *Id.* at 928.  Nor can the Court determine what information a reasonable

TPP should be expected to possess at a given time.  It would require speculation, or at least the improper drawing of an inference against plaintiff, for the Court to determine "when even a sophisticated benefit fund should have uncovered its injuries."  *Id.* at 929.

The lack of factual information at this stage equally affects the Court's ability to address AbbVie's, Auxilium's, and Actavis' timeliness arguments as it does its ability to determine whether Endo and Lilly entered the market too late to be liable for claims based on alleged misrepresentation.  "These questions, in [the Court's] view, should be left for summary judgment, when they can be reviewed with a more complete record."  *Id.*

### B. RICO injury and causation

In addition to faulting plaintiff for the untimeliness of its claims, defendants contend that plaintiff's complaint fails to allege crucial elements of a civil RICO claim. Specifically, defendants argue that plaintiff has failed to allege facts sufficient to support the following propositions:  (1) that defendants' alleged misconduct was a but-for cause of plaintiff's injury, (2) that defendants' alleged misconduct was a proximate cause of plaintiff's injury, or (3) that the injury plaintiff claims is cognizable under the RICO Act. The Supreme Court has held that all three elements must be met to entitle a plaintiff to sue under 18 U.S.C. § 1964(c).  *See Holmes*, 503 U.S. at 267–68.

Defendants have cited a number of district court decisions in which courts have ruled against TPPs' civil RICO claims on injury or causation grounds.  Some of the cases are plainly distinguishable from this one, such as those in which TPPs have failed

to allege that the drugs for which they paid were actually unsafe or ineffective.[2]  In this case, as discussed in connection with the issue of standing, plaintiff has provided numerous specific examples of the alleged risks of off-label TRT drug use, as well as studies purporting to document the ineffectiveness and lack of safety for off-label use.

In some of the other district court cases defendants cite, courts have ruled that the TPP plaintiffs' theories of injury and causation involved too many intermediary actors, or links in the chain of causation, between the defendants' alleged misconduct and the alleged injury.  *See, e.g.*, *In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & Products Liab. Litig.*, No. 3:09-CV-20071-DRH, 2010 WL 3119499, at *7 (S.D. Ill. Aug. 5, 2010) (dismissing civil RICO claims on proximate cause grounds where "multiple steps separate[d] the alleged wrongful conduct (the fraudulent advertising campaign and/or the alleged bribery) and the alleged injuries (paying "too much" for "too many") Yaz prescriptions, including patient preference, the independent judgment of the prescribing physician, and the reimbursement decision rendered by the third party payor").  The courts in these cases have reasoned that a chain of causation that involves too many independent steps in between the alleged misconduct and the injury fails to meet RICO's requirement that plaintiffs show "some direct relation between the

---

[2]        *See, e.g.*, *Health Care Serv. Corp. v. Pfizer, Inc.*, No. 2:10-CV-221, 2012 WL 2505555, at *3 (E.D. Tex. Apr. 23, 2012), *report and recommendation adopted,* No. 2:10-CV-221, 2012 WL 2504884 (E.D. Tex. June 28, 2012); *Cent. Reg'l Employees Ben. Fund v. Cephalon, Inc.*, No. CIV.A.09-3418MLC, 2010 WL 1257790, at *3 (D.N.J. Mar. 29, 2010); *In re Schering-Plough Corp. Intron/Temodar Consumer Class Action*, No. 2:06-CV-5774(SRC), 2009 WL 2043604, at *12 (D.N.J. July 10, 2009); *In re Epogen & Aranesp Off-Label Mktg. & Sales Practices Litig.*, No. MDL 08-1934 PSGAGRX, 2009 WL 1703285, at *5-6 (C.D. Cal. June 17, 2009), *aff'd sub nom. United Food & Commercial Workers Cent. Pennsylvania & Reg'l Health & Welfare Fund v. Amgen*, Inc., 400 F. App'x 255 (9th Cir. 2010).

injury asserted and the injurious conduct alleged."  *Holmes*, 503 U.S. at 268.

For their part, plaintiffs cite three circuit court decisions with facts similar to this one upholding the type of claims plaintiff asserts.  *See In re Avandia Mktg., Sales Practices & Prod. Liab. Litig.*, 804 F.3d 633, 633 (3d Cir. 2015) (affirming denial of motion to dismiss RICO claims based on allegations that defendant manufacturer misrepresented and concealed safety risks associated with use of its Type II diabetes drugs); *In re Neurontin Mktg. & Sales Practices Litig.*, 712 F.3d 21, 25 (1st Cir. 2013) (affirming jury verdicts in favor of TPP against defendant manufacturer for RICO claims based on misrepresentations concerning effectiveness of off-label use of its anticonvulsant drug); *Desiano v. Warner-Lambert Co.*, 326 F.3d 339, 340 (2d Cir. 2003) (reversing, after analyzing sufficiency of causation allegations under *Holmes*, dismissal of TPP's state-law claims based on defendant manufacturers fraudulent marketing of their Type II diabetes drugs).  In each of these cases, unlike in those defendants cite, the TPP plaintiffs alleged that the defendant drug manufacturers made misrepresentations *directly* to the TPPs.  *See Avandia*, 804 F.3d at 644; *Neurontin*, 712 F.3d at 37; *Desiano*, 326 F.3d at 350.

Other courts have recognized the significance of such allegations of direct misrepresentations with respect to the outcomes reached in those cases.  *See, e.g.*, *UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121, 134 (2d Cir. 2010) ("Crucially, the TPPs do not allege that *they* relied on Lilly's misrepresentations—the misrepresentations at issue were directed through mailings and otherwise at doctors.") (internal quotation marks omitted); *Employer Teamsters-Local Nos. 175/505 Health & Welfare Trust Fund v. Bristol Myers Squibb Co.*, 969 F. Supp. 2d 463, 474 (S.D.W. Va.

2013) (highlighting distinction between cases like *Yasmin*, where courts have found proximate cause lacking under *Holmes*, and cases like *Neurontin*, where "defendants made misrepresentations about Neurontin directly to . . . Kaiser's Drug Information service," which "helped establish the causation necessary"); *S. Illinois Laborers'*, 2009 WL 3151807, at *7 (dismissing TPP RICO claims and ruling that alleged misrepresentation was of "a materially different kind than [those] in *Desiano*" where plaintiffs did not "allege that Defendant misrepresented [drug's] safety directly to Plaintiffs" but rather made general misrepresentation on website); *In re Schering-Plough Corp. Intron/Temodar Consumer Class Action*, No. 2:06-CV-5774(SRC), 2009 WL 2043604, at *18 (D.N.J. July 10, 2009) (noting distinction between misrepresentations directed at TPPs in *Desiano* and misrepresentations directed at physicians as "an important one" in dismissing TPPs' RICO claims); *Health Care Serv. Corp. v. Olivares*, No. 2:10-CV-221-TJW-CE, 2011 WL 4591913, at *7 (E.D. Tex. Sept. 2, 2011) *report and recommendation adopted,* No. 2:10-CV-221-DF-CE, 2011 WL 4591915 (E.D. Tex. Sept. 30, 2011) (distinguishing *Neurontin* and *Desiano* and recommending dismissal of TPP's RICO claim where TPP "fail[ed] to allege what misrepresentations, if any, were made directly to it and upon which it relied").[3]

---

[3] Defendants contend that they have cited cases involving direct misrepresentations to TPPs in which courts have nonetheless ruled against the TPPs' RICO claims. *See UFCW*, 620 F.3d 121; *Yasmin*, 2010 WL 3119499, at *2; *Employer Teamsters*, 969 F. Supp. 2d at 469–70; *S. Ill. Laborers'*, 2009 WL 3151807, at *5; *Se. Laborers Health & Welfare Fund v. Bayer Corp.*, 655 F. Supp. 2d 1270, 1274 (S.D. Fla. 2009); *Ironworkers Local Union No. 68 v. AstraZeneca Pharm. LP*, 585 F. Supp. 2d 1339, 1342 (M.D. Fla. 2008), *aff'd on other grounds sub nom. Ironworkers Local Union 68 v. AstraZeneca Pharm., LP*, 634 F.3d 1352 (11th Cir. 2011). But this is simply a mischaracterization of those cases. In three of those cases—*UFCW*, *Employer Teamsters*, and *Southern Illinois Laborers*—as just discussed, the courts expressly recognized the distinction between their cases and those in which defendants made

At oral argument in this case, plaintiff's counsel emphasized that the difference between the complaints in the cases defendants cite, such as that in *Yasmin*, and plaintiff's complaint here is that "those lawyers did not plead any direct misrepresentation to third-party payors." Dec. 4, 2015 Tr. 52. Counsel conceded that without such allegations of direct misrepresentations to TPPs, "you can see why [Judge Herndon] concluded those [too] attenuated." *Id.* Perhaps recognizing the significance of this distinction in the case law, plaintiff has tailored its allegations so that its case more closely resembles *Avandia*, *Neurontin*, and *Desiano* than cases in which courts have dismissed TPPs' RICO claims because the chain of causation was too attenuated. As counsel explained, "without access to the formulary, there is not access to payment, and our clients' injury is their economic losses, and that's exactly what the *Avandia* court held as well." *Id.* 33. Access to the formulary is the "ticket" that ensures that TPPs will pay for the allegedly unnecessary prescriptions. *Id.*

Thus plaintiff's contention regarding RICO injury and causation appears to be as follows: (1) defendants made direct misrepresentations to plaintiff and other TPPs, (2) which directly caused their injuries (favorable formulary placement of TRTs), and (3)

---

direct misrepresentations to TPPs. And as recognized by the court in Employer Teamsters, the situation in *Yasmin* is "distinguishable from that presented in [*Neurontin*]." 969 F. Supp. at 474. Importantly, the court's description of the alleged marketing campaign in *Yasmin* does not mention any alleged communication directed at or made to TPPs. *See* 2010 WL 3119499, at *2. Similarly, the only direct misrepresentations alleged in the scheme at issue in *Ironworkers* targeted non-profit mental health organizations and physicians. *See Ironworkers*, 585 F. Supp. 2d at 1341–42. Finally, the only allegations in *Southeastern Laborers* of any misrepresentation to the TPP concerned the drug manufacturer's general failure to disclose the drug's risks, and not any direct misrepresentation made to the TPP or alleged meeting with the TPP at which such disclosure might be required. *Se. Laborers*, 655 F. Supp. 2d at 1274–77.

defendants' misrepresentations to physicians and consumers ensured that defendants could "pull through" on the formulary placement, Compl. ¶ 233, thereby increasing plaintiff's injury with each off-label prescription.  With this in mind, the Court addresses whether plaintiff has stated a claim under the RICO Act.

### 1. But-for causation

Plaintiff's claim, as alleged, is not deficient due to the absence of sufficient allegations of but-for causation.  Plaintiff alleges that the RICO defendants created a false disease and claimed that their drugs could treat it safely and effectively; concealed evidence of the drugs' risks; distorted the scholarly literature about their drugs and about their false disease; and launched nationwide campaigns to make false representations about their drugs to consumers, physicians, and TPPs.  Accepting these allegations as true, as the Court must do at this stage, one can reasonably infer that at least some of the $38,962.566.73 plaintiff paid for TRT drugs was likely spent on drugs for which it would never have paid absent defendants' alleged schemes.  *Cf. BCS Servs., Inc. v. Heartwood 88, LLC*, 637 F.3d 750, 758 (7th Cir. 2011) (asking, in civil RICO case in which plaintiffs claimed they lost auction bids for tax liens where defendants fraudulently distorted bidding process: "How likely is it that [plaintiffs] lost *no* bids to bidders who had 13 arms in the room but should have had only three?") (emphasis in original).

Defendants make three primary attacks against plaintiff's but-for causation allegations.  First, defendants contend that plaintiff has failed to allege facts showing that defendants' misrepresentations were the cause of plaintiff's payments for allegedly unnecessary and unsafe prescriptions as opposed to some other cause, such as a

doctor's or patient's independent action.  Second, defendants insist that plaintiff is required, but has failed, to identify a particular misrepresentation to a particular physician that induced the physician to prescribe TRT drugs to a particular patient. Third, they argue that allegations in plaintiff's complaint conclusively demonstrate that defendants' alleged misrepresentations were not the cause of plaintiff's payments.

Defendants' first attack is unavailing.  As the Court discussed above, plaintiff's allegations outlining defendants' fraudulent schemes aimed at various levels of the American health care system—from patient to physician to TPP—allow a reasonable inference that defendants' fraud was a likely cause of plaintiff's payments for at least some TRT drugs.  Plaintiff need not do more to plausibly allege but-for causation at this stage.  "The plaintiff doesn't have to prove a series of negatives; he doesn't have to offer evidence which positively excludes every other possible cause of the [injury]." *BCS Servs.*, 637 F.3d at 757 (internal quotation marks omitted).  In this case, plaintiff does not have to allege facts that exclude the possibility that, for example, a doctor's independent medical judgment or a patient's independent preferences caused plaintiff to reimburse for an unnecessary TRT drug.

The Court is also unpersuaded by defendants' second argument—that to adequately plead but-for causation, plaintiff must identify in its complaint a specific doctor who relied on a specific misrepresentation in prescribing a TRT drug, for which plaintiff reimbursed, to a specific patient.  As discussed below in regard to Rule 9(b)'s particularity requirements, plaintiff has explained in its complaint that it "did not have access to the patient's diagnosis as a component of the TRT drug claims payment transaction."  Compl. ¶ 179.  Thus it would be unnecessarily burdensome at this stage

to require plaintiff to identify which of its members received a TRT prescription for off-label use in order to then identify the prescribing doctor and determine whether he relied on misrepresentations in issuing the prescription. In addition, plaintiff may be able to prove causation without ever identifying a particular doctor who prescribed to a particular patient. In *Neurontin*, for example, the court approved of plaintiff's use of expert testimony providing a statistical link between fraudulent marketing and off-label prescribing in order to establish causation. *See Neurontin*, 712 F.3d at 29–30.

Defendants object that the use of such statistical or "aggregate" or "general" proof to establish causation is impermissible. They have not, however, cited a Seventh Circuit to that effect, and the use of such proof would appear to comport with the "probabilistic" approach to causation that Judge Posner endorsed in the RICO context in *BCS Services*. *See BCS Servs.*, 637 F.3d at 758 ("The causal relation between a defendant's act and a plaintiff's injury, like that required to establish standing under Article III of the Constitution, need only be probable."). At this stage of the case, the Court cannot say, without reviewing the evidence plaintiff might offer in this regard, that it would be inadequate. *Cf. UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121, 133-34 (2d Cir. 2010) (disapproving of plaintiff's reliance on generalized proof to establish causation only after determining that evidence in record did not support conclusion for which generalized proof would be proffered).

Defendants' third attack—that allegations in plaintiff's complaint belie its assertion of but-for causation—arguably has some force. But a liberal reading of plaintiff's complaint still permits a reasonable inference that defendants' actions were a but-for cause of plaintiff's injury. Defendants highlight one paragraph in the complaint, in which

plaintiff appears to admit that defendants' alleged misrepresentations were *not* the cause of its decisions to place defendants' TRT drugs on its formulary. According to that particular paragraph, TPPs "widely accepted" TRT drugs on their formularies because TRT drugs are indicated to treat classical hypogonadism, which is a "very serious and sometimes difficult to treat disease." Compl. ¶ 175. Defendants contend that an admission that this, as opposed to defendants' misrepresentations, was the reason for placing the drugs on formulary is fatal to plaintiff on the issue of but-for causation.

A court, however, "owe[s] a plaintiff's complaint a generous construction in deciding whether it states a claim on which relief can be granted." *Minch v. City of Chicago*, 363 F.3d 615, 630 (7th Cir. 2004). Reading the allegation at issue in the context of the entire complaint, the Court understands plaintiff to allege that because it was not aware of defendants' off-label marketing scheme, which resulted in numerous off-label prescriptions, it had good reason to place TRT drugs on formulary believing they would only (or primarily) be prescribed to treat classical hypogonadism. Plaintiff also suggests that TPPs have tools to adjust a drug's formulary status so that prescriptions for on-label uses are covered, while off-label uses require "prior authorization or a letter of medical necessity." Compl. ¶ 32.[4] Thus the Court concludes, based on the allegations in the complaint, that plaintiff could have taken steps to limit payments for off-label uses of TRT drugs, such that any misrepresentations preventing it from doing so could constitute a but-for cause of its injury.

---

[4]    Plaintiff alleges that defendants acted to make it difficult for TPPs to "restrict utilization to on-label uses" by disguising the fact of off-label use. Compl. ¶ 32. Even if this is so, defendants' fraud—that is, its fraudulent concealment of patients' true diagnoses—still could be the but-for cause of plaintiff's injury.

### 2. Proximate causation

Defendants also argue that plaintiff has failed to adequately allege proximate causation. The parties disagree about the appropriate proximate cause standard that applies to civil RICO claims. The United States Supreme Court first articulated RICO's proximate cause standard in *Holmes*. In that case, a stock-manipulation scheme prevented two stock broker-dealers from meeting obligations to their customers, and as a result, an insurer of the broker-dealers became obligated to reimburse the customers. 503 U.S. at 261. The Supreme Court ruled that the insurer's injury was too remote from the stock manipulation to allow the insurer to recover from the broker-dealers under RICO. *Id.* at 270. The Court held that only those "directly injured victims" could satisfy RICO's proximate cause requirement, and it offered three justifications for this requirement. *Id.* at 269. First, the less direct the injury, "the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent factors." *Id.* Second, a directness requirement simplifies the apportionment of damages and "obviate[s] the risk of multiple recoveries." *Id.* And third, allowing indirectly injured parties to sue does not serve any general interest in deterring injurious conduct, because directly injured parties can bring suit and serve the role of "private attorneys general." *Id.*

Plaintiff argues that because its claims are not derivative of any injuries suffered by third parties, the injuries are sufficiently "direct" under *Holmes*, and Plaintiff also insists that all three of *Holmes*' "functional factors" favor it. In support of this argument, plaintiff points to the analysis in *Desiano* and *Neurontin*, where the courts concluded that TPP claims similar to those asserted here satisfied *Holmes*' three policy rationales

and therefore met RICO's proximate cause requirement.  There can be little dispute here that plaintiff's claims satisfy *Holmes*' second and third factors.  Plaintiff alleges a discrete and identifiable economic injury:  the loss it suffered by paying for unnecessary off-label TRT prescriptions.  As the court in *Desiano* noted, even if damages must be apportioned between the TPP and the patient, this can be easily calculated on the basis of their respective co-pay.  *Desiano*, 326 F.3d at 350.  Thus the second factor favors plaintiff.  The third factor also favors plaintiff because as the parties paying 80–90% of the TRT drugs' costs, TPPs have the best incentives to act as private attorneys general to bring claims for this economic loss.

Regarding *Holmes*' first factor, the concern that independent causes may contribute to the alleged injury, the court in *Desiano* ruled that there was no such concern in that case given that the TPPs had alleged direct misrepresentation on the part of the defendants, which directly led the TPPs to make the payments at issue.  *Id.* Similarly, in *Neurontin*, the court found *Holmes*' factors satisfied because defendants' fraudulent marketing plan targeted TPPs and "only became successful once [the defendant] received payments [from TPPs] for the additional Neurontin drug prescriptions it induced."  *Neurontin*, 712 F.3d at 39.  Thus because the TPP was an intended victim of the fraudulent and scheme and its injury a "foreseeable and natural consequence" of the scheme, proximate causation had been shown.  *Id.* at 37 (quoting *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 658 (2008)).

Defendants emphasize the "independent actions" of intermediaries, which they argue cuts against a finding that plaintiff has met the first *Holmes* factor.  In addition, defendants reject the contention that satisfaction of *Holmes*' three factors or suffering

injury as a "foreseeable and natural consequence" of a scheme—even as an intended victim—is sufficient to satisfy RICO's proximate cause requirement. Rather, they contend, the Supreme Court has rejected foreseeability and intent as the appropriate proximate cause standard and has focused on the directness of the injury to the alleged misconduct. In *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006), for example, the Court held that a steel company's RICO claim failed for lack of proximate cause where it sued a competing steel company, alleging that the competitor's tax fraud had allowed it to charge lower prices and gain market share from the plaintiff. The Court ruled that the true direct victim of the alleged fraud was the State of New York, which was not receiving the taxes it was owed, and that the alleged misconduct of engaging in tax fraud was distinct—and thus too remote—from plaintiff's alleged injury of having to compete against artificially low prices. *Id.* at 458. The dissent noted that the Court's ruling allowed defendants to evade RICO liability on proximate causation grounds even where the alleged injuries were foreseeable and intended consequences of the alleged misconduct. *Id.* at 470 (Thomas, J., dissenting).

Two years after *Anza*, in *Bridge*, the Supreme Court held that a RICO plaintiff had adequately shown proximate cause where its injury was a "foreseeable and natural consequence" of the defendants' fraudulent scheme. *Bridge*, 553 U.S. at 658. In *Bridge*, the plaintiff alleged that it had lost out on tax liens it had bid for at a tax lien auction because a rival bidder had fraudulently obtained a disproportionate share of bids at the auction. Although the rival bidder did not deceive or make false representations to the plaintiff, the Court concluded that the relationship between the fraud and the injury to other bidders (decreased probability of a winning bid) was

sufficiently direct to allow plaintiff's RICO claim to survive. *Id.* As defendants note, however, the Court still asked whether there were "independent factors that account[ed] for [plaintiff's] injury," as it did in *Holmes* and *Anza*, and found none. *Id.* While the foreseeability of plaintiff's injury appeared to play a role in the Court's reasoning in *Bridge*, a plurality of the Court suggested two years later in *Hemi* that the focus of the RICO proximate cause analysis is "on the directness of the relationship between the conduct and the harm," not on foreseeability. *Hemi*, 559 U.S. at 1. Justice Ginsburg, however, who provided the fifth vote to reverse the decision below, did so without "subscribing to the broader range of the Court's proximate cause analysis." *Id.* at 995 (Ginsburg, J., concurring).

Defendants argue that under the proximate cause standard established in these cases, the injury plaintiff alleges in the present case lacks a sufficiently direct relationship to defendants' alleged misconduct. As a result, they contend, the Court should dismiss the TPP's RICO claim on proximate cause grounds because too many independent steps (for example, patients' personal preference for the drugs or physicians' independent medical judgment in prescribing the drugs) separate the misconduct and the injury.

Defendants, citing *International Brotherhood of Teamsters, Local 734 Health and Welfare Trust Fund v. Philip Morris Inc. ("Teamsters")*, 196 F.3d 818 (7th Cir. 1999), also assert that Seventh Circuit precedent requires this result. *See id.* at 825 (requiring dismissal of TPPs' RICO claims where the injury for which they sought relief was "remote indeed, the chain of causation long"). That case, however, is factually dissimilar from this one; it involved claims against tobacco companies based on injuries

the TPPs' *members* suffered.  Though Judge Herndon relied on *Teamsters* in *Yasmin*, he said that "[e]xtrapolating from *Teamsters* . . . is difficult because certain aspects of the case are unique to tobacco litigation and clearly distinguishable from the claims advanced [in *Yasmin*]."  *Yasmin*, 2010 WL 3119499, at *5.

In a decision subsequent to both *Teamsters* and *Yasmin*, the Seventh Circuit made it clear that where a suit is brought by the direct victim and the plaintiff "suffered the sort of injury that would be the expected consequence of the defendant's wrongful conduct," it is inappropriate to grant summary judgment (and, therefore, inappropriate to dismiss under Rule 12(b)(6)) based on the purported absence of proximate cause.  *BCS Servs.*, 637 F.3d at 758; *see also id.* at 754 ("[T]he doctrine of proximate cause does its work [where] too many unexpected things had to happen between the defendant's wrongdoing and the plaintiff's injury, in order for the injury to occur—so many unexpected things that the defendant couldn't have foreseen the effect of his wrongdoing . . . .).  Such is the case here.  Plaintiffs allege that defendants targeted them and that the injury was both foreseeable and intended.  Nothing more is required.

As the Court discussed in a previous section of this decision, a consistent pattern emerges from a review of previous decisions involving RICO claims brought by TPPs against drug manufacturers for fraudulent off-label marketing.  Specifically, the RICO claims generally survive where TPPs allege that defendants made direct misrepresentations to them and fail where they do not.  This case falls in the former category.  Thus the Court need not address at this point whether the complaint would pass muster absent such allegations.  Where a drug manufacturer or supplier directly deceives a TPP into granting its drug favorable formulary status, the relationship

between the misconduct and the harm is direct and immediate.  Unlike in *Holmes* and *Anza*, the alleged misconduct (misrepresenting the safety and efficacy of a drug) is not wholly distinct from the injury (deciding to pay for the drug when prescribed).  Though other steps must occur for the payment to actually be made—for example, physicians' prescribing the drugs and patients' filling the prescriptions—they do not interrupt the relationship between the manufacturers' direct misrepresentations and the TPP's resulting formulary decision.  Moreover, plaintiff alleges that defendants' fraudulent scheme effectively "infects" the entire chain of causation from consumer to physician to TPP, in that once a TPP unknowingly grants favorable formulary status to a drug being marketed off-label, it becomes virtually inevitable (and thus foreseeable) that it will pay for unnecessary, off-label uses of the drug.

Plaintiff's claims are like those in *Avandia*, *Neurontin*, and *Desiano*, where the TPPs alleged that the defendants made direct misrepresentations to them and the courts upheld their claims.  Defendants contend that *Avandia* and *Neurontin* are distinguishable.  They note that each of those cases involved only a single group of defendants and a single drug.  In addition, they attempt to distinguish *Neurontin* on the grounds that the difference between the approved use of Neurontin (epilepsy) and the uses for which it was prescribed off-label (for example, bipolar disorder) was starker than the alleged differences between classical hypogonadism and the alleged off-label uses of TRT drugs.  *Avandia*, they argue, is distinguishable because that case did not involve off-label marketing, but rather allegations of specific misrepresentations aimed at discrediting unfavorable studies, which resulted in a higher market price for Avandia and which induced the plaintiff to avoid placing the cheaper alternatives to Avandia on

its formulary. Though defendants are correct that plaintiff's claims involves multiple drugs and multiple defendants, this fact does not make this case different in kind from *Avandia* and *Neurontin.* In those cases, as in this one, the TPP relied on misrepresentations the defendants made directly that induced the TPP to place the defendants' drugs on formulary and pay for prescriptions for which it otherwise would not have paid. Any differences between this case on the one hand, and *Neurontin* or *Avandia* on the other, regarding the differences between the on-label and off-label uses of the drug are matters of degree that do not provide a basis for dismissal under Rule 12(b)(6).

### 3.    Injury to business or property

Defendants also contend that plaintiff has not adequately alleged an injury to its business or property that is cognizable under RICO. First, defendants argue that plaintiff may not sue under RICO for pecuniary losses "flowing" from its insureds' personal injuries. Though plaintiff's complaint does refer to the cost of treating certain patients, the Court does not understand plaintiff's claims to be based on injuries that derive or "flow" from its insureds' personal injuries, as opposed to the economic injuries plaintiff itself allegedly suffered by purchasing unnecessary TRT drugs. Second, defendants rely on an Eleventh Circuit decision for the proposition that TPPs must allege that they did not assume the risk of reimbursing for the prescriptions at issue. *Ironworkers Local Union 68 v. AstraZeneca Pharm., LP*, 634 F.3d 1352, 1368 (11th Cir. 2011). In *Ironworkers*, the court inferred from what it called its "common understanding of insurance practices" that TPPs adjust their premiums for all known risks, including the risk of fraud, that might cause them to pay for unnecessary prescriptions. *Id.* Thus, the

court said, any loss resulting from such fraud is passed on to their beneficiaries and does not constitute a cognizable injury to the TPPs themselves. This Court, like the court in *Avandia*, disagrees with the reasoning in *Ironworkers*. As the court stated in *Avandia*, courts are not entitled to make "presumptions at the motion-to-dismiss stage" about how, for example, TPPs typically adjust their premiums. *Avandia*, 804 F.3d at 641. The Court also agrees that the Eleventh Circuit's reasoning, which could apply to any company with the ability to adjust its pricing in anticipation of being defrauded, "lacks a limiting principle" and is infirm for that reason as well. *Id.* Plaintiff has thus plausibly alleged an injury cognizable under RICO.

### 4. Particularity under Rule 9(b)

Defendants also contend that plaintiff has failed to plead the circumstances of each defendant's alleged direct misrepresentations to plaintiff with the particularity required by Federal Rule of Civil Procedure 9(b). Rule 9(b) requires a plaintiff alleging fraud to plead the "who, what, when, where, and how of the fraud." *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 737 (7th Cir. 2014).

Defendants contend that throughout plaintiff's description of the alleged fraudulent marketing schemes, it relies on generalizations and fails to provide particularized factual allegations regarding several key elements of the alleged fraud. For example, defendants fault plaintiff for failing to identify any particular doctor who wrote a prescription for a patient insured by plaintiff, failing to allege that any particular prescription was medically inappropriate, and failing to allege that any particular prescribing doctor relied on a particular false statement made by defendants. Plaintiff responds that the degree of particularity necessary to satisfy Rule 9(b) varies depending

on the facts of each case and that where specific information lies outside a plaintiff's control, it is required only to "inject precision and some measure of substantiation" into its claims. *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 442 (7th Cir. 2011) (internal quotation marks and citation omitted).

The Court agrees with plaintiff that Rule 9(b) is applied with some flexibility such that the "requisite information . . . may vary on the facts of a given case." *Id.* As discussed above, for example, plaintiff has explained in its complaint that it lacked access to information about the diagnoses for which its patients were receiving TRT prescriptions. This is a plausible contention, and Rule 9(b) does not require plaintiff to identify particular inappropriate prescriptions written for particular patients or the particular reasons why a physician prescribed a TRT drug to a particular patient. Similarly, Rule 9(b) does not prohibit plaintiff from grouping corporate affiliates in its allegations, given that it is unlikely to possess information about the specifics of the relationships among the various entities or the particular roles they played in the alleged scheme.[5]

But a flexible application of Rule 9(b) can only go so far before it resembles "whistling past the rules of civil procedure." *Id.* at 446. Plaintiffs have done a good job of describing the types of misrepresentations made by defendants, but they have not done enough to meet Rule 9(b)'s requirements in the current version of their complaint. Though one would expect plaintiff to have knowledge about the time, place, and content of communications made directly to it (or to its P&T committee members), it has not

_____

[5] In addition, Rule 9(b) does not require plaintiff to plead defendants' fraudulent intent or plaintiff's reliance with particularity. The Rule states that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

provided this information in its complaint, nor has it explained why it is unable to do so. Though plaintiff alleges generally that defendants met with TPPs regularly, provided them with materials, and made safety and efficacy representations, it does not identify which defendants made these representations or the approximate dates of any such meetings. In addition, its allegations regarding the contents of these communications are unduly general, at least given the absence of other details.[6]  And if plaintiff contends that defendants omitted or concealed certain information, it does not provide any details about meetings or communications during which information that plaintiff says should have been provided was omitted.  The existence of specific allegations that some of the defendants targeted plaintiff as part of their formulary access enterprises is also inadequate in its present form, as the allegations leave unclear whether this targeting resulted in misrepresentations or significant omissions.

Plaintiff comes close to describing the circumstances of one alleged misrepresentation with sufficient particularity when it alleges that one defendant, Solvay, funded a free continuing medical education event directed at TPP personnel and made available online.  Plaintiff adequately describes the content and timing of the misrepresentations made "to TPPs" during the event.  But plaintiff does not expressly allege that any of its personnel received the misrepresentations, or how (in person, or online?)  Thus although this allegation comes closer to the mark, it still falls short of what Rule 9(b) requires.

The nature of plaintiff's claims, and thus the degree of particularity required,

---

[6]    Plaintiff does offer some details about meetings between some defendants and other TPPs, but it has not attempted to explain how these allegations relate to plaintiff's claims that *it* was deceived by defendants' misrepresentations.

differs from the fraud claims brought by the personal injury plaintiffs in this MDL proceeding, which the Court addressed in an earlier decision. *See In Re TRT*, 2014 WL 7365872, at *7. The personal injury plaintiffs alleged that they and their physicians viewed allegedly fraudulent advertisements on television or the Internet at some time before the drugs were prescribed, and they identified specific misleading statements contained in such advertisements. *Id.* at *6. Though they did not identify the exact dates they or their physicians heard or read the misrepresentations, the Court concluded that it would be "unnecessarily burdensome" to require them to do so in their complaints. *Id.* at *7. The Court distinguished the plaintiffs' claims based on allegedly misleading television and Internet advertisements from those brought in *Ackerman v. Northwestern Mutual Life Insurance Co.*, 172 F.3d 467, 470 (7th Cir. 1999), in which the court required plaintiffs to identify the approximate date on which their insurance agents made direct, face-to-face misrepresentations to them. *Id.* Plaintiff's claims here are closer to those at issue in *Ackerman*. Plaintiff alleges generally that defendants made direct misrepresentations or fraudulent omissions to it, whether in person, in writing, or by telephone. One would expect plaintiff to have information about the approximate dates and locations (if done in person), as well as information about the contents of the alleged misrepresentations or omissions. Under the circumstances, it is not unnecessarily burdensome to require plaintiff to include such information in its complaint.

Without offering details of the misrepresentations it alleges defendants made, plaintiff appears to be pleading the circumstances constituting fraud on information and belief. But a plaintiff making alleging fraudulent circumstances on information and belief

"has to show that [that is, explain why] the missing pieces are outside of its control." *Id.* at 444. Plaintiff has not done so in this case. At oral argument, plaintiff's counsel attempted to justify this lack of specificity by explaining that plaintiff had contracted out much of its pharmacy benefits work to "a PBM [pharmacy benefits manager]—in this case, Medco—through most of the period." Dec. 4, 2015 Tr. 37. But even if one overlooks the fact that there is no reference to Medco's role as plaintiff's PBM in the complaint, plaintiff has made no effort to explain why this would inhibit its access to information about such misrepresentations, if in fact Medco is or amounts to the plaintiff's agent.

The Court also notes that plaintiff has brought substantive RICO claims against multiple defendant groups, making it important to assess whether there is a sufficient basis for a fraud claim against each defendant or group. Plaintiff's allegations do not describe with sufficient particularity the circumstances of any misrepresentations that a defendant allegedly made directly to plaintiff. Because, as discussed, all of its RICO claims hinge on the existence of such misrepresentations, plaintiff has not alleged any of its RICO claims with the particularity Rule 9(b) requires. The Court therefore dismisses the substantive RICO claims, with leave to amend.

### C. RICO conspiracy

In addition to the RICO claims plaintiff asserts under 18 U.S.C. § 1962(c), it also brings claims under section 1962(d) against each RICO defendant for conspiring to violate section 1962(c). Plaintiff alleges that each RICO defendant conspired with the others and with third parties, such as publicists, sales representatives, medical professionals, and academics, to deceive TPPs, physicians, and consumers about the

safety and efficacy of TRT drugs.

To state a claim for conspiracy under section 1962(d), a plaintiff must allege that "(1) the defendant agreed to maintain an interest in or control of an enterprise or to participate in the affairs of an enterprise through a pattern of racketeering activity, and (2) the defendant further agreed that someone would commit at least two predicate acts to accomplish those goals." *Slaney v. The Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 600 (7th Cir. 2001). The defendant itself need not actually commit a predicate act. *Id.* Rather, the "touchstone of liability under [section] 1962(d) is an agreement to participate in an endeavor which, if completed, would constitute a violation of the substantive statute." *Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 732 (7th Cir. 1998). Because a predicate act need not actually be committed, a plaintiff asserting a section 1962(d) claim does not need to "identify with particularity the two predicate acts, but only needs to allege an agreement that two predicate acts would occur." *Nesbitt v. Regas*, No. 13 C 8245, 2015 WL 1331291, at *17 (N.D. Ill. Mar. 20, 2015).

In arguing that plaintiff's section 1962(d) claim should be dismissed, defendants primarily focus on plaintiff's allegations that defendants conspired with each other. Defendants contend that plaintiff's assertions regarding their off-brand marketing of TRT drugs reflect only "parallel conduct" as opposed to any actual agreements. But the alleged agreement among defendants is only part of the basis for plaintiff's conspiracy claims; plaintiff also alleges that each defendant conspired with multiple third parties. Defendants reference these allegations only in a footnote; they say that plaintiff's conspiracy claim based on conspiracies with third parties must be dismissed for the same reasons as its section 1962(c) claims. *See* Defs.' Jt. Br. 23 n.13. But in the two

cases defendants cite for this proposition, the courts dismissed claims under section 1962(d) only after concluding that the plaintiffs had failed to identify enterprises with the structure needed to state a RICO claim under section 1962(c).  *See Stachon v. United Consumers Club, Inc.*, 229 F.3d 673, 677 (7th Cir. 2000); *United Food & Commercial Workers Unions & Employers Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849, 856 (7th Cir. 2013).  Thus even if the defendants in those cases had entered into agreements, there was no "endeavor which, if completed" would establish a violation of section 1962(c).  In this case, however, the existence of enterprises with the proper structure under RICO is not in dispute; if defendants' enterprises were carried out as plaintiff alleges they were, defendants would have violated section 1962(c).  Thus plaintiff need only allege that defendants entered into agreements that someone would commit two predicate acts in furtherance of the enterprises.

Plaintiff's complaint includes detailed allegations of each defendant's four enterprises and of the many third parties who plaintiffs say knowingly participated in the enterprises in exchange for financial compensation, committing numerous RICO predicate acts in the process.  Plaintiff also includes allegations regarding some express co-promotion agreements between Auxilium and third parties.  Though plaintiff's allegations of fraud are insufficiently particularized under Rule 9(b), it has alleged enough factual detail to satisfy Rule 8(a)'s less-strict pleading requirements and to allow the court to infer an agreement "from the circumstances."  *United States v. Useni*, 516 F.3d 634, 646 (7th Cir. 2008); *see Nesbitt*, 2015 WL 1331291, at *17 ("From the detailed allegations [of the enterprise's operation], it is fair to infer that each willing participant in the enterprise agreed to participate in the scheme and that acts of wire or

43

mail fraud would occur throughout the multi-year duration of the scheme.").

At this stage, the Court need not determine whether plaintiff's allegations regarding defendants' agreements with each other, standing alone, would be sufficient to support its section 1962(d) claims. When deciding a motion to dismiss for failure to state a claim, the only question is "whether the complaint includes factual allegations that state a plausible claim for relief." *BBL, Inc. v. City of Angola*, No. 14-1199, 2015 WL 8021983, at *6 (7th Cir. Dec. 7, 2015). "A motion to dismiss under Rule 12(b)(6) doesn't permit piecemeal dismissals of *parts* of claims." *Id.* (emphasis in original). Determining the most appropriate facts to support a claim is a task best reserved for summary judgment, where "the court can properly narrow the individual factual issues for trial . . . ." *Id.* at *7 (emphasis omitted).

III.    **State law claims**

In addition to its federal claims, plaintiff asserts claims under the insurance fraud statutes of the states in which each RICO defendant is located; claims under the consumer protection laws of every state, the District of Columbia, and the Commonwealth of Puerto Rico; and common law claims for fraud, negligent misrepresentation, and unjust enrichment.

A.    **Choice of law**

In order to rule on these state-law claims, the Court must make a choice-of-law determination. Plaintiff urges the Court to defer deciding the choice-of-law issue until a later stage of the case because plaintiff expects discovery to reveal that much of defendants' schemes were conceived and implemented largely from defendants' respective headquarters. Both the Court and defendants, however, assume for present

purposes that this is so.  Plaintiff argues that if the Court does address the issue of choice of law, it should conclude that the law of the states in which each defendant is located should govern its respective state-law claims against them.  Defendants disagree and argue that the laws of plaintiff's home state (Ohio) should apply.

"In an MDL proceeding, a transferee court applies the substantive state law, including choice-of-law rules, of the jurisdiction in which the action was filed." *In re TRT*, 2014 WL 7365872, at *10 (internal quotation marks omitted).  This case was filed in Illinois, so the Court applies Illinois' choice-of-law rules.[7]  Illinois has adopted the approach of the Second Restatement of Conflict of Laws. *See Barbara's Sales, Inc. v. Intel Corp.*, 227 Ill. 2d 45, 61, 879 N.E.2d 910, 919 (2007).  In addition, the Illinois Supreme Court has noted that "the bench and bar . . . have undervalued the [Second Restatement's] specific presumptive rules." *Id.* at 62, 879 N.E.2d at 920 (internal quotation marks omitted).  Illinois' application of the Second Restatement involves a two-step process by which "the court (1) chooses a presumptively applicable law under the appropriate jurisdiction-selecting rule, and (2) tests this choice against the principles of § 6 [of the Second Restatement] in light of relevant contacts identified by general provisions like § 145 (torts) and § 188 (contracts)." *Townsend v. Sears, Roebuck & Co.*, 227 Ill. 2d 147, 164, 879 N.E.2d 893, 903 (2007) (internal quotation marks omitted).

Under this two-step approach, the Court looks to section 148 of the Second

---

[7]     Defendant argues that Case Management Order No. 12 dictates that this case, like other directly-filed cases, should be treated as if it were originally filed in the federal district in which the plaintiff is a citizen.  The order, however, was only intended to apply to personal injury claims; it states that it applies only to cases based on the "use" of prescription TRTs.  In any event, the parties agree that both Illinois and Ohio have adopted the Second Restatement of Conflict of Laws to govern choice-of-law determinations, so the analysis would be the same under either state's rules.

Restatement, which applies to claims of fraudulent misrepresentation. Under that section, if the plaintiff relied on defendant's false representations in the same state in which the representations were made and received, the local law of that state governs. Restatement (Second) of Conflict of Laws § 148(1) (1971). If the plaintiff's action in reliance took place in part in a state other than the one where the representations were made, the court considers the following relevant factors: (a) the place where the plaintiff acted in reliance upon the defendant's representations, (b) the place where the plaintiff received the representations, (c) the place where the defendant made the representations, and (d) the domicile, residence, place of incorporation, or place of business of the parties. *Id.* § 148(2). Though the lack of specificity of plaintiff's misrepresentation allegations makes it difficult to determine where defendants made their representations, the Court will assume for the sake of argument that defendants made the representations outside plaintiff's home state of Ohio, such that section 148(1) does not dictate that Ohio law presumptively applies. Even under that generous assumption, however, the factors from section 148(2) (other than place the misrepresentation was made) favor application of Ohio law. Ohio, where plaintiff is headquartered, is the place where it allegedly acted in reliance by placing defendants' drugs on its formulary. Ohio is also presumably the place where plaintiff received any alleged misrepresentations.[8] And the Illinois Supreme Court has endorsed the

---

[8] Plaintiff does not deny that it relied on defendants' alleged misrepresentations at its principal place of business, but it asserts that its "members and their physicians around the country relied on Defendants' marketing representations" and may have done in so in states other than Ohio. Pl.'s Resp. at 84. As defendants respond, plaintiff does not claim to be asserting claims on behalf of its members or doctors, so the location of their alleged reliance is beside the point. Plaintiff cannot on the one hand claim direct injury and reliance in order to sustain its claims and

Restatement's position that the plaintiff's domicile or residence is "of substantial significance" because a financial loss usually will be of greatest concern to the state to which the person suffering the loss has the greatest relationship. *Barbara's Sales*, 227 Ill. 2d at 67–68, 879 N.E.2d at 923.

As the Sixth Circuit has ruled, in applying the Second Restatement to a consumer fraud claim, "the State with the strongest interest in regulating [deceptive or fraudulent practices] is the State where the consumers—the residents protected by *its consumer*-protection laws—are harmed by it." *Pilgrim v. Universal Health Card, LLC*, 660 F.3d 943, 946 (6th Cir. 2011). The court in *Pilgrim* noted that this is particularly true in a case involving the conduct of companies located in separate states, "diluting the interest of any one State in regulating the source of the harm." *Id.* at 946–47. The Court agrees and concludes that Ohio, where plaintiff allegedly suffered its economic harm, has the greatest interest in applying its laws in this case.

Plaintiff has failed to point to a relevant interest of another state that outweighs Ohio's significant interest. As defendants note, plaintiff's reliance on *Clark v. TAP Pharmaceutical Products Inc.,* 343 Ill. App. 3d 538, 798 N.E.2d 123 (2003), and *In re Mercedes-Benz Tele Aid Contract Litigation*, 257 F.R.D. 46 (D.N.J. 2009), is misplaced. The appellate court's decision in *Clark*, in which the court applied Illinois law because the defendant's fraudulent scheme emanated from Illinois, is distinguishable. *Clark* involved only one defendant in Illinois but multiple plaintiffs from around the country. Thus the state where the defendant was located played a greater role than it does in this case, which involves multiple defendants located in different states and (at this

on the other hand rely on misrepresentations to other actors to obtain favorable choice-of-law rules.

stage at least) only one plaintiff.  In addition, *Clark* is not binding on this Court, which

must look to the law of the appropriate state's supreme court to "make a predictive

judgment as to how the supreme court of the state would decide the matter." *Allstate*

*Ins. Co. v. Menards, Inc.*, 285 F.3d 630, 635 (7th Cir. 2002).  In this case, that means

following *Barbara's Sales*, which emphatically stated that the plaintiff's attempt in that

case to tie its claims to the law of the defendant's headquarters because the

"representation emanated from there does not accord with any previous precedent of

any Illinois court." *Barbara's Sales*, 227 Ill. 2d at 70, 879 N.E.2d. at 924.  As for the

other case plaintiff cites, *In re Mercedes-Benz*, the Third Circuit has explained why that

court's reasoning was unpersuasive:  "it is far from clear that [a state's interest in

deterring consumer fraud by corporations headquartered within its borders] would be

sufficient enough to outweigh other significant contacts with a plaintiff's home state."

*Maniscalco v. Brother Int'l (USA) Corp.*, 709 F.3d 202, 210 (3d Cir. 2013).[9] In this

context, the consumer's home state's interest in protecting its residents from fraud is

significant.  The Court therefore concludes that plaintiff's home state of Ohio provides

the most appropriate law to apply here.

>    **B.      Statutory claims**

>    Though plaintiff cites cases in which courts have held that a class representative

---

[9]      On occasion, a state's interest in deterring misconduct in its own state
may outweigh other contacts—for example, where the purpose of the underlying
substantive law is primarily to deter.  *See, e.g.*, *Smith v. I-Flow Corp.*, 753 F. Supp. 2d
744, 749 (N.D. Ill. 2010) (Kennelly, J.) (concluding that law determining availability of
punitive damages governed by state in which defendant had headquarters because that
state's interest in regulating conduct of its resident corporations far outweighed
whatever interest other state had in protecting non-resident corporations against
excessive liability).  *See also Smith v. I-Flow Corp.*, No. 09 C 3908, 2011 WL 12556366,
at *6 (N.D. Ill. May 3, 2011) (Kennelly, J.) ("Outside of the context of punitive damages,
this heightened interest [in deterring misconduct] does not exist.").

TPP has standing to assert claims in those states in which it made reimbursement payments to its members, plaintiff's argument that its own state-law claims are governed by the laws of defendants' home states essentially concedes that only one state's laws can apply to its claims against each respective defendant.[10]  As the Court has determined, the appropriate law to apply to plaintiff's state law claims is Ohio law. Plaintiff, however, has not asserted any statutory insurance fraud claim under Ohio law, and it has withdrawn its claim under the Ohio Consumer Sales Practices Act in response to defendants' motion to dismiss.  Thus plaintiff has not stated any viable state statutory claim against any defendant.

### C.    Common law claims

The parties do not devote much discussion to the viability of plaintiff's common law claims for fraud, negligent misrepresentation, and unjust enrichment under Ohio law.  As defendants note, plaintiff fails to respond to their argument that the causation principles that apply to its RICO claims also apply to its common law claims under Ohio law.  As discussed above, however, plaintiff has plausibly alleged but-for and proximate causation under RICO.  The Court sees no basis to apply a different rule to plaintiff's common law claims.  Defendants also argue that plaintiff has failed to plausibly allege justifiable reliance, an element of both fraud and negligent misrepresentation claims under Ohio law.  *See Mishler v. Hale*, 26 N.E.3d 1260, 1270 (Ohio App. 2d Dist. 2014) (fraud)*; Heinz & Assoc., Inc. v. Diamond Cellar Holdings, L.L.C.,* 2012 WL 1079087, at *4-*10 (Ohio App. 10th Dist. Mar. 30, 2012) (negligent misrepresentation).  But in both

---

[10]      Should the case proceed to the class certification stage, following plaintiff's filing of an amended complaint, the Court may need to revisit whether plaintiff may assert state-law claims on behalf of the class based on the laws of states where other members of the putative class are located.

*Mishler* and *Heinz*, the two cases defendants cite, the courts were reviewing summary judgment rulings, and the court in *Mishler* stated expressly that justifiable reliance is a question of fact. *Mishler*, 26 N.E.3d at 1271. Thus dismissing plaintiff's claims for failure to show justifiable reliance would be improper at this stage.

Plaintiff's common law fraud and unjust enrichment claims against all defendants (including AbbVie) are also deficient, however, for the same reason as its RICO claims: plaintiff has not alleged with sufficient particularity the circumstances of the fraud underlying these claims. "[T]he dictates of Rule 9(b) apply to allegations of fraud, not claims of fraud." *Pirelli*, 631 F.3d at 446. Thus any claim that is "premised upon a course of fraudulent conduct" may be subject to Rule 9(b)'s pleading requirements. *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007). Plaintiff's common law fraud claim is obviously based on allegations of fraudulent conduct. Plaintiff's unjust enrichment claim also sounds in fraud. *See* Compl. ¶ 1342 ("Defendants have been and continue to be enriched by their fraudulent acts and omissions alleged herein . . . .). Thus that claim must also comply with Rule 9(b)'s particularity requirements. *See Zurich Capital Markets Inc. v. Coglianese*, No. 03 C 7960, 2005 WL 1950653, at *10 n.12 (N.D. Ill. Aug. 12, 2005) ("To the extent [the plaintiff's] unjust enrichment claims rely on theories of fraud, its averments of fraud must comply with Rule 9(b)."). For these reasons, plaintiff's fraud and unjust enrichment claims fall short of what Rule 9(b) requires.

Plaintiff's negligent misrepresentation claims survive. In contrast to a claim sounding in fraud, Rule 9(b)'s strictures do not apply to claims of negligent misrepresentation. *See Tricontinental Indus., Ltd. v. PricewaterhouseCoopers, LLP*,

475 F.3d 824, 833 (7th Cir. 2007).  Thus plaintiff's allegations in support of those claims are sufficient to survive a Rule 12(b)(6) motion.

**IV.    Personal jurisdiction over Solvay, S.A. and Solvay America, Inc.**

The AbbVie defendants contend that plaintiff lacks personal jurisdiction over Solvay, S.A. and Solvay America, Inc.  In response to defendants' motion, plaintiff agreed to dismiss Solvay America, Inc. as a defendant, but it continues to maintain that the Court has jurisdiction over Solvay, S.A.  AbbVie has attached to its motion an affidavit from Paul Vanderhoeven, a senior manager for Solvay, S.A.  Vanderhoeven avers that Solvay, S.A. is a Belgian corporation that has never been incorporated or maintained its principal place of business anywhere in the United States.  In addition, he states that Solvay S.A. did not "at any time develop, design, manufacture, test, label, distribute, market, promote, or sell any pharmaceutical products," including AbbVie's TRT drug at issue in this litigation.  Vanderhoeven Aff.  ¶ 8.  This affidavit directly contradicts the allegation in plaintiff's complaint that AbbVie's TRT drug "was first marketed in the United States by Solvay, S.A."  Compl. ¶ 68.

Once a defendant moves to dismiss a complaint against it for lack of personal jurisdiction, the "plaintiff bears the burden of demonstrating the existence of jurisdiction." *Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003). In general, "once the defendant has submitted affidavits or other evidence in opposition to the exercise of jurisdiction, the plaintiff must go beyond the pleadings and submit affirmative evidence supporting the exercise of jurisdiction." *Id.* at 783.  Plaintiff has offered no such evidence; it merely responds in a footnote that Solvay S.A.'s previous involvement in litigation in the United States (in an unrelated case) and its "ownership

roles from July 1999 to 2010" raise "fact questions which cannot be decided as a matter of law."  Pl.'s Resp. at 34 n.21.  This response is insufficient to carry plaintiff's burden. The Court dismisses plaintiff's claims against both Solvay S.A. and Solvay America, Inc. for lack of personal jurisdiction.

## Conclusion

For the reasons discussed above, the Court grants defendants' motion to dismiss in part and denies it in part.  The Court dismisses all claims against Solvay S.A. and Solvay America, Inc. for lack of personal jurisdiction.  As for the remaining defendants, the Court declines to dismiss plaintiff's claims 18 U.S.C. § 1962(d) (counts twenty-one through twenty-five) and its claims for negligent misrepresentation.  The Court dismisses the remaining claims against all remaining defendants except for Oscient, Besins Inc., and Besins Healthcare, S.A., which have not filed motions to dismiss. Because these defects are the type that may be cured by amendment, the dismissal of these claims is with leave to amend, on or before March 3, 2016.

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  February 4, 2016
      (corrected February 5, 2016)