**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE: TESTOSTERONE REPLACEMENT THERAPY PRODUCTS LIABILITY LITIGATION | MDL No. 2545 |
| | Master Docket Case No. 1:14cv1748 |
| | Honorable Matthew F. Kennelly |
| MEDICAL MUTUAL OF OHIO,<br><br>Plaintiff,<br><br>v.<br><br>ABBVIE INC., ABBOTT LABORATORIES, ABBOTT PRODUCTS, INC., SOLVAY PHARMACEUTICALS, INC., UNIMED PHARMACEUTICALS, LLC, AUXILIUM, INC., GLAXOSMITHKLINE LLC, OSCIENT PHARMACEUTICALS, INC., ELI LILLY AND COMPANY, LILLY USA, INC., ACRUX COMMERCIAL PARTY LTD., ACRUX DDS PARTY LTD., ACTAVIS PLC, ACTAVIS, INC., ACTAVIS PHARMA, INC., WATSON PHARMACEUTICALS, INC., WATSON LABORATORIES, INC., ANDA, INC., and ENDO PHARMACEUTICALS, INC.,<br><br>Defendants. | **No. 1:14-cv-8857**<br><br>**THIRD AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.      NATURE OF THE CASE ................................................................................1

II.     PARTIES ....................................................................................................17

III.    JURISDICTION AND VENUE ..................................................................26

IV.     FACTUAL ALLEGATIONS:  TRT DRUGS' BACKGROUND....................27

V.      SOURCES OF INFORMATION ABOUT PRESCRIPTION DRUGS RELIED
        UPON BY MEDICAL DECISION MAKERS, INCLUDING PLAINTIFF MMO
        AND THE TPP CLASS MEMBERS ..............................................................31

        A.      Pharmaceutical Sales Representative Promotion of Drugs to Physicians ............32

        B.      CME Courses Funded by Pharmaceutical Companies ...........................................34

        C.      Commercial Control of Design, Analysis, and Publication of Clinical
                Trials in Peer-Reviewed Medical Journals ............................................................39

VI.     USE OF TRT DRUGS IS TIED TO SERIOUS ADVERSE EVENTS ...........................43

VII.    INSURANCE COVERAGE FOR DEFENDANTS' TRT DRUGS WAS VITAL
        TO THE SUCCESS OF THEIR FRAUDULENT MARKETING SCHEME ................59

        A.      Absent Insurance Coverage, Physicians Did Not (or Were Reluctant to)
                Prescribe TRT Drugs ..............................................................................................59

        B.      Plaintiff MMO and The TPP Class Members' Pharmacy Benefit Programs
                and Tools to Manage Prescription Drug Costs ......................................................61

        C.      Managed Care Program Tools to Control Drug Costs............................................62

        D.      TPP Cost-Sharing Tools to Control Cost of Pharmaceuticals ..............................65

        E.      Plaintiff MMO Was Targeted By Defendants to Obtain TRT Drug
                Coverage .................................................................................................................68

                a.      Plaintiff MMO's Pharmacy Benefit Programs to Assure Quality
                        and Control Drug Costs ...........................................................................68

                b.      Defendants Made or Caused to Be Made Direct Misrepresentations
                        to MMO ...................................................................................................71

                        i.      Defendants' Elaborate Managed Care Strategies Targeted
                                MMO Including, But Was Not Limited to, Managed Care
                                Representatives Directly Calling on MMO to Gain TRT
                                Drug Coverage ...........................................................................71

                        ii.     MMO Pharmacy Personnel Were Members and Attendees
                                at Conferences as well as Recipients of AMCP Publications........72

                        iii.    Plaintiff MMO Regularly Received Managed Care
                                Periodicals which Included Defendants' False and
                                Misleading Representations Concerning the Safety and

i

Efficacy of TRT drugs ...................................................................74

VIII.   FORMATION OF THE FALSE AND MISLEADING TRT DRUGS
MARKETING ENTERPRISES.........................................................................77

    A.   Formation of the Illegal TPP Formulary Access Enterprises to Obtain
Insurance Coverage.........................................................................80

        a.   Role of Third Party Payor Marketing Firms in the TPP Formulary
Access Enterprises .....................................................................84

        b.   TRT Drugs Have Been Covered by Plaintiff MMO and the TPP
Class Members' For Hypogonadism ..........................................87

        c.   Defendants Deceived Plaintiff MMO and the TPP Class Members
into Placing TRT drugs "On Formulary" in Order to Undertake the
Fraudulent Promotion ................................................................88

    B.   Formation of the Illegal Peer Selling Enterprises. ................................91

        a.   Role of Medical Marketing Firms in Peer Selling Enterprises ................93

        b.   Role of Physicians in the Peer Selling Enterprises .....................99

    C.   Formation of the Illegal Publication Enterprises .........................110

    D.   Formation of the Illegal DTC Enterprises .........................................117

IX.   THE ABBVIE DEFENDANTS' FRAUDULENT MARKETING OF
ANDROGEL...................................................................................................126

    A.   The AndroGel TPP Formulary Access Enterprise.............................128

        a.   AbbVie Managed Markets Personnel Made False and Misleading
Statements Concerning the Safety and Efficacy of AndroGel
Directly to Plaintiff MMO and the TPP Class Members........................128

        b.   AbbVie Offers Numerous Other Managed Care "Initiatives" To
Influence Plaintiff MMO and the TPP Class Members.........................136

        c.   Defendant AbbVie Used False and Misleading Managed Care
CME Programs to Promote AndroGel's Safety and Efficacy to
Plaintiff MMO and the TPP Class Members .............................139

        d.   Misrepresentations to Managed Care Plans Related to the Safety
and Efficacy of AndroGel for the Treatment of AIDS Wasting,............142

        e.   AbbVie's Scheme Depended on Its Efforts to Garner Access on
Plaintiff MMO and the TPP Class Members' Formularies ....................144

    B.   The AndroGel Peer Selling Enterprise .............................................148

        a.   CME Events Used to Disseminate the False and Misleading Safety
and Efficacy Message ...............................................................155

        b.   Promotional Speakers Used to Disseminate the False and
Misleading Safety and Efficacy Message .................................158

   c. AndroGel Sales Representatives' Delivery of False and Misleading Safety and Efficacy Message to Physicians...............160

   d. Marketing AndroGel for the Treatment of the Invented Disease "Andropause"...............................................................161

  C. The AndroGel Publication Enterprise...............................................169

   a. Funding of Consensus Practice Guidelines that Include False and Misleading Safety and Efficacy Claims...............171

    i. AbbVie Support of the Endocrine Society Consensus Practice Guidelines, Which Included False and Misleading Safety and Efficacy Claims...............................172

    ii. AbbVie Funded the American Academy of Clinical Endocrinologists' Guidelines, Which Included False and Misleading Safety and Efficacy Claims...............174

   b. AbbVie Funding of "Key Opinion Leaders" as Authors of Clinical Research...............................................................175

   c. AbbVie-Sponsored TRT Symposia Published in Medical Journals, Including False and Deceptive Safety and Efficacy Claims...................177

   d. Deceptive AbbVie-Sponsored Publications on the Use of TRT drugs to Treat Depression.......................................178

   e. AbbVie-Sponsored Deceptive Publications on the "Cardioprotective" Influence of TRT drugs...........................179

  D. The AndroGel DTC Enterprise..........................................................184

X. DEFENDANT AUXILIUM'S FRAUDULENT MARKETING OF TESTIM AND TESTOPEL..........................................................................................186

  A. The Auxilium TPP Formulary Access Enterprise..............................186

   a. Auxilium Managed Markets Personnel Made False and Misleading Statements Concerning the Safety and Efficacy of Testim and Testopel to Plaintiff MMO and the TPP Class Members.......................186

   b. Defendant Auxilium Used False and Misleading Managed Care CME Programs to Promote Testim's and Testopel's Safety and Efficacy to Plaintiff MMO and the TPP Class Members.......................203

   c. Defendant Auxilium's Use of Testim Access Hotline to Evade Plaintiff MMO's and the TPP Class Members' Cost Containment.........204

  B. The Auxilium Testim and Testopel Peer Selling Enterprise..............207

   a. Testim Peer Selling Association with GSK..............................209

   b. Testim Peer Selling Enterprise Association with Lathian Health............212

  C. The Auxilium Testim and Testopel Publication Enterprise................214

  D. The Testim and Testopel DTC Enterprise.........................................217

iii

a.  The Testim DTC Enterprise Association with Heartbeat Ideas..............218

b.  The Testim and Testopel DTC Enterprise Association with Transit Creative Brand Design Group.................................................................220

c.  The Testim DTC Enterprise Association with "e-tractions" .................228

d.  The Testopel DTC and Peer Selling Enterprise with TRG Communications, LLC.................................................................................231

XI.   DEFENDANT ELI LILLY'S FRAUDULENT MARKETING OF AXIRON..............232

A.  The Axiron TPP Formulary Access Enterprise ..................................................233

a.  Lilly Managed Markets Personnel Made False and Misleading Statements Concerning the Safety and Efficacy of Axiron to Plaintiff MMO and the TPP Class Members ...........................................233

b.  Lilly Made Direct Misrepresentations to Plaintiff MMO ......................237

c.  Lilly Offers Numerous Other Managed Care "Initiatives" to Influence Plaintiff MMO and the TPP Class Members ..........................239

B.  The Axiron Peer Selling Enterprise ....................................................................243

C.  The Axiron Publication Enterprise .....................................................................252

D.  The Axiron DTC Enterprise.................................................................................256

XII.  DEFENDANT ACTAVIS' FRAUDULENT MARKETING OF ANDRODERM ........259

A.  The Androderm TPP Formulary Access Enterprise ...........................................260

B.  The Androderm Peer Selling Enterprise .............................................................262

C.  The Androderm Publication Enterprise ..............................................................265

D.  The Androderm DTC Enterprise .........................................................................267

XIII. DEFENDANT ENDO'S FRAUDULENT MARKETING OF FORTESTA.................271

A.  The Fortesta TPP Formulary Access Enterprise.................................................273

B.  The Fortesta Peer Selling Enterprise...................................................................277

C.  The Fortesta Publication Enterprise....................................................................282

D.  The Fortesta DTC Enterprise ..............................................................................287

XIV.  CONSPIRACY IN VIOLATION OF FEDERAL RICO LAW ....................................291

A.  Inter-Company Conspiracy:  Defendants Conspired with Each Other to "Grow the Pie" by Agreements to Further a Vast "Unbranded" Campaign........291

a.  Making a "Bigger Pie":  Concerted Joint Efforts to Grow the TRT Market........................................................................................................295

b.  Joint Funding of AstroTurf Organizations as Mouthpieces for "Unbranded" TRT Campaigns...................................................................299

i.  Men's Health Network................................................................300

iv

ii. TestosteroneUpdate.org ...............................................................312

iii. Androgen Study Group ...............................................................316

c. Joint CME Programs.........................................................................319

d. Jointly-Funded Presentations at AMCP to Influence Plaintiff MMO and the TPP Class Members to Add TRT Drugs to Their Formularies Without Managed Care Restrictions....................................322

e. Joint Use of Industry KOLs to Spread False and Misleading Safety and Efficacy Message ........................................................................329

i. Dr. Shalender Bhasin ................................................................329

ii. Dr. Culley C. Carson.................................................................332

iii. Dr. Adrian Dobs.......................................................................334

iv. Dr. Mohit Khera.......................................................................336

v. Dr. Martin Miner.......................................................................338

vi. Dr. Abraham Morgentaler.........................................................339

vii. Dr. Ronald Swerdloff................................................................343

f. Defendants' "Collaboration" in Their Joint Response to FDA AdComm...........................................................................................346

g. Defendants Have Used the Unbranded TRT Disease Awareness Campaign to Further the Inter-Company Conspiracy.............................351

B. Co-Promotion Conspiracies: Defendants Conspire with Co-Promoters to Create an Explosion of TRT Drug Prescribing...................................................354

C. Intra-Corporate Conspiracy: Defendants Conspire with Co-Marketing Partners, Medical Marketing and Media Companies and Others ......................358

XV. PLAINTIFF'S CLAIMS ARE TIMELY.................................................................360

XVI. INJURY TO PLAINTIFF AND TPP CLASS MEMBERs..............................................367

XVII. CLASS ACTION ALLEGATIONS .......................................................................377

XVIII. CLAIMS FOR RELIEF .......................................................................................382

FIRST CLAIM FOR RELIEF .........................................................................................382

SECOND CLAIM FOR RELIEF .....................................................................................387

THIRD CLAIM FOR RELIEF ........................................................................................393

FOURTH CLAIM FOR RELIEF .....................................................................................398

FIFTH CLAIM FOR RELIEF .........................................................................................403

SIXTH CLAIM FOR RELIEF .........................................................................................408

SEVENTH CLAIM FOR RELIEF ...................................................................................412

EIGHTH CLAIM FOR RELIEF ......................................................................................417

v

NINTH CLAIM FOR RELIEF................................................................................................421

TENTH CLAIM FOR RELIEF .............................................................................................426

ELEVENTH CLAIM FOR RELIEF ......................................................................................430

TWELFTH CLAIM FOR RELIEF........................................................................................435

THIRTEENTH CLAIM FOR RELIEF ..................................................................................440

FOURTEENTH CLAIM FOR RELIEF .................................................................................445

FIFTEENTH CLAIM FOR RELIEF .....................................................................................450

SIXTEENTH CLAIM FOR RELIEF .....................................................................................455

SEVENTEENTH CLAIM FOR RELIEF ...............................................................................459

EIGHTEENTH CLAIM FOR RELIEF ..................................................................................464

NINETEENTH CLAIM FOR RELIEF ..................................................................................468

TWENTIETH CLAIM FOR RELIEF ....................................................................................472

TWENTY-FIRST CLAIM FOR RELIEF ..............................................................................477

TWENTY-SECOND CLAIM FOR RELIEF ..........................................................................480

TWENTY-THIRD CLAIM FOR RELIEF .............................................................................483

TWENTY-FOURTH CLAIM FOR RELIEF ..........................................................................486

TWENTY-FIFTH CLAIM FOR RELIEF ..............................................................................489

TWENTY-SIXTH CLAIM FOR RELIEF ..............................................................................492

XIX.    DEMAND FOR RELIEF..........................................................................................494

## THIRD AMENDED CLASS ACTION COMPLAINT
## AND DEMAND FOR JURY TRIAL

Plaintiff Medical Mutual of Ohio ("MMO"), on behalf of itself and a class (or classes) of similarly situated third party payers ("Plaintiff MMO and the TPP Class Members"), brings this Third Amended Complaint ("TAC") against Defendants AbbVie Inc.; Abbott Laboratories; Abbott Products, Inc.; Solvay Pharmaceuticals, Inc.; Unimed Pharmaceuticals, LLC; Auxilium, Inc.; GlaxoSmithKline LLC; Oscient Pharmaceuticals, Inc.; Eli Lilly and Company; Lilly USA, Inc.; Acrux Commercial Pty Ltd.; Acrux DDS Pty Ltd.; Actavis PLC; Actavis, Inc.; Actavis Pharma, Inc.; Watson Pharmaceuticals, Inc.; Watson Laboratories, Inc.; Anda, Inc.; and Endo Pharmaceuticals, Inc. (collectively "Defendants"), alleging civil violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, and negligent misrepresentation. The facts and information averred herein are based upon Plaintiff's personal knowledge and beliefs and upon investigation of counsel. Plaintiff MMO alleges as follows:

## I.      NATURE OF THE CASE

1.      This case is brought by Plaintiff MMO on behalf of itself and TPP Class Members who paid all or a portion of the cost of AndroGel® 1.0% and AndroGel® 1.62% (hereinafter "AndroGel"), Testim® ("Testim"), Testopel® ("Testopel"), Axiron® ("Axiron"), Androderm® ("Androderm"), and/or Fortesta Gel® ("Fortesta"), all of which are testosterone replacement therapy drugs (hereinafter "TRT drugs") marketed by the AbbVie Defendants (and their predecessors-in-interest) (hereinafter "the AbbVie Defendants"), Defendant Auxilium (along with co-marketers GlaxoSmithKline LLC and Oscient Pharmaceuticals, Inc.), Defendants Eli Lilly and Acrux (hereinafter "Defendant Lilly"), Defendants Actavis, Watson, and Anda (hereinafter "Defendant Actavis") and Defendant Endo, respectively.

2.      Plaintiff MMO and the TPP Class Members consist of entities that provide prescription drug benefits utilized by some 200 million Americans.  Where the patient is covered by a drug benefit provided through Plaintiff MMO and the TPP Class Members, the patient is not primarily responsible for the cost of the drug he or she is prescribed.  Although the physician prescribes, the pharmacist dispenses, and the patient takes the medication, it is Plaintiff MMO and the TPP Class Members who bear most of the cost of TRT drug prescriptions. Plaintiff MMO and the TPP Class Members typically pay approximately 80-90% of the cost of a TRT prescription, while the patient pays a co-payment for the remainder. Although the full cost of TRT drugs runs into the hundreds of dollars (most TRT drugs cost about $300 per prescription), a patient's co-pay averages approximately $30 per prescription. Plaintiff MMO and the TPP Class Members are obligated to reimburse the remainder, approximately $270 using the averages above.

3.      Given the mechanics of prescription drug reimbursement, Plaintiff MMO and the TPP Class Members are thus customers of the Defendants as co-payers with their patient members, and as such, are the entities that are most harmed financially by Defendants' fraudulent marketing schemes.  As described below, Plaintiff MMO and the TPP Class Members were the intended targets of Defendants' unlawful marketing strategies, which successfully resulted in excessive and unnecessary prescriptions for the TRT drugs – the cost of which was paid for by the TPP Class – and giving rise to the direct economic claims set forth herein.

4.      These TRT drugs were marketed as part of a more than decade-long fraudulent marketing scheme to transform the male aging process into a curable disease state Defendants variously called "Andropause," "late-onset male hypogonadism," "age-related hypogonadism," or simply "Low T," which were invented from whole cloth. Defendants then promoted and

marketed the TRT drugs to Plaintiff MMO and the TPP Class Members, patients, and physicians for the treatment of "Andropause" and as a treatment for a host of actual disease states, for which there was no evidence (and indeed contrary evidence) that TRT drugs were safe or effective and for which the TRT drugs were not approved by the U.S. Food and Drug Administration ("FDA").

5.     Defendants marketed the TRT drugs as safe and effective for these unapproved and unsafe uses, when in fact (a) TRT drugs confer little or no benefit for so-called "Low T" in the absence of "classical hypogonadism" (as defined in the TRT drugs' labeling); and (b) the drugs cause serious medical problems, including life threatening cardiac, cerebrovascular, and thromboembolic events, which Defendants knew or should have known would occur. As a direct result of Defendants' respective fraudulent marketing schemes, including the failure to provide sufficient warnings and/or concealment of serious cardiovascular, cerebrovascular, and thromboembolic safety risks, Plaintiff MMO and the TPP Class Members were financially injured by paying for millions of TRT prescriptions for drugs that, unbeknownst to Plaintiff MMO and the TPP Class Members until recently, did not work as had been advertised and promoted and that had unknown serious health risks. Indeed, only in 2014, just prior to any FDA action on TRT drugs, did media outlets such as Bloomberg note that "[t]he FDA's safety questions have put a damper on [TRT] sales."

6.     Defendants' respective "disease awareness" schemes (sometimes referred to by critics as "disease mongering"), as well as their collaborative conspiracy in a so-called "unbranded campaign" (discussed *infra*) to increase the size of the TRT market, concealed the fact that the vast majority of TRT patients did not and do not suffer from diagnosed primary or hypogonadotropic hypogonadism ("classical hypogonadism"), the only condition for which TRT

3

drugs are indicated for treatment by the FDA. Defendants' respective and complementary marketing strategies specifically focused on, for dangerous off-label TRT drug use, patients with age-appropriate testosterone levels and patients with erectile dysfunction, diabetes, AIDS, cancer, depression and obesity (among other false and misleading promotions), many of whom were already at higher risk for cardiovascular adverse events. Indeed, Defendants reported to the FDA's Advisory Committee in September 2014 that nearly seventy percent (70%) of patients on TRT drugs were concurrently being prescribed cardiovascular ("CV") medications.

7.      Defendants – both individually and collectively – succeeded in corrupting the medical discourse and medical literature concerning testosterone therapy received by Plaintiff MMO and the TPP Class Members to such a degree that the contours of the entire disease state and diagnosis were distorted.

8.      In addition, Defendants ensured that Plaintiff MMO and the TPP Class Members were deceived concerning the scale of such unsafe off-label usage of TRT drugs by, for example, encouraging doctors to document diagnoses in patient medical records as hypogonadism because – in AbbVie's own words – ██████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ████████████

9.      TRT did not begin with the approval of any of the TRT drugs referenced herein. In fact, isolated testosterone was first synthesized in 1935, and was introduced to the market shortly thereafter to treat hypogonadism. Thus, for example, TRT had been available for sixty-five years when AndroGel came to the market.

10.     During those sixty-five years, TRT was appropriately limited to only those patients suffering from classical hypogonadism, a rare condition that results in insufficient ██████████████

testosterone secretion for normal bodily functions. For decades TRT experienced limited utilization data to match the disease state prevalence. In 1988, sales for drugs indicated to treat hypogonadism were approximately $18 million *in toto*. In 1997, approximately 806,000 TRT drug prescriptions were written.

11.     Coinciding with the approval of AndroGel in early 2000, and in the preceding and years following, Defendants' respective false and misleading marketing schemes spawned voluminous medical literature. This literature was sponsored by each Defendant, and much of it focused on the prevalence of hypogonadism. What was once a rare condition was suddenly said to affect up to 40% of middle-aged men, according to respected "thought leaders" – mostly specialist urologists and endocrinologists at teaching university hospitals – many of whom were in fact on one or more of Defendants' respective payrolls as consultants, speakers, and/or researchers. Such studies were and are cited and re-cited zealously by the Defendants to create the impression that hypogonadism was a vastly under diagnosed and prevalent condition. In this way, Defendants hoped to disguise the rampant unsafe and unapproved prescribing of TRT drugs that resulted from their respective fraudulent promotional schemes; Defendants hoped and hope to pass their fraudulent promotion off as simply an evolution in medicine resulting in increased on-label diagnoses.

12.     However, Defendants themselves knew and understood that promotion of TRT drugs for "Low T" (or age-related hypogonadism) encouraged the unapproved use of TRT drugs that Defendants also knew was unsafe and dangerous.

5

13.     These speakers and "thought leaders" were paid by Defendants to promote and spread Defendants' false and misleading marketing messages and to create the false impression among patients, primary care physicians and Plaintiff MMO and the TPP Class Members (and the entire medical community) that almost half of the middle-aged male population in the United States was hypogonadal and now needed TRT drugs.

14.     Just how rapidly and cooperatively Defendants worked to inflate the hypogonadism prevalence numbers (a form of off-label marketing referred to as "label expansion") is exemplified by two Solvay press releases less than a year apart. In the first, a Solvay press release dated March 2004, it was estimated that "four to five million American men are estimated to suffer from low testosterone," which was a grossly exaggerated figure, as discussed *infra*. In the second press release dated January 2005, Solvay asserted (relying on a yet-to-be-published Solvay-funded study by a doctor on Solvay's payroll that was secretly ghostwritten by Solvay) that "[i]t is estimated that low T affects up to 13 million American men aged 45 and older."

15.     Auxilium's false and misleading marketing campaign, relying on the Solvay HIM Study, likewise asserted that "[u]p to 13 million men in the United States may have low testosterone, although many don't know they are affected." Eli Lilly made similar statements in reliance on the HIM Study; upon Axiron's approval by the FDA, Lilly announced in a November 2010 press release that "up to 13 million men over 45 years of age in the U.S. may have symptoms associated with low testosterone." Lilly also suggested that "up to 39% of men over

45 years of age may have testosterone levels below the normal healthy range." Auxilium then upped the ante by suggesting that "22.7 million men in this age group [50-64 year old men] suffer from low testosterone." Aside from the inflation of the number of hypogonadal men increasing almost three-fold in less than a year according to Solvay and almost five-fold according to Auxilium, numerous articles soon followed relating additional benefits to using TRT drugs. Most prominent among these benefits was the assertion that TRT drugs had the potential to reverse or slow the male aging process.

16.     Defendants' false and misleading marketing schemes directly convinced Plaintiff MMO and the TPP Class Members that hypogonadism was vastly underdiagnosed and undertreated, directly causing prescriptions for TRT drugs to increase 170% from 1999 to 2002. Sales of AndroGel alone amounted to $115.8 million in 2002 (compared to only $26 million in 2000), and then skyrocketed thereafter. Defendants reported to the FDA's Advisory Committee in September 2014 that a full eighty percent (80%) of TRT drug prescriptions were for men aged forty-five and up. Most of this increased prescribing of TRT drugs between 2000 and 2013 has been by primary care physicians, who were and remain the main physician subjects of Defendants' false and fraudulent marketing schemes. While specialist endocrinologist and urologist prescribing has remained largely flat – because classical hypogonadism prevalence numbers have remained roughly the same – primary care physician prescribing has increased by orders of magnitude on account of Defendants' efforts to grow the TRT market beyond classical hypogonadism.



17.     Plaintiff MMO and the TPP Class Members at no point were aware that this increase was not due to medical advances in the understanding and treatment of hypogonadism – as Defendants suggested through their unbranded promotion and through their pollution of the relevant medical literature – but instead was almost entirely attributable to what are now known to be dangerous and unsafe off-label uses.

18.     This dramatic increase in TRT drug prescribing continued unabated until only recently, when the very serious safety risks associated with the promoted off-label uses (and long known to the Defendants) were finally exposed.  In the five years leading up to 2012, according to IMS Health, sales of TRT drugs grew by 90%. In its 2011 Annual Report, Abbott identified "several key initiatives" for 2012, including "maximizing the market potential" for AndroGel. The initiative was successful.  By 2012, sales of AndroGel alone had topped $1 billion in the United States ($1.15 billion, an increase of nearly $250 million from $874 million in sales in 2011 according to AbbVie's 2013 Form 10-K), and sales of TRT drugs collectively had grown to about $2 billion annually. Testim's sales have increased to over $209 million per year, from

$125 million in 2008. In 2011, Testim revenues accounted for nearly 80% of Auxilium's total net revenues. However, sales data alone do not inform of the fact that most of the utilization was for unsafe and dangerous unapproved uses being vigorously promoted by Defendants individually and collectively.

19.     The astronomical spike in prescriptions coincided with a proportionate increase in marketing money spent by the TRT Defendants and other TRT manufacturers. A Time Magazine cover article published August 18, 2014 regarding TRT emphasized "that the low-T bandwagon will keep collecting passengers, fueled by a 2,800% increase in marketing dollars." Auxilium concurred in its Form 10-K for 2013: "We believe that the increase in promotional activities has been the primary driver of the growth of the overall TRT . . . market[ ]." Even one of the physician participants in the AbbVie Defendants' Peer Selling Enterprise, Dr. Natan Bar-Chama (a urologist who first gained notoriety when, as a speaker for Pfizer, he suggested "preventative" daily treatment with Viagra), remarked with astonishment how successful Defendants were in expanding the testosterone market: "All of a sudden you've got these big players with a lot of money using consumer directed marketing to change the landscape.... They see the potential, they see the market growth annually and it's very impressive."

20.     According to one market research company, Encuity Research, "in 2009, the top six branded [TRT] products spent approximately $55 million on promotion, but by 2013 that number had grown five-fold to just over $282 million." Lilly's aggressive promotional efforts, after Axiron's approval in 2011, accounted for much of the increase; Lilly spent $122 million in 2013 alone promoting Axiron.

21.     Sales of TRT drugs at one point were expected to triple to $5 billion by 2017, according to forecasts by Global Industry Analysts. However, the FDA's recent actions requiring

9

additional warnings with respect to the recently disclosed cardiovascular safety risks (discussed *infra*) has resulted in lower TRT sales, despite continued rampant promotion by Defendants.

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████,"[3]

22.     In addition to the recently revealed serious safety risks associated with dangerous unapproved TRT use, many experts now believe TRT drugs provide negligible efficacy for the marketed unapproved uses. According to Dr. Brad Anawalt of the University of Washington, millions of patients are using TRT drugs unapproved and with absolutely zero benefit: "For people with truly low testosterone levels, the benefits outweigh the risks . . . But for millions of others, it's in the same category as snake oil."[4]

23.     Prompted by several recent studies pointing to a link between TRT use and cardiovascular adverse events, the FDA announced on January 31, 2014 that it was "investigating the risk of stroke, heart attack, and death in men taking FDA-approved testosterone products" and the link between TRT use and cardiovascular adverse events. In September 2014, the FDA's AdComm voted 20-1 to limit testosterone prescribing to "classical hypogonadism," rejecting the label-expanding efforts of Defendants to promote TRT drugs to aging men. And on March 3, 2015, the FDA acted on the AdComm's recommendation and found that the Defendants' TRT labeling was inadequate. The FDA "requir[ed] labeling changes for all prescription testosterone products to reflect the possible increased risk of heart attacks and

---

[3] ████████████████████████████

[4] *See* Roni Caryn Rabin, *Weighing Testosterone's Benefits and Risks*, N.Y. Times, Feb. 3, 2014, http://well.blogs.nytimes.com /2014/02/03/weighing-testosterone-benefits-and-risks/ (last visited on September 22, 2014).

strokes associated with testosterone use." Undaunted, Defendants nonetheless continue to claim that TRT drugs are safe and effective.

24.     As observed by Lisa M. Schwartz, M.D., M.S., and Steven Woloshin, M.D., M.S.[5]:

> Whether the campaign is motivated by a sincere desire to help men or simply by greed, we should recognize it for what it is: a mass, uncontrolled experiment that invites men to expose themselves to the harms of a treatment unlikely to fix problems that may be wholly unrelated to testosterone levels.
>
> . . . [T]here is a strong analogy between the marketing of testosterone therapy for men and estrogen therapy for menopausal women. Ignoring the lessons of estrogen therapy is scandalous. Before anyone makes millions of men aware of Low T, they should be required to do a large-scale randomized trial to demonstrate that testosterone therapy for healthy aging men does more good than harm.

25.     TRT drug makers, including the Defendants, led initially by the AbbVie Defendants, created a disease state focused specifically at aging men with age-appropriate or borderline testosterone levels that they labeled "Andropause" (the male version of menopause). It has been well known since the 1960's that, after reaching the age of thirty (30), men's testosterone levels can be expected to decline naturally by about 1% per year. However, according to the *New York Times*, "[t]o the pharmaceutical industry, that [natural] decline was ripe for treatment."[6]

26.     With the Defendants' false and fraudulent marketing scheme(s) now exposed, along with the serious safety risks associated with dangerous, unapproved use of TRT drugs, estimates are that the vast majority of TRT drug prescribing, use and reimbursement should

---

[5] Lisa M. Schwartz and Steven Woloshin, *Low T as a Template: How to Sell Disease*, 173 JAMA Internal Medicine 1460-1462 (August 2013).
[6] *See* Natasha Singer, *Selling that New Man Feeling,* N.Y. Times, Nov. 23, 2013, http://www.nytimes.com/2013/11/24/business/selling-that-new-man-feeling.html?pagewanted=all (last visited on Sept. 22, 2014).

never have occurred. For once-daily TRT drugs, such as gels, estimates are that such unsafe unapproved use is even higher.

27.     A study published in the Journal of the American Medical Association ("JAMA") in August 2013 indicated that many men who get testosterone prescriptions have no evidence of hypogonadism. For example, one third of men prescribed testosterone had only a diagnosis of fatigue, and one quarter of men did not even have their testosterone levels tested before they received a testosterone prescription.[7]

28.     TRT drugs have not been proven to be safe or effective to treat male aging (no drug manufacturer has presented any competent medical evidence let alone gain FDA approval for any such indication). The same is true for the host of other symptoms and conditions for which Defendants promoted TRT drugs mostly as an "add-on" therapy (*i.e.*, in conjunction with as opposed to replacing other on-label treatments). As explained by a vigorous promoter of testosterone therapy – Dr. Abraham Morgentaler (who has been paid many thousands of dollars by pharmaceutical companies with testosterone products on the market) – it can take "years, even decades, to correct a medical myth." Of course, Dr. Morgentaler was speaking of the association of testosterone and prostate cancer; however, his statement is more applicable to the marketing juggernaut Defendants have created surrounding testosterone therapy and male aging, which is only just beginning to be unraveled.  This, combined with the recently revealed serious safety risks posed by TRT drugs, has resulted in a recent understanding that the vast majority of patients being prescribed TRT drugs should not have been using any TRT drug at all.

29.     Moreover, Defendants knew or should have known of and concealed the serious adverse health effects associated with the off-label use of TRT drugs, particularly among elderly

---

[7] *See* Baillargeon, J., et al., *Trends in Androgen Prescribing in the United States, 2001 to 2011*, 173 JAMA 12/26 (August 2013), http://archinte.jama network.comarticle.aspx?articleid=1691925 (last visited on Sept. 22, 2014).

men. Recent studies have demonstrated increased incidence of cardiovascular adverse events, including myocardial infarction, stroke, pulmonary embolism, and other thromboembolic adverse events. Aging men, the patients Defendants sought with their false and misleading marketing scheme, tend to be at particular risk for such adverse events. As part of Defendants' illegal schemes to increase sales of their TRT drug(s), these known safety risks were and continue to be systematically concealed and minimized from the public and from Plaintiff MMO and the TPP Class Members.

30.     For example, none of the seven (7) clinical trials referenced on the AndroGel Defendants' www.AndroGel.com website from 2000-2011 includes any meaningful reference to cardiovascular effects of AndroGel use. The same is true for Auxilium's www.testim.com website, as well as the websites of Defendant Lilly, Defendant Actavis, and Defendant Endo for Axiron, Androderm, and Fortesta, respectively. This is despite reports that several TRT drug makers have been proactively addressing cardiovascular safety issues in their promotional efforts. One physician who was detailed by Eli Lilly on Axiron noted that "[c]ardiovascular risk has all of a sudden become a discussion topic" in such details. Similarly, a physician detailed by the AbbVie Defendants on AndroGel noted that the sales rep was "[t]rying to quell concerns over cardiac risk."

31.     From 2000 until today, each Defendant has been engaged in a fraudulent and illegal scheme to cause increased prescribing and reimbursement for their TRT product(s). As the entities directly reimbursing most, if not all, of the cost of TRT drug prescriptions, Plaintiff MMO and the TPP Class Members were the primary and intended victims of these fraudulent schemes. Defendants' respective schemes targeted and defrauded Plaintiff MMO and the TPP Class Members on a massive scale.  Each Defendant focused its managed markets teams to give

presentations to Plaintiff MMO and the TPP Class Members concerning the safety, efficacy, and formulary placement of the TRT drugs. ███████████████████████████████

███████████████ ███████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████ "[8] In another example, Defendant Auxilium

███████████████████████████████████████████████

███████████████████████████████████ "[9] ████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████

32.    ███████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████

33.    Each Defendant knew that Plaintiff MMO and the TPP Class Members would reimburse for on-formulary prescriptions of TRT drugs, even if the drugs were being prescribed as a result of their respective covert, systematic, and illegal schemes to promote their TRT drug(s) for unsafe and unapproved uses. ███████████████████████████████

_____

█████████████████

████████████████████████████████████████████████████████

████████████████████████████. For example, Defendant Auxilium in ██████████████

████████████████████████████████████████████████████████

█████████████" Indeed, █████████████████████████████████████

████████████████████████████████████████████████████████

████.[10] Consequently, Plaintiff MMO and the TPP Class Members included many of the TRT

drugs on their formularies, and unknowingly paid for TRT drug prescriptions for ineffective,

unsafe, and/or ineffective unapproved purposes as a result of Defendants' false and misleading

marketing practices. At all times material hereto, each Defendant knew that, because TRT drugs

are FDA approved and effective for the treatment of the limited population of patients with

hypogonadism, the products were placed on TPP formularies nationally.

34.     ██████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

■██████████████████████████████

████████████████████████████████████████████████████████

███ .

35.   ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████ . As a result of Defendants' misrepresentation and concealment of the true safety and efficacy profiles of TRT drugs, Plaintiff MMO and the TPP Class Members were denied the opportunity to make fully informed decisions about whether (and how) to include TRT drugs on their formularies and/or paid for far more TRT drug prescriptions than they otherwise would have paid absent Defendants' fraudulent and illegal TRT drug promotion schemes. Plaintiff MMO and the TPP Class Members have been injured to the extent that they have paid for inappropriate and unsafe use of TRT.

36.   Due to Defendants' illegal marketing schemes and enterprises set forth in detail below, there resulted a flurry of fraudulent TRT prescribing activity, which continues to this day. Plaintiff MMO and the TPP Class Members, as a direct and foreseeable result of each Defendant's fraudulent scheme, have been forced and will continue to be forced to reimburse millions of TRT drug prescriptions even though it has only recently become apparent that, for the vast majority of TRT drug patients, no prescriptions should have or would have been written absent Defendants' unfair conduct and illegal enterprises.

37.   In addition to the personal injuries, deaths, and other adverse events associated with TRT drug use, which have had serious implications for men's health, the financial impact of each Defendant's false and deceptive marketing of their respective TRT drug(s) has likewise been profound, especially for Plaintiff MMO and the TPP Class Members, which bear the ultimate cost of TRT drug prescriptions. As has only recently become clear, Plaintiff MMO and

the TPP Class Members across the nation were the primary financial victims of Defendants' false and misleading schemes, having been duped by each Defendant into paying billions of dollars for unapproved, ineffective, and unsafe TRT drug prescriptions.

## II.  PARTIES

38.  Plaintiff MMO, on behalf of itself and its subsidiaries, is a not-for-profit mutual insurance company organized under Ohio law with its principal place of business in Cleveland, Ohio, and is a proposed class representative.  The oldest health care insurer in Ohio, MMO provides individual and group health benefits, Medicare supplemental insurance, and other ancillary products, such as vision, dental, and prescription drug coverage. Through its wholly-owned subsidiary Medical Mutual Services, LLC ("MMS"), including Mutual Health Services, the specialty third party administrator division of MMS, MMO also offers administrative services contracts to self-insured groups.

39.  At all times material hereto, MMO reimbursed for one or more of Defendants' drug products.  During the Class Period MMO has paid for thousands of TRT drug prescriptions. MMO sustained injury when it purchased, paid for and/or provided reimbursement for the TRT drugs and related medical services during the relevant period in the states of Alabama, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Georgia, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maryland, Massachusetts, Maine, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Oregon, Tennessee, Texas, Rhode Island, South Carolina, South Dakota, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin and the District of Columbia and, therefore, paid more in these states than it would have absent the Defendants' unlawful conduct.

17

40.     Based on preliminary data, MMO paid $38,962,566.73 for Defendants' TRT drugs from November 2001 through April 2015, including for the following states:

| | |
|---|---|
| AL | $14,063.70 |
| AR | $9,158.62 |
| AZ | $44,836.31 |
| CA | $89,520.94 |
| CO | $15,683.89 |
| CT | $16,963.50 |
| DE | $3,491.39 |
| FL | $180,692.60 |
| GA | $856,266.58 |
| IA | $10,901.33 |
| ID | $3,658.44 |
| IL | $46,233.82 |
| IN | $576,669.93 |
| KS | $5,963.83 |
| KY | $118,669.93 |
| LA | $5,374.56 |
| MA | $10,575.40 |
| MD | $15,787.49 |
| ME | $3,192.19 |
| MI | $179,010.37 |
| MN | $278.30 |
| MO | $7,638.27 |
| MS | $484.13 |
| NC | $59,653.33 |
| ND | $682.96 |
| NE | $715.76 |
| NJ | $26,939.65 |
| NM | $6,054.03 |
| NV | $16,018.42 |
| NY | $12,670.04 |
| OH | $34,932,724 |
| OK | $10,866.60 |
| OR | $641.47 |
| PA | $344,977.33 |
| RI | $1,500.43 |
| SC | $1,071,277.86 |
| TN | $32,403.70 |
| TX | $92,461.91 |
| UT | $6,063.53 |
| VA | $17,111.24 |
| WA | $11,429.84 |
| WI | $16,765.97 |

|       |             |
|-------|-------------|
| WV    | $85,437.79  |
| WY    | $1,054.58   |

41.     Plaintiff MMO and the TPP Class Members bore the financial brunt of Defendants' unlawful marketing schemes, and as a result, paid billions of dollars for Defendants' TRT drugs.

42.     Defendant Solvay Pharmaceuticals, Inc. ("Solvay") is a corporation incorporated in the State of Delaware with its principal place of business in Marietta, Georgia. Defendant Solvay conducts extensive business throughout the United States, including in the State of Illinois. Solvay Pharmaceuticals may be served through its registered agent, CT Corporations Systems, 1201 Peachtree Street, NE, Atlanta, Georgia, 30361.  At all times relevant to this TAC, Solvay Pharmaceuticals was engaged in the business of designing, licensing, manufacturing, distributing, selling, marketing, and introducing into interstate commerce, either directly or indirectly through third parties or related entities, the prescription TRT drugs sold under the name AndroGel throughout the United States, including in the State of Illinois.

43.     Defendant Unimed Pharmaceuticals, LLC f/k/a Unimed Pharmaceuticals, Inc. ("Unimed") is a limited liability company organized and existing under the laws of Delaware, with its headquarters and principal place of business at 1 North Waukegan Road, North Chicago, Illinois, 60064.  Unimed is a wholly-owned subsidiary of Defendant AbbVie, Inc. and a direct, wholly-owned subsidiary of Defendant AbbVie Products.  Unimed is the registered owner of the trademark for AndroGel that is registered with the United States Patent and Trademark Office.

44.     Defendant Abbott Products, Inc. is a Georgia corporation whose principal business is the development, manufacture, and sale of health care products and services, including pharmaceuticals. Abbott Products, Inc. conducts extensive business throughout the United States, including in the State of Illinois. On February 16, 2010, Abbott Laboratories

acquired Solvay Pharmaceuticals for EUR 4.5 billion ($6.2 billion). Abbott Laboratories'
purchase of Solvay Pharmaceuticals has resulted in the substantial continuity of Solvay
Pharmaceuticals' business practices. After the acquisition, Abbott Laboratories renamed Solvay
Pharmaceuticals "Abbott Products, Inc." Abbott Products, Inc. has continued to produce and
market Solvay Pharmaceuticals' products, such as AndroGel. Abbott Products, Inc. has retained
some of Solvay Pharmaceuticals' employees in doing so. Abbott Products, Inc. may be served
through its registered agent, CT Corporations Systems, 350 N. St. Paul St., Suite 2900, Dallas,
Texas 75201. At all times relevant to this TAC, Abbott Products, Inc. was engaged in the
business of designing, licensing, manufacturing, distributing, selling, marketing, and introducing
into interstate commerce, either directly or indirectly through third parties or related entities, the
prescription TRT drugs sold under the name AndroGel throughout the United States, including in
the State of Illinois.

45. Defendant AbbVie Inc. ("AbbVie") was incorporated in Delaware on April 10,
2012. AbbVie's principal place of business is Chicago, Illinois. AbbVie became an independent
entity on January 1, 2013. AndroGel, while initially developed, marketed, and sold by Solvay
and later Abbott Products, Inc. is now marketed and sold by AbbVie. Defendant AbbVie
conducts extensive business in the United States, including in the State of Illinois. At all times
relevant to this TAC, AbbVie was engaged in the business of designing, licensing,
manufacturing, distributing, selling, marketing, and introducing into interstate commerce, either
directly or indirectly through third parties or related entities, the prescription TRT drugs sold
under the name AndroGel throughout the United States, including in the State of Illinois.

46. Defendant Abbott Laboratories ("Abbott") is an Illinois corporation with its
principal place of business in Abbott Park, Illinois. Prior to 2013, Abbott engaged in the global

business of development, manufacturing, marketing and sale of prescription drugs and related products. At the end of 2012, Abbott separated into two companies, one focused on the development and sale of medical products (Abbott), and the other focused on the development and sale of research-based pharmaceuticals (AbbVie). Defendant Abbott conducts extensive business in the United States, including in the State of Illinois. At all times relevant to this TAC, Abbott was engaged in the business of designing, licensing, manufacturing, distributing, selling, marketing, and introducing into interstate commerce, either directly or indirectly through third parties or related entities, the prescription TRT drugs sold under the name AndroGel throughout the United States, including in the State of Illinois.

47. Collectively, Solvay Pharmaceuticals, Unimed, Abbott Products, Inc., AbbVie and Abbott shall be referred to herein as "the AbbVie Defendants."

48. Defendant Auxilium Pharmaceuticals, Inc., is a Delaware corporation which has its principal place of business at 640 Lee Road, Chesterbrook, Pennsylvania 19087. Auxilium has conducted business and derived substantial revenue from sales of Testim and Testopel throughout the United States, including in the State of Illinois. At all times relevant to this TAC, Auxilium was engaged in the business of designing, licensing, manufacturing, distributing, selling, marketing, and introducing into interstate commerce, either directly or indirectly through third parties or related entities, the prescription TRT drugs sold under the names Testim and Testopel throughout the United States, including the State of Illinois.

49. Defendant GlaxoSmithKline LLC ("GSK") is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business at the Philadelphia Navy Yard, 5 Crescent Drive, Philadelphia, Pennsylvania 19112. GSK is a wholly-owned subsidiary of GlaxoSmithKline plc, a British public limited company

that is registered to do business in the United States. As described in detail below, during relevant times, GSK was a co-promoter, with Auxilium, of Testim.

50.     Defendant Oscient Pharmaceuticals Corp. ("Oscient") is a corporation organized and existing under the laws of Massachusetts and has its principal place of business at 1000 Winter Street, Suite 2200, Waltham, MA 02451.   As described in detail below, during relevant times, Oscient was a co-promoter, with Auxilium, of Testim.

51.     On or about January 29, 2015, Endo (directly or indirectly) acquired Auxilium. Auxilium owned, manufactured, marketed, and sold three TRT drugs, including Testim and Testopel.  In acquiring Auxilium, Endo assumed all liabilities arising from those products.  Endo is sued herein in connection with its two original TRT drugs Fortesta and Delatestryl, and also in connection with the three products it acquired from Auxilium, Testim, Testopel, and Striant. To the extent that any of Auxilium's liabilities were not assumed, and to the extent that Auxilium continues to exist, Auxilium is sued herein in connection with Testim, Testopel, and Striant.

52.     Defendant Eli Lilly and Company is a corporation organized and existing under the laws of Indiana with its principal place of business at Lilly Corporate Center, Indianapolis, Indiana 46285. Defendant Lilly USA, Inc. is a limited liability company operating as a wholly owned subsidiary of Defendant Eli Lilly and Company (hereinafter collectively referred to as "Lilly"), with its principal place of business at Lilly Corporate Center, Indianapolis, Indiana 46285.  At all times material hereto, Defendant Lilly conducted business and derived substantial revenue from sales of Axiron throughout the United States, including within the State of Illinois. At all times material hereto, Lilly was engaged in the business of designing, licensing, manufacturing, distributing, selling, marketing, and introducing into interstate commerce, either

directly or indirectly through third parties or related entities, the prescription TRT drug sold under the name Axiron throughout the United States, including the State of Illinois.

53.    Defendant Acrux Commercial Pty Ltd. is a foreign corporation organized and existing under the laws of Australia, with its principal place of business at 103-113 Stanley Street, West Melbourne VIC 3003, Australia.

54.    Defendant Acrux DDS Pty Ltd. is a foreign corporation organized and existing under the laws of Australia, with its principal place of business at 103-113 Stanley Street, West Melbourne VIC 3003, Australia.

55.    Collectively, Acrux Commercial Pty Ltd. and Acrux DDS Pty Ltd. shall be referred to as "Acrux." Defendant Acrux originally developed Axiron and owns the intellectual property rights to Axiron. In March of 2010, Acrux and Eli Lilly and Company entered into an exclusive worldwide license agreement for the commercialization of Axiron. Defendant Lilly has agreed to pay Acrux royalties for Axiron sales based on milestones agreed to in the license agreement. On November 23, 2010, Axiron received FDA approval.  At all times relevant herein, Acrux was engaged in the research, development, manufacture, sales, marketing, and/or distribution of pharmaceutical products, including Axiron in the State of Illinois and is therefore subject to the jurisdiction and venue of the State of Illinois. Acrux has conducted business throughout the United States and in Illinois, and has availed itself as a plaintiff of the United States courts. *See, e.g., Ely Lilly and Co., Ely Lilly Export S.A., and Acrux DDS Pty Ltd. v. Watson Laboratories, Inc., Actavis, Inc., and Actavis Pharma, Inc.,* Civ. No. 3:13-cv-00637-RCJ-WGC (D. Del.).

56.    Hereinafter, Defendants Eli Lilly and Company, Lilly USA, Inc., and Acrux will be referred to as "Lilly."

57. Defendant Actavis plc is a foreign corporation organized and existing under the laws of Ireland, with its principal place of business at 1 Grand Canal Square, Docklands Dublin 2, Ireland and administrative headquarters located at Morris Corporate Center III, 400 Interpace Parkway Parsippany, New Jersey 07054. At all times relevant herein, Actavis plc was engaged in the research, development, manufacture, sales, marketing, and/or distribution of pharmaceutical products, including Androderm, in the State of Illinois and is therefore subject to the jurisdiction and venue of the State of Illinois. Actavis plc has conducted business and derived substantial revenue in the United States and from within the State of Illinois, and has regularly availed itself as a plaintiff of the United States courts. *See, e.g., Takeda Pharm. Co. Ltd, Takeda Pharm. N.A., Inc. Takeda Global Research and Dev. Ctr., Inc., Watson Pharmaceuticals, Inc., and Andrx Labs, LLC v. Mylan, Inc. and Mylan Pharm., Inc.,* Civ. No. 1:12-cv-00024-DLC (S.D.N.Y.).

58. Defendant Actavis Pharma, Inc., formerly known as Watson Pharmaceuticals, Inc., is a domestic corporation organized and existing under the laws of the state of Nevada and maintains its principal place of business at Morris Corporate Center III, 400 Interpace Parkway, Parsippany, New Jersey 07054. Watson Pharmaceuticals acquired Actavis Group in 2012 and announced shortly thereafter that, as of January 2013, it would change its name to Actavis, Inc. Watson Pharmaceuticals, Inc. had acquired the original manufacturer of Androderm, TheraTech, in 1999. At all times material hereto, Actavis Pharma, f/k/a Watson Pharmaceuticals, Inc., was engaged in the research, development, manufacture, sales, marketing, and/or distribution of pharmaceutical products, including Androderm in the State of Illinois and is therefore subject to the jurisdiction and venue of the State of Illinois. Actavis Pharma, Inc., f/k/a Watson Pharmaceuticals, Inc., has conducted business and derived substantial revenue from within the State of Illinois. On March 17, 2015, Actavis acquired Allergan, Inc. for approximately $77

24

billion, including outstanding indebtedness assumed of $2.2 billion, cash consideration of $40.1 billion and equity consideration of $34.7 billion. In connection with the Allergan acquisition, Actavis plc changed its name to Allergan plc.

59.     Defendant Watson Laboratories, Inc. is a domestic corporation organized and existing under the laws of the state of Delaware and previously operated at 577 Chipeta Way, Salt Lake City, Utah 84108, and with its current principal place of business at Morris Corporate Center III, 400 Interpace Parkway, Parsippany, New Jersey 07054.  At all relevant times herein, Defendant Watson Laboratories, Inc., a subsidiary of Actavis, Inc., was engaged in the research, development, manufacture, sales, marketing, and/or distribution of pharmaceutical products, including Androderm, in the State of Illinois and is therefore subject to the jurisdiction and venue of the State of Illinois.  Watson Laboratories, Inc. has conducted business and derived substantial revenue from within the State of Illinois.

60.     Defendant Anda, Inc. is a domestic corporation organized and existing under the laws of the State of Florida and maintains its principal place of business at 2915 Weston Road Weston, Florida 33331.  At all relevant times herein, Defendant Anda, Inc., a subsidiary of Actavis, plc, was engaged in the research, development, manufacture, sales, marketing, and/or distribution of pharmaceutical products, including Androderm, in the State of Illinois and is therefore subject to the jurisdiction and venue of the State of Illinois.  Anda, Inc. has conducted business and derived substantial revenue from within the State of Illinois.

61.     Throughout the TAC, "Actavis" collectively refers to Actavis, Inc., Actavis plc, Actavis Pharma, Inc., Watson Pharmaceuticals, Inc., Watson Laboratories, Inc., Anda, Inc., and Allergan plc.

62.     Defendant Endo Pharmaceuticals, Inc. (hereinafter "Endo"), formerly Endo Laboratories, LLC, and a subsidiary of Endo Pharmaceuticals Holdings, Inc., is a corporation organized and existing under the laws of Delaware with its principal place of business at 100 Endo Boulevard, Chadds Ford, Pennsylvania 19317. Cellegy Pharmaceuticals, Inc. originally developed Fortesta and sought FDA approval in 2002. In November 2006, the NDA for Fortesta was transferred to ProStraken Pharmaceuticals, Inc.  Before the drug was approved by the FDA in December 2010, Endo acquired the U.S. rights for Fortesta from ProStraken Pharmaceuticals and subsequently brought Fortesta to market.  At all times material hereto, Endo was engaged in the research, development, manufacture, sales, marketing, and/or distribution of pharmaceutical products, including Fortesta in the State of Illinois and is therefore subject to the jurisdiction and venue of the State of Illinois. Endo has conducted business and derived substantial revenue from Fortesta within the State of Illinois.

## III.     JURISDICTION AND VENUE

63.     This Court has subject matter jurisdiction over all of the claims of Plaintiff MMO and the TPP Class Members pursuant to 28 U.S.C. § 1331, because the claims in this action arise under the laws of the United States; pursuant to 18 U.S.C. § 1964, because this Court has jurisdiction to prevent, remedy, and restrain violations of 18 U.S.C. § 1962 (RICO); pursuant to 28 U.S.C. § 1332(d) (CAFA) because there is minimal diversity of citizenship among the parties and the amount in controversy exceeds $5 million, exclusive of interest and costs; and pursuant to 28 U.S.C. § 1367(a), because this Court has supplemental jurisdiction over all non-federal claims in this action that form part of the same case or controversy as those within the Court's original jurisdiction.

64.     Venue is proper in this District under 28 U.S.C. § 1391 because all Defendants engaged in substantial conduct relevant to Plaintiff MMO and the TPP Class Members' claims

within this District, and all Defendants have caused harm to Plaintiff MMO and the TPP Class Members residing within this District. Venue is also proper in this District under 18 U.S.C. § 1965(a), which provides that "[a]ny civil action or proceeding under this chapter against any person may be instituted in the district court of the United States for any district in which such person resides, is found, has an agent, or transacts his affairs." All Defendants received substantial compensation from the sales of their respective TRT drug(s) in this District, all Defendants made misrepresentations and material omissions about their respective TRT drug(s) in this District, and all Defendants can be found, have an agent, and/or transact their affairs in this District.

## IV.     FACTUAL ALLEGATIONS:  TRT DRUGS' BACKGROUND

65.     New pharmaceutical drugs may not be marketed in the United States until the sponsor of the pharmaceutical has proven to the FDA that the drug is safe and effective for specific indications at specified doses. 21 U.S.C. § 355(b); 21 C.F.R. § 310.3(h)(f). The indication and dosages approved by the FDA are set forth in the drug's labeling, the content of which is also approved by the FDA. Importantly, no law or regulation prevents a pharmaceutical manufacturer from unilaterally adding or strengthening a warning in the pharmaceutical's label. In addition, although it is not unlawful for physicians to prescribe approved drugs for indications or at dosages different than those set forth in a drug's labeling (referred to as "unapproved" or "off-label" use), the Food, Drug, and Cosmetic Act ("FDCA") generally prohibits drug companies from marketing or promoting approved drugs for uses other than those set forth in the drug's approved labeling. 21 U.S.C. § 355(b). The policy behind the off-label promotion laws and regulations, as stated by Professor Stephanie Greene in a University of Pennsylvania Law Review debate article, is "that drugs should be promoted based on scientific proof that they are safe and effective, not on anecdotal information, conjecture, or profit motives."

27

66.     The AbbVie Defendants' AndroGel is a gel containing synthetic testosterone developed originally by Unimed and currently marketed by the AbbVie Defendants. AndroGel was first marketed in the United States by Solvay S.A., a Belgian pharmaceutical manufacturer, through its U.S.-based subsidiaries. Solvay was later acquired by Abbott on February 16, 2010 for 4.5 billion Euros ($6.2 billion). AndroGel was by far Solvay's largest asset at the time of Abbott's acquisition. The gel is applied to the shoulder, upper arms, and/or the abdomen once daily so that the testosterone can be absorbed through the skin, or transdermally. AndroGel 1% was approved by the FDA on February 28, 2000 for the treatment of primary and hypogonadotropic hypogonadism. AndroGel 1.62% was approved on April 29, 2011 for the treatment of primary and hypogonadotropic hypogonadism. The AndroGel product originally came in individual packets. Defendant Solvay launched new packaging for AndroGel on September 8, 2004 in the form of a metered pump.

67.     Defendant Auxilium's Testim is a gel containing synthetic testosterone developed by Defendant Auxilium. Testim is available in a 1% concentration and in a single, premeasured tube packaging only. The gel is applied to the shoulder, upper arms, and/or the abdomen once daily so that the testosterone can be absorbed through the skin, or transdermally. Testim was approved by the FDA on October 31, 2002 for the treatment of primary and hypogonadotrophic hypogonadism. Testim is manufactured and marketed by Defendant Auxilium. On May 21, 2012, Auxilium and GSK announced a Testim co-promotion agreement to last through September 30, 2015, the stated goal of which was "to expand our reach to U.S. physicians who treat men with low testosterone and its resulting symptoms, known as hypogonadism, which we believe is a prevalent, but poorly recognized condition." GSK's press release stated that GSK's sales force would focus primarily on primary care physicians, and that Testim would

28

"complement GSK's existing portfolio of products[,]" including a "range of cardiovascular, metabolic and urology" products. After the GSK co-promotion agreement was terminated, Defendant Auxilium promoted Testim through the Primera sales force, which "consists of 150 representatives currently devoted to strategic targeting of urologists, endocrinologists, and certain high prescribing primary care physicians."

68.     Defendant Auxilium's Testopel pellets are cylindrically shaped pellets 3.2mm (or 1/8 in.) in diameter and approximately 9mm in length, consisting of seventy-five (75) mg of crystalline testosterone. When implanted subcutaneously, the pellets slowly release the hormone for a long acting androgenic effect. The dosage guideline for Testopel testosterone pellets for replacement therapy in androgen-deficient males is 150mg to 450mg subcutaneously every 3 to 6 months. Testopel is a generic product that was approved by the FDA on July 13, 1972, and is approved to treat men with primary and hypogonadotropic hypogonadism. The Abbreviated New Drug Application ("ANDA") holder is Actient Pharmaceutical Holdings, LLC, which was acquired by Defendant Auxilium on April 29, 2013. Defendant Auxilium promotes Testopel through its Innovia sales force, which Defendant Auxilium recently "increased by 50% … to increase depth of TESTOPEL utilization and provide greater penetration into remaining untapped urologist audience."

69.     Defendant Lilly's Axiron is a testosterone gel topical solution (2%) available as a metered-dose pump. One pump actuation delivers 30mg of testosterone to be applied to the axilla (under the arms) with the provided applicator. Axiron was developed by Defendant Acrux, which entered into an exclusive commercialization license agreement with Defendant Lilly. Defendant Lilly submitted Axiron for approval in the United States, which the FDA granted on November 23, 2010, for the treatment of primary and hypogonadotropic hypogonadism.

70.     Defendant Actavis' Androderm (testosterone transdermal system) is a prescription TRT medication in the form of a transdermal patch, manufactured by TheraTech Inc. and Actavis Inc. (formerly Watson Pharmaceuticals), and was approved for use (2.5 mg and 5.0 mg) by the FDA on September 29, 1995 for the treatment of primary and hypogonadotropic hypogonadism. On October 11, 2011, the FDA approved 2 mg and 4 mg formulations of Androderm.   From 1995 through 1999, Androderm was marketed by SmithKline Beecham ("SKB") under an agreement with TheraTech.  In 1999, when Watson purchased TheraTech, it began marketing Androderm through its own sales force and a contracted sales force through InVentiv Health.

71.     Defendant Endo's Fortesta is a patented two percent (2%) testosterone transdermal gel approved by the FDA on December 29, 2010 for treatment of primary and hypogonadotropic hypogonadism. Fortesta is delivered transdermally and is applied to the skin in the form of a gel.  In August 2009, Endo entered into a License and Supply Agreement (the ProStrakan Agreement) with Strakan International Limited, a subsidiary of ProStrakan Group plc ("ProStrakan"), for the exclusive right to commercialize Fortesta® Gel in the United States. Endo launched Fortesta® Gel in the first quarter of 2011. In a March 3, 2011 press release announcing the launch, Endo stated that the "introduction of FORTESTA Gel in the U.S. comes at a time when only about 1.3 million (9 percent) of the estimated 14 million men with Low T are actually receiving treatment."   On December 27, 2011, Endo entered into a Sales and Promotional Services Agreement with Ventiv Commercial Services, LLC (Ventiv), effective as of December 30, 2011. Under the terms of the Ventiv Agreement, the Ventiv Field Force promoted Fortesta® Gel, and its sales representatives were required to perform face-to-face, one-on-one discussions with physicians and other health care practitioners to promote these products.

30

72.     None of the aforementioned TRT drugs was exempt from the prohibition against commercializing off-label uses, pursuant to 21 U.S.C. § 355(i).

73.     This regulatory scheme is designed to protect physicians, patients and consumers by insuring that pharmaceutical companies do not promote drugs for uses other than those proven to be safe and effective before an independent, scientific governmental body.

74.     The FDA has approved all TRT drugs solely for treatment of male patients with particular types of hypogonadism. For example, the AndroGel label reads:

> AndroGel is indicated for replacement therapy in males for conditions associated with a deficiency or absence of endogenous testosterone:
>
> Primary hypogonadism (congenital or acquired) – testicular failure due to cryptorchism, bilateral torsion, orchitis, vanishing testis syndrome, orchiectomy, Klinefelter's syndrome, chemotherapy, or toxic damage from alcohol or heavy metals.
>
> Hypogonadotropic hypogonadism (congenital or acquired) – idiopathic gonadotropin or … LHRH … deficiency or pituitary-hypothalamic injury from tumor, trauma, or radiation.

## V.     SOURCES OF INFORMATION ABOUT PRESCRIPTION DRUGS RELIED UPON BY MEDICAL DECISION MAKERS, INCLUDING PLAINTIFF MMO AND THE TPP CLASS MEMBERS

75.     The standard upon which doctors are expected to rely when making treatment decisions for their patients is "evidence-based medicine." The Center for Evidence-Based Medicine ("CEBM") provides the following definition: "Evidence based medicine is the conscientious, explicit, and judicious use of current best evidence in making decisions about the care of individual patients."[11]

---

[11] Sackett, *et al.*, *Evidence based medicine: what it is and what it isn't: It's about integrating individual clinical expertise and the best external evidence*, 312 British Medical Journal 71-72 (1996), accessed from the Center for Evidence-Based Medicine, http://www.cebm.net/?o=1014.

76.    Further, physicians are counseled that the gold standard methodology for producing such evidence is randomized trials rather than from "non-experimental approaches." When deciding whether a given treatment is in their patients' best interest, physicians are advised "to avoid the non-experimental approaches, since these routinely lead to false positive conclusions about efficacy. Because the randomized trial, and especially the systematic review of several randomized trials, is much more likely to inform physicians and so much less likely to mislead them, it has become the "gold standard" for judging whether a treatment does more good than harm.[12]

77.    Physicians' primary sources of the evidence for their evidence-based decisions are the results of gold standard double-blind randomized controlled clinical trials ("RCTs") and systematic reviews of RCTs published in peer-reviewed journals.  The medical "literature" thus defines the scientific evidence that provides the foundation for "evidence-based medicine." These same sources of information are used by TPP decision makers in determining which drugs to include on payer formularies, the list of drugs available for their members.

78.    Pharmaceutical companies have both in-house and third-party marketing firms to assist them in the branding and product placement of prescription drugs.  Marketing, of which sales or drug representatives are only one aspect, generally includes the oversight of all printed material concerning a prescription drug, the look and feel of all advertisements, the pictures and colors used, the product message and the way that the risks and benefits of the product are described.

### A.    Pharmaceutical Sales Representative Promotion of Drugs to Physicians

79.    Sales or drug representatives ("drug reps") act as a source of information for physicians.  The number of drug reps making sales calls in doctors' offices tripled between the

[12] *Id.*

early 1990s and 2001, and now there are about 90,000 drug reps making calls on practicing physicians or one full time rep for every four and half office-based doctors.[13] Between 80-90% of office-based doctors talk to drug reps,[14] and, somewhat paradoxically, the busier a doctor is the more likely he or she is to talk to drug reps.[15] According to a 2002 survey conducted by the Kaiser Family Foundation, 74% of doctors consider the information provided by drug reps very or somewhat useful, and 81% of doctors consider the information provided by drug reps very or somewhat accurate.[16]

80.     Public relations campaigns and non-profit public service organizations like the Endocrine Society, the American Academy of Family Physicians, the American Urological Association, and the American Diabetes Association also act as a source of medical information for consumers, medical providers and TPPs, frequently acting as well-paid forums for drug company promotion.

81.     At all times material hereto, the doctors to whom Defendants promoted the TRT drugs reasonably believed that the knowledge that informed their clinical decisions and standards of care derived from the scientific evidence published in medical journals, presented in review articles, and endorsed by thought leaders and trusted organizations at speaker programs and Continuing Medical Education ("CME") events. Defendants' documents show, however, that they engaged in a carefully orchestrated and comprehensive program to exploit physicians' trust in this process of knowledge creation and dissemination. Rather than being the product of

---

[13] Hensley, *As Drug-Sales Teams Multiply, Doctors Start to Tune Them Out*, Wall Street Journal, June 13, 2003.

[14] Moynihan, *Who Pays for the Pizza? Redefining the Relationships Between Doctors and Drug Companies*, 326 British Medical Journal 1189-92 (2003).

[15] Ferguson, *et al.*, *Encounters with Pharmaceutical Representatives among Practicing Internists*, 107 Am. J. Med., 149-152 (1999).

[16] National Survey of Physicians *Part II: Doctors and Prescription Drugs*, The Kaiser Family Foundation, March 2002. http://www.kff.org/rxdrugs/loader.cfm?url=/commonspot/security/getfile.cfm&PageID=13965.

unbiased scientific inquiry, the "scientific evidence" supporting off-label use of the TRT drugs derived from Defendants' carefully designed and orchestrated campaign, in which pre-determined, readily marketable "key messages" formed the basis for the scientific evidence, and not the other way around.

82.    Defendants' drug reps were to (and did) provide seemingly useful services to busy doctors. Along with their tickets to sporting and cultural events, trinkets, doughnuts, and free lunches, Defendants' drug reps arrived with reprints of articles from medical journals, as well as the drug company's own educational materials summarizing the latest TRT medical research. Most doctors firmly believed that their opinions regarding drugs and scientific evidence were not compromised by these interactions.

83.    Since at least 2000, Defendants' sales reps were to (and did) provide healthcare professionals nationwide with Defendants' approved materials to influence the prescribing of the TRT drugs, including "approved" clinical studies, industry supplements, and CME materials. These materials were provided to healthcare professionals at one-on-one details, in-services, speaker programs (both CME and non-CME), advisory boards, conferences, dinners, sporting events, and cultural events.

**B.    CME Courses Funded by Pharmaceutical Companies**

84.    Another key source of drug information for formulary and medical decision makers is CME courses, usually medical lectures held locally featuring Defendants' Key Opinion Leaders ("KOLs"). Required to maintain medical licenses and to stay current with new developments to give patients the best medical care, many doctors attend these CME courses because they provide expert syntheses of clinical trial information.

85.    Doctors also keep abreast of developments in their field by participating in CME activities.  The majority of states require ongoing participation in CME activities, typically 50

34

hours per year, in order to maintain medical licensure. CME activities provide information about new drugs, tests and procedures, as well as optimal care for medical conditions.

86.     CME, according to the American Medical Association, consists of "educational activities that serve to maintain, develop, or increase the knowledge, skills, and professional performance and relationships a physician uses to provide service for patients, the public, or the profession."[17] As such, ongoing participation in CME plays a major role in doctors' fulfillment of the responsibility to their patients to stay current with new medical knowledge.

87.     CME activities are typically provided by recognized clinical experts, often recognized and virtually always respected by practicing physicians. Therapeutic recommendations made by such authoritative clinical experts have a major impact on attendees' beliefs about optimal therapy for their patients.

88.     The percentage of CMEs that are commercially funded increased significantly from 48 percent in 1998 to 58 percent by 2002. Currently, sixty percent of CMEs have direct commercial sponsorship; indirect sponsorship (*e.g.*, via non-profits funded by company money) accounts for a large portion of the remainder. Total industry contributions towards CME are estimated to be seventy percent or higher and total in the hundreds of millions of dollars.

89.     The content of the CME programs is intended to be independent of drug companies. According to ACCME standards[18] and FDA guidance,[19] independent educational

---

[17] Harrison, *The Uncertain Future of Continuing Medical Education: Commercialism and Shifts in Funding*, 23 J. of Continuing Ed. in the Health Professions 198-209 (2003).

[18] *See* Accreditation Council for Continuing Medical Education Standards for Commercial Support, Adopted April 2004, approved Sept 2004, available at http://www.accme.org/dir_docs/doc_upload/68b2902a-fb73-44d1-8725-80a1504 e520c_uploaddocument.pdf.

[19] *See* U.S. Food and Drug Administration Center for Drug Evaluation and Research Guidance for Industry: Industry-Supported Scientific and Educational Activities. U.S. Department of Health and Human Services Food and Drug Administration Office of Policy, Nov 1997, available at http://www.fda.gov/cder/ guidance/isse.htm.

grants cannot be tied to the purchase, sale, prescription, or recommendation of the company's products. There cannot be price concessions to help offset a customer's purchase or reimbursement of drugs, and there cannot be any payment to ensure that the grant recipient markets the company's drugs during the educational program. Grants provided to customers of a pharmaceutical company (retail chain pharmacies, pharmacy benefit managers ("PBMs"), managed care organizations ("MCOs"), and others) must be especially focused on educating health care professionals in order to avoid any appearance of price concession or *quid pro quo* arrangement. Responsibility for and control over the selection of content, faculty, educational methods, materials, and venue belong solely to the CME provider in accordance with their guidelines.

90.     Drug companies exert widespread influence over the medical education activities they sponsor.[20] An article published in *JAMA* shows that drug company-sponsored lectures are 2.5 to 3 times more likely to mention the sponsor's drug in a positive light and the competitors' drugs in a neutral or negative light than are non-commercially sponsored lectures.[21] In addition, the odds are 3.9 times greater that doctors who accepted money from drug companies for speaking at CME activities would make specific requests for addition of the sponsor's drug to the hospital formulary.[22]

91.     The Defendants herein have regularly violated the FDA guidance and their own funding guidelines governing CME events in that, although the programs offered through CME vendors could ostensibly present only educational information, Defendants manipulated the CME programs into events they controlled in order to promote the unapproved and unsafe uses

---

[20] Brennan, et al, *Health Industry Practices that Create Conflicts of Interest: A Policy Proposal for Academic Medical Centers,* 295 JAMA, 429-33 (2006).
[21] Wazana, *Physicians and the pharmaceutical industry*, 283 JAMA 373-80 (2000).
[22] Chren, et al., *Physicians' Behavior and Their Interactions With Drug Companies: A Controlled Study of Physicians Who Requested Additions To a Hospital Drug Formulary*, 271 JAMA, 684-89 (1994).

of the TRT drugs. Therefore, even though the events highlighting the unapproved and unsafe uses of the TRT drugs were run through the CME vendors, in fact, they were simply a well-disguised marketing messages mimicking Defendants' illegal promotional speaker programs that encouraged unsafe and unapproved use of the TRT drugs.

92.　　The purpose of using CME vendors was to provide the appearance of an "arms length" transaction between Defendants and the educational programs they were funding. The CME vendor was to be the "independent" third party so that any discussion of unsafe and unapproved indications during the CME would appear to be unrelated to Defendants.

93.　　At all times material hereto, the CME vendors understood that their direct funding from Defendants in the form of educational grants was implicitly, if not explicitly, conditioned on the presentation of topics that interested Defendants and included speakers that spoke favorably of the TRT drugs.

94.　　In addition to original scientific evidence and systematic reviews, CME is one of the, if not the, most important source of information about evolving therapies for practicing physicians. Physicians are busy and want to learn as efficiently as possible about new therapies that will allow them to provide the best possible care to their patients. Physicians are taught during their many years of training to trust and learn from the hierarchy of medical authority. CME programs generally are presented by such trusted authorities or experts with academic credentials. When talking to a drug rep or reading marketing material, physicians are "on guard" that commercial bias may be coloring the information. But when physicians attend CME activities they are in a receptive mode, poised to learn new material from trusted authorities. Physicians should be able to rely on the information shared during CME programs without needing to verify whether the information that was presented by the expert was an accurate and

balanced review of the best available scientific evidence. For all these reasons, the content of medical education is not expected to be driven by commercial concerns, especially when trusted authorities provide reviews of data that lead to clinical recommendations. But, as shown below, this is exactly what the Defendants did in the medical education that they provided for what was, in truth, scientifically unsubstantiated use of the TRT drugs.

95. CME courses featuring the unsafe and unapproved use of TRT drugs are perhaps the most egregious examples of abuse of the "education" provided to the health care community. A December 13, 2015 Milwaukee Journal Sentinel/MedPage Today investigative report by John Fauber, Coulter Jones, and Kristina Fiore, entitled "Slippery Slope: Testosterone Muscles Its Way to Profits: When CME joined forces with marketing, testosterone took off," raises troubling questions about the use of CME events touting unsafe and unapproved use of TRT drugs to grow sales of the products. The reporters reviewed 75 drug industry-funded CMEs involving testosterone, and found that "the majority of the faculty experts already were on the payroll of drug companies as speakers, consultants, and advisors."

96. In one particular 2012 CME sponsored by Defendant AbbVie, a faculty member told physicians they could safely prescribe testosterone to men with prostate cancer "despite treatment guidelines – and the product label itself – warning that testosterone should not be given to men with prostate cancer." The course was led by Rhode Island physician Martin Miner, who cited two studies as support – both by authors with financial ties to companies that marketed testosterone products – one a review paper written by one author; the other involved a study of only 13 men. The report found that this same faculty member, Dr. Martin Miner, had participated

in at least 19 CME activities since 2010, "part of a wave of courses touting the dubious virtues of testosterone treatment – all bankrolled by companies that manufacture the products."[23]

97.    Per the authors: "[CME] payments increasingly are made to third-party organizations — often for-profit firms — that help create the materials, hire the faculty and put on the courses. Those payments don't have to be disclosed.  Consider it the dark money of medicine."[24]

## C.    Commercial Control of Design, Analysis, and Publication of Clinical Trials in Peer-Reviewed Medical Journals

98.    In today's health care market, doctors along with TPP pharmacy and medical directors, their pharmacy and therapeutics committees ("P&T committees"), PBMs and other decision makers, rely upon a variety of trusted sources for the scientific evidence upon which to base their decisions.  Many of these sources are directly controlled (or heavily influenced) by pharmaceutical manufacturers like the Defendants here.  All of these sources contain susceptibilities that have been exploited by pharmaceutical manufacturers.

99.    Physicians rely on the findings of RCTs published in respected peer-reviewed medical journals in order to make the best decisions for their patients. However, corporate influence now permeates every aspect of the research process including: the design of clinical studies (including the trial population, the choice of drugs, doses, duration of the trial, and the outcome and safety measures to be tracked); control of the data and data analysis; writing the manuscripts for articles, and publication decisions (including where, or even whether the study will be published); and publicity following publication.  Through these methodologies even

---

[23] *Id.*

[24] *See* Fauber, et al., *Testosterone courses downplay risks, lead to overuse in older men*, Milwaukee Sentinel Journal/MedPage Today, December 13, 2015.

"gold standard" double-blind randomized controlled trials can be "spun" to favor the interests of corporate sponsors, exaggerating benefits and minimizing adverse events.

100.    As the National Institute of Health ("NIH") funding of clinical trials started decreasing in the late 1970s, pharmaceutical companies moved in to fill the void.  Between 1977 and 1990, pharmaceutical companies increased their funding for clinical trials six-fold.[25]  By 1991, approximately 70% of clinical trials were being funded by the pharmaceutical companies, but 80% of those trials were still being carried out in academic medical centers where there was a tradition of academic researchers participating in study design, data analysis and publication decisions.[26]  As the 1990s progressed, this changed dramatically, so that by 2000 only 41% of commercially funded studies were being done in universities; the rest were being done by for-profit contract research organizations.  By 2004, only 26% of commercially funded studies were being performed in an academic setting.[27]

101.    One important consequence of this transition is that it has changed the locus of control of clinical research from academic researchers working in academic medical centers to the pharmaceutical companies themselves. Since pharmaceutical companies were hiring the research companies directly, they could play the primary role in designing the study and controlling the data, while at the same time denying researchers, who would author the articles to be published in medical journals (the "scientific evidence"), free access to the data.  This allows the pharmaceutical companies to retain a great deal of control over publication decisions.

---

[25]Dramatic Growth of Research and Development, Pharmaceutical Research and Manufacturers of America  (PhRMA), *Pharmaceutical Industry Profile 2003* (2003).
 http://www.phrma.org/publications/publications/profile02/2003%20CHAPTER%202.pdf.
[26] Bodenheimer, *Uneasy alliance – clinical investigators and the pharmaceutical industry*, 342 NEJM 1539-1544 (2003).
[27] Steinbrook, *Gag Clauses in Clinical-Trial Agreements*, 352 NEJM 2160-62 (2008).

102.    Currently, 80 to 90 percent of clinical research is commercially funded.  In the ten years between 1994 and 2003, 65 of the 77 most frequently cited clinical trials, or 84%, had commercial sponsorship.  Furthermore, the percentage increased significantly during that time: since 1999, 31 out of 32 of the most frequently cited clinical trials, or 97%, had industry sponsorship.[28]

103.    A study published in the *New England Journal of Medicine* ("*NEJM*") examined the standards for the arrangements between pharmaceutical companies and academic medical centers – the clinical trial contracting agreements that would be expected to maintain the highest standards of academic independence.  The researchers found that more than two-thirds of the academic institutions accepted research contracts that prohibit researchers from changing the sponsor's research design.  Half of the university medical centers allowed commercial sponsors to "draft manuscripts reporting the research results, with the investigators' role limited to review and suggestions for revision." And "24 percent of the responding institutions would grant the sponsor the right to insert its own statistical analyses into manuscripts."[29]

104.    Discussing the failure of universities to defend their scientists' research independence when conducting commercially-sponsored medical studies, Drummond Rennie, M.D., Deputy Editor of JAMA, said that universities and scientists "are seduced by industry funding, and frightened that if they don't go along with these gag orders, the money will go to less rigorous institutions… It's a race to the ethical bottom."[30]  Given the primary fiduciary responsibility of the drug companies to their shareholders rather than the public's health, this transition from public to private financing of clinical research means that – at best – studies are

---

[28] Patsopoulos, et al., *Origin and funding of the most frequently cited papers in medicine: database analysis*, 332 BMJ 106-64 (2006).
[29] Mello, et al., *Academic medical centers' standards for clinical-trial agreements with industry*, 352 NEJM 2202-10 (2005).
[30] Knox, Boston Globe, March 30, 1999.

designed and medical "knowledge" has grown towards maximizing corporate profits rather than optimizing health most effectively and efficiently.

105.     Between two-thirds and three-quarters of the clinical studies published in even the most prestigious journals are now commercially funded.[31]  Among the highest quality published studies (those deemed good enough to be included in Cochrane Reviews), the odds are 5.3 times greater that commercially funded studies will conclude that the sponsor's drug is the treatment of choice compared to non-commercially funded studies of exactly the same drugs.[32]  This means that the "scientific evidence" produced by commercially sponsored studies is effectively and systematically biased in favor of the sponsor's drug.  An editorial in the American Journal of Medicine noted that the "link between commercial sponsorship and the conduct and presentation of research" is difficult to minimize "because there is usually a substantial power gradient between the sponsor and the investigator."[33]

106.     Drug manufacturers can also bias even the most trusted "scientific evidence" by having financial relationships with researchers, funding research and coordinating research publications.  A study of the effect of researchers' financial conflicts of interest and industry funding on clinical trials, published in the *American Journal of Psychiatry* in 2005, concluded: "Industry sponsorship and author conflict of interest are prevalent and do appear to affect study outcomes."[34]  The study looked at clinical trials that were published between 2001 and 2003 in the four most widely cited general psychiatry journals.  Forty-seven percent of the articles included at least one author with a financial conflict of interest, defined as "any report of

---

[31] Smith, *Medical Journals Are an Extension of the Marketing Arm of Pharmaceutical Companies*, 2(5) PLOS Medicine 138 (2005), available at 10.1371/journal.pmed.0020138.
[32] Als-Neilsen, et al., *Association of Funding and Conclusions in Randomized Drug Trials*, 290 JAMA 921-28 (2003).
[33] Landefeld, *Commercial Support and Bias in Pharmaceutical Research*, 117 Am J Med, 876-78 (2004).
[34] Perlis, et al, *Industry Sponsorship and Financial Conflict of Interest in the Reporting of Clinical Trials in Psychiatry*, 162 Am J Psychiatry 1957-60 (2005).

consulting or speaking fees or honoraria, stock ownership, or employment by the study sponsor." The odds were 4.9 times higher that articles including at least one author with a conflict of interest would report positive results for the drug company's product. For those studies that had both industry sponsorship and at least one author with a conflict of interest the odds were 8.4 times higher than the study would favor the sponsor's drug.

## VI.   USE OF TRT DRUGS IS TIED TO SERIOUS ADVERSE EVENTS

107.   Defendants and their associates misrepresented that their TRT drug(s) were safe and effective treatment for both hypogonadism and for the various unapproved and unsafe uses they promoted as part of their "disease mongering" enterprises, a descriptor used by Dr. Adriane Fugh-Berman of Georgetown University Medical Center to summarize the unapproved and unsafe TPP Formulary Access, Peer Selling, Publication, and Direct-to-Consumer ("DTC") Enterprises detailed above.

108.   Defendants purposefully downplayed, understated and outright ignored the health hazards and risks associated with using TRT drugs. Defendants deceived potential TRT users, their physicians, and their health insurance companies, by relaying positive information through the press, including testimonials from retired professional athletes, and manipulating the definition of hypogonadism and statistics of its occurrence in men to suggest widespread disease prevalence, while downplaying known adverse and serious health effects.

109.   Defendants concealed material, relevant information from potential TRT users, physicians, Plaintiff MMO and the TPP Class Members, and minimized user, prescriber, and payer concern regarding the safety of TRT, including but not limited to its known propensity to drastically increase hematocrit and estradiol. In some patient populations, TRT drugs may increase the incidence of adverse events and death by over 500%.

110.    Testosterone regulates the expression of platelet TXA2 receptors in humans, which significantly increases platelet aggregation. It causes increased hematocrit and estradiol in adult males, resulting in thickened blood, the development of blood clots, and heart damage. These effects, if not monitored and controlled properly, can lead to life-threatening cardiac events, stroke, and thromboembolic events, including but not limited to deep vein thrombosis, pulmonary embolism, transient ischemic attacks ("TIAs"), ischemic stroke, and numerous types of cardiovascular injury.

111.    Use of exogenous testosterone can cause an increase in serum levels of estradiol, the primary female sex hormone, through the conversion of excess testosterone into estradiol. Increased serum levels of estradiol have been associated with the development of blood clots and with life-threatening cardiac events, strokes, and thromboembolic events, including but not limited to deep vein thrombosis, pulmonary embolism, TIAs, ischemic stroke, and numerous types of cardiovascular injury.

112.    At relevant times material hereto, the prescribing information and medication guides contained in the package materials of each Defendant's TRT drugs did not adequately warn against stroke, pulmonary embolism, TIAs, cardiovascular disease, myocardial infarction, coronary heart failure, or any thromboembolic event not related to polycythemia.

113.    At relevant times material hereto, the medication guide contained within the package insert of each of the Defendants' TRT drugs instructed patients to tell their healthcare provider if they have any of the following before initiating use of a TRT product: (a) breast cancer; (b) prostate cancer; (c) urinary problems due to an enlarged prostate; (d) heart problems; (e) kidney or liver problems; (f) problems breathing during sleep (or sleep apnea); or (g) any other medical conditions.

114.    However, the prescribing information and medication guide contained within the package materials of each of the Defendants' TRT drugs failed to instruct patients to tell their healthcare provider if they have an underlying inherited trait which increases their risk of blood clotting, particularly the Factor V Leiden mutation, the Prothrombin gene mutation, high Factor VIII, high homocysteine, or the lupus anticoagulant because the increase in serum estradiol caused by the drug can interact with the underlying clotting trait to produce blood clots in the legs, the lungs, the eyes, the brain, and the bones. The prescribing information also failed to instruct patients and physicians to be aware of the presence of comorbid conditions or pre-existing heart disease, which has been proven to double the risk in men under the age of sixty-five (65) who use testosterone therapy.

115.    Although the prescribing information and medication guide contained within the package materials of each of the Defendants' TRT drugs did warn that the use of the product may result in increased red blood cell count, at relevant times it did not instruct physicians, patients, Plaintiff MMO or the TPP Class Members that it can increase a red blood cell count to the point that it more than doubles the risk for stroke, pulmonary embolism, ischemic heart disease, coronary heart failure, and myocardial infarction. The warning in regard to red blood cell count did not warn physicians, patients, Plaintiff MMO and the TPP Class Members that hematocrit levels can rise by as much as ten percent (10%) above normal range, nor did it warn of the serious and life-threatening risks associated with red blood cell counts exceeding fifty percent (50%), including the fact that individuals with a hematocrit greater to or equal than fifty-one percent (51%) have a doubling of the risk of stroke, new-onset heart failure, and coronary heart disease.

116.    The prescribing information and medication guide contained within the package materials of each of the Defendant's TRT drugs did instruct physicians to re-evaluate their patient's hematocrit every three (3) to six (6) months after starting treatment, but at relevant times failed to warn patients, physicians, Plaintiff MMO and the TPP Class Members that the product can cause dangerous increases in hematocrit much more rapidly, and also failed to instruct physicians to monitor their patient's hematocrit more frequently.

117.    Although the prescribing information and medication guide contained within the package materials of each of the Defendants' TRT drugs warned that use of the product may result in risk of blood clots in the veins, at relevant times the warning was specifically limited to "blood clots in the legs" and only warned against blood clots in the legs that form as a result of increased red blood cell count (polycythemia). There was no warning for blood clots in the veins other than "blood clots in the legs," nor was there any warning of blood clots resulting from causes other than polycythemia. Also, Defendants included no warnings that blood clots in veins as a consequence of polycythemia could result in pulmonary embolism, or other injuries secondary to the formation of deep vein thrombosis in the legs or other parts of the body.

118.    The prescribing information and medication guide contained within the package materials of each of the Defendants' TRT drugs failed to warn that use of the product may result in elevated levels of estradiol. Defendants did not instruct physicians to monitor estradiol levels, nor did they provide any guidance to physicians, patients, Plaintiff MMO or the TPP Class Members regarding the significant health risks associated with elevated levels of serum estradiol in men, including the fact that there was a two-fold excess risk of stroke for men who had serum estradiol levels in the top quintile versus those men whose estradiol levels were lower, and that estradiol blood levels greater than 34.1 pg/mL resulted in more than doubling of stroke incidence

in men. There was also no warning that elevated serum estradiol levels resulting from use of the product can cause impairment of contractility of the heart.

119.    The prescribing information and medication guide contained within the package materials of each of the Defendants' TRT drugs did not adequately warn that use of the product may result in the formation of deep vein thrombosis, pulmonary embolism, stroke, infarction, coronary heart failure, cardiovascular disease, or myocardial infarction caused by elevated levels of estradiol.

120.    At relevant times material hereto, the prescribing information and medication guide contained within the package materials of each of the Defendants' TRT drugs did not offer any warning of the very serious health risks for men over the age of 65 who use TRT. There was no mention of the fact that there is a doubling of the risk of heart attacks in men over the age of 65 who use TRT. The absence of a warning failed to adequately advise and instruct patients, physicians, Plaintiff MMO and the TPP Class Members of the very serious health risks caused by the use of testosterone in this patient population.

121.    In addition to the increased risk of cardiovascular adverse events, TRT drugs, and particularly the gel products, have been linked to several severe and life changing medical disorders in both users and those who come into physical contact with users or the unwashed clothes of someone who applied any of the gels. Patients taking TRT drugs may experience enlarged prostates and increased serum PSA levels.

122.    Secondary exposure to TRT drugs (and particularly the gels) can cause side effects in others as well.  In 2009 the FDA issued a black box warning for the gel products, advising patients of reported virilization in children who were secondarily exposed to the gels.

Testosterone may also cause physical changes in women exposed to the drug and cause fetal damage with pregnant women who come into secondary contact with testosterone gel.

123.     In addition to other physiologic adverse health effects caused by TRT drugs, it has recently come to light that TRT drugs cause hematocrit levels to increase, thereby thickening the blood. This effect, if not monitored and properly controlled, can lead to life-threatening cardiovascular adverse events, including myocardial infarction, stroke, thromboembolic events, and death.

124.     Defendants' research into their products put them in a position to be aware of the risks and danger of the use of TRT drugs, in particular the risks of deep vein thrombosis, pulmonary embolism, stroke, infarction, coronary heart failure, cardiovascular disease, or myocardial infarction at the time they brought their products to market. This is particularly true because the dangers of increased serum levels of estradiol have long been understood in the context of oral contraceptives and hormone replacement therapy for women. Defendants nonetheless failed to warn doctors, consumers, Plaintiff MMO and the TPP Class Members of these dangers. Indeed, ████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████████████

125.     To the extent that any dangers resulting from TRT were not known at the time any of the products were brought to market, the Defendants, and each of them, were entitled, and required, to make unilateral changes to the labels for their products in order to warn physicians, consumers, Plaintiff MMO and the TPP Class Members of dangers of which they became aware.

126.     In late 2009, a Testim study for testosterone therapy in frail and aging men was abruptly halted by the study's drug safety review board after it was discovered that 23 of the 106

████████████████

patients in the Testim group suffered adverse cardiovascular events, compared to only 5 of the 103 placebo group patients. The study results were published in June 2010 in the NEJM.[36] Defendants, and Auxilium in particular, publicly asserted at the time that the trial's results did not alter its position that TRT drugs were safe and effective. Defendants introduced no cardiovascular warning to their product labeling, and continued to promote TRT drugs as safe and effective for a host of label expanding and unapproved and unsafe conditions. Defendant Auxilium has yet to publish or make publicly available the full set of data from this trial.

127. Also in 2010, researchers at the University of California San Francisco (UCSF) studied a group of 700 men aged sixty-five (65) and older. According to the researchers, "[t]hose whose testosterone levels placed them in the top 25 percent of study participants were 2.2 times as likely to experience a heart attack or other event related to heart disease over four years compared to men whose testosterone levels were in the bottom 25 percent."

128. In April 2013, a meta-analysis of twenty-seven (27) randomized, placebo-controlled trials representing 2,994 men was conducted by a group of researchers and published in the Journal of BMC Medicine.[37] The study found that testosterone therapy increased the risk of cardiovascular-related events by approximately 50%. Interestingly, the authors also noted that "[t]he risk of testosterone therapy was particularly marked in trials not funded by the pharmaceutical industry." The FDA observed that the discrepancy could be attributable to "differences in study design or adverse event reporting." Notably, Defendants themselves exercise a great degree of control over study protocols and adverse event reporting guidelines in

---

[36] *See* Basaria, *et al.*, *Adverse events associated with testosterone administration,* 363 NEJM 109-122 (2010).
[37] Xu, *et al.*, *Testosterone Therapy and cardiovascular events among men: a systematic review and meta-analysis of placebo-controlled randomized trials*, 11 BMC 108 (April 2013).

studies funded by Defendants. In non-industry funded trials, the increased risk of cardiovascular adverse events was upwards of 110%.

129.    In November 2013, a study was published in JAMA indicating that testosterone therapy raised the risk of death, heart attack and stroke by about 30%.[38] The "Vigen Study" was a retrospective cohort study of Veterans Affairs ("VA") patients' post-angiography with low testosterone levels (< 300ng/dL) from 2005-2011.  The researchers found that "the use of testosterone therapy was associated with increased risk of adverse outcomes."

130.    Specifically, the Vigen Study concluded that: "Use of testosterone therapy in this cohort of veterans with significant medical comorbidities was associated with increased risk of mortality, MI, or ischemic stroke." In fact, testosterone therapy increased the risk of death, heart attack, and stroke by approximately 30%.

131.    On January 29, 2014, the Finkle Study was released in PLoS ONE.[39] This large study demonstrated an increased risk of heart attack in men over the age of 65 years, and in men younger than 65 years with a prior history of heart disease.

132.    Specifically, the Finkle Study was a retrospective cohort study of 55,593 men from Medicare and health insurance databases. The study investigated the rate of heart attacks among men in the ninety (90) days following a testosterone therapy prescription, and selected as a comparator group men receiving prescriptions for erectile dysfunction drugs, because of similar patient demographics and the fact that erectile dysfunction drugs do not have androgenic effects.  The study results indicated that "[a]mong men aged 65 years and older, [the authors] observed a two-fold increase in the risk of [myocardial infarction] in the 90 days after filling an

---

[38] *See* Vigen, *et al., Association of Testosterone Therapy with Mortality, Myocardial Infarction, and Stroke in Men with Low Testosterone Levels*, 310 JAMA 1829-1836 (2013).
[39] Finkle, *et al., Increased Risk of Non-Fatal Myocardial Infarction Following Testosterone Therapy Prescription in Men*, 9 PLoS One e85805 (2014).

initial [testosterone therapy] prescription …." Similarly, "[a]mong younger men with a history of heart disease, [the authors] observed a two to three-fold increased risk of MI in the 90 days following an initial [testosterone therapy] prescription …." The authors concluded that, "[t]aken together, the evidence supports an association between testosterone therapy and risk of serious, adverse cardiovascular-related events – including non-fatal myocardial infarction – in men."

133.    On January 31, 2014, the FDA announced that it was investigating possible increased risks of stroke, heart attack and death in individuals using TRT drugs. The FDA based its decision to reassess the safety of TRT drugs based, in part, on the Vigen Study. However, at the time of the announcement, the FDA stated that it "has not concluded that FDA-approved testosterone treatment increases the risk of stroke, heart attack, or death." The FDA also provided no timetable for conducting its investigation.

134.    On June 19, 2014, and in response to post-market reports of venous blood clots unrelated to polycythemia in testosterone users, the FDA announced that it was requiring manufacturers of testosterone products to include a general warning in the drug labeling of all approved testosterone products about the risk of venous thromboembolism, including deep vein thrombosis and pulmonary embolism.  The FDA's stated goal in requiring this change was "to provide a more general warning regarding venous blood clots and to ensure this risk is described consistently in the labeling of all approved testosterone products."

135.    Notably, the FDA clarified that this new warning requirement concerning venous clots "was not related to FDA's ongoing evaluation of the possible risk of stroke, heart attack, and death in patients taking testosterone products.  We are currently evaluating the potential risk of these cardiovascular events, which are related to blood clots in the arteries."

136.    As a result of this mandate, on June 21, 2014, Defendants were required to update their prescribing information to provide the general warning required by the FDA regarding deep vein thrombosis and pulmonary embolism, and also updated the medication guide to include the significant risk of pulmonary embolism as follows: "Blood clots in the legs *or lungs*.  Signs and symptoms of a blood clot in your leg can include leg pain, swelling, or redness.  Signs and symptoms of a blood clot in your lungs can include difficulty breathing or chest pain." (emphasis added)

137.    However, following the June 21, 2014 update, the prescribing information and the medication guide contained within the package materials of each of the Defendants' TRT drugs still lacked any warning about the risks of elevated estradiol levels and the need to screen for underlying clotting traits.  They also lacked warnings for strokes or for cardiovascular injuries.

138.    The updated "warnings" also failed to warn about blood clots that occur in locations other than the legs and lungs – *i.e.*, the arms, spinal cord, heart, and other locations throughout the body or that injuries secondary to the formation of deep vein thrombosis or pulmonary embolism may occur.

139.    On March 3, 2015, the FDA concluded its investigation into the cardiovascular and stroke risks associated with TRT first announced in January 2014. It required that all manufacturers (including the Defendants) must clarify the approved uses of TRT drugs, cautioning that "prescription testosterone products are approved only for men who have low testosterone levels caused by certain medical conditions."  The FDA further noted that the "benefit and safety of these medications have not been established for the treatment of low testosterone levels due to aging, even if a man's symptoms seem related to low testosterone."

140.    The FDA also required that manufacturers (including Defendants) must add information about a "possible risk of heart attacks and strokes in patients taking testosterone." "[B]ased on the available evidence from published studies and expert input from an Advisory Committee meeting, FDA has concluded that there is a possible increased cardiovascular risk associated with testosterone use.  These studies included aging men with testosterone.  Some studies reported an increased risk of heart attack, stroke, or death associated with testosterone treatment, while others did not."

141.    The FDA concluded, "[b]ased on our findings, we are requiring labeling changes for all prescription testosterone products to reflect the possible increased risk of heart attacks and strokes associated with testosterone use.  Health care professionals should make patients aware of this possible risk when deciding whether to start or continue a patient on testosterone therapy."

142.    Further, in recognition of Defendants' failure to conduct meaningful studies of the cardiovascular and stroke risks presented by TRT, the FDA required "manufacturers of approved testosterone products to conduct a well-designed clinical trial to more clearly address the question of whether an increased risk of heart attack or stroke exists among users of these products."

143.    Prior to the FDA's announcement on March 3, 2015, the prescribing information and medication guide contained within the package materials for each of the Defendants' TRT drugs failed to provide any warning to consumers, physicians or Plaintiff MMO and the TPP Class Members against:

- Avascular Necrosis;

- Cardiovascular Disease;

- Cerebrovascular Accident (Stroke);

- Coronary Heart Failure;

- Myocardial Infarction (Heart Attack); or

- Transient ischemic attack ("TIA").

144.    Defendants failed to instruct patients, physicians, Plaintiff MMO and the TPP Class Members that:

- Dangerous increases in hematocrit levels can happen rapidly;

- There are serious and life threatening risks, including stroke, new-onset heart failure, and coronary heart disease, that are associated with a red blood cell count that exceeds 50%; and

- Hematocrit levels need to be monitored frequently.

145.    Defendants failed to warn Plaintiff MMO and the TPP Class Members that use of TRT drugs may result in elevated levels of Thromboxane A2 and failed to instruct physicians to monitor Thromboxane A2 levels. Defendants failed to provide any guidance to physicians, patients, Plaintiff MMO or the TPP Class Members regarding the significant health risks associated with elevated levels of Thromboxane A2 in men.

146.    Defendants' marketing and promotion overstated the benefits of their products by creating the impression that TRT drugs are a safe and effective treatment for a variety of aging-related conditions and symptoms.  This was misleading and failed to adequately warn physicians, patients, Plaintiff MMO and the TPP Class Members about the numerous, life-threatening health risks associated with use of the drugs.

147.    Defendants omitted and/or fraudulently misrepresented the safety profiles of TRT drugs in engaging in the aforementioned promotional activities. To wit, Defendants failed to

54

adequately disclose the risks associated with TRT use. As noted in a study published in April 2013, "[n]o randomized placebo-controlled trial has been implemented to assess the effect of testosterone therapy on cardiovascular events[.]"[40]

148.    Defendants instead focused on studies that were consistent with the marketing messages surrounding their products. Defendants knew a large scale, sufficiently powered, randomized placebo-controlled study would have likely confirmed the association of testosterone therapy with increased cardiovascular events and would not have been consistent with Defendants' marketing messages for TRT, as many aimed at patients (including those suffering from erectile dysfunction, obesity, and diabetes) were already susceptible to cardiovascular adverse events.

149.    Defendants' respective false and misleading marketing programs sought to create the image and belief by consumers, physicians, and Plaintiff MMO and the TPP Class Members (and their P&T committees) that low testosterone affected a large number of men in the United States and that the use of TRT drugs is safe, even though Defendants knew these assertions to be false, and had no reasonable grounds to believe them to be true.

150.     Another example is the remark made to the *New York Times* by Dr. Larry Lipshultz, a frequent Solvay speaker, who stated: "There is

---

[40] Xu *et al.*, *Testosterone Therapy and cardiovascular events among men: a systematic review and meta-analysis of placebo-controlled randomized trials*, 11 BMC Medicine 108 (April 2013), http://www.biomedcentral.com/1741-7015/11/108 (last checked on September 22, 2014).

no reason to withhold treatment from patients with symptoms and lab reports of low testosterone levels because someone has not done a placebo-controlled study." Both physicians were participants in the Peer Selling Enterprise, described *infra*, and were being paid by Defendants to encourage this type of prescribing behavior among their peers. Another example is the Auxilium "e-tractions" which promoted Testim off-label to diabetic and erectile dysfunction patients, patient classes already subject to high cardiovascular disease prevalence. Defendant Lilly likewise urged patients to seek Axiron treatment based on "instinct" alone.

151.    Of course, these proclamations were misinformed, at best, in light of a number of recent studies demonstrating that testosterone use in men is associated with serious adverse events, including life threatening cardiac events, strokes, and thromboembolic events, including deep vein thrombosis, pulmonary embolism, TIAs, ischemic stroke, and numerous other types of cardiovascular injuries.

152.    In early 2014, Defendant Auxilium stated in its Form 10-K that it had "conducted initial clinical trials for a potential high concentration testosterone gel product. However, we do not believe that the clinical results from such studies … warrant further development for this product candidate at this time …." The results of these trials, and many others, are non-public.

153.    Defendants' advertising program sought to create the image and belief by patients, their physicians and Plaintiff MMO and the TPP Class Members that the use of TRT drugs was a safe method of alleviating their symptoms, had few side effects and would not interfere with their daily lives, even though Defendants knew these assertions to be false and had no reasonable grounds to believe they were true.

154.    Defendants purposefully downplayed, understated and outright ignored the health hazards and risks associated with using TRT drugs. Defendants deceived potential TRT drug

users by relaying positive information through DTC advertising, including press statements and testimonials from retired professional athletes, and by manipulating hypogonadism prevalence numbers while downplaying adverse health effects.

155.    In fact, not only have Defendants downplayed or minimized such risks, they have deliberately pursued at-risk populations, including elderly men, diabetics and obese individuals, with claims that their products actually improved cardiovascular health, despite knowledge to the contrary.

156.    A key part of selling this narrative involved Defendants obscuring the fact that few, if any, studies or clinical trials actually supported the marketing messages they were pushing. For example, regarding his 2004 NEJM article, Dr. Morgentaler added, "[a]lthough it would be helpful to have data from long-term, large-scale studies, it must be recognized that there already exists a substantial body of research on the effects of testosterone in men." The veracity of such a statement is directly contradicted by the FDA's March 3, 2015 announcement in which it required all manufacturers of TRT drugs to "conduct a well-designed clinical trial to more clearly address the question of whether an increased risk of heart attack or stroke exists among users of these products."

157.    ███████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
█████████████████████████████████

158.    Despite the association of testosterone therapy with cardiovascular adverse events, which was known or should have been known to Defendants, Defendants purposely shied

57

away from conducting an adequately powered, large scale, randomized placebo-controlled study assessing cardiovascular adverse events as an outcome measure. Even the principal investigator of one such ongoing cardiovascular study sponsored by the AbbVie Defendants, Dr. Peter J. Snyder, conceded that his study was "nowhere near large enough to determine any important risk. Not prostate cancer, not heart disease." Dr. Snyder had argued for a larger study, but, anticipating negative results from an adequately powered study, the AbbVie Defendants were more interested in hedging their bets. If the study's results were positive, the AbbVie Defendants would have made the study its champion; if negative, the AbbVie Defendants would have emphasized the limitations in the study. As related by Dr. Snyder, the most important function of the studies was the "spin" that would inevitably be placed upon the results by the TRT manufacturers. Indeed, Defendants anticipated that an adequately powered study would produce negative results and would serve merely to alert the public and Plaintiff MMO and the TPP Class Members to the association of testosterone therapy and serious cardiovascular adverse events.

159.    Defendants concealed materially relevant information from potential TRT drug users and from Plaintiff MMO and the TPP Class Members and minimized prescriber concern regarding the safety of TRT drug use.

160.    Even after the FDA's required label warning regarding venous thromboembolic adverse events, the TRT Defendants failed to mention any potential risk of cardiovascular adverse events, stroke, pulmonary embolism or other dangerous side effects related to blood clotting in their commercials, and online and print advertising, and have falsely represented that they adequately tested TRT drugs for all likely side effects.

161.    Had Defendants adequately disclosed the risks and dangers associated with TRT drugs, consumers and physicians in the United States would not have sought out and prescribed,

58

respectively, anywhere near the volume of TRT drugs that is currently dispensed. In addition, Plaintiff MMO and the TPP Class Members would have made different decisions on how and whether to include TRT drugs on their formularies.

162.    It was only after the FDA's March 2015 announcement requiring stricter warnings regarding major cardiovascular and stroke risks that Defendants added black box warnings to their respective TRT drugs.

163.    These serious adverse health effects are common to the entire class of TRT.

## VII.    INSURANCE COVERAGE FOR DEFENDANTS' TRT DRUGS WAS VITAL TO THE SUCCESS OF THEIR FRAUDULENT MARKETING SCHEME

### A.    Absent Insurance Coverage, Physicians Did Not (or Were Reluctant to) Prescribe TRT Drugs

164.    Although the physician prescribes the TRT drugs, it is the patients and their TPP insurance company which pay their costs.  Plaintiff MMO and the TPP Class Members generally pay 75-90% of the retail cost of brand name drugs, while the patient is responsible for a small copayment.  The physician does not pay anything, but will bill the patient's insurance company for associated office visits and lab tests.   Accordingly, Plaintiff MMO and the TPP Class Members have been the primary and intended victims of Defendants' fraudulent marketing.

165.    Absent insurance coverage, a patient is responsible for paying 100% of the cost of their prescribed TRT drugs.  Defendants realized, first as to Solvay, beginning with the launch of AndroGel in 2000, that their marketing to physicians for "Andropause" was met with resistance. Physicians were opposed to, or reluctant, to prescribe TRT drugs if their patients were responsible for paying hundreds of dollars out of pocket when the TRT drugs were not "on formulary" or were but with very high copayments or restrictions.

166.    Defendants knew that gaining insurance coverage, or favorable formulary status, was essential to both growing the pie and the sales of their respective TRT drugs, as physicians based their prescribing on Plaintiff MMO's and the TPP Class Members' drug coverage.

167.    First Solvay, and thereafter each of the Defendants, included in their strategic business plans a managed care marketing plan, targeting Plaintiff MMO and the TPP Class Members, to disseminate their false and misleading representations.  Utilizing multiple channels, including a dedicated managed care sales force that called on Plaintiff MMO and the TPP Class Members, third party organizations, medical societies, and conferences, to direct their false and misleading efficacy and safety messages to Plaintiff MMO and the TPP Class Members, the Defendants over time succeeded in gaining formulary status for the TRT drugs.

168.    Defendants' strategic business plans emphasized getting formulary "wins" which were publicized to physicians in multiple forms such as announcement cards, thereby removing physicians' concern that their patients not shoulder the cost of these drugs.  Formulary wins thus provided opportunities for Defendants to engage in "pull-through" deceptive marketing to physicians.

169.



████████████████████████████████████████████

███████████████████████████████.[42]

170.    As more fully alleged in this TAC, Defendants' multi-pronged RICO enterprises were calculated to overcome Plaintiff MMO and the TPP Class Members' andropause coverage objections by misrepresentations delivered in person, through influential medical societies, publications, KOLs, as well as widespread electronic and media advertising, using the wires in interstate commerce.

**B.    Plaintiff MMO and The TPP Class Members' Pharmacy Benefit Programs and Tools to Manage Prescription Drug Costs**

171.    Pharmacy benefit programs are a common component of the health care benefit offered to insured individuals. Although Plaintiff MMO and the TPP Class Members remain financially at risk for the cost of pharmaceuticals, Plaintiff MMO and many TPP Class Members have contracted with PBMs to provide pharmacy program administration and to process pharmacy claims using a uniform electronic claim transaction process that is standardized throughout the United States.

172.    Plaintiff MMO and the TPP Class Members provide medical and pharmacy benefits to a wide range of organizations nationally, including employers, state and local governments and Medicaid programs through insurance contracts and through self-funded contracts with employers. Likewise, some employers choose to contract directly with a PBM for the management of their pharmacy benefit, rather than acquiring pharmacy benefits through a health plan.

173.    There are more than 55 PBMs currently operating in the United States and the range of services provided by these individual companies is substantially similar. All PBMs

_____

[42] *Id.*

provide point-of-service ("POS") claim processing services as described below. In addition, PBMs may contract with retail pharmacies, provide mail order pharmacy services, negotiate rebates with drug manufacturers, develop formularies, and conduct drug utilization review activities. The PBM services are performed for the benefit of Plaintiff MMO and the TPP Class Members.

### C.    Managed Care Program Tools to Control Drug Costs

174.    There exist a number of programs or tools available to Plaintiff MMO and the TPP Class Members (often working with their PBMs) to manage drug utilization within the insured population. The primary tools available for this purpose are formulary placement after review by the appropriate P&T committee, cost sharing, claim edits and prior authorization. Several of these are discussed below.

175.    The P&T committee is an entity established by Plaintiff MMO and the TPP Class Members (and/or for their benefit by their PBMs) for the purpose of evaluating products that are being considered for formulary placement and developing programs to promote appropriate utilization of pharmaceuticals. The use of P&T committees is a requirement for health plan accreditation and is widely used and accepted as the basis for decisions related to a TPP or PBM's formulary. P&T committees are an established component of health care delivery throughout the TPP sector, including at PBMs, health plans, and government agencies.

176.    The typical P&T committee meets periodically throughout the year, often bi-monthly or once per calendar quarter. When considering drugs in a therapeutic class or new products for consideration on the formulary, P&T committee members are provided with relevant clinical information about the product, often in the form of a formulary packet or monograph. The information included in this packet is often derived from published medical literature, manufacturer-supplied materials, comments from FDA proceedings (including

approval status), and the TPP or PBM's drug utilization experience. The P&T committee packet is intended to help committee members as they decide which products to include or exclude from formularies and when considering drug management options. Committee members also rely on their own clinical experience.

177. The P&T committee performs no independent clinical research or laboratory analysis. P&T committees make recommendations as to which drugs should be included or excluded from formulary. They also provide guidance and approval regarding the use of any tools, such as quantity limits or prior authorization, used in managing the insurance coverage of a specific drug or class of drugs. P&T committee members do not control prescribing nor do they prevent or mandate the prescribing of any drug for a specific condition.

178. The identity of the P&T committee membership is highly sought by pharmaceutical companies, including by the TRT Defendants. Because the purpose of drug marketing is to influence prescribing habits, drug makers like Defendants have perceived that direct marketing to P&T committee members benefit their drug products during the formulary evaluation process. Pharmaceutical companies, including Defendants, are anxious to know the schedule adopted by the P&T committee for review of their products. Using this information, they aggressively seek opportunities to promote their products directly to P&T committee members immediately prior to these review dates.

179. P&T committee members are often invited to participate in advisory board meetings and other informational sessions sponsored by manufacturers, including Defendants, during which information about products is disseminated. While these sessions can provide valid clinical information about a product, to the extent that information provided by

pharmaceutical companies is incorrect or misleading, such information can improperly influence the members of the P&T committee as they consider formulary initiatives.

180.    The formulary is a list of medications that have been selected for the purpose of encouraging high quality and cost-effective prescribing of pharmaceuticals within a patient population.  Formularies are segmented by the therapeutic uses of the drugs, with the TRT drugs are classified as androgens.[43]

181.    In addition to the formulary, Plaintiff MMO and the TPP Class Members often limit coverage of some classes of medication based on the conditions being treated.

182.    Plaintiff MMO and the TPP Class Members can utilize their formularies to promote compliance with national treatment guidelines, to discourage undocumented or non-medical uses of drug therapies, and to educate prescribers regarding the cost-effectiveness of drug treatment options; however, their ability to effectively do so is subject to practical limitations discussed below.

183.    The development of the formulary, and of formulary management initiatives, is conducted under the direction of the TPP's P&T committee or under the P&T committee of the PBM that is used by the TPP for this purpose.  The use of the P&T committee for this purpose is meant to assure that the formulary is clinically sound, is sufficiently robust to meet the medical needs of the population being served, and is not unduly burdensome to providers and patients when accessing care.

184.    The decision whether to place a given pharmaceutical product on a drug formulary is first and foremost a clinical decision.  The P&T committee will review the FDA approved clinical indications for the product or products in question and FDA comments

---

[43] Also called androgenic hormone or testoid, "androgens" is a broad term for any natural or synthetic compound, usually a steroid hormone, that stimulates or controls the development and maintenance of male characteristics in vertebrates by binding to androgen receptors.

associated with the approval of the products. The P&T committee relies on published studies and other materials that evaluate product efficacy, safety and, when available, directly compare the product to other agents in the appropriate therapeutic category or with comparable clinical uses.

185. Manufacturers like the Defendants often submit a formulary dossier and other materials about their drug products for use by the P&T committee during the drug review process. The P&T committee will also review any existing utilization of the product, or of comparable products, by health plan members. The P&T committee's evaluation is limited to a review of published medical information, such as clinical studies published in peer-reviewed articles and the formulary dossier provided by the manufacturer, and drug utilization data. The P&T committee does not engage in primary research and cannot detect instances in which information about a drug may have been suppressed by a manufacturer, is unpublished, or is inaccurately represented in the medical literature or other information provided by the manufacturer.

### D. TPP Cost-Sharing Tools to Control Cost of Pharmaceuticals

186. Plaintiff MMO and the TPP Class Members use cost-sharing as a tool when promoting cost-effective utilization of pharmaceuticals. Plaintiff MMO and the TPP Class Members typically achieve member cost-sharing through three different methods: (a) deductibles in which the patient pays his or her entire prescription cost until a specific dollar amount has been paid out of pocket; (b) coinsurance, or percentage co-payment, the percentage of the prescription cost which the patient pays for each prescription; or (c) co-payments, fixed dollar amounts which members pay for each prescription.

187. Plans can have a single co-payment or co-insurance regardless of the drug type or use a tiered design that allows for different payment amounts for different types of drugs (*e.g.*,

generics and brands). Plans may also combine the use of deductibles, co-payments and co-insurance within their benefit programs.

188. Of the various cost-sharing designs used by Plaintiff MMO and the TPP Class Members, tiered benefits have been widely accepted for many years, and accounted for over 80% of benefit programs offered in 2006. Formularies are often tied to tiered benefits to encourage utilization of lower cost products, particularly for brand and generic medications; however, tiered benefits are not typically used to discourage off-label utilization of medications. By 2002 over 50% of all employers utilized incentive formularies.

189. In the typical three-tiered incentive formulary, a low co-pay is charged for generic products and a modest co-pay is applied to preferred brand medications, while the highest co-payment levels are reserved for branded medications for which a generic equivalent is available and for non-preferred branded medications. Other benefit plans that are utilized within the insurance industry include four- and five-tier benefits, co-insurance (where the patient typically pays a flat percentage of the cost of the drug), and programs with annual and maximum deductibles. Some TPP plan benefits assign unique co-pays to very expensive biotechnology products for cost-sharing purposes.

190. Cost-sharing is often aligned with the TPP's formulary in an effort to promote the use of low-cost products and to maximize rebates and discounts on medications, particularly for those drugs which are clinically comparable. For example, proton pump inhibitors ("PPIs"), medications used for the treatment of heartburn, are widely considered to be clinically equivalent. Examples of PPIs include Prilosec, Nexium, Acifex, and Prevacid. While all of these products are very effective, the cost of the products can differ significantly. Prilosec is available in generic form and as an over-the-counter medication. Many P&T committees have

adopted programs to establish generic drugs as first-line agents, with minimal cost-sharing. Because the remaining products are clinically similar, the P&T committee may consider product cost and rebates offered by manufacturers when selecting a preferred brand product for the formulary. Preferred products are often subject to moderate cost-sharing, while non-preferred agents are subject to higher cost-sharing.

191.     TRT drugs have been widely accepted as preferred branded formulary agents and are subject to modest branded cost sharing requirements.

192.     Prior authorization is a drug management tool that is used when the drug coverage process requires information that cannot be readily obtained through the claim processing system.  Such criteria may include diagnosis, laboratory values or other clinical parameters.   For example, a health plan may wish to cover growth hormone for deficiency states or Turner's Syndrome, but would wish to exclude the product when it is being prescribed to enhance athletic performance.  When a prior authorization is applied, the claim is rejected at the pharmacy and the pharmacist is notified that the prescriber must contact the TPP or the TPP's PBM to obtain approval for coverage, much in the same manner that pre-certification is required for the use of certain health care services.

193.     At all times material hereto, Plaintiff MMO and the TPP Class Member (and/or their PBMs) did not have access to the patient's diagnosis as a component of the claim transaction through the POS system. Because it is impossible for Plaintiff MMO and the TPP Class Members to know the reasons (whether lifestyle-related or for diagnosed hypogonadism) for which TRT drugs were being prescribed when claims are being processed, a prior authorization would be necessary if Plaintiff MMO's and the Class Member TPP's coverage of TRT drugs were limited to FDA-approved diagnoses.

67

194.    Plaintiff MMO and the TPP Class Members (and/or their PBMs) are unable to identify off-label uses of drugs from the POS pharmacy claim transaction. The diagnosis for which a drug is prescribed is not required on a prescription and pharmacies do not have access to diagnostic information at the time a claim is adjudicated. As a result, a diagnosis code is not included as a component of typical claim transactions and is unknown to Plaintiff MMO and the TPP Class Members (and/or to their PBMs).

**E.    Plaintiff MMO Was Targeted By Defendants to Obtain TRT Drug Coverage**

      *a.*    **Plaintiff MMO's Pharmacy Benefit Programs to Assure Quality and Control Drug Costs**

195.    Plaintiff MMO's healthcare business involves managing the full spectrum of its employer-customers' health benefits, including the pharmacy benefit. MMO employs a team of medical and pharmacy professionals who oversee the quality and cost of the benefits provided to its covered patients.

196.    MMO employs clinical best practices criteria in evaluating a drug's coverage status: efficacy, safety and cost. In addition, because a drug's coverage status may change, its formulary status is periodically reviewed. MMO has modified its formulary to add or delete certain drugs, to designate certain drugs as "preferred" or "non-preferred," or to require that certain drugs be subject to conditions such as step therapy,[44] prior authorization, or other limits such as quantity limits or refill-too-soon.

197.    At all relevant times, including following the FDA approval of AndroGel, MMO has provided oversight of its pharmacy programs by various means including through its Pharmacy Quality Management ("PQM") Committee, which is MMO's equivalent of a P&T committee. MMO's PQM Committee regularly reviews and approves the MMO prescription

---

[44] Step therapy is the process whereby a preferred drug must be used first, and fail, before a more expensive drug will be covered under the formulary.

drug formulary, and provides ongoing oversight and direction to MMO's prescription drug program and drug management initiatives as it relates to clinical and quality issues. PQM Committee responsibilities include assisting in the development, evaluation and support of drug management initiatives, and monitoring clinical quality direction over all pharmacy benefit initiatives.

198.     The MMO PQM Committee, which meets at least nine times annually, is comprised of 15 members, including pharmacists, physicians, practicing participating providers, as well as representatives from MMO's Pharmacy, Clinical, and Medical Management departments.  The PQM Committee is chaired by MMO's Pharmacy Director.  In addition, the PQM Committee includes pharmacist and medical representatives from its PBM partner.

199.     MMO's pharmacy benefit administration is aided by consultation with MMO's PBM partner, formerly Medco Health Solutions ("Medco"), from 1999 until Medco was merged with another PBM, Express Scripts, Inc. ("ESI") in 2013.  Medco, and now ESI, consult with MMO to make decisions concerning formulary development, including the Androgen class of drugs, which includes the TRT drugs at issue in this case.  ESI representatives, comprised of pharmacists and physicians, have close working relationships with their counterparts at MMO.

200.     Together with its PBM partner, MMO provides simplified administration and streamlined prescription drug coverage to its customers and their members.  For example, MMO consolidates aspects of both the medical and prescription drug benefit.  Operationally, MMO customers send MMO their patient eligibility files, and in turn MMO sends each eligible patient one ID card with both medical and prescription drug coverage information.

201.     At all relevant times hereto, MMO has, along with its PBM partner Medco/ESI, made decisions, based on FDA approvals, manufacturer-supplied information and clinical

studies, to include or exclude new or existing prescription drugs from its formulary, or to implement tools to control utilization or to modify coverage criteria.

202.    Medco/ESI has at all times material hereto acted as a conduit to MMO and its PQM Committee. Medco/ESI regularly passes on information to MMO for MMO and its PQM Committee to consider in connection with MMO's coverage and formulary decision-making. This information includes the medical appropriateness underpinning ESI's formulary drug and coverage criteria recommendations.

203.    Although Medco/ESI has regularly consulted with MMO on formulary and coverage criteria, MMO at the same time has regularly conducted its own evaluation, and does not always follow Medco/ESI's recommendations.

204.    Medco/ESI has regularly conveyed information to MMO in multiple ways, including (1) face-to-face meetings (Medco/ESI and MMO have regularly scheduled "Formulary Consulting" meetings); (2) by email, (3) via mailed news and publications, such as ESI's "Sales & Marketing" weekly newsletter (summarizing recent FDA and prescription drug news); (4) distribution of studies and clinical information, including information provided by drug manufacturers; and (5) other regular communications.

205.    For example, following a review of the Androgen drug class, Medco made its recommendations to Plaintiff MMO in May 2008. Medco's written recommendation, based on Defendants' false and misleading information, included citations to many ghostwritten articles and Defendants-sponsored studies, including: (i) Dr. Shalender Bhasin, et al, "Clinical Practice Guideline Testosterone Therapy in Adult Men with Androgen Deficiency Syndromes: An Endocrine Society Clinical Practice Guideline" J Clin Endocrinol Metab. 2006; 91(6):1995-2010; (ii) Dr. Abraham Morgentaler, et al, "Risks of Testosterone-Replacement Therapy and

70

Recommendations for Monitoring" NEJM. 2004; 350:482-492; (iii) AACE Hypogonadism Task Force. American Association of Clinical Endocrinologists Medical Guidelines for Clinical Practice for the Evaluation and Treatment of Hypogonadism in Adult Male Patients – 2002 Update. Endocr Pract. 2002; 8(No. 6): 439-456; and (iv) Summary from the Second Annual Andropause Consensus Meeting. Testosterone Replacement Strategies: Signs, Symptoms, Potential Benefit and Potential Risks. 2001; 1-6. Plaintiff MMO had access to (and received) these and other Defendants'-sponsored studies and articles and relied on them when making its formulary status determinations with respect to Defendants' TRT drugs.

<blockquote>

*b.*     **Defendants Made or Caused to Be Made Direct Misrepresentations to MMO**

       i.     Defendants' Elaborate Managed Care Strategies Targeted MMO Including, But Was Not Limited to, Managed Care Representatives Directly Calling on MMO to Gain TRT Drug Coverage

</blockquote>

206. As alleged in detail below in the Formulary Access Enterprises for each Defendant, each of the Defendant's strategic plans included multi-pronged targeting of Plaintiff MMO and the TPP Class Members. As alleged herein, Defendants' common tactics included comprehensive business plans that carefully tracked Plaintiff MMO and the TPP Class Members' coverage decisions – *e.g.*, whether one or more TRT drugs was on formulary, what tier, and any restrictions.

207. As alleged herein below, each of Defendants' managed markets account managers coordinated and reported the success of their multiple contacts with Plaintiff MMO and the TPP Class Members via emails and telephone calls to their respective managed care supervisors, sales teams, and others, requiring extensive use of the wires and mails in interstate commerce.

208. ████████████████████████████████████████
████████████████████████████████████████████

██████████████████████████████████████████████████████

██████      ██████████████████████████████████████████.

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████,,[45]  To circumvent these concerns, Defendants planned and implemented false and misleading marketing campaigns to target Plaintiff MMO and the TPP Class Members to ensure formulary access for hypogonadism's numerous bogus "male-aging" and other chronic conditions, (notwithstanding lack of evidence of safety or efficacy) – *e.g.,* misrepresentations that the TRT drugs conferred added health benefits such as cardiovascular health, when the opposite was true.

<div align="center">

ii.     MMO Pharmacy Personnel Were Members and Attendees at Conferences as well as Recipients of AMCP Publications

</div>

209.    As alleged in more detail below, MMO's Pharmacy, Clinical and Medical Management personnel regularly have participated in professional programs and organizations, such as the Academy of Managed Care Pharmacy ("AMCP"), as part of their job responsibilities and professional development.  AMCP describes itself as "a national professional association of pharmacists and other health care practitioners who serve society by the application of sound medication management principles and strategies to improve health care for all. The Academy's 5,700-plus members develop and provide a diversified range of clinical, educational, and business management services and strategies on behalf of the more than 200 million Americans covered by a managed care pharmacy benefit."

210.    AMCP's stated goals include: (1) monitoring the safety and clinical effectiveness of new medications on the market; (2) alerting patients to potentially dangerous drug interactions

---

■ ██████████████████

when a patient is taking two or more medications prescribed by different providers; (3) designing and carrying out medication therapy management programs to ensure patients are taking medications that give them the best benefit to keep them healthy; and (4) creating incentives to control patients' out-of-pocket costs, including through lower copayments on generic drugs and certain preferred brands.

211.    AMCP serves its members in many ways, including through live national conferences, online learning programs, continuing education ("CE") events, research in peer-reviewed literature and advocacy. Each is designed with the goal of advancing professional knowledge, improving the design and delivery of pharmacy benefits, and ultimately, patient satisfaction and health outcomes.

212.    AMCP hosts two national meetings each year: the AMCP Managed Care & Specialty Pharmacy Annual Meeting and the AMCP Nexus conference. Both of these events draw thousands of managed care pharmacy leaders and feature renowned keynote speakers, an array of educational sessions, extensive networking opportunities and an exhibit hall of companies and organizations sharing their latest innovations and services.

213.    Plaintiff MMO, and many of its employees, including its Clinical Director and Medical Director, are members of AMCP and regularly attend AMCP meetings as well as regularly receive and read communications from AMCP. Many TPP Class Members are also actively involved AMCP members. PBMs, including Medco and ESI, are also members and regularly attend meetings.

214.    For example, Asuncion D. Borja-Barton, MMO's Vice President of Pharmacy Management presented at AMCP's Specialty Pharmacy Conference in Tampa, Florida, on April 1-2, 2014, which was held immediately before AMCP's 2014 Annual Meeting & Expo.

215. As alleged in detail below, drug manufacturers, including Defendants and their representatives, have at all times material hereto regularly attended AMCP events, exhibiting information about their TRT Drug products as well as giving or sponsoring presentations to managed care and PBM representatives. Defendants' AMCP attendees regularly included sales representatives, national account directors, and managed markets / managed care personnel whose explicit aim was to influence TRT drug formulary access.

216. As alleged in further detail below, at all times material hereto, Defendants' AMCP exhibits and presentations were calculated to be received and reviewed by the TPPs in attendance, including MMO Pharmacy and Medical employees, and thereby influencing their decisions to continue coverage of the TRT drugs on their formularies.

> iii. Plaintiff MMO Regularly Received Managed Care Periodicals which Included Defendants' False and Misleading Representations Concerning the Safety and Efficacy of TRT drugs

217. Plaintiff MMO's pharmacy and medical personnel are regular recipients of periodicals, sent through the mails and through electronic delivery through the wires, both in interstate commerce, which include information relevant to management of the pharmacy benefit for their members. These periodicals include the AMCP Daily Dose, Journal of Clinical Pathways, First Report Managed Care, the Journal of Clinical Outcomes Management ("JCOM"), Managed Healthcare Executive, The American Journal of Managed Care, The American Journal of Pharmacy Benefits ("AJPB"), American Health & Drug Benefits, and Pharmacy Times. MMO employees regularly reviewed what they reasonably believed were reputable publications as part of gathering relevant information in their TRT coverage decision-making.

218.    Defendants utilized these and other managed care periodicals to disseminate their false and misleading messages concerning TRT drugs to Plaintiff MMO and the TPP Class Members. Many of Defendants' marketing messages appeared in these publications.

219.    In just one example,[46] for years Pharmacy Times has offered numerous CE courses in dozens of specialties, including hypogonadism and TRT use. These courses, which Pharmacy Times describes as "superior accredited activities," are available online and are completely free to participants. The courses were accredited by the Accreditation Council for Pharmacy Education for continuing pharmacy education.

220.    Defendants have used Pharmacy Times to target Plaintiff MMO and the TPP Class Members with their misleading messages on unapproved and unsafe uses of TRT drugs. Defendants have sponsored at least three of the TRT CE courses provided by Pharmacy Times and disseminated to Plaintiff MMO and the TPP Class Members.

221.    For example, Auxilium sponsored a Pharmacy Times CE course titled, "Hypogonadism: The Role of the Pharmacist." The course was first presented on February 15, 2010. It highlighted many of the "symptoms" of hypogonadism designed to drive overutilization of TRT drugs, including erectile dysfunction, reduced libido, educed energy and stamina, depressed mood, increased irritability, and difficulty concentrating. In fact, the presentation included a slide devoted to the Androgen Deficiency in Aging Male ("ADAM") test, the notorious questionnaire designed by Defendants to over-identify men who exhibit signs of low testosterone. The presentation also failed to provide any discussion of cardiovascular risks associated with TRT use.

222.    A second CE course available through Pharmacy Times was sponsored by Solvay and titled, "Testosterone Replacement Therapy: Hypogonadism and The Role of the

[46] *See* other examples below.

Pharmacist." The course was first presented on February 16, 2010, one day after the Auxilium-sponsored course. In fact, the Solvay-sponsored course is substantially similar to the Auxilium-sponsored course, evidencing clear coordination by the two entities. The course noted the same "symptoms" for hypogonadism, including erectile dysfunction, reduced libido, educed energy and stamina, depressed mood, increased irritability, and difficulty concentrating. The presentation also discussed the connection between low testosterone and diabetes, HIV and obesity, among other conditions, and failed to provide any warning of the cardiovascular risks of TRT use.

223.    A third Pharmacy Times CE course was the Abbott-sponsored, "Hypogonadism and Testosterone Replacement Therapy: Practical Insights for the Pharmacist." This course was originally released as a webinar on September 15, 2011. The contents of this course are very similar to those in the first two CE courses. The presentation reviewed many of the same symptoms designed to lead to overutilization of TRT drugs, including loss of energy, fatigue, depressed mood, and sexual dysfunction, and noted the connection with diabetes, HIV and obesity. It also discussed the connection between low testosterone and cardiovascular disease, suggesting that TRT use would be cardio-protective. The presentation highlighted the industry-designed ADAM questionnaire. The presentation concluded with a review of several TRT drugs, including AbbVie's AndroGel, Auxilium's Testim and Testopel, Lilly's Axiron, and Endo's Fortesta, as well as a discussion of Defendants' cost-saving programs for AndroGel, Axiron and Testim.

224.    The Defendants' intent to publicize these Defendant-sponsored CE courses was disseminate to and to influence decisions of pharmacy professionals, including employees of Plaintiff MMO and the TPP Class Members.  Thus, the foreseeable goal of the Defendants' false

and misleading media messages was that Plaintiff MMO and the TPP Class Members would add and/or maintain coverage of the TRT drugs on their formularies.

## VIII. FORMATION OF THE FALSE AND MISLEADING TRT DRUGS MARKETING ENTERPRISES

225. Beginning approximately in 2000 and continuing to the present, each Defendant (as its TRT drug entered the market) implemented a marketing, advertising and promotion campaign by combining its own respective significant personnel and financial resources with an identifiable number of medical marketing firms and peer-influencing physicians through which Defendants (i) falsely and deceptively oversold the efficacy of the TRT drugs, (ii) failed to adequately warn of, and affirmatively misled the medical community regarding, the severe side effects of the TRT drugs, and (iii) deceptively promoted the TRT drugs for usage in populations for which it had not received FDA approval and for which the efficacy and side effects had not been established through adequate clinical evidence. These associations-in-fact created by each Defendant are denominated in this TAC as the AndroGel, Testim and Testopel, Axiron, Androderm, and Fortesta TPP Formulary Access Enterprises; the AndroGel, Testim and Testopel, Axiron, Androderm, and Fortesta Peer Selling Enterprises; the AndroGel, Testim and Testopel, Axiron, Androderm, and Fortesta Publication Enterprises; and the AndroGel, Testim and Testopel, Axiron, Androderm, and Fortesta Direct-to-Consumer Enterprises (collectively "the Enterprises"). Each Defendant and its associated participants established the respective Enterprises to accomplish the common goal of causing increased prescribing activity of the Defendant's TRT drug(s) for unsafe, unapproved uses. The schemes were accomplished through fraudulent, or false and deceptive claims of efficacy and safety and medical usefulness for dangerous and unapproved purposes.

226.    First, to execute their TPP Formulary Access Enterprises successfully, each Defendant had to provide Plaintiff MMO and the TPP Class Members' managed pharmaceutical personnel directly, through intermediaries, and/or through marketing materials that discussed or suggested that the TRT drug(s) were safe and/or effective for the promoted uses in order to secure (and, once on formulary, continued) access to TPP drug formularies.

227.    Second, to execute their Peer Selling Enterprises successfully and in order to "pull-through" TPP access, each Defendant had to create parallel marketing structures that appeared independent from the ordinary promotion forces.  In fact, they each did so both to avoid federal regulations concerning off-label promotion and to create the façade of independence behind the misleading messages of safety, efficacy and non-indicated usage they each wished to promote. Each Defendant specifically developed speaking events, seminars, CME events, or other physician gatherings. Defendants each worked with and paid vendor participants to create content for such speaking events that misrepresented the safety, efficacy, and usefulness of Defendants' TRT drug(s) for dangerous unapproved uses, and then paid physician participants to serve as faculty or lecturers at such events to deliver the disguised promotional messages to unsuspecting physician attendees.

228.    Third, to execute their Publication Enterprises successfully, each Defendant had to generate and publish favorable study results (negative study results were sequestered) and articles that appeared to emanate from independent physicians. ████████████████████ ███████████████████████████████████████████████████ ████████████████████████████████████████Adequately powered safety studies for such unapproved uses were deliberately avoided or even rejected. Defendants maintained exclusive control over the study protocols, the selection of investigators and/or

external authors, and the study results. Investigators were required to sign non-disclosure agreements, such that Defendants maintained exclusive control over which study results were made public. Assuming a particular study yielded positive results, each Defendant then retained one or more medical communications vendors to ghostwrite a publication with the assistance of Defendant's employees. Undue importance was given to injecting promotional messaging into such articles. Finally, the articles were published as unbiased scientific literature under the names of the external authors/investigators; such authors were paid to lend their names and reputations for a fee. Finally, each Defendant ordered reprints of such studies by the thousands, and each Defendant's sales force was instructed to deliver reprints to physicians on sales calls, while not disclosing the process by which these publications were generated. These studies were designed to give the appearance of independent peer-to-peer credibility for study results that were cherry-picked and for articles that were designed much the same as a sales aid.

229. Fourth, to execute their DTC Enterprises successfully, each Defendant had to disseminate marketing materials or advertisements that discussed or suggested to the public that the TRT drug(s) being promoted were safe and effective for the promoted uses, and that discussed medical conditions or disease states, generally known as "unbranded promotions", to redefine and expand the definition of hypogonadism beyond the FDA-approved indications.

230. The goals and implementation of the Enterprises were intentionally complementary and mutually reinforcing. The Defendants' respective Enterprises, individually and collectively, succeeded in distorting and polluting the medical discourse and medical literature surrounding the TRT drugs to such a degree that physicians and patients were rendered incapable of making objective and informed decisions concerning the appropriateness of

prescribing and using TRT drugs. Plaintiff MMO and the TPP Class Members were similarly prevented from making informed decisions on how and whether to reimburse for TRT drugs.

### A. Formation of the Illegal TPP Formulary Access Enterprises to Obtain Insurance Coverage

231. Defendants' respective TPP Formulary Access Enterprises centered on direct fraudulent, deceptive and misleading representations to Plaintiff MMO and the TPP Class Members concerning the safety and efficacy of the TRT drugs. Plaintiff MMO and the TPP Class Members, unaware of Defendants' schemes, relied on Defendants' fraudulent, deceptive and misleading representations to place TRT drug(s) on their formulary tiers and paid for these prescriptions. Despite the fact that in many cases no TRT drugs should have been prescribed, Defendants' promotion and marketing of their TRT drug(s) to Plaintiff MMO and the TPP Class Members based upon false promises of efficacy and safety for dangerous, unapproved uses has been highly successful, resulting in billions of dollars in profits, representing ill-gotten gains to which Defendants were not entitled.

232. The TPP Formulary Access Enterprises employed false and misleading sales and marketing practices, including: (a) deliberately misrepresenting to Plaintiff MMO and the TPP Class Members the safety and medical efficacy of the TRT drug(s) for indicated, on-label uses and for a variety of unsafe off-label uses; (b) knowingly misrepresenting to Plaintiff MMO and the TPP Class Members the existence and findings of scientific data, studies, reports and clinical trials concerning the safety and medical efficacy of the TRT drug(s) for both approved indications and for a variety of unsafe off-label uses; (c) deliberately concealing from Plaintiff MMO and the TPP Class Members the negative findings or the absence of positive findings relating to the unsafe off-label uses of the TRT drug(s); (d) knowingly providing Plaintiff MMO and the TPP Class Members with articles, studies and reports misrepresenting the scientific

credibility of data and falsely touting the medical efficacy and safety of the TRT drug(s) for both on-label and off-label uses; (e) intentionally misrepresenting and concealing from Plaintiff MMO and the TPP Class Members the Defendants' role and participation in the creation and sponsorship of a variety of events, articles and publications used to sell the TRT drug(s); and (f) intentionally misrepresenting and concealing from Plaintiff MMO and the TPP Class Members the financial ties between Defendants and other participants in the Enterprises.

233.    As alleged herein, the TRT Defendants, their co-promoters and the TPP marketing firms have made direct fraudulent and deceptive representations to Plaintiff MMO and the TPP Class Members in order to take advantage of TPP formulary placement.

234.    All of the participants in the Defendants' TPP Formulary Access Enterprises associated with the respective Defendants with the common purpose of aiding them in the false and fraudulent marketing that Defendant's TRT drug(s) directly to Plaintiff MMO and the TPP Class Members and to achieve unsafe, unapproved use to increase profits. Each of the participants received substantial revenue or other consideration from each Defendant for their efforts in the scheme to promote the TRT drug(s) for the dangerous unsubstantiated uses. The more successful the marketing to Plaintiff MMO and the TPP Class Members was, the more TPP marketing there would be in the future and the more fees each of the participants would receive for participating in the events. For these reasons, all of the participants knowingly and willingly agreed to assist each of the Defendants in their false and misleading promotion of the TRT drug(s) to Plaintiff MMO and the TPP Class Members, notwithstanding the fact that such a promotional campaign required the systematic repetition of false and misleading statements throughout the United States, and that the promotion of the TRT drugs for unsafe and unapproved indications by Defendants was illegal.

235.    Each Defendant exercised control over and participated in its respective TPP Formulary Access Enterprise.  Each Defendant compensated the other participants for their efforts, and controlled the money flow to the participating vendors and physicians. Defendants each closely monitored all TPP promotional events to ensure the expected misrepresentations and fraudulent marketing messages related were made to TPP personnel attending the events. Each Defendant closely tracked each TPP's formulary decision and utilization to ensure that the messaging was successful in causing increased prescribing activity for the respective TRT drug(s).

236.    Each Defendant developed a dedicated "managed care" (also called "managed markets") sales group, many of whom had advanced science degrees, whose job it was to call on TPP pharmacy personnel and P&T committee members. These specialized managed market representatives presented false and misleading studies/abstracts/dossiers/monographs to influence Plaintiff MMO and the TPP Class Members into adding the TRT drugs to (or retaining on) their formularies.

237.    Managed market representatives were specifically trained to initiate each Defendant's rehearsed messages designed to cause the TPP to add the TRT drugs (or retain) on their formularies.  Much of the material that they provided to the P&T committees went beyond the TRT drugs' approved labels.

238.    The Defendants' managed markets personnel were trained how to present their carefully hewn message in order to cause the TRT drugs to be added to and maintained on TPP formularies.

239.    The Defendants' managed markets personnel regularly made direct, in person false and misleading safety and efficacy representations to TPP pharmacy personnel and P&T

committee members (discussed below). ███████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

Defendant personnel in attendance at these meetings included corporate executives, account

managers, medical science liaisons, health economics staff, and other personnel. ███████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

240. ███████████████████████████████████████████

███████████████████████████████████ ██████[48]:

██
██████████████



241.    The Defendants' safety and efficacy representations made to Plaintiff MMO and the TPP Class Members throughout the United States were false and misleading when made.

        *a.*    ***Role of Third Party Payor Marketing Firms in the TPP Formulary Access Enterprises***

242.    TPP marketing firms were critical to each Defendant's scheme to falsely and fraudulently promote its TRT drug(s) to Plaintiff MMO and the TPP Class Members from the scheme's inception.

243.    Each Defendant's respective and collective TPP marketing strategies (including each Defendant's marketing strategy for Plaintiff MMO) turned on its head the proper practices for presenting objective TRT drug information. Instead of objective TRT drug information, each Defendant intended to (and did) provide Plaintiff MMO and the TPP Class Members with materially false and deceptive information concerning the safety and efficacy of the TRT drugs.

84

244.     Among the information each Defendant, its co-conspirators, and the participating TPP marketing vendors deliberately omitted from the information provided to Plaintiff MMO and the TPP Class Members was the following:  (a) the complete lack of adequate clinical trial evidence to support the unapproved and unsafe uses of the TRT drugs; (b) negative clinical trial results that demonstrated TRT drugs were not effective; (c) negative evidence that TRT drugs were associated with serious cardiovascular side effects and other major health risks; (d) information that virtually all publications and studies that allegedly supported the off-label use of TRT drugs had been funded by one or more Defendant(s); and (e) information that virtually all publications and studies that allegedly supported the unapproved and unsafe use of the TRT drugs had been initiated by one or more Defendant(s) pursuant to a corporate marketing plan designed to increase sales and profits while deceiving Plaintiff MMO and the TPP Class Members into providing formulary access.

245.     Each of the participating TPP marketing vendors was in regular communication with the respective Defendant(s). In connection with the presentations to Plaintiff MMO and the TPP Class Members, the participating TPP marketing vendors coordinated their events to ensure their false and misleading messages advocating TRT drug safety and efficacy in the most effective manner. The participating vendors were also in regular communication with many of the participating physicians, and individual participating physicians gave the same presentation (or a substantially equivalent presentation) at different TPP meetings, per each sponsoring Defendant's directions.

246.     The planning and coordination of all of these events by the Defendants, their co-conspirators and the TPP marketing firms required extensive use of the wires and mails, including the mailing of materials to Plaintiff MMO and the TPP Class Members, booking of

hotels and airplane tickets, the arrangement of meals, the scheduling of teleconference calls, the development and modification of the tactical plans, and the coordination of the content of the presentations on TRT drugs to be presented at the TPP meetings.

247.    Firms that participated in the AndroGel TPP Formulary Access Enterprise include co-promoters, third party advertisers, proliferation firms and outside consultants such as:



248.    Firms that participated in the Testim and Testopel TPP Formulary Access Enterprise include co-promoters, third party advertisers, proliferation firms and outside consultants such as:

249.    Firms that participated in the Axiron TPP Formulary Access Enterprise include co-promoters, third party advertisers, proliferation firms and outside consultants such as:

250.    Firms that participated in the Androderm TPP Formulary Access Enterprise include co-promoters, third party advertisers, proliferation firms and outside consultants such as:

███████████████████████████████████████████

██████████████

251.    Firms that participated in the Fortesta TPP Formulary Access Enterprise include co-promoters, third party advertisers, proliferation firms and outside consultants such as:

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████

252.    Plaintiff at this time does not know the identities of all the vendor participants involved in respective TPP Formulary Access Enterprises.

        *b.*     ***TRT Drugs Have Been Covered by Plaintiff MMO and the TPP Class Members' For Hypogonadism***

253.    Manufacturers like the Defendants submitted false and misleading materials about their TRT drug products to Plaintiff MMO, the TPP Class Members and their respective P&T committees. The P&T committee (or PQM committee), as in the case of Plaintiff MMO) evaluations were limited to a review of published medical information, such as clinical studies published in peer-reviewed articles and the formulary dossier provided by the manufacturer. These committees did not engage in primary research and therefore could not detect instances in which information about the TRT drugs had been suppressed by a manufacturer, was unpublished, or was inaccurately represented in the medical literature or other information provided by the manufacturer.

254.    Use of dossiers was particularly appealing to the Defendants as a TPP marketing tool because it allowed them to take advantage of an FDA exception to provide "unsolicited" information regarding off-label use of TRT drugs.  But, Defendants regularly and illegally opened the door to off-label communications with Plaintiff MMO and the TPP Class Members.

For example, ██████████████████████████████████████████

████████████████████████████████████████████████

████████████"[49] In just this way Defendants regularly and illegally solicited the opportunity to provide Plaintiff MMO and the TPP Class Members with TRT drug dossiers laden with false and misleading information which materially misrepresented the drugs' safety and efficacy.

255.    At all times material hereto, the Defendants knew that the Plaintiff MMO and the TPP Class Members did not have access to the patient's diagnosis as a component of the TRT drug claims payment transaction.  Because Defendants knew it was impossible for the Plaintiff MMO and the TPP Class Members to know the reasons (whether lifestyle-related or for diagnosed hypogonadism) for which TRT drugs were being prescribed when claims were being processed, Defendants knew that it would be difficult (if not impossible) for Plaintiff MMO and the TPP Class Members to limit coverage for TRT drugs except to place the drugs on a different formulary tier.

> c.    **Defendants Deceived Plaintiff MMO and the TPP Class Members into Placing TRT drugs "On Formulary" in Order to Undertake the Fraudulent Promotion**

256.    At all times material hereto, the Defendants' TPP Formulary Access Enterprises have undertaken systematic efforts to deceive Plaintiff MMO and the TPP Class Members into placing their respective TRT drugs on their formularies in order to treat the very rare condition of hypogonadism.  Defendants, their co-promoters and the TPP marketing firms knew that, relative to the thousands of other drugs on TPP formularies, TRT drugs would likely remain ██████████ ██████ and thus be put on formularies.

257.    Defendants, their co-promoters and the TPP marketing firms knew that, once their TRT drug(s) were on formulary, there would be little Plaintiff MMO and the TPP Class

---

█ ██████████████████████

Members could do to control their widespread use for disease states for which there was no substantial evidence proving the drugs' safety and/or efficacy. As noted by Acrux in relation to Defendant Lilly, "Tier 2 access to national formulary coverage is critical to the growth and maintenance of market share."[50]

258.    Defendants, their co-promoters and the TPP marketing firms made false and misleading safety claims concerning the TRT drugs directly to TPP pharmacy personnel during regular promotional visits, advisory boards, and related industry meetings. Not surprisingly, Defendants, their co-promoters and the TPP marketing firms have engaged in aggressive contracting to gain favorable formulary status on Plaintiff MMO's and the TPP Class Members' formularies. Defendants, their co-promoters and the TPP marketing firms very closely monitored formulary status, and aggressively contracted with Plaintiff MMO and the TPP Class Members to secure the most favorable formulary status possible. In this way Defendants, their co-promoters and the TPP marketing firms could ensure that they had access to their formularies.

259.    Plaintiff MMO and the TPP Class Members, their employees (including their pharmacists and medical professionals), their PBMs, and their P&T committees viewed the information provided by the Defendants, their co-promoters and the TPP marketing firms as legitimate science, when in fact they were created by Defendants, their co-promoters and the TPP marketing firms and served as yet another means to deliver marketing messages masquerading as unbiased science. These very articles and the studies on which they were premised were often cited in drug dossiers provided by Defendants, their co-promoters and the TPP marketing firms to P&T committees, including to Plaintiff MMO and the TPP Class Members, which related the false and misleading messaging on their TRT drugs' safety/efficacy

---

[50] http://www.asx.com.au/asxpdf/20131121/pdf/42l0znqvktl0cl.pdf.

profile(s), as well as presented pharmacoeconomic studies proclaiming that TRT drug utilization now could lead to reduced medical treatment expenditures in the future for payers.

260. Indeed, Defendants have presented TRT drug clinical data and pharmacoeconomic studies, which were relied on by Plaintiff MMO and the TPP Class Members in making formulary placement decisions. Defendants stressed in pharmacoeconomic studies and presentations that TRT drug utilization could lead to healthier lives for aging men, thus reducing overall expenditures. The recent disclosures of the TRT drugs' serious adverse cardiovascular effects confirm such pharmacoeconomics claims to have been false and misleading, and have caused Plaintiff MMO and the TPP Class Members to spend millions reimbursing for treatment of TRT drug-related adverse events.

261. Plaintiff MMO and the TPP Class Members have only recently learned that these presentations were false and misleading with regard to the safety/efficacy profile of the TRT drugs. In addition, such materials were misleading in that they relied on and extensively cited medical literature sponsored and ghostwritten by Defendants.

262. Defendants, their co-promoters and their co-conspirator marketing firms led the way in creating a multi-billion dollar TRT market mostly comprised of dangerous and unapproved sales for "Andropause" or as add-on therapies for existing conditions, which would not have occurred had they not misrepresented the safety and efficacy profiles of their TRT drug(s).

263. Furthermore, since the cardiovascular safety and efficacy revelations affect the entire class of TRT drugs, for the vast majority of these patients, Plaintiff MMO and the TPP Class Members would not have paid for any TRT drug prescription, as most male aging patients should not have been on any "aging" medication at all.

90

264.    The Formulary Access Enterprises were directed at, were intended to, and did, cause Plaintiff MMO and the TPP Class Members to place Defendants' TRT drugs in favorable formulary positions, causing them direct economic injury.

**B.    Formation of the Illegal Peer Selling Enterprises.**

265.    Defendants' respective Peer Selling Enterprises centered on each hosting numerous events where doctors trained and/or approved by Defendants would falsely oversell the efficacy and safety of TRT drugs, and the sponsoring Defendant's TRT drug(s) in particular, and would provide favorable information on the off-label use of such TRT drug(s), often under conditions where physicians would be compensated for attending the presentation. Defendants each have funded and continue to fund scores of such events between approximately 2000 to present.

266.    Because Defendants were prohibited from directly producing such events, they each created and controlled a Peer Selling Enterprise composed of medical marketing firms (the "vendor participants") and several dozen physicians (the "physician participants") who routinely promoted one or more of the TRT drugs to other physicians in venues all across the country. Defendants each maintained sufficient control over their respective Peer Selling Enterprises to select and approve the content of the programs and the physician participants that would deliver the false and fraudulent marketing messages. Physicians who were not receptive to promoting the TRT drug(s) for the unsafe off-label uses were not considered for inclusion in the respective Peer Selling Enterprises. The physicians (mostly primary care physicians) who attended these events were deceived into thinking that the events were educational in nature and independent from the control of the sponsoring Defendant(s).

267.    The Peer Selling Enterprises employed false and misleading sales and marketing practices, including: (a) deliberately misrepresenting the safety and medical efficacy of the TRT

drug(s) for a variety of unsafe off-label uses; (b) knowingly misrepresenting the existence and findings of scientific data, studies, reports and clinical trials concerning the safety and medical efficacy of the TRT drug(s) for both approved indications and for a variety of unsafe off-label uses; (c) deliberately concealing negative findings or the absence of positive findings relating to the unsafe off-label uses of the TRT drug(s); (d) wrongfully and illegally compensating physicians for causing the prescribing of the TRT drug(s); (e) knowingly publishing articles, studies and reports misrepresenting the scientific credibility of data and touting the medical efficacy and safety of the TRT drug(s) for both on-label and off-label uses, and then disseminating copies of such studies by the thousands; (f) intentionally misrepresenting and concealing Defendants' role and participation in the creation and sponsorship of a variety of events, articles and publications used to sell the TRT drug(s) to unapproved and unsafe markets; and (g) intentionally misrepresenting and concealing the financial ties between Defendants and other participants in the Enterprises.

268.    Each Defendant's scheme reaped significant financial gain. From 2000 to present, each Defendant's revenues from the sale of their TRT drug(s) soared into the millions and billions of dollars. Eventually, as a result of each Defendant's Peer Selling Enterprise efforts and unbeknownst to Plaintiff MMO and the TPP Class Members, the vast majority of all TRT drug prescriptions were for unsafe and unapproved uses. Sales of each drug have grown at a significant rate each year.

269.    All of the participants in the Defendants' Peer Selling Enterprises associated with the respective Defendants with the common purpose of aiding them in the false and fraudulent marketing of Defendant's TRT drug(s) and to achieve "market expansion" to increase profits. Each of the participants received substantial revenue or other consideration from each Defendant

for their efforts in the scheme to promote the TRT drug(s) for the dangerous off-label uses. The more successful these marketing events were, the more events there would be in the future and the more fees each of the participants would receive for participating in the events. For these reasons, all of the participants knowingly and willingly agreed to assist each of the Defendants in their false and misleading promotion of the TRT drug(s), notwithstanding the fact that such a promotional campaign required the systematic repetition of false and misleading statements to, and the commercial bribery (through kickbacks) of, a score or more physicians throughout the United States, and that the promotion of any of the TRT drugs for unsafe and unapproved indications by Defendants was illegal.

270.    Each Defendant exercised control over and participated in its respective Peer Selling Enterprise. Each Defendant compensated the other participants for their efforts, and controlled the money flow to the participating vendors and physicians. Defendants each closely monitored all events to ensure the expected misrepresentations and fraudulent marketing messages related were made to physicians attending the events. Following such events, each Defendant tracked attending physicians' prescribing habits to ensure that the messaging was successful in causing prescribing activity for their respective TRT drug(s).

### a.    Role of Medical Marketing Firms in Peer Selling Enterprises

271.    Third party medical marketing firms were critical to each Defendant's scheme to falsely and fraudulently promote its TRT drug(s) from the scheme's inception. Each Defendant's marketing plans called for unsafe off-label information concerning its TRT drug(s) to be widely disclosed in CME programs, "consultants' meetings" (also called "advisory boards"), and other programs where physicians could instruct other doctors how to use each Defendant's TRT drug(s) for unapproved and unsafe indications. Bona fide CME programs and similar educational events are exempt from FDA rules prohibiting off-label because the sponsoring organization

93

(which was often a nonprofit, like a medical school) is presumed to be independent and in control of the content of such programs. In practice, however, these programs were produced with the assistance of third party medical marketing firms, some of whom are listed below, and these firms, acting at the direction of the sponsoring Defendant(s), supplied content and controlled the selection of presenting physicians.

272.     Each Defendant's respective and collective marketing strategies turned the proper practices for presenting CME programs on their head. Instead of accredited institutions planning independent programs and then approaching third party vendors and financial sponsors, each Defendant intended to create turnkey medical programs, with financing already included, and then find "independent" institutions that would present the package in the format each Defendant and its Enterprise created.

273.     ████████████████████████████████████████

████████████████████████████████████████ ████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████

274.     Among the information each Defendant, the participating vendors, and the participating physicians deliberately omitted from the events they sponsored was the following: (a) the complete lack of adequate clinical trial evidence to support the unapproved and unsafe uses of TRT drugs; (b) negative clinical trial results that demonstrated TRT drugs were no more effective than other, less costly, medications; (c) negative evidence that TRT drugs were associated with serious cardiovascular side effects; (d) information that virtually all publications

94

and studies that allegedly supported the off-label use of TRT drugs had been funded by one or more Defendant(s); (e) information that virtually all publications and studies that allegedly supported the unapproved and unsafe use of TRT drugs had been initiated by one or more Defendant(s) pursuant to a corporate marketing plan designed to increase sales and profits; (f) information that the participating doctors who were conducting the peer selling had been paid substantial subsidies to use Defendants' TRT drugs on their patients for unsafe off-label purposes; (g) that the events the physicians were attending were neither fair nor balanced and were created to ensure the physicians would not hear a fair and balanced examination of TRT drugs; (h) information that the events were not funded, as advertised, by an "unrestricted" grant from each Defendant, but that the grants were conditioned upon the participating vendors and sponsoring institutions putting on presentations that painted the TRT drugs and the promoted off-label uses in the most favorable light; and (i) information with respect to dangerous side effects revealed through each Defendant's internal research, adverse event reports, and independent research.

275. Each of the participating vendors was in regular communication with the respective Defendant(s). In connection with major medical congresses or conventions of the specialists that were the audience for the false and misleading promotion campaign, the participating vendors coordinated their events to ensure their false and misleading messages advocating TRT off-label use reached the most physicians in the most effective manner. The participating vendors were also in regular communication with many of the participating physicians, and individual participating physicians gave the same presentation (or a substantially equivalent presentation) at different participating vendors' events, per each sponsoring Defendant's directions.

276. The planning and coordination of all of these events by the third party medical marketing firms required extensive use of the wires and mails, including the mailing of invitations to physicians, the payment of "honoraria" to physicians, the mailing of proposals to the accrediting institutions, booking of hotels and airplane tickets, the arrangement of meals, the scheduling of teleconference calls, the development and modification of the tactical plans, and the coordination of the content of the presentations on TRT drugs to be presented at the event.

277. Firms that participated in the AndroGel Peer Selling Enterprise include co-promoters, third party advertisers, proliferation firms and outside consultants such as: Dowden Health Media (110 Summit Ave., Montvale, NJ 07645); Edelman Worldwide (250 Hudson Street, 16th Floor, New York, NY 10013); EDU-Medical Management, Inc. (1621 18th St, Denver, CO 80202); Excerpta Medica (Apollo Building, Herikerbergweg 17, 1101 CN Amsterdam, Netherlands); Paddock Laboratories, Inc. (3940 Quebec Ave. N., Minneapolis, MN 55427); Par Pharmaceutical Companies (300 Tice Boulevard, Woodcliff Lake, NJ 07677); TAP Pharmaceutical Products, Inc. (675 North Field Drive, Lake Forest, IL 60045); Watson Pharmaceuticals, Inc. (Euro House, Euro Business Park, Little Island Business Park, Cork, Ireland); Digitas Health (100 E. Penn Square, Philadelphia, PA 19107); Abelson Taylor (33 W. Monroe St., Chicago, IL 60603); CogniMed, Inc. (70 S. Orange Ave., Livingston, NJ 07039); Dannemiller (5711 Northwest Parkway, San Antonio, TX 78249); Curatio CME Institute (100 Campbell Boulevard, Suite 103 Exton, PA 19141); Applied Clinical Education (545 West 45th St, Floor 8, New York, NY 10036); PeerView Press (174 W. 4th Street, Suite 182, New York, NY 10014); Education Awareness Solutions (One Selleck Street, Norwalk, CT, 06855); Practicing Clinicians Exchange (One Dock Street, Suite 510, Stamford, CT 06902); Curry

Rockefeller Group (660 White Plains Road, Tarrytown, NY 10591); and Covance Periapproval Services (555 E. North Lane # 6000, Conshohocken, PA 19428).

278.    Firms that participated in the Testim and Testopel Peer Selling Enterprise include co-promoters, third party advertisers, proliferation firms and outside consultants such as: e-tractions (Watermanstraat 40, Apeldoorn, Netherlands); GlaxoSmithKline, LLC (GSK House, 980 Great West Road, Brentford, Middlesex TW8 9GS, United Kingdom); Heartbeat Ideas (200 Hudson St., 9th Floor, New York, NY 10013); Lathian Health (246 Industrial Way West, Avenue at the Common, Eatontown, NJ 07724); Transit Creative Brand Design Group (45 Wilder Street, #4, San Francisco, CA 94131); MedVal Scientific Information Services, LLC (30 Vreeland Drive, Building 30 Suite 2, Skillman, NJ 08558); MedReviews, LLC (1333 Broadway, New York, NY 10018); CogniMed, Inc. (70 S. Orange Ave., Livingston, NJ 07039); Dannemiller (5711 Northwest Parkway, San Antonio, TX 78249); Area 23 A DraftFCB Company (622 Third Avenue, 3rd Floor, New York, NY 10017); TRG Communications, LLC (www.trgcommunications.us); and MCS Healthcare Public Relations (1420 U.S. Highway 206 North Suite 100 Bedminster, New Jersey 07921).

279.    Firms that participated in the Axiron Peer Selling Enterprise include co-promoters, third party advertisers, proliferation firms and outside consultants such as: Gargano Creative Group (New York, NY); Grey Group (200 Fifth Avenue, New York, NY 10010); Acrux Commercial Pty Ltd., and Acrux DDS Pty Ltd. (103-113 Stanley Street, West Melbourne VIC 3003, Australia); Abelson Taylor (33 W. Monroe St., Chicago, IL 60603); The Hobart Group (240 Main Street, Suite 400 Gladstone, NJ 07934); McCann Torre Lazur Group (20 Waterview Blvd., Parsippany, NJ 07054); GSW Advertising, LLC (1180 Avenue of the Americas, 10th Floor, New York, NY 10036); FCB Health (100 W. 33rd Street, New York, NY 10001); The

Agency Inside, A Harte Hanks Company (777 Township Loop, Suite 300, Yardley, PA 19067); AccelMed, LLC (900 E. 96th Street, Suite 125, Indianapolis, Indiana 46240); CME Outfitters, LLC (10319 Westlake Dr. # 106, Bethesda, MD 20817); CogniMed, Inc. (70 S. Orange Ave., Livingston, NJ 07039); Continuing Education Alliance, LLC (One Dock Street, Suite 510, Stamford, CT 06902); Educational Review Systems, Inc. (3015 Shannon Lakes Drive, Suite 303, Tallahassee, Florida 32309); Elsevier, Inc. – Elsevier Office of Continuing Medical Education (65 East Butler Avenue, Suite 102, New Britain, PA 18901); Paradigm Medical Communications, LLC (523 Route 303, Orangeburg, NY 10962); Foundation for Men's Health, Inc. (www.foundationformenshealth.org); Japri Planners Corporation (P.O. Box 1600 Suite 272 Cidra, Puerto Rico 00739); Med-IQ, LLC (5523 Research Park Drive, Suite 210, Baltimore, MD 21228); Miller Medical Communications, LLC (501 5th Ave., New York, NY 10017); North American Center for Continuing Medical Education, LLC (104 Windsor Center Drive, Suite 200, East Windsor, NJ 08520); Postgraduate Healthcare Education, LLC 777 Passaic Ave., Suite 380, Clifton, NJ 07012); Prova Education, Inc. (500 Office Center Drive, Suite 300, Fort Washington, PA 19034); PVI PeerView Institute for Medical Education, Inc. (174 W. 4th Street, Suite 182, New York, NY 10014); Suasion Group, LLC – Educational Awareness Solutions (One Selleck Street, Norwalk, CT 06855); Ultimate Medical Academy LLC – dba Global Education Group (2 East Congress Street, Suite 900 Tucson, AZ 85701); Ultimate Medical Academy LLC – Med Learning Group (26 W. 17th Street, New York, NY 10011); WebMD Health Corp. – Medscape LLC (825 Eighth Avenue, 11th Floor, New York, NY 10019); American Health Resources, Inc. (130 Liberty Street, Suite 13A, Brockton, MA 02301); Asante Communications, LLC (800 Third Avenue, 23rd Floor, New York, NY 10022); Integritas

Communications (95 River Street, Suite 5C, Hoboken, NJ 07030); and i3 Statprobe dba inVentive Health Clinical (504 Carnegie Center, Princeton, NJ 08540).

280. Firms that participated in the Androderm Peer Selling Enterprise include co-promoters, third party advertisers, proliferation firms and outside consultants such as: Grant Downing Education (600 Grant Street, Suite 510, Denver, CO 80203).

281. Firms that participated in the Fortesta Peer Selling Enterprise include co-promoters, third party advertisers, proliferation firms and outside consultants such as: Dannemiller (5711 Northwest Parkway, San Antonio, TX 78249); CogniMed (70 S. Orange Ave., Livingston, NJ 07039); Postgraduate Institute for Medicine (367 Inverness Pkwy, Englewood, CO 80112); Miller Medical Communications, LLC (501 5th Ave., New York, NY 10017); Complete Healthcare Communications, Inc., One Dickinson Drive, Chadds Ford, PA 19317; and Watermeadow Medical (Range Rd, Witney, Oxfordshire OX29, United Kingdom).

282. Plaintiff at this time does not know the identities of all the vendor participants involved in respective Peer Selling Enterprises.

### b. Role of Physicians in the Peer Selling Enterprises

283. One of the principal strategies pursued by all Defendants in their respective Peer Selling Enterprises was to convince key physicians to serve as "thought leaders." These doctors promoted the assigned TRT drug(s) to their peers through peer selling programs and spread the Defendants' false and fraudulent marketing messages to other physicians. These physicians introduced attending physicians to the off-label uses and presented them as safe and effective and widely used by specialists. These physicians also claimed that they were privy to the latest clinical data that had not been released yet, but which would support the unsafe, unapproved uses they were encouraging these physicians to try on their patients.

284.     To lure physicians to participate in the Peer Selling Enterprises, each Defendant approached key doctors and informed them of an interest in funding research opportunities and clinical trials at their institutions. Doctors who were willing to speak favorably about one or more TRT drugs could receive substantial funds in the form of research grants or other monies. In addition, these doctors were frequently remunerated for other less-defined services, including "consulting" and "advisory board" services. For example, ███████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████[1]

285.     ███████████████████████████████

███████████████████████████████████████████

███████████████ ███████████████████████

███████████████ ████████████████

███████████████████████████████████████████

286.     Each Defendant instructed its sales departments to select doctors at the major teaching hospitals to become TRT drug "experts" or opinion and thought leaders ("OTLs") who would in turn deliver the TRT message to other physicians to grow sales. This was done formally to other physicians at marketing events or informally to colleagues within a hospital or medical practice, or at a dinner or lunch roundtable.

---



287.     Having recruited these physicians, each Defendant's Peer Selling Enterprise created an explosion in the unsafe, unapproved use of TRT drugs by artificially creating the perception that physician specialists were clinically using TRT drugs and investigating, with positive results, their efficacy in off-label uses on their own initiative, and not as a result of the Defendants' illegal marketing activities and inducements. Each Defendant developed a stable of physicians to create this perception.  Each Defendant, principally through the vendor-participants to minimize reportable conflicts of interest, paid these physicians to induce them to write journal articles and letters to the editor that favorably discussed the off-label use of TRT drugs. Each Defendant also paid these physicians (in addition to providing free travel to resorts, free lodging and free meals) to induce them to give talks at medical education seminars, advisory boards, consultants' meetings, speakers bureaus and similar events where the primary focus of the discussion was the off-label use of TRT drugs. One example involved ███████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████.[53] Participation in the Enterprises through sham "authorships" and serving as presenting "faculty" at CME events and other honoraria also enhanced the physician-participants' professional reputations.

288.     The returns on investment ("ROI") in each Defendant's Peer Selling Enterprise were highly favorable. For example, ████████████████████████████████████

█ ████████████████



,,55

289.     Physician-participants were absolutely critical to the success of each Defendant's

Peer Selling Enterprise.

.
,,57

290.     Moreover, as noted above, each Defendant and the vendor-participants knew that

peer-to-peer selling was far more persuasive than traditional drug rep detailing.[58] Primary care

physicians are more likely to follow the advice of a Professor of Medicine at Johns Hopkins or

------

[57]

[58] When a sales representative "details" a physician, often during a call to the physician's office during work hours, the representative delivers to the physician the pharmaceutical company's key selling messages for one or more pharmaceutical products. In most cases, the sales pitch is accompanied by handing out free samples of the product and/or approved materials delivered to the physician, such as sales aids, slides, or branded merchandise such as pens and prescription pads.

another teaching hospital than that of a sales rep. As stated by AbbVie's AndroGel brand team, ███████████████████████████████████████████ By funneling the payments to the physician-participants through the vendor-participants, the Peer Selling Enterprises could hide the speakers' financial ties with each Defendant, and the Enterprises were able to mislead physician-listeners into believing that the speakers were not biased and that the events were not promotional. As a result, the vast amounts of money the physician-participants received from one or more of the Defendants, for speaking and other purposes, was largely hidden from the physicians who attended events at which the physician-participants spoke.

291.    Physicians who participated in the Peer Selling Enterprise(s), either as speakers or as authors, entered into mutually advantageous contractual relationships with the Defendant(s). The more favorable a physician's statements were, the more he or she could expect to receive in the form of speaker fees, consulting fees, advisory board fees, and research grants. Physicians who refused to deliver the messages that each Defendant wanted were blackballed and would not receive additional payments.

292.    The physician-participants knew that minimal scientific evidence supported the use of TRT drugs for the unsafe, unapproved uses and that the type of clinical evidence that existed was insufficient, under the accepted standards in the medical profession, to represent that TRT drugs worked for these indications. For example, ██████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

─────────────────────────

███████████████

███████████████████████████████████████████████

███████████████████████████████

293.    Physician-participants worked with, and were retained by, multiple vendor-participants.  All of the physician participants also had personal relationships with employees of each Defendant, and frequently each Defendant recommended specific individual participants for events.

294.    Some of the physicians that participated in the AndroGel Peer Selling Enterprise include(d): George Coseriu, M.D. (Urology, Cleveland Clinic, 9500 Euclid Ave, Cleveland, OH 44195), Glenn Cunningham, M.D. (Internal Medicine, Baylor Clinic, 6620 Main St., Suite 1375, Houston, TX 77030), Adrian S. Dobs, M.D. (the Johns Hopkins Hospital, 600 N. Wolfe St., 1830 Monument Street Room 328, Baltimore, MD 21287), Ken Goldberg, M.D. (Texas Urology, 541 W. Main St., Suite 150, Lewisville, TX 75057), Larry Lipshultz, M.D. (Baylor College of Medicine, 6624 Fannin St., Suite 1700, Houston, TX 77030), John Morley, M.D. (SLUCare Endocrinology, 1034 S. Brentwood Blvd., Saint Louis, MO 63117), Thomas Mulligan, M.D. (Senior Health Clinic, 303 E Matthews Ave, Suite 202, Jonesboro, AR 72401), Ramon Perez, M.D. (5305 Gulf Dr., Suite 4, New Port Richey, FL 34652), Harrison Pope, M.D. (Mclean Hospital- Psychiatry, 115 Mill St, Belmont, MA 02478), Richard F. Spark, M.D. (Beth Israel Hospital, 148 Chestnut Street, Needham, MA 02492), Ronald Swerdloff, M.D. (1124 West Carson Street RB-1, Torrance, CA 90502), Christina Wang, M.D. (General Clinical Research Center, 1124 West Carson St., RB-1, Torrance, CA 90502); Molly M. Shores, M.D. (1660 S. Columbian Way, MS 358280 (S-182B), Seattle, WA 98108); Abraham Morgentaler, M.D. (Men's Health Boston, One Brookline Place, Suite 624, Brookline, MA 02445); Shalender Bhasin, M.D. (70 Albany Street, Boston, MA 02118); Alvin Matsumoto, M.D. (1660 S.

██ ██████████████

Columbian Way, Seattle, WA 98108); and Peter J. Snyder, M.D. (University of Pennsylvania Medical Center, 3400 Civic Center Blvd., Philadelphia, PA 19104).

295.    Some of the physicians who participated in the Testim Peer Selling Enterprises include(d): George Coseriu, M.D. (Urology, Cleveland Clinic, 9500 Euclid Ave, Cleveland, OH 44195), Mohit Khera, M.D. (Urology, Baylor College of Medicine Medical Center, 7200 Cambridge St., Suite 10B, Houston, TX 77030), Larry Lipshultz, M.D. (Baylor College of Medicine, 6624 Fannin St., Suite 1700, Houston, TX 77030), Rajib K. Bhattacharya, M.D. (3901 Rainbow Blvd., Kansas City, KS 66103); Gary Blick, M.D. (153 E Ave. # 32, Norwalk, CT 06851); Abraham Morgentaler, M.D. (Men's Health Boston, One Brookline Place, Suite 624, Brookline, MA 02445); Martin Miner, M.D. (Brown University – Miriam Hospital, 164 Summit Avenue, Providence, RI 02906); Jacob Rajfer, M.D. (1000 W Carson St, Torrance, CA 90502); Irwin Goldstein, M.D. (6719 Alvarado Road, Suite 108 San Diego, CA 92120); Jed Kaminetsky, M.D. (215 Lexington Ave., 20th Floor, New York, NY 10016); Culley C. Carson III, M.D., FACS (101 Manning Dr., Chapel Hill, NC 27514); Allen Seftel, M.D. (3 Cooper Plaza, Camden, NJ 08103); Edward D. Kim, M.D. (1928 Aloca Hwy, Knoxville, TN 37920); and Ridwan Shabsigh, M.D. (161 Fort Washington Ave., New York, NY 10032).

296.    Some of the physicians who participated in the Axiron Peer Selling Enterprise include(d): Ronald Swerdloff, M.D. (1124 West Carson Street RB-1, Torrance, CA 90502); Mohit Khera, M.D. (Urology, Baylor College of Medicine Medical Center, 7200 Cambridge St., Suite 10B, Houston, TX 77030); Irwin Goldstein, M.D. (6719 Alvarado Road, Suite 108, San Diego, CA 92120); Christina Wang, M.D. (General Clinical Research Center, 1124 West Carson St., RB-1, Torrance, CA 90502); Isaiah Pittman, M.D. (3560 S. 4th Street Terre Haute, IN 47802); L Dean Knoll, M.D. (345 23rd Ave. N. Suite 212, Nashville, TN 37203);  Abraham

Morgentaler, M.D. (Men's Health Boston, One Brookline Place, Suite 624, Brookline, MA 02445); Wayne J.G. Hellstrom, M.D., FACS (1415 Tulane Ave., New Orleans, Louisiana 70112); Martin Miner, M.D. (Brown University – Miriam Hospital, 164 Summit Avenue, Providence, RI 02906); Matt. T. Rosenberg, M.D. (214 N. West Ave., Jackson, MI 49201); Cully C. Carson III, M.D., FACS (101 Manning Dr., Chapel Hill, NC 27514); George Coseriu, M.D. (Urology, Cleveland Clinic, 9500 Euclid Ave, Cleveland, OH 44195); Louis Kuritzky, M.D. (625 SW 4th Ave., Gainesville, Florida 32601); Jed Kaminetsky, M.D. (215 Lexington Ave., 20th Floor, New York, NY 10016); Richard Sadovsky, M.D. (450 Clarkson Ave., Brooklyn, NY 11203); Robert Oberstein, M.D. (100 Retreat Ave. #400, Hartford, CT 06106); Shehzad Basaria, M.D. (670 Albany Street, 2nd Floor, Boston, MA 02118); Pascal Dauphin, M.D. (3810 Bedford Ave., Nashville, TN 37215); Sandeep Mistry, M.D. (970 Hesters Crossing Rd. #101, Round Rock, TX 78681); Manish Damani, M.D. (1718 E. 4th Street #807, Charlotte, NC 28204); Edward D. Kim, M.D. (1928 Aloca Hwy, Knoxville, TN 37920); Edward Condon, M.D. (6080 Jericho Turnpike #314, Commack, NY 11725); Adrian S. Dobs, M.D. (The Johns Hopkins Hospital, 600 N. Wolfe St., 1830 Monument Street Room 328, Baltimore, MD 21287); James Wigand, M.D. (7001 Jahnke Road, Richmond, VA 23225); Douglas Grier, M.D. (21822 76th Avenue West, Edmonds, WA 98026); Allen Seftel, M.D. (3 Cooper Plaza, Camden, NJ 08103); and Ridwan Shabsigh, M.D. (161 Fort Washington Ave., New York, NY 10032).

297.    Some of the physicians who participated in the Androderm Peer Selling Enterprise include(d): Jed Kamintesky, M.D. (215 Lexington Avenue, New York, NY 10016); Abraham Morgentaler, M.D. (Men's Health Boston, One Brookline Place, Suite 624, Brookline, MA 02445); Herbert Lepor, M.D. (150 E. 32nd St. New York, NY 10016); Kenneth Kernen,

M.D. (130 Town Center Dr. Troy, MI 48084); Evan Goldfischer, M.D. (1 Columbia Street, Poughkeepsie, NY 12601); James Bailen, M.D. (100 E. Market St. Louisville, KY 40202).

298.    Some of the physicians who participated in the Fortesta Peer Selling Enterprise include(d): Richard Sadovsky, M.D. (450 Clarkson Ave., Brooklyn, NY 11203); Allen Seftel, M.D. (3 Cooper Plaza, Camden, NJ 08103); Adrian S. Dobs, M.D. (The Johns Hopkins Hospital, 600 N. Wolfe St., 1830 Monument Street Room 328, Baltimore, MD 21287); Andre Guay, M.D. (1 Essex Center Dr, Peabody, MA 01960); Michael Brennan, M.D. (301 E Wendover Ave, Greensboro, NC 27401); Ridwan Shabsigh, M.D. (161 Fort Washington Ave., New York, NY 10032); Wayne J.G. Hellstrom, M.D., FACS (1415 Tulane Ave., New Orleans, Louisiana 70112).

299.    Plaintiff does not at this time know the identity of all of the physician-participants, which likely number in the hundreds.

300.    The Defendants' respective Peer Selling Enterprises each sponsored hundreds of events across the country between 2000 and the present.  The Plaintiff MMO and the TPP Class Members have only had an opportunity to review the records of a small subgroup of these events. Based on the records reviewed to date, dozens of physician-participants received $25,000 or more for participating in the Peer Selling Enterprise activities of one or more TRT drugs for the time period indicated below (not counting travel, food, lodging and entertainment benefits they received for events held at resorts or out of town hotels).

301.    In order to implement their respective plans to transform their TRT drug(s) into blockbuster drugs despite a small on-label patient population, each Defendant created separate Peer Selling Enterprises composed of each Defendant, co-promoting firms including those listed above, numerous medical marketing vendors, research institutions and physician societies, and

dozens of physician-participants, some of whom are listed above and others whose identities will be revealed in discovery. These participants all acted together and under each Defendant's control in promoting the Defendants' respective TRT drug(s) for unsafe, unapproved uses to the healthcare industry, employing numerous tactics with an enormous degree of success.

302.     Each Defendant, co-promoters, and the medical marketing firms hosted numerous seminars and events over the course of several years that were falsely represented to be neutral, educational forums.  At these events, the roster of physician-participants provided misleading and deceptive information to fellow physicians on the off-label uses of TRT drugs(s) (*i.e.*, peer-to-peer marketing). The physician-participants were not independent, but received behind-the-scenes coaching and remuneration from each Defendant and/or its vendors, and often used slide decks and PowerPoint presentations prepared by the marketing teams of each Defendant. Targeted audience members, many of whom were primary care physicians, were not aware that the specialists (including prominent urologists and endocrinologists) speaking to them were in fact delivering, and being paid to deliver, the false and misleading marketing messages of each Defendant.

303.     In addition, the sales force of each Defendant (and of the co-promoting pharmaceutical companies) promoted the Defendant's TRT drug(s) to physicians through "details" or sales calls to physicians' offices. On these sales calls, sales representatives – often using a sales aid and/or sales script developed by each Defendant's marketing team in conjunction with medical marketing vendors – "detail" the physician on the unsafe and unapproved uses of the Defendant's TRT drug(s). For example, ███████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████.[61]

304.     In addition, the sales representatives were instructed to deliver to physicians reprints of medical journal articles advocating the dangerous, unapproved use of the Defendant's TRT drug(s), many of which were created pursuant to the Publication Enterprises, and to notify physicians of and ask for their attendance at upcoming CME events and lectures sponsored by Defendants pursuant to the Peer Selling Enterprise. All aspects of each Defendant's Peer Selling Enterprise were mutually reinforcing. For example, █████████████████████

███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████ ██████████████████████
███████████████████████████████████████
███████████████████████████

305.     Having already caused an increase in prescribing through the fraudulent and illegal marketing efforts, the sales force of each Defendant then engaged Plaintiff MMO and the TPP Class Members and delivered the same false and misleading sales pitches to encourage favorable formulary placements for their TRT drug(s). Once those formulary placements were



109

obtained, each Defendant attempted to "pull through" on the placements by encouraging use of its TRT drug(s) among that particular payer's members.

306.    All components of each Defendant's Peer Selling Enterprise were fully integrated and operated under each Defendant's exclusive control.

307.    The Peer Selling Enterprises were directed at, and were intended to, and did, cause Plaintiff MMO and the TPP Class Members to place Defendants' TRT drugs in favorable formulary positions, causing them direct economic injury.

### C.    Formation of the Illegal Publication Enterprises

308.    Defendants each planned and implemented sophisticated publication strategies to gain and maintain favorable formulary coverage, and expand the uses for which the TRT drugs were prescribed.  In order to execute their respective publication strategies, each Defendant also needed to generate favorable articles (1) about the efficacy the TRT drugs for normal male aging conditions, despite lack of any scientifically reliable data, (2) that greatly expanded the definition of hypogonadism to support the blockbuster sales each Defendant hoped to achieve, and (3) omitted side effects and safety concerns. Although each Defendant had control of this strategy, its role was concealed. Articles had to appear as if they emanated from "independent" physicians who were investigating each Defendant's TRT drug(s). To perform these tasks each Defendant established a Publication Enterprise, which created these "independent" articles. Each of the Defendant's Publication Enterprises was an association in fact of medical marketing companies, participating physicians and each Defendant ███████████████████████████ ███████████████████████ for the purpose of promoting the unsafe, unapproved uses of the Defendant's TRT drug(s).

309.    Each Defendant's publication strategy required publications from independent physicians when in fact no such publications existed. To effectuate the strategy, each Defendant

designed study protocols that had the highest chances of generating favorable results for the unsafe off-label use of their TRT drug(s). Sufficiently powered studies assessing the safety and tolerability of TRT drugs were avoided, as conceded by Dr. Peter J. Snyder, lead investigator of the Testosterone Trial, a series of seven (7) trials to assess the effects of TRT among elderly men. Even though one of the Testosterone Trial studies was supposed to have assessed cardiovascular risk, Dr. Snyder himself conceded it was "nowhere near large enough to determine any important risk. Not prostate cancer, not heart disease." Instead, Dr. Snyder ruefully explained that the most important function of the studies was the spin that would inevitably be placed upon the results by the TRT manufacturers. The Testosterone Trial is financially underwritten by the AbbVie Defendants.

310. For example, the Executive Chairman of Defendant Acrux, the Australian pharmaceutical company that developed Axiron and then granted Lilly a license to commercialize Axiron in the United States, noted in one November 2013 presentation that "[c]linical trials are being conducted by Lilly … These trials represent significant commitments by Lilly to expanding the therapeutic indications for Axiron."[63] The listed trials included: "A trial for enhanced sex drive and energy levels"; "An ejaculatory dysfunction trial"; "A trial for suboptimal responders to testosterone gels other than Axiron."[64] The accompanying slide deck also listed "[e]xploratory clinical studies" for Alzheimer's and Multiple Sclerosis patients, late stage cancer patients with cachexia, chronic opioid users, renal disease patients, Type II diabetics and obese patients.[65] Since the acknowledged purpose of the Lilly studies was to "expand the therapeutic indications" for Axiron and support a host of off-label uses, no safety studies assessing cardiovascular risk as a primary endpoint appear to be in Lilly's Axiron pipeline.

---

[63] http://www.asx.com.au/asxpdf/20131121/pdf/42l0znqvktl0cl.pdf
[64] *Id.*
[65] *Id.*

311. ███████████████████████████████████

████████████████████████████████████████████

██████████████████████

312.     Maintaining absolute control over the respective Publication Enterprises, each Defendant (usually through an internal "Publication Strategy Team" or ███████████ ████████████ similar group) hand-picked specialists to be the study "investigators," but these specialists have little input in the study design and which study results could be released to the public. Each Defendant, as part of the Publication Enterprise, then hired non-physician technical writers and vendor-participants and used internal employees to create the necessary articles and then paid the specialists to be the articles' purported "authors." This practice is referred to as "ghostwriting." In order to monitor the status of publications, and in order to coordinate and execute the ghostwriting plan, marketing firms were necessary. The role played by the firms in assisting each Defendant in creating publications was very similar to the role played by marketing firms in the coordination of peer-to-peer marketing events, and are vendor participants. For example, █████████████████████████████████ ████████████████████████████████████████████ ██████████████████████

313.     Feeding into the Peer Selling Enterprise, once the favorable articles were published, each Defendant distributed so-called "reprints" of these publications by the thousands and required its Peer Enterprise physician-participants to discuss these study results at peer influence events as part of the publication strategy, and intentionally misrepresented or fraudulently omitted each Defendant's role in the creation and sponsorship of the publications. Physicians who reviewed these publications were led to believe that the publications were the

result of independent, unbiased research of the authors of the articles. They were not made aware of the fact that each Defendant had in fact solicited these articles, that they had paid significant sums of money in various forms to the physician-authors to induce them to make favorable statements about Defendants' TRT drugs, and that they had controlled the published content of these articles.

314.    Even in cases in which physician-authors drafted the articles themselves, they did so under the same system of direction and control through which each Defendant controlled speaker content. Physicians were promised grants and other gifts if they wrote favorable articles. If a physician attempted to write a negative article, each Defendant would attempt to intervene and have a more favorable draft written. If this failed, each Defendant would do its best to suppress the article or restrict its dissemination. As part of the recruitment process of study "authors" and "investigators," such participating physicians were usually required to sign agreements restricting their ability to discuss the studies or their results. Defendants used these agreements to filter potentially negative study results from entering the medical discourse concerning their TRT drugs.

315.    Some physicians participated in the Publication Enterprises by publishing favorable journal articles and letters to the editor about unapproved use of the TRT drug(s). Each Defendant paid large sums of money, often in the form of research grants, to the physician-participants in order to publish such articles.

316.    In some cases, the participating physicians were not required to perform any research or even write the article.  Marketing firms, who were financed by a Defendant or internal employees of a Defendant, ghostwrote articles under the physician-participants' names. Physicians merely had to "lend" their names to the articles, in exchange for a payment, which

was usually made by the vendor-participant so as to minimize reportable conflicts that might otherwise be disclosed at the end of the resulting article. Authorship on such articles also enhanced the professional reputations of participating physicians.

317.  For example,



318.  The final method by which a Defendant controlled the stream of published information was through a policy of publishing only favorable results of its own internal trials and suppressing results that were unfavorable. The product of this selective publishing was a corpus of data that inaccurately represented safety profiles of the TRT drugs individually and as a class. For example, Xu, *et al.*, conducted a recent meta-analysis of randomized placebo controlled clinical trials for TRT drugs.[67] Aside from finding that testosterone increased the risk of cardiovascular-related events by approximately 50%, discussed *infra*, the authors also

---

[67]Xu, *See Testosterone Therapy and cardiovascular events among men: a systematic review and meta-analysis of placebo-controlled randomized trials*, 11 BMC 108  (April 2013).

discovered that "[t]he risk of testosterone therapy was particularly marked in trials not funded by the pharmaceutical industry."

319.    Pursuant to the express terms of each Defendant's corporate decisions implementing its Publication Enterprise, all information regarding negative studies funded by each Defendant remains in the sole possession of the Defendant and/or members of the Defendant's respective Publication Enterprise. Without access to records or the negative studies that were funded and the results of those studies, Plaintiff cannot identify specific negative findings. No Defendant has ever produced the results of these studies to the public or to Plaintiff MMO and the TPP Class Members.

320.    Participating physicians and researchers in all of the Publication Enterprises, who were paid by a Defendant to promote the unsafe and unapproved use of that Defendant's TRT drug(s) through seemingly credible medical literature, authored such articles.  Each Defendant and its participating medical vendors proceeded by offering funding and support to participating researchers for studies with protocols designed by each Defendant and with predetermined results favorable to off-label uses of the Defendant's TRT drug(s). Articles were then drafted, sometimes by the researchers with each Defendant exercising a heavy editing hand, and sometimes "ghostwritten" by a Defendant's employees or medical literature vendors, such as Watermeadow Medical, an entity that describes its "scientific publications" services as follows:

> Influential, informative and accurate scientific publication writing underpins all clinical, marketing and sales activities. It's a fundamental way of disseminating product information to key audiences and it's one of Watermeadow's key areas of activity. Our services include developing all types of manuscripts, such as primary manuscripts, secondary manuscripts, review articles, letters, editorials and proceedings supplements, as well as abstracts and posters. We can also provide optimization of publication timing and advice on strategic article submission.

321.    Articles such as the ones developed by Watermeadow on behalf of Defendant Endo, as well as other medical communications firms acting on behalf of the other Defendants, masqueraded these predetermined and/or cherry-picked study results as credible science, negative results were sequestered, and the resulting articles were published in prominent medical journals of national subscribership, such as the Journal of Urology or the American Journal of Medicine, when in fact they were replete with each Defendant's false and misleading marketing messages. The misleading marketing messages included fraudulently concealing and/or misrepresenting TRT drugs' propensity to cause adverse cardiovascular events. ██████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████ ████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████████.[69]

322.    Physicians who participated in the Publication Enterprises, either as speakers or as authors, entered into mutually advantageous relationships with the respective Defendant. The more favorable a physician's statements were, the more he or she could expect to receive in the form of research grants. Physicians who refused to deliver the favorable off-label messages about TRT drugs that each Defendant wanted were blackballed and would not receive additional payments.

323.    The participating physicians knew that minimal scientific evidence supported the use of any of the TRT drugs for the promoted uses and that the type of clinical evidence that

---

[68] ██████████████████████

[69] *Id.*

existed was insufficient, under the usual standards in the medical profession, to represent that TRT drugs worked or were safe for the unapproved indications.

324.    Physician-participants worked with, and were retained by, multiple vendor participants, and were usually paid for their authorship by the vendor-participants to minimize reportable conflicts.  The physician-participants also had personal relationships with employees of a Defendant, and frequently the Defendant recommended specific individual participants for events.

325.    The planning and coordination of the Publication Enterprises described below required extensive use of the wires and mails, including mailing invitations to physicians, booking hotels and plane tickets, arranging meals, scheduling and participating on conference calls, and coordinating the content of TRT drug publications.

326.    All components of each Publication Enterprise were fully integrated and operated under each Defendant's exclusive control.

327.    The Publication Enterprises were directed at, and were intended to, and did, cause Plaintiff MMO and the TPP Class Members to place Defendants' TRT drugs in favorable formulary positions, causing them direct economic injury.

### D.    Formation of the Illegal DTC Enterprises

328.    Although the FDCA prohibits off-label marketing of specific products, it does not similarly regulate marketing materials or advertisements that discuss medical conditions or disease states, generally known as "unbranded promotions." Thus, each Defendant and other TRT manufacturers' DTC advertising redefined and expanded the definition of hypogonadism through unchecked and misleading print, internet, and television advertisements.

329.    With the help of their associates, each Defendant engaged in DTC advertising campaigns that fraudulently, misleadingly, and deceptively concealed and minimized serious

117

health risks associated with the use of TRT drugs, and promoted the drugs as safe and effective for unapproved off-label uses lacking scientific support.

330.    Each Defendant's DTC advertising was designed to drive patients to ask their physicians for prescriptions for TRT drugs. Prescribing physicians were thus being told to prescribe TRT drugs by a Defendant, by their peers, by respected thought leaders, and by their patients who were exposed to each Defendant's DTC advertising.

331.    Ad campaigns on television, print, and the internet urging men age 45 and over to get screened for low testosterone and consider long-term TRT are everywhere.  The ads use macho imagery: cars, sports, powerboats, construction, and racing prominently. Untreated men look moderately overweight in many ads, while treated men appear fit and trim. Some of the information on testosterone replacement on the web was aimed at men with high cholesterol, diabetes, COPD, and asthma, suggesting that TRT could reverse low libido, a bummed mood, and low energy in men age 45 and over. The catch-phrase "is it low T?" is ubiquitous in the AbbVie Defendants' materials.

332.    Defendants, and their vendor-participants, also ensured that their false and fraudulent TRT DTC advertising reached consumers through the news media. Defendants worked to ensure that the best possible message concerning TRT drug use was presented in news media pieces and that these favorable pieces reached the largest audience possible. For example,

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████[70] At all

████████████                    _____

times material hereto, these media impressions required extensive use of the wires and mails in interstate commerce.

333. 

334. Defendants and their vendor- and physician-participants also devoted immense resources to influence the news media's portrayal of TRT therapy and of AndroGel. For example, ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████.[72]

335. Defendants also prepared press statements (again requiring extensive use of the wires and mails in interstate commerce), supporting the dangerous off-label use of TRT drugs and attributed them to OTL specialists on their speaking rosters; these were then provided to the media when necessary.

336. By flooding the media with pro-TRT therapy "key messages" advocating the unsafe and off-label use of TRT drugs and by directly influencing reporters, Defendants

---

[71] *Id.* ████████████

succeeded in both spreading their DTC advertising and in drowning out any media pieces that might have expressed skepticism or were generally negative on TRT therapy.

337. Third party medical marketing firms were critical to Defendants' respective DTC schemes to promote their TRT drugs for dangerous off-label uses from the schemes' respective inceptions. The marketing plans of each Defendant called for false and fraudulent information concerning TRT drugs to be widely disclosed directly to consumers through multiple media channels. These programs were produced with the assistance of third party medical marketing firms, some of which are listed above. Under the direction and control of the Defendant, these firms supplied content and controlled the production of the DTC programs.

338. Among the information each Defendant, the participating vendors and the physician-participants deliberately omitted from the DTC events they sponsored was the following: the complete lack of adequate clinical trial evidence to support TRT drugs' unsafe, unapproved uses Defendants were and are promoting; negative clinical trial results that demonstrated that TRT drugs were no more effective than other, less costly, medications; negative evidence that TRT drugs did not work and were unsafe for the promoted off-label conditions; information that virtually all publications and studies that allegedly supported TRT drugs' unapproved and unsafe uses had been funded and created by each Defendant, respectively; information that virtually all publications and studies that allegedly supported TRT drugs' off label use had been initiated by each Defendant pursuant to a corporate marketing plan designed to increase off-label sales; information that the participating doctors who were conducting the DTC programs had been paid substantial subsidies to use TRT drugs on their patients for unsafe, unapproved purposes; that the DTC events were neither fair nor balanced and were created to ensure the consumers would not hear a fair and balanced examination of TRT

drugs for unsafe, unapproved uses; information that the events were not funded, as advertised, by an "unrestricted" grant from each Defendant, respectively, but that the grants were conditioned upon the participating vendors and sponsoring institutions putting on presentations that painted the unsafe, unapproved use of TRT drugs in the most favorable light; and information with respect to dangerous side effects revealed through each Defendant's internal research, adverse event reports, and independent research.

339. Each of the participating vendors was in regular communication with the Defendant. In connection with DTC promotion, the participating vendors coordinated their events to ensure their false and misleading messages reached the most consumers in the most effective manner.

340. The planning and coordination of all of these events by each Defendant and third party medical marketing firms required extensive use of the wires and mails, including the mailing of information to consumers, airing of commercials on television and/or radio, booking of hotels and airplane tickets, the arrangement of meals, the scheduling of teleconference calls, the development and modification of the tactical plans, and the coordination of the content of the presentations on TRT to be presented at the event.

341. In June 2011, an ad (paid for by Abbott) appeared concerning an event held in New York City's Times Square. The event featured a young race car driver, a race car, and old vintage cars. The ad stated that the race car driver had his testosterone checked, that it was fine, and he was relieved. The clear message was that, if you maintain a high testosterone level, you can still drive fast cars and perform like you did 20 to 40 years ago.

342. One 2011 television ad showed a robust man slamming a laptop shut, walking across the screen, with the bold message: "Stop living life in the shadows." An ad in the *Boston*

*Globe* shows a healthy-looking man in his forties, reading: "Has he lost that loving feeling? He may have low testosterone (lowT)." Frequently men are shown with their female partners. The men look distracted and disinterested in sex.

343.    In an Axiron television ad dated December 10, 2013 that was created by vendor participant Grey Group and titled "Vacation," the patient and protagonist is a handsome partially greying man with scruffy facial hair. He narrates the following to the listener: "I always say, 'Be the man with the plan.' But with less energy, moodiness, and low sex drive, I had to do something. I saw my doctor. A blood test showed it was low testosterone not age. We talked about Axiron . . . ." Meanwhile, our silver fox is seen engaging in high speed motor boating, receiving a felicitous glance from his younger wife as he pushes the throttle to fully open. The ad then transitions to our protagonist applying Axiron for his symptom treatment, such as depression and low libido. Defendant Lilly's www.Axiron.com website, under the tab "About Low T," urges patients to talk to their doctors if they experience any one of an expansive set of vaguely defined symptoms ranging from "Depressed mood" to "Erectile dysfunction" to "Decrease in strength."

344.    In May 2011, the publication *Pharmaceutical Executive* gave Heartbeat and Auxilium Pharmaceuticals (Testim) top billing for "rich media ads that helped dispel common misunderstandings of low testosterone symptoms and increase awareness of the condition and its treatment, while keeping a sense of humor about the potentially sensitive medical issue." The unbranded ads were accompanied by the www.lowtfacts.com website and directed users to additional information on symptoms and treatment.

345.    Some low testosterone awareness ads on the internet had links to the American Diabetes Association ("ADA"), implying that ADA must have espoused the point of view that

diabetes is associated with low libido, low energy, and low testosterone; hence, screening for low testosterone in men with diabetes is sensible and safe. However, such links have since been removed, perhaps because the implication that the ADA has guidelines on testosterone screening for men with diabetes was misleading.

346.    In or about 2009, Solvay deployed a multi-channel fraudulent DTC print and television low testosterone campaign with the platform www.IsItLowT.com. The 30-second television spot showed a man who missed his old self – his shadow – having fun golfing and disco dancing. The call-to-action for the advertisement was to go online to learn more, accompanied by unbranded DTC ads that call out symptoms or offer a quick LowT quiz. In reviewing the DTC campaign, the company Medical Marketing & Media ("MM&M") stated that "[t]his campaign works because it leverages a bit of mystery and intrigue . . . If AndroGel can get rid of grumpy old men, we'll all be dancing under the disco ball." MM&M understood the AbbVie Defendants to be promoting AndroGel as an anti-aging and anti-depression medication.

347.    One of Defendant AbbVie's marketing initiatives was the "Drive for Five" campaign, which urges men to know their testosterone (T) levels, in addition to lipid, blood pressure, blood sugar and PSA numbers. On the website[73] was an animated "gear box" that shifts from high cholesterol (first gear) to high blood pressure (second gear) to high blood sugar (third gear) to high prostate-specific antigens ("PSA") (fourth gear) and, finally, to low testosterone (fifth gear). AbbVie's "Drive for Five" DTC ad campaign declares that there are five major risks to male health: high cholesterol, high blood pressure, high blood sugar, high PSA levels, and, finally, low testosterone levels. The clear message is that T level is as crucial, or life threatening, as possible hypertension or diabetes.

---

[73] http://www.driveforfive.com; "Men's Health | Learn about 5 risks to men's health"

348.     Each Defendant hoped that its DTC campaign would cause patients to wonder whether they could benefit from the TRT drug(s) in question, and to approach their physician concerning treatment. As noted in an AndroGel internal document, the sales force wanted to engage in "Screening Programs to take Advantage of Direct to Consumer Campaign." Once the patient expressed a willingness to be treated with his physician, each Defendant's Peer Selling and Publication efforts were expected to take over.

349.     Dr. Adriane Fugh-Berman has been outspoken in the criticism of Low T DTC advertising. In September 2013, in a Chicago Tribune editorial, Dr. Fugh-Berman and PharmedOut project manager Nicole Dubowitz explained how vague suggestions of a loss of manliness have turned into billion dollar sales for testosterone drug peddlers.  They explain that through questionnaires, such as the ADAM questionnaire, discussed in detail elsewhere, on sites like Auxilium's IsItLowT.com and the AbbVie Defendants' DriveForFive.com, and the over-expansive symptoms list on Lilly's Axiron website, it is hard for any man not to determine he must be suffering from low testosterone.  While the commercials often claim "it is a number," suggesting a definitive level of testosterone that indicates whether you have low T or you do not, it is simply not that straightforward.  As the editorial notes:

> The symptoms are so common and vague, it's a rare person who would avoid self-diagnosing Low T after taking the quiz at IsItLowT.com. The site is sponsored by AbbVie (formerly part of Abbott Laboratories), manufacturer of best-selling testosterone treatment AndroGel. If you're bored, stressed or aging normally, you probably have Low T symptoms: grumpiness, less energy, lower libido and 'falling asleep after dinner.' Even if you feel fine, you may still qualify for treatment. AbbVie's other website, DriveForFive.com, describes five risks to men's health: high cholesterol, high blood pressure, high blood sugar, high PSA levels and — can you guess — low testosterone.

350.    In 2010, the Endocrine Society warned that such self-reporting quizzes show little indication of providing useful evidence of a problem. Testosterone treatments were only approved by the FDA for confirmed testosterone deficiency seen in conjunction with an associated medical condition, such as failure of the testicles to produce testosterone due to genetic problems or chemotherapy.

351.    This has not stopped each Defendant from inundating men in the U.S. with DTC commercials showing fit men with graying hair lifting heavy objects, jogging down country roads, or making eyes at their (typically much younger) wives. The tactics have worked. Each Defendant's disease mongering increased testosterone prescriptions by a factor of five between 2002 and the present. Defendants themselves openly discuss the success of their DTC programs. As stated by one market research firm, "[t]he ramp-up of [TRT drug] promotional activity is clearly having its desired effect. According to Encuity's *TreatmentAnswers*™ audit, over the course of the last five years, the TRT market has seen dramatic growth in patient visits, up 55% from 1.2 million in 2009 to 1.9 million in 2013." The vast majority of these patients were likely exposed to Defendants' DTC advertising prior to visiting their physician.

352.    For example, Acrux reported the following concerning Defendant Lilly's Axiron DTC efforts:

Lilly's effective use of direct to consumer ('DTC') marketing has been instrumental in building and maintaining market share. During the period in which the Axiron sales force was being restructured, Axiron's market share was maintained by the DTC campaign run by Lilly. Given the effectiveness of DTC advertising in building Axiron's market share to

date, we anticipate Lilly will continue to this as a key plank in their overall market development platform.[74]

353.    Unfortunately, amid this drive to generate blockbuster medications to improve their bottom lines, each Defendant has failed to provide adequate warnings about the health risks associated with TRT drugs.

354.    All components of each Defendant's DTC Enterprise were fully integrated and operated under each Defendant's exclusive control.

355.    The DTC Enterprises were directed at, and were intended to, and did, cause Plaintiff MMO and the TPP Class Members to place Defendants' TRT drugs in favorable formulary positions, causing them direct economic injury.

## IX.    THE ABBVIE DEFENDANTS' FRAUDULENT MARKETING OF ANDROGEL

356.    Hypogonadism has been understood for many decades in the medical community to be a rare condition occurring in men across all age groups associated with a deficiency or absence of endogenous testosterone. The diagnosis of hypogonadism in adult males involves a comprehensive history and physical examination in addition to laboratory tests for levels of testosterone and gonadotropins, and possible further testing to determine the cause.

357.    The AbbVie Defendants knew well and understood the difference between classical hypogonadism (*i.e.*, primary and hypogonadotrophic hypogonadism), for which AndroGel was approved, versus the "Low T" Defendants were promoting to aging men, which the AbbVie Defendants understood was not approved and which the AbbVie Defendants knew or should have known was dangerous and likely to cause serious cardiovascular side effects and adverse events.

---

[74] http://www.asx.com.au/asxpdf/20131121/pdf/42l0znqvktl0cl.pdf

358.    The AbbVie Defendants planned to promote AndroGel for these dangerous off-label uses from the beginning. For example, ████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

359.    ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████,"[75]

360.    Ever thirsty for expanded sales, the AbbVie Defendants nevertheless decided to – in their own words – ████████████████████████████████████,"[76] The AbbVie Defendants then further adopted a laundry list of other false and misleading off-label messages, promoting AndroGel for "wasting" in HIV and AIDS patients, women, methadone and other opioid users, diabetics and those with "metabolic syndrome" (*i.e.*, obesity), cancer patients, patients with clinical depression, and patients suffering from osteoporosis. By 2006, AndroGel had grown to be Solvay's top-selling pharmaceutical product, with U.S. sales of over $300 million. AndroGel became Solvay's top-selling drug and the chief asset on sale when Abbott Laboratories bought the company in early 2010. According to publicly-released IMS data, even as recently as the twelve-month period from June 30, 2008 to June 30, 2009, the testosterone replacement drug class increased sales by twenty-five percent, to over $840 million, with

[75] ████████████

[76] *Id.*

AndroGel leading the way. AndroGel sales alone comfortably topped $1 billion in 2012 and 2013.

361.    The AbbVie Defendants publicly attributed these increased sales to evolutions in diagnosing and treating hypogonadism, and cited as support hypogonadism prevalence studies, such as Dr. Mulligan's HIM Study. At no point did the AbbVie Defendants acknowledge that the increased AndroGel prescribing was on account of their own false and misleading marketing campaigns that promoted the off-label use of AndroGel without adequately disclosing and/or concealing the serious cardiovascular safety risks associated with AndroGel use by these patients.

**A.    The AndroGel TPP Formulary Access Enterprise**

*a.    AbbVie Managed Markets Personnel Made False and Misleading Statements Concerning the Safety and Efficacy of AndroGel Directly to Plaintiff MMO and the TPP Class Members*

362.    As part of the AndroGel TPP Formulary Access Enterprise, the AbbVie Defendants developed a dedicated "managed care" (also called "Regional Account Executives" or "Managed Markets") sales group, many of whom had advanced science degrees, whose job it was to call on TPP pharmacy directors and P&T committees, including on MMO pharmacy personnel. These specialized Managed Markets representatives presented false and misleading studies/abstracts to Plaintiff MMO and the TPP Class Members to influence placement of AndroGel on their formularies. Indeed, ██████████████████████████████████████████ ████████████████████████████████████████████████████.[77]

363.    From the outset of AndroGel's launch in 2000, Solvay announced internally ██



████████████████████████████████████████████████████

████████████████████[78]

364.     In its confidential plans preparing for its AndroGel launch, Solvay management

spelled out that, among the ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████[9]

365.     █████████████████████████████████████████████

█     ███████████████████████████████████████████

█     ███████████████████████████████████████████

█     ███████████████████████████████████████████

█     ███████████████████████████████████████████

366.     █████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████

*Id.*

129



370.    The AbbVie Managed Market representatives were specifically trained to initiate

the Company's rehearsed false and misleading safety and efficacy message to Plaintiff MMO's



and the TPP Class Members' managed care personnel designed to cause them to add (and retain) AndroGel on the formulary without restrictions to access.

371.    The training and preparation for the misleading safety and efficacy TPP message were elaborate. AbbVie's Managed Markets personnel were trained how to present the Company's carefully hewn false and misleading safety and efficacy message to MMO and the TPP Class Members in order to cause AndroGel to be included on their formularies.    For example, ███████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

372.    The Solvay Managed Markets representatives did as they were trained and instructed, and succeeded in deceiving Plaintiff MMO into adding AndroGel on its formulary, starting at least by 2001.

373.    For example, ███████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████



374.



376. ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████



377.     These are the same false and misleading safety and efficacy messages that Solvay (now AbbVie) has given to numerous physicians, including to physicians participating in MMO networks.

378.



███████████████████████████████████████████████████

█████████████████████

379.  ██████████████████████████████████████████

███████████████████████████████████████████████████

███████████████



380.  ██████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████

███████████████



*b.* ***AbbVie Offers Numerous Other Managed Care "Initiatives" To Influence Plaintiff MMO and the TPP Class Members***

381. ████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████      ████████████████

████████████████████████████████████



382.

383. ████████████████████████████████████████

████████████████████████████████████████

████████████████████ ████████████████████

████████

▮ ████████████████████████████████████████
████████████

▮ ████████████████████████████████████████
████████████████████████████████

384.    Plaintiff MMO and the TPP Class Members thus were to receive the same false

and misleading promotion as the company was giving to physicians. ████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████

---

385.    ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

      *c.*      ***Defendant AbbVie Used False and Misleading Managed Care CME Programs to Promote AndroGel's Safety and Efficacy to Plaintiff MMO and the TPP Class Members***

386.    Yet another way that Defendant AbbVie made its false and misleading safety and efficacy claims regarding AndroGel directly to Plaintiff MMO and the TPP Class Members was in managed care CME events that it sponsored throughout the United States.

387.    For example, ████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

_____

████████████████████████

388. ████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████



sk

389. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████ ███████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████

390. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████

140

391.    The Solvay event provided free CME credit to TPP personnel between March 1, 2006 and March 1, 2007, and is still available online at http://elcaminourology.com/wp-content/uploads/2014/11/Princetoncme_article.pdf.[107] The CME vendors' mass distribution, using the mails and wires in furtherance of their schemes, was designed to be widely disseminated to managed care personnel and to provide false and misleading safety and efficacy information to the same pool of payer decision makers that Solvay had targeted for its managed markets presentations.

392.    AbbVie also sponsored at least two CME events specifically intended for pharmacy personnel, including managed care pharmacy personnel, through Pharmacy Times, one of the leading publications and resources for pharmacists in the United States. Pharmacy Times publishes a monthly periodical that is distributed to more than 160,000 pharmacists and related personnel, including Plaintiff MMO and the TPP Class Members and their employees. Plaintiff MMO and several employees regularly receive Pharmacy Times monthly periodical.

393.    For years, Pharmacy Times has offered numerous continuing professional education courses in dozens of specialties, including hypogonadism and TRT use. These courses, described as "superior accredited activities," are available online and are completely free to participants. The courses were accredited by the Accreditation Council for Pharmacy Education ("ACPE") for continuing pharmacy education.

394.    In this way, AbbVie used Pharmacy Times to target Plaintiff MMO and the TPP Class Members with their misleading messages on unapproved and unsafe uses of TRT drugs.

395.    For example, ███████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

_____

[107] Last visited April 5, 2016.

396. ████████████████████████████████████████████████

397.     It was thus reasonably foreseeable that these AbbVie-sponsored CME and CE courses would influence medical and pharmacy professionals working for Plaintiff MMO and the TPP Class Members to add and maintain TRT drugs on their formularies.

        *d.*     ***Misrepresentations to Managed Care Plans Related to the Safety and Efficacy of AndroGel for the Treatment of AIDS Wasting,***

398.     Solvay also actively focused on doctors and pharmacists who were members of managed care plans and pushed its false and misleading safety and efficacy messages for AndroGel in an effort to obtain placement of its drugs on the formularies of Plaintiff MMO and the TPP Class Members.

142

399.     Nationwide, Solvay representatives and managers devoted great effort to learning what physicians served on P&T committees. Representatives sometimes offered preceptorships (*i.e.* cash) to pharmacists and physicians willing to disclose such members. Once a board member's identity was discovered, the sales force showered the member with offers of gifts, dinners, and other forms of bribes in exchange for hearing Solvay's sales details. Such members often had no clinical practice, or specialized in a different area of medicine; they too received such attention.

400.     And AbbVie made the false and misleading promotion of the safety and efficacy of AndroGel for the treatment of AIDS wasting one of the centerpieces of its managed care CMEs.  For example, ███████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

_____

██████████████████

401.     These efforts to include AndroGel on formularies for the benefit of HIV patients involved the same false and misleading promotion of AndroGel's supposed special benefits for HIV patients and the same manipulated prevalence data that sales representatives were foisting on physicians. ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

    *e.*     ***AbbVie's Scheme Depended on Its Efforts to Garner Access on Plaintiff MMO and the TPP Class Members' Formularies***

402.     Defendant AbbVie's most recent Form 10-K also emphasizes the importance of managed care customers, and Defendant AbbVie's ability to successfully negotiate terms of inclusion of AbbVie's products on formularies through rebates.

403.     One internal AbbVie document stated ████████████████████████

████████████████████████████████████████[109]████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

404.     The AbbVie Defendants closely tracked the formulary status of the TRT drug(s) with various TPP plans. For example, the AbbVie Defendants noted that ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████[110]

---

██ ████████████████

405. 

406.    For example, a presentation document for the AbbVie Defendants' Dallas area sales representatives titled "Managed Care Programs and Tactics" included the following tactic: "Maximize formulary status of BCBS/Texas by including status message on all calls with physicians who have high BCBS population." More generally, the same presentation stated the objective to "maximize representative pull-through with [TPP's] with access to our products."[112]

407.    With respect to Plaintiff MMO,  [113]

408.

[114]

409.    To achieve the important favorable formulary placement in the first place, the AbbVie Defendants direct their systematic Peer Selling Enterprise at the pharmacy decision makers at Plaintiff MMO the TPP Class Members. For example,

---

[111] 

[112] *U.S. ex rel. King v. Solvay S.A.*, (S.D. Tex.) 4:06-cv-2262, Dkt No. 240-34.

[113]

██████████████████████████████████████████████████████

████████████████████████████████ The strategy was a success, causing

Plaintiff MMO to include AndroGel as a preferred TRT drug on its formulary.

410.    Even if a favorable formulary position were not achieved (for example, if a TPP

required PA for a TRT drug), Defendants' sales representatives were trained to be more than

eager to fill out the PA forms in order to clear the TPP hurdle for an AndroGel prescription. For

example, in one district sales plan, the district manager for AndroGel stated that there was a

"lack of P/A forms to insure pull-through"[116] for AndroGel prescriptions. Another challenge was

listed as TPP "kick back on several plans."[117]

411.    Recognizing the importance of formulary placements for their TRT drug(s), the

AbbVie Defendants have made MMO and TPP Class Member contracting a key priority. As

explained in an internal business planning document, ████████████████████████████

███████████████████████████████████████████████████████

█████████████

412.    As part of this aggressive campaign to win over Plaintiff MMO and the TPP Class

Members, AbbVie submitted drug dossiers for their respective TRT drug(s) discussing clinical

studies and safety/efficacy of the drug, and made presentations to P&T committees. Such

dossiers and presentations influence the decision-making of P&T committees. In these materials

and interactions with P&T committees and TPP pharmacy personnel, AbbVie made material

misrepresentations and omissions regarding the safety and efficacy profiles of their respective

TRT drug(s) with the hope that Plaintiff MMO and the TPP Class Members would place their

---

[116] *U.S. ex rel. King v. Solvay S.A.*, (S.D. Tex.) 4:06-cv-2262, Dkt No. 240-34.
[117] *Id.*

product as the preferred TRT product on their formularies or, as Defendant Auxilium referred to

it: 

413.

414.

415.

[121] Wang C, Swerdloff RS, Iranmanesh A, et al; and the Testosterone Gel Study Group, *Transdermal testosterone gel improves sexual function, mood, muscle strength, and body composition parameters in hypogonadal men*, 85 J. Clin. Endocrinol Metab. 2839-2853 (2000)



416.     The AbbVie Defendants made material misrepresentations and omissions regarding the safety and efficacy profiles of AndroGel and thus caused Plaintiff MMO and the TPP Class Members to place AndroGel on their formularies.

   **B.     The AndroGel Peer Selling Enterprise**

417.     Beginning shortly after AndroGel was launched in 2000, the AbbVie Defendants and their associates unleashed from all angles a barrage of branded Peer Selling promotions upon potential prescribing physicians. The AbbVie Defendants' sales representatives detailed physicians on off-label uses that AbbVie knew or should have known were dangerous and unsafe, used sales materials and scripts specifically created by AbbVie marketing teams along with medical marketing vendors and distributed reprints of articles created pursuant to the AndroGel Peer Selling and Publication Enterprises that either explicitly promoted the dangerous, unapproved use of AndroGel or grossly exaggerated the hypogonadism prevalence figures to include aging men whom the AbbVie Defendants pursued.

418.     Influential physician-specialists associated with the AndroGel Peer Selling Enterprise traveled around the country delivering what the AbbVie Defendants described ▮

█████████████████████████████████████████████

█████████████████████

419.    At one point AndroGel brand managers informed the sales force that, ████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████ Of course, the "education" the AbbVie Defendants and their

associates hoped to impart was based on facts largely fabricated in order to sell more AndroGel.

420.    By 2006, the AbbVie Defendants' internal marketing presentations were reporting

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████,,[123]

421.    A key part of the AndroGel Peer Selling Enterprise was buying the influence of

prominent doctors and medical researchers. These influential health care professionals would

then disseminate a screening tool, the ADAM questionnaire, which was not designed to detect

█ ████████████████

149

the on-label condition of hypogonadism, but was rather a biased series of largely subjective questions designed to lead inevitably to answers suggestive of Andropause, and then either a testosterone test and/or an AndroGel prescription.

422. ██████████████████████████████████████

████████████████████████████████████████ ██████████████

████████████████████████████████████████████

██████████████████████████,,[124]

423.     Dr. John Morley, the author of the ADAM questionnaire (which was later re-branded as the "Is It Low T? Quiz" and which is still available on multiple of the AbbVie Defendants' websites), recounted that he was asked in the early 2000s by a Dutch pharmaceutical company, Organon BioSciences, to come up with a screening questionnaire covering symptoms common to older men with lower testosterone. The ADAM questionnaire became a central feature of Defendants' and other TRT manufacturers' unbranded aspect of the AndroGel Peer Selling Enterprise to inflate hypogonadism prevalence numbers. According to Dr. Morley, his instructions were: "Don't make it too long and make it somewhat sexy." As Dr. Morley recalled, he drafted the questionnaire in 20 minutes in the bathroom, scribbling the questions on toilet paper, and then gave them to his secretary the next day to type up. When asked his opinion of the questionnaire years later, Dr. Morley responded: "I have no trouble calling it a crappy questionnaire."[125] And yet this "crappy questionnaire" is a central feature of the AndroGel Peer Selling and DTC Enterprises.  As emphasized to the AbbVie Defendants'

---

[124] ██████████████

[125]Singer, Natasha, *Selling That New Man Feeling*, N.Y. Times, Nov. 23, 2013, at http://www.nytimes.com/2013/11/24/business/selling-that-new-man-feeling.html (last visited Apr. 6, 2016).

sales force in one internal marketing strategy document: "ADAM must be left and sold with each AndroGel target."

424.    Understanding that the questions on the ADAM quiz are almost absurd in their generality, ██████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████ ████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████[127]████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████████████

425.    Not surprisingly, Dr. Morley and his institution, St. Louis University, have been beneficiaries of the AbbVie Defendants' largesse and have partnered in promoting AndroGel for years afterward for the treatment of Andropause through a national CME Grand Rounds series, and other programs. The Grand Rounds involved Solvay speaker events held in every region of the U.S., and dozens of speakers, including physician participants Drs. Ken Goldberg, Molly Shores, Glenn Cunningham and Larry Lipschultz. Physician participant Dr. Morley has since received Solvay funds to study testosterone and renal failure as well as membership on Solvay's and Unimed's speaker bureaus.

426.    The AbbVie Defendants instructed sales representatives to talk to doctors about symptoms and "low testosterone," or even better, "low T" (a term Dr. Morgentaler proudly



claims to have coined) rather than "hypogonadism."[128] Importantly, "low T" is not synonymous with "hypogonadism." ███████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████



427. ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████

428.    As an example, ████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████ "████████████████████

████████████████████████████████████████████████████████

██████████████████████████

---

[128] https://www.sciencebasedmedicine.org/low-t-the-triumph-of-marketing-over-science/.

████████████████████

429.     The success of AndroGel hinged on false and misleading off-label promotion, but because the AbbVie Defendants had to maintain plausible deniability for such promotion, it was difficult to rely entirely on its sales force to promote AndroGel off-label.

430.     Much of the burden of the false and misleading off-label promotion was reserved for physician-speakers paid by the AbbVie Defendants, who delivered presentations to other doctors that frequently advocated off-label AndroGel use for any of the unsafe, unapproved uses described above, and in particular for age-related hypogonadism or Andropause. Sales representatives and professional services associates ("PSAs") (sometimes called "medical liaisons" or "medical science liaisons" at other companies), in addition to AbbVie's vendor participants, played an integral role in disseminating false and misleading information through physician speakers. █████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

431.     Finally, there was one additional positive noted by the AndroGel marketing directors to the plan of promoting through physicians: ████████████████████████████████ Pharmaceutical companies are required to submit promotional materials to the FDA's Division of Drug Marketing, Advertising, and Communications ("DDMAC")[133] for review. DDMAC's mission statement is to "guard against false and misleading advertising and promotion through comprehensive surveillance, enforcement, and educational programs." In effectuating this mission, DDMAC requires pharmaceutical manufacturers to submit all promotional and advertising materials to DDMAC.

───────────────────────

[132] ████████████████████████
[133] DDMAC has since been renamed the Office of Prescription Drug Promotion ("OPDP").

432.    However, because the CME slides were to be "authored" by the physician lecturers, the AbbVie Defendants realized the extra benefit of not being required to submit the materials to DDMAC. And the AbbVie Defendants would have been correct, had the physician participants actually authored the slides. As stated later ████████████████████████████
██████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████
████████████████[134] (emphasis added).

433.    According to an internal AbbVie Defendant document, ████████████████████
██████████████████████████████████████████████████████████████████████
██████████████████████████████████ ████████████████████████████
██████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████
████████████████████████████████████████████ The MLs were employees of the AbbVie Defendants who were often trained in pharmacology or who held other advanced science degrees; these MLs developed slide kits for use by the participating speaker physicians to ensure that the favorable publications developed pursuant to the Publication Enterprise were known and used by the participating physicians. Physicians who refused to

---

██ ████████████

follow the AbbVie approved and/or provided slide decks were removed from the AbbVie Defendants' speaking rosters.

434.    The AbbVie Defendants referred to such interactions as ███████████



███████ [137]

     *a.*     ***CME Events Used to Disseminate the False and Misleading Safety and Efficacy Message***

435.    CMEs delivered by physicians were a frequently-used medium for unsafe and unapproved Peer Selling messages.    The AbbVie Defendants sponsored and improperly influenced numerous live CMEs relating to unapproved and unsafe topics consistent with the AbbVie Defendants' false and fraudulent promotional campaign, often given in conjunction with a paid-for lunch or dinner.

436.    In December 2001, ██████████████████████



437. ██████████████████████████████████

,,139

438.     The AbbVie Defendants' sales representatives not only helped host CMEs, but frequently provided doctors with CME credit during calls by playing pre-recorded CMEs, typically on an off-label topic, and typically influenced by the AbbVie Defendants and/or their associates with regard to content and speaker choice, while feeding lunch to the doctor and the doctor's staff.  AndroGel Peer Selling associates commonly handled the application for CME

credit on behalf of doctors at these Lunch n' Learns, even filling out required quizzes on the contents of the CME.

439.    In October 2005, ████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████[140]

The lectures touted the benefits of testosterone and downplayed the risks. Solvay AndroGel Speaker Bureau members delivered all three lectures, two of which focused on aging men, the third on diabetes. The lectures were later packaged as CME articles. In conjunction with publication of those articles, Solvay paid about $1 million to fund University of Wisconsin-sponsored doctor education in 2005, 2006 and 2007 such as dinner meetings around the country and newsletters designed to reach more than 50,000 physicians. The University of Wisconsin's CME program has been the subject of intense criticism. One article, which focused on UW's AndroGel CME articles, stated that the CME articles "read more like promotions than rigorous research, touting the benefits of testosterone and downplaying the risks."[141] The article further averred that "UW was an active participant in the testosterone surge" and "directly received about $115,000" from the AbbVie Defendants. Solvay hired for-profit medical education consultant Dowden Health Media not only to organize the events, but also to participate in preparing the content of the lectures.

440.    The AbbVie Defendants often required sales representatives to meet quotas regarding these in-office CMEs. Managers generally kept track of and held out as job accountability the number of IRAs or similar programs that sales representatives completed.

---

[140] ████████████████████████████

[141]    Fauber, et al., *Side Effects -- Are Doctors' Loyalties Divided? -- UW Tied To Male Hormone Marketing Testosterone Prescriptions Soar Despite Weak Research,* Milwaukee Journal Sentinel, August 8, 2009, http://www.jsonline.com/news/health/52802117.html (last checked on September 22, 2014).

       b. ***Promotional Speakers Used to Disseminate the False and Misleading Safety and Efficacy Message***

441. The AbbVie Defendants conveyed false and misleading messages through promotional speakers as well. ███████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████.'' These relationships included an implicit consideration element, discussed in more detail below. In exchange for being paid substantial sums of money to give lectures using slide decks supplied by the AbbVie Defendants promoting the unsafe and unapproved use of AndroGel, these high-prescribing physicians understood that they were to write large volumes of AndroGel prescriptions to their patients. In one instance, ████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████

442. The AbbVie Defendants' sales representatives often drove these speakers to their lectures, and/or attended to make sure that the speaker was delivering the appropriate key selling points regarding the unsafe and unapproved use of AndroGel. If the physician did not adequately promote AndroGel at these speaking events, he/she would be dropped from the AbbVie Defendants' speaker rosters.

443. In addition, the AbbVie Defendants' sales representatives supplied these high-prescribing physicians with large amounts of free samples as part of this arrangement. These samples were given out by the physicians to their non-hypogonadal patients in order to increase the unsafe and unapproved use of AndroGel.

---

[142] ████████████████

444. 

. These speakers were often local specialists, such as urologists, hired to speak to primary care physicians to tout the benefits of AndroGel to primary care physicians. For example,

[144]

445. The sales force and PSAs from Solvay's Professional Services Department typically developed promotional speakers. PSAs were what many pharmaceutical companies called medical liaisons. They often had degrees – masters of science, or registered pharmacists, or PhDs – and they had supposed impunity to provide false and misleading materials advocating unsafe and off-label use of AndroGel to physicians, including slide decks to be used as speaking events. Their job was to groom, and to provide all the off-label research and promotional messages for, physician speakers whom the AbbVie Defendants were developing.

446. In developing a speaker,

The more coachable of the speakers developed by PSAs were used more frequently and rose to national ranks.

447. The AbbVie Defendants referred to the most influential physicians as national "Opinion Thought Leaders" or "OTLs" (also called "KOLs"). OTLs could either be groomed physicians who started as regional speakers and who proved to be successful in touting

AndroGel's false and misleading promotional messages, or they could be already prominent physicians, often researchers with long publication lists, whose support lent credibility to the AbbVie Defendants' false and fraudulent claims about the off-label use of AndroGel. These OTLs spoke on a national circuit, and sometimes lectured to the sales force at national meetings.

448.    As an early example of this OTL development, ███████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████

449.    Particularly effective speakers often traveled throughout a territory with a representative on a circuit of different speaking engagements. Typically, handouts and a meal were included.

450.    ███████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████    Other regional AndroGel physician-speakers have included Dr. Glenn Cunningham, who spoke on AndroGel and diabetes.

     *c.*     ***AndroGel Sales Representatives' Delivery of False and Misleading Safety and Efficacy Message to Physicians***

451.    Sales representatives acted as the AbbVie Defendants' front line in delivering false and misleading messages to physicians about all the drugs at issue here. The AbbVie



Defendants' sales forces are divided into various specialty groups, including primary care. Primary care sales representatives are typically responsible for marketing several drugs at the same time. ███████████████████████████████████████████

████████████████████████████████████████████

452. The goal was to identify high prescribers within a product's drug class (or for potential unapproved uses) and high potential prescribers of the drug in addition to those already heavily prescribing the drug. Physicians sought by the AbbVie Defendants include primary care doctors, gerontologists, endocrinologists, urologists, psychiatrists, and others, especially those prescribing high numbers of hormones, Viagra, or Cialis. The same high-level managers and executives at Solvay Pharmaceuticals' Atlanta headquarters (and presently at the AbbVie Defendants' Illinois headquarters) who shaped the false and misleading selling schemes at issue assigned doctor call lists contained in electronic "DART" data (prescribing activity data purchased from an outside vendor) to districts and particular representatives on a semi-annual basis.

453. The AbbVie Defendants often reserved the most blatant false and misleading communications with its sales force for closed-door sessions with smaller groups at regional or national meetings.

454. The AbbVie Defendants' sales representatives, professional service associates, district managers, and regional managers, as well as the brand or marketing team, were involved in the false and misleading marketing campaign for AndroGel and in the execution of the Peer Selling, Publication, and DTC Enterprises, as the essential sales needed for AndroGel to become a commercial success were for unapproved and unsafe uses.

> d. **Marketing AndroGel for the Treatment of the Invented Disease "Andropause"**

455.     The AbbVie Defendants had planned to market AndroGel for unapproved and unsafe uses long before the FDA even approved AndroGel for hypogonadism.

456.     At least three (3) years before AndroGel gained FDA approval, Solvay's predecessor, Unimed Pharmaceuticals, Inc., received a letter from FDA's DDMAC pertaining to a March 31, 1997 news release for AndroGel. Aside from promoting AndroGel as safe and effective prior to FDA approval and while still under investigation, forbidden by 21 C.F.R. § 312.7, the news release also listed as a potential use "treatment of geriatric hypogonadism in elderly men and the treatment for postmenopausal women," indications that were not even under consideration by the FDA at the time.

457.     Ignoring the FDA's warning not to promote AndroGel for unapproved or unsafe uses, the AbbVie Defendants' AndroGel launch letter explicitly promoted the product for a host of unapproved, unsafe uses. As stated in the ███████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████ Even before approval and on the first launch day, however, Solvay had a plan in place to market AndroGel for unapproved and unsafe uses as a remedy for any number of non-indicated ailments.

458.     The AbbVie Defendants promoted an expanded definition of hypogonadism to create the figures necessary to support the supposedly vast silent epidemic delineated in the Peer Selling Enterprise. The AbbVie Defendants have marketed (and continue to market) AndroGel for "Andropause," a dubious medical condition for which the FDA has never approved the drug.

[147] ██████████████████

The AbbVie Defendants have promoted this unapproved and unsafe use despite admonitions from the FDA in early 2000 that Andropause, or "age-related hypogonadism" is *not* an approved indication. Specifically, ███████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████ █████████████████████

███████████████████████████████████████████████████

459.    The AbbVie Defendants well understood the prohibition, and its regulatory department often disguised promotion for "age-related" hypogonadism, by ████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████ █████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████ As described below, however, the AbbVie Defendants have focus on older men experiencing symptoms of aging and men with age-appropriate testosterone levels.

460.    While the AndroGel Peer Selling Enterprise had its Andropause messaging roots established even before the launch, AndroGel's sales exploded after the company focused more sharply on "educating" doctors about the Andropause condition its marketing vendors had created.

461.    In 2000, the AbbVie Defendants laid the foundation for sales by scheming with influential specialists to support an expanded need for testosterone supplementation. ██████████

███ ██████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████

462.     The AbbVie Defendants held numerous physician events, which focused on Andropause messaging. For instance, ████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████

463.     The AbbVie Defendants and their associates made the linguistic move to "low T" at this time as well in order to support the Peer Selling Enterprise. "Peer influence" efforts were redoubled in 2002 to assist in the primary care sector.  Sales from 2001 had been $115.8 million. By November of 2002, annual sales had already reached $164 million, and by the end of 2002 sales reached $188 million.

464.     The "education" that the AbbVie Defendants and the Peer Selling Enterprise associates provided to physicians and consumers concerned the supposed existence of the invented disease state Andropause and the widespread need for hormone replacement therapy in men.  The AbbVie Defendants noted the overall decline in testosterone among men as they reach old age, and claimed that such a decline was not a "normal" part of aging but a disorder affecting strength, well-being, cognitive function, mood, sexual function, and other attributes, sometimes disproportionately or acutely, not unlike menopause in women. In early 2002, ████████████████

██████████████

---

███████████████████████████████████████

███████████████████████████████████

465.    Importantly, in identifying those supposedly suffering from Andropause, the AbbVie Defendants applied the same normal range for testosterone to octogenarians that they did to twenty-year-olds (despite the fact that testosterone levels decline naturally in men as they age).  The AbbVie Defendants further used (and still use) the over-inclusive ADAM screening questionnaire described above to persuade "andropausal" men that they need AndroGel. As the long title of the questionnaire indicates, it was never designed to identify male hypogonadism. It was designed to identify "androgen deficiency in aging men" – in other words, Andropause or "age-associated" hypogonadism.

466.    The term "Andropause" itself was not only absent from AndroGel's label, but its existence as a recognized medical condition is questionable. It has never been listed in any drug compendium.  The FDA has never approved a drug for treating Andropause. The notion that sex hormones maintain or improve a person's health into old age has turned out to be a flawed one as applied to women, most famously with regard to the World Health Organization's estrogen replacement study, which was aborted early because of the prevalence of dangerous adverse effects. As alleged earlier with regard to the recent safety revelations concerning TRT drug therapy, the use of TRT in men appears headed for the same fate.  The facile way in which the AbbVie Defendants have urged (and continue to urge) the same theory for aging men may endanger men's health in similar ways. In particular, steroid and testosterone use are associated with prostate or testicular cancer, increased cardiovascular adverse events, and may cause the body to reduce its own manufacture of testosterone, perhaps permanently.

467.     Coaxing physicians into screening patients through the ADAM questionnaire or otherwise was crucial to the AbbVie Defendants' Peer Selling Enterprise, because false positive results were frequent, and led either directly to an AndroGel prescription, or to a testosterone test. As reported in the 2013 JAMA article *supra*, one quarter of men did not even have their testosterone levels tested before they received a testosterone prescription, such as for AndroGel. The ADAM questionnaire created as part of the Peer Selling Enterprise influenced this high number of AndroGel prescriptions written with no testing of patients' testosterone levels. Indeed, testing strategies were central to the marketing of AndroGel, as the AbbVie Defendants exploited the notorious unreliability of such tests in hopes of false positives. With older men, the AbbVie Defendants suggested, a free testosterone test was superior to a total testosterone test, the standard test, and particularly, if a total testosterone test came back in the low-normal range or the borderline hypogonadal range, a free testosterone test should be performed as well.

468.     Relying on these strategies of heavy "screening and testing" allowed the AbbVie Defendants to identify far more patients beyond those suffering from AndroGel's on-label indication. It segued easily into the promotion of AndroGel to aging men with normal testosterone levels and men with "age-associated hypogonadism," despite the FDA's warnings.

469.



███████████████████████████████████████████████

████████████████████

470.    Perhaps, the materials posited, a man in his fifties was accustomed to a testosterone level of 1000 mg/dL, but experienced a sudden drop in testosterone that nevertheless remained in the normal range. ████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████

███████████████████████████████████████████████
███████████████████████████████████████████████

471.    These and similar statements made by specialist thought leader physicians and researchers, as well as by as the Endocrine Society (for which it was paid handsomely), advocated more expansive testosterone use and were relied upon by Plaintiff MMO and the TPP Class Members in deciding whether and how to include (and maintain) AndroGel on their formularies.

_____



472.    The AbbVie Defendants' speakers increasingly promoted AndroGel for Andropause during this period. At a National Business Meeting in Las Vegas in January 2002, Dr. Larry Lipshultz of Houston, Texas, lectured the sales force on Andropause. Handwritten notes from that lecture reveal that he suggested a "focus on aging" in marketing, noting the aging population of baby boomers, and advocated treating patients with borderline or normal testosterone with AndroGel based on symptoms, "not lab values." In February, the Pittsburgh District sponsored two speakers at a West Virginia DO conference in Charleston, West Virginia. At that conference, a presentation titled "Andropause and the Role of AndroGel" was given to around 120 physicians by a Solvay-paid doctor. Also in 2002, ██████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████

473.    Speakers like Dr. Ramon Perez first catapulted to nationwide OTL speaker status in 2003 by pressing the envelope regarding "normal" testosterone levels. Sales representative Stephanie Boeke's summary of a Dr. Perez presentation to thirteen professionals on May 26, 2004 in San Antonio, Texas, states he pushed the idea that any testosterone level under 500 ng/dL should be treated, even though testosterone levels above 298 ng/dL were deemed normal in studies appearing on AndroGel's label and in the medical community at large. Dr. Perez thereafter made many presentations on behalf of Defendants, and delivered the AbbVie Defendants' marketing messages to hundreds of physicians.

474.    In essence, Dr. Perez and numerous other OTLs like him were paid by the AbbVie Defendants to advocate for the systematic experimentation on non-hypogonadal patients with the unapproved and unsafe use of AndroGel.

---

156 ████████████████████████

C.       **The AndroGel Publication Enterprise**

475.   In order to carry out their AndroGel Publication Enterprise, the AbbVie Defendants and their associates exercised close control to ensure that their false and misleading marketing messages were prominently included in seemingly unbiased clinical studies which were in fact the opposite. As stated in one 2006 AbbVie document, ████████████████████

████████████████████████████████████████

████████  ███████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

476.   One particular example is an article published in the American Journal of Medicine promoting AndroGel for HIV/AIDS patients, discussed *infra*.  Tying the Publication Enterprise back to the Peer Selling Enterprise, Defendants ordered reprints of these articles by the thousands, and, along with its Peer Selling Enterprise participants as well as its own sales force, distributed them to physicians, P&T committees purportedly as credible and independent results of unbiased scientific studies.

477.   For example, ███████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████ ,"[159] Another reprint Defendants' frequently distributed was the "Wang Study," which could have referred to any number of favorable studies published by Dr. Christina Wang. Of the three (3) publications referenced on the AbbVie Defendants' efficacy webpage for AndroGel, Dr. Wang is listed as the

---

██ ██████████████
██
██ ██████████

primary author on two (2) of the publications and the second-listed author on the third one. (*See* www.androgelpro.com/1-percent/efficacy.aspx). The two (2) "Wang Studies" (on which Dr. Wang is listed as the primary author) list the figurative "kitchen sink" of the AbbVie Defendants' favored false and misleading promotions in their titles. Defendants also trained physician participant speakers on how to present such study results at speaking events, including supplying the physician participant speakers with slide decks containing desired marketing messages to be used in their presentations. In receiving an award from the American Society for Andrology ("ASA"), the ASA stated that Dr. Wang was "a role model and mentor for a generation of students, residents and fellows." Notably, Dr. Wang is a physician participant in the Peer Selling Enterprise, and has on numerous occasions disclosed consulting and advising relationships with the AbbVie Defendants, along with a number of other pharmaceutical companies.

478.    In 2005, the AbbVie Defendants began relying on a yet-to-be-published study "authored" by Thomas Mulligan, a frequent beneficiary of Solvay funds and Peer Selling and Publication Enterprise associate. Mulligan's study, "Prevalence of Hypogonadism in Males at Least 45 Years: the HIM Study" ("HIM study"), which was eventually published in 2006, concluded that a whopping 38.7 percent, roughly 13.8 million, of American men over forty-five years of age seeing primary care doctors for any reason are hypogonadal, dwarfing the MMAS's estimated population.[160]

479.    The HIM study was funded by Solvay and co-authored by Dr. Cecilia McWhirter, a Solvay employee, and by several employees of Publication Enterprise vendor participant Covance Peripproval. Under the "Commercialization" section of their website, Covance exhorts

---

[160] *See* HIM Study, *available at* http://www.ncbi.nlm.nih.gov /pmc/articles/PMC1569444/ (last visited June 20, 2014).

its pharmaceutical clients to "Create your Own Success" by "[p]rov[ing] your product value to a diverse group of stakeholders, most importantly . . . payers." The HIM Study did just that. By polluting the medical literature with a study that has been re-cited thousands of times by TRT Defendants and their vendor and physician participants, the AbbVie Defendants created a market out of thin air where AndroGel could become a blockbuster drug.

480.     Naturally, the AbbVie Defendants planned to capitalize on the HIM Study results, with one business plan urging



481.     The promotional (as opposed to scientific) nature of the HIM Study, including the true extent of the AbbVie Defendants' involvement in developing the study, was never adequately disclosed to physicians.

          *a.*       ***Funding of Consensus Practice Guidelines that Include False and Misleading Safety and Efficacy Claims***

482.     From the outset, a key part of AbbVie's scheme for promotion of the TRT drugs was the development and use of clinical practice guidelines, which it would then distribute to physicians to promote broader use of AndroGel. Clinical practice guidelines ("CPGs") – summaries of "expert" opinion which are often used to identify standards of care – are an important source of drug information for physicians. CPGs are typically formulated by panels of experts under the auspices of medical professional societies, non-profit organizations, or quasi-governmental organizations. Many of these organizations, however, are partially or fully financially supported by pharmaceutical manufacturers.

---



[162] *Id.*

483.    In an August 2013 article published in JAMA's internal medicine journal, Stephen R. Braun (who is not even a physician according to his website[163]), discussed his experience as an AndroGel "ghostwriter" for the AbbVie Defendants as part of the Publication Enterprise.[164] In the article, Braun describes ghostwriting articles from 2009-2012 for physicians, ghostwriting patient education materials, and ghostwriting "consensus" physician panel statements, all of which were funded by the AbbVie Defendants.

484.    For example, relating to the "consensus" panel statements, Mr. Braun writes:

In 2012, I was hired by a professional physicians' organization to attend a meeting of experts in the field of hypogonadism and to write a summary of the meeting's conclusions – a "consensus" statement – to be published as a guide to clinical practice. In this case consensus was not difficult to achieve because . . . [t]he meeting was funded by Abbott, and every panel member had served as either a consultant or researcher for Abbott or other companies with TRT drugs on the market or in the pipeline [*i.e.*, Auxilium, Endo Pharmaceuticals].

485.    Of course, the resulting monograph was published and used by AbbVie-paid lecturers during AbbVie-funded CME courses, promoting increased utilization of TRT drugs generally and of AndroGel for unapproved and unsafe uses (the physician-lecturers' slide decks were also ghostwritten by Mr. Braun).

486.    Having distorted the medical literature with its false and misleading marketing messages for AndroGel, the AbbVie Defendants then ordered reprints of the various articles by the thousands as part of their Peer Selling Enterprise. Sales representatives, armed with these reprints, distributed them to physicians on sales calls, highlighting the embedded marketing messages as the medical opinions of the physician thought leaders attributed as authors.

i.    AbbVie Support of the Endocrine Society Consensus Practice Guidelines, Which Included False and Misleading Safety and Efficacy Claims

---

[163] http://braunmedicalmedia.com/background.html (last visited April 5, 2016).
[164] *See* Braun, *Promoting 'Low T': A Medical Writer's Perspective*, 173 JAMA Intern. Med. 1458-1460 (2013).

487. One such CPG was developed by the Endrocrine Society, 8401 Connecticut Avenue, Suite 900, Chevy Chase, MD 20815, and has received heavy support and direction from the Defendants.

488. The "First Annual Andropause Consensus Conference" held in April 2000 in Beverly Hills (six weeks before AndroGel came on the market) was sponsored by The Endocrine Society and was funded by Solvay. The first Andropause Consensus Meeting convened endocrine "thought leaders" in the diagnosis and treatment of hypogonadism and the effects of TRT. The goal of the group was to reach a consensus on the state-of-the-art of diagnosis and treatment.

489. ,,165

490. The second Andropause Consensus Meeting held in April 2001 (again funded by Solvay and led by KOL Drs. Glenn Cunningham and Ronald Swerdloff, both recipients of Solvay largesse) was expanded to include a multi-disciplinary group with the intention of

developing evidence-based clinical guidelines. Nine of the thirteen panel members declared that they received financial support from Solvay.

491.    According to an internal Solvay marketing document ████████████████
█████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████

492.    The panel report acknowledged that the benefits of testosterone replacement in aging men had not been established, but it nonetheless recommended that all men over the age of fifty be screened for testosterone deficiency. Screening should start with a questionnaire, like the one that Unimed had provided for Dr. Morgentaler. Patients who had symptoms, whose morning testosterone levels were under the lower limit of normal, specified as 300, and who had no conditions that would rule out testosterone replacement, like prostate cancer, "would likely benefit from treatment," the panel stated. A table accompanying the recommendations suggested that low testosterone levels would be found in more than ten per cent of men over fifty, and nearly thirty per cent of men over seventy in perhaps as many as seven million Americans.

493.    Consensus guidelines and other best practices materials promulgated or endorsed by physician societies, such as the Endocrine Society, have been routinely provided to TPPs and their P&T committees in order to influence them when evaluating whether and how to place pharmaceutical products on their formularies.

        ii.      <u>AbbVie Funded the American Academy of Clinical Endocrinologists' Guidelines, Which Included False and Misleading Safety and Efficacy Claims</u>

494.    For additional support in challenging definitions of hypogonadism, representatives were instructed verbally and in writing when "detailing" doctors to rely on the

166 ██████████████████████

174

American Academy of Clinical Endocrinologists' ("AACE") 2002 consensus guidelines. These guidelines discussed the potential treatment of men suffering from hypogonadism caused by "aging" with "low-normal" testosterone levels as high as 400 ng/dL, which was 100 ng/dL within the normal range as understood in the studies cited on AndroGel's label.

495.    The guidelines were circulated to the sales force with a cover letter warning representatives to use them promotionally, but without mentioning "Andropause." While the cover letter made the point that the AbbVie Defendants had not funded AACE, at least two of four committee members for AACE (Drs. Ronald Swerdloff and Richard F. Spark) at the time had long received Defendants' funding, and were physician participants in the Peer Selling Enterprise.

> b.    *AbbVie Funding of "Key Opinion Leaders" as Authors of Clinical Research*

496.    As a crucial part of the Publication Enterprise, the AbbVie Defendants paid influential thought and opinion leader physicians to research and/or write about the specific unsafe, unapproved uses that provided the most promise in terms of profits. Many of these payments took the form of large "unrestricted educational grants" that were anything but unrestricted.

497.    Some grants supported research, but the research activities (including study designs and protocols) were closely controlled by the AbbVie Defendants. Drs. Christina Wang, Harrison Pope, Molly Shores, John Morley, and Adrian Dobs, among others, all received research grants to study AndroGel.

498.    Another example of a study widely used by the AbbVie Defendants to support sales of AndroGel for unsafe, unapproved uses was the previously discussed "HIM study," which was "authored" by Thomas Mulligan, a frequent beneficiary of the AbbVie Defendants'

largesse for services listed as "consulting," and co-authored by a Solvay employee. Even though Thomas Mulligan is listed as the lead author (and thus the cited author), upon information and belief, the "HIM Study" was authored primarily if not exclusively by the AbbVie Defendants' employees or a medical communications company hired by the AbbVie Defendants, who had predetermined the study's results and had the intention of using it promotionally. Indeed, the AbbVie Defendants were promoting the study's results before it was even published. In other words, as part of the Publication Enterprise, Mulligan lent his name for a fee to give the study additional credibility.

499. Other authors of medical journal publications received payments from the AbbVie Defendants, in addition to fees for speaking, consulting, and serving on advisory boards, with the expectation that they would receive funding for clinical studies and articles developed from those studies designed to support the false and misleading marketing of AndroGel.

500. The AbbVie Defendants did not disclose to DRUGDEX (nor physicians or health plans) the nature of its financial relationships with and influence over entities such as the Endocrine Society or the University of Wisconsin. The AbbVie Defendants did not reveal the role of marketing consultants such as EDU-Medical or Dowden Health Media in its research activities. Nor did the AbbVie Defendants reveal even the status of its NDAs pending before the FDA. It was as a direct result of the AbbVie Defendants' deception and manipulation that they were able to gain the inclusion of a number of unapproved and unsafe uses in DRUGDEX in the hopes of legitimizing such uses.

501. The AbbVie Defendants exercised control over both study designs and resulting medical literature, which was either drafted by their employees or by a medical communications company and signed by the study authors in a practice known as "ghostwriting," or which was

reviewed and heavily edited by the AbbVie Defendants' employees to ensure that the literature contained the appropriate false and misleading marketing messages for AndroGel. "Ghostwriting" is a particularly damaging form of pharmaceutical marketing. The drug company and/or its retained medical literature vendors author what is represented as an independent scientific paper, and pays an OTL to place their name on the paper as its author to give the appearance of objectivity and credibility, suggesting that the OTL performed the research and authored the paper. Effort is made by the pharmaceutical company to ensure that the specific marketing messages for the drug are placed in these ghostwritten articles as frequently as possible. The pollution of the medical literature for AndroGel was particularly damaging to Plaintiff MMO and the TPP Class Members, who, in reviewing drugs and making formulary decisions, rely extensively on medical literature purportedly written by respected thought leaders, such as prominent endocrinologists and urologists.

c.    ***AbbVie-Sponsored TRT Symposia Published in Medical Journals, Including False and Deceptive Safety and Efficacy Claims***

502.    The AbbVie Defendants also paid for and developed symposia through "educational grants," and the materials presented were largely created and controlled by the AbbVie Defendants and their associates. The materials were often later published in medical journals.

503.    The AbbVie Defendants and/or their associates also sought out supposedly independent associations of specialists to issue "clinical practice guidelines" or "consensus guidelines" in favor of controversial positions that impacted its AndroGel sales.   The simultaneous lobbying and financial support of the Endocrine Society and its officers by the AbbVie Defendants and their associates, discussed above, is an example.

504. The resulting literature provided false and deceptive selling points for sales representatives' detailing and for speaker program lectures, but more fundamentally, at the highest levels, it influenced the way TPP clinical decision-making was framed. These decisions took place among P&T committees and including between Plaintiff MMO and the TPP Class Members, in their efforts to determine an appropriate formulary placement for AndroGel. Plaintiff MMO and the TPP Class Members were deprived of the opportunity to come to an appropriate decision regarding AndroGel's reimbursement status since the materials shaping the debate had been altered by Defendants.

505. Once the favorable clinical studies had been published, the AbbVie Defendants and/or their associates stamped an imprimatur on such medical literature by submitting them to prestigious medical journals and medical compendia such as DRUGDEX. Because DRUGDEX imposes few or no editorial requirements for inclusion, the mere listing of a use or study can convey an air of legitimacy to the poorest scientific effort. As CMS has declared, a mere listing is therefore not "supportive" for purposes of rendering a use "medically accepted."

> d. **Deceptive AbbVie-Sponsored Publications on the Use of TRT drugs to Treat Depression**

506. The AbbVie Defendants and their associates likewise used the Publication Enterprise to convince doctors that men with hypogonadism or decreased testosterone levels frequently suffered from depression-like symptoms; thus, if AndroGel helped the patient's depression, low testosterone would be shown to be the underlying cause.

507. The AbbVie Defendants developed, sponsored, and paid for a study on testosterone and depression, the Pope Trial, reprints of which sales representatives distributed widely.[167] The only evidence of the AbbVie Defendants' involvement from the face of the article

---

[167] *See* Pope, Jr., *et al. Testosterone Gel Supplementation for Men with Refractory Depression: A*

is the statement tucked at the very end that the study was "[s]upported in part by a grant from Unimed Pharmaceuticals Corporation." Sales representatives received comprehensive training on depression, mood, and physiological effects of low testosterone, even as they were told not to discuss the Pope trial. In fact, handwritten notes from a June 26, 2001 Southwest Regional POA II meeting show explicit instruction on making the pitch:

- How are you treating depressed/moody men?
- How is this working?
- Do you ever have SSRI patients that have sexual dysfunction?
- How would it be if you could eliminate that problem?

508. The AbbVie Defendants also made numerous grants, totaling nearly $100,000, to a Seattle-based psychiatrist named Dr. Molly Shores, who served as the lead author on several articles asserting that AndroGel was effective in treating clinically depressed patients. In addition to research funding, Dr. Shores also served as a consultant to Defendant Solvay, and received an unknown amount of compensation. In one of these studies, Dr. Shores and her co-authors found that TRT could be effective in treatment of depressed elderly male patients.[168] However, the AbbVie Defendants have yet to disclose the results of this study, as reflected on www.clinicaltrials.gov, despite the fact that the study has been completed since November 2006.

### e. AbbVie-Sponsored Deceptive Publications on the "Cardioprotective" Influence of TRT drugs

509. In another example, the AbbVie Defendants again turned to Dr. Morgentaler to push the narrative of the "cardioprotective" influence of TRT drugs. In 2004, the NEJM published a "retrospective analysis" conducted by Dr. Morgentaler in which he wrote that "few,

---

*Randomized, Placebo-Controlled Trial*, 160 Am. J. Psychiatry 105-111 (2003).
[168] Shores et al., *A randomized, double-blind, placebo-controlled study of testosterone treatment in hypogonadal older men with sub-threshold depression (dysthymia or minor depression)*, 70 J. Clin. Psychiatry 1009-1016 (July 2009).

if any, data support a causal relation between higher testosterone levels and heart disease."[169] Dr. Morgentaler's article concluded that "[s]tudies of testosterone replacement therapy have not demonstrated an increased incidence of cardiovascular disease, myocardial infarction, stroke, or angina[.]" Not surprisingly, the article went so far as to suggest that higher testosterone levels may actually have a favorable effect on atherosclerosis and heart disease.

510. The AbbVie Defendants were fully cognizant of the fact that such "cardioprotective messaging" is false and misleading. For example,



Nevertheless,

511. What the AbbVie Defendants' Publication Enterprise concealed is that AndroGel and TRT therapy carries serious cardiovascular health risks. As stated in Time Magazine's August 2014 article, "trusting testosterone to relieve men of aging amounts to a massive science experiment with unknown risks."[172] However, as is becoming increasingly clear, whatever the unknown risks, the known risks include serious cardiovascular adverse events associated with vein and arterial blood clotting, including stroke, heart attack, and pulmonary embolism.

---

[169]

http://www.bidmc.org/News/InResearch/2004/January/StudyFindsNoDirectLinksBetweenTestosteroneTherapyDiseases.aspx.

[172] David Von Drehle, *Manopause?!*, TIME, Aug. 18, 2014, at 41.

512. 

513.



514. Things changed, however, when Solvay came on board.

515.





519. So, not only have the AbbVie Defendants and their KOL surrogates regularly touted the supposed cardioprotective effects (and the absence of risks) of TRT, even most recently to the AdComm (*see infra*), they have actively suppressed the very research that could have shed light on this issue – something they and their surrogates insisted has never been done to date.



### D. The AndroGel DTC Enterprise

520.     The AbbVie Defendants and their associates engaged in AndroGel DTC marketing, promotional, and comprehensive educational campaigns through a variety of educational, advertising, and informational multimedia platforms.

521.     Targeted DTC advertising of AndroGel was designed to drive patients to ask their physicians for prescriptions for AndroGel. Unbranded DTC disease state marketing was thus undertaken by the AbbVie Defendants and their associates, and was geared specifically toward expanding the definition of hypogonadism and/or branding Andropause as a recognized disease state in need of treatment. One of the AbbVie Defendants' AndroGel annual business plans described the AndroGel ███████████████████████████████████████████ ████████████

522.     Beginning before launch, ██████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████ ███████████████████████████████████████████ Thus, Defendants engaged in the DTC advertising to mass market AndroGel for Andropause, and for supposedly related ailments such as osteoporosis, sexual dysfunction, and depression, in male patients with both normal *and* abnormal testosterone levels, with *and* without clinical symptoms.

523.     ████████████████████████████████████████████ ████████████████████████████████████████████████████

██████████████████



The key demographic, of course, was middle-aged to elderly men, the vast majority of whom did not suffer from hypogonadism.

524.   More recently, [REDACTED]

Of course, this is simply another manifestation of Defendants' strategy suggesting that low testosterone/hypogonadism is a condition as prevalent as high blood pressure, and to drive patients to ask for notoriously unreliable testosterone screening and testing, with the intention that it lead to an AndroGel prescription.

525.   An article discussing AbbVie's receipt of an award from Medical Marketing & Media for "Large Pharma Marketing Team of the Year: AndroGel," (titled *Vim, Vigor and Sales Drive*) quoted Frank Jaeger, director of Men's Health, AbbVie: "Hypogonadism affects about 14 million men in the US alone, but less than 10% are currently being treated for the condition … We felt something needed to be done to educate men about this condition." The article also states that "[i]t didn't hurt [AbbVie's sales efforts] that baby-boomers have proven less than shy about availing themselves of any product that they believe will increase their quality of life." The AbbVie Defendants merely had to instill that belief for AndroGel to thrive. Of course, the

www.driveforfive.com website links to Defendant AbbVie's www.isitlowT.com website, to encourage patients to take the misleading and over inclusive ADAM screening questionnaire.

526.    Despite the fact that the ADAM or IsItLowT? Quiz is palpably false and geared to misleading results, the AbbVie Defendants have centrally featured the quiz on its websites, including the AndroGel product website (http://www.AndroGel.com/low-testosterone-symptoms-quiz (last visited June 13, 2014)), as well as an independent AbbVie-sponsored website with the web address, www.isitlowt.com.[196]

# X.    DEFENDANT AUXILIUM'S FRAUDULENT MARKETING OF TESTIM AND TESTOPEL

## A.    The Auxilium TPP Formulary Access Enterprise

### a.    *Auxilium Managed Markets Personnel Made False and Misleading Statements Concerning the Safety and Efficacy of Testim and Testopel to Plaintiff MMO and the TPP Class Members*

527.    As part of the Auxilium TPP Formulary Access Enterprise, Auxilium developed a dedicated "managed care" (also called "Managed Markets") sales group  whose job it was to call on TPP pharmacy directors and P&T committees. These specialized Managed Markets representatives presented false and misleading studies/abstracts to persuade TPP P&T committees to add and maintain Testim and Testopel on their formularies.

528.    The training around the false and misleading safety and efficacy message was elaborate. ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████

---

[196] Plaintiff MMO notes that Defendant AbbVie appears to have recently deleted these two websites.
██ ████████████████████████████████████

529. The Auxilium Managed Markets representatives and MCLs were specifically trained to initiate the Company's rehearsed false and misleading safety and efficacy messages designed to cause the P&T committee to add Testim and Testopel to their formularies.

530. For example, the Company trained them through role-playing exercises to promote Testim and Testopel based on false and misleading safety and efficacy statements that had been rejected by the FDA.

531. The Auxilium Managed Markets representatives did as they were trained and instructed, and the TPP Formulary Access Enterprise succeeded in deceiving Plaintiff MMO into adding Testim and Testopel to its formulary.

532. . Like Solvay's managed care strategy, Auxilium's strategy was to track MMO's coverage status, and obtain preferred coverage from MMO, spinning the misleading andropause elevator pitch.

533.

534. Auxilium's MMO strategy was similar to Solvay's, which included maintaining ongoing communications with MMO, as formulary status was subject to periodic review.

535. Defendant Auxilium and/or its associates also attempted to obscure from Plaintiff MMO and the TPP Class Members that TRT prescriptions were for unsafe and unapproved uses.

██████████████████████████████████████████████████

███████████████████████████████████     █████████████████

████████████████     ████████

        ██████████████████████████████████

        ███████████████████████████████████████████
        ███████████████     ████████████

        ████████████████████████████████████████████

536.    ████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████

537.    Auxilium personnel also trained doctors' offices to communicate with payers

directly, including Plaintiff MMO and the TPP Class Members, to assist pull-through efforts. In

fact, ████████████████████████████████████████████████

████████████████████     █

538.    Auxilium even ████████████████████████████████

███████████████████████████████████████     ██████████

███████████████████████     █     ████████████████████████

                          _____

██
██ ████████████████████████████     ████
██ ████████████████████████████

188

███████████████████████████████████████████ ██████ ███

████████████████████████████████████████ █

539.     Auxilium's Managed Markets personnel regularly met with Plaintiff MMO and

the TPP Class Members to promote false and misleading efficacy and safety Testim messages, in

order to secure favorable formulary placement, including:

- ████████████████████████████████████████

  █████████████████████████████████

  ███████████████████████████████████████

  ██████████████████████████████████

  ████████████████████████████████████████

  ████████████████████████████████████████

  ████████████████████████████████████

  ████████████████████████████████████████

  ████████████████████████████████████████

  ████████████████████████████████████████

  ████████████████████████████████████████

  ████████████████████████████████████████

  ████████████████████████████████████████

  █████████

  ████████████████████████████████████████

  ████████████████████████████████████████

███████████████████████████████████████████████



540.

541.

542. ████████████████████████████

543. ██████ ████ ████████████████

544. Auxilium provided comprehensive managed care training to its MCLs. For example, ████████████████████████████

545. ███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████

546. ████████████████████████████████████

█████████ ████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████

547. ████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████

████ █████████████████████████████████ ███████





549.    Specific  strategies  and  tactics  included: █████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████

550.    ██████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████

551.    Auxilium's  National  Account  Directors  routinely,  if  not  always,  brought

marketing materials when promoting TRT drugs to Plaintiff MMO and the TPP Class Members,

including  Plaintiff  MMO.  These  marketing  materials  included  AMCP  dossiers  and  formulary

kits.  For  example, ██████████████████████████████████

[213] ███████████████████████████



552.

553.



554.

217 *Id.*

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████

555.    ████████████████████████████████████

████████████████████ █ ████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████

556.    The exchange perfectly encapsulates not just the message to MMO but TPP messaging generally, including promoting TRT drugs for unapproved uses and sidestepping concerns raised by managed care personnel.

557.    ████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

---

[218] *Id.*
[219] *Id.*

196



558.

559.    Auxilium also instructed its sales representatives to train health care providers and their office staff to place pressure on TPP Class Members for coverage of Auxilium products,



including Testim and Testopel. For example, ██████████████████████████

████████████████████████████ ██████████

████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████

560.    The Auxilium strategy to obtain favorable formulary status for Testim and Testopel on MMO's formulary has been repeated with TPP Class Members throughout the United States. ███████████████████████████████

████████████████████████████████████████

████████████████████████████████

   ██ █████████████████████████████████████

      █████████████████████████████████████

      ███████

   ██ █████████████████████████████████████

      ███████████████████████████████

   ██ █████████████████████████████████████

_____

██ ████████████████████████



561.    On Defendant Auxilium's Testopel

562.

563.    For example, as stated by Auxilium Areas Sales Manager Michael Pelish on his LinkedIn page, Mr. Pelish is more than willing to provide and fill out such letters of medical necessity to be submitted to inquisitive TPPs seeking to confirm a hypogonadism diagnosis prior to reimbursement.

564.    Another Auxilium Testopel Area Manager explains on his LinkedIn profile that he "[p]rovide[s] problem solving solutions around managed care coverage (Letters of Medical Necessity, Prior Authorizations and Pre-Determinations), Contracting, ICD-9 Billing and Coding updates, Buy and Bill and Specialty Pharmacy procurement services." In other words, if the managed care coverage for Testopel was "problematic" (by, for example, requiring prior authorization), Auxilium's sales force would fill out and submit the PA forms, as well as pursue other tactics, to overcome managed care hurdles.

565.    Defendant Auxilium's Form 10-K for 2013 included the following statement emphasizing just how important managed care was to the commercial success of Testim:

> The TRT and ED markets are highly competitive. Our success will depend, in part, on our ability to grow our prescription volume and protect our share of the markets from competitors. Potential competitors in North America, Europe and elsewhere include major pharmaceutical companies, specialty pharmaceutical companies and biotechnology firms, universities and other research institutions and government agencies, and also include compounding pharmacy companies. As competition has increased, access to managed care plans has also become more competitive in the TRT and ED markets. Pricing, rebate and discount strategies required to gain or maintain access or, in some cases, preferential access to certain managed care plans may have a material adverse effect on the revenue we derive from our TRT Products and ED Products. The loss of preferred status or any access at all for certain managed care plans may have a material adverse effect on our TRT Products' and/or our ED Products' share of their respective markets.

566.    Formulary access was, therefore, the key profitable success. ██████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████



567.

568.



201



569.

570.



████████████████████████████████████████

████████████████████████████████████████ ██

b.   *Defendant Auxilium Used False and Misleading Managed Care CME Programs to Promote Testim's and Testopel's Safety and Efficacy to Plaintiff MMO and the TPP Class Members*

572.   Yet another way that Defendant Auxilium made its false and misleading safety and efficacy claims regarding Testim and Testopel directly to Plaintiff MMO and the TPP Class Members was through managed care CMEs that it sponsored throughout the United States.

573.   For example, Auxilium used Pharmacy Times to target Plaintiff MMO and the TPP Class Members with their misleading messages on unapproved and unsafe uses of TRT drugs by sponsoring continuing education courses provided by Pharmacy Times and marketed to Plaintiff MMO and the TPP Class Members.

574.   Pharmacy Times is one of the leading publications and resources for pharmacists in the United States. It publishes a monthly periodical that is distributed to more than 160,000 pharmacists and related personnel, including MMO and its employees. Plaintiff MMO and several employees regularly received Pharmacy Times' monthly periodical.

575.   For years, Pharmacy Times has offered numerous continuing professional education courses in dozens of specialties, including hypogonadism and TRT use. These courses, which Pharmacy Times describes as "superior accredited activities," are available online and are completely free to participants. The courses were accredited by the ACPE for continuing pharmacy education.

576.   On February 15, 2010, Auxilium sponsored a Pharmacy Times CME course titled, "Hypogonadism: The Role of the Pharmacist." The course highlighted many of the "symptoms" of hypogonadism designed to drive overutilization of TRT drugs, including erectile dysfunction,

██ ████████████████████████

reduced libido, educed energy and stamina, depressed mood, increased irritability, and difficulty concentrating. In fact, the presentation included a slide devoted to the ADAM test, the notorious questionnaire designed by Defendants to over-identify men who exhibit signs of low testosterone. The presentation also failed to provide any discussion of cardiovascular risks associated with TRT use. The presentation concluded with a review of several TRT drugs, including Testim and Testopel.

577.    The purpose of this Auxilium-sponsored CME course was to influence pharmacy professionals, including those working for Plaintiff MMO and the TPP Class Members, to add and maintain TRT drugs on their formularies.

> ### *c.    Defendant Auxilium's Use of Testim Access Hotline to Evade Plaintiff MMO's and the TPP Class Members' Cost Containment*

578.    When in a "disadvantaged" formulary position, Auxilium would use its Testim Access Hotline, through which Auxilium provided assistance with insurance coverage issues, denials, or problems arising out of the prescription or potential prescription of Testim therapy. The Testim Access Hotline effectively overrode numerous TPP limits to Testim coverage for thousands of patients, even for dangerous, off-label uses, such as these 2012 prior authorization limit overrides, all of which had no diagnosis of hypogonadism in the Hotline records:







580.    The Auxilium Defendants and/or their associates' successful false and misleading marketing and misrepresentations concerning the safety and efficacy profile of Testim and Testopel served as a primer to allow for successful false and misleading formulary negotiations with Plaintiff MMO and the TPP Class Members.

### B.    The Auxilium Testim and Testopel Peer Selling Enterprise

581.    As part of its Testim and Testopel Peer Selling Enterprise, Auxilium and its co-promoters recruited and financially engaged a cadre of "thought leaders," "key opinion leaders," and industry funded speakers, including individuals with leadership positions in influential scientific organizations and societies (*e.g.,* the Endocrine Society and the American Urological Association) to offer opinions that supported, advocated, and encouraged "off-label" clinical indications for testosterone therapy.

582.    Auxilium engaged "thought-leaders," "key opinion leaders," and medical consultants, including Dr. Abraham Morgentaler from Harvard University, who was a member of Auxilium's Scientific Advisory Board, and Dr. Francis Hayes from Harvard University and the Massachusetts General Hospital, who was a co-author of the 2010 Endocrine Society testosterone guidelines, Testosterone Therapy in Adult Men with Androgen Deficiency Syndromes: An Endocrine Society Clinical Practice Guideline, to influence physicians concerning the diagnosis of "Low T" and the benefits of TRT for the treatment of age-related declines in testosterone levels and age-related symptoms in men. These physicians aggressively condoned and advocated unsafe and unapproved uses for the testosterone products.

583.    In 2006, Auxilium and Oscient signed a co-promotion partnership to promote Auxilium's Testim product in the United States to significantly larger group of primary care physicians beyond those already called upon by Auxilium detailing personnel and sales representatives.

584.    Under the terms of the co-promotion agreement with Oscient, Oscient would promote Testim to primary care physicians using its 250-person sales force.[233] At the time, the

---

[233] http://www.sec.gov/Archives/edgar/data/1182129/000119312505075184/dex991.htm

Oscient sales force was active in the promotion of Oscient's FACTIVE® (gemifloxacin mesylate) tablets.

585. Auxilium's sales force continued to promote Testim to urologists, endocrinologists, and select primary care physicians using its own specialty sales force and sales representatives.

586. Auxilium and Oscient agreed to share the profits from primary care sales above a pre-determined baseline after marketing expenses were reimbursed. The co-promotion partnership had an initial term of two years, with the potential for extension for up to a six-year duration, pending achievement of mutually agreed upon milestones.

587. Auxilium and Oscient projected the budget for marketing and promotion of Testim in the primary care physician market in the United States to be approximately $10.5 million in 2005 and approximately $13 million in 2006.

588. Auxilium and Oscient knew that that they were entering into an agreement with an intent to conduct "off-label" promotion for clinical use and "label expansion" of Testim and Testopel.

589. Through its promotional campaigns, including physician detailing, Auxilium denominated and characterized age-related declines in testosterone levels and age-related symptoms in men as "Low T," and it used the "Low T" moniker or designator to denote and connote that the presence of age-related declines in testosterone levels and age-related symptoms in men were a form of "acquired" hypogonadism.

590. Auxilium engaged in "label expansion" in both its promotion of its TRT products to physicians and in its marketing of these products to consumers and patients.

591.     In order to carry out the Testim and Testopel Peer Selling Enterprise, Defendant Auxilium associated with numerous marketing organizations.

<div align="center">

a.     ***Testim Peer Selling Association with GSK***

</div>

592.     In 2012, Auxilium and GSK entered into a co-promotion agreement relating to Testim. The co-promotion began shortly thereafter and continued until the parties mutually agreed to terminate the arrangement in late July 2013.

593.     Under the terms of the agreement, "if net sales of Testim exceed a baseline established under the GSK Agreement, [Auxilium] pay[s] GSK a promotional payment equal to a percentage of incremental net sales above that established baseline."[234] In other words, through this profit-share agreement, Auxilium incentivized GSK to aggressively promote Testim, including for unapproved and unsafe uses.

594.     GSK has a long history of aggressively promoting its own products for unapproved and unsafe uses. For example, as recently as June 2014, GSK paid $105 million to settle claims that it promoted numerous of its drugs illegally, including for unapproved and unsafe uses. Strikingly, under the terms of the settlement, GSK agreed to reform its marketing practices and refrain from disseminating information relating to the unapproved and unsafe uses of its drugs.

595.     In 2012, GSK paid $3 billion to settle investigations by the U.S. Department of Justice related to allegations that GSK marketed Paxil for unapproved and unsafe use in children and marketed Wellbutrin for weight loss and substance abuse, among other claims.

596.     GSK even has a documented history of promoting TRT drugs for unapproved and unsafe use prior to being engaged by Defendant Auxilium. As discussed in more detail below,

---

[234]          https://us.gsk.com/en-us/media/press-releases/2012/auxilium-pharmaceuticals-inc-and-glaxosmithkline-llc-enter-into-a-co-promotion-agreement-for-testim-in-the-us/.

SKB, which merged with Glaxo Wellcome to become GSK, had been retained to promote the TRT drug Androderm, which received FDA approval in September of 1995. Concerned with GSK's rampant false and misleading promotion of Androderm, the FDA's DDMAC sent a warning letter to GSK in November of 1998 in relation to a "Promotional Dear Doctor Letter" that was "written on SKB letterhead and signed by SKB representatives" that was "misleading because it suggests that Androderm is safe and effective for treating non-insulin dependent diabetes mellitus (NIDDM) when such has not been demonstrated by adequate and well-controlled clinical trials." The letter had claimed that "testosterone supplementation . . . may result in significant improvements in insulin sensitivity, thereby potentially improving glucose control."

597.    The engagement of GSK in the co-promotion agreement, including GSK's vast sales force, allowed Auxilium to expand its access to prescribing physicians. In 2012, Auxilium "[c]arefully targeted sales and marketing efforts aimed as the most productive segment of the TRT market – 17,000 high volume prescribing physicians who account for approximately 51% of all gel TRT prescriptions."[235]

598.    Auxilium and GSK agreed on a baseline revenue forecast for Testim through September 30, 2015, and agreed that GSK would be compensated to the extent that Testim net sales exceed this baseline. In addition, in certain circumstances, Auxilium would pay GSK specified tail payments following the term of the agreement.  The GSK sales force was expected to begin promoting Testim to physicians early in the third quarter 2012. Auxilium was to remain responsible for all Testim commercial drug manufacturing, supply, and regulatory activities.

599.    In providing for "tail" payments following the term of the agreement, GSK and Auxilium recognized that, in at least some circumstances, the effects of GSK's efforts in

_____

[235] *See* Auxilium 2012 Annual Report ("Fully Maximize Value of Current Portfolio") at 42.

marketing and promoting Testim would persist even after the agreement had terminated, and that, in particular, prescribers "sold" on Testim by GSK and its sales force would in all likelihood continue to prescribe Testim, or other TRT drugs, even after GSK sales representatives no longer met with them to promote it.

600. Auxilium and GSK knew that they were entering into an agreement to conduct promotion for unapproved and unsafe clinical use and "label expansion" of the Testim product.

601. On or about August 1, 2013, the co-promotion agreement between GSK and Auxilium was mutually and prematurely terminated approximately two years prior to the projected and scheduled end-date of September 30, 2015.

602. During the life of the co-promotion agreement, GSK participated and played a role in the selling and distribution of Testim.

603. During the life of the co-promotion agreement, GSK, along with Auxilium, knowingly engaged in the unsafe and off-label detailing and promotion of Testim to physicians and misrepresented to physicians that Testim was an FDA-approved treatment for "Low T" and age-related declines in testosterone levels and age-related symptoms in men.

604. During the life of the co-promotion agreement, GSK knew and understood that the male aging process is not an acquired form of hypogonadism and that declines in testosterone levels are a physiologic response during male aging.

605. During the life of the co-promotion agreement, GSK made false, deceptive, inaccurate, and misleading statements and claims to physicians and healthcare providers regarding the clinical safety and effectiveness profiles of Testim and Testim's spectrum of FDA-approved indications for clinical use.

606.    As co-promoter, GSK not only engaged in off-label marketing of Testim along with Auxilium, it was also obliged, and failed, to disclose to physicians and consumers the risks of TRT drugs, as described in detail below.

607.    GSK denominated and characterized age-related declines in testosterone levels and age-related symptoms in men as "Low T" and used the "Low T" moniker to denote and connote that the presence of age-related declines in testosterone levels and age-related symptoms in men were a form of acquired hypogonadism.

608.    GSK knew and understood the meaning of the terms "off-label" and "label expansion."

609.    GSK knew and understood the FDA regulations pertaining to "off-label" marketing and promotion of an FDA-approved pharmaceutical product.

610.    GSK marketed, promoted, and detailed Testim for "off-label" use for the purpose of "label expansion," and detailed and promoted the product to physicians, and advertised the product to consumers and patients, promoting the idea that "Low T" is synonymous with hypogonadism and that Testim is approved and indicated for clinical use in treating "Low T."

        *b.*     ***Testim Peer Selling Enterprise Association with Lathian Health***

611.    In 2006, Auxilium retained Lathian Health ("Lathian"), a provider of pharmaceutical marketing services and technology-based sales solutions, to perform Peer Selling "ePromotion" and "eBrand Messaging" programs on behalf of Auxilium with respect to the Testim product.

612.    Lathian recruited 150 physicians to participate in an on-line branding campaign for Testim, which then enabled Auxilium's Testim branding and marketing teams to select a broader promotional campaign directed towards an expanded number of physicians for the

purpose of increasing and promoting unapproved and unsafe prescriptions for the Testim product.

613.    The goal of the "ePromotion" program was to use Lathian's "Virtual Detailing" to increase physician prescribing habits with respect to the Testim product among a group of 25,000 focus physicians by retaining a respected physician to relate a marketing narrative for a pharmaceutical product. As related on Lathian's website, Lathian delivers "[c]reative narratives using KOL and interactive data review [that] are carefully crafted to deliver unique learning experiences . . . ."

614.    ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

615.    An IMS Health Study of Lathian's Virtual Detailing program for Testim revealed that it was highly successful in influencing prescribing behavior. Several metrics of the program's success were related in a Business Wire article: "[f]or every $1 that was invested in the programs, Testim gained $4.45 in revenue from increased sales"; "[d]uring the post-test period, test physicians prescribed (TRx) 38.9 percent more of the brand compared to control physicians"; "[p]hysician penetration increased by a differential of +4.6 share points between the two groups, which was statistically significant"; and "[t]he brand's TRxs increased as physician participation increased, with the maximum increases seen with participants completing all three waves of the Virtual Detailing program."

616.    David Keats, an Auxilium Testim product manager, agreed with the study results that the eDetailing program had a significant impact on physician prescribing habits. As stated by Mr. Keats, "Lathian came to the table with a broad range of ideas and concepts, which

236 ████████████████████████████████████

213

quickly demonstrated they understand what works, what doesn't and what is truly a new front for sharing key messages. In all areas – content development, account management, recruitment and reporting – we are quite satisfied."[237] The "broad" range of "key message" ideas included unapproved and unsafe promotion of Testim.

617. The "ePromotion" strategic initiative relied upon in promoting Testim to physicians for unapproved and unsafe use for the treatment of age-related declines in testosterone levels and age-related symptoms in men encouraged off-label prescribing and label expansion with respect to the Testim product's clinical uses.

### C. The Auxilium Testim and Testopel Publication Enterprise

618. In order to carry out their Testim and Testopel Publication Enterprise, Defendant Auxilium and its associates exercised close control to ensure that their false and misleading marketing messages were prominently included in seemingly unbiased clinical studies which were in fact the opposite.

619. Auxilium regularly engaged ghostwriters to repackage its marketing message for Testim and whose work it then touted as the work of independent clinical researchers. For example, Robert Withers of WithersWorks bills himself as a "pharma/healthcare writer" and states that his "experience and skills are broadened by former work as a medical ghostwriter . . . ." Mr. Withers (who holds an MFA in Film and a B.A. in Art History) lists Testim among his clients.

620. A 2012 Testim study is exemplary of Auxilium's Publication Enterprise. The study listed five (5) authors, four (4) of whom are physician participants in the Peer Selling Enterprise with Auxilium speaking and consulting relationships. The fifth author is an Auxilium

---

[237]http://www.businesswire.com/news/home/20081006005253/en/Founder-Quang-X.-Pham-Returns-Lathian-Transform.

employee.[238] After concluding that "Hypogonadal men [aged 65 and above] showed significant benefit from TRT" and that "TRT was well tolerated in older patients[,]" the authors disclose in the "Acknowledgments" Section that "The authors thank Lynanne McGuire, PhD, of MedVal Scientific Information Services, LLC, for providing medical writing and editorial assistance." Buried in a separate footnote is an apparent concession that MedVal provided more than just "assistance" to the "authors": "All authors contributed equally and were involved in . . . drafting and/or critically revising the manuscript. All authors reviewed the final manuscript and gave approval for submission." In other words, the authors (one of which was an Auxilium employee) rubber-stamped their credentialed names to a paper drafted by a medical writing company paid for by Auxilium. The fact that this article was part and parcel of Auxilium's false and fraudulent promotional campaign was not disclosed to patients, physicians, or to Plaintiff MMO and the TPP Class Members in Auxilium's TRT drug dossiers provided during managed care details.

621.    Another similar example is an article featuring largely the same authorship, both named and unnamed. The article promotes TRT use among opioid users regardless of whether they suffer from hypogonadism.[239] The authors include internal Auxilium-employee authors Harvey Kushner and Dat Nguyen. Once again, the authors disclose their extensive ties to Auxilium and "acknowledge" ghostwriter "Sherri Jones, PharmD of MedVal Scientific Information Services, LLC for providing medical writing and editorial assistance."

622.    Another example is a Testopel article with six (6) listed authors, at least four (4) of whom are participants in the Auxilium Peer Selling Enterprise.[240] The article extols the virtues

---

[238] Bhattacharya et al., *Testosterone Replacement Therapy Among Elderly Males: The Testim Registry in the U.S. (TRiUS)*, 7 J. Clin. Interv. Aging 321-330 (2012).
[239] G. Blick, et al., *Testosterone Replacement Therapy Outcomes Among Opioid Users: The Testim Registry in the United States (TRiUS)*, 13 Pain Medicine 688-98 (May 2012), http://www.ncbi.nlm.nih.gov/pubmed/22536837 (last checked on September 22, 2014).
[240] McCullough, et al., *A Multi-Institutional Observational Study of Testosterone Levels After*

of Testopel, which is not surprising considering the authors have received grants and personal fees from Auxilium and Endo, among others.

623.    In another original article published in the International Journal of Impotence Research, several Auxilium Peer Selling Enterprise physician participants argued that "Changing from AndroGel to Testim offers hypogonadal men the potential for improved clinical and biochemical responsiveness" among the "significant proportion of men . . . [who] have a suboptimal response to the initial brand of testosterone gel prescribed."[241] Despite the fact that every listed author disclosed financial ties to Auxilium for speaking, consulting, and research, the lone conflicts of interest disclosure reads in its entirety: "There are no sources of funding *directly* related to this research to disclose." (emphasis added).

624.    As an example of how such studies distort the public's perception of a drug, a Livestrong.com article (a popular resource for patients) on "Effects of Testosterone Cream" cites "a study published in a 2005 issue of 'Reviews in Urology' . . . by Dr. John D. Dean of the Salisbury Clinic in the U.K." for the results that TRT "found a significant increase in body composition after treatment. Bone mineral density improved, and there was an increase in lean body mass as well as a decrease in fat mass." The Livestrong.com article omitted (likely unintentionally) that the other three authors of the review article were Auxilium employees; that the article was sponsored by Auxilium; and that the copyright was owned by MedReviews, LLC, which states on its website that it was "[f]ounded to disseminate credible scientific information via three key publications . . . Reviews in Urology, we have grown into a full-service medical communications agency, providing content development and strategic marketing management services to our clients." In other words, Livestrong.com cited a promotional paper masquerading

---

*Testosterone Pellet (Testopel) Insertion*, 9 J. of Sexual Medicine 594-601 (2012).
[241] E.D. Grober, et al., *Efficacy of Changing Testosterone Gel Preparations (AndroGel or Testim) Among Suboptimally Responsive Hypogonadal Men*, 20 Int'l J. of Impotence Research 213-217 (2008).

as credible science. The article, of course, touted testosterone therapy for a host of unsafe, unapproved uses.

### D.     The Testim and Testopel DTC Enterprise

625.     At all times material hereto, Auxilium well understood the importance of its DTC advertising in creating a market for unapproved and unsafe use of Testim and Testopel. In its 2012 Annual Report to investors, Auxilium stated that "the U.S. market will continue to expand based on disease education programs and increasing patient disease awareness, driven in part by national 'direct-to-consumer' television and Internet advertising campaigns focused on adult males with low testosterone." Thus, Auxilium admitted that its focus was "adult males with low testosterone," rather than men with hypogonadism, and it further acknowledged the role its disease-mongering and DTC campaigns had in generating sales of its TRT drugs.

626.     As described below, Auxilium's advertising campaigns for its TRT drugs included, *inter alia*, an unbranded "Low T Facts" campaign, "The Shaun Micheel Story" campaign, the "Level Up Plan" for Testim, the "Low Testosterone Therapy With Testim" campaign, and the "Reclaim Your Life" campaign for Testopel.

627.     Auxilium's advertising campaigns, including, in particular, its unbranded and "disease awareness" campaigns, were intended to, and did, promote sales of all three of Auxilium's TRT drugs: Testim, Testopel, and Striant.

628.     In 2003, Auxilium developed a marketing strategy to increase consumer and physician sales by working with educational groups, including "Everyday Health," "Hormone.org," and "MensHealthNetwork," with respect to its testosterone products.

629.     Throughout its DTC marketing and branding campaigns for Testim and Testopel, Auxilium provided consumers and patients with comprehensive medical advice, diagnostic information, and explanations of specific medical diagnostic criteria and medical terminology.

630.    Throughout its DTC marketing and branding campaigns for Testim and Testopel, Auxilium provided consumers and patients with, and directed consumers and patients to, "Low T" medical self-screening and self-diagnosis materials.

631.    Auxilium engaged in DTC marketing, promotional, and comprehensive educational campaigns through a variety of educational, advertising, and informational multimedia platforms, including Internet-based dedicated "Low T," "Testim" and "Testopel" websites.

### a.    The Testim DTC Enterprise Association with Heartbeat Ideas

632.    During or prior to 2010, Heartbeat Ideas, a full service digital marketing agency, together with and on behalf of Auxilium, initiated Auxilium's DTC "Low Testosterone Therapy with Testim" advertising campaign.

633.    In 2011, Auxilium's "Low Testosterone Therapy with Testim" advertising campaign received awards from the Pharmaceutical Executive's Ad Stars and the DTC Perspectives National Ad Awards.[242]

634.    On October 13, 2011, Auxilium announced that the company's low testosterone awareness campaign, "Low T Facts," was recognized as the "Best Interactive Initiative for Consumers" at the 2011 Medical Marketing & Media (MM&M) Awards.[243]

635.    In its award submission for the "Low T Facts" campaign (see http://www2.heartbeatideas.com/auxilium/lowtfacts.html), which was undertaken on behalf of and for the benefit of Auxilium, Heartbeat Ideas stated:

Award Submission – Low T Facts Online Media Campaign

---

[242] See Heartbeat and Auxilium Work Recognized by Ad Stars and DTC National, BUSINESS WIRE (May 24, 2011).

[243] See New Release-Investors-Auxilium. Low T Facts Recognized as "Best Interactive Initiative for Consumers, PR Newswire via COMTEX (Oct. 13, 2011).

*Unbranded Rich Media Banners, LowTFacts.com Microsite, Testim.com Website*

Low testosterone, medically known as hypogonadism, occurs when a man doesn't produce enough of the hormone testosterone. Up to 13 million men in the United States may have low testosterone, although many don't know they are affected. That's because low testosterone produces symptoms like reduced sexual function, desire and performance, low energy or fatigue, bad mood or poor concentration, reduced muscle mass/strength and increased body fat, which are often attributed to other conditions.

The target audience for this campaign was 50-64-year-old men who have not been diagnosed with low testosterone, but have the symptoms of low testosterone. This group includes 20.5 million undiagnosed men (currently, 22.7M men in this age group suffer from low testosterone, but only 2.2M (10%) are being treated).

Since low testosterone can be hard to detect and a sensitive topic to discuss, our goal was to help men recognize their symptoms and encourage them to seek treatment for the real problem. The result was an online media campaign featuring broadcast quality commercials that dispelled common misunderstandings of low testosterone symptoms, and increased awareness of the condition and its treatment, all while keeping a sense of humor about the potentially sensitive medical issue. We achieved this through gently humorous unbranded videos featured in unbranded ads that drove users to www.lowtfacts.com for additional information on symptoms and a branded treatment solution.

636.    As is clear from a screen-shot of DTC bannering, the messaging was clearly to support the promotion of label expanding utilization of Testim in aging men. The banners featured the claim that "Low Testosterone Affects up to 1 in 3 Men Over Age 45" and asked the question: "Is Your Sex Drive Not What It Used To Be?" The implication, of course, was that Testim could be used for unapproved and unsafe uses to treat erectile dysfunction or decreased libido. As HeartBeat Ideas stated on its website, its challenge was to "[s]eparate low testosterone from erectile dysfunction" and to "[d]o it *delicately*." (emphasis added). In other words, HeartBeat Ideas sought to promote the understanding that sexual dysfunction in men could be the result of low testosterone, as opposed to other conditions which might cause erectile dysfunction. Other DTC banners suggested that "depressed mood may be signs of low testosterone."

637.    If the DTC materials were not clear that Defendants, with the assistance of HeartBeat Ideas, were suggesting Testim off-label use, the screenshot of the Testim.com website reproduced by HeartBeat Ideas as part of its portfolio is explicit in its promotion of unapproved and unsafe use for a number of conditions (*e.g.*, erectile dysfunction, osteoporosis, obesity). The screenshot of the website states: "With Testim, you may experience: SUSTAINED symptom improvement with continued use; IMPROVED sexual function, desire, and performance; INCREASED muscle mass and bone density; DECREASED fat mass."[244]

638.    None of the DTC materials developed by HeartBeat Ideas disclosed or discussed any issues regarding the cardiovascular effects of Testim or testosterone use, despite the fact that several of these materials were developed after the Testim Basaria Study in frail and elderly men was halted by the study's drug safety review panel due to an excess of adverse cardiovascular events among Testim patients.

639.    Auxilium and HeartBeat Ideas materially and deceptively misrepresented and mischaracterized the definition of hypogonadism.

640.    Auxilium and HeartBeat Ideas materially and deceptively misrepresented Testim's safety and efficacy profile for any number of unapproved and unsafe uses.

>    b.    ***The Testim and Testopel DTC Enterprise Association with Transit Creative Brand Design Group***

641.    The Auxilium Defendants retained the "Transit Creative Brand Design Group" to formulate and design a DTC marketing strategy and marketing plan with respect to the Testim and Testopel products.

---

[244] http://www.heartbeatideas.com/work.php.

642. The "Transit Creative Brand Design Group" formulated a DTC marketing plan that provided men with educational and medical informational materials about the Testim product.

643. The "Transit Creative Brand Design Group" DTC marketing plan included a celebrity testimonial and endorsement from United States Professional Golf Association (PGA) golfer Shaun Micheel, who the endorsement stated had been "successfully" treated for "Low T" with Testim by providing "[m]ore support . . . to help him be himself." The testimonial was obtained with the assistance of vendor participant MCS Healthcare Public Relations.

644. The website featuring "The Shaun Micheel Story" and "Shaun's experience with Low T" offered consumers and patients "Education about Low T," an "Interactive ADAM Questionnaire," "Comprehensive disease-state information," and a "Physician Finder" service to assist patients in finding physicians who were prescribing Testim therapy for the treatment of "Low T."

645. Auxilium's "Interative ADAM Questionnaire" referenced on the Shaun Micheel endorsement website for the Testim product invited consumers to visit a website designed to self-screen and self-assess "Low T" signs and symptom patterns. The website provided criteria for the diagnosis of "Low T" and a scoring system for signs and symptoms as they relate to the diagnosis of "Low T." Shaun Micheel later publicized that he underwent heart surgery, at age forty-five (45), and has since disappeared from Defendant Auxilium's DTC campaign.

646. The ADAM Questionnaire was largely the same questionnaire used by the AndroGel Defendants. However, in 2010, an article was published in the International Journal of Impotence Research by several authors, including two ((Drs. Khera and Lipshultz) who disclosed that they were paid speakers for Auxilium. The article proposed a modified

"quantitative" ADAM Questionnaire (qADAM), which instead of posing simple "yes" or "no" questions, asked screened patients to answer the questions on a scale. For example, the ADAM Questionnaire asked, "Are you falling asleep after dinner?" The qADAM asks, "How often do you fall asleep after dinner?", with answers given on a 1-5 scale ranging from "never" to "every night."

647.     From a marketing perspective, it can be safely assumed that all people sometimes fall asleep after dinner, and yet many of these people would respond "no" when given only "yes" or "no" options.   By allowing for a quantification of such a vaguely phrased question, Defendants anticipated that screened patients who would have responded "no" to the ADAM question might concede that sometimes they do fall asleep after dinner. The qADAM was thus likely to generate even more false positives of "Low T" than the original ADAM Questionnaire.

648.     Under either the ADAM or qADAM Questionnaires, the "signs" and "symptoms" Defendants sought to link to low testosterone are not approved clinical indications for androgen therapy, including use of the Testim and Testopel products.

649.     The "Interactive ADAM Questionnaire" further provided a mechanism for a consumer or patient, without a physician intermediary, "[t]o order a home-saliva test" for further self-diagnostic testing for "Low T."

650.     The Shaun Micheel endorsement website afforded consumers a means to be referred to or gain access to a physician known by Auxilium to treat "Low T" and to prescribe the Testim product, with Auxilium serving as the referral.

651.     Both the Endocrine Society and the European Association of Urology have recommended against using "Low T"-type quizzes, screeners, and self-assessment questions because these methods are known to be unreliable and over-inclusive.

652.    Auxilium knowingly promoted Testim and Testopel to physicians as being a treatment for the "conditions" set forth in the "Interactive ADAM Questionnaire." Those "conditions" are mostly for unapproved and unsafe use of Testim and Testopel.

653.    At all times material hereto, Auxilium engaged men in the "The Level Up Plan" on its Testim website, which was undertaken to drive men to seek "Low T" treatment with unapproved and unsafe prescriptions for Testim.

654.    The "The Level Up Plan" solicited Protected Health Information ("PHI") from patients, including current medication profiles ("I am currently being treated with Testim"), and, whether patients were currently diagnosed with "Low T" ("When do you intend to seek treatment for Low T?"). Notably, the preliminary question of whether the patient actually suffered from hypogonadism was not asked.

655.    As set forth on Auxilium's dedicated Testim website, the "Level Up Plan" solicited PHI from patients who were clearly identified by their name, address (including email address), and date of birth, including current medication profile ("I am currently being treated with Testim"), and whether patients were currently diagnosed with "Low T" ("I do not intend on treating my Low T in the immediate future . . . ."). The "Level Up Plan" was framed as "[w]hether you're ready to treat your Low T or not," rather than as "Whether your doctor is ready to treat your Low T or not."

656.    Auxilium knew that physician prescription practices with respect to the Testim product were heavily influenced by and driven by consumer demand for the testosterone treatment, and that patients were in fact deciding whether they would be treated with testosterone-containing products for their "Low T."

223

657.    The "Level Up Plan" acknowledged the central and pivotal role of consumer choice and product demand with respect to Testim treatment and usage and the fact that consumer acceptance of Testim treatment was a key driver of product sales, revenues and earnings growth, and prescription demand.

658.    Auxilium's "Level Up Plan" offered to provide consumers with ongoing medical information concerning Testim in order to further "educate" men with respect to the product, and to assist men in obtaining Testim treatment.

659.    The "Level Up Plan" shows that Auxilium knew and understood that consumers reasonably and justifiably relied upon Auxilium to provide true, accurate, and correct information to assist in their choice concerning use of the Testim product.

660.    The "Level Up Plan" and the Testim website provided consumers with the opportunity for a continuing and ongoing relationship directly with Auxilium, and without an intervening physician, with respect to the Testim product.

661.    Auxilium's "Level Up Plan" website offered consumers and patients an opportunity for ongoing medical information from and dialogue with Auxilium concerning the Testim product and "Low T" in order to provide men with "information most relevant to [their] specific needs." A patient's "specific needs" were ascertained via the solicitation of PHI by Auxilium.

662.    Auxilium's "Level Up Plan" and Testim websites were crafted to establish ongoing interactive and comprehensive medical, educational, and informational "consumer-pharmaceutical company relationship" in order to drive demand for "Low T" testing and self diagnosis to stimulate and increase consumer demand for "off-label" treatment with Testim.

663.    Auxilium's "Level Up Plan" and Testim websites knowingly provided consumers and patients with misinformation concerning the FDA-approved indications for clinical use of the Testim product and were designed to establish, expand, and advantage an internet-cultivated consumer base for the purpose of driving Auxilium's revenues, earnings, and market share in the Testim product space through unapproved and unsafe prescription and product use.

664.    Auxilium assumed and undertook duties separate and apart from, but coterminous with, roles traditionally reserved for and undertaken by healthcare providers, including:

- offering consumers and patients extensive medical information concerning a "disease," including signs, symptoms, etiology, and associated co-morbidities;

- advising patients concerning the treatment and/or treatment options for that "disease";

- providing assistance in the diagnosis of the "disease" by taking a detailed history of patient signs and symptoms, and recommending or directing laboratory testing for the "disease";

- providing information about specific drug therapy for the "disease";

- providing patients with physician referrals for evaluation and treatment;

- soliciting PHI and data concerning the health status of patients, including prior or current signs and symptoms; and

- maintaining an ongoing and relationship with the patient to provide further medical information.

665.    The "Level Up Plan" acknowledged the central and pivotal role of consumer choice and product demand with respect to Testim treatment and usage, and the fact that consumer acceptance of Testim treatment was a key driver of product sales, revenue and earnings growth, and prescription demand.

666.    The Auxilium Defendants also retained the "Transit Creative Brand Design Group" to redesign its Testopel website and to produce video materials to promote Testopel.

667.    The Transit Creative Brand Design Group's website includes a Testopel portfolio page that succinctly describes its efforts on behalf of the Auxilium Defendants; "When you're the little guy in a field of giants, you've got to be smart. Rather than expend limited resources trying to go head-to-head with larger players, [the Auxilium Defendants] chose to do one thing and do it well: get patients with low testosterone on therapy and keep them there. Transit helped show how easily Testopel pellets can do that."

668.    Overlapping with the Testim and Testopel Peer Selling Enterprise, the "Transit Creative Brand Design Group" also acknowledged part of its mission with the Testopel account was to promote Testopel to those within the medical profession, and, thanks to its video materials and website redesign, "10,000 doctors now know about Testopel."

669.    In 2010, the FDA sent a warning letter to the Auxilium Defendants concerning its promotion of Testopel.

670.    The FDA was concerned about certain promotional materials relating to Testopel, including a sales aid and certain webpages and video materials available at www.testopel.com.

671.    The FDA noted that the materials "promote unapproved uses of Testopel, omit and minimize important risk information associated with Testopel, broaden the indication of Testopel, overstate the efficacy of Testopel, present unsubstantiated superiority claims for Testopel, omit material facts, present misleading convenience claims, present an unapproved dosing regimen for Testopel, and/or present other unsubstantiated claims about Testopel."

672.    For example, the FDA criticized comments made by Dr. Abraham Morgentaler in a video on the Testopel website. In the video, Dr. Morgentaler, asking physicians to rely on his

authority as a sexual medicine specialist, told them that when his patients started treatment for Low T, "[t]heir strength may improve, their workouts at the gym may get better, they start chasing their wives around the room a little bit - they just feel like guys again."

673.    With regards to Dr. Morgentaler's sales pitch, the FDA stated the "totality of these claims misleadingly implies that Testopel can be used to treat sexual dysfunction" and "misleadingly implies that Testopel has a positive impact on the enhancement of athletic performance."

674.    The FDA also noted its serious concern that the video omitted or minimized the "serious risks" associated with the use of Testopel. Specifically, the video materials failed "to convey any risks specific to Testopel during the efficacy presentation." The only risk information presented was relegated to the end of the video, "in small print type in single-spaced paragraph format, with no accompanying audio presentation, and it appears on the screen for less than ten seconds, which does not allow adequate time for viewers to read this information."

675.    Further, although the video materials presented some of the contraindications associated with Testopel, the FDA was distressed the materials "completely omit[ted] the most serious and important warnings," precautions, and adverse reactions.

676.    Although the Testopel website has since been edited and Dr. Morgentaler's video is no longer available, the Testopel website is still misleading and omits and minimizes serious risk information.

677.    For example, the Testopel website explicitly equates hypogonadism with low testosterone by stating, "Low testosterone (Low T), also known as hypogonadism, occurs when a man's body produces little or no testosterone and has associated signs and symptoms."

678.    The Testopel website adds that studies have found that 1 in 3 men suffer from Low T. This "statistic" (likely pulled from the Mulligan HIM Study developed by the AbbVie Defendants) misleadingly implies that a third of the male population suffers from hypogonadism, which significantly overstates the prevalence of this rare condition.

679.    The Testopel website also lists a plethora of "signs and symptoms" of Low T, including decreased sex drive, decreased energy, decreased motivation, decreased self confidence, feeling sad or blue, poor concentration or memory, sleep disturbance, reduced muscle bulk and strength, increased body fat, and decline in physical performance.

### c.    *The Testim DTC Enterprise Association with "e-tractions"*

680.    In 2010, Auxilium engaged the marketing services of "e-tractions," a web-based marketing solutions provider, to optimize the web-based Testim DTC marketing campaign.

681.    In 2010, "e-tractions" published its "Case Study of Testim"[245] as follows:

THE BRAND: TESTIM

TESTIM, manufactured and marketed by Auxilium, is a prescription medicine used to treat hypogonadism, a medical condition that occurs when the body does not make enough testosterone. There are an estimated five million American men living with symptoms of low testosterone.

THE CHALLENGE

The challenge for e-tractions and the TESTIM brand team was to increase overall brand awareness. Testosterone replacement therapy is a category with very low awareness and there had been no significant investment by TESTIM or its competitor, AndroGel®.

THE SOLUTION

The TESTIM brand team turned to e-tractions to develop and manage an online marketing campaign designed to create awareness of TESTIM and stimulate demand for the product. Campaign elements were tracked and measured using EnterAct™, the e-tractions technology platform.

---

[245] Case Study of Testim, available at http://peerengage.com/downloads/TESTIM_CS.pdf

KEY PROGRAM FEATURES

The program components developed by e-tractions included:

- Co-registration
- An engaging interactive
- Relationship marketing emails

There were four objectives for the campaign. The first was to drive traffic to www.testim.com in order to create greater awareness and understanding of hypogonadism and TESTIM in particular. The second was to encourage registrant to download a rebate coupon to stimulate demand. The third was to collect names and email addresses of registrants so that TESTIM could communicate with registrants through permission-based emails on a regular basis. And lastly, the goal was to use the registration as a means to better understand the demographic and behavioral profile of potential TESTIM patients. e-tractions developed an informative and engaging game, "Fact or Fiction", designed to provide people with a better understanding of hypogonadism and TESTIM as a possible therapy.

RESULTS

The nine-month online marketing campaign generated a database of over 260,000 names and email addresses of men who gave permission for TESTIM to communicate with them via email. Both traffic to testim.com and registrations on the site increased significantly, with more than 30% of those who responded to the online advertising downloading a TESTIM rebate offer.

Emails segmented by condition, such as erectile dysfunction and type 2 diabetes, enjoyed open rates averaging more than 6%, a strong performance as compared to industry norms. As important as the strong open rates, TESTIM gathered valuable data to assist future marketing efforts. Based on registration information, the average age of prospects was 10 years younger than TESTIM had originally projected and over 60% of registrants claimed to have type 2 diabetes.

Contact Dan Keefe at (781) 276-1800 x27 or dkeefe@e-tractions.com

682.    As stated by e-tractions itself in the above-reproduced text, among the primary

men Auxilium sought for Testim DTC marketing were patients with erectile dysfunction and

Type II diabetes, both unapproved and unsafe conditions for which Testim use was not shown to

be safe or effective.    Notably, patients with erectile dysfunction and Type II diabetes are

typically at greater risk of cardiovascular disease, and therefore a drug's cardiovascular safety profile would have been particularly important to physicians treating such patients.

683.    As was true with its "Level Up Plan," Auxilium solicited PHI via "relationship marketing emails" including patient information concerning "erectile dysfunction and type 2 diabetes." Neither of these conditions was a clinical indication for Testim therapy. Auxilium thus sought to drive patient demand for the Testim product on the front end, and to increase physician prescribing habits for Testim on the back end, to improve Auxilium's revenues and market share in the TRT product market.

684.    Auxilium promoted Testopel with a "Reclaim Your Life" campaign that portrayed Testopel as a remedy for aging. The Testopel website that promoted this campaign prominently featured a quotation from Oliver Wendell Holmes: "Men do not quit playing because they grow old; they grow old because they quit playing." The Testopel website claimed that "common symptoms of Low T" included depression, erectile dysfunction, and Type II Diabetes. The website asked men "Do you have Low T?" and encouraged them to "Take the Quiz."

685.    Auxilium's predecessor-in-interest, Slate, received a "Warning Letter" from the FDA DDMAC dated March 24, 2010, concerning the "Reclaim Your Life" campaign and in particular, certain webpages and a consumer video on the Testopel website. The FDA found that the pages and the video were misleading because, *inter alia*, they "promote unapproved uses of Testopel" and because they "broaden the indication for Testopel." The FDA noted in its warning letter: "The overall impression conveyed by the above claims misleadingly implies that Testopel can be used to treat the symptoms of depression, erectile dysfunction, type 2 diabetes, HIV, mood disorders, and loss in sexual interest, and that Testopel treatment results in an increase in

muscle mass and bone strength. FDA is unaware of any data to support these claims and implications."

686.    Dr. Abraham Morgentaler, the physician discussed in the 2010 "Warning Letter" to Slate, was and remains a member of Auxilium's Scientific Advisory Board since 2004.

687.    Although the current Testopel website no longer includes the Holmes quotation, the site still lists as symptoms of "Low T" such conditions as "decreased energy, motivation, and self-confidence"; "[f]eeling sad or blue"; "[p]oor concentration/memory"; "[s]leep disturbance, increased sleepiness"; "[r]educed muscle bulk and strength"; "[i]ncreased body fat, body mass index"; and "[d]ecline in physical or work performance," even though none of these are specific to hypogonadism or low testosterone as a result of a clinical disease or condition.

688.    The message provided by www.testim.com that was intended "to create greater awareness and understanding of hypogonadism and TESTIM in particular" and to "stimulate demand for the product" was knowingly false, inaccurate, deceptive, and misleading with respect to the information offered. This message also willfully sought to conflate the diagnosis of hypogonadism with the diagnosis of "Low T" or age-related declines in testosterone levels or age-related symptoms in men, among other inappropriate, unsafe, and unapproved uses.

> *d.*    ***The Testopel DTC and Peer Selling Enterprise with TRG Communications, LLC***

689.    Defendant Auxilium also engaged vendor-participant TRG Communications, LLC to develop a "Core sales aid, patient educations materials, and posters."

690.    The "Concept" was to "TURN IT ON" with Testopel, and TRG Communications explained that "[w]e used the universal 'On' symbol (as seen on a multitude of devices used today) as highlight recognizable iconography to denote the patient being 'Powered On' for 3-6 months once TESTOPEL® is placed."

691.    Defendant Auxilium and TRG sought to link Testopel with symptom treatment for fatigue and to give middle-aged men a boost of energy. The materials are highly suggestive of unsafe and unapproved use.

## XI.    DEFENDANT ELI LILLY'S FRAUDULENT MARKETING OF AXIRON

692.    Defendant Eli Lilly launched Axiron in the first quarter of 2011, after purchasing an exclusive license to commercialize the product from Australia-based Acrux. According to the terms of the license, Lilly agreed to pay $50 million upfront, an additional $87 million upon FDA approval of Axiron, and $195 million in potential post-approval milestones.

693.    Defendant Lilly's press release announcing the deal made it clear that Lilly intended to promote Axiron for unapproved and unsafe uses. In the "About Hypogonadism" section, Defendant Lilly explained: "Testosterone deficiency in men (hypogonadism) is associated with a number of clinical problems. It has been estimated that up to 39% of men over 45 years of age may have testosterone levels below the normal healthy range [citing the Mulligan HIM Study, *supra*]. However, in the majority of men this remains undiagnosed, with approximately 10% of those with the condition receiving treatment." Even before Axiron's approval, Defendant Lilly sought to link age-appropriate testosterone levels to other co-morbidities and to suggest testosterone treatment was appropriate for nearly half of the male population over the age of 45. These statements echoed (and even cited) the decade or so of disease mongering pioneered by the AbbVie Defendants.

694.    Defendant Lilly's Peer Selling Enterprise, Publication Enterprise, and DTC Enterprise were similar in structure and function to those of the AbbVie Defendants and of Auxilium, described above. Defendant Lilly has poured significant monies into its Axiron commercialization efforts. According to a 2014 report by Encuity Research, the top six branded TRT drugs combined to spend a total of $282 million on promotional efforts in 2013, up from

just $55 million in 2009. Lilly's Axiron led the way, even surpassing the AbbVie Defendants' AndroGel promotion efforts; Lilly spent almost $122 million on Axiron promotion in 2013, spread among the Peer Selling, Publication, and DTC Enterprises. This is despite only achieving $178 million in sales in 2013. Defendant Lilly clearly sees Axiron as a long-term project and made a large bet on its success.

695. The consensus among both observers (such as Encuity) and participants (such as Acrux) is that "[t]he ramp-up of promotional activity is clearly having its desired effect." Fueled by Lilly's success promoting Axiron, Acrux's stock soared 63% in one month alone in July 2014.

### A. The Axiron TPP Formulary Access Enterprise

#### a. *Lilly Managed Markets Personnel Made False and Misleading Statements Concerning the Safety and Efficacy of Axiron to Plaintiff MMO and the TPP Class Members*

696. As part of the Axiron TPP Formulary Access Enterprise, Defendant Lilly developed a dedicated "managed care" (also called "managed markets") sales group whose job it was to call on TPP pharmacy directors and P&T committees. These specialized managed market representatives presented false and misleading studies/abstracts to persuade TPP to add Axiron to their formularies.

697. The Lilly managed market representatives were specifically trained to disseminate the Company's rehearsed false and misleading safety and efficacy message designed to cause the P&T committee to add Axiron as a formulary agent.

698. For example, the Company trained them through role-playing exercises to promote Axiron based on false and misleading safety and efficacy statements that had been rejected by the FDA.

699.    The Lilly managed markets representatives did as they were trained and instructed, and the TPP Formulary Access Enterprise succeeded in deceiving Plaintiff MMO into adding Axiron as an androgen agent on its formulary.

700.    

701.    The Lilly Defendants understood that the TPPs' understanding and conception of a product's safety profile was important to formulary management decisions, and – armed with false and fraudulent messages – sought to present Axiron not only as safe and effective for the unsafe off-label uses, but *safer and more effective* than other TRT drugs.

702.    Likewise, the Lilly Defendants noted in a presentation that 

703. ████████████████████████████████████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
██████████

704. ████████████████████████████████████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████

705. ████████████████████████████████████

████████████████████████████████████████
███████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████





706.

707.

708.

709.

710.



711. ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████ ██ ████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████

      *b.*    ***Lilly Made Direct Misrepresentations to Plaintiff MMO***

712. ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████

713. ████████████████████████████████████████████████

████████████████████████████████████████████

_____

[263] *Id.*

714.　████████████████████████████████████

████████████████████████████████████████

████████████████████████

715.　Lilly's MMO strategy was similar to Solvay's and Auxilium's, which included maintaining ongoing communications with MMO, as formulary status was subject to periodic review.

716.　Lilly representatives brought many of these misrepresentations directly to Plaintiff MMO. For example, Paul Titus is an Account Manager of Regional Managed Markets for Lilly since 2001. His territory includes Ohio, Indiana and West Virginia.

717.　An internal Lilly email ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

█████████████████████████ ████████████████████

████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████

264 ████████████████████████



718.    In a subsequent email,

719.    Plaintiff MMO thus became a priority target for Defendant Lilly's fraudulent marketing scheme.

          *c.*     ***Lilly Offers Numerous Other Managed Care "Initiatives" to Influence Plaintiff MMO and the TPP Class Members***

720.

721.

265

239

█████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████

722.　██████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████[267]████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████

723.　Following the Axiron presentation, ██████████████████████

█████████████████████████████████████████████

████████████████████████████████████

724.　██████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████

---

[267] *Id.*
[268] *Id.*

240

725. 

726.

727.

---

[269] *Id.*
[270] *Id.*
[271] *Id.*

728. 

729.



730.    These recommendations ████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████  As seen above, Lilly put all of these recommendations into effect

in an effort to market to MCOs, including Plaintiff MMO and the TPP Class Members.

731.    The Lilly Defendants' and/or their associates' successful false and misleading

marketing and misrepresentations concerning Axiron's safety and efficacy profile served as a

primer to allow for successful formulary negotiations with managed care.██████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████

**B.      The Axiron Peer Selling Enterprise**

732.    When Defendant Lilly entered the TRT market in the first quarter of 2011 with

Axiron, the testosterone market was already nearing $2 billion total in annual sales. In other

words, Lilly entered a mature market. This did not stop Defendant Lilly from adopting the AbbVie Defendants' philosophy of "making a bigger pie" by vigorously promoting the disease state and alleged unapproved comorbidities Axiron was supposedly safe and effective in treating.

733.    Defendant Lilly's Peer Selling Enterprise centered on (through vendor participants) hosting numerous events where doctors who had been trained and/or approved by Defendant Lilly would falsely oversell the efficacy and safety of Axiron and endorse the unapproved use of Axiron, often under conditions where physicians were compensated for attending the presentation. Defendant Lilly has funded (and continues to fund) scores of such events.

734.    Defendant Lilly created and controlled a Peer Selling Enterprise composed of medical marketing firms and dozens of physicians who routinely promoted Axiron to other physicians in venues all across the country. Defendant Lilly maintained sufficient control over the Axiron Peer Selling Enterprise to select and approve the content of the programs and the physician participants that would deliver the false and misleading messages. Physicians who were not receptive to promoting Axiron for the unapproved uses were not considered for inclusion in the Axiron Peer Selling Enterprise. The physicians (mostly primary care physicians) who attended these events were deceived into thinking that the events were unbiased, educational in nature and independent from the strategic control of Defendant Lilly.

735.    Recruiting many of its physician participants from the rosters already developed by the AbbVie Defendants and Auxilium, as well as developing its own, Defendant Lilly promoted Axiron for unapproved and unsafe uses through these physician speakers. Defendant Lilly has paid extravagant sums of money to leading urologists and endocrinologists in exchange for their publicized support of Axiron. For example, Dr. Irwin Goldstein, President and Director

of the San Diego-based Institute for Sexual Medicine and a Lilly physician participant, has been paid at least $122,000 by Defendant Lilly in the past three years for travel, speaking, meals, and consulting. Dr. L. Dean Knoll, of Urology Associates Nashville, has been paid over $200,000 by Defendant Lilly in the past several years for consulting, speaking, meals, travel, and "other." Dr. Culley C. Carson III, who is a Professor of Urology at UNC-Chapel Hill and a physician participant in Defendant Lilly's Peer Selling Enterprise, has been paid a comparatively modest $55,000 by Defendant Lilly for travel, consulting, meals, speaking, and "other" since 2009.

736.    For all of the money that has been disclosed, many of Lilly's payments remain under the radar. As mentioned above and described in detail below, Defendant Lilly funnels millions of dollars per year toward so-called "educational programs" in the form of CME events. The events are remarkably homogenous both in content and in terms of the chosen faculty/speakers for such events. This is because these are pre-packaged programs prepared and paid for by Defendant Lilly, which then passes them off in the form of educational "grants" to disguise its role and payments to the physician lecturers.

737.    Defendant Lilly's Grant Office, for example, states that it "provides grants and charitable contributions for healthcare profession education . . . programs in a variety of therapeutic areas." Those therapeutic areas more than often coincide with the products Lilly is promoting. Lilly only cagily acknowledges that "it is possible that the educational programs funded by the company through grants have discussed off-label uses of our products."

738.    According to the 2013 Lilly Grant Registry, Defendant Lilly expended approximately $2.75 million on so-called "Educational Programs" falling under the disease state "Urology – Hypogonadism" during the 2013 calendar year. This followed similar expenditures of approximately $2.3 million in 2012. Defendant Lilly expended tens of millions more on

educational programs for supposed co-morbid diseases, such as erectile dysfunction, Alzheimer's, diabetes, etc., where off-label references to TRT or Axiron treatment might "possibly" have been discussed.[275] The funding for these programs (and for the physician participants) was channeled through dozens of Axiron Peer Selling Enterprise vendor participants, some of which are detailed *supra*.

739.    The Axiron Peer Selling Enterprise employed false and misleading sales and marketing practices, including: (a) deliberately misrepresenting the safety and medical efficacy of Axiron for a variety of unapproved and unsafe uses; (b) knowingly misrepresenting the existence and findings of scientific data, studies, reports and clinical trials concerning the safety and medical efficacy of Axiron for both approved indications and for a variety of unapproved and unsafe uses; (c) deliberately concealing negative findings or the absence of positive findings relating to the unapproved and unsafe uses of Axiron; (d) wrongfully and illegally compensating physicians for causing the prescribing of Axiron; (e) knowingly publishing articles, studies and reports misrepresenting the scientific credibility of data and touting the medical efficacy of Axiron for both on-label and unapproved and unsafe uses, and then disseminating copies of such studies by the thousands; (f) intentionally misrepresenting and concealing Defendant Lilly's role and participation in the creation and sponsorship of a variety of events, articles and publications used to sell Axiron to unapproved and unsafe markets; and (g) intentionally misrepresenting and concealing the financial ties between Defendant Lilly and other participants in the Enterprises.

740.    For example, AccelMed, LLC is the first-listed vendor on Defendant Lilly's 2013 Grant Registry, having received nearly $450,000 for three hypogonadism-related programs in 2013. As cryptically conceded on AccelMed's website, the focus of such programs was not purely educational: "We understand the sensitive balance between science, adult learning, and

---

[275] http://www.lillygrantoffice.com/_assets/pdf/grantregistryreport_2013.pdf.

tactical preferences that can turn educational challenges into opportunities." Of course, the "tactical preferences" and "opportunities" related to the commercialization efforts by AccelMed's pharmaceutical clients for their products, which included Eli Lilly for its Axiron product.

741.    Unsurprisingly, the faculty presenting these AccelMed programs include physician participants in the Axiron Peer Selling Enterprise who presented at these and a multitude of other Lilly-sponsored "educational programs." For example, in a 2014 AccelMed Program titled "Practical Primary Care Strategies for Diagnosing and Managing Hypogonadism in Men – Best Practices to Improve Patient Outcomes," the two faculty lecturers were Dr. Martin Miner and Dr. Matt T. Rosenberg, both of whom are Axiron physician participants and are frequently on the roster of Lilly lecturers at such events. Dr. Rosenberg disclosed serving as a consultant for Lilly (among other pharmaceutical companies). Dr. Miner disclosed such arrangements with AbbVie and Endo, but not for Eli Lilly, which is surprising since Dr. Miner has disclosed elsewhere that he served on Eli Lilly's advisory board.

742.    Defendant Lilly expected that Dr. Miner and Dr. Rosenberg would present on the unapproved and unsafe uses of TRT drugs, including Axiron. Indeed, the "Program Overview" of this CME-accredited program states: "Testosterone deficiency is associated with a well-documented increase in risk of mortality and detrimental effects on quality of life: loss of energy and libido, erectile dysfunction (ED), joint pain and stiffness, memory impairment, irritability, and depression. In spite of this, hypogonadism remains an under diagnosed syndrome that, with its links to age, obesity, type 2 diabetes mellitus (T2DM), and metabolic syndromes, is becoming increasingly relevant."

743.    Assuming that Dr. Miner and Dr. Rosenberg followed the "Program Overview" (as well as the script and slides prepared by Defendant Lilly and provided through AccelMed), it appears that the entire program centered on the unapproved and unsafe uses of Axiron and TRT drugs. Furthermore, because the payments to Dr. Miner and Dr. Rosenberg were funneled by Defendant Lilly through AccelMed, they are not listed in the physician payment databases that are publicly available. For example, publicly available reports show Dr. Miner having only received a few thousand dollars in total from Defendant Lilly despite his participation in dozens of these CME lectures.

744.    Despite the limited information that is publicly available concerning physician payments, the local Michigan press ran a story on Dr. Rosenberg titled "Jackson doctor gets big checks from drug companies." In the story, Dr. Rosenberg defended himself asserting, "I don't do promotional pieces . . . . Everything I do is based on education." It just so happened, however, that the content of Dr. Rosenberg's lecture mirrored Defendant Lilly's false and misleading promotional efforts of Axiron.

745.    Similarly, Paradigm Medical Communications, LLC released in November 2013 a "Controversies in the Treatment of Male Hypogonadism" CME program "supported by an educational grant from Lilly." (The differences between Lilly "educational grants" and Lilly "independent educational grants" will be explored in discovery.) The faculty included two prominent Lilly physician participants: Drs. Culley C. Carson and Mohit Khera. Dr. Carson is the Chief of Urology at UNC-Chapel Hill, but also serves on Lilly's advisory board and speakers bureau. Dr. Carson has received hundred of thousands of dollars in payments from pharmaceutical companies, including Defendant Lilly. Dr. Khera is a Urology professor at Baylor University, and is likewise on Lilly's speakers bureau and has been paid at least $75,000

by Defendant Lilly in the last three (3) years alone. Exemplifying how Defendant Lilly pre-packaged the scripts and slides for these events, the "Statement of Need" for this CME reads almost identically to the "Program Overview" in the previous CME discussed and presented by Dr. Miner and Dr. Rosenberg: "The condition is associated with symptoms including erectile dysfunction, loss of libido, and decreased energy levels, as well as comorbidities including obesity, decreased muscle mass, and potential cardiovascular complications, and can result in decreased vitality and a reduced quality of life. However, studies have shown that a significant proportion of men with hypogonadism go undiagnosed, or do not receive testosterone replacement therapy due to either poor physician understanding of the benefits and safety of therapy or physicians' concerns of exacerbating other comorbid conditions."

746.    The consistency of the message in all the Lilly-supported CME events is attributable to the fact that Lilly controlled the content of these packages as part of the Axiron Peer Selling Enterprise.

747.    In another example, Defendant Lilly made two payments of $68,138 to vendor-participant Med-IQ, LLC, for two runs of the program "Tackling Taboos: Optimizing Management of Men's Health Through Evidence-Based Care and Effective Patient Communication." The faculty for each event were comprised of Dr. Rosenberg, who again disclosed extensive pharmaceutical ties, including to Defendant Lilly, and Dr. Steven A. Kaplan, who disclosed no potential conflicts. However, a review of ProPublica's Dollars for Docs database reveals that Dr. Kaplan received hundreds of thousands of dollars from pharmaceutical companies, much of it through his consulting firm Solera Consulting, LLC. The slides for the Med-IQ CME, which are available online, begin their discussion of hypogonadism (after a discussion of erectile dysfunction) with the assertion that "Hypogonadism Is Underdiagnosed

and Undertreated," relying on the Mulligan HIM Study funded and created by the AbbVie Defendants. The very next slide launches into non-indicated treatment suggestions; titled "Common Comorbidities of Hypogonadism," the slide listed co-morbidities (along with odds ratios) such as obesity, diabetes, hypertension, hyperlipidemia, osteoporosis, and Asthma/COPD. The next slides focus on "Screening for Low Testosterone" and reproduce the ADAM Questionnaire developed by the AbbVie Defendants as well as list the vague set of symptoms found on the www.Axiron.com website, including: fatigue, poor concentration, sleep disturbance, decreased muscle mass, decreased erections, and fragility fractures.

748.    Dr. Louis Kuritzky, a Family Medicine Professor at University of Florida, declared in a Lilly-sponsored video that "replacement of testosterone is a very satisfying process." Defendant Eli Lilly paid almost $80,000 toward Dr. Kuritzky's seven (7) minute long video lecture delivered to the 2013 Men's Health World Congress, available on the Foundation for Men's Health website. Neither the website nor the video discloses Defendant Lilly's involvement. Dr. Kuritzky himself has received tens of thousands of dollars from Defendant Lilly and other pharmaceutical interests for consulting, speaking, and other services. In a four (4) minute lecture at the same Men's Health World Congress by Axiron physician participant Dr. Jed Kaminetsky, who is on the faculty at NYU Medical School, Dr. Kaminetsky attempted to address the association of TRT with prostate cancer growth by stating his opinion that TRT has "very little effect on the prostate." Neither the website nor the video discloses Defendant Lilly's involvement. Dr. Kaminetsky has been paid nearly $400,000 by Defendant Lilly alone since 2009 for research, consulting, speaking, travel, and meals.

749.    Even some of the Peer Selling Enterprise materials had an air of DTC styling about them. At an American Association of Family Practitioners (AAFP) conference held in

250

September 2013 in San Diego, Defendant Lilly (along with the AbbVie Defendants) gave $150,000 for the AAFP IDEAL "Hitting Below the Belt: Winning Strategies to Promote Men's Health" presentation. The series of panels depicted muscular and shirtless prizefighters and were boxing-themed. Several of the panels were TRT-related with titles such as "Go Toe to Toe with Testosterone Deficiency" and "Don't Get Caught Against the Ropes – Confirm the Diagnosis." In conjunction with the "Go Toe to Toe" panel, a "Clinical Pearl" of wisdom offered was the false and misleading claim that doctors should "[e]xplore the possibility of testosterone deficiency in certain middle-aged and older patients, such as those with type 2 diabetes and symptoms such as low libido and erectile dysfunction." The identity of the presenter(s) for these TRT panel slides is unclear, but the message was classic unapproved andropausal promotion by Defendant Lilly and the AbbVie Defendants.

750.    These CME-driven efforts were complemented with traditional detailing by Defendant Lilly's sales force. Lilly's sales force had been promoting Lilly's erectile dysfunction drug, Cialis, since 2003, and thus was well positioned to take on Axiron as well, given "Lilly's success with Cialis and the synergy between prescribing groups of Axiron and Cialis …."  The sales force also arranged for the utilization of non-CME physician lecturers to whom Defendant Lilly's sales and marketing teams served as handlers. Defendant Lilly's sales force arranged less formal lectures and roundtables, publicized them to primary care physicians on details, drove the lecturers to the events, and provided them with scripts and slides for the events. As with the CME events, the lectures contained largely uniform messaging centering on: (1) the unapproved and unsafe uses for Axiron; (2) suggesting utilization of vague screening criteria such as the ADAM questionnaire or the list of symptoms on Axiron's website; and (3) disease fear mongering by suggesting that as little as 5% of men with "low T" were being treated. Eventually,

physician speakers were also asked to make reassuring statements concerning cardiovascular safety of TRT and of Axiron.

### C. The Axiron Publication Enterprise

751. Although Defendant Lilly, along with other TRT manufacturers, relied extensively on studies created largely by the AbbVie Defendants' Publication Enterprise, such as the Mulligan HIM Study, Defendant Lilly also sought to create the impression that the medical literature supported TRT and Axiron for unapproved and unsafe uses.

752. As noted by Acrux, Defendant Lilly had undertaken clinical trials focusing largely on unapproved and unsafe usage of Axiron, "represent[ing] significant commitments by Lilly to expanding the therapeutic indications for Axiron." Notably, Defendant Lilly has yet to request the FDA to expand the FDA-approved indications for Axiron. Whether the indications were FDA-approved mattered little to Defendant Lilly, so long as Axiron was being prescribed for these expanded indications.

753. Clinical trials undertaken by Lilly to support the "expanded" unapproved and unsafe use of Axiron included: "A trial for enhanced sex drive and energy levels"; "An ejaculatory dysfunction trial"; and "A trial for suboptimal responders to testosterone gels other than Axiron." Acrux was hopeful that other off-label pursuits would materialize, stating "[t]here is scope for testosterone use in other indications such as cachexia, which is the muscle wasting and weight loss that occurs in the later stages of cancer." Acrux also stated that "[e]xploratory clinical studies have been publicized investigating testosterone effects in Alzheimer's and Multiple Sclerosis. Another slide also listed chronic opioid use, renal disease, Type II Diabetes, and obesity as potentially ripe markets for testosterone. As did the AbbVie Defendants with AndroGel, Defendant Lilly used its Publication Enterprise to promote Axiron as snake oil.

754.     Notably, all three (3) of the studies referenced above have been completed, but no trial results have been published and no publications have been released. In fact, the entries for all three trials on clinicaltrials.gov list Lilly alone as the "Study Sponsor," "Responsible Party," and "Investigator." No research physicians or collaborators are named. This is because Defendant Lilly is in control of all aspects of these studies, from inception and protocol creation to resulting publications.

755.     Nevertheless, the efficacy study titled "A Study in Men with Low Testosterone to Measure the Effects of Testosterone Solution on Testosterone Levels, Sex Drive and Energy" bears the clinical trials identifying number NCT01816295, which is listed on the Urologic Consultants of Southeastern Pennsylvania's website (http://www.urologicconsultsepa.com/handler.cfm?event=practice,template&cpid=26336) under clinical trials being conducted by that physician group. A sampling of the group's physicians reveals extensive pharmaceutical ties, with several physicians raking in hundreds of thousands of dollars from Eli Lilly and other pharmaceutical interests. For example, Dr. Phillip Ginsberg, seated front and center in the physician practice's team photo, has received nearly $250,000 in payments from Defendant Lilly and others since 2009 for meals, speaking, travel, consulting, and "combination." His colleague Dr. Richard Harkaway has been paid at least $365,000 by Defendant Lilly and others for speaking, travel, consulting, and meals since 2009. Dr. Laurence Belkoff has received over $200,000 from Defendant Lilly and other pharmaceutical interests for research and speaking since 2009. Once the (doubtless) favorable study results for this study are published, the study investigators and potential authors will be tapped by Defendant Lilly to ride the speaker circuit, proclaiming the study's positive results supporting Axiron's unapproved and unsafe use in exchange for handsome speaker payment fees. As is clear from the trial's clinicaltrials.gov entry,

the trial is an Eli Lilly funded marketing venture designed, as stated by Acrux, for the purpose of "expanding the therapeutic indications for Axiron."

756.    Even the studies supporting Defendant Lilly's NDA approval for Axiron followed the usual steps and involved the usual physician participants. For example, Defendant Lilly's www.Axironmd.com website (for healthcare professionals) states under the "Clinical Study" tab that "AXIRON was evaluated in a multicenter, open-label, 120-day trial of 155 men with hypogonadism." Defendant Lilly then relates some of the positive findings of the open-label study for potential prescribing physicians to cogitate on, while failing to disclose Defendant Lilly's and Acrux's extensive involvement in the study, including the resulting publication, Wang *et al.*, Efficacy and safety of the 2% formulation of testosterone topical solution applied to the axillae in androgen-deficient men, J. Clin. Endocrinology (2011) 75:836-4. Dr. Christina Wang, whom Defendant Lilly recruited from the AbbVie Defendants' Peer Selling and Publication Enterprises, served as the lead author on the study. However, Dr. Wang's exact role in the study is unclear, as the study's clinicaltrials.gov entry lists the "Study Sponsor" as "Eli Lilly and Company," the "Responsible Party" as "Chief Medical Officer, Eli Lilly," the "Investigators" as "Eli Lilly and Company," and "Collaborators" as "None Provided." Two of Dr. Wang's co-authors were Acrux employees, and all of the authors (including Dr. Wang) with the exception of Dr. Niloufar Ilani, disclosed financial ties to Lilly, Acrux, or both. Dr. Wang herself disclosed a consulting relationship with Lilly and having received research grants from Acrux.

757.    The "authors" went on to acknowledge several Lilly employees and employees of a ghostwriter company called "i3 Statprobe" for their purported "critical review of the manuscript." The company i3 Statprobe's website (www.i3global.com) redirects to inVentiv

Health clinical (http://www.inventivhealthclinical.com/). Among the services provided by i3 Statprobe is "Phase IIB-III Clinical Trial Medical Writing" (http://www.inventivhealth clinical.com/phase-ii-iii-clinical-trials-medical-writing.htm). Defendant Lilly's study was a Phase III clinical trial. Described as providing a "full complement of medical writing services" through at least "160 writers, editors, and writing management staff[,]" the medical writers "provide all your documentation and writing needs." One of the medical writers "acknowledged" by Dr. Wang is Rich Pistolese, who holds a bachelor's degree in chemistry. This study was used to support Axiron's NDA and is featured prominently on Defendant Lilly's website and in the prescribing information.

758. Defendant Lilly employed many of the same tactics utilized by the other TRT Defendants, including the AbbVie Defendants, in the formation of the Axiron Publication Enterprise. Study "authors" such as Dr. Wang exercised little control over the study's protocol and only had a superficial role in the dissemination of the study results and the creation of the medical literature pieces. Nevertheless, Dr. Wang's professional reputation was enhanced as the "lead author" of the study. Dr. Wang boasts on her faculty profile at UCLA School of Medicine's website that she "has authored over 250 peer-reviewed publications[.]" Dr. Wang was paid more than $250,000 in 2011 and 2012 by Defendant Lilly for her "research."

759. As part of Defendant Lilly's Publication Enterprise, Defendant Lilly created study protocols consistent with Defendant Lilly's intended Axiron marketing messages, funded these studies to completion, exercised total control over the decision to publish and the format and substance of the resulting medical journal articles, and paid largely through its vendor participants prominent physicians to lend their names for "authorship" of such articles in exchange for handsome payments. Defendant Lilly then masqueraded these predetermined study

results, often ghostwritten by Defendant Lilly and its vendor participants, as credible science on its websites, through reprints distributed by Defendant Lilly's sales force to physicians, and through physician speakers as part of the Peer Selling Enterprise.

### D.    The Axiron DTC Enterprise

760.    With the help of its vendor-participants, Defendant Lilly has engaged in DTC advertising campaigns that fraudulently, misleadingly, and deceptively concealed and minimized serious health risks associated with the use of Axiron and promoted Axiron as safe and effective for unapproved and unsafe uses lacking scientific support.

761.    Targeted DTC advertising of Axiron was designed to drive patients to ask their physicians for prescriptions of Axiron. Both branded Axiron and unbranded DTC disease state marketing were thus undertaken by Defendant Lilly and its associates, and were geared specifically toward expanding the definition of hypogonadism or branding "Low T" as a recognized disease state in need of treatment, preferably with Axiron.

762.    Defendant Lilly has invested heavily in DTC advertising. Of the $122 million Defendant Lilly spent on promoting Axiron in 2013, nearly 70% of it ($84 million) funded DTC efforts. Defendant Lilly spent more than double the amount of money on Axiron DTC alone in 2013 than the combined total for all promotional efforts of TRT manufacturers for Testim, Testopel, Fortesta, and Androderm. As stated by Encuity Research, "[m]anufacturers have taken note of how successful DTC advertising has been for driving market share in other lifestyle markets, such as erectile dysfunction, dermatology, and eye care." For its part, having the experience of promoting Cialis for approximately a decade, Defendant Lilly understood the importance of wildly extravagant DTC spending efforts in commercializing Axiron.

763.    Defendant Lilly associated with high-profile (and high budget) New York advertising firms to develop a multitude of Axiron commercials, most variations on the same

themes of lean and attractive middle-aged men with grey hair applying Axiron and then power boating or sporting (or otherwise exuding masculinity) while their young attractive female partners look upon them lustfully.

764. In addition to the "Vacation" commercial produced by Grey Group and described *supra*, these DTC ads, which are highly suggestive of unapproved and unsafe use and which rarely mention hypogonadism, have won national recognition.

765. For example, Grey New York produced a television ad titled "A New Day" in the summer of 2013, which won the bronze medal at the 2013 DTC National Advertising Awards. The television ad mentions "hypogonadism" a total of zero times and shows a fit middle-aged man waking up in the morning with a burst of energy, applying Axiron in the bathroom, suiting up and flirting with his attractive wife over breakfast, and then striding confidently into the office as the commercial cuts to Axiron's classical silhouette of a chiseled man applying Axiron to his raised underarms. As observed by Deborah Dick-Rath of MM&M, the image is evocative of "a classic Greek statue of a very athletic man who probably never heard of 'low T.'"

766. The "A New Day" commercial was designed to suggest to men that they could use Axiron to treat low energy levels, which is consistent with the false and misleading messages being developed as part of the Lilly Axiron Peer Selling, Publication, and DTC Enterprises. Defendant Lilly's www.axiron.com website lists "[f]atigue and loss of energy" as one of several "[s]igns and symptoms of low testosterone (Low T)." The FDA has not approved Axiron to treat "[f]atigue and loss of energy," nor has Axiron been proven to be safe or effective at treating "fatigue," which for many men is likely attributable to something other than the rare condition of hypogonadism.

767.     Another Axiron television commercial featured our patient and protagonist serving as a lively home plate umpire in a baseball game. As he slaps on his face mask, he extols the listener: "My mantra? Trust your instincts to make the call." The commercial then cuts to our umpire applying Axiron in the bathroom, giving himself a reassuring look in the mirror before leaving the bathroom, and proceeding energetically to call a runner out at home plate. Hypogonadism is again mentioned zero (0) times, and the commercial urges patients to self-diagnose based on "instincts" and then ask their physicians for treatment. Defendant Lilly manipulated those instincts by suggesting that low testosterone was the root cause of any number of medical conditions and generalized symptoms.

768.     Many of these commercials instruct the viewer to "[s]ee our ad in Money Magazine." Money Magazine has a readership of approximately 7.6 million, of which approximately 5 million are men with a median male readership age of 44.5. Consistent with Defendant Lilly's television commercials, which also feature middle-aged men, Defendant Lilly's DTC advertising in Money Magazine and elsewhere was designed specifically to attract middle-aged men with gradually declining, but non-hypogonadal age-appropriate testosterone levels.

769.     Overall, the advertisements disseminated by Lilly have suggested that various symptoms often associated with other conditions may instead be caused by low testosterone and encouraged men to discuss TRT with their doctors if they experienced any of the "symptoms" of low testosterone. These "symptoms" included "decreased sexual desire (libido)," "erectile dysfunction," "fatigue and loss of energy," "depressed mood," "loss of body hair (decreased need to shave)," "decrease in strength," and "osteoporosis (decreased bone density)." All of these

are general symptoms that are often a result of aging, weight gain, or lifestyle, rather than conditions associated with hypogonadism.

770.    Lilly makes Axiron even more enticing to consumers and physicians by providing an easily downloadable "Savings Card" that can be used for a free 30-day trial and up to $75 in monthly savings on Axiron. The solicitation states: "Your eligible patients with commercial insurance get 1 year of monthly savings with the FIRST MONTH FREE, and pay no more than $25 per month up to a maximum of $75 after the first month free." The website further encourages physicians to "[d]ownload as many as you'd like[.]"  For consumers, card activation requires a simple clicking of three buttons: (1) that you are a resident of the United States or Puerto Rico; (2) that you are 18 years old; and (3) that your prescription is not covered by insurance through the government. Once the Savings Card is downloaded and activated, consumers are directed to show the Savings Card and prescription to the consumer's pharmacist. The Savings Card solicitation fails to mention any step regarding consultation with a physician and diagnosis of hypogonadism.

## XII.    DEFENDANT ACTAVIS' FRAUDULENT MARKETING OF ANDRODERM

771.    Androderm is a prescription TRT medication in the form of a transdermal patch, manufactured by TheraTech Inc. and Actavis Inc. (formerly Watson Pharmaceuticals). Androderm was initially approved for use (2.5 mg and 5.0 mg) by the US FDA on September 29, 1995, to treat adult males who have low or no testosterone due to hypogonadism.  On October 11, 2011, the FDA approved 2 mg and 4 mg formulations of Androderm.

772.    Androderm is indicated for TRT in men with a deficiency or absence of endogenous testosterone.  This includes cases of primary hypogonadism, which may be caused by cryptorchidism, bilateral torsion, orchitis, vanishing testis syndrome, orchiectomy, Klinefelter's syndrome, chemotherapy, or alcohol/heavy metal toxicity. It is also prescribed to

treat hypogonadotrophic hypogonadism, including in patients with luteinizing hormone or luteinizing hormone-releasing hormone (LHRH) deficiency caused by tumors, injury, or radiation.

773.    From 1995 through 1999, Androderm was marketed by SKB under an agreement with TheraTech.  In 1999, when Watson purchased TheraTech, it began marketing Androderm through its own sales force and through a contracted sales force from InVentiv Health.

774.    Androderm is applied topically through a patch that adheres to the skin and is applied nightly for 24 hours of medication delivery. Patches come in two different doses, the 2mg patch or the 4mg patch, the 4 mg patch is the recommended dosage.  Androderm's most common side effect is listed as skin irritation at the site of the patch. Androderm's product warning label does not include heart attack, stroke or death in its list of health risks.

### A.    The Androderm TPP Formulary Access Enterprise

775.    As part of the Androderm TPP Formulary Access Enterprise, Defendant Actavis developed a dedicated "managed care" (also called "managed markets") sales group, many of whom had advanced science degrees, whose job it was to call on TPP pharmacy directors and P&T committees. These specialized managed market representatives presented false and misleading studies/abstracts to influence TPP P&T committees into adding Androderm as a formulary drug.

776.    The Androderm TPP Formulary Access Enterprise was created to target Plaintiff MMO and the TPP Class Members to obtain favorable insurance coverage that, in turn, paved the way for "pull-through" strategies.

777.    The Actavis managed market representatives were specifically trained to initiate the Company's rehearsed false and misleading safety and efficacy message designed to cause the P&T committee to add Androderm as a formulary drug.

778.    For example, the Company trained them through role-playing exercises to promote Androderm based on false and misleading safety and efficacy statements that had been rejected by the FDA.

779.    The Actavis managed markets representatives did as they were trained and instructed, and succeeded in deceiving Plaintiff MMO and the TPP Class Members into adding Androderm on its formulary.

780.    ████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████

781.    ████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

782.



783.    The marketing plan described multiple tactics, including visual aids, journal ads for professional publications, convention panels, and product monographs.

**B.    The Androderm Peer Selling Enterprise**

784.    Defendant Actavis' Peer Selling Enterprise centered on hosting numerous events where doctors trained and/or approved by Defendant Actavis would falsely oversell the efficacy and safety of Androderm and would provide favorable information on the unapproved and unsafe use of Androderm, often under conditions where physicians would be compensated for

---

276

attending the presentation. Defendant Actavis funded and continues to fund scores of such events from 1999 to present.

785.    Indeed, the FDA's DDMAC was concerned about the false and misleading marketing of Androderm as far back as 1998, when it served a warning letter on SKB, a vendor participant which at that time had acquired marketing and promotion rights to Androderm granted by Defendant Watson. Referencing a "Promotional Dear Doctor Letter" that was "written on SKB letterhead and signed by SKB representatives," the FDA instructed SKB that the letter "is misleading because it suggests that Androderm is safe and effective for treating non-insulin dependent diabetes mellitus (NIDDM) when such has not been demonstrated by adequate and well-controlled clinical trials." Among the statements in the Dear Dr. Letter was the following off-label assertion: "testosterone supplementation … may result in significant improvements in insulin sensitivity, thereby potentially improving glucose control …."

786.    One example of Defendant Actavis' Peer Selling Enterprise comes directly from Defendant Actavis' website. In announcing FDA approval of Androderm 2mg/day and 4mg/day dosing forms, Defendant Actavis' news release quotes Dr. Jed Kaminetsky: "'The approval of the new low-dose testosterone patch offers millions of men a reliable and convenient transdermal option for what continues to be an under-diagnosed and undertreated condition,' said Jed C. Kaminetsky, M.D., urologist at University Urology Associates and clinical assistant professor of urology at New York University School of Medicine. 'The new Androderm® formulation effectively treats symptoms of male hypogonadism, which include decreased sexual desire, fatigue and mood depression. In addition, the patch helps minimize the risk that the testosterone may be transferred from patients to children or women, unlike testosterone gel preparations.'"

787.    Assuming Dr. Kaminetsky was involved in the clinical trials supporting FDA approval (a fair assumption since he is quoted in the FDA approval news release), Defendant Actavis did not disclose that Dr. Kaminetzky was contractually obligated to speak out in favor of Androderm. As denoted in the two Watson-sponsored hypogonadism studies on clinicaltrials.gov that supported the Androderm 2mg and 4mg approval, "There **IS** an agreement between Principal Investigators and the Sponsor (or its agents) that restricts the PI's rights to discuss or publish trial results after the trial is completed." (emphasis from source). Furthermore, Defendant Actavis failed to disclose that Dr. Kaminetsky has been paid hundreds of thousands of dollars by TRT manufacturers, including by Defendant Actavis for "consulting."

788.    Defendant Actavis created and controlled a Peer Selling Enterprise composed of medical marketing firms and several dozen physicians who routinely promoted Androderm to other physicians in venues all across the country. Defendant Actavis maintained sufficient control over the Androderm Peer Selling Enterprise to select and approve the content of the programs and the physician participants that would deliver the off label message.  Physicians who were not receptive to promoting Androderm for the unapproved and unsafe uses were not considered for inclusion in the Androderm Peer Selling Enterprise. The physicians (mostly primary care physicians) who attended these events were deceived into thinking that the events were educational in nature and independent from the control of Defendant Actavis.

789.    The Androderm Peer Selling Enterprise employed false and misleading sales and marketing practices, including: (a) deliberately misrepresenting the safety and medical efficacy of Androderm for a variety of unapproved and unsafe uses; (b) knowingly misrepresenting the existence and findings of scientific data, studies, reports and clinical trials concerning the safety and medical efficacy of Androderm for both approved indications and for a variety of

unapproved and unsafe uses; (c) deliberately concealing negative findings or the absence of positive findings relating to the unapproved and unsafe uses of Androderm; (d) wrongfully and illegally compensating physicians for causing the prescribing of Androderm; (e) knowingly publishing articles, studies and reports misrepresenting the scientific credibility of data and touting the medical efficacy of Androderm for both on-label and unapproved and unsafe uses, and then disseminating copies of such studies by the thousands; (f) intentionally misrepresenting and concealing Defendant Actavis' role and participation in the creation and sponsorship of a variety of events, articles and publications used to sell Androderm to off-label markets; and (g) intentionally misrepresenting and concealing the financial ties between Defendant Actavis and other participants in the Enterprises.

### C.     The Androderm Publication Enterprise

790.     In order to carry out their Androderm Publication Enterprise, Defendant Actavis and its associates exercised close control to ensure that their off-label Androderm marketing messages were prominently included in seemingly unbiased clinical studies which were in fact the opposite.

791.     As part of the Actavis Publication Enterprise, Actavis hired non-physician technical writers and used internal employees to create the necessary articles and then paid the specialists to be the articles' "authors." This practice is referred to as "ghostwriting," as previously discussed. In order to monitor the status of publications, and in order to coordinate and execute the ghostwriting plan, marketing firms were necessary. The role played by the firms in assisting each Defendant in creating publications was very similar to the role played by marketing firms in the coordination of peer-to-peer marketing events.

792.     Most prominent in Defendant Actavis' Publication Enterprise was the selective publication of data and through its close control of what study investigators or physician

participants could say concerning these trials. Defendant Actavis hand-picked specialists to be study "investigators," but these specialists had little input in the study design and which study results could be released to the public. Defendant Actavis controlled the stream of published information concerning Androderm through its policy of publishing only favorable results of its own internal trials and suppressing results that were unfavorable. For example, the two Watson studies referenced above, bearing clinical trial numbers NCT01104246 ("Dose Titration Investigation of the Pharmacokinetics of Testosterone Transdermal Systems in Hypogonadal Men") and NCT01323140 ("Pharmacokinetics, Metabolism, Efficacy, and Safety Study of Two Testosterone Matrix Transdermal Systems"), have only published selective results. For example, the second trial was both a safety and an efficacy study, with the primary outcome measure efficacy-related "Percent of Subjects with Testosterone Levels in the Normal Range." No secondary outcome measures have been published or disclosed publicly, where measures such as hematocrit increases might have been taken as part of the study protocol (which has also not been made public). The trial does report study participants having had few adverse events, which is unsurprising given its short duration (30 days), and the fact that there was no data monitoring committee.

793. Making public only favorable results of such studies and at the same time contractually obligating physician participants only to speak favorably of the trial was part of Defendant Actavis' Publication Enterprise. As noted above, the product of this selective publishing was a corpus of data that inaccurately represented safety profiles of the TRT drugs individually and as a class.

794. Feeding into the Peer Selling Enterprise, Defendant Actavis distributed reprints of these publications by the thousands in its physician details. Additionally, Actavis required its

physician participants to discuss these study results at peer influence events as part of the publication strategy that intentionally misrepresented each Defendant's role in the creation and sponsorship of the publications. Physicians who reviewed these publications were led to believe that the publications were the independent, unbiased research of the authors of the articles. They were not made aware of the fact that each Defendant had in fact solicited these articles or that they had paid significant sums of money in various forms to the physician authors to induce them to make favorable statements about Defendants' TRT drugs.

795. Defendant Actavis also relied extensively on the Publication Enterprises of the other TRT Defendants, and in particular the AbbVie Defendants' AndroGel Publication Enterprise. For example, under the "Strong Safety Profile" and "Highly Effective" sections of the Androderm website, Defendant Actavis cites the infamous HIM Study "authored" by Dr. Thomas Mulligan, and which is discussed above. In addition, the Androderm website cites Dandona & Rosenberg, A practical guide to male hypogonadism in the primary care setting, Int. J. Clin. Pract. (2010) 64(6):682-96. The article was funded and sponsored by the AbbVie Defendants and one of its vendor participants as part of its Publication Enterprise. As disclosed in the article: "Writing assistance to the authors was funded by Solvay Pharmaceuticals, Inc. (Solvay) and provided by Robin Smith, PhD, of the Curry Rockefeller Group, on behalf of Solvay. The authors provided guidance and direction at the initiation of the outline and on all drafts, and maintained full control of the intellectual content of this review article."

796. All components of the Androderm Publication Enterprise operated under the exclusive control of Defendant Actavis.

**D.    The Androderm DTC Enterprise**

797. After Androderm was approved by the FDA in 1995, the Actavis Defendants engaged in DTC media campaigns to convince men who were experiencing the typical effects of

the aging process that they were suffering from low testosterone, which could be treated with testosterone supplements, including Androderm. The DTC marketing campaign consisted of advertisements, promotional literature placed in healthcare providers' offices and distributed to potential Androderm users, and online media including Defendants' website for Androderm: www.myAndroderm.com.

798.    MyAndroderm.com asserts that 4 to 5 million otherwise healthy men experience low testosterone and encourages male visitors to get "a simple blood test" to determine whether they have low testosterone. The site also identifies a number of "symptoms" that it associates with low testosterone which are symptoms that are more commonly associated with aging, weight gain, and lifestyle.

799.    The Androderm website also explicitly promotes Androderm for unapproved and unsafe uses. Under the "Highly Effective" tab in bold lettering is the heading, "Effectively Treats Male Hypogonadism." However, the text below contains explicit off-label messaging: "Androderm® 2mg/4mg effectively treats signs and symptoms associated with male hypogonadism, some of which include:

- Erectile dysfunction

- Decreased sexual desire

- Fatigue/loss of energy

- Mood depression

800.    One of the websites Actavis operates is an unbranded website, www.myTlevel.com, which purports to be a neutral, informational site and has no mention of Androderm. Viewers who are persuaded they need TRT and click on the "Available Treatment" link are led to MyAndroderm.com, one of Actavis' branded websites.

801.     The unbranded myTlevel site greatly expands the approved indications for TRT drugs, and in particular, Androderm. The website tells men that "[t]estosterone deficiency can be associated with a variety of symptoms, including fatigue, depression, decreased libido, impotence, and decreased muscle mass." It tells men they can "confirm the diagnosis" by answering the ADAM questionnaire, the same questionnaire used by other TRT manufacturers.

802.     Actavis's ADAM questionnaire asks men such questions as:

Do you have a decrease in libido (sex drive)?

Do you have a lack of energy?

Do you have a decrease in strength and/or endurance?

Have you noticed a decreased "enjoyment of life"?

Are you sad and/or grumpy?

Are your erections less strong?

Have you noted a recent deterioration in your ability to play sports?

Are you falling asleep after dinner?

The website presentation of the ADAM Questionnaire prompts men by placing the word "YES" in capital letters next to each question. The website instructs men "if you answered 'Yes' to any 3 questions in total, you may wish to talk to your doctor about having a blood test to determine your testosterone level."

803.     In fact, the symptoms listed on Actavis's ADAM Questionnaire are virtually all symptoms of normal aging in middle-aged and older men. Actavis's myTlevel website suggests, however, that a man with any three of these symptoms is a candidate for TRT. In this way, Actavis seeks to expand the indication for Androderm and engages in off-label marketing of its TRT product.

804.    Actavis also actively sought to capitalize on its competitors' marketing campaigns by selling Androderm as a safer alternative to other TRT drugs. Its Internet advertising asked men if they are a "High Five Type of Guy," a "Bear Hug Type of Guy," or a "Firm Handshake Type of Guy" and portrayed Androderm as safer because, the advertisements suggested, the user will not transmit the drug to coworkers, children, and friends.

805.    Defendant Actavis' DTC Enterprise has sought to convince primary care physicians that low testosterone levels are widely under-diagnosed and that conditions associated with normal aging (such as the ones described above) could be caused by low testosterone levels.

806.    As part of its DTC Enterprise, Actavis and its associates promoted Androderm as an easy to apply patch for TRT. Actavis has contrasted its product's at-home patch with other topical testosterone supplements in that the patch protects against the transfer of testosterone to others and assures proper dosing. *See* Androderm Patches, *available at* http://www.myAndroderm.com/Androderm_patches.aspx#HighlyEffective (last visited October 20, 2014).

807.    Actavis' DTC Enterprise encouraged men to discuss TRT with their doctors and consumers and their physicians relied on promises of safety, effectiveness, and ease of use. Although prescription TRT has been available for years, millions of men who had never been prescribed testosterone flocked to their doctors and pharmacies.

808.    Actavis has engaged in aggressive DTC advertising campaigns to grow the market for Androderm.  For example, the Androderm website indicates that it is "[f]or men with low testosterone," a condition which the Androderm website claims is largely caused by the aging process. The Androderm website also represents that Androderm is "highly effective" and that its design ensures proper dosing and minimized risks. As stated by Defendant Watson's

CEO in a Q3 2011 Earnings Call, "We expanded our sales force in the U.S. by just over 40 representatives . . . to support the launch of the 2 new strands of ANDRODERM."

809. Through DTC marketing campaigns that feature slogans like "Think Beyond the Gel" and "The Patch is Where It's At," Actavis' DTC Enterprise has promoted that the testosterone patch is safer than testosterone gel products, such as AndroGel, which is currently the best selling TRT.

810. Androderm DTC advertisements have suggested that it is superior to gel products, which are dispensed in a spray pump that could provide inaccurate doses. In addition, testosterone gel side effects may pose a risk for children and women, who may suffer adverse health problems from testosterone if they come into contact with the gel.

811. Unfortunately, a number of recent studies have suggested that men face a serious risk of heart problems from Androderm and all other testosterone products.

812. All components of the Androderm DTC Enterprise operated under the exclusive control and direction of Defendant Actavis.

## XIII. DEFENDANT ENDO'S FRAUDULENT MARKETING OF FORTESTA

813. In a late 2009 deal worth up to approximately $210 million, Defendant Endo acquired a license to commercialize Fortesta in the United States from Prostrakan Group, PLC of Great Britain. David Holveck, president and CEO of Endo, stated that Fortesta "is synergistic with our recent therapeutic expansion," which includes testosterone injection and testosterone implant products as well.

814. Defendant Endo's Fortesta® Gel ("Fortesta") is a patented two percent (2%) testosterone transdermal gel and is a treatment for men suffering from hypogonadism. Fortesta is delivered transdermally and is applied to the skin in the form of a gel. Endo's two original TRT products are Fortesta and Delatestryl. Delaytestryl (Testosterone Enanthate

Injection, USP) is indicated for replacement therapy in conditions associated with a deficiency or absence of endogenous testosterone.

815.    In August 2009, Endo entered into a License and Supply Agreement (the ProStrakan Agreement) with Strakan International Limited, a subsidiary of ProStrakan Group plc (ProStrakan), for the exclusive right to commercialize Fortesta® Gel in the United States.

816.    On or about January 29, 2015, Endo (directly or indirectly) acquired Auxilium. At various times material hereto, Auxilium has owned, manufactured, marketed, and sold three TRT products, Testim, Testopel, and Striant. In acquiring Auxilium, Endo has assumed all liabilities arising from those three products.  To the extent that any of Auxilium's liabilities were not assumed, and to the extent that Auxilium continues to exist, Auxilium is sued herein in connection with Testim, Testopel, and Striant.

817.    The FDA approved Fortesta on December 29, 2010, for the treatment of adult males with hypogonadism, in conjunction with an associated medical condition. Examples of these conditions include failure of the testicles to produce testosterone for reasons such as genetic problems or chemotherapy.  After FDA approval, Fortesta was widely advertised and marketed by Endo as a safe and effective TRT. However, Endo itself acknowledges on its Fortesta website, fortestagel.com, that Fortesta's safety and effectiveness for treating male-aging conditions has not been proven:  "It is not known if FORTESTA® Gel and Testosterone Gel are safe or effective to treat men who have low testosterone due to aging."  Thus, Endo's representations to the contrary made to Plaintiff MMO and the TPP Class Members were false by Endo's own admission.

818.    Endo launched Fortesta® Gel in the first quarter of 2011. In a March 3, 2011 press release announcing the launch, Endo stated that the "introduction of FORTESTA Gel in the

U.S. comes at a time when only about 1.3 million (9 percent) of the estimated 14 million men with Low T are actually receiving treatment."

819.    Net sales of Fortesta® Gel were $65.9 million, $30.6 million and $14.9 million for the years ended December 31, 2013, 2012 and 2011, respectively.

820.    The Endo Enterprises described below and this TAC were calculated to influence Plaintiff MMO and the TPP Class Members to cover the cost of the TRT drugs via multi-pronged managed care strategies involving (1) direct in-person misrepresentations, and (2) planting of misleading promotional messages through a vast corrupt publication and advertising strategy.

### A.    The Fortesta TPP Formulary Access Enterprise

821.    The Fortesta TPP Formulary Access Enterprise was created to target Plaintiff MMO and the TPP Class Members to obtain favorable insurance coverage that, in turn, paved the way for Endo's "pull-through" strategies.

822.    The Endo Defendants, like the other manufacturers, realized the critical importance of obtaining favorable formulary access and developed a dedicated "managed care" (also called "managed markets") sales group whose job it was to call on Plaintiff MMO and TPP pharmacy departments, pharmacy and medical directors, P&T committees, and clinical groups. These specialized managed market representatives presented false and misleading information, including studies or abstracts, to influence Plaintiff MMO and the TPP Class Members in order to obtain favorable formulary coverage for Fortesta.

823.    As a critical strategy to ensure the successful launch of Fortesta in 2010, ███

██████████████████████████████████████  ████████████████████

████████████████████████████████████████████████████

277 ███████████████



824. ██████████████████████████████

825. ██████████████████████████████

826. For example, the Company trained them through "mock" role-playing exercises to promote Fortesta based on false and misleading safety and efficacy statements that had been rejected by the FDA.

827. ███████████████████████████████████

███████████████████████████████████████

███████████████████████ ▪

828. ███████████████████████████████████

███████████████████████████████████████

█████████████████████████████████

829. ███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████

830. ███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████



831.    Because there is no scientifically reliable evidence showing efficacy for the various symptoms or conditions associated with the male-aging process, this was an intentional misrepresentation.

832.    As a result of Endo's sales pitch to MMO, MMO decided to grant Fortesta favorable formulary status.  In 2012, MMO implemented a changed to the formulary status and added Fortesta to the preferred brand (tier 2) (with co-preferred brands AndroGel 1.0% and 1.62% and Androderm).  This resulted in moving Testim to non-preferred tier 3, with Axiron and Striant.

833.    The Endo managed markets representatives did as they were trained and instructed, and succeeded in deceiving Plaintiff MMO into adding Fortesta to its formulary.

834.    



835.



836.    Endo understood that the TPPs' understanding and conception of a product's safety profile was important to formulary management decisions, and – armed with false and fraudulent messages – sought to present Fortesta as safe and effective for the off-label uses, and indeed, *safer and more effective* than other TRT drugs.

**B.    The Fortesta Peer Selling Enterprise**

837.    Defendant Endo's Peer Selling Enterprise centered on Endo hosting numerous events where doctors trained and/or approved by Defendant Endo would falsely oversell the efficacy and safety of Fortesta and would provide favorable information on the unapproved and unsafe use of Fortesta, often under conditions where physicians would be compensated for attending the presentation. Defendant Endo funded and continues to fund scores of such events.

838.    In fact, an Encuity Research report detailing the TRT Defendants' promotional efforts in 2013 revealed that Defendant Endo, as a percentage of its total promotional budget, devoted a larger share of that budget toward "Meeting and Events" than did any other TRT manufacturer, including Defendants Lilly and the AbbVie Defendants.

839.    Defendant Endo created and controlled a Peer Selling Enterprise composed of medical marketing firms and several dozen physicians who routinely promoted Fortesta to other

---

physicians in venues all across the country. Defendant Endo maintained sufficient control over the Fortesta Peer Selling Enterprise to select and approve the content of the programs and the physician-participants that would deliver the off label messages. Physicians who were not receptive to promoting Fortesta for the unapproved and unsafe uses were not considered for inclusion in the Fortesta Peer Selling Enterprise. The physicians (mostly primary care physicians) who attended these events were deceived into thinking that the events were educational in nature and independent from the control of Defendant Endo.

840. The Fortesta Peer Selling Enterprise employed false and misleading sales and marketing practices, including: (a) deliberately misrepresenting the safety and medical efficacy of Fortesta for a variety of unapproved and unsafe uses; (b) knowingly misrepresenting the existence and findings of scientific data, studies, reports and clinical trials concerning the safety and medical efficacy of Fortesta for both approved indications and for a variety of unapproved and unsafe uses; (c) deliberately concealing negative findings or the absence of positive findings relating to the unapproved and unsafe uses of Fortesta; (d) wrongfully and illegally compensating physicians for causing the prescribing of Fortesta; (e) knowingly publishing articles, studies and reports misrepresenting the scientific credibility of data and touting the medical efficacy of Fortesta for both on-label and unapproved and unsafe uses, and then disseminating copies of such studies by the thousands; (f) intentionally misrepresenting and concealing Defendant Endo's role and participation in the creation and sponsorship of a variety of events, articles and publications used to sell Fortesta to unapproved and unsafe markets; and (g) intentionally misrepresenting and concealing the financial ties between Defendant Endo and other participants in the Fortesta Enterprises.

841.     For example, Defendant Endo sponsored a CME-creditable supplement to the Journal of Family Practice with "an educational grant." The title of the CME program centered on so-called "Late-onset male hypogonadism" and the so-called learning objectives included "broadly classify[ing] late-onset male hypogonadism" and the intended audience included "Family physicians" and primary care physicians "interest[ed] in treating patients with late-onset male hypogonadism." Of course, Fortesta is not approved to treat "late-onset male hypogonadism" and is only approved to treat Primary hypogonadism and Hypogonadotropic hypogonadism. There is no indication for so-called "late-onset male hypogonadism," which is merely a synonym of "andropause" and the natural result of male aging. One of the faculty for this CME publication was Dr. Richard Sadovsky, who disclosed that he serves on Defendant Endo's advisory board, and the medical accuracy reviewer was Dr. Martin Miner, who is on the Auxilium speakers bureau. Dr. Sadovsky received a $2,500 consulting fee payment on December 8, 2013 according to the CMS Sunshine Act database that recently went online. Defendant Endo's payments to Dr. Sadovsky prior to August 2013 will be examined in discovery.

842.     In another example, Defendant Endo sponsored an obviously unapproved and unsafe TestosteroneUpdate CME titled "Hypogonadism and Erectile Dysfunction." The faculty for this June 2013 event was Dr. Allen D. Seftel, who disclosed that he was a consultant to AbbVie, Actient, Auxilium, Endo, and Lilly. Dr. Seftel has received tens of thousands of dollars from these pharmaceutical companies, and the CMS Sunshine Act database reveals that Dr. Seftel received a $3,000 payment from Auxilium in November 2013 for "Food and Beverage" purposes.

843. The event, which was organized by Defendant Endo through vendor participants Dannemiller and CogniMed (both Peer Selling Enterprise vendor participants for multiple Defendants), stated the following for its "Needs Assessment":

> Hypogonadism and erectile dysfunction (ED) are under diagnosed and therefore undertreated conditions that can be associated with serious comorbid conditions, including metabolic and cardiovascular disease (CVD). Appropriate screening for comorbidities and treatment by any provider seeing men who are at risk should be encouraged. Mounting evidence indicates that ED and hypogonadism are associated with premature CVD, cardiovascular events, and cardiac death, as well as increased all-cause mortality. Despite compelling evidence, many clinicians are not aware of the connections between ED, hypogonadism, comorbid conditions, and overall health.

844. The event, at Defendant Endo's direction and direct control, sought to convey the Endo marketing message concerning the purported link between ED and hypogonadism to each other and to other co-morbidities to encourage unapproved and unsafe use of Fortesta.

845. In another example, Defendant Endo supported with an "educational grant" an event organized by Fortesta Peer Selling Enterprise vendor-participants Postgraduate Institute for Medicine and Miller Communications, LLC, titled "Opioid-Induced Androgen Deficiency: Approaches to Diagnosis and Management." The title of the event explicitly promoted unapproved and unsafe use of Fortesta and other TRT drugs in chronic opioid users. All three faculty – Dr. Michael J. Brennan (consulting, speakers bureau), Dr. Andre Guay (speakers bureau, consulting), and Dr. Abraham Morgentaler (contracted research) – disclosed extensive financial connections to Defendant Endo. The event also falsely suggested that "[t]he opinions expressed in the educational activity are those of the faculty and do not necessarily represent the views of . . . Endo Pharmaceuticals, Inc." Defendant Endo sought to keep its extensive content control of programs, like the one described, secret, as part of the Peer Selling Enterprise.

846. In addition, Defendant Endo's sales representatives provided physicians and healthcare providers with information and literature concerning the indications for clinical use of

Fortesta, as well as discount and/or rebate coupons to give to patients for the purchase of Fortesta.

847. Defendant Endo's drug sales representatives detailed and marketed Fortesta to physicians as a product approved and indicated for the treatment of age-related declines in testosterone levels and age-related symptoms.

848. Defendant Endo denominated and characterized age-related declines in testosterone levels and age-related symptoms in men as "Low T," and used the "Low T" moniker to denote and connote that the presence of age-related declines in testosterone levels and age-related symptoms in men were a form of acquired hypogonadism.

849. At all times material hereto, Defendant Endo knew and understood the meaning of the term "false and misleading promotion." Endo knew and understood the FDA regulations pertaining to "off-label" marketing and promotion of an FDA-approved pharmaceutical product.

850. Defendant Endo has marketed, promoted, and detailed Fortesta for unapproved and unsafe use for the purpose of label expansion, and it detailed and promoted the product to physicians in furtherance of the Peer Selling Enterprise under the rubric that "Low T" was an indication for clinical use of Fortesta.

851. Defendant Endo has promoted and marketed TRT to physicians as a lifestyle drug that could treat a variety of symptoms caused by the normal aging process in males, including: erectile dysfunction; loss of libido; loss of athleticism; loss of muscle mass; fatigue; and mood swings. Defendant Endo overstated the benefits of testosterone as a treatment for lifestyle changes associated with the aging process despite the fact that the drug was never FDA approved for these uses.

852.    Defendant Endo has purposefully downplayed, understated and outright ignored the health hazards and risks associated with using Fortesta. Defendant Endo concealed materially relevant information from potential Fortesta users and their physicians, and minimized user and prescriber concern regarding the safety of Fortesta, including but not limited to its known propensity to drastically increase hematocrit and estradiol levels in users.

853.    Defendant Endo has misrepresented that Fortesta is a safe and effective treatment for hypogonadism or "low testosterone," when in fact the drug causes serious medical problems, including life threatening cardiac events, strokes, and thromboembolic events.

854.    Fortesta causes the hematocrit level to increase, thereby thickening the blood. This effect, if not monitored and controlled properly, can lead to life threatening cardiac events, strokes and thromboembolic events.

855.    Defendant Endo has failed to warn physicians adequately about the risks associated with Fortesta and the monitoring required to ensure the safety of patients using Fortesta.

### C.    The Fortesta Publication Enterprise

856.    Like the other manufacturers, Endo's publication enterprise was intended to target Plaintiff MMO and the TPP Class Members, with misleading messages of safety and efficacy. An Endo internal

857. The pervasive nature of the Defendants' extensive misinformation campaign infected the nationwide sources of information relayed to Plaintiff MMO and the TPP Class Members (as well as their PBMs).

858. Together with Endo's direct misrepresentations, Endo's publication strategies reinforced the false messages conveyed to Plaintiff MMO and the TPP Class Members.

859. For their Fortesta Publication Enterprise, the Endo Defendants and their associates exercised close control over publication materials to ensure that their false and misleading marketing messages were prominently included in seemingly unbiased clinical studies when, in fact, the opposite was true.

860. As part of the Fortesta Publication Enterprise, Endo hired non-physician technical writers and used internal employees to create the necessary articles and then paid the specialists to be the articles' "authors." This practice is referred to as "ghostwriting." In order to monitor the status of publications, and in order to coordinate and execute the ghostwriting plan, marketing firms were necessary. The role played by the firms in assisting each Defendant in creating publications was very similar to the role played by marketing firms in the coordination of peer-to-peer marketing events.

861. One particular example is the article by Dr. Adrian S. Dobs.[288] The article, which is the only study cited by Defendant Endo on its Fortesta healthcare professionals website for both safety and efficacy,[289] purports to present the results of an independent study involving Fortesta's "novel" 2% testosterone gel for hypogonadal males. In fact, the true purpose of the article was to promote Fortesta on behalf of the Endo Defendants and is merely exemplary of

---

[288] Dr. Adrian S. Dobs, et al., *A Novel Testosterone 2% Gel for the Treatment of Hypogonadal Males,* 33 J. Androl. 601-07 (2012).

[289] http://www.fortestagel.com/hcp/tolerability-and-safety.html *and* http://www.fortestagel.com/hcp/testosterone-gel-efficacy.html.

Defendant Endo's Publication Enterprise. The facts and circumstances surrounding the creation of this study, which are outlined below, and its purpose were disclosed nowhere on Defendant Endo's Fortesta website.

862.    The article discloses that the "study was funded by ProStrakan Pharmaceuticals, Inc." and that "[w]riting and editorial assistance was supported by Endo Pharmaceuticals." These disclosures are misleading in that Defendant did not just "support" the writing and editorial assistance. Defendant Endo controlled the content of the publication to ensure that the resulting article would support Defendant Endo's intended false and misleading marketing strategy.

863.    As an initial matter, none of the so-called "external authors" disclosed any conflicts of interest to the Defendants, including Dr. Dobs, the lead (and thus cited) author. Two of the authors were ProStrakan employees and one was an Endo employee. Dr. Dobs has received thousands of dollars from TRT pharmaceutical interests over the years, and states on her Johns Hopkins faculty profile that she has "published extensively" on the "risks and benefits of testosterone replacement therapies." According to the CMS Sunshine Act physician payment database, Dr. Dobs, less than a year after publication of this study, received a $3,000 "consulting" payment from Defendant Endo. Payments to Dr. Dobs from Defendant Endo prior to August 2013 will be explored in discovery.  However, Dr. Dobs has received tens to hundreds of thousands of dollars of pharmaceutical interests' money over the years, including from Defendant Endo.  Most of Dr. Dobs's TRT publications center on the benefits of unapproved and unsafe use.

864.    While the Endo Defendants hired doctors to serve as "authors" of the study in order to support the perception that this article was an independent and scientific publication, Endo also took significant steps to ensure that the resulting product presented a message Endo

could promote to potential prescribing physicians. After the article's favorable discussion of TRT drugs and of Fortesta as a result of the Endo-funded study, the authors "thank Peter Budka and Catherine Jones (Watermeadow Medical) for their writing and editorial assistance."

865. Watermeadow, an Endo vendor participant, is a medical communications firm that specializes in "Excellence in Medical Communications," publication planning and development, advocacy development and medical education. It has been retained by multiple pharmaceutical companies to promote their respective products, including Endo Pharmaceuticals for Fortesta.

866. Under the "Scientific Publications" section of its website, Watermeadow states that "[i]nfluential, informative and accurate scientific publication writing underpins all clinical, marketing and sales activities." Under the "Publication planning" section of its website, Watermeadow opens with, "[p]ublication planning is vital to the success of the marketing strategy of any product." Watermeadow also notes that scientific publications are "one of the most influential communication channels for healthcare and scientific audiences." Of course, such channels are influential only when the articles appear to be the result of unbiased research by specialist researchers at teaching universities, such as Dr. Dobs at Johns Hopkins. While most medical writing firms are more discreet about their value to their clients, Watermeadow has understood, and stated on its website that it understood, that Endo intended that and would in fact be using the Dobs et al. article for promotional and sales purposes.

867. Watermeadow Medical's own promotional materials emphasize that its employees will "be working directly with clients" in an effort to "unite scientific and creative flair to maximise the communication of your key messages to the people who matter," and "deliver striking and influential communications that will set you apart from your competition."

In an employment brochure describing a day in the life of "Jane," who is a more or less fictional Watermeadow medical writer, "Jane has a sandwich and a chat with colleagues in the communal area at lunchtime, then returns to her desk to go through a draft manuscript which a senior writer has reviewed for her and corrected using tracked changes. Going through them, Jane realizes that the senior writer has filled in some gaps in the discussion and also improved the structure. She makes a mental note of what she needs to do differently next time." Interactions with the study "authors" as denoted on the final published product appear not to be a part of Jane's normal day as a medical writer.

868.     Watermeadow Medical's employment brochure emphasizes the importance of medical writers and medical editors to its efforts. The brochure quotes a medical writer who states, "I choose to work for Watermeadow because it allows me to use my scientific background in a more creative way." However, a scientific background is not required to be employed as a medical writer or editor, and apparently was not in the Dobs *et al*. article created by Watermeadow at Endo's direction. One of the Watermeadow employees who was thanked in the Dobs' article for his "writing and editorial assistance," Peter Budka, holds a B.A. in English Literature and Classics. Defendant Endo and Watermeadow understood that a publication authored by Mr. Budka would not be as influential as a publication by Dr. Dobs, which is why Dr. Dobs was paid for her "authorship" of the study.

869.     The Endo Defendants used the efforts of Watermeadow Medical and others to control the misleading messages promoted by the Fortesta Publication Enterprise. These efforts gave the impression that their products were supported by independent science, which allowed them to conceal the serious risks, including cardiovascular health, associated with TRT therapy.

870.    Defendant Endo created study protocols consistent with Defendant Endo's intended Fortesta false and misleading marketing messages, funded these studies to completion, exercised total control over the decision to and the format and substance of the resulting medical journal articles, and paid largely through its vendor participants prominent physicians to lend their names for "authorship" of such articles in exchange for handsome payments. Defendant Endo then masqueraded these predetermined study results, often ghostwritten by Defendant Endo and its vendor participants, as credible science on its websites, through reprints distributed by Defendant Endo's sales force to physicians, and through physician speakers as part of the Peer Selling Enterprise.

### D.    The Fortesta DTC Enterprise

871.    Defendant Endo and its associates engaged in aggressive, DTC and physician marketing and advertising campaigns for Fortesta. Further, Defendant engaged in an aggressive unbranded "disease awareness" campaign to alert men that they might be suffering from "low T."

872.    Defendant Endo and its associates published a quiz on the website for Fortesta titled "Could it be Low T?", and encouraged men as young as 35 to take the quiz to find out whether their symptoms are caused by low testosterone levels. According to the "Could it be Low T?" quiz, the symptoms of "Low T" include feeling tired, a loss of body hair, and needing to shave less.[290]

873.    In one 2011 DTC ad campaign aimed at physicians, Endo ran ads in Urology Times and other periodicals with the banner "[h]elp replenish his testosterone levels with a low volume gel."  This campaign used a gas station pump representation to show how FORTESTA®

---

[290] See http://www.gettestedforlowt.com/.

Gel helps patients with testosterone deficiency "fill back up" and achieve normal testosterone levels. Urology Times has a circulation of over 11,000 urologists in the United States.

874. In a 2012 ad that Endo ran in Urology Times and elsewhere which was aimed at urologists, the company showed two drops of Fortesta Gel to represent two pump actuations on the front of the patient's thigh, and made the claim: "When his pair needs some help, this pair could raise his T."

875. In another DTC advertisement, Endo used the tagline "Pump Up your T" to convince men that "If You're a Man With Low Testosterone (Low T), FORTESTA® Gel Could Help You. The ad claims that a "small amount of gel applied each day may be all that's need to help raise your T."

876. In 2013, Endo retained healthcare communications company GSW Global from Westerville, Ohio to formulate and design a DTC marketing strategy and marketing plan with respect to Fortesta. In one award-winning direct mail campaign, GSW actually printed a not so subliminal "Fortesta Gel Application Tool" message on boxer shorts to extoll virtues of using Fortesta to treat Low T, which it then mailed to physicians throughout the United States:



After the mailing's January 2013 launch, total prescriptions of Fortesta increased 64% (month-over-month).

877.    As a result, diagnoses of Low T have increased exponentially. This has directly related to Fortesta's net sales increasing by 154% in 2013 as compared to 2012.

878.    Defendant Endo attributed the sales increase to "improved [TPP] formulary access to this product."[291]

879.    However, consumers, the Plaintiff MMO and the TPP Class Members were misled as to the drug's safety and efficacy, including for unapproved and unsafe uses, and as a result have suffered injuries including life-threatening cardiac events, strokes, and thromboembolic events.

880.    Defendant Endo and its associates successfully marketed Fortesta by undertaking a DTC "disease awareness" marketing campaign which sought to create a consumer perception

---

[291] http://biz.yahoo.com/e/130806/endp10-q.htm.

that low testosterone is prevalent among U.S. men and that symptoms previously associated with other physical and mental conditions, such as aging, stress, depression, and lethargy were actually attributable to "Low T."

881.    Endo's DTC Enterprise sought to create the image and belief by consumers, their physicians, and Plaintiff MMO and the TPP Class Members that the use of Fortesta was a safe method of alleviating their symptoms that had few side effects and would not interfere with their daily lives, even though it knew or should have known these assertions to be false, and even though it had no reasonable grounds to believe them to be true.

882.    Through its DTC Enterprise, Defendant Endo and its associates purposefully downplayed, understated and outright ignored the health hazards and risks associated with using Fortesta. Defendant Endo deceived potential Fortesta users by relaying positive information through the press, including testimonials from retired professional athletes, and manipulating hypogonadism statistics to suggest widespread disease prevalence, while downplaying known adverse and serious health effects.

883.    Defendant Endo concealed materially relevant information from potential Fortesta users and minimized user and prescriber concern regarding the safety of Fortesta.

884.    In particular, in the warnings Defendant Endo and its co-conspirators gave in their DTC Enterprise commercials, online and print advertisements, they fail to mention any potential cardiac or stroke side effects and falsely represent that Endo adequately tested Fortesta and disclosed results for all likely side effects.  Defendant Endo also failed to warn and instruct regarding the importance of adequate monitoring of hematocrit levels. As a result of the DTC Enterprise, men in the United States pervasively seek out prescriptions for Fortesta. If Plaintiff

MMO and the Class had known the risks and dangers associated with Fortesta, they would have limited access to Fortesta accordingly.

## XIV.   CONSPIRACY IN VIOLATION OF FEDERAL RICO LAW

885.   As alleged herein (and incorporated herein by reference), Defendants have engaged in multiple conspiracies to broaden the market for their TRT drugs both artificially and unlawfully causingd Plaintiff MMO and the TPP Class Members to suffer economic injury by paying for medically inappropriate TRT prescriptions. Defendants entered into agreements to conspire (a) among Defendants themselves, in a deceptive "unbranded" marketing campaign (hereinafter the "Inter-Company Conspiracy"); (b) between Defendants and their co-promoters (hereinafter the "Co-Promoter Conspiracy"); and (c) between each Defendant and its third party marketers and promoters, which as described in this TAC include physician thought leaders, KOLs, medical ghostwriters, medical marketing firms, digital marketers, and front groups (hereinafter the "Intra-Corporate Conspiracy").

### A.   Inter-Company Conspiracy:  Defendants Conspired with Each Other to "Grow the Pie" by Agreements to Further a Vast "Unbranded" Campaign

886.   Defendants' "Grow the Pie" conspiracy involved implementation of their fraudualent marketing schemes, but without promoting a particular TRT drug.  Defendants, highly sophisticated pharmaceutical manufacturers with entire departments dedicated to understanding and working within (and, in this case, around) the regulation of prescription drugs pursuant to the Food, Drug and Cosmetic Act ("FD&C Act"), knew that the FDA polices drug marketing related to promotion of particular identified drugs, consistent with FDA's approved labeling, as to a drug's effectiveness, side effects and potential health risks.  Both affirmative misrepresentations, as well as material omissions, are subject to FDA's oversight. Prescription drug marketing, including advertisements, internet sites and all other promotional materials for

prescription drugs, must include, among other things, information relating to FDA-approved uses, side effects, safety, contraindications, and effectiveness. However, promotion of so-called disease states, like "Low-T" are not usually not monitored by the FDA.

887. Defendants' jointly exploited this loophole in FDA's monitoring of pharmaceutical company advertising and promotion. In particular, the FDA looks out for drug companies that misrepresent their drugs' safety and efficacy, including unsubstantiated comparison claims, and for "off-label" uses for their drugs – *i.e.*, uses for which the drug is not FDA-approved.

888. FDA regulations encompass advertisements in published journals, magazines, other periodicals, newspapers, and advertisements broadcast through media such as radio and television.

889. Defendants knew (but ignored) that FDA regulations prohibit promotion of prescription drugs for the underlying symptoms, or indications, of medical conditions that have not been supported by adequate clinical data and approved by the FDA.

890. Defendants also knew (but ignored) that the FDA has the authority to regulate prescription drug promotion even if such promotion did not actually mention any particular drug or drug manufacturer. Thus, Defendants viewed prescription drug "unbranded" promotions or "disease-awareness" campaigns as being entirely unregulated by the FD&C Act, allowing them the unfettered ability to promote the TRT drugs. This loophole has enabled Defendants to position the "diseases" their TRT drugs treat as a malady to treat a laundry list of symptoms or conditions as described in this TAC. Some of these symptoms are not necessarily medical conditions at all, such as listlessness, moodiness, lacking energy — that afflict nearly all men and women, at least once in a while. Yet other symptoms or conditions for which Defendants

promoted their TRT drugs involve serious medical conditions treatable by FDA-approved (and effective) prescription drugs, such as HIV, diabetes, depression and high cholesterol.

891.    Defendants named herein, at various times, have unlawfully and knowingly conspired to exploit this loophole in order to create, market and perpetuate fraudulent and deceptive schemes to transform the normal male aging process into a purported curable disease. In concert, Defendants promoted their new disease state using various labels, such as "Andropause," "late-onset male hypogonadism," "age-related hypogonadism," or simply "Low T."

892.    Defendants' coordinated unbranded campaign was intended to, and did, cause dramatically increased and unnecessary prescribing, and of critical importance, TPP reimbursements for Defendants' TRT drugs.

893.    By cooperating and synchronizing their efforts to promote their TRT drugs through a vast "unbranded" marketing campaign, Defendants conspired by agreements to further their joint endeavors in an "advertising over science" campaign.

894.    Defendants' profit-driven zeal to broaden the market through deception was so vast and pervasive it could not be contained within even the supposed loophole in the FD&C Act.

895.    Defendants knew (but ignored) that in February 2004 FDA had provided direction on the permissible boundaries of such unbranded campaigns.  In three FDA guidances on drug promotion, FDA affirmed the principles applicable to drug-specific marketing to disease awareness promotion – truthful, non-misleading marketing. The FDA outlined these principles in its "Help-Seeking and Other Disease Awareness Communications by or on Behalf of Drug and Device Firms" ("Disease Awareness Guidance"), which was intended by FDA to provide clear

directives to drug makers like Defendants on the rules applicable to communications to consumers and health care practitioners.

896.    Defendants knew (but ignored) that the Disease Awareness Guidance explained that its principal objectives included encouraging prescription drug firms to present risk information in their consumer-directed advertisements using language that is understandable by a lay user, and to encourage truthful, non-misleading, clear and scientifically accurate information on medical products and health conditions to consumers and health care practitioners. Defendants instead omitted or downplayed risk information and disseminated false, misleading, vague, scientifically unsupported and inaccurate information.

897.    Defendants knew (but ignored) that the Disease Awareness Guidance expressly cautioned drug companies that disease awareness communications should avoid encouraging self-diagnosis and self-treatment.  Defendants instead used the ADAM questionnaire for that exact purpose.

898.    Defendants knew (but ignored) that the FDA had cautioned that any unbranded communication or advertising is further subject to the FDA's express enforcement authority if it mentions a specific drug or contains a representation or suggestion concerning a specific drug. Under these specific situations, a supposed disease awareness communication may be treated by the FDA as labeling or advertising subject to regulations requiring fair and balanced communications, including truthfulness as to safety and efficacy. Defendants instead linked such advertising to their branded websites, or noted a Defendant's funding for such communication or advertisement.

899.    Similarly, Defendants knew (but ignored) that FDA guidance stressed that the practice of combining disease awareness communications with reminder or product-claim

advertisements (sometimes referred to as "bookending") triggers FDA oversight. The draft guidance had explained, in considering whether two unbranded communications together qualify as promotional labeling or advertising, the FDA would consider whether the pieces are perceptually distinct in the use of graphic, visual, thematic or other presentation elements, and whether the pieces are presented in close physical or temporal proximity. In this way, Defendants used their unbranded campaign as a means to link and promote their product-specific TRT drugs.

900. Defendants knew (but ignored) that FDA's position on the distinction between properly executed disease awareness materials and materials that "effectively promote" a drug are subject to FDA's regulatory oversight. With this knowledge, Defendants executed their disease awareness marketing campaign linking their drug products in an advertising and multi-faceted promotional blitz rivaling Madison Avenue's best.

901. Defendants knew (but ignored) that their vast unbranded marketing campaign fell under FDA's enforcement authority, but instead knowingly agreed to facilitate, and cooperate with, the activities of those individuals and companies which operated or managed the unbranded enterprise.

902. Defendants knew (but ignored) that their unbranded campaign's foundation was built on deception. The vast majority of TRT patients did not and do not suffer from diagnosed hypogonadism, the only condition for which TRT drugs are indicated for treatment by the FDA. To succeed, Defendants knew and intended that their synchronized marketing strategies needed to focus on Plaintiff MMO and the TPP Class Members' insureds, including those with age-appropriate testosterone levels and patients with marketable symptoms, many of whom were at risk for cardiovascular adverse events.

        *a.*      ***Making a "Bigger Pie": Concerted Joint Efforts to Grow the TRT Market***

903.    A key part of the Inter-Company Conspiracy between the Defendants has been the recognition that they were promoting essentially "undifferentiated" TRT drugs, and that their best marketing strategy would be to join together to promote TRT instead.  This sales-growth strategy would ignore market segment differences and attempted instead to appeal to all prospective customers with a single disease state through mass advertising and distribution. They were marketing a disease state that had a treatment, TRT.

904.    

_____

292 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
293 *Id.*



905.

906.  ██████████████████████████████████████

████████████████  ███████████████████████████

██████████████████████████████████████████████

████████████████████████████████

907.    To those who might have questioned whether such marketing collusion would work, Solvay's marketing materials reminded them this had worked in the past: ██████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████

908.  ██████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████





909.    This undifferentiated disease awareness campaign, which emphasized selling a new disease, was the focus for all Defendants. For example, ████████████████

████████████████████████████████████████████████████

████████████████████████████ ██████████████████████████

██████████████████████████████████ ████████

██████████████████████████████████████████████

████ ██

b.    ***Joint Funding of AstroTurf Organizations as Mouthpieces for "Unbranded" TRT Campaigns***

910.    Defendants at various times conspired with so-called "AstroTurf" co-marketing partners, individuals, marketing companies and others to implement Defendants' conspiratorial unbranded marketing campaign.



[303] *Id.*

911. AstroTurf marketing is the practice of masking the sponsors of a message or organization (*e.g.*, political, advertising, religious or public relations) to make it appear as though it originates from and is supported by grassroots participant(s). It is a practice intended to give the statements or organizations credibility by withholding information about the source's financial connection.

912. Defendants' marketing machines deployed funding to these AstroTurf organizations and groups whose supposed mission was to advocate for and educate consumers about health issues.

i. <u>Men's Health Network</u>

913. One such AstroTurf organization is the Men's Health Network ("MHN") (Tagline:"Building Healthy Families One Man At A Time") P.O. Box 75972, 236 Massachusetts Ave., NE, Washington, DC 20013, Phone: 202-543-MEN-1. This is an organization that dubs itself as a "a national non-profit organization whose mission is to reach men, boys, and their families where they live, work, play, and pray with health awareness and disease prevention messages and tools, screening programs, educational materials, advocacy opportunities, and patient navigation."

914. MHN has been jointly funded by AbbVie, Auxilium, Endo, GSK, and Lilly, among other drug companies.

915. Among MHN's drug-company sponsored activities are:

- National disease awareness campaigns;

- Public and retail screening and awareness programs;

- Data collection system that allows MHN to act as a clearinghouse for information about men's health issues;

- Providing and maintaining a network of healthcare providers and services that deal with men's health issues; and

- Lobbying activity with healthcare providers/agencies on men's health issues.

916.    Defendants AbbVie, Auxilium, Endo, GSK, and Lilly conspired with MHN in a ubiquitous disease awareness campaign to boost TRT drug use.  Defendants AbbVie, Auxilium, Endo, GSK, and Lilly then repeatedly referenced MHN in their promotional materials. MHN is one of the primary vehicles through which Defendants implemented their false and fraudulent unbranded campaign to expand the TRT market.

917.    MHN became the central AstroTurf mouthpiece for Defendants to promote the false safety and efficacy message regarding the TRT drugs.  For example, in 2002 Solvay, ████████████████████████████████████, spread its false and misleading safety and efficacy message to counter a February 4, 2002 article written by Dr. Jerome Groopman and published in *The New Yorker.* ████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████ Per its report, ██████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████ ███████████████████████████████████████████████

918.    AbbVie (Solvay) thus used, and knowingly caused the use of, mail and interstate wire communications to create, execute, and manage its fraudulent ███████████████

---

304 ██████████████████████████
305 *Id.*

███████████████████████████████████████████████

████████████████████████████████████████

919.    Likewise, using funding from Solvay ███████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████

920.    Throughout the campaign, MHN was used as a surrogate to counter the
Groopman *New Yorker* story and to get out ████████████████████████████

██████████████████████████████████████████ ███ █

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████ ████████





921.

922.



923.    Defendants used affiliation with MHN to legitimize its safety and efficacy messages.  Starting in 2004, ███████████████████████████████████████████

924.    The state-by-state online directory includes an MHN directory of doctors "participating in the National Testosterone Tune-Up."[314] In practice, this list includes doctors who repeatedly prescribed Defendants' TRT drugs and who have received training and compensation from Defendants. For example of the thirty-nine doctors from Ohio currently appearing in the directory, more than half have been detailed by one or more Defendants'

http://tuneupyourt.com/find-a-doctor/

304

representatives and/or received compensation to promote one or more of Defendants' TRT drugs.

925.  For example, 

926.



[redacted]

927. [redacted]

928. [redacted] Again, the safety and efficacy message falsely minimized cardiovascular risk associated with TRT. [redacted]

929. [redacted]

---

[redacted]

930.

931.

932.

933.





936.

937.



938.    Notably, a Men's Health Month event was held in Cleveland, Ohio on November 10, 2012.[334] This was another "Time Out for Men's Health" initiative by MHN, which was dubbed a "Free Health Screening and Educational Event." In addition to the typical Men's Health Month sponsors, the partners for this event included MHN, the Cleveland Clinic and Plaintiff MMO. [335]

939. 

940.

---

[334] http://www.menshealthmonth.org/event/health-screening-event-with-the-cleveland-browns
[335] *Id.*



941.

942.



944.    As alleged above, Defendants utilized the "non-profit" MHN as a front to project the appearance of neutrality, but in reality MHN was an AstroTurf partner that had been co-opted to further Defendants' mutual interests, and thereby expand the TRT disease market.

ii.    TestosteroneUpdate.org



312

945.    TestosteroneUpdate is another important AstroTurf organization that became the messenger in Defendants' scheme. AbbVie, Auxilium, Endo and Lilly are all listed as sponsors of the organization, along with CogniMed, Inc. and DanneMiller.

946.    TestosteroneUpdate, whose website can be found at TestosteroneUpdate.org, is an organization dedicated to men's health issues and features clinical literature, clinical consults, webcasts and podcasts, and other CME events. AbbVie, Endo, and Lilly are currently listed on its website as providing "educational grants." Nearly all of the contributors of content are KOLs cultivated by Defendants and members of Defendants' peer selling enterprises, including Dr. Culley Carson, Dr. Mohit Khera, Dr. Martin Miner, and Dr. Abraham Morgentaler.

947.    For example, Dr. Carson and Dr. Miner conducted a CME satellite symposium Webcast entitled "The Primary Perspective: Bridging Gaps in Male Urologic and Cardiovascular Health" which "examine[d] strategies to improve the concomitant management of ED, BPH/LUTS, hypogonadism, and CVD with PDE5 inhibitor therapy and testosterone therapy, focusing on how the management of these conditions may improve cardiometabolic parameters and overall health."[344] The webcast remains available online, though CME credit was only eligible through November 20, 2015.

948.    The webcast discusses how "sexual health for men can be a portal . . . cardiovascular disease." Instead of providing warnings about the cardiovascular risks of TRT use, the presentation sets out to show the link between erectile dysfunction and cardiovascular events. It also argues that Low T levels are associated with increased mortality rates and cardiovascular disease and to establish the link between obesity and hypogonadism. Dr. Miner states that, "Testosterone therapy has no direct effect on myocardial function, or so it is thought."

---

[344] http://www.testosteroneupdate.org/aafp_11_14_b.php.

949.   The real purpose of this webcast was to discredit the emerging literature and studies that were attempting to link TRT use with cardiovascular events. Specifically, Dr. Miner set out to discredit a 2010 Basaria NEJM article that reported over twenty percent of Testim patients suffered adverse cardiovascular events. In a slide titled, "New Concerns TOM Trial: Study Design," Dr. Miner discussed how the Basaria article "brought a great deal of controversy" but, in reality, the results were overstated or completely inaccurate: One bullet on the slide states:  "Cardiovascular AEs had variable clinical importance." Under "Limitations," Dr. Miner stated that the "[s]tudy population differs from most populations in which testosterone therapy has been administered. At baseline, participants had high prevalence of chronic conditions, including heart disease, obesity, diabetes, and hypertension. Cardiovascular [Adverse Events ("AEs")] were not planned primary or secondary outcome. Structured analysis of cardiovascular AEs was not performed. Trials terminated early tend to overestimate treatment differences. Lack of consistent pattern and small number of overall AEs suggest that difference may be due to chance."

950.   Dr. Miner next turned to the Vigen Study, reported in JAMA, which "brought a groundswell of criticism and anger against" TRT. He again engaged in a systematic attempt to refute the JAMA study's conclusions. "The abstract said 'The absolute rate of events were 19.9% in the no testosterone group vs. 25.7% in the testosterone therapy group, with an absolute risk difference of 5.8% at 3 years after coronary arteriography.' But that's not true!" He told his audience that "we had this reviewed by two statisticians at Harvard" who criticized the statistical method, though Dr. Miner does not identify them by name. Dr. Miner also leveled a critique of the Finkle PLoSOne study before turning to other studies / evidence "which showed the complete opposite" – *i.e*., the cardiovascular benefits of TRT use.

314

951.    TestosteroneUpdate.org also provides a "Clinical Consult" podcast by Dr. Morgentaler on the Vigen Study regarding the cardiovascular events in men utilizing TRT drugs.[345] The goal of the podcast was a repudiation of the Vigen Study, which Dr. Morgentaler said was "surprising to us who have worked in this field for 20 years." Dr. Morgentaler highlighted many of what he characterized as perceived problems with the study, its methodology and its conclusions. He also discussed how the authors were "forced to revise their paper" when they were confronted with these criticisms. His critique closely parallels that provided by Dr. Miner, and he similarly concluded by turning to the "considerable body of evidence accumulated over more than 20 years" that "indicates that men who have normal serum testosterone levels have a lower risk of [cardiovascular disease] and overall mortality compared with hypogonadal men and that testosterone therapy in middle-aged to elderly men does not increase the incidence of cardiovascular events."

952.    Other CME materials available through TestosteroneUpdate include:

953.    Dr. Allen Seftel provided a "Clinical Consult," which discussed the importance of the Princeton III recommendations and implications of new evidence in evaluating the relationships of hypogonadism and erectile dysfunction with cardiovascular disease. This activity was first made available on June 28, 2013, and was sponsored by Endo and Lilly. Dr. Seftel also provided a podcast focusing on differences between testosterone formulations for a patient with adherence concerns. The podcast was first published on testosteroneupdate.org in March 2013, and was sponsored by Endo and Lilly.

954.    Dr. Edward Kim provided a Case Report Podcast on helping a patient incorporate the application of topical testosterone into a daily hygiene routine. The discussion included

---

[345] Available at http://testosteroneupdate.org/20131213ClinicalConsult_b.php.

details on history, diagnosis, management, treatment, and follow-up. The podcast was first published on testosteroneupdate.org in April 2013, and was sponsored by Endo and Lilly.

955.    Dr. Dobs and Dr. Morgentaler produced a CME event describing hypogonadism as an "underdiagnosed" and "undertreated" condition. This activity was originally released December 28, 2012, and was sponsored by Endo.

956.    Dr. Carson, Dr. Kevin McVary, and Dr. Miner produced a "Doctor On Call" Podcast where they discussed their clinical experience with and the latest evidence on the diagnosis and management of hypogonadism. The podcast was first released on August 31, 2012, and sponsored by AbbVie, as well as Dannemiller and CogniMed Inc.

957.    TestosteroneUpdate also held a symposium entitled "Hypogonadism and Cardiometabolic Disease: Defining the Relationship" at its 2012 annual meeting in New Orleans. Several presentations explored the relationship between hypogonadism and cardiovascular disease. Dr. Miner presented on "Hypogonadism as a Prognosticator of Cardiovascular Disease: Evaluating the Need for Screening, Diagnosis, and Referral"; Dr. Dobs presented on "Safely Managing Hypogonadism and Concomitant Cardiometabolic Conditions"; and Dr. Hellstrom presented on "Optimizing Hypogonadism Management: Importance of Adherence to Therapy."

958.    Defendants utilized the "non-profit" TestosteroneUpdate as a front to project the appearance of neutrality, but in reality it had been co-opted to further Defendants' mutual interests, and thereby expand the TRT disease market.

### iii.    Androgen Study Group

959.    Another AstroTurf organization that grew out of Defendants' efforts to promote TRT drugs for unsafe and unapproved uses was the Androgen Study Group. The organization describes itself as a "multidisciplinary group of clinicians and researchers dedicated to education and accurate reporting on the science of testosterone deficiency in men and its treatment."

960.    According to its website, the "impetus for the formation of The Androgen Study Group was the publication of several flawed testosterone trials whose conclusions have already caused unnecessary concern and confusion among healthcare providers and their patients. With the media attention that testosterone therapy is attracting it is critical that clinical trials are properly conducted and analyzed, and that results are presented in a way that is not misleading. It is our mission to ensure that the results of research regarding testosterone deficiency and its treatment is presented accurately and fairly within medical literature and to the public."

961.    While the website states that the organization is "an independent professional organization which does not receive any funding from pharmaceutical companies," the leadership of the Androgen Study Group are some of the very same KOLs that have received thousands of dollars from Defendants to promote TRT promote products for unsafe and unapproved uses: Dr. Abraham Morgentaler, Dr. Martin Miner, Dr. Abdulmaged Traish, Dr. Andre Guay, and Dr. Mohit Khera.

962.    The Adrogen Study Group undertook two initiatives: (1) a rebuttal of the Vigen Study that identified a link between TRT use and cardiovascular events, and (2) a letter to the FDA concerning the proposed black box warning on TRT drugs.

963.    With respect to the JAMA rebuttal letter, which was published March 25, 2014, and distributed using interstate wire communications, Dr. Morgentaler and dozens of co-signers implored JAMA Editor-in-Chief Howard Baucher to retract the November 2013 JAMA article. The letter, titled "Letter to JAMA Asking for Retraction of Misleading Article on Testosterone Therapy," noted that "publication of results that are unlikely to be accurate is a disservice to the scientific community and the literature." The letter attempted to call the study's credibility into question, citing "mis-reporting of data" and "major errors in values presented." The letter

concluded by stating that the "study by Vigen et al is no longer credible. In the interests of science and the medical literature, we urge you to retract this article immediately."

964. ███████████████████████████████████████████

███████████████████████████████████████████

███████████████████

965. The letter was widely disseminated and reported upon in the media, using the mails and wires in furtherance of their Peer Selling Enterprise schemes. In fact, it was distributed to AMCP members, ESI, Plaintiff MMO and the TPP Class Members and their personnel. The letter did not disclose any financial links between Defendants and the authors.

966. The Androgen Study Group's second imitative was penning a letter to the FDA, using the mails and wires in furtherance of their schemes, urging the agency to "deny the petition by Public Citizen to add a black box warning to product labels for [TRT] drugs regarding an increased risk of heart attacks and other cardiovascular (CV) dangers[.]" http://www.androgenstudygroup.org/ pdf/AndrogenStudyGroup-comment-on-Public-Citizen-FDA-black-box-petition.pdf. The letter labeled the Vigen JAMA study and the Finkle PLoS One study as being "without scientific merit."

967. The letter concluded, "Any objective assessment of the literature regarding testosterone and CV effects must recognize a broad, rich literature in which numerous studies demonstrate increased CV concerns with *T deficiency*, and improvement in a variety of CV risk factors and some CV outcomes with *T therapy*."

968. Even though the members of the Androgen Study Group all have been regular recipients of Defendants' largesse, the letter did not disclose any financial links between Defendants and the authors.

969.    Defendants utilized the Androgen Study Group as a messenger to project the appearance of expertise, but in reality these doctors' pervasive bias has been permeated to further Defendants' mutual interests, and thereby expand the TRT disease market.  The intended, if not sole, purpose of these joint AstoTurf organizations was to influence decisions by physicians and pharmacy professionals, including to influence Plaintiff MMO and the TPP Class Members to add and maintain TRT drugs on their formularies.

       *c.*       ***Joint CME Programs***

970.    In keeping with their conspiracy to promote TRT drug awareness, Defendants have frequently jointly funded CMEs discussing TRT.  For example,





319



972.     AbbVie and Lilly jointly funded a CME entitled "Delivering Patient-Focused Care for Testosterone Deficiency," which was hosted by vendor CME Outfitters, Inc.  The presenters were KOLs Drs. Miner and Carson.

973.     AbbVie and Auxilium also sponsored and coordinated continuing education courses for pharmacy professionals, including Plaintiff MMO and its employees. As discussed in the TPP Formulary Access Enterprise sections for both AbbVie and Auxilium, Pharmacy Times is one of the leading publications and resources for pharmacists in the United States. Plaintiff MMO and several of its employees regularly receive Pharmacy Times monthly periodical.

974.     For years, Pharmacy Times has offered numerous continuing professional education courses in dozens of specialties, including hypogonadism and TRT use. These courses are available online and are completely free to participants. The courses were accredited by the Accreditation Council for Pharmacy Education (ACPE) for continuing pharmacy education.



975.    AbbVie and Auxilium have used Pharmacy Times to target Plaintiff MMO and the TPP Class Members with their misleading messages on unapproved and unsafe uses of TRT drugs. AbbVie and Auxilium have sponsored at least three nearly identical TRT continuing education courses provided by Pharmacy Times that were marketed to Plaintiff MMO and the TPP Class Members.

976.    For example, Auxilium sponsored a Pharmacy Times continuing education course titled, "Hypogonadism: The Role of the Pharmacist." The course was first presented on February 15, 2010. It highlighted many of the "symptoms" of hypogonadism designed to cause overdiagnosis of hypogonadism and drive overutilization of TRT drugs, including erectile dysfunction, reduced libido, reduced energy and stamina, depressed mood, increased irritability, and difficulty concentrating. In fact, the presentation included a slide devoted to the ADAM test, the notorious questionnaire designed by Defendants to over-identify men who exhibit signs of low testosterone. The presentation also failed to provide any discussion of cardiovascular risks associated with TRT use. It concluded with a review of several TRT drugs, including AndroGel, Testim and Testopel.

977.    A second continuing education course available through Pharmacy Times was sponsored by Solvay and titled, "Testosterone Replacement Therapy: Hypogonadism and The Role of the Pharmacist." The course was first presented on February 16, 2010, one day after the Auxilium-sponsored course appeared. In fact, the Solvay-sponsored course is substantially similar to the Auxilium-sponsored course, evidencing clear coordination by the two entities in approving their messages. The course noted the same "symptoms" for hypogonadism, including erectile dysfunction, reduced libido, reduced energy and stamina, depressed mood, increased irritability, and difficulty concentrating. The presentation also discussed the connection between

low testosterone and diabetes, HIV and obesity, among other conditions, and failed to provide any warning of the cardiovascular risks of TRT use. It concluded with a review of several TRT drugs, including AndroGel, Testim and Testopel.

978.     A third Pharmacy Times continuing education course was the Abbott-sponsored, "Hypogonadism and Testosterone Replacement Therapy: Practical Insights for the Pharmacist." This course was originally released as a webinar on September 15, 2011. The contents of this course are very similar to those in the first two continuing education courses. The presentation reviewed many of the same symptoms designed to lead to overutilization of TRT drugs, including loss of energy, fatigue, depressed mood, and sexual dysfunction, and noted the connection with diabetes, HIV and obesity. It also discussed the connection between low testosterone and cardiovascular disease. The presentation highlighted the industry-designed ADAM questionnaire. The presentation concluded with a review of several TRT drugs, including AbbVie's AndroGel, Auxilium's Testim and Testopel, Lilly's Axiron, and Endo's Fortesta, as well as a discussion of Defendants' cost-saving programs for AndroGel, Axiron and Testim.

979.     The intended, if not sole, purpose of these joint Defendant-sponsored CME and continuing education courses was to influence decisions by physicians and pharmacy professionals, including to influence Plaintiff MMO and the TPP Class Members to add and maintain TRT drugs on their formularies.

> d.     ***Jointly-Funded Presentations at AMCP to Influence Plaintiff MMO and the TPP Class Members to Add TRT Drugs to Their Formularies Without Managed Care Restrictions***

980.     One of the vehicles Defendants used to influence formulary decision making by Plaintiff MMO and the TPP Class Members was to fund TRT presentations at AMCP meetings at which managed care personnel (including MMO managed care decision makers) would be in attendance.

322

981.    The AMCP hosts two national meetings each year: the AMCP Annual Meeting and Expo, and the AMCP Nexus conference, formerly known as AMCP's Educational Conference. These conferences draw thousands of managed care pharmacy leaders to listen to renowned keynote speakers, to attend an array of education sessions, to capitalize on extensive networking opportunities, and to browse an exhibit hall of companies and organizations sharing their latest innovations and services.

982.    The following is a full list of the AMCP's gatherings that took place between 2000 and 2015, including their respective hosting cities and dates. Plaintiff MMO pharmacy and medical staff were in attendance at all of these conferences, as were thousands of pharmacy and medical staff from TPP Class Members around the United States:

| Conference | Date | Location |
|---|---|---|
| AMCP Nexus 2015 | October 26th-29th, 2015 | Orlando, FL |
| 27th Annual Meeting & Expo | April 7th-10th, 2015 | San Diego, CA |
| AMCP Nexus 2014 | October 7th-10th, 2014 | Boston, MA |
| 26th Annual Meeting & Expo | April 1st-4th, 2014 | Tampa, FL |
| AMCP Nexus 2013 | October 15th-18th, 2013 | San Antonio, TX |
| 25th Annual Meeting & Expo | April 3rd-5th, 2013 | San Diego, CA |
| 2012 Educational Conference | October 2nd-5th, 2012 | Cincinnati, OH |
| 24th Annual Meeting & Expo | April 18th-20th, 2012 | San Francisco, CA |
| 2011 Educational Conference | October 19th-21st, 2011 | Atlanta, GA |
| 23rd Annual Meeting & Showcase | April 27th-29th, 2011 | Minneapolis, MN |
| 2010 Educational Conference | October 13th-15th, 2010 | St. Louis, MO |
| 22nd Annual Meeting & Showcase | April 7th-10th, 2010 | San Diego, CA |
| 2009 Educational Conference | October 7th-9th, 2009 | San Antonio, TX |
| 21st Annual Meeting & Showcase | April 15th-18th, 2009 | Orlando, FL |
| 2008 Educational Conference | October 15th-18th, 2008 | Kansas City, MO |
| 20th Annual Meeting & Showcase | April 19th-22nd, 2008 | San Francisco, CA |

| 2007 Educational Conference | October 24th-27th, 2007 | Boston, MA |
|---|---|---|
| 19th Annual Meeting & Showcase | April 11th-14th, 2007 | San Diego, CA |
| 2006 Educational Conference | October 4th-7th, 2006 | Chicago, IL |
| 18th Annual Meeting & Showcase | April 5th-8th, 2006 | Seattle, WA |
| 2005 Education Conference | October 5th-8th, 2005 | Nashville, TN |
| 17th Annual Meeting & Showcase | April 20th-23rd 2005 | Denver, CO |
| 2004 Educational Conference | October 13th-16th, 2004 | Baltimore, MD |
| 16th Annual Meeting & Showcase | March 31st-April 3rd, 2004 | San Francisco, CA |
| 2003 Educational Conference | October 15th-18th, 2003 | Montreal, QC |
| 15th Annual Meeting & Showcase | April 9th-12th, 2003 | Minneapolis, MN |
| 2002 Educational Conference | October 9th-12th, 2002 | Washington D.C. |
| 14th Annual Meeting & Showcase | April 3rd-6th, 2002 | Salt Lake City, UT |
| 2001 Educational Conference | October 17th-20th, 2001 | Dallas, TX |
| 13th Annual Meeting & Showcase | April 18th-21st, 2001 | Tampa, FL |
| 2000 Educational Conference | 2000 | |
| 12th Annual Meeting & Showcase | April, 2000 | Phoenix, AZ |

983. ████████████████████████████████████████████

████████████████████████████████████████ AbbVie is also consistently listed as a corporate sponsor. The company also supported several satellite symposia for these events with "educational grants" and sponsored presentations by testosterone thought leaders, which included false and misleading representations concerning the safety and efficacy of the TRT drugs.

984. ████████████████████████████████████████████

████████████████████████████████████████████████████



985. ███████████████████████████████████████

███████████████████████████████████████

████████ ███████ ███████████████████████████

███████████████████████████████ ███████ ███

███████████████████████ ██████ ███████████

███████████████████ ██████ █████████████████

██ ███████ and AMCP's 2006 Educational Conference in Chicago, Illinois.

986. ███████████████████████████████████████

███████████████████████████████████████ ██████



987. ███████████████████████████████████████████

988. ███████████████████████████████████████████

[355] ████████████████████████████████████████
[356] http://www.amcp.org/WorkArea/DownloadAsset.aspx ?id=18543 (last checked on March 29, 2016).

989. 

990.

991.    Moreover, AbbVie, Auxilium, GSK, and Lilly are all noted as part of AMCP's Corporate Member Roster.[357] Corporate Membership requires an annual payment of at least $10,000 in membership dues to AMCP, which entitles the sponsor to complimentary attendance at annual meetings, discounts on exhibition fees, ad space in the Journal of Managed Care Pharmacy, and access to AMCP mailing lists. Defendants regularly used AMCP mailings lists to contact AMCP members and meeting attendees, including Plaintiff MMO and the TPP Class Members.

992.    Likewise, Defendants are generous sponsors of AMCP meetings.  AbbVie and Lilly were Silver Level Sponsors of the 2015 AMCP Nexus Meeting in Orlando, Florida.  This meeting was attended by personnel from both companies, including Jed Cicak, National Care

---

[357] *See* http://www.amcp.org/Dynamic Roster.aspx?id=15189.

Executive for AbbVie and, for Lilly, Katina Kambeck, Payer Brand Director and Richard Williams, Account Manager.[358] Silver Level Sponsors paid in excess of $30,000 for that status.

993.     Defendants were also regularly solicited for (and did provide) thousands of dollars to the AMCP to sponsor specific events during national meetings. ████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████

994.     Even if Defendants were not formally presenting during AMCP meetings or events, they consistently attended meetings to informally meet with managed care representatives and further promote their TRT drugs. For example, ████████████████

████████████████████████████████ ██ ████████████

████████████████████████

995.     Auxilium's Vice President, Betty Jean Swartz, regularly attended AMCP events and met with managed care representatives about pharmaceutical products, including Testim. For example, ████████████████████████████

████████████████████████████████████████████████

████ █ ████████████████ ██ ████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████



---

[358] *See* http://www.amcpmeetings.org/past/2015fall/pdf/attendeelist.pdf.
█
█  ████████████████████████████████████████
█

██████████████████████████████████████████

███████████████████

996.  ████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████  ██████████████████

██████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████. Medco and ESI

relied on these materials in making their recommendations to their managed care clients,

including to Plaintiff MMO, which relied on this information when it put Testim on its

formulary.

        *e.*      ***Joint Use of Industry KOLs to Spread False and Misleading Safety and Efficacy Message***

997.  Among the most pervasive means by which Defendants have joined together is in

their retention of the same KOLs to do their sponsored research, write articles favorable to the

TRT drugs, and speak to their peer physicians at numerous promotional and educational events.

Defendants, acting in concert, entered into agreements with, utilized and compensated these

doctors. Ostensibly engaged in raising public awareness about under-diagnosed and under-

treated problems, these KOLs were in actuality highly-paid talking heads, promoting the

message of their unified scheme that Low T was a unique disease state, which was widespread,

serious, and treatable with a TRT drug.

        i.      <u>Dr. Shalender Bhasin</u>



998.    Dr. Shalender Bhasin, M.D. (70 Albany Street, Boston, MA 02118) has headed multiple clinical trials and studies regarding TRT in close conjunction with Defendants for over a decade. He has been instrumental in lending Defendants credibility through not only the publishing of multiple studies, directly funded by Defendants, but also through articles, of which he has published more than 300 in the area of androgen use, speeches, and other means of promotion.

999.    From 2010 to 2014 alone, Dr. Bhasin has reported receiving $149,931 for research, consulting, travel, meals and speaker fees from drug companies, including AbbVie, Lilly, and GSK.[364] This does not include additional money from Solvay Pharmaceuticals, before its acquisition by Abbott, extending as far back as 2000 for research funding for hundreds of thousands of dollars.

1000.



1001.    At a 2002 symposium held in conjunction with the American Association of Clinical Endocrinologists annual meeting in Chicago, Illinois, four leaders in testosterone

---

[364] ProPublica Dollars for Docs database, https://projects.propublica.org/docdollars/
[365]

research and therapy presented the latest research on TRT and its risks.[367] The program was supported by an unrestricted educational grant from Solvay. Dr. Bhasin's task was to educate clinicians on testosterone's effects on muscle mass.

1002.  In a 2003 article by Dr. Bhasin entitled "Testosterone Supplementation for Aging-Associated Sarcopenia,"[368] he asserted that "[t]he available data do not support the presumption that testosterone supplementation will increase cardiovascular risk." During this time, ████████ ███████████████████████████████████████████████████████████████████████ ████████████████████████████████████

1003.  In 2005, Dr. Bhasin entered into an investigator initiated clinical study agreement with Solvay as the principal investigator, working in supported activity with Unimed. Solvay provided financial and other support to the clinical study known as "The Effect of Testosterone Replacement on Physical Function, Health-Related Quality of Life, and Atherosclerosis Progression," ostensibly designed by Dr. Bhasin. The study was intended in part to assess the adverse events and safety of the use of AndroGel. The primary purpose of the study was to look at the effects of testosterone replacement on the progression of atherosclerosis in older men. Solvay paid Dr. Bhasin and Boston University Medical Center $400,000, with additional payments of $125,000 for advertising and $36,000 for research pharmacist expenses.

1004.  In spite of the fact that the National Institute on Aging (NIA), Division of Geriatrics and Clinical Gerontology, had prematurely discontinued the study of the "Testosterone in Older Men with Mobility Limitations (TOM)" because of a statistically significant increase in

---

[367] http://www.cmecorner.com/macmcm/aace/aace2002_02.htm.
[368] http://biomedgerontology.oxfordjournals.org/content/58/11/M1002.full.html.
████ ███████████████████

serious cardiac adverse events in the testosterone treatment group,[370] Dr. Bhasin has consistently held to the Defendants' party line, maintaining that "it's not conclusive by any means."

1005.  Even in a JAMA study published in 2015, Dr. Bhasin asserted that "[i]t doesn't necessarily mean that testosterone has no effects on cardiovascular events [such as myocardial infarction or stroke], it just means that if [it] has an effect on the cardiovascular-event rate, then it's not due to atherosclerosis progression."[371] The JAMA study had additionally found that patients who were given testosterone exhibited no more improvement in sexual function or quality of life than the control group. This finding runs counter to multiple assertions made by Dr. Bhasin, touting testosterone for its improvement in "many domains of sexual function in androgen-deficient men."[372]

1006.  Dr. Bhasin was one of Defendants' paid presenters at the September 17, 2014 AdComm and gave a presentation on the relation between cardiovascular risk and TRT. His presentation slides were heavily edited by the collaboration of Defendants, as alleged below.

ii.     Dr. Culley C. Carson

1007.  Dr. Culley C. Carson III, M.D. (101 Manning Dr., Chapel Hill, NC 27514) is the Rhodes Distinguished Professor at the University of North Carolina's Department of Urology. Dr. Carson specializes in Men's Health, including the treatment of Peyronie's Disease and erectile dysfunction.

1008.  Between 2010 and 2014, Dr. Carson received a total amount of $218,378 from eight pharmaceutical companies, including AbbVie, Auxilium, Lilly, and GSK. Dr. Carson's

---

[370]     http://www.bloomberg.com/news/articles/2010-06-30/auxilium-testosterone-gel-linked-to-heart-problems-in-older-men.
[371] http://jama.jamanetwork.com/article.aspx?articleid=2425744.
[372]     http://www.massmed.org/Continuing-Education-and-Events/Conference-Proceeding-Archive/9th-Annual-Symposium-on-Men-s-Health--Hearing-Men-s-Voices/#.VvwxJRIrJcA.

most recent disclosures state that he has received research support from, has served as a consultant for, and has served on the speaker's bureaus of Auxilium, Lilly, and GSK.

1009. 

1010. Dr. Carson is also heavily involved in several noted AstroTurf organizations, including TestosteroneUpdate, and has served as chair of that organization. In 2012, Dr. Carson presented during TestosteroneUpdate's "Testosterone Therapy and Prostate Health: Examining Barriers to Treatment of Hypogonadism" conference. The conference was sponsored by AbbVie, Lilly, Endo, and CogniMedInc. Along with Dr. Jacob Rajfer, Dr. Carson presented on "Testosterone Therapy Dual Function: Relief of Hypogonadism Symptoms and LUTS."

1011. In 2011, 

1012. Dr. Carson speaks regularly on TRT. For example, he presented at the American Society for Men's Health – AUA 2015 Annual Meeting in New Orleans, Louisiana on May 15, 2015. The event was sponsored by AbbVie.

333

1013.   A brief video of Dr. Carson discussing TRT use was uploaded to YouTube on December 9, 2015. Dr. Carson defends TRT use with regards to cardiovascular safety. In the video, he attempts to counter the FDA's 2015 statements linking TRT with cardiovascular risks, stating that new data recently published show that TRT is not only "safe for cardiovascular disease in elderly men but it actually improves cardiac functions in some of these men." He adds that there appears to be a "significant safety margin for the treatment of men with low testosterone in the elderly age group."

### iii.   Dr. Adrian Dobs

1014.   Dr. Adrian Sandra Dobs, M.D., MHS, is Professor of Medicine and Oncology and Vice Chair for Faculty Development in the Department of Medicine of the Johns Hopkins University School of Medicine, in Baltimore, Maryland, and Director of the Johns Hopkins Clinical Research Network of the Johns Hopkins Institute for Clinical and Translational Research. In one of her most recent disclosures, she declared she has received honoraria, travel grants, and research funding from pharmaceutical research sponsors including Endo and has been on a speaker's bureau/advisory board and has an investigator-initiated trial with Endo. According to 2013 information on ProPublica's Dollar for Docs, Dr. Dobs received a total of $85,253 from four companies, including AbbVie, Lily and Endo, for consulting and promotional speaking.

1015.   The 2003 edition of DRUGDEX lists a study Dr. Dobs co-authored, which was published in the Journal of Urology on the use of AndroGel to treat sexual dysfunction in men.[373] The study's conclusion directly supported the use of TRT to increase sexual function, which was one of the AbbVie Defendants' most disseminated false and misleading messages. As stated in

---

[373] *See* Arver S, Dobs AS, Meikle AW, et al., *Improvement of sexual function in testosterone deficient men treated for 1 year with a permeation enhanced testosterone transdermal system*, 155 J Urol 1604-1608 (1996).

the article's abstract, the conclusion was that "sexual function improved significantly in men with hypogonadism treated with the testosterone transdermal system."

1016.  Dr. Dobs is also the author of a ghostwritten article,[374] which is the only study cited by Endo on its Fortesta healthcare professionals website in support of the drug's supposed safety[375] and efficacy.[376] The study purports to present the results of independent research involving Fortesta's "novel" 2% testosterone gel for hypogonadal males. Dr. Dobs, as lead author, and the so-called "external authors" failed to disclose any conflicts of interest.

1017.



1018.  Dr. Dobs has also been a frequent CME speaker on behalf of Defendants.  For example, she gave a presentation (funded by Solvay) to 4,500 physicians in 2002 and 2003 entitled, "The Aging Male: New Advances in the Treatment of Hypogonadism." The producer of the program was INCE. Solvay controlled the content of INCE programs, down to the placement of a comma in a presentation. Solvay's Regulatory Department, for instance, demanded revisions

---

[374] Dobs, et al., *A Novel Testosterone 2% Gel for the Treatment of Hypogonadal Males,* 33 J. Androl. 601-07 (2012).
[375] http://www.fortestagel.com/hcp/tolerability-and-safety.html.
[376] http://www.fortestagel.com/hcp/testosterone-gel-efficacy.html.

to a similar AndroGel CME to be delivered via CD-ROMs in 2003, including, as relayed by AndroGel's associate product manager, the deletion of the phrase, "In the aging male," masking the presentation's Andropause theme.

1019.  More recently, in 2008 Dr. Dobs participated in a free CME supported by Auxilium entitled "Testosterone and Mortality:  An Expert Interview with Dr. Adrian S. Dobs," which was made available on Medscape.  One of the CME topics was the possible role of TRT in reducing cardiovascular disease, cardiovascular death, and all-cause death.

1020.  Dr. Dobs was also one of the retained presenters at the September 17, 2014 AdComm meeting, speaking on behalf of Defendants.  She provided a perspective on the benefits of TRT and the current approach to patient selection and management. According to her presentation, the evidence demonstrating age-related hypogonadism and chronic disease that Defendants had been touting for more than a decade is "limited": "There is increasing appreciation that certain chronic diseases that may suppress the hypothalamic pituitary gonadal access might warrant consideration for treatment. The data on the benefits of testosterone therapy in patients with other chronic diseases, such as age-related hypogonadism, is limited and requires further study."

<div align="center">iv.    <u>Dr. Mohit Khera</u></div>

1021.  Dr. Mohit Khera, M.D., MBA, MPH (Urology, Baylor College of Medicine Medical Center, 7200 Cambridge St., Suite 10B, Houston, TX 77030) is Associate Professor of Urology at the Baylor College of Medicine and the Director of the Laboratory for Andrology Research at McNair Medical Institute. Dr. Khera specializes in sexual dysfunction and declining testosterone levels in aging men. Dr. Khera's research focuses on TRT use.

1022.  Dr. Khera has been an active participant in the AndroGel, Testim and Axiron Peer Selling Enterprises and has also provided presentations to TPPs on Testim. Dr. Khera has also

been extensively involved with several AstroTurf organizations, including the Androgen Study Group and TestosteroneUpdate.

1023. Dr. Khera has received more than $120,000 from pharmaceutical manufacturers (including AbbVie, Auxilium and Lilly) for speaking, consulting and travel fees. This amount includes more than $50,000 from Auxilium related to Testim and Testopel, and more than $16,000 from Lilly related to Axiron.

1024. Dr. Khera is a prolific author and co-author, having published numerous articles. For example, he co-authored "A Multi-Institutional Observational Study of Testosterone Levels after Testosterone Pellet (Testopel®) Insertion," in the April 2010 Journal of Urology along with Wayne J.G. Hellstrom and Abraham Morgentaler. Although the study is directed at Auxilium's TRT product, Testopel, no source of funding is listed.

1025. Dr. Khera also co-authored "The Safety and Efficacy of Testosterone Replacement Therapy Following Radical Prostatectomy" (2008), which concluded: "TRT is safe, and effective in improving symptoms of hypogonadism in men following radical prostatectomy." Another Khera article, "The Safety and Efficacy of Testosterone Replacement Therapy in Post-Radical Prostatectomy Patients," was supported by an $83,000 grant from Auxilium.

1026. Dr. Khera, together with Dr. Miner, co-authored "Effect of 12 months of testosterone replacement therapy on metabolic syndrome components in hypogonadal men: data from the Testim Registry in the US (TRiUS)." Auxilium funded the study. The study authors asserted that, "TRT may be useful in treating sexual dysfunction" in hypogonadal men with erectile dysfunction. Dr. Khera concluded that, "[m]en presenting with [erectile dysfunction] should be screened for hypogonadism and TRT should be considered as an additional therapy if their testosterone levels are below the normal range."

1027.   Dr. Khera has given numerous presentations advocating TRT use. He recently gave a presentation on "Testosterone Therapy and Prostrate Health, Examining Barriers to Treatment of Hypogonadism" at the AUA 2012 Annual Meeting in Atlanta, Georgia. There were approximately 15,000 urologists and allied health professionals in attendance. Dr. Khera's presentation, given alongside Dr. Morgentaler, specifically attempted to dispel what Dr. Khera termed to be "anecdotal evidence" regarding TRT safety and efficacy.

1028.   Other presentations include: the 2010 SMSNA Annual Meeting in Florida; a 2011 roundtable discussion with Abraham Morgentaler and Andrew McCullough on "Long-Acting Testosterone Therapy in Clinical Practice"; a presentation at the AUA Annual Meeting in 2012 on "Testosterone: Diagnosis and Management of the Hypogonadal Male: 2012 Update" with Dr. Wayne Hellstrom and Dr. Andre T. Guay.

v.      Dr. Martin Miner.

1029.   Dr. Martin Miner, M.D. (Brown University – Miriam Hospital, 164 Summit Avenue, Providence, RI 02906), has been an active member of the AndroGel, Testim and Axiron Peer Selling Enterprises.

1030.   From 2009 to 2014, Dr. Miner received more than $60,563 in speaker fees, consulting fees, reimbursements for travel and honoraria from AbbVie, Auxilium, Lilly, and Endo to promote AndroGel, Testim and Testopel, Axiron, and Fortesta, respectively.

1031.   Dr. Miner was also a faculty member during a number of Defendant-sponsored CME courses. For example, he presented a 2014 AccelMed Program, funded by Lilly, entitled "Practical Primary Care Strategies for Diagnosing and Managing Hypogonadism in Men – Best Practices to Improve Patient Outcomes." The program repeated many of Defendants' key misleading messages that hypogonadism remains an "under-diagnosed syndrome" that affects quality of life, including loss of energy, libido and erectile dysfunction, and depression. During

the presentation, Dr. Miner failed to disclose his financial connections with Lilly, even though he had previously served on Lilly's Axiron advisory board.

1032. Dr. Miner has also participated in several noted AstroTurf organizations, including the Androgen Study Group and TestosteroneUpdate. In fact, more than ten CME activities from Dr. Miner are available on testosteroneupdate.org, including webcasts, video presentations, podcasts, and articles.

1033. Dr. Miner co-signed a letter to the editor in response to a *New York Times* editorial on February 4, 2014. Dr. Miner, along with Dr. Morgentaler, disputed the previous editorial's "anti-aging treatment," comparing TRT use to "other age-related conditions, including diabetes, heart disease, hypertension, or cataracts." It added, "the data are indisputable that testosterone therapy increases muscle mass, decreases fat mass, and improves bone mineral density. There are strongly suggestive data that treatment may also reduce obesity, resolve components of the metabolic syndrome."

<div align="center">

vi.    <u>Dr. Abraham Morgentaler</u>

</div>

1034. Dr. Abraham Morgentaler, M.D. (Men's Health Boston, One Brookline Place, Suite 624, Brookline, MA 02445), has been one of the most vocal and prolific advocates for TRT since the first products came to market. In exchange for the hundreds of thousands of dollars he has been paid by Defendants in research grants and consulting fees, he has become perhaps the principal spokesperson called on to defend TRT when the products come under fire. For example, Dr. Morgentaler was recruited to speak at the FDA AdComm meeting in September 2014, and he is a prime media source touting the health benefits of TRT and minimizing the risks, in particular the cardiovascular risks that came under fire in 2013.

1035. Dr. Morgentaler has become one of Defendants' most prolific "peer-to-peer" spokespersons, using his Harvard Medical School credentials to lend even more credibility to

<div align="center">339</div>

Defendants' marketing scheme. On October 3, 2003, he reportedly "invited" 88 physicians to a discussion at a Ruth's Chris Steakhouse in Greensboro, North Carolina. The topic was "Perspectives on the Clinical Management of Hypogonadism and Advances in the Treatment of Low Testosterone," and the results of the Testim clinical trials." ████████████████████

████████████████████████████████████████

1036. From 2009 through 2014, Dr. Morgentaler reported receiving $286,041 for research, consulting, travel, meals and speaker fees from multiple drug companies, including AbbVie, Auxilium, Lilly, Endo and GSK.[378] But additional money from Defendants for research grants was paid to Dr. Morgentaler through his corporation, Cavernosa Corporation, for which he is listed as the corporation's President, Vice President, Treasurer and Secretary.

1037. ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████

1038. From the time testosterone replacement therapies were introduced, Dr. Morgentaler has been a vocal (and frequent) advocate in the media. In 2002, Dr. Morgentaler

[377] ████████████████████████████████████████
[378] ProPublica Dollars for Docs database (2009-2012); www.openpayments.cms.gov database (2013-2014).

was featured in the Groopman article in *The New Yorker*: "He [Dr. Morgentaler] views testosterone deficiency in older men as a silent epidemic, and worries that, of the perhaps five million American men who suffer from it, ninety-five per cent go undiagnosed. Replacing testosterone, he believes, will help restore youthful muscle tone, bone strength, potency, and general vigor. He recently put an ad in the Boston Globe urging men who were experiencing 'low sex drive' or 'low energy' to have their testosterone level tested at his clinic. The costs of both the ad and the tests were underwritten by a Unimed [Solvay] educational grant."

1039.   In a letter to the editor of the *New York Times*, in response to a February 4, 2014 editorial questioning the safety and efficacy of TRT drugs, Dr. Morgentaler and his co-signer, Dr. Martin Miner, took issue with many claims in the editorial, in particular with the notion that TRT was just an "anti-aging treatment."[379] The doctors compared using TRT to treat men's symptoms to "the treatment of innumerable other age-related conditions, including diabetes, heart disease, hypertension, or cataracts." They go on to state, "Regarding general health, the data are indisputable that testosterone therapy increases muscle mass, decreases fat mass, and improves bone mineral density. There are strongly suggestive data that treatment may also reduce obesity, resolve components of the metabolic syndrome."[380]

1040.   At an internal AbbVie AndroGel Ad Hoc meeting 

---

[379]

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████

1041.  Dr. Morgentaler also chairs the recently established the Androgen Study Group, an AstroTurf coalition that was founded in early 2014 in response to numerous articles questioning the safety and efficacy of TRT, most notably the Vigen Study that reported testosterone therapy is associated with cardiovascular risks. According to its website, the Androgen Study Group "is an independent professional organization which does not receive any funding from pharmaceutical companies." While the Androgen Study Group may not have received money directly from pharmaceutical companies, Dr. Morgentaler has. For example, on May 6, 2014, he received a $4,725 consulting fee from AbbVie; Auxilium paid him $1,650 on April 22, 2014 for Research; and another payment of $8,073 was made to Dr. Morgentaler from Eli Lilly for Research on February 25, 2014.

1042.  Dr. Morgentaler was quoted in a *Wall Street Journal* blog on March 25, 2014, condemning the Vigen Study. In the blog post, it was noted that "Morgentaler, by the way, has received payments from AbbVie, which markets AndroGel, the most widely used testosterone treatment. Similarly, several of the other academics and physicians who have signed his letter also have relationships with drug makers, including those that sell these therapies. But he dismisses suggestions that the group is a stalking horse for drug makers. 'A great number of the people who do research in testosterone do have some financial relationships or have received grants with some of those companies,' he says."[382]

---

[381] ████████████████████████████

[382] http://blogs.wsj.com/corporate-intelligence/2014/03/25/a-high-stakes-battle-over-testosterone/.

1043.   In response to the perceived media assault on the safety and efficacy of TRT, Dr. Morgentaler coined the term, "hormonophobia" in an article he authored in the June 2014 issue of the *Journal of Sexual Medicine* entitled "Testosterone, Cardiovascular Risk, and Hormonophobia." He writes, "The use of weak studies as proof of danger indicates that cultural (*i.e.*, nonscientific) forces are at play. Negative media stories touting T's risks appear fueled by anti-pharma sentiment, anger against aggressive marketing, and anti-sexuality. This stance is best described as 'hormonophobia.' As history shows, evidence alone may be insufficient to alter a public narrative. The true outrage is that social forces and hysteria have combined to deprive men of a useful treatment without regard for medical science."[383]

1044.   Morgentaler posted a YouTube video of his March 22, 2015 presentation at the annual meeting of the European Association of Urology entitled, "Testosterone Therapy and Hormonophobia—Cardiovascular Risk, The Media and the Authorities." This video has been viewed more than 3,700 times.[384]

vii.   Dr. Ronald Swerdloff

1045.   Ronald Swerdloff, M.D. (1124 West Carson Street RB-1, Torrance, CA 90502), from 2009 to 2014, received $92,797 in speaker fees, consulting fees, reimbursements for travel and research from drug companies, including AbbVie, Eli Lilly, and GSK.

1046.   In a video interview for the Endocrine Society Oral History Collection with Dr. Swerdloff on June 19, 2010, he is asked what his role was in developing and evaluating formulations of androgens:

> Well, that was sort of opportunistic because the pharmaceutical industry suddenly became interested in this. A small pharmaceutical company came to my

---

[383] http://www.jsm.jsexmed.org/article/S1743-6095(15)30788-8/fulltext.
[384] https://www.youtube.com/watch?v=NPx2dRG1zRQ.

wife, Dr. Christina Wang and myself and asked us to develop studies, and we did that. As I told you, we then realized that new formulations could give good blood levels, and we began to look at what blood levels were appropriate to get these types of biologic effects. [385]

1047. ██████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████

1048. Dr. Swerdloff co-chaired the influential Second Annual Andropause Consensus Meeting, which was the platform to develop recommendations for TRT that could be used in a clinical setting. The guidelines, as well as the screening and diagnostic tool that they published, have been used by doctors and researchers since they were released by The Endocrine Society in 2001. The conference was sponsored by The Endocrine Society and funded by an unrestricted educational grant from Solvay to an independent medical education company.

1049. Defendants wrapped themselves in the legitimacy of The Endocrine Society's purported independence and credibility, using the guidelines to tout the safety and efficacy of their products. Defendants distributed the screening tool to their sales teams to help them sell their products to doctors. Swerdloff's influence as the head of the Endocrine Society CPG group endures. Indeed, ████████████████████████████████████████████████████

---

[385] Ronald S. Swerdloff, M.D., *An oral history conducted in 2010 by Michael Chappelle*, The Endocrine Society, The Clark Sawin Library, Chevy Chase, Maryland (2010).
[386] ████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████

1050.  Rather than warn patients, physicians and TPPs of the cardiovascular risks associated with TRT use, Defendants have regularly used Swerdloff to tout its "cardioprotective" effects.  In 2003, Solvay sponsored an American Association of Clinical Endocrinologists presentation, "The Impact of Low Testosterone in Chronic Disease," in Chicago, Illinois. During the presentation, Dr. Swerdloff discussed the impact of testosterone deficiency or its treatment on the incidence of cardiovascular disease ("CAD").  According to Swerdloff: "There have been a number of prospective, cohort, nested case-control studies that failed to show that increased testosterone is a causal factor for CAD." "Taken together, the epidemiological studies suggest that either testosterone is cardioprotective or neutral. Very few of the data suggest that testosterone is a cardiac risk factor."[388]

1051.  Likewise, Defendants jointly used Dr. Swerdloff, speaking on behalf of the Endocrine Society, to provide key testimony at the FDA's Advisory Committee meeting on September 17, 2014:

> I am a member of the Endocrine Society Guidelines Committee for Testosterone Therapy in Men with Androgen Deficiency Syndromes as well as a guideline author for other National and International Societies. The testimony I am about to deliver is the opinion of the Endocrine Society and was developed by a panel of experts in testosterone therapy…. We have reviewed the data on cardiovascular risk from testosterone therapy and have concluded that there are inadequate data from well-controlled, adequately powered, interventional studies to determine if

---

[387] ████████████████████████████

[388] *See* The Impact of Low Testosterone in Chronic Diseases, AACE, available at http://www.cmecorner .com/macmcm/aace/aace2003_04.htm (last visited on March 29, 2016).

testosterone therapy will result in increased, decreased or neutral effects on the cardiovascular system. Similar needs exist regarding risks of testosterone therapy on the prostate gland.[389]

1052.  In a 2013 study published in the Journal of Adolescent Health,[390] in which Dr. Swerdloff was an author, he disclosed serving as a consultant for AbbVie. Notably, AbbVie disclosed that it designed the study and undertook the collection, analysis, and interpretation of the data, and drafted the manuscript and made the decision to publish the manuscript. In light of AbbVie's disclosures, Dr. Swerdloff's role (as well as the role of the other "authors") remains unclear. Furthermore, Dr. Swerdloff also was an author on at least one uncontrolled AndroGel study funded by Defendants supporting a host of unsafe, unapproved uses for AndroGel.[391]

### f.  Defendants' "Collaboration" in Their Joint Response to FDA AdComm

1053.  The natural culmination of Defendants' joint conspiracy to defraud Plaintiff MMO and the TPP Class Members was their "collaboration" in their presentation to the FDA AdComm Board on September 17, 2014.  During this meeting, Defendants presented their joint views in response to the FDA's questions on the marketing and promotion of the TRT drugs. Although the FDA invited the "Sponsors" to present their views, Defendants' planning and joint execution of their scheme went beyond simple coordination of presentations and was instead an

---

[389] See Endocrine Society Testimony to the Joint Meeting of the Bone, Reproductive and Urologic Drugs Advisory Committee and Drug Safety and Risk Management Advisory Committee, Endocrine Society, available at https://www.endocrine.org/~/media/endosociety/files/advocacy-and-outreach/society-testimony/fda-testosterone-testimony.pdf (last visited Apr. 6. 2016).
[390]Rogol, et al., A Multicenter, Open-Label, Observational Study of Testosterone Gel (1%) in the Treatment of Adolescent Boys with Klinefelter Syndrome or Anorchia, 54 J. 1 Adolescent Health 20-25 (Jan. 2014).
[391]Wang, et al., Long-Term Testosterone Gel (AndroGel) Treatment Maintains Beneficial Effects on Sexual Function and Mood, Lean and Fat Mass, and Bone Mineral Density in Hypogonadal Men, 89 J. of Clin. Endocrinol. Metab. 2085-2098 (2005).

elaborately planned and executed joint collaboration to protect, at all costs, the TRT drugs and the disease state they had created.

1054. Following the FDA's initial invitation



1055. Thereafter, Defendants used, and knowingly caused the use of, mail and interstate wire communications to create, execute, and manage the Collaboration, including during regular



347

conference calls, emails, and face-to-face meetings in order to shape their joint communications plan for the AdComm meeting.

1056. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

1057. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

1058. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

1059.████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████





1060.   The draft presentations by the Collaboration were jointly edited in various email exchanges, mail and interstate wire communications.

1061.   The Collaboration participants controlled the content of many, if not all, of the KOL and stakeholder presentations as well.  For example,

1062.

1063. ████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

██████████████ ████████████████████████████████████████████████████████

████████████████████████████████████ ██ ██████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

██████████████████████████████ ██

1064. ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

• ████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████ ██

█ ████████████████████████████████████████████████████████████████

████████████████████████████████████████████ ██

████████████████████████████████████████████████████████████████████

███████████████████████████████████ ██



350

Case: 1:14-cv-08857 Document #: 162 Filed: 05/09/16 Page 358 of 503 PageID #:7604

- 

1065.   Throughout, it has been Defendants' implicit (if not express) intention that their joint Collaboration in response to the AdComm would be used to dissuade Plaintiff MMO and the TPP Class Members from limiting formulary access to the TRT drugs.

> *g.   **Defendants Have Used the Unbranded TRT Disease Awareness Campaign to Further the Inter-Company Conspiracy.***

1066.   Defendants' unified goal in their unbranded campaign was to create the false and misleading impression that hypogonadism was a vastly under-diagnosed, but prevalent condition. Defendants cooperatively agreed and worked to inflate the hypogonadism prevalence numbers by grossly exaggerating what they characterized as a low testosterone epidemic.

1067.   Defendants acted in concert to implement their disease awareness basic strategies: (1) to lower the bar for diagnosis (turning ordinary life experiences into conditions that require medical diagnoses); (2) to raise the stakes so that all aging men would believe they should be using a TRT drug; and (3) to spin the evidence about drug benefits and harms.

1068.   Defendants acted in concert, employing a sense of urgency as an essential component of the unbranded campaign.  Indeed, the unbranded campaign sent a dire message, suggesting that Low T not only makes you irritable and lethargic, but that it may also kill you.

---



351

1069. Defendants' unbranded campaign's false and misleading messages was calculated to and did reach Plaintiff MMO and the TPP Class Members, physicians and patients who reasonably and justifiably relied on Defendants' misrepresentations that TRT treatment has an important therapeutic effect on all or most symptoms, yet were not informed that evidence from randomized trials supporting these claims was lacking.

1070. Defendants injured Plaintiff MMO and the TPP Class Members by the commission of overt acts in furtherance of the conspiracy, involving activity (as alleged herein) directed toward TPPs, which directly and proximately caused injuries in paying for excessive prescriptions of TRT drugs.

1071. ████████████████████████████████████████████
████████████████████████████████████████████████████
██████

1072. Auxilium's disease awareness promotion included educating consumers, patients and doctors that "Low T" is a "disease" by providing specific misinformation regarding the diagnosis and treatment of "Low T," and portraying "Low T" as a "disease" subsumed under the medical category of acquired hypogonadism. Auxilium's internal documents include marketing strategies related to Auxilium's part in the unbranded campaign. ████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████ The marketing pitch is in harmony with the unbranded promotion disseminated for the past dozen years by one or more Defendants.

1073. Eli Lilly began marketing Axiron in the United States in 2011, a product originally developed by Lilly. Lilly expanded the indications for use by promoting and detailing

[4] ██████████████████████

"Low T" as an acquired form of hypogonadism.  Although Lilly entered a mature TRT market, it similarly jointly promoted unbranded disease awareness promotion, caused by the normal aging process in males, including: erectile dysfunction; loss of libido; loss of athleticism; loss of muscle mass; fatigue; and mood swings. Lilly overstated the benefits of testosterone as a treatment for lifestyle changes associated with the aging process despite the fact that the drug was never FDA approved for these uses.

1074.  Endo has promoted and marketed the disease state and TRT as a lifestyle drug that could treat a variety of symptoms caused by the normal aging process in males, including: erectile dysfunction; loss of libido; loss of athleticism; loss of muscle mass; fatigue; and mood swings. Endo overstated the benefits of testosterone as a treatment for lifestyle changes associated with the aging process despite the fact that the drug was never FDA approved for these uses.

1075.  Actavis has used a broad spectrum of marketing tools to drive Androderm interest and sales from men seeking general information, from men who are already interested in competing products, and from doctors making prescribing decisions.  One of the websites Actavis operates is an unbranded website, www.myTlevel.com, which purports to be a neutral, informational site and has no mention of Androderm. Viewers who are persuaded they need TRT and click on the "Available Treatment" link are led to MyAndroderm.com, one of Actavis's branded websites. The Actavis' unbranded myTlevel website deceptively tells men that "[t]estosterone deficiency can be associated with a variety of symptoms, including fatigue, depression, decreased libido, impotence, and decreased muscle mass." It tells men they can "confirm the diagnosis" by answering the ADAM questionnaire, the same questionnaire used by other TRT manufacturers.

1076.  Each Defendant jointly adopted the philosophy of "making a bigger pie" by utilizing the unbranded disease awareness marketing strategies and repeating the deceptive and misleading messages that treating a wide array of symptoms of this "disease" with TRT drugs was safe and effective.

1077.  As alleged in this TAC, Defendants thus conspired in a fraudulent and unlawful marketing scheme to cause increased prescribing and TPP payments for their TRT drugs.  As the entities directly reimbursing most, if not all, of the cost of TRT drug prescriptions, Plaintiff MMO and the TPP Class Members were the primary and intended targets and victims of Defendants' unified, unbranded, disease awareness conspiracy.

1078.  Defendants and their co-conspirators knew that their marketing and promotion was deceptive, yet knowingly agreed to facilitate, and cooperate with, the activities of their co-conspirators.  Defendants' Inter-Company conspiracy involved the commission of overt acts in furtherance of the conspiracy, including activity directed toward Plaintiff MMO and the TPP Class Members, which actually and proximately caused them injuries in paying for excessive prescriptions of TRT drugs and related medical services.

**B.    Co-Promotion Conspiracies:  Defendants Conspire with Co-Promoters to Create an Explosion of TRT Drug Prescribing**

1079.  As alleged in this TAC, certain Defendants entered into co-promotion agreements that facilitated the expansion of the RICO enterprises alleged in this TAC. These Co-Promotion Conspiracies employed the same fraudulent marketing schemes already employed by Defendant manufacturers, resulting in substantial additional payments by Plaintiff MMO and the TPP Class Members.

1080.  When Solvay acquired Unimed, the developer of Androgel, in 1999, Solvay was a relatively small pharmaceutical company, employing some 200 sales representatives.  Almost

immediately after Androgel's launch in June 2000, Solvay's false and misleading promotion to urologists created significant increases in demand, as well as substantial sales increases. Faced with growing demand, and realizing opportunities created by their illegal market expansion schemes, Solvay sought out sales and marketing help from third party co-promoters, such as Contract Sales Organizations ("CSO")[414], to enter into agreements to increase sales of Androgel. Thus Solvay entered into a series of co-promotion agreements with third parties. Former Solvay, now AbbVie, Vice President of Sales, James B. Hynd, has been the primary driver of Solvay's co-promotion deals, including as lead negotiator, with the exception of the TAP Pharmaceuticals agreement described below.

1081. Pharmaceutical companies like Solvay enter into co-promotion relationships to increase their breadth and reach in promoting products. Co-promotion agreements can be used to increase sheer numbers of sales representatives or to access sales representatives who have contact with physicians and/or expertise in a therapeutic area. Solvay trains the sales and marketing employees of its co-promotion partners to deliver Solvay's false and misleading promotional messages.

1082. The first Solvay co-promotion agreement was with TAP Pharmaceuticals ("TAP") in 2001, following the June 2000 launch of Androgel. Solvay viewed TAP's large urology sales force and existing relationships as an advantage to a relatively small (at that time) pharmaceutical company, since Solvay was focused on promoting Androgel primarily (at that time) to urologists. As part of the co-promotion agreement, ███████████████████

████████████████████████████████████████████

████████████████████████████████████████████

────────────────────────────

[414] ████████████████████████████████████████████
████

████████████████  During the time period of TAP's co-promotion with Solvay, Androgel sales skyrocketed.  The TAP co-promotion agreement was terminated by 2004.

1083.  Solvay's second co-promotion agreement was with ICOS Corporation, a small biotechnology company, best-known for developing tadalafil (Cialis) – a drug used to treat erectile dysfunction.  ICOS was sold to Eli Lilly and Company in 2007.  The ICOS co-promotion agreement began in 2005 and ended in 2006.  Under the agreement, ICOS provided promotional support for AndroGel through physician detailing and other promotional activities, including implementation of Solvay's false and misleading marketing schemes.  Meanwhile, Solvay agreed to train ICOS' sales force, and provide promotional material.  ICOS was paid a base service fee per physician detail, as well as fees based on achievement of specified sales goals for AndroGel.  The ICOS sales representatives promoted both Cialis for men with erectile dysfunction and AndroGel to urologists and primary care providers.

1084.  In 2006, Solvay entered into its next co-promotion agreements with Watson and Par Pharmaceutical Companies, Inc. ("Par") in order to market Androgel.  Ultimately, Abbott/Abbvie inherited Solvay's obligations under these co-promotion agreements in 2010 when it closed on the Solvay acquisition.

1085.  On September 13, 2006, Solvay agreed with Watson on a co-promotion deal to settle then pending patent litigation involving Watson's attempt to introduce a cheaper generic version of AndroGel into the market. ██████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████  This was also at a time when Watson was promoting its own TRT drug Androderm.

1086.  On the same day Solvay and Watson entered into a co-promotion deal, Solvay and Par settled their AndroGel patent litigation, which included Par's agreement to delay a generic AndroGel.  In return, under the co-promotion deal, Solvay agreed to pay Par $10 million per year for six years, and Par agreed to promote AndroGel to primary care doctors for at least a minimum of 30,000 calls annually.

1087.  ████████████████████████████████████████████████████

██████████████████████████████████████ ████ ████████████████████

████████████████████████████████████████████ From the outset, Solvay fully expected that these co-promotion agreements would expand sales of AndroGel through its fraudulent marketing campaign.  "Through these agreements, Solvay Pharmaceuticals is able to extend the reach of AndroGel information to more physicians and ultimately men about the diagnosis and treatment of low testosterone," Solvay Pharmaceuticals Chief Executive Officer Laurence Downey said in a statement.

1088.  In October 2012, Watson and Actavis combined, which included rights to Watson's Androderm. The Watson combination also resulted in Actavis picking up Watson's AndroGel co-promotion deal with Solvay. Thus since 2012, Actavis has been promoting Androderm as well as AndroGel.

1089.  By virtue of Co-Promotion Agreements with their Co-Promoters, Solvay/AbbVie entered into conspiracies to expand the market for TRT drugs artificially and unlawfully (the "Co-Promoters Conspiracy").

1090. The systematic linkages and interrelationships between and among the Solvay/AbbVie Defendants, the Co-Promoters, and their respective sales and marketing forces were established for common and conspiratorial purposes – to aid in deceptively marketing the

TRT drugs to increase profits. Each participant in the Co-Promoters Conspiracy – Co-Promoters and sales and market personnel – received substantial revenue from the schemes to promote the TRT drugs.

1091.  All participants were aware of the Solvay/AbbVie Defendant's control over the content of the sales aids and marketing materials that involve the marketing of the TRT drugs. Solvay/AbbVie utilized their Co-Promoters' sales forces to detail hundreds of doctors and other healthcare practitioners.  The AbbVie Defendants directed the Co-Promoters and their sales forces to disseminate their false and misleading messages about the safety and efficacy of their TRT drugs.

1092.  Plaintiff MMO and the TPP Class Members have been injured in their property by reason of the various Co-Promoters Conspiracies, and have paid millions of dollars in payments for the TRT drugs that they would not have paid had Defendants not engaged in the Co-Promoters Conspiracy.

### C.  Intra-Corporate Conspiracy:  Defendants Conspire with Co-Marketing Partners, Medical Marketing and Media Companies and Others

1093.  Defendants' fraudulent marketing schemes, as alleged in detail in this TAC, which include the Formulary Access Enterprises, Peer Selling Enterprises, Publication Enterprises and Direct-to-Consumer Enterprises describe each Defendants' employment of a vast array of marketing partners, medical marketing, media companies and others (collectively, "TRT Marketers") which caused Plaintiff MMO and the TPP Class Members to pay for medically inappropriate TRT prescriptions.  Defendants and the TRT Marketers planned and implemented Defendants' sophisticated fraudulent marketing schemes by agreements, including Defendants' payment of substantial compensation for their services and promotional materials.

1094.   By virtue of agreements with the TRT Marketers of their respective Enterprises as alleged in this TAC, each Defendant and their TRT Marketers conspired to further Defendants' fraudulent marketing schemes.

1095.   The systematic linkages and interrelationships between and among the TRT Marketers, including physicians, vendors, third parties and Defendants, all were established for a common and conspiratorial purpose – to aid in deceptively marketing the TRT drugs to increase profits.  Each participant in the respective Intra-Corporate Conspiracies — physicians, medical marketing firms, and third party vendors — received substantial revenue from the scheme to promote the TRT drugs.  Such revenue was exponentially greater than it would have been if the TRT drugs had been marketed appropriately.

1096.   All participants were aware of Defendants' control over the content of the presentations, speeches, promotional events, and articles that involve the marketing of the TRT drugs.  Furthermore, each portion of the enterprise benefited from the existence of other parts. For example, the Publication and DTC Enterprises provided literature and advertising which lent an air of academic legitimacy and buttressed the claims being made by the promotion the Peer-Selling enterprise. And, on the other hand, the Peer-Selling Enterprises generated direct contacts with the physician community and Plaintiff MMO and the TPP Class Members to spread the word regarding the TRT drugs, which provided the Publication Enterprises with greater interest in their work.   Standing alone and together these enterprises then provided support and credibility for the TPP Formulary Enterprises which targeted Plaintiff MMO and the TPP Class Members.

1097.   This common fraudulent purpose was effectuated through this broad network of Defendants, vendors and physicians. That network was held together by the funneling of funds

through and to the enterprise participants, and the content controlled by Defendants, which made up the Intra-Corporate Conspiracies that furthered the fraudulent marketing scheme.

1098. Plaintiff MMO and the TPP Class Members were misled about the TRT drug's efficacy and by these Intra-Corporate Conspiracies.

1099. Plaintiff MMO and the TPP Class Members have been injured in their property by reason of the various Intra-Corporate Conspiracies and have paid billions of dollars in payments for the TRT drugs that they would not have made had Defendants not engaged in the Intra-Corporate Conspiracies.

## XV. PLAINTIFF'S CLAIMS ARE TIMELY

1100. The claims set forth herein are timely because – among other reasons – Plaintiff MMO and the TPP Class Members in the exercise of reasonable diligence were unable to discover their injuries and because Defendants' fraudulently concealed their illegal conduct and aggressively countered any negative publicity regarding Defendants' promotion of the TRT drugs.

1101. As evidenced by the allegations in this TAC, Defendants have concealed and/or failed to adequately disclose the TRT drugs' propensity to cause adverse cardiovascular events, have employed and continue to employ practices and techniques of secrecy and public denial in order to avoid detection of, to assuage potential concern, and have fraudulently hidden their deceptive and conspiratorial behavior regarding the safety and efficacy of TRT drugs.

1102. As such, Plaintiff MMO and the TPP Class Members have not been effectively alerted to the existence and scope of this industry-wide fraud and thus were not on notice of their potential claims until shortly prior to the filing of this TAC.

1103. The accrual of Plaintiff MMO's and the TPP Class Members' claims is tied to the recent safety disclosures regarding TRT drugs' association with cardiovascular adverse events.

1104.   In pursuit of their efforts to promote TRT drugs for unsafe off-label purposes, Defendants concealed and failed to disclose the known or reasonably knowable serious adverse side effects of TRT drugs, described above. Plaintiff MMO and the TPP Class Members could not have known, nor could they have reasonably discovered TRT drugs' propensity to cause cardiovascular adverse events, the data for which was exclusively within the hands of Defendants and were not generally known until very recently.

1105.   The FDA's own actions with respect to the TRT drugs labeling have occurred only very recently. On January 31, 2014, the FDA announced that it was investigating the risk of stroke, heart attack, and death in men taking the entire class of FDA-approved testosterone products. In September 2014, the FDA Advisory Committee voted 20-1 to restrict TRT labeling. And in March 2015, the FDA announced that it was requiring additional safety information in Defendants' TRT drug labeling. Those proposed labels were only approved weeks ago, in May 2015.

1106.   It was only with these revelations that Plaintiff MMO and the TPP Class Members were put on notice that the vast majority of TRT drug prescribing for unsafe off-label uses would have and should have never occurred had Defendants made adequate disclosures and cardiovascular safety risks.

1107.   Plaintiff MMO and the TPP Class Members could not have acquired such knowledge through the exercise of reasonable diligence. Through their public statements, marketing and advertising, Defendants' self-concealing scheme, which was also designed to prevent Plaintiff MMO and the TPP Class Members from discovering their injuries, as well as their affirmative conduct to perpetuate their fraud deprived Plaintiff MMO and the TPP Class

Members of actual or presumptive knowledge of facts sufficient to put them on notice as to their potential claims.

1108.   The false and misleading TPP, marketing, and publication schemes, as well as the illegal kickback schemes, depended on Defendants' concealment of their involvement, because of the various prohibitions on manufacturers promoting their products for unapproved uses and the obvious illegality of bribing physicians in the form of kickbacks.  Indeed, Defendants' CME and promotional speaker programs as well as the medical literature and publishing programs, were only successful because Defendants managed to hide the true extent of their control over these activities. Defendants strove to make these CME seminars, medical journal articles, and speaking events appear as independent and legitimate as possible, when in reality the physicians and researchers participating in the schemes were merely the paid mouthpieces for Defendants' false and misleading promotions.  And, of course, the written materials were in large part less explicit about false and misleading promotion, even though Defendants trained their sales force to deliver explicit unapproved and unsafe pitches during sales calls. The result of this concealment was a body of medical literature and a roster of well-respected teaching physicians supporting the unsafe off-label use of TRT drugs.

1109. As alleged in the TPP, Peer Selling, Publication, and DTC Enterprises, Defendants jointly and acting in concert sought to create the impression to Plaintiff MMO and the TPP Class Members, to patients, and to physicians that the increased utilization of TRT drugs was for on-label indicated usage that was simply underdiagnosed. Defendants, however, knew and understood that promotion of the TRT drugs to treat age-related hypogonadism, andropause, and Low T was off-label and that Defendants' own data suggested that TRT drug use in this population, as well as other off-label populations at risk for cardiovascular events, was

inappropriate and dangerous. Defendants failed to make adequate disclosures because the vast majority of TRT drug prescribing and reimbursement never would have occurred had adequate disclosures and warnings been made.

1110.  To the extent that anyone publicly called into question Defendants' false and fraudulent promotional activities, Defendants were highly aggressive in their attacks against such negative media. For example, when *The New Yorker* published an article in 2002 that seemingly called into question Defendants' promotional efforts for TRT drugs, ███████████████

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████

1111.  ████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████

1112.  ███████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████

1113.  To ensure that Defendants' counter-messaging reached its intended subjects, Defendants had equipped their sales forces with counter-messaging and talking points to reassure patients, physicians, and Plaintiff MMO and the TPP Class Members with respect to TRT therapy. The AbbVie Defendants provided scripts to their sales representatives and managed care account representatives on how to handle objections from physicians, patients, and Plaintiff MMO and the TPP Class Members. ███████████████████████████

████████████████████████████████████████████████████

████████████████████████

1114.  ███████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

████████

1115.   As exemplified in the AbbVie Defendants' efforts to undermine *The New Yorker* article, Defendants took extreme measures to counter any negative disclosures regarding TRT drugs and TRT therapy for the unsafe, off-label uses promoted by Defendants. These messages were delivered directly to TPP Class Members by Defendants' respective managed care account executives.

1116.   Plaintiff MMO and the TPP Class Members were thus not put on inquiry notice of any injuries by articles (such as *The New Yorker* article) on account of Defendants' extreme and successful efforts to attack and undermine negative media reports with Plaintiff MMO and the TPP Class Members, physicians, and patients.

1117.   Likewise, Defendants' involvement in their primary false and fraudulent promotional activities as well as in their attacks on any negative press was hidden because Defendants largely used intermediaries to deliver their deceptive messages. These activities, and others described above, concealed Defendants' false and misleading promotional activities and were designed such that Plaintiff MMO and the TPP Class Members could not have discovered the alleged scheme or their causes of action earlier in the exercise of reasonable diligence. Much of the scheme – to this day – remains concealed.

1118.   A False Claims Act whistleblower complaint, *United States ex rel. King v. Solvay, et al.,* was unsealed in 2010, and one of the drugs (several were non-TRT drugs) in that lawsuit was AndroGel.  However, virtually all of the *King* complaint's exhibits referring to AndroGel still remain under seal.  In a December 2013 submission, the *King* relator's counsel noted that "document production [in the case] is still in its infancy." As a result, much of the AbbVie

Defendants' scheme to defraud Plaintiff MMO and the TPP Class Members was not reproduced in the *King* complaint. As such, Plaintiff was not aware nor through reasonable diligence should have been aware of the *King* case (nor have access to the full database of *King v. Solvay* documents) until research for this TAC was undertaken.

1119. Furthermore, due to their illegality, physician kickbacks for prescriptions were concealed or disguised as payments for other purposes for obvious reasons through a number of artifices described above, including sham "honoraria," preceptorships, ALERT testing payments, and other methods.

1120. Thus, any applicable statutes of limitation have not commenced and/or have been tolled by Defendants' knowing and active concealment and public denials of the facts alleged herein. Plaintiff MMO and the TPP Class Members have been kept in ignorance of vital information essential to the pursuit of these claims without any fault or lack of diligence on their part, and as part of each Defendant's scheme. Plaintiff MMO and the TPP Class Members could not have reasonably discovered the fraudulent nature of Defendants' conduct, and in fact were prevented from discovering the fraudulent nature of Defendants' conduct on account of Defendants' respective schemes to prevent Plaintiff MMO and the TPP Class Members from discovering that TRT drug use was for ineffective, unsafe, and unapproved uses. Accordingly, Defendants are estopped from relying on any statute of limitations to defeat any of Plaintiff's or the other Class Members' claims.

1121. Defendants' motive in concealing the serious adverse side effects and negative safety profiles of the TRT drugs, all while controlling and operating the various Enterprises described above, was to obtain additional revenues from the illegal and false and misleading marketing of their TRT drugs, which would have had significantly lower sales had they only

been sold for their approved indication and if the true safety and efficacy profile of the drugs had been disclosed. Due to the conduct described herein, Defendants achieved combined sales near or in excess of $2 billion in both 2012 and 2013.

## XVI.   INJURY TO PLAINTIFF AND TPP CLASS MEMBERS

1122.   Plaintiff MMO and the TPP Class Members – entities that provide prescription drug benefits to their insured patients – were directly harmed by Defendants' fraudulent marketing schemes. When listed on the formulary, Plaintiff MMO and the TPP Class Members reimburse 80%-90% of the cost of TRT prescriptions. Plaintiff MMO and the TPP Class Members were thus integral to the success of Defendants' unlawful marketing campaigns, as the primary payers for TRT prescriptions.

1123.   Defendants and their alleged Enterprises were designed to cause, and did cause, Plaintiff MMO and the TPP Class Members to pay for TRT prescriptions to treat conditions for which the drugs are not FDA-approved and for which there was no reliable scientific evidence that they were effective.  On top of this, there was reliable evidence that TRT drugs are not safe when prescribed non-indicated, and Defendants acting in concert and separately concealed this information from the public and from Plaintiff MMO and the TPP Class Members to prevent them from discovering the causes of action asserted herein. Patients, including those whose prescription drug charges were paid by Plaintiff and Class Members, and who were prescribed TRT drugs for non-indicated and unsafe uses, received no therapeutic benefit and were subject to life threatening side effects. Absent Defendants' conduct, Plaintiff MMO and the TPP Class Members would not have paid for such TRT prescriptions and would not have paid for any substitute product.

1124.   Defendants' deceptive and misleading marketing scheme increased the number of prescriptions of TRT drugs written and filled during the Class Period. Because Defendants

withheld material information about the true safety and efficacy of TRT drugs, the prescribing physicians did not have the knowledge necessary to make informed decisions regarding TRT prescriptions. Plaintiff MMO and the TPP Class Members, unaware of Defendants' scheme, paid for these prescriptions. Defendants' promotion and marketing of TRT safety and effectiveness has been highly successful, resulting in Defendants receiving billions of dollars in profits, representing ill-gotten gains to which Defendants were not entitled.

1125. Plaintiff MMO and the TPP Class Members reasonably and justifiably relied on Defendants and their co-conspirators to provide truthful, scientifically-based and clinically relevant information when deciding to include the TRT drugs on formularies or to provide coverage for payment of TRT prescriptions. Ultimately, Plaintiff MMO and the TPP Class Members have shouldered the responsibility of paying for the TRT prescriptions and associated medical claims, including medical costs to treat patients harmed by taking TRT drugs.

1126. Here are representative examples of the injury suffered by Plaintiff MMO and the TPP Class Members resulting from the Defendants' false and misleading promotion of the TRT drugs:

















1127.   Defendants falsely promoted TRT drugs as safe and effective directly to Plaintiff MMO and the TPP Class Members in order to get TRT drugs placed more favorably on the TPP formularies and thereby obtain coverage.

1128.   Plaintiff MMO and the TPP Class Members relied on the Defendants' misrepresentations of TRT drugs' safety and efficacy.   Physicians relied on the Defendants' misrepresentations of TRT drugs' safety and efficacy in prescribing the drug for their patients. Plaintiff MMO and the TPP Class Members relied on the Defendants' misrepresentations of TRT safety and efficacy when placing TRT drugs on formularies. Plaintiff MMO and the TPP Class Members relied on the Defendants' misrepresentations of TRT safety and efficacy in reimbursing and/or paying for prescriptions of TRT drugs for their members.

1129.   Defendant pharmaceutical manufacturers have superior access to information about their drugs, especially in the post-marketing phase, and are under a special duty to investigate and report adverse effects of their drugs.   Defendants' duty to disclose also arises where a Defendant makes partial or ambiguous statements about efficacy of their TRT drugs that require further disclosure in order to avoid being misleading.

1130.   Defendants' nondisclosure or concealment of health and safety risks, including when Defendants make partial representations, but also suppresses some material facts, was done intentionally.

1131.   Defendants also had a duty to disclose the lack of efficacy of the TRT drugs as they were marketing the drug for a fabricated disease state, for symptoms associated with the male-aging process.  Defendants' failure to disclose lack of efficacy is particularly egregious given the complete lack of reliable scientific data supporting efficacy, and where there were actual negative side effects.

1132.   Truthful information rather than Defendants' misrepresentations would have been material to MMO and the TPP class in making coverage decisions and managing formularies, as MMO and the TPP class rely on receiving accurate scientific information about the TRT drugs, including evidence-based medical studies, further relying on the integrity of the published literature to determine whether a pharmaceutical product is effective and safe. Defendants' untruthfulness deceived a reasonable health plan like MMO.

1133.   Therefore, Defendants' failure to adequately inform consumers, Plaintiff MMO and the TPP Class Members and those in the medical community that the use of TRT drugs dangerously increases the risk of cardiovascular adverse events, and their false and misleading promotion of TRT drugs' efficacy caused Plaintiff MMO and the TPP Class Members to pay for TRT drugs, which are neither safe nor effective except for a very few patients.

1134.   But for Defendants' actions, Plaintiff MMO and the TPP Class Members would not have paid for TRT drugs.  The AbbVie Defendants themselves noted that adequate labeling would decrease AndroGel prescriptions: ███████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████ Also, but for Defendants' actions, Plaintiff MMO and the TPP Class Members would not have had to pay for the costs of care related to its members' adverse medical events.

1135.  Defendants used, and knowingly caused the use of, mail and interstate wire communications to create, execute, and manage their fraudulent schemes, as well as to further them. This scheme involved national marketing and sales plans and programs and encompassed physicians and consumers across the country.

1136.  Defendants' use of, and causing the use of, the mails and wires in furtherance of their schemes to defraud involved thousands of communications and transmissions through the Class period all over the country, including:

- Transmission through mail and wire marketing and advertising materials about the non-indicated and unsafe uses of their TRT drug(s) to physicians across the country;

- Communications and transmissions, including financial payments, from Defendants or vendors to participants in the TPP Formulary Access, Peer Selling, Publication, and DTC Enterprises, including physicians and medical marketing vendors, discussing and relating to the production and publication of articles and dissemination of materials and speeches misrepresenting the non-indicated uses and safety and efficacy of their TRT drug(s);

- Communications with Plaintiff MMO and the TPP Class Members, other health insurers, and patients, inducing payments for TRT drugs to be made based on misrepresentations concerning their safety, efficacy, effectiveness, and usefulness; and

- Communications, payments and monetary transfers using the wires concerning the receipt and distribution of the proceeds of Defendants' improper schemes.

1137.  In addition, Defendants' respective corporate headquarters have communicated, and knowingly caused communications, by United States mail, telephone and facsimile with or by various local district managers, medical liaisons, and pharmaceutical representatives, in furtherance of Defendants' schemes.

## XVII.  CLASS ACTION ALLEGATIONS

1138.  Plaintiff brings this suit as a Class action pursuant to Rule 23(b)(2), (b)(3), and (c)(4) of the Federal Rules of Civil Procedure, on behalf of a Class consisting of:

> All health insurance companies, third-party administrators, health
> maintenance organizations, self-funded health and welfare benefit

plans, third party payers and any other health benefit provider ("TPPs"), in the United States of America and its territories, which were at financial risk for and paid, reimbursed or incurred drug and medical costs for AndroGel, Testim, Testopel, Axiron, Fortesta, and/or Androderm for purposes other than resale, since their respective approval dates, during the relevant time period. Excluded from the Class are employees of Defendants, including their respective officers or directors, and the Court(s) to which this case is assigned.

1139. The proposed Class is sufficiently numerous, as thousands of members of the Class were deceived and/or induced to pay for TRT drugs and related medical costs caused by Defendants' unlawful marketing campaigns. The TPP Class is so numerous and dispersed throughout the United States that joinder of all members is impracticable. The Class is composed of Plaintiff MMO and the TPP Class Members, and the disposition of their claims in a Class action will benefit both the parties and the Court. It is estimated that in 2010 alone, at least one million individuals nationwide received prescriptions for TRT drugs that were paid by Plaintiff MMO and the TPP Class Member. Defendants sell millions of doses of TRT drugs in the United States every year, and thus the Class is sufficiently numerous to make joinder impracticable, if not outright impossible. The Class Members can be identified by, *inter alia,* by records maintained by TPPS, Defendants, pharmacies and prescription drug data sources such as IMS Health.

1140. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class Members include, but are not limited to whether Defendants targeted Plaintiff MMO and the TPP Class Members and conspired with others to obtain reimbursement and coverage, by *inter alia* misrepresenting the safety and efficacy of their respective TRT Drug(s) for the myriad age-related conditions for which Defendants marketed

their drugs; whether Defendants' acts, omissions and conspiracies violated and continue to violate, federal RICO laws and common law negligent misrepresentation claims; whether Defendants engaged in a conspiratorial multifaceted "unbranded" marketing campaign to deceive TPP, doctors and consumers about the benefits of TRT drugs in a nationwide promotional blitz to achieve acceptance and payments for Defendants' products to treat everything from aging and listlessness to HIV; whether Defendants made misrepresentations of fact or omitted to state facts to Plaintiff MMO and the TPP Class Members, TPP formulary committees, doctors, consumers and others, as to the TRT drugs' unproven effectiveness and downplayed safety risks which misrepresentations or omissions were deceptive, and operated as a fraud and deceit upon the TPP class; whether TPP members covered by TPP prescription drug benefits who took TRT drugs are at increased risk of severe and permanent injuries, including cardiovascular adverse events such as myocardial infarction, stroke, and pulmonary embolism; whether, in marketing and selling TRT drugs, including to Plaintiff MMO and the TPP Class Members, and their P&T committees, Defendants failed to disclose the effectiveness, dangers and risks to TPP's members ingesting the drugs; whether Defendants failed to warn adequately of the adverse effects of the TRT drugs; whether Defendants misrepresented in their marketing, advertisements, internet sites, promotional materials, publications, and other materials, among other things, the safety, potential side effects and effectiveness of TRT drugs; whether Defendants knew or should have known that TPP members' ingestion of TRT drugs would lead to serious adverse health events; and whether Defendants were part of a scheme and/or conspiracy that violated the federal RICO statute.

1141. The conduct and patterns of conduct alleged herein, relating to the AbbVie Defendants' sales and marketing of AndroGel, began on or about at least February 28, 2000, the

date of AndroGel's initial approval by the FDA, and possibly before to the extent that the AbbVie Defendants' animal and premarketing studies demonstrated cardiovascular adverse effects and the AbbVie Defendants engaged in pre-approval marketing. The conduct and patterns of conduct continue to the present and well after AbbVie's acquisition of Solvay.

1142. The conduct and patterns of conduct alleged herein, relating to Defendant Auxilium's sale and marketing of Testim and Testopel, began as early as 2000 (Testopel), or October 31, 2002 (the date of Testim's initial approval by the FDA), and possibly before to the extent that Defendant Auxilium's animal and premarketing studies demonstrated cardiovascular adverse effects. Auxilium's conduct and patterns of conduct continue to the present.

1143. The conduct and patterns of conduct alleged herein, relating to Defendant Eli Lilly's sale and marketing of Axiron, began as early as November 23, 2010, the date of Axiron's initial approval by the FDA, and possibly before to the extent that Defendant Eli Lilly's animal and premarketing studies demonstrated cardiovascular adverse effects. The Lilly Defendants' conduct and patterns of conduct continue to the present.

1144. The conduct and patterns of conduct alleged herein, relating to Defendant Endo's sale and marketing of Fortesta, began as early as December 29, 2010, the date of Fortesta's initial approval by the FDA, and possibly before to the extent that Defendant Endo's animal and premarketing studies demonstrated cardiovascular adverse effects. Endo's conduct and patterns of conduct continue to the present.

1145. The conduct and patterns of conduct alleged herein, relating to Defendant Actavis' sale and marketing of Androderm, began as early as September 29, 1995, the date of Androderm's initial approval by the FDA, and possibly before to the extent that Defendant

Actavis' animal and premarketing studies demonstrated cardiovascular adverse effects. The Actavis Defendants' conduct and patterns of conduct continue to the present.

1146.   The conduct and patterns of conduct alleged herein, relating to the sale and marketing of TRT drugs, took place throughout the United States, the District of Columbia and Puerto Rico.

1147.   Plaintiff MMO will fairly and adequately represent and protect the interests of the Class, as required by Rule 23(a)(4). Plaintiff MMO has retained counsel with substantial experience in the prosecution of TRT drug litigation and experience in the prosecution of nationwide class actions.   Plaintiff MMO and its counsel are committed to the vigorous prosecution of this action on behalf of the Class and have the financial resources to do so. Neither Plaintiff MMO nor counsel have any interests in conflict with, or antagonistic to, those of the Class.

1148.   Plaintiff MMO and the TPP Class Members seek actual and compensatory damages against all Defendants, and appropriate equitable, injunctive and declaratory relief, treble damages, as well as reasonable attorneys' fees under the RICO statute.

1149.   The prosecution of separate actions by individual members of the TPP Class would create a risk of inconsistent or varying adjudications which could establish incompatible standards of conduct for Defendants.

1150.   Plaintiff MMO and the TPP Class Members have suffered, and will continue to suffer, harm and damages as a result of Defendants' false and misleading conduct. A class action is superior to other available methods for the fair and efficient adjudication of the controversy under Rule 23(b)(3).   Absent a class action, because the amount of their individual damages may be relatively small, many members of the TPP Class likely would find the cost and burden of

individually litigating their claims to be prohibitive if not impossible, and will have no effective remedy at law. The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants, and promotes consistency and efficiency of adjudication. It is also superior because joinder of all members of the Class is impracticable. Class treatment will permit a large number of similarly situated persons and entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would require. The benefits of proceeding by way of class action, including providing injured persons or entities with a method for obtaining redress on claims that they might not be able to pursue individually, substantially outweigh any difficulties that may arise in the management of a class action.

1151. Plaintiff does not know of any difficulty that would be encountered in the management of the claims advanced by the TPP Class that would preclude certification.

1152. This case presents common issues of fact and law that are appropriate for issue class certification under Rule 23(c)(4); and the management of this action may be facilitated through the certification of additional subclasses under Rule 23(c)(5), if necessary and appropriate.

## XVIII. CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Violation of 18 U.S.C. § 1962(c)
### (The AndroGel TPP Formulary Access Enterprise – Against the AbbVie Defendants)

1153. Plaintiff incorporates by reference all preceding paragraphs, as if fully set forth herein.

1154.   The AbbVie Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3) who participated in the conduct of the affairs of the AndroGel TPP Formulary Access Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

1155.   The AndroGel TPP Formulary Access Enterprise is an association-in-fact within the meaning of 18 U.S.C. § 1961(4) consisting of (i) the AbbVie Defendants, including their employees and agents, (ii) managed care sales groups and managed market sales representatives, (iii) TPP marketing firms that Defendants associated with to promote AndroGel to Plaintiff MMO and the TPP Class Members and P&T committees, including those listed in the foregoing allegations as well as numerous other firms whose identities are not yet known but will be learned in discovery, and (iv) physician participants who promoted substantially similar messages to Plaintiff MMO and the TPP Class Members and P&T committees, including those listed in the foregoing allegations, as well as countless others whose identities are not yet known but will be learned in discovery.

1156.   The AndroGel TPP Formulary Access Enterprise is an ongoing organization that functions as a continuing unit.  The AndroGel TPP Formulary Access Enterprise was created and used by the AbbVie Defendants as a tool to effectuate a pattern of racketeering activity.  The AbbVie Defendants "persons" are distinct from the AndroGel TPP Formulary Access Enterprise. The AbbVie Defendants, however, were aware of the essential nature and scope of this Enterprise and intended to participate in and/or conduct it.

1157.   The AndroGel TPP Formulary Access Enterprise falls within the meaning of 18 U.S.C. § 1961(4) and consists of a group of "persons" associated together for the common purpose of promoting AndroGel for unsafe, non-indicated uses and earning profits therefrom.

1158. The AbbVie Defendants have conducted and participated in the affairs of the AndroGel TPP Formulary Access Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and 1961(5), which includes multiple instances of mail fraud in violation of 18 U.S.C. § 1341, and multiple instances of wire fraud in violation of 18 U.S.C. § 1343, as described above. The false and misleading predicate acts of racketeering activity committed, or caused to be committed, by the AbbVie Defendants throughout the Class Period number in the thousands, and the AbbVie Defendants committed, or caused to be committed, at least two of the predicate acts within the requisite ten (10) year period.

1159. The AndroGel TPP Formulary Access Enterprise engaged in and affected interstate commerce, because, *inter alia*, it marketed, sold, purchased or provided AndroGel to thousands of entities and individuals throughout the United States.

1160. The AbbVie Defendants exerted control over the AndroGel TPP Formulary Access Enterprise, and the AbbVie Defendants participated in the operation or management of the affairs of the AndroGel TPP Formulary Access Enterprise, through a variety of actions including the following:

- the AbbVie Defendants controlled the content of the messages being delivered by the AndroGel TPP Formulary Access Enterprise at each TPP and P&T committee meeting, including the content of the messages promulgated by marketing firms, managed care sales groups and physician participants;

- the AbbVie Defendants and their employees and agents controlled the stream of information disseminated by the AndroGel TPP Formulary Access Enterprise concerning AndroGel by exerting control over the communications concerning AndroGel by marketing firms, managed care sales groups and physician

participants;

- the AbbVie Defendants utilized the AndroGel TPP Formulary Access Enterprise to target Plaintiff MMO and the TPP Class Members and their P&T committees with false and fraudulent marketing to deceive them into placing AndroGel on their formularies;

- the AbbVie Defendants selected and approved the marketing firms, managed care sales groups and physician participants that participated in the AndroGel TPP Formulary Access Enterprise;

- the AbbVie Defendants paid the marketing firms, managed care sales groups and physician participants for their participation in the AndroGel TPP Formulary Access Enterprise;

- the AbbVie Defendants placed their own employees and agents in positions of authority and control over the AndroGel TPP Formulary Access Enterprise;

- the AbbVie Defendants concealed their involvement in the AndroGel TPP Formulary Access Enterprise such that the materials and messages it disseminated would have a veneer of credibility as independent and unbiased scientific research.

1161. As detailed above, the AbbVie Defendants' AndroGel TPP Formulary Access Enterprise consisted of: (a) deliberately misrepresenting, and causing others to misrepresent, the uses for which AndroGel was safe and effective so that Plaintiff and Class Members added AndroGel to their formularies and paid for this drug to treat conditions and/or symptoms for which it was not scientifically proven to be safe, effective and useful; (b) presenting events

385

misrepresenting the unapproved and unsafe uses for which the AbbVie Defendants knew AndroGel was not proven to be scientifically safe, effective, and useful to Plaintiff MMO and the TPP Class Members, P&T committees and their members; (c) disseminating materials created by the AbbVie Defendants and their Enterprises to Plaintiff MMO and the TPP Class Members, P&T committees and their members and using those materials to misrepresent, and cause others to misrepresent, the uses for which AndroGel was safe, effective and useful; and (d) actively concealing, and causing others to conceal, material information about the safety, efficacy and usefulness of AndroGel to treat conditions for which it had not been approved by the FDA.

1162. The AbbVie Defendants' schemes and the above-described racketeering activities amounted to common courses of conduct intended to cause Plaintiff MMO and the TPP Class Members to pay for excessive amounts of AndroGel. Within the AndroGel TPP Formulary Access Enterprise, each such racketeering activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiff MMO and the TPP Class Members. The AbbVie Defendants' fraudulent activities are part of their ongoing business and constitute a continuing threat to Plaintiff's and the Class Members' property.

1163. The pattern of racketeering activities alleged herein and the AndroGel TPP Formulary Access Enterprise are separate and distinct from each other. The AbbVie Defendants engaged in a pattern of racketeering activities alleged herein for the purpose of conducting the affairs of the AndroGel TPP Formulary Access Enterprise.

1164. Plaintiff MMO and the TPP Class Members have been injured in their property by reason of these violations in that they have made millions of dollars in payments for AndroGel that they otherwise would not have made had the AbbVie Defendants not engaged in their

pattern of racketeering activities. Plaintiff MMO and the TPP Class Members suffered direct, consequential and concrete financial loss flowing from the injury of their property by having overpaid for AndroGel, having received a product or prescription (AndroGel) that was worth less than what they paid for it, and thereby suffered out-of-pocket losses. And but for the predicate acts committed or caused to be committed by the AbbVie Defendants, the Plaintiff MMO and the TPP Class Members would not have suffered their RICO injuries.

1165.  Plaintiff's and the Class Members' injuries were directly and proximately caused by the AbbVie Defendants' racketeering activity, as described above. Plaintiff's and Class Members' injuries were directly caused by the predicate acts and are not attributable to any independent or intervening factors; their injuries were a foreseeable and natural consequence of the AbbVie Defendants' scheme; there is no difficulty posed by having to apportion damages among Class Members with different standing or different levels of injury because there are no other injured parties beside the Plaintiff MMO and the TPP Class Members in this case, who are the parties directly injured by the AbbVie Defendants' RICO violations; and there are no others, more directly injured, that could vindicate Plaintiff's and Class Members' claims.

1166.  By virtue of these violations of 18 U.S.C. § 1962(c), the AbbVie Defendants are jointly and severally liable to Plaintiff MMO and the TPP Class Members for three times the damages Plaintiff MMO and the TPP Class Members have sustained, punitive damages, plus the cost of this lawsuit, including reasonable attorney fees.

<div align="center">

**SECOND CLAIM FOR RELIEF**
**Violation of 18 U.S.C. § 1962(c)**
**(The Testim and Testopel TPP Formulary Access Enterprise – Against Auxilium)**

</div>

1167.  Plaintiff incorporates by reference all preceding paragraphs, as if fully set forth herein.

<div align="center">

387

</div>

1168.  Defendant Auxilium is a "person" within the meaning of 18 U.S.C. § 1961(3) who participated in the conduct of the affairs of the Testim and Testopel TPP Formulary Access Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

1169.  The Testim and Testopel TPP Formulary Access Enterprise is an association-in-fact within the meaning of 18 U.S.C. § 1961(4) consisting of (i) Defendant Auxilium, including their employees and agents, (ii) managed care sales groups and managed market sales representatives, (iii) TPP marketing firms that Defendant associated with to promote Testim and Testopel to Plaintiff MMO and the TPP Class Members and P&T committees, including those listed in the foregoing allegations as well as numerous other firms whose identities are not yet known but will be learned in discovery, and (iv) physician participants who promoted substantially similar messages to Plaintiff MMO and the TPP Class Members and P&T committees, including those listed in the foregoing allegations, as well as countless others whose identities are not yet known but will be learned in discovery.

1170.  The Testim and Testopel TPP Formulary Access Enterprise is an ongoing organization that functions as a continuing unit. The Testim and Testopel TPP Formulary Access Enterprise was created and used by Defendant Auxilium as a tool to effectuate a pattern of racketeering activity.  The Defendant Auxilium "persons" are distinct from the Testim and Testopel TPP Formulary Access Enterprise.  Defendant Auxilium, however, was aware of the essential nature and scope of this Enterprise and intended to participate in and/or conduct it.

1171.  The Testim and Testopel TPP Formulary Access Enterprise falls within the meaning of 18 U.S.C. § 1961(4) and consists of a group of "persons" associated together for the common purpose of promoting Testim and Testopel for unsafe, unapproved uses and earning profits therefrom.

1172. Defendant Auxilium has conducted and participated in the affairs of the Testim and Testopel TPP Formulary Access Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and 1961(5), which includes multiple instances of mail fraud in violation of 18 U.S.C. § 1341, and multiple instances of wire fraud in violation of 18 U.S.C. § 1343, as described above. The false and misleading predicate acts of racketeering activity committed, or caused to be committed, by Defendant Auxilium throughout the Class Period number in the thousands, and Defendant Auxilium committed, or caused to be committed, at least two of the predicate acts within the requisite ten (10) year period.

1173. The Testim and Testopel TPP Formulary Access Enterprise engaged in and affected interstate commerce, because, *inter alia*, it marketed, sold, purchased or provided Testim and Testopel to thousands of entities and individuals throughout the United States.

1174. Defendant Auxilium exerted control over the Testim and Testopel TPP Formulary Access Enterprise, and Defendant Auxilium participated in the operation or management of the affairs of the Testim and Testopel TPP Formulary Access Enterprise, through a variety of actions including the following:

- Defendant Auxilium controlled the content of the messages being delivered by the Testim and Testopel TPP Formulary Access Enterprise at each TPP and P&T committee meeting, including the content of the messages promulgated by marketing firms, manage care sales groups and physician participants;

- Defendant Auxilium and its employees and agents controlled the stream of information disseminated by the Testim and Testopel TPP Formulary Access Enterprise concerning Testim and Testopel by exerting control over the communications concerning Testim and Testopel by marketing firms, managed

389

care sales groups and physician participants;

- Defendant Auxilium utilized the Testim and Testopel TPP Formulary Access Enterprise to target Plaintiff MMO and the TPP Class Members with false and fraudulent marketing to deceive them into placing Testim and Testopel on their formularies;

- Defendant Auxilium selected and approved the marketing firms, managed care sales groups and physician participants that participated in the Testim and Testopel TPP Formulary Access Enterprise;

- Defendant Auxilium paid the marketing firms, managed care sales groups and physician participants for their participation in the Testim and Testopel TPP Formulary Access Enterprise;

- Defendant Auxilium placed its own employees and agents in positions of authority and control over the Testim and Testopel TPP Formulary Access Enterprise;

- Defendant Auxilium concealed its involvement in the Testim and Testopel TPP Formulary Access Enterprise such that the materials and messages it disseminated would have a veneer of credibility as independent and unbiased scientific research.

1175. As detailed above, Defendant Auxilium's Testim and Testopel TPP Formulary Access Enterprise consisted of: (a) deliberately misrepresenting, and causing others to misrepresent, the uses for which Testim and Testopel were safe and effective so that Plaintiff MMO and the TPP Class Members added Testim and Testopel to their formularies and pay for this drug to treat conditions and/or symptoms for which it was not scientifically proven to be

safe, effective and useful; (b) presenting events misrepresenting the unapproved and unsafe uses for which Defendant Auxilium knew Testim and Testopel were not proven to be scientifically safe, effective, and useful to Plaintiff MMO and the TPP Class Members; (c) disseminating materials created by Defendant Auxilium and its Enterprises to  and using those materials to misrepresent, and cause others to misrepresent, the uses for which Testim and Testopel were safe, effective and useful; and (d) actively concealing, and causing others to conceal, material information about the safety, efficacy and usefulness of Testim and Testopel to treat conditions for which they had not been approved by the FDA.

1176.  Defendant Auxilium's schemes and the above-described racketeering activities amounted to common courses of conduct intended to cause Plaintiff MMO and the TPP Class Members to pay for excessive amounts of Testim and Testopel. Within the Testim and Testopel TPP Formulary Access Enterprise, each such racketeering activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiff MMO and the TPP Class Members. Defendant Auxilium's fraudulent activities are part of its ongoing business and constitute a continuing threat to Plaintiff MMO's and the TPP Class Members' property.

1177.  The pattern of racketeering activities alleged herein and the Testim and Testopel TPP Formulary Access Enterprise are separate and distinct from each other. Defendant Auxilium engaged in a pattern of racketeering activities alleged herein for the purpose of conducting the affairs of the Testim and Testopel TPP Formulary Access Enterprise.

1178.  Plaintiff MMO and the TPP Class Members have been injured in their property by reason of these violations in that they have made millions of dollars in payments for Testim and Testopel that they otherwise would not have made had Defendant Auxilium not engaged in its

pattern of racketeering activities. Plaintiff MMO and the TPP Class Members suffered direct, consequential and concrete financial loss flowing from the injury of their property by having overpaid for Testim and Testopel, having received a product or prescription (Testim or Testopel) that was worth less than what they paid for it, and thereby suffered out-of-pocket losses. And but for the predicate acts committed or caused to be committed by Defendant Auxilium, Plaintiff MMO and the TPP Class Members would not have suffered their RICO injuries.

1179.  Plaintiff MMO's and the TPP Class Members' injuries were directly and proximately caused by Defendant Auxilium's racketeering activity, as described above. Plaintiff MMO's and TPP Class Members' injuries were directly caused by the predicate acts and are not attributable to any independent or intervening factors; their injuries were a foreseeable and natural consequence of Defendant Auxilium's scheme; there is no difficulty posed by having to apportion damages among Class Members with different standing or different levels of injury because there are no other injured parties beside the Plaintiff MMO and the TPP Class Members in this case, who are the parties directly injured by Defendant Auxilium's RICO violations; and there are no others, more directly injured, that could vindicate Plaintiff MMO's and the TPP Class Members' claims.

1180.  By virtue of these violations of 18 U.S.C. § 1962(c), Defendant Auxilium is jointly and severally liable to Plaintiff MMO and the TPP Class Members for three times the damages Plaintiff MMO and the TPP Class Members have sustained, punitive damages, plus the cost of this lawsuit, including reasonable attorney fees.

### THIRD CLAIM FOR RELIEF
### Violation of 18 U.S.C. § 1962(c)
### (The Axiron TPP Formulary Access Enterprise – Against the Eli Lilly Defendants)

1181.   Plaintiff MMO incorporates by reference all preceding paragraphs, as if fully set forth herein.

1182.   The Eli Lilly Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3) who participated in the conduct of the affairs of the Axiron TPP Formulary Access Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

1183.   The Axiron TPP Formulary Access Enterprise is an association-in-fact within the meaning of 18 U.S.C. § 1961(4) consisting of (i) the Eli Lilly Defendants, including their employees and agents, (ii) managed care sales groups and managed market sales representatives, (iii) TPP marketing firms that Defendants associated with to promote Axiron to Plaintiff MMO and the TPP Class Members, including those listed in the foregoing allegations as well as numerous other firms whose identities are not yet known but will be learned in discovery, and (iv) physician participants who promoted substantially similar messages to Plaintiff MMO and the TPP Class Members, including those listed in the foregoing allegations, as well as countless others whose identities are not yet known but will be learned in discovery.

1184.   The Axiron TPP Formulary Access Enterprise is an ongoing organization that functions as a continuing unit.  The Axiron TPP Formulary Access Enterprise was created and used by the Eli Lilly Defendants as a tool to effectuate a pattern of racketeering activity.  The Eli Lilly Defendants "persons" are distinct from the Axiron TPP Formulary Access Enterprise.  The Eli Lilly Defendants, however, were aware of the essential nature and scope of this Enterprise and intended to participate in and/or conduct it.

1185.   The Axiron TPP Formulary Access Enterprise falls within the meaning of 18 U.S.C. § 1961(4) and consists of a group of "persons" associated together for the common purpose of promoting Axiron for unsafe, unapproved uses and earning profits therefrom.

1186.   The Eli Lilly Defendants have conducted and participated in the affairs of the Axiron TPP Formulary Access Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and 1961(5), which includes multiple instances of mail fraud in violation of 18 U.S.C. § 1341, and multiple instances of wire fraud in violation of 18 U.S.C. § 1343, as described above. The false and misleading predicate acts of racketeering activity committed, or caused to be committed, by the Eli Lilly Defendants throughout the Class Period number in the thousands, and the Eli Lilly Defendants committed, or caused to be committed, at least two of the predicate acts within the requisite ten (10) year period.

1187.   The Axiron TPP Formulary Access Enterprise engaged in and affected interstate commerce, because, *inter alia*, it marketed, sold, purchased or provided Axiron to thousands of entities and individuals throughout the United States.

1188.   The Eli Lilly Defendants exerted control over the Axiron TPP Formulary Access Enterprise, and the Eli Lilly Defendants participated in the operation or management of the affairs of the Axiron TPP Formulary Access Enterprise, through a variety of actions including the following:

- the Eli Lilly Defendants controlled the content of the messages being delivered by the Axiron TPP Formulary Access Enterprise at each TPP and P&T committee meeting, including the content of the messages promulgated by marketing firms, manage care sales groups and physician participants;

- the Eli Lilly Defendants and their employees and agents controlled the stream of

information disseminated by the Axiron TPP Formulary Access Enterprise concerning Axiron by exerting control over the communications concerning Axiron by marketing firms, managed care sales groups and physician participants;

- the Eli Lilly Defendants utilized the Axiron TPP Formulary Access Enterprise to target Plaintiff MMO and the TPP Class Members with false and fraudulent marketing to deceive them into placing Axiron on their formularies;

- the Eli Lilly Defendants selected and approved the marketing firms, managed care sales groups and physician participants that participated in the Axiron TPP Formulary Access Enterprise;

- the Eli Lilly Defendants paid the marketing firms, managed care sales groups and physician participants for their participation in the Axiron TPP Formulary Access Enterprise;

- the Eli Lilly Defendants placed their own employees and agents in positions of authority and control over the Axiron TPP Formulary Access Enterprise;

- the Eli Lilly Defendants concealed their involvement in the Axiron TPP Formulary Access Enterprise such that the materials and messages it disseminated would have a veneer of credibility as independent and unbiased scientific research.

1189. As detailed above, the Eli Lilly Defendants' Axiron TPP Formulary Access Enterprise consisted of: (a) deliberately misrepresenting, and causing others to misrepresent, the uses for which Axiron was safe and effective so that Plaintiff MMO and the TPP Class Members added Axiron to their formularies and paid for this drug to treat conditions and/or symptoms for which it was not scientifically proven to be safe, effective and useful; (b) presenting events

misrepresenting the unapproved and unsafe uses for which the Eli Lilly Defendants knew Axiron was not proven to be scientifically safe, effective, and useful to Plaintiff MMO and the TPP Class Members; (c) disseminating materials created by the Eli Lilly Defendants and their Enterprises to Plaintiff MMO and the TPP Class Members and using those materials to misrepresent, and cause others to misrepresent, the uses for which Axiron was safe, effective and useful; and (d) actively concealing, and causing others to conceal, material information about the safety, efficacy and usefulness of Axiron to treat conditions for which it had not been approved by the FDA.

1190.   The Eli Lilly Defendants' schemes and the above-described racketeering activities amounted to common courses of conduct intended to cause Plaintiff MMO and the TPP Class Members to pay for excessive amounts of Axiron. Within the Axiron TPP Formulary Access Enterprise, each such racketeering activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiff MMO and the TPP Class Members. The Eli Lilly Defendants' fraudulent activities are part of their ongoing business and constitute a continuing threat to Plaintiff MMO's and the TPP Class Members' property.

1191.   The pattern of racketeering activities alleged herein and the Axiron TPP Formulary Access Enterprise are separate and distinct from each other. The Eli Lilly Defendants engaged in a pattern of racketeering activities alleged herein for the purpose of conducting the affairs of the Axiron TPP Formulary Access Enterprise.

1192.   Plaintiff MMO and the TPP Class Members have been injured in their property by reason of these violations in that they have made millions of dollars in payments for Axiron that they otherwise would not have made had the Eli Lilly Defendants not engaged in their pattern of

racketeering activities. Plaintiff MMO and the TPP Class Members suffered direct, consequential and concrete financial loss flowing from the injury of their property by having overpaid for Axiron, having received a product or prescription (Axiron) that was worth less than what they paid for it, and thereby suffered out-of-pocket losses. And but for the predicate acts committed or caused to be committed by the Eli Lilly Defendants, Plaintiff MMO and the TPP Class Members would not have suffered their RICO injuries.

1193. Plaintiff MMO's and the TPP Class Members' injuries were directly and proximately caused by the Eli Lilly Defendants' racketeering activity, as described above. Plaintiff MMO's and the TPP Class Members' injuries were directly caused by the predicate acts and are not attributable to any independent or intervening factors; their injuries were a foreseeable and natural consequence of the Eli Lilly Defendants' scheme; there is no difficulty posed by having to apportion damages among Plaintiff MMO and the TPP Class Members with different standing or different levels of injury because there are no other injured parties beside Plaintiff MMO and the TPP Class Members in this case, who are the parties directly injured by the Eli Lilly Defendants' RICO violations; and there are no others, more directly injured, that could vindicate Plaintiff MMO's and the TPP Class Members' claims.

1194. By virtue of these violations of 18 U.S.C. § 1962(c), the Eli Lilly Defendants are jointly and severally liable to Plaintiff MMO and the TPP Class Members for three times the damages Plaintiff MMO and the TPP Class Members have sustained, punitive damages, plus the cost of this lawsuit, including reasonable attorney fees.

**FOURTH CLAIM FOR RELIEF**
**Violation of 18 U.S.C. § 1962(c)**
**(The Androderm TPP Formulary Access Enterprise – Against the Actavis Defendants)**

1195.   Plaintiff MMO incorporates by reference all preceding paragraphs, as if fully set forth herein.

1196.   The Actavis Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3) who participated in the conduct of the affairs of the Androderm TPP Formulary Access Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

1197.   The Androderm TPP Formulary Access Enterprise is an association-in-fact within the meaning of 18 U.S.C. § 1961(4) consisting of (i) the Actavis Defendants, including their employees and agents, (ii) managed care sales groups and managed market sales representatives, (iii) TPP marketing firms that Defendants associated with to promote Androderm to Plaintiff MMO and the TPP Class Members, including those listed in the foregoing allegations as well as numerous other firms whose identities are not yet known but will be learned in discovery, and (iv) physician participants who promoted substantially similar messages to Plaintiff MMO and the TPP Class Members, including those listed in the foregoing allegations, as well as countless others whose identities are not yet known but will be learned in discovery.

1198.   The Androderm TPP Formulary Access Enterprise is an ongoing organization that functions as a continuing unit.  The Androderm TPP Formulary Access Enterprise was created and used by the Actavis Defendants as a tool to effectuate a pattern of racketeering activity.  The Actavis Defendants "persons" are distinct from the Androderm TPP Formulary Access Enterprise.  The Actavis Defendants, however, were aware of the essential nature and scope of this Enterprise and intended to participate in and/or conduct it.

1199.   The Androderm TPP Formulary Access Enterprise falls within the meaning of 18 U.S.C. § 1961(4) and consists of a group of "persons" associated together for the common purpose of promoting Androderm for unsafe, unapproved uses and earning profits therefrom.

1200.   The Actavis Defendants have conducted and participated in the affairs of the Androderm TPP Formulary Access Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and 1961(5), which includes multiple instances of mail fraud in violation of 18 U.S.C. § 1341, and multiple instances of wire fraud in violation of 18 U.S.C. § 1343, as described above. The false and misleading predicate acts of racketeering activity committed, or caused to be committed, by the Actavis Defendants throughout the Class Period number in the thousands, and the Actavis Defendants committed, or caused to be committed, at least two of the predicate acts within the requisite ten (10) year period.

1201.   The Androderm TPP Formulary Access Enterprise engaged in and affected interstate commerce, because, *inter alia*, it marketed, sold, purchased or provided Androderm to thousands of entities and individuals throughout the United States.

1202.   The Actavis Defendants exerted control over the Androderm TPP Formulary Access Enterprise, and the Actavis Defendants participated in the operation or management of the affairs of the Androderm TPP Formulary Access Enterprise, through a variety of actions including the following:

- the Actavis Defendants controlled the content of the messages being delivered by the Androderm TPP Formulary Access Enterprise at each TPP and P&T committee meeting, including the content of the messages promulgated by marketing firms, manage care sales groups and physician participants;

- the Actavis Defendants and their employees and agents controlled the stream of

information disseminated by the Androderm TPP Formulary Access Enterprise concerning Androderm by exerting control over the communications concerning Androderm by marketing firms, managed care sales groups and physician participants;

- the Actavis Defendants utilized the Androderm TPP Formulary Access Enterprise to target Plaintiff MMO and the TPP Class Members with false and fraudulent marketing to deceive them into placing Androderm on their formularies;

- the Actavis Defendants selected and approved the marketing firms, managed care sales groups and physician participants that participated in the Androderm TPP Formulary Access Enterprise;

- the Actavis Defendants paid the marketing firms, managed care sales groups and physician participants for their participation in the Androderm TPP Formulary Access Enterprise;

- the Actavis Defendants placed their own employees and agents in positions of authority and control over the Androderm TPP Formulary Access Enterprise;

- the Actavis Defendants concealed their involvement in the Androderm TPP Formulary Access Enterprise such that the materials and messages it disseminated would have a veneer of credibility as independent and unbiased scientific research.

1203. As detailed above, the Actavis Defendants' Androderm TPP Formulary Access Enterprise consisted of: (a) deliberately misrepresenting, and causing others to misrepresent, the uses for which Androderm was safe and effective so that Plaintiff MMO and the TPP Class Members added Androderm to their formularies and paid for this drug to treat conditions and/or

symptoms for which it was not scientifically proven to be safe, effective and useful; (b) presenting events misrepresenting the unapproved and unsafe uses for which the Actavis Defendants knew Androderm was not proven to be scientifically safe, effective, and useful to Plaintiff MMO and the TPP Class Members; (c) disseminating materials created by the Actavis Defendants and their Enterprises to Plaintiff MMO and the TPP Class Members and using those materials to misrepresent, and cause others to misrepresent, the uses for which Androderm was safe, effective and useful; and (d) actively concealing, and causing others to conceal, material information about the safety, efficacy and usefulness of Androderm to treat conditions for which it had not been approved by the FDA.

1204.   The Actavis Defendants' schemes and the above-described racketeering activities amounted to common courses of conduct intended to cause Plaintiff MMO and the TPP Class Members to pay for excessive amounts of Androderm. Within the Androderm TPP Formulary Access Enterprise, each such racketeering activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiff MMO and the TPP Class Members. The Actavis Defendants' fraudulent activities are part of their ongoing business and constitute a continuing threat to Plaintiff MMO's and the TPP Class Members' property.

1205.   The pattern of racketeering activities alleged herein and the Androderm TPP Formulary Access Enterprise are separate and distinct from each other. The Actavis Defendants engaged in a pattern of racketeering activities alleged herein for the purpose of conducting the affairs of the Androderm TPP Formulary Access Enterprise.

1206.   Plaintiff MMO and the TPP Class Members have been injured in their property by reason of these violations in that they have made millions of dollars in payments for Androderm

that they otherwise would not have made had the Actavis Defendants not engaged in their pattern of racketeering activities. Plaintiff MMO and the TPP Class Members suffered direct, consequential and concrete financial loss flowing from the injury of their property by having overpaid for Androderm, having received a product or prescription (Androderm) that was worth less than what they paid for it, and thereby suffered out-of-pocket losses. And but for the predicate acts committed or caused to be committed by the Actavis Defendants, Plaintiff MMO and the TPP Class Members would not have suffered their RICO injuries.

1207.  Plaintiff MMO's and the TPP Class Members' injuries were directly and proximately caused by the Actavis Defendants' racketeering activity, as described above. Plaintiff MMO's and the TPP Class Members' injuries were directly caused by the predicate acts and are not attributable to any independent or intervening factors; their injuries were a foreseeable and natural consequence of the Actavis Defendants' scheme; there is no difficulty posed by having to apportion damages among Plaintiff MMO and the TPP Class Members with different standing or different levels of injury because there are no other injured parties beside Plaintiff MMO and the TPP Class Members in this case, who are the parties directly injured by the Actavis Defendants' RICO violations; and there are no others, more directly injured, that could vindicate Plaintiff MMO's and the TPP Class Members' claims.

1208.  By virtue of these violations of 18 U.S.C. § 1962(c), the Actavis Defendants are jointly and severally liable to Plaintiff MMO and the TPP Class Members for three times the damages Plaintiff MMO and the TPP Class Members have sustained, punitive damages, plus the cost of this lawsuit, including reasonable attorney fees.

**FIFTH CLAIM FOR RELIEF**
**Violation of 18 U.S.C. § 1962(c)**
**(The Fortesta TPP Formulary Access Enterprise – Against the Endo Defendants)**

1209.  Plaintiff MMO incorporates by reference all preceding paragraphs, as if fully set forth herein.

1210.  The Endo Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3) who participated in the conduct of the affairs of the Fortesta TPP Formulary Access Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

1211.  The Fortesta TPP Formulary Access Enterprise is an association-in-fact within the meaning of 18 U.S.C. § 1961(4) consisting of (i) the Endo Defendants, including their employees and agents, (ii) managed care sales groups and managed market sales representatives, (iii) TPP marketing firms that Defendants associated with to promote Fortesta to Plaintiff MMO and the TPP Class Members, including those listed in the foregoing allegations as well as numerous other firms whose identities are not yet known but will be learned in discovery, and (iv) physician participants who promoted substantially similar messages to Plaintiff MMO and the TPP Class Members, including those listed in the foregoing allegations, as well as countless others whose identities are not yet known but will be learned in discovery.

1212.  The Fortesta TPP Formulary Access Enterprise is an ongoing organization that functions as a continuing unit.  The Fortesta TPP Formulary Access Enterprise was created and used by the Endo Defendants as a tool to effectuate a pattern of racketeering activity.  The Endo Defendants "persons" are distinct from the Fortesta TPP Formulary Access Enterprise.  The Endo Defendants, however, were aware of the essential nature and scope of this Enterprise and intended to participate in and/or conduct it.

1213.   The Fortesta TPP Formulary Access Enterprise falls within the meaning of 18 U.S.C. § 1961(4) and consists of a group of "persons" associated together for the common purpose of promoting Fortesta for unsafe, unapproved uses and earning profits therefrom.

1214.   The Endo Defendants have conducted and participated in the affairs of the Fortesta TPP Formulary Access Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and 1961(5), which includes multiple instances of mail fraud in violation of 18 U.S.C. § 1341, and multiple instances of wire fraud in violation of 18 U.S.C. § 1343, as described above. The false and misleading predicate acts of racketeering activity committed, or caused to be committed, by the Endo Defendants throughout the Class Period number in the thousands, and the Endo Defendants committed, or caused to be committed, at least two of the predicate acts within the requisite ten (10) year period.

1215.   The Fortesta TPP Formulary Access Enterprise engaged in and affected interstate commerce, because, *inter alia*, it marketed, sold, purchased or provided Fortesta to thousands of entities and individuals throughout the United States.

1216.   The Endo Defendants exerted control over the Fortesta TPP Formulary Access Enterprise, and the Endo Defendants participated in the operation or management of the affairs of the Fortesta TPP Formulary Access Enterprise, through a variety of actions including the following:

- the Endo Defendants controlled the content of the messages being delivered by the Fortesta TPP Formulary Access Enterprise at each TPP and P&T committee meeting, including the content of the messages promulgated by marketing firms, manage care sales groups and physician participants;

- the Endo Defendants and their employees and agents controlled the stream of

information disseminated by the Fortesta TPP Formulary Access Enterprise concerning Fortesta by exerting control over the communications concerning Fortesta by marketing firms, managed care sales groups and physician participants;

- the Endo Defendants utilized the Fortesta TPP Formulary Access Enterprise to target Plaintiff MMO and the TPP Class Members with false and fraudulent marketing to deceive them into placing Fortesta on their formularies;

- the Endo Defendants selected and approved the marketing firms, managed care sales groups and physician participants who participated in the Fortesta TPP Formulary Access Enterprise;

- the Endo Defendants paid the marketing firms, managed care sales groups and physician participants for their participation in the Fortesta TPP Formulary Access Enterprise;

- the Endo Defendants placed their own employees and agents in positions of authority and control over the Fortesta TPP Formulary Access Enterprise;

- the Endo Defendants concealed their involvement in the Fortesta TPP Formulary Access Enterprise such that the materials and messages it disseminated would have a veneer of credibility as independent and unbiased scientific research.

1217. As detailed above, the Endo Defendants' Fortesta TPP Formulary Access Enterprise consisted of: (a) deliberately misrepresenting, and causing others to misrepresent, the uses for which Fortesta was safe and effective so that Plaintiff MMO and the TPP Class Members added Fortesta to their formularies and paid for this drug to treat conditions and/or symptoms for which it was not scientifically proven to be safe, effective and useful; (b)

presenting events misrepresenting the unapproved and unsafe uses for which the Endo Defendants knew Fortesta was not proven to be scientifically safe, effective, and useful to Plaintiff MMO and the TPP Class Members; (c) disseminating materials created by the Endo Defendants and their Enterprises to Plaintiff MMO and the TPP Class Members and using those materials to misrepresent, and cause others to misrepresent, the uses for which Fortesta was safe, effective and useful; and (d) actively concealing, and causing others to conceal, material information about the safety, efficacy and usefulness of Fortesta to treat conditions for which it had not been approved by the FDA.

1218. The Endo Defendants' schemes and the above-described racketeering activities amounted to common courses of conduct intended to cause Plaintiff MMO and the TPP Class Members to pay for excessive amounts of Fortesta. Within the Fortesta TPP Formulary Access Enterprise, each such racketeering activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiff MMO and the TPP Class Members. The Endo Defendants' fraudulent activities are part of their ongoing business and constitute a continuing threat to Plaintiff's and the Class Members' property.

1219. The pattern of racketeering activities alleged herein and the Fortesta TPP Formulary Access Enterprise are separate and distinct from each other. The Endo Defendants engaged in a pattern of racketeering activities alleged herein for the purpose of conducting the affairs of the Fortesta TPP Formulary Access Enterprise.

1220. Plaintiff MMO and the TPP Class Members have been injured in their property by reason of these violations in that they have made millions of dollars in payments for Fortesta that they otherwise would not have made had the Endo Defendants not engaged in their pattern of

racketeering activities. Plaintiff MMO and the TPP Class Members suffered direct, consequential and concrete financial loss flowing from the injury of their property by having overpaid for Fortesta, having received a product or prescription (Fortesta) that was worth less than what they paid for it, and thereby suffered out-of-pocket losses. And but for the predicate acts committed or caused to be committed by the Endo Defendants, Plaintiff MMO and the TPP Class Members would not have suffered their RICO injuries.

1221. Plaintiff MMO's and the TPP Class Members' injuries were directly and proximately caused by the Endo Defendants' racketeering activity, as described above. Plaintiff MMO's and the TPP Class Members' injuries were directly caused by the predicate acts and are not attributable to any independent or intervening factors; their injuries were a foreseeable and natural consequence of the Endo Defendants' scheme; there is no difficulty posed by having to apportion damages among Plaintiff MMO and the TPP Class Members with different standing or different levels of injury because there are no other injured parties beside Plaintiff MMO and the TPP Class Members in this case, who are the parties directly injured by the Endo Defendants' RICO violations; and there are no others, more directly injured, that could vindicate Plaintiff MMO's and the TPP Class Members' claims.

1222. By virtue of these violations of 18 U.S.C. § 1962(c), the Endo Defendants are jointly and severally liable to Plaintiff MMO and the TPP Class Members for three times the damages Plaintiff MMO and the TPP Class Members have sustained, punitive damages, plus the cost of this lawsuit, including reasonable attorney fees.

**SIXTH CLAIM FOR RELIEF**
**Violation of 18 U.S.C. § 1962(c)**
**(The AndroGel Peer Selling Enterprise – Against the AbbVie Defendants)**

1223.   Plaintiff MMO incorporates by reference all preceding paragraphs, as if fully set forth herein.

1224.   The AbbVie Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3) who participated in the conduct of the affairs of the AndroGel Peer Selling Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

1225.   The AndroGel Peer Selling Enterprise is an association-in-fact within the meaning of 18 U.S.C. § 1961(4) consisting of (i) the AbbVie Defendants, including their employees and agents, (ii) physician and/or physician society participants, including those listed in the foregoing allegations as well as countless other physicians and/or physician societies whose identities are not yet known but will be learned in discovery, (iii) and medical marketing vendors, including those listed in the foregoing allegations as well as numerous other vendors whose identities are not yet known but will be learned in discovery.

1226.   The AndroGel Peer Selling Enterprise is an ongoing organization that functions as a continuing unit. The AndroGel Peer Selling Enterprise was created and used by the AbbVie Defendants as a tool to effectuate a pattern of racketeering activity. The AbbVie Defendants "persons" are distinct from the AndroGel Peer Selling Enterprise. The AbbVie Defendants, however, were aware of the essential nature and scope of this Enterprise and intended to participate in and/or conduct it.

1227.   The AndroGel Peer Selling Enterprise falls within the meaning of 18 U.S.C. § 1961(4) and consists of a group of "persons" associated together for the common purpose of promoting AndroGel for unsafe, unapproved uses and earning profits therefrom.

1228. The AbbVie Defendants have conducted and participated in the affairs of the AndroGel Peer Selling Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and 1961(5), which includes multiple instances of mail fraud in violation of 18 U.S.C. § 1341, and multiple instances of wire fraud in violation of 18 U.S.C. § 1343, as described above. The false and misleading predicate acts of racketeering activity committed, or caused to be committed, by the AbbVie Defendants throughout the Class Period number in the thousands, and the AbbVie Defendants committed, or caused to be committed, at least two of the predicate acts within the requisite ten (10) year period.

1229. The AndroGel Peer Selling Enterprise engaged in and affected interstate commerce, because, *inter alia*, it marketed, sold, purchased, or provided AndroGel to thousands of entities and individuals throughout the United States.

1230. The AbbVie Defendants exerted control over the AndroGel Peer Selling Enterprise, and the AbbVie Defendants participated in the operation or management of the affairs of the AndroGel Peer Selling Enterprise, through a variety of actions including the following:

- the AbbVie Defendants controlled the content of the messages being delivered by the AndroGel Peer Selling Enterprise at each seminar, event and presentation, and in the publications by the vendor and physician participants, including the misinformation and false statements concerning the safety, efficacy, effectiveness, and usefulness of AndroGel for unapproved and unsafe uses;

- the AbbVie Defendants and their employees and agents controlled the stream of information disseminated by the AndroGel Peer Selling Enterprise concerning AndroGel

by exerting control over the communications concerning AndroGel by participant physician and medical marketing vendors;

- the AbbVie Defendants selected and approved the physician participants to deliver the false and misleading messages for AndroGel at each seminar, speaking event, presentation, or other event where physician participants interacted with other health care providers concerning AndroGel or testosterone replacement therapies;

- the AbbVie Defendants selected the participants of each such event and, more generally, selected the targets of the false and misleading AndroGel Peer Selling Enterprise;

- the AbbVie Defendants paid the vendor and physician participants for their participation in the AndroGel Peer Selling Enterprise; and

- the AbbVie Defendants placed their own employees and agents in positions of authority and control over the AndroGel Peer Selling Enterprise.

1231. As detailed above, the AbbVie Defendants' AndroGel Peer Selling Enterprise consisted of: (a) deliberately misrepresenting, and causing others to misrepresent, the uses for which AndroGel was safe and effective so that Plaintiff MMO and the TPP Class Members paid for this drug to treat conditions and/or symptoms for which it was not scientifically proven to be safe, effective, and useful; (b) presenting seminars and events misrepresenting the non-indicated and unsafe uses for which the AbbVie Defendants knew AndroGel was not proven to be scientifically safe, effective, and useful to physician attendees and other healthcare providers; (c) disseminating materials created pursuant to the AndroGel Publication Enterprise and using those materials to misrepresent, and cause others to misrepresent, the uses for which AndroGel was safe and effective and useful; and (d) actively concealing, and causing others to conceal,

information about the safety, efficacy, and usefulness of AndroGel to treat conditions for which it had not been approved by the FDA.

1232.   The AbbVie Defendants' schemes and the above-described racketeering activities amounted to common courses of conduct intended to cause Plaintiff MMO and the TPP Class Members to pay for excessive amounts of AndroGel. Within the AndroGel Peer Selling Enterprise, each such racketeering activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiff MMO and the TPP Class Members.   The AbbVie Defendants' fraudulent activities are part of their ongoing business and constitute a continuing threat to Plaintiff MMO's and the TPP Class Members' property.

1233.   The pattern of racketeering activities alleged herein and the AndroGel Peer Selling Enterprise are separate and distinct from each other.   The AbbVie Defendants engaged in a pattern of racketeering activities alleged herein for the purpose of conducting the affairs of the AndroGel Peer Selling Enterprise.

1234.   Plaintiff MMO and the TPP Class Members have been injured in their property by reason of these violations in that they have made millions of dollars in payments for AndroGel that they otherwise would not have made had the AbbVie Defendants not engaged in their pattern of racketeering activities. Plaintiff MMO and the TPP Class Members suffered direct, consequential, and concrete financial loss flowing from the injury to their property by having overpaid for AndroGel, having received a product or prescription (AndroGel) that was worth less than what they paid for it, and thereby suffered out-of-pocket losses. And but for the predicate acts committed or caused to be committed by the AbbVie Defendants, Plaintiff MMO and the TPP Class Members would not have suffered their RICO injuries.

1235. Plaintiff MMO's and the TPP Class Members' injuries were directly and proximately caused by the AbbVie Defendants' racketeering activity, as described above. Plaintiff MMO's and the TPP Class Members' injuries were directly caused by the predicate acts and are not attributable to any independent or intervening factors; their injuries were a foreseeable and natural consequence of the AbbVie Defendants' scheme; there is no difficulty posed by having to apportion damages among Plaintiff MMO and the TPP Class Members with different standing or different levels of injury because there are no other injured parties besides Plaintiff MMO and the TPP Class Members in this case, who are the parties directly injured by the AbbVie Defendants' RICO violations; and there are no others, more directly injured, that could vindicate Plaintiff MMO's and the TPP Class Members' claims.

1236. By virtue of these violations of 18 U.S.C. § 1962(c), the AbbVie Defendants are jointly and severally liable to Plaintiff MMO and the TPP Class Members for three times the damages Plaintiff MMO and the TPP Class Members have sustained, punitive damages, plus the cost of this lawsuit, including reasonable attorney fees.

**SEVENTH CLAIM FOR RELIEF**
**Violation of 18 U.S.C. § 1962(c)**
**(The Testim and Testopel Peer Selling Enterprise – Against Auxilium)**

1237. Plaintiff MMO incorporates by reference all preceding paragraphs, as if fully set forth herein.

1238. Defendant Auxilium is a "person" within the meaning of 18 U.S.C. § 1961(3) who participated in the conduct of the affairs of the Testim and Testopel Peer Selling Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

1239. The Testim and Testopel Peer Selling Enterprise is an association-in-fact within the meaning of 18 U.S.C. § 1961(4) consisting of (i) Defendant Auxilium, including its

employees and agents, (ii) physician and/or physician society participants, including those listed in the foregoing allegations as well as countless other physicians and/or physician societies whose identities are not yet known but will be learned in discovery, (iii) and medical marketing vendors, including those listed in the foregoing allegations as well as countless other vendors whose identities are not yet known but will be learned in discovery.

1240.   The Testim and Testopel Peer Selling Enterprise is an ongoing organization that functions as a continuing unit. The Testim and Testopel Peer Selling Enterprise was created and used as a tool to effectuate Defendant Auxilium's pattern of racketeering activity. The Defendant Auxilium "persons" are distinct from the Testim and Testopel Peer Selling Enterprise. Defendant Auxilium was aware of the essential nature and scope of this Enterprise and intended to participate in it.

1241.   The Testim and Testopel Peer Selling Enterprise falls within the meaning of 18 U.S.C. § 1961(4) and consists of groups of "persons" associated together for the common purpose of promoting Testim and Testopel for unapproved and unsafe uses and earning profits therefrom.

1242.   Defendant Auxilium has conducted and participated in the affairs of the Testim and Testopel Peer Selling Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and 1961(5), which includes multiple instances of mail fraud in violation of 18 U.S.C. § 1341, and multiple instances of wire fraud in violation of 18 U.S.C. § 1343, as described above. The false and misleading predicate acts of racketeering activity committed, or caused to be committed, by Defendant Auxilium throughout the Class Period number in the thousands, and the Defendant Auxilium committed, or caused to be committed, at least two of the predicate acts within the requisite ten year period.

413

1243.  The Testim and Testopel Peer Selling Enterprise engaged in and affected interstate commerce, because, *inter alia*, it marketed, sold, purchased, or provided Testim and Testopel to thousands of entities and individuals throughout the United States.

1244.  Defendant Auxilium exerted control over the Testim and Testopel Peer Selling Enterprise, and participated in the operation or management of its affairs through a variety of actions including the following:

- Defendant Auxilium controlled the content of the messages being delivered by the Testim and Testopel Peer Selling Enterprise at each seminar, event and presentation, and in the publications by the vendor and physician participants, including the misinformation and false statements concerning the safety, efficacy, effectiveness, and usefulness of Testim and Testopel for unapproved and unsafe uses;

- Defendant Auxilium and its employees and agents controlled the stream of information disseminated by the Testim and Testopel Peer Selling Enterprise by exerting control over the communications concerning Testim and Testopel by participant physician and medical marketing vendors;

- Defendant Auxilium selected and approved the physician participants to deliver the false and misleading messages for Testim and Testopel at each seminar, speaking event, presentation, or other event where physician participants interacted with other health care providers concerning Testim and Testopel or testosterone replacement therapies;

- Defendant Auxilium selected the participants of each such event and, more generally, selected the targets of its unapproved and unsafe Testim and Testopel Peer Selling Enterprise;

- Defendant Auxilium paid the vendor and physician participants for their participation in the Testim and Testopel Peer Selling Enterprise; and

- Defendant Auxilium placed its own employees and agents in positions of authority and control over the Testim and Testopel Peer Selling Enterprise.

1245.  As detailed above, the Testim and Testopel Peer Selling Enterprise consisted of: (a) deliberately misrepresenting, and causing others to misrepresent, the uses for which Testim and Testopel were safe and effective so that Plaintiff MMO and the TPP Class Members paid for this drug to treat conditions and/or symptoms for which Testim and Testopel was not scientifically proven to be safe, effective, and useful; (b) presenting seminars and events misrepresenting the unapproved and unsafe uses for which Defendant Auxilium knew Testim and Testopel were not proven to be scientifically safe, effective, and useful to physician attendees and other healthcare providers; (c) disseminating materials created pursuant to the Testim and Testopel Publication Enterprise and using those materials to misrepresent, and cause others to misrepresent, the uses for which Testim and Testopel was safe and effective and useful; and (d) actively concealing, and causing others to conceal, information about the safety, efficacy, and usefulness of Testim and Testopel to treat conditions for which they had not been approved by the FDA.

1246.  Defendant Auxilium's schemes and the above described racketeering activities amounted to common courses of conduct intended to cause Plaintiff MMO and the TPP Class Members to pay for excessive amounts of Testim and Testopel. Within the Testim and Testopel Peer Selling Enterprise, each such racketeering activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiff MMO and the TPP Class Members.  Defendant

Auxilium's fraudulent activities are part of their ongoing business and constitute a continuing threat to Plaintiff MMO and the TPP Class Members' property.

1247.   The pattern of racketeering activities alleged herein and the Testim and Testopel Peer Selling Enterprise are separate and distinct from each other. Defendant Auxilium engaged in a pattern of racketeering activities alleged herein for the purpose of conducting the affairs of the Testim and Testopel Peer Selling Enterprise.

1248.   Plaintiff MMO and the TPP Class Members have been injured in their property by reason of these violations in that they have made millions of dollars in payments for Testim and Testopel that they otherwise would not have made had Defendants not engaged in their pattern of racketeering activities. Plaintiff MMO and the TPP Class Members suffered direct consequential and concrete financial loss flowing from the injury to their property by having overpaid for Testim and Testopel, having received a product or prescription (Testim or Testopel) that was worth less than what they paid for it, and thereby suffered out-of-pocket losses.  And but for the predicate acts committed or caused to be committed by the Defendant Auxilium, the Plaintiff MMO and the TPP Class Members would not have suffered their RICO injuries.

1249. Plaintiff MMO and the TPP Class Members' injuries were directly and proximately caused by Defendant Auxilium's racketeering activity, as described above. Plaintiff's and Class members' injuries were directly caused by the predicate acts and are not attributable to any independent or intervening factors; their injuries were a foreseeable and natural consequence of the Defendant Auxilium's scheme; there is no difficulty posed by having to apportion damages among Class members with different standing or different levels of injury because there are no other injured parties besides the Plaintiff MMO and the TPP Class Members in this case, who are the parties directly injured by the Defendant Auxilium's RICO violations;

and there are no others, more directly injured, that could vindicate the Plaintiff's and Class members' claims.

1250. By virtue of these violations of 18 U.S.C. § 1962(c), Defendant Auxilium is jointly and severally liable to Plaintiff MMO and the TPP Class Members for three times the damages Plaintiff MMO and the TPP Class Members have sustained, punitive damages, plus the cost of this lawsuit, including reasonable attorney fees.

<div align="center">

**EIGHTH CLAIM FOR RELIEF**
**Violation of 18 U.S.C. § 1962(c)**
**(The Axiron Peer Selling Enterprise – Against the Eli Lilly Defendants)**

</div>

1251. Plaintiff MMO incorporates by reference all preceding paragraphs, as if fully set forth herein.

1252. The Eli Lilly Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3) who participated in the conduct of the affairs of the Axiron Peer Selling Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

1253. The Axiron Peer Selling Enterprise is an association-in-fact within the meaning of 18 U.S.C. § 1961(4) consisting of (i) the Eli Lilly Defendants, including their employees and agents, (ii) physician and/or physician society participants, including those listed in the foregoing allegations as well as countless other physicians and/or physician societies whose identities are not yet known but will be learned in discovery, (iii) and medical marketing companies, including those listed in the foregoing allegations as well as numerous other companies whose identities are not yet known but will be learned in discovery.

1254. The Axiron Peer Selling Enterprise is an ongoing organization that functions as a continuing unit. The Axiron Peer Selling Enterprise was created and used by the Eli Lilly Defendants as a tool to effectuate a pattern of racketeering activity. The Eli Lilly Defendants

"persons" are distinct from the Axiron Peer Selling Enterprise. The Eli Lilly Defendants, however, were aware of the essential nature and scope of this Enterprise and intended to participate in and/or conduct it.

1255.   The Axiron Peer Selling Enterprise falls within the meaning of 18 U.S.C. § 1961(4) and consists of a group of "persons" associated together for the common purpose of promoting Axiron for unapproved and unsafe uses and earning profits therefrom.

1256.   The Eli Lilly Defendants have conducted and participated in the affairs of the Axiron Peer Selling Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and 1961(5), which includes multiple instances of mail fraud in violation of 18 U.S.C. § 1341, and multiple instances of wire fraud in violation of 18 U.S.C. § 1343, as described above. The false and misleading predicate acts of racketeering activity committed, or caused to be committed, by the Eli Lilly Defendants throughout the Class Period number in the thousands, and the Eli Lilly Defendants committed, or caused to be committed, at least two of the predicate acts within the requisite ten (10) year period.

1257.   The Axiron Peer Selling Enterprise engaged in and affected interstate commerce, because, *inter alia*, it marketed, sold, purchased, or provided Axiron to thousands of entities and individuals throughout the United States.

1258.   The Eli Lilly Defendants exerted control over the Axiron Peer Selling Enterprise, and the Eli Lilly Defendants participated in the operation or management of the affairs of the Axiron Peer Selling Enterprise, through a variety of actions including the following:

- the Eli Lilly Defendants controlled the content of the messages being delivered by the Axiron Peer Selling Enterprise at each seminar, event and presentation, and in the publications by the Eli Lilly and physician participants, including the misinformation and

false statements concerning the safety, efficacy, effectiveness, and usefulness of Axiron for unapproved and unsafe uses;

- the Eli Lilly Defendants and their employees and agents controlled the stream of information disseminated by the Axiron Peer Selling Enterprise concerning Axiron by exerting control over the communications concerning Axiron by participant physician and medical marketing;

- the Eli Lilly Defendants selected and approved the physician participants to deliver the false and misleading messages for Axiron at each seminar, speaking event, presentation, or other event where physician participants interacted with other health care providers concerning Axiron or testosterone replacement therapies;

- the Eli Lilly Defendants selected the participants of each such event and, more generally, selected the targets of the unapproved and unsafe Axiron Peer Selling Enterprise;

- the Eli Lilly Defendants paid the Eli Lilly and physician participants for their participation in the Axiron Peer Selling Enterprise; and

- the Eli Lilly Defendants placed their own employees and agents in positions of authority and control over the Axiron Peer Selling Enterprise.

1259. As detailed above, the Eli Lilly Defendants' Axiron Peer Selling Enterprise consisted of: (a) deliberately misrepresenting, and causing others to misrepresent, the uses for which Axiron was safe and effective so that Plaintiff MMO and the TPP Class Members paid for this drug to treat conditions and/or symptoms for which it was not scientifically proven to be safe, effective, and useful; (b) presenting seminars and events misrepresenting the non-indicated and unsafe uses for which the Eli Lilly Defendants knew Axiron was not proven to be scientifically safe, effective, and useful to physician attendees and other healthcare providers; (c)

disseminating materials created pursuant to the Axiron Publication Enterprise and using those materials to misrepresent, and cause others to misrepresent, the uses for which Axiron was safe and effective and useful; and (d) actively concealing, and causing others to conceal, information about the safety, efficacy, and usefulness of Axiron to treat conditions for which it had not been approved by the FDA.

1260.   The Eli Lilly Defendants' schemes and the above-described racketeering activities amounted to common courses of conduct intended to cause Plaintiff MMO and the TPP Class Members to pay for excessive amounts of Axiron. Within the Axiron Peer Selling Enterprise, each such racketeering activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiff MMO and the TPP Class Members.  The Eli Lilly Defendants' fraudulent activities are part of their ongoing business and constitute a continuing threat to Plaintiff MMO and the TPP Class Members' property.

1261.   The pattern of racketeering activities alleged herein and the Eli Lilly Peer Selling Enterprise are separate and distinct from each other.  The Eli Lilly Defendants engaged in a pattern of racketeering activities alleged herein for the purpose of conducting the affairs of the Axiron Peer Selling Enterprise.

1262.   Plaintiff MMO and the TPP Class Members have been injured in their property by reason of these violations in that they have made millions of dollars in payments for Axiron that they otherwise would not have made had the Eli Lilly Defendants not engaged in their pattern of racketeering activities. Plaintiff MMO and the TPP Class Members suffered direct, consequential, and concrete financial loss flowing from the injury to their property by having overpaid for Axiron, having received a product or prescription (Axiron) that was worth less than

what they paid for it, and thereby suffered out-of-pocket losses. And but for the predicate acts committed or caused to be committed by the Eli Lilly Defendants, the Plaintiff MMO and the TPP Class Members would not have suffered their RICO injuries.

1263.  Plaintiff MMO's and the TPP Class Members' injuries were directly and proximately caused by the Eli Lilly Defendants' racketeering activity, as described above. Plaintiff MMO's and the TPP Class Members' injuries were directly caused by the predicate acts and are not attributable to any independent or intervening factors; their injuries were a foreseeable and natural consequence of the Eli Lilly Defendants' scheme; there is no difficulty posed by having to apportion damages among Plaintiff MMO and the TPP Class Members with different standing or different levels of injury because there are no other injured parties besides Plaintiff MMO and the TPP Class Members in this case, who are the parties directly injured by the Eli Lilly Defendants' RICO violations; and there are no others, more directly injured, that could vindicate Plaintiff MMO's and the TPP Class Members' claims.

1264.  By virtue of these violations of 18 U.S.C. § 1962(c), the Eli Lilly Defendants are jointly and severally liable to Plaintiff MMO and the TPP Class Members for three times the damages Plaintiff MMO and the TPP Class Members have sustained, punitive damages, plus the cost of this lawsuit, including reasonable attorney fees.

**NINTH CLAIM FOR RELIEF**
**Violation of 18 U.S.C. § 1962(c)**
**(The Androderm Peer Selling Enterprise – Against the Actavis Defendants)**

1265.  Plaintiff MMO incorporates by reference all preceding paragraphs, as if fully set forth herein.

1266.   The Actavis Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3) who participated in the conduct of the affairs of the Androderm Peer Selling Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

1267.   The Androderm Peer Selling Enterprise is an association-in-fact within the meaning of 18 U.S.C. § 1961(4) consisting of (i) the Actavis Defendants, including their employees and agents, (ii) physician and/or physician society participants, including those listed in the foregoing allegations as well as countless other physicians and/or physician societies whose identities are not yet known but will be learned in discovery, (iii) and medical marketing companies, including those listed in the foregoing allegations as well as numerous other companies whose identities are not yet known but will be learned in discovery.

1268.   The Androderm Peer Selling Enterprise is an ongoing organization that functions as a continuing unit. The Androderm Peer Selling Enterprise was created and used by the Actavis Defendants as a tool to effectuate a pattern of racketeering activity. The Actavis Defendants "persons" are distinct from the Androderm Peer Selling Enterprise. The Actavis Defendants, however, were aware of the essential nature and scope of this Enterprise and intended to participate in and/or conduct it.

1269.   The Androderm Peer Selling Enterprise falls within the meaning of 18 U.S.C. § 1961(4) and consists of a group of "persons" associated together for the common purpose of promoting Androderm for non-indicated and unsafe uses and earning profits therefrom.

1270.   The Actavis Defendants have conducted and participated in the affairs of the Androderm Peer Selling Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and 1961(5), which includes multiple instances of mail fraud in violation of 18 U.S.C. § 1341, and multiple instances of wire fraud in violation of 18 U.S.C. §

1343, as described above. The false and misleading predicate acts of racketeering activity committed, or caused to be committed, by the Actavis Defendants throughout the Class Period number in the thousands, and the Actavis Defendants committed, or caused to be committed, at least two of the predicate acts within the requisite ten (10) year period.

1271.  The Androderm Peer Selling Enterprise engaged in and affected interstate commerce, because, *inter alia*, it marketed, sold, purchased, or provided Androderm to thousands of entities and individuals throughout the United States.

1272.  The Actavis Defendants exerted control over the Androderm Peer Selling Enterprise, and the Actavis Defendants participated in the operation or management of the affairs of the Androderm Peer Selling Enterprise, through a variety of actions including the following:

- the Actavis Defendants controlled the content of the messages being delivered by the Androderm Peer Selling Enterprise at each seminar, event and presentation, and in the publications by Actavis and physician participants, including the misinformation and false statements concerning the safety, efficacy, effectiveness, and usefulness of Androderm for unapproved and unsafe uses;

- the Actavis Defendants and their employees and agents controlled the stream of information disseminated by the Androderm Peer Selling Enterprise concerning Androderm by exerting control over the communications concerning Androderm by participant physicians and medical marketing firms;

- the Actavis Defendants selected and approved the physician participants to deliver the false and misleading messages for Androderm at each seminar, speaking event, presentation, or other event where physician participants interacted with other health care providers concerning Androderm or testosterone replacement therapies;

- the Actavis Defendants selected the participants of each such event and, more generally, selected the targets of the unapproved and unsafe Androderm Peer Selling Enterprise;

- the Actavis Defendants paid the Actavis and physician participants for their participation in the Androderm Peer Selling Enterprise; and

- the Actavis Defendants placed their own employees and agents in positions of authority and control over the Androderm Peer Selling Enterprise.

1273.  As detailed above, the Actavis Defendants' Androderm Peer Selling Enterprise consisted of: (a) deliberately misrepresenting, and causing others to misrepresent, the uses for which Androderm was safe and effective so that Plaintiff MMO and the TPP Class Members paid for this drug to treat conditions and/or symptoms for which it was not scientifically proven to be safe, effective, and useful; (b) presenting seminars and events misrepresenting the unapproved and unsafe uses for Androderm for which the Actavis Defendants knew were not proven to be scientifically safe, effective, and useful to physician attendees and other healthcare providers; (c) disseminating materials created pursuant to the Androderm Publication Enterprise and using those materials to misrepresent, and cause others to misrepresent, the uses for which Androderm was safe and effective and useful; and (d) actively concealing, and causing others to conceal, information about the safety, efficacy, and usefulness of Androderm to treat conditions for which it had not been approved by the FDA.

1274.  The Actavis Defendants' schemes and the above-described racketeering activities amounted to common courses of conduct intended to cause Plaintiff MMO and the TPP Class Members to pay for excessive amounts of Androderm. Within the Androderm Peer Selling Enterprise, each such racketeering activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar

victims, including Plaintiff MMO and the TPP Class Members. The Actavis Defendants' fraudulent activities are part of their ongoing business and constitute a continuing threat to Plaintiff MMO and the TPP Class Members' property.

1275. The pattern of racketeering activities alleged herein and the Actavis Peer Selling Enterprise are separate and distinct from each other. The Actavis Defendants engaged in a pattern of racketeering activities alleged herein for the purpose of conducting the affairs of the Androderm Peer Selling Enterprise.

1276. Plaintiff MMO and the TPP Class Members have been injured in their property by reason of these violations in that they have made millions of dollars in payments for Androderm that they otherwise would not have made had the Actavis Defendants not engaged in their pattern of racketeering activities. Plaintiff MMO and the TPP Class Members suffered direct, consequential, and concrete financial loss flowing from the injury to their property by having overpaid for Androderm, having received a product or prescription (Androderm) that was worth less than what they paid for it, and thereby suffered out-of-pocket losses. And but for the predicate acts committed or caused to be committed by the Actavis Defendants, the Plaintiff MMO and the TPP Class Members would not have suffered their RICO injuries.

1277. Plaintiff MMO and the TPP Class Members' injuries were directly and proximately caused by the Actavis Defendants' racketeering activity, as described above. Plaintiff MMO's and the TPP Class Members' injuries were directly caused by the predicate acts and are not attributable to any independent or intervening factors; their injuries were a foreseeable and natural consequence of the Actavis Defendants' scheme; there is no difficulty posed by having to apportion damages among Plaintiff MMO and the TPP Class Members with different standing or different levels of injury because there are no other injured parties besides

Plaintiff MMO and the TPP Class Members in this case, who are the parties directly injured by the Actavis Defendants' RICO violations; and there are no others, more directly injured, that could vindicate Plaintiff's and Class Members' claims.

1278.   By virtue of these violations of 18 U.S.C. § 1962(c), the Actavis Defendants are jointly and severally liable to Plaintiff MMO and the TPP Class Members for three times the damages Plaintiff MMO and the TPP Class Members have sustained, punitive damages, plus the cost of this lawsuit, including reasonable attorney fees.

<div align="center">

**TENTH CLAIM FOR RELIEF**
**Violation of 18 U.S.C. § 1962(c)**
**(The Fortesta Peer Selling Enterprise – Against the Endo Defendants)**

</div>

1279.   Plaintiff MMO incorporates by reference all preceding paragraphs, as if fully set forth herein.

1280.   The Endo Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3) who participated in the conduct of the affairs of the Fortesta Peer Selling Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

1281.   The Fortesta Peer Selling Enterprise is an association-in-fact within the meaning of 18 U.S.C. § 1961(4) consisting of (i) the Endo Defendants, including their employees and agents, (ii) physician and/or physician society participants, including those listed in the foregoing allegations as well as countless other physicians and/or physician societies whose identities are not yet known but will be learned in discovery, (iii) and medical marketing vendors, including those listed in the foregoing allegations as well as numerous other vendors whose identities are not yet known but will be learned in discovery.

1282.   The Fortesta Peer Selling Enterprise is an ongoing organization that functions as a continuing unit. The Fortesta Peer Selling Enterprise was created and used by the Endo

Defendants as a tool to effectuate a pattern of racketeering activity. The Endo Defendants "persons" are distinct from the Fortesta Peer Selling Enterprise. The Endo Defendants, however, were aware of the essential nature and scope of this Enterprise and intended to participate in and/or conduct it.

1283.  The Fortesta Peer Selling Enterprise falls within the meaning of 18 U.S.C. § 1961(4) and consists of a group of "persons" associated together for the common purpose of promoting Fortesta for unapproved and unsafe uses and earning profits therefrom.

1284.  The Endo Defendants have conducted and participated in the affairs of the Fortesta Peer Selling Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and 1961(5), which includes multiple instances of mail fraud in violation of 18 U.S.C. § 1341, and multiple instances of wire fraud in violation of 18 U.S.C. § 1343, as described above. The false and misleading predicate acts of racketeering activity committed, or caused to be committed, by the Endo Defendants throughout the Class Period number in the thousands, and the Endo Defendants committed, or caused to be committed, at least two of the predicate acts within the requisite ten (10) year period.

1285.  The Fortesta Peer Selling Enterprise engaged in and affected interstate commerce, because, *inter alia*, it marketed, sold, purchased, or provided Fortesta to thousands of entities and individuals throughout the United States.

1286.  The Endo Defendants exerted control over the Fortesta Peer Selling Enterprise, and the Endo Defendants participated in the operation or management of the affairs of the Fortesta Peer Selling Enterprise, through a variety of actions including the following:

- the Endo Defendants controlled the content of the messages being delivered by the Fortesta Peer Selling Enterprise at each seminar, event and presentation, and

in the publications by the vendor and physician participants, including the misinformation and false statements concerning the safety, efficacy, effectiveness, and usefulness of Fortesta for unapproved and unsafe uses;

- the Endo Defendants and their employees and agents controlled the stream of information disseminated by the Fortesta Peer Selling Enterprise concerning Fortesta by exerting control over the communications concerning Fortesta by participant physicians and medical marketing vendors;

- the Endo Defendants selected and approved the physician participants to deliver the false and misleading messages for Fortesta at each seminar, speaking event, presentation, or other event where physician participants interacted with other health care providers concerning Fortesta or testosterone replacement therapies;

- the Endo Defendants selected the participants of each such event and, more generally, selected the targets of the unapproved and unsafe Fortesta Peer Selling Enterprise;

- the Endo Defendants paid the vendor and physician participants for their participation in the Fortesta Peer Selling Enterprise; and

- the Endo Defendants placed their own employees and agents in positions of authority and control over the Fortesta Peer Selling Enterprise.

1287. As detailed above, the Endo Defendants' Fortesta Peer Selling Enterprise consisted of: (a) deliberately misrepresenting, and causing others to misrepresent, the uses for which Fortesta was safe and effective so that Plaintiff MMO and the TPP Class Members paid for this drug to treat conditions and/or symptoms for which it was not scientifically proven to be safe, effective, and useful; (b) presenting seminars and events misrepresenting the unapproved

and unsafe uses for which the Endo Defendants knew Fortesta was not proven to be scientifically safe, effective, and useful to physician attendees and other healthcare providers; (c) disseminating materials created pursuant to the Fortesta Publication Enterprise and using those materials to misrepresent, and cause others to misrepresent, the uses for which Fortesta was safe and effective and useful; and (d) actively concealing, and causing others to conceal, information about the safety, efficacy, and usefulness of Fortesta to treat conditions for which it had not been approved by the FDA.

1288. The Endo Defendants' schemes and the above-described racketeering activities amounted to common courses of conduct intended to cause Plaintiff MMO and the TPP Class Members to pay for excessive amounts of Fortesta. Within the Fortesta Peer Selling Enterprise, each such racketeering activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiff MMO and the TPP Class Members. The Endo Defendants' fraudulent activities are part of their ongoing business and constitute a continuing threat to Plaintiff's and the Class Members' property.

1289. The pattern of racketeering activities alleged herein and the Endo Peer Selling Enterprise are separate and distinct from each other. The Endo Defendants engaged in a pattern of racketeering activities alleged herein for the purpose of conducting the affairs of the Fortesta Peer Selling Enterprise.

1290. Plaintiff MMO and the TPP Class Members have been injured in their property by reason of these violations in that they have made millions of dollars in payments for Fortesta that they otherwise would not have made had the Endo Defendants not engaged in their pattern of racketeering activities. Plaintiff MMO and the TPP Class Members suffered direct,

consequential, and concrete financial loss flowing from the injury to their property by having overpaid for Fortesta, having received a product or prescription (Fortesta) that was worth less than what they paid for it, and thereby suffered out-of-pocket losses. And but for the predicate acts committed or caused to be committed by the Endo Defendants, Plaintiff MMO and the TPP Class Members would not have suffered their RICO injuries.

1291. Plaintiff MMO's and the TPP Class Members' injuries were directly and proximately caused by the Endo Defendants' racketeering activity, as described above. Plaintiff MMO's and the TPP Class Members' injuries were directly caused by the predicate acts and are not attributable to any independent or intervening factors; their injuries were a foreseeable and natural consequence of the Endo Defendants' scheme; there is no difficulty posed by having to apportion damages among Plaintiff MMO and the TPP Class Members with different standing or different levels of injury because there are no other injured parties besides Plaintiff MMO and the TPP Class Members in this case, who are the parties directly injured by the Endo Defendants' RICO violations; and there are no others, more directly injured, that could vindicate Plaintiff MMO's and the TPP Class Members' claims.

1292. By virtue of these violations of 18 U.S.C. § 1962(c), the Endo Defendants are jointly and severally liable to Plaintiff MMO and the TPP Class Members for three times the damages Plaintiff MMO and the TPP Class Members have sustained, punitive damages, plus the cost of this lawsuit, including reasonable attorney fees.

<div align="center">

**ELEVENTH CLAIM FOR RELIEF**
**Violation of 18 U.S.C. § 1962(c)**
**(The AndroGel Publication Enterprise – Against the AbbVie Defendants)**

</div>

1293. Plaintiff MMO incorporates by reference all preceding paragraphs, as if fully set forth herein.

<div align="center">430</div>

1294.   The AbbVie Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3) who participated in the conduct of the affairs of the AndroGel Publication Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

1295.   The AndroGel Publication Enterprise is an association-in-fact within the meaning of 18 U.S.C. § 1961(4) consisting of (i) the AbbVie Defendants, including their employees and agents, (ii) physician and/or researcher participants (including physician societies), including those listed in the foregoing allegations as well as other physicians and/or researchers (including physician societies) whose identities are not yet known but will be learned in discovery, (iii) and medical marketing and/or communications vendors, including those listed in the foregoing allegations as well as other vendors whose identities are not yet known but will be learned in discovery.

1296.   The AndroGel Publication Enterprise is an ongoing organization that functions as a continuing unit. The AndroGel Publication Enterprise was created and used as a tool to effectuate the AbbVie Defendants' pattern of racketeering activity.  The AbbVie Defendants "persons" are distinct from the AndroGel Publication Enterprise.  The AbbVie Defendants were aware of the essential nature and scope of this Enterprise and intended to participate in it.

1297.   The AndroGel Publication Enterprise falls within the meaning of 18 U.S.C. § 1961(4) and consists of groups of "persons" associated together for the common purpose of disseminating publication materials promoting AndroGel for unapproved and unsafe uses not proven to be safe, effective and useful, and earning profits therefrom.

1298.  The AbbVie Defendants have conducted and participated in the affairs of the AndroGel Publication Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and 1961(5), which includes multiple instances of mail fraud in violation

of 18 U.S.C. § 1341, and multiple instances of wire fraud in violation of 18 U.S.C. § 1343, as described above. The false and misleading predicate acts of racketeering activity committed, or caused to be committed, by the AbbVie Defendants throughout the Class Period number in the thousands, and the AbbVie Defendants committed, or caused to be committed, at least two of the predicate acts within the requisite ten year period.

1299. The AndroGel Publication Enterprise engaged in and affected interstate commerce, because, *inter alia*, it operated through medical journals with national subscription, disseminated reprints of articles to physicians across the nation, and were used as part of the AndroGel Peer Selling Enterprise, which, *inter alia*, marketed, sold, purchased, or provided AndroGel to thousands of entities and individuals throughout the United States.

1300. The AbbVie Defendants exerted control over the AndroGel Publication Enterprise, and participated in its operation or management through a variety of actions including the following:

- the AbbVie Defendants controlled the content of the publications, and the marketing messages contained therein, promulgated by the AndroGel Publication Enterprise, including the misinformation and false statements concerning the hypogonadism as well as the safety, efficacy, effectiveness, and usefulness of AndroGel for unapproved and unsafe uses;

- the AbbVie Defendants, and their employees and medical marketing and/or communications vendors, controlled the content of the AndroGel Publication Enterprise publications through ghostwriting, editing, and/or funding or other restrictions for AndroGel studies requiring pre-approval of publications;

- the AbbVie Defendants selected and approved the physician and/or researcher participants to serve as "authors" of publications promoting a more expansive definition of hypogonadism as well as the false and misleading messages for AndroGel contained therein;

- the AbbVie Defendants focused on specific medical journals for AndroGel or unbranded publications created pursuant to the AndroGel Publication Enterprise;

- the AbbVie Defendants paid the vendor and physician/researcher participants for their participation in the AndroGel Publication Enterprise;

- the AbbVie Defendants placed their own employees and agents in positions of authority and control over the AndroGel Publication Enterprise; and

- the AbbVie Defendants concealed their involvement in the AndroGel Publication Enterprise such that its publications would have a veneer of credibility as independent and unbiased scientific research.

1301. As detailed above, the AbbVie Defendants' AndroGel Publication Enterprise consisted of: (a) creating and disseminating publications deliberately misrepresenting, and causing others to misrepresent, the prevalence of hypogonadism and the uses for which AndroGel was safe and effective so that Plaintiff MMO and the TPP Class Members paid for this drug to treat conditions and/or symptoms for which AndroGel was not scientifically proven to be safe, effective, and useful; (b) distributing or causing to be distributed reprints of said publications to physicians misrepresenting the unapproved and unsafe uses for which the AbbVie Defendants knew AndroGel was not proven to be scientifically safe, effective, and useful to physician attendees and other healthcare providers; (c) disseminating materials created pursuant to the AndroGel Publication Enterprise and using those materials to misrepresent, and cause

others to misrepresent, the uses for which AndroGel was safe and effective and useful; (d) actively concealing, and causing others to conceal, information about the safety, efficacy, and usefulness of AndroGel to treat conditions for which it had not been approved by the FDA; and (e) actively concealing, and causing others to conceal, the AbbVie Defendants' involvement in the AndroGel Publication Enterprise.

1302.   The AbbVie Defendants' scheme and the above described racketeering activities amounted to a common course of conduct intended to cause Plaintiff MMO and the TPP Class Members to pay for excessive amounts of AndroGel. Each such racketeering activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiff MMO and the TPP Class Members. The AbbVie Defendants' fraudulent activities are part of their ongoing business and constitute a continuing threat to Plaintiff MMO's and the TPP Class Members' property.

1303.   The pattern of racketeering activities alleged herein and the AndroGel Publication Enterprise are separate and distinct from each other.   The AbbVie Defendants engaged in a pattern of racketeering activities alleged herein for the purpose of conducting the affairs of the AndroGel Publication Enterprise.

1304.   Plaintiff MMO and the TPP Class Members have been injured in their property by reason of these violations in that they have made millions of dollars in payments for AndroGel that they otherwise would not have made had the AbbVie Defendants not engaged in their pattern of racketeering activities.   Plaintiff MMO and the TPP Class Members suffered direct consequential and concrete financial loss flowing from the injury to their property by having overpaid for AndroGel, having received a product or prescription (AndroGel) that was worth less

than what they paid for it, and thereby suffered out-of-pocket losses. And but for the predicate acts committed or caused to be committed by the AbbVie Defendants, Plaintiff MMO and the TPP Class Members would not have suffered their RICO injuries.

1305. Plaintiff MMO and the TPP Class Members' injuries were directly and proximately caused by the AbbVie Defendants' racketeering activity, as described above. Plaintiff MMO's and the TPP Class members' injuries were directly caused by the predicate acts and are not attributable to any independent or intervening factors; their injuries were a foreseeable and natural consequence of the AbbVie Defendants' scheme; there is no difficulty posed by having to apportion damages among Plaintiff MMO and the TPP Class Members with different standing or different levels of injury because there are no other injured parties besides Plaintiff MMO and the TPP Class Members in this case, who are the parties directly injured by the AbbVie Defendants' RICO violations; and there are no others, more directly injured, that could vindicate the Plaintiff MMO's and the TPP Class Members' claims.

1306. By virtue of these violations of 18 U.S.C. § 1962(c), the AbbVie Defendants are jointly and severally liable to Plaintiff MMO and the TPP Class Members for three times the damages Plaintiff MMO and the TPP Class Members have sustained, punitive damages, plus the cost of this lawsuit, including reasonable attorney fees.

**TWELFTH CLAIM FOR RELIEF**
**Violation of 18 U.S.C. § 1962(c)**
**(The Testim and Testopel Publication Enterprise – Against Defendant Auxilium)**

1307. Plaintiff MMO incorporates by reference all preceding paragraphs, as if fully set forth herein.

1308.   Defendant Auxilium is a "person" within the meaning of 18 U.S.C. § 1961(3) who participated in the conduct of the affairs of the Testim and Testopel Publication Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

1309.   The Testim and Testopel Publication Enterprise is an association-in-fact within the meaning of 18 U.S.C. § 1961(4) consisting of (i) Defendant Auxilium, including its employees and agents, (ii) physician and/or researcher participants (including physician societies), including those listed in the foregoing allegations as well as other physicians and/or researchers (including physician societies) whose identities are not yet known but will be learned in discovery, (iii) and medical marketing and/or communications vendors, including those listed in the foregoing allegations as well as other vendors whose identities are not yet known but will be learned in discovery.

1310.   The Testim and Testopel Publication Enterprise is an ongoing organization that functions as a continuing unit. The Testim and Testopel Publication Enterprise was created and used as a tool to effectuate Defendant Auxilium's pattern of racketeering activity.   The Defendant Auxilium "persons" are distinct from the Testim and Testopel Publication Enterprise.

1311.   The Testim and Testopel Publication Enterprise falls within the meaning of 18 U.S.C. § 1961(4) and consists of groups of "persons" associated together for the common purpose of disseminating publication materials promoting Testim and Testopel for unapproved and unsafe uses not proven to be safe, effective and useful, and earning profits therefrom.

1312.   Defendant Auxilium has conducted and participated in the affairs of the Testim and Testopel Publication Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and 1961(5), which includes multiple instances of mail fraud in violation of 18 U.S.C. § 1341, and multiple instances of wire fraud in violation of 18 U.S.C. §

1343, as described above. The false and misleading predicate acts of racketeering activity committed, or caused to be committed, by the Defendant Auxilium throughout the Class Period number in the thousands, and the Defendant Auxilium committed, or caused to be committed, at least two of the predicate acts within the requisite ten year period.

1313. The Testim and Testopel Publication Enterprise engaged in and affected interstate commerce, because, *inter alia*, it operated through medical journals with national subscribership, disseminated reprints of articles to physicians across the nation, and was used as part of the Testim and Testopel Peer Selling Enterprise, which, *inter alia*, marketed, sold, purchased, or provided Testim and Testopel to thousands of entities and individuals throughout the United States.

1314. Defendant Auxilium exerted control over the Testim and Testopel Publication Enterprise, and participated in its operation or management through a variety of actions including the following:

- Defendant Auxilium controlled the content of the publications, and the marketing messages contained therein, promulgated by the Testim and Testopel Publication Enterprise, including the misinformation and false statements concerning hypogonadism as well as the safety, efficacy, effectiveness, and usefulness of Testim and Testopel for unapproved and unsafe uses;

- Defendant Auxilium, and its employees and medical marketing and/or communications vendors controlled the content of the Testim and Testopel Publication Enterprise publications through ghostwriting, editing, and/or funding or other restrictions for Testim and Testopel studies requiring pre-approval of publications;

- Defendant Auxilium selected and approved the physician and/or researcher participants to serve as "authors" of publications promoting a more expansive definition of hypogonadism as well as the false and misleading messages for Testim and Testopel contained therein;

- Defendant Auxilium focused on specific medical journals for branded or unbranded publications created pursuant to the Testim and Testopel Publication Enterprise;

- Defendant Auxilium paid the vendor and physician/researcher participants for their participation in the Testim and Testopel Publication Enterprise;

- Defendant Auxilium placed its own employees and agents in positions of authority and control over the Testim and Testopel Publication Enterprise; and

- Defendant Auxilium concealed its involvement in the Testim and Testopel Publication Enterprise so that its publications would have a veneer of credibility as independent and unbiased scientific research.

1315. As detailed above, Defendant Auxilium's Testim and Testopel Publication Enterprise consisted of: (a) creating and disseminating publications deliberately misrepresenting, and causing others to misrepresent, the prevalence of hypogonadism and the uses for which Testim and Testopel were safe and effective so that Plaintiff MMO and the TPP Class Members paid for this drug to treat conditions and/or symptoms for which Testim and Testopel were not scientifically proven to be safe, effective, and useful; (b) distributing or causing to be distributed reprints of said publications to physicians misrepresenting the unapproved and unsafe uses for which Defendant Auxilium knew Testim and Testopel were not proven to be scientifically safe, effective, and useful to physician attendees and other healthcare providers; (c) disseminating materials created pursuant to the Testim and Testopel Publication

Enterprise and using those materials to misrepresent, and cause others to misrepresent, the uses for which Testim and Testopel were safe and effective and useful; (d) actively concealing, and causing others to conceal, information about the safety, efficacy, and usefulness of Testim and Testopel to treat conditions for which they had not been approved by the FDA; and (e) actively concealing, and causing others to conceal, Defendant Auxilium's involvement in the Testim and Testopel Publication Enterprise.

1316.   Defendant Auxilium's scheme and the above described racketeering activities amounted to a common course of conduct intended to cause Plaintiff MMO and the TPP Class Members to pay for excessive amounts of Testim and Testopel. Each such racketeering activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiff MMO and the TPP Class Members.  Defendant Auxilium's fraudulent activities are part of its ongoing business and constitute a continuing threat to Plaintiff MMO's and the TPP Class Members' property.

1317.   The pattern of racketeering activities alleged herein and the Testim and Testopel Publication Enterprise are separate and distinct from each other.  Defendant Auxilium engaged in a pattern of racketeering activities alleged herein for the purpose of conducting the affairs of the Testim and Testopel Publication Enterprise.

1318.   Plaintiff MMO and the TPP Class Members have been injured in their property by reason of these violations in that Plaintiff MMO and the TPP Class Members have made millions of dollars in payments for Testim and Testopel that they otherwise would not have made had Defendant Auxilium not engaged in its pattern of racketeering activities.  Plaintiff MMO and the TPP Class Members suffered direct consequential and concrete financial loss flowing from the injury to their property by having overpaid for Testim and Testopel, having received a product or

prescription (Testim and/or Testopel) that was worth less than what they paid for it, and thereby suffered out-of-pocket losses. And but for the predicate acts committed or caused to be committed by the Defendant Auxilium, Plaintiff MMO and the TPP Class Members would not have suffered their RICO injuries.

1319. Plaintiff MMO and the TPP Class Members' injuries were directly and proximately caused by Defendant Auxilium's racketeering activity, as described above. Plaintiff MMO's and the TPP Class Members' injuries were directly caused by the predicate acts and are not attributable to any independent or intervening factors; their injuries were a foreseeable and natural consequence of the Defendant Auxilium's scheme; there is no difficulty posed by having to apportion damages among Plaintiff MMO and the TPP Class Members with different standing or different levels of injury because there are no other injured parties besides the Plaintiff MMO and the TPP Class Members in this case, who are the parties directly injured by the Defendant Auxilium's RICO violations; and there are no others, more directly injured, that could vindicate Plaintiff MMO's and the TPP Class Members' claims.

1320. By virtue of these violations of 18 U.S.C. § 1962(c), Defendant Auxilium is jointly and severally liable to Plaintiff MMO and the TPP Class Members for three times the damages Plaintiff MMO and the TPP Class Members have sustained, punitive damages, plus the cost of this lawsuit, including reasonable attorney fees.

<div align="center">

**THIRTEENTH CLAIM FOR RELIEF**
**Violation of 18 U.S.C. § 1962(c)**
**(The Axiron Publication Enterprise – Against Defendant Eli Lilly)**

</div>

1321. Plaintiff MMO incorporates by reference all preceding paragraphs, as if fully set forth herein.

1322. Defendant Eli Lilly is a "person" within the meaning of 18 U.S.C. § 1961(3) who participated in the conduct of the affairs of the Axiron Publication Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

1323. The Axiron Publication Enterprise is an association-in-fact within the meaning of 18 U.S.C. § 1961(4) consisting of (i) Defendant Eli Lilly, including its employees and agents, (ii) physician and/or researcher participants (including physician societies), including those listed in the foregoing allegations as well as other physicians and/or researchers (including physician societies) whose identities are not yet known but will be learned in discovery, (iii) and medical marketing and/or communications vendors, including those listed in the foregoing allegations as well as other vendors whose identities are not yet known but will be learned in discovery.

1324. The Axiron Publication Enterprise is an ongoing organization that functions as a continuing unit. The Axiron Publication Enterprise was created and used as a tool to effectuate Defendant Eli Lilly's pattern of racketeering activity. The Defendant Eli Lilly "persons" are distinct from the Axiron Publication Enterprise.

1325. The Axiron Publication Enterprise falls within the meaning of 18 U.S.C. § 1961(4) and consists of groups of "persons" associated together for the common purpose of disseminating publication materials promoting Axiron for unapproved and unsafe uses not proven to be safe, effective and useful, and earning profits therefrom.

1326. Defendant Eli Lilly has conducted and participated in the affairs of the Axiron Publication Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and 1961(5), which includes multiple instances of mail fraud in violation of 18 U.S.C. § 1341, and multiple instances of wire fraud in violation of 18 U.S.C. § 1343, as described above. The false and misleading predicate acts of racketeering activity committed, or

caused to be committed, by the Defendant Eli Lilly throughout the Class Period number in the thousands, and the Defendant Eli Lilly committed, or caused to be committed, at least two of the predicate acts within the requisite ten year period.

1327. The Axiron Publication Enterprise engaged in and affected interstate commerce, because, *inter alia*, it operated through medical journals with national subscribership, disseminated reprints of articles to physicians across the nation, and was used as part of the Axiron Peer Selling Enterprise, which, *inter alia*, marketed, sold, purchased, or provided Axiron to thousands of entities and individuals throughout the United States.

1328. Defendant Eli Lilly exerted control over the Axiron Publication Enterprise, and participated in its operation or management through a variety of actions including the following:

- Defendant Eli Lilly controlled the content of the publications, and the marketing messages contained therein, promulgated by the Axiron Publication Enterprise, including the misinformation and false statements concerning the hypogonadism as well as the safety, efficacy, effectiveness, and usefulness of Axiron for unapproved and unsafe uses;

- Defendant Eli Lilly, and its employees and medical marketing and/or communications vendors controlled the content of the Axiron Publication Enterprise publications through ghostwriting, editing, and/or funding or other restrictions for Axiron studies requiring pre-approval of publications;

- Defendant Eli Lilly selected and approved the physician and/or researcher participants to serve as "authors" of publications promoting a more expansive definition of hypogonadism as well as the false and misleading messages for Axiron contained therein;

- Defendant Eli Lilly focused on specific medical journals for branded or unbranded publications created pursuant to the Axiron Publication Enterprise;

- Defendant Eli Lilly paid the vendors and physician/researcher participants for their participation in the Axiron Publication Enterprise;

- Defendant Eli Lilly placed its own employees and agents in positions of authority and control over the Axiron Publication Enterprise; and

- Defendant Eli Lilly concealed its involvement in the Axiron Publication Enterprise so that its publications would have a veneer of credibility as independent and unbiased scientific research.

1329.  As detailed above, Defendant Eli Lilly's Axiron Publication Enterprise consisted of:  (a) creating and disseminating publications deliberately misrepresenting, and causing others to misrepresent, the prevalence of hypogonadism and the uses for which Axiron was safe and effective so that Plaintiff MMO and the TPP Class Members paid for this drug to treat conditions and/or symptoms for which Axiron was not scientifically proven to be safe, effective, and useful; (b) distributing or causing to be distributed reprints of said publications to physicians misrepresenting the unapproved and unsafe uses for which Defendant Eli Lilly knew Axiron was not proven to be scientifically safe, effective, and useful to physician attendees and other healthcare providers; (c) disseminating materials created pursuant to the Axiron Publication Enterprise and using those materials to misrepresent, and cause others to misrepresent, the uses for which Axiron was safe and effective and useful; (d) actively concealing, and causing others to conceal, information about the safety, efficacy, and usefulness of Axiron to treat conditions for which it had not been approved by the FDA; and (e) actively concealing, and causing others to conceal, Defendant Eli Lilly's involvement in the Axiron Publication Enterprise.

1330.  Defendant Eli Lilly's scheme and the above described racketeering activities amounted to a common course of conduct intended to cause Plaintiff MMO and the TPP Class

Members to pay for excessive amounts of Axiron. Each such racketeering activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiff MMO and the TPP Class Members. Defendant Eli Lilly's fraudulent activities are part of its ongoing business and constitute a continuing threat to Plaintiff MMO's and the TPP Class Members' property.

1331. The pattern of racketeering activities alleged herein and the Axiron Publication Enterprise are separate and distinct from each other. Defendant Eli Lilly engaged in a pattern of racketeering activities alleged herein for the purpose of conducting the affairs of the Axiron Publication Enterprise.

1332. Plaintiff MMO and the TPP Class Members have been injured in their property by reason of these violations in that Plaintiff MMO and the TPP Class Members have made millions of dollars in payments for Axiron that they otherwise would not have made had Defendant Eli Lilly not engaged in its pattern of racketeering activities. Plaintiff MMO and the TPP Class Members suffered direct consequential and concrete financial loss flowing from the injury to their property by having overpaid for Axiron, having received a product or prescription (Axiron) that was worth less than what they paid for it, and thereby suffered out-of-pocket losses. And but for the predicate acts committed or caused to be committed by the Defendant Eli Lilly, Plaintiff MMO and the TPP Class Members would not have suffered their RICO injuries.

1333. Plaintiff MMO's and the TPP Class Members' injuries were directly and proximately caused by Defendant Eli Lilly's racketeering activity, as described above. Plaintiff MMO's and Class Members' injuries were directly caused by the predicate acts and are not attributable to any independent or intervening factors; their injuries were a foreseeable and natural consequence of the Defendant Eli Lilly's scheme; there is no difficulty posed by having

to apportion damages among Plaintiff MMO and the TPP Class Members with different standing or different levels of injury because there are no other injured parties besides the Plaintiff MMO and the TPP Class Members in this case, who are the parties directly injured by the Defendant Eli Lilly's RICO violations; and there are no others, more directly injured, that could vindicate the Plaintiff MMO's and the TPP Class Members' claims.

1334.  By virtue of these violations of 18 U.S.C. § 1962(c), Defendant Eli Lilly is jointly and severally liable to Plaintiff MMO and the TPP Class Members for three times the damages Plaintiff MMO and the TPP Class Members have sustained, punitive damages, plus the cost of this lawsuit, including reasonable attorney fees.

<div align="center">

**FOURTEENTH CLAIM FOR RELIEF**
**Violation of 18 U.S.C. § 1962(c)**
**(The Androderm Publication Enterprise – Against Defendant Actavis)**

</div>

1335.  Plaintiff MMO incorporates by reference all preceding paragraphs, as if fully set forth herein.

1336.  Defendant Actavis is a "person" within the meaning of 18 U.S.C. § 1961(3) who participated in the conduct of the affairs of the Androderm Publication Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

1337. The Androderm Publication Enterprise is an association-in-fact within the meaning of 18 U.S.C. § 1961(4) consisting of (i) Defendant Actavis, including its employees and agents, (ii) physician and/or researcher participants (including physician societies), including those listed in the foregoing allegations as well as other physicians and/or researchers (including physician societies) whose identities are not yet known but will be learned in discovery, (iii) and medical marketing and/or communications vendors, including those listed in the foregoing

allegations as well as other vendors whose identities are not yet known but will be learned in discovery.

1338.  The Androderm Publication Enterprise is an ongoing organization that functions as a continuing unit. The Androderm Publication Enterprise was created and used as a tool to effectuate Defendant Actavis' pattern of racketeering activity. The Defendant Actavis "persons" are distinct from the Androderm Publication Enterprise.

1339.  The Androderm Publication Enterprise falls within the meaning of 18 U.S.C. § 1961(4) and consists of groups of "persons" associated together for the common purpose of disseminating publication materials promoting Androderm for unapproved and unsafe uses not proven to be safe, effective and useful, and earning profits therefrom.

1340.  Defendant Actavis has conducted and participated in the affairs of the Androderm Publication Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and 1961(5), which includes multiple instances of mail fraud in violation of 18 U.S.C. § 1341, and multiple instances of wire fraud in violation of 18 U.S.C. § 1343, as described above. The false and misleading predicate acts of racketeering activity committed, or caused to be committed, by the Defendant Actavis throughout the Class Period number in the thousands, and the Defendant Actavis committed, or caused to be committed, at least two of the predicate acts within the requisite ten year period.

1341. The Androderm Publication Enterprise engaged in and affected interstate commerce, because, *inter alia*, it operated through medical journals with national subscribership, disseminated reprints of articles to physicians across the nation, and was used as part of the Androderm Peer Selling Enterprise, which, *inter alia*, marketed, sold, purchased, or provided Androderm to thousands of entities and individuals throughout the United States.

1342. Defendant Actavis exerted control over the Androderm Publication Enterprise, and participated in its operation or management through a variety of actions including the following:

- Defendant Actavis controlled the content of the publications, and the marketing messages contained therein, promulgated by the Androderm Publication Enterprise, including the misinformation and false statements concerning the hypogonadism as well as the safety, efficacy, effectiveness, and usefulness of Androderm for unapproved and unsafe uses;

- Defendant Actavis, and its employees and medical marketing and/or communications vendors controlled the content of the Androderm Publication Enterprise publications through ghostwriting, editing, and/or funding or other restrictions for Androderm studies requiring pre-approval of publications;

- Defendant Actavis selected and approved the physician and/or researcher participants to serve as "authors" of publications promoting a more expansive definition of hypogonadism as well as the false and misleading messages for Androderm contained therein;

- Defendant Actavis focused on specific medical journals for branded or unbranded publications created pursuant to the Androderm Publication Enterprise;

- Defendant Actavis paid the vendors and physician/researcher participants for their participation in the Androderm Publication Enterprise;

- Defendant Actavis placed its own employees and agents in positions of authority and control over the Androderm Publication Enterprise; and

447

- Defendant Actavis concealed its involvement in the Androderm Publication Enterprise so that its publications would have a veneer of credibility as independent and unbiased scientific research.

1343.  As detailed above, Defendant Actavis' Androderm Publication Enterprise consisted of: (a) creating and disseminating publications deliberately misrepresenting, and causing others to misrepresent, the prevalence of hypogonadism and the uses for which Androderm was safe and effective so that Plaintiff MMO and the TPP Class Members paid for this drug to treat conditions and/or symptoms for which Androderm was not scientifically proven to be safe, effective, and useful; (b) distributing or causing to be distributed reprints of said publications to physicians misrepresenting the unapproved and unsafe uses for which Defendant Actavis knew Androderm was not proven to be scientifically safe, effective, and useful to physician attendees and other healthcare providers; (c) disseminating materials created pursuant to the Androderm Publication Enterprise and using those materials to misrepresent, and cause others to misrepresent, the uses for which Androderm was safe and effective and useful; (d) actively concealing, and causing others to conceal, information about the safety, efficacy, and usefulness of Androderm to treat conditions for which it had not been approved by the FDA; and (e) actively concealing, and causing others to conceal, Defendant Actavis' involvement in the Androderm Publication Enterprise.

1344.  Defendant Actavis' scheme and the above described racketeering activities amounted to a common course of conduct intended to cause Plaintiff MMO and the TPP Class Members to pay for excessive amounts of Androderm. Each such racketeering activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiff MMO and the

TPP Class Members. Defendant Actavis' fraudulent activities are part of its ongoing business and constitute a continuing threat to Plaintiff's and the Class Members' property.

1345. The pattern of racketeering activities alleged herein and the Androderm Publication Enterprise are separate and distinct from each other. Defendant Actavis engaged in a pattern of racketeering activities alleged herein for the purpose of conducting the affairs of the Androderm Publication Enterprise.

1346. Plaintiff MMO and the TPP Class Members have been injured in their property by reason of these violations in that Plaintiff MMO and the TPP Class Members have made millions of dollars in payments for Androderm that they otherwise would not have made had Defendant Actavis not engaged in its pattern of racketeering activities. Plaintiff MMO and the TPP Class Members suffered direct consequential and concrete financial loss flowing from the injury to their property by having overpaid for Androderm, having received a product or prescription (Androderm) that was worth less than what they paid for it, and thereby suffered out-of-pocket losses. And but for the predicate acts committed or caused to be committed by the Defendant Actavis, the Plaintiff MMO and the TPP Class Members would not have suffered their RICO injuries.

1347. Plaintiff MMO and the TPP Class Members' injuries were directly and proximately caused by Defendant Actavis' racketeering activity, as described above. Plaintiff's and Class members' injuries were directly caused by the predicate acts and are not attributable to any independent or intervening factors; their injuries were a foreseeable and natural consequence of the Defendant Actavis' scheme; there is no difficulty posed by having to apportion damages among Class members with different standing or different levels of injury because there are no other injured parties besides the Plaintiff MMO and the TPP Class Members in this case, who are

the parties directly injured by the Defendant Actavis' RICO violations; and there are no others, more directly injured, that could vindicate the Plaintiff's and Class members' claims.

1348.  By virtue of these violations of 18 U.S.C. § 1962(c), Defendant Actavis is jointly and severally liable to Plaintiff MMO and the TPP Class Members for three times the damages Plaintiff MMO and the TPP Class Members have sustained, punitive damages, plus the cost of this lawsuit, including reasonable attorney fees.

### FIFTEENTH CLAIM FOR RELIEF
#### Violation of 18 U.S.C. § 1962(c)
#### (The Fortesta Publication Enterprise – Against Defendant Endo)

1349.  Plaintiff MMO incorporates by reference all preceding paragraphs, as if fully set forth herein.

1350.  Defendant Endo is a "person" within the meaning of 18 U.S.C. § 1961(3) who participated in the conduct of the affairs of the Fortesta Publication Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

1351.  The Fortesta Publication Enterprise is an association-in-fact within the meaning of 18 U.S.C. § 1961(4) consisting of (i) Defendant Endo, including its employees and agents, (ii) physician and/or researcher participants (including physician societies), including those listed in the foregoing allegations as well as other physicians and/or researchers (including physician societies) whose identities are not yet known but will be learned in discovery, (iii) and medical marketing and/or communications vendors, including those listed in the foregoing allegations as well as other vendors whose identities are not yet known but will be learned in discovery.

1352.  The Fortesta Publication Enterprise is an ongoing organization that functions as a continuing unit. The Fortesta Publication Enterprise was created and used as a tool to effectuate

Defendant Endo's pattern of racketeering activity. The Defendant Endo "persons" are distinct from the Fortesta Publication Enterprise.

1353. The Fortesta Publication Enterprise falls within the meaning of 18 U.S.C. § 1961(4) and consists of groups of "persons" associated together for the common purpose of disseminating publication materials promoting Fortesta for unapproved and unsafe uses not proven to be safe, effective and useful, and earning profits therefrom.

1354. Defendant Endo has conducted and participated in the affairs of the Fortesta Publication Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and 1961(5), which includes multiple instances of mail fraud in violation of 18 U.S.C. § 1341, and multiple instances of wire fraud in violation of 18 U.S.C. § 1343, as described above. The false and misleading predicate acts of racketeering activity committed, or caused to be committed, by the Defendant Endo throughout the Class Period number in the thousands, and the Defendant Endo committed, or caused to be committed, at least two of the predicate acts within the requisite ten year period.

1355. The Fortesta Publication Enterprise engaged in and affected interstate commerce, because, *inter alia*, it operated through medical journals with national subscribership, disseminated reprints of articles to physicians across the nation, and were used as part of the Fortesta Peer Selling Enterprise, which, *inter alia*, marketed, sold, purchased, or provided Fortesta to thousands of entities and individuals throughout the United States.

1356. Defendant Endo exerted control over the Fortesta Publication Enterprise, and participated in its operation or management through a variety of actions including the following:

- Defendant Endo controlled the content of the publications, and the marketing messages contained therein, promulgated by the Fortesta Publication Enterprise, including the

451

misinformation and false statements concerning hypogonadism as well as the safety, efficacy, effectiveness, and usefulness of Fortesta for unapproved and unsafe uses;

- Defendant Endo, and its employees and medical marketing and/or communications vendors controlled the content of the Fortesta Publication Enterprise publications through ghostwriting, editing, and/or funding or other restrictions for Fortesta studies requiring pre-approval of publications;

- Defendant Endo selected and approved the physician and/or researcher participants to serve as "authors" of publications promoting a more expansive definition of hypogonadism as well as the false and misleading messages for Fortesta contained therein;

- Defendant Endo focused on specific medical journals for branded or unbranded publications created pursuant to the Fortesta Publication Enterprise;

- Defendant Endo paid the vendor and physician/researcher participants for their participation in the Fortesta Publication Enterprise;

- Defendant Endo placed its own employees and agents in positions of authority and control over the Fortesta Publication Enterprise; and

- Defendant Endo concealed its involvement in the Fortesta Publication Enterprise so that its publications would have a veneer of credibility as independent and unbiased scientific research.

1357.  As detailed above, Defendant Endo's Fortesta Publication Enterprise consisted of: (a) creating and disseminating publications deliberately misrepresenting, and causing others to misrepresent, the prevalence of hypogonadism and the uses for which Fortesta was safe and effective so that Plaintiff MMO and the TPP Class Members paid for this drug to treat conditions

and/or symptoms for which Fortesta was not scientifically proven to be safe, effective, and useful; (b) distributing or causing to be distributed reprints of said publications to physicians misrepresenting the unapproved and unsafe uses for which Defendant Endo knew Fortesta was not proven to be scientifically safe, effective, and useful to physician attendees and other healthcare providers; (c) disseminating materials created pursuant to the Fortesta Publication Enterprise and using those materials to misrepresent, and cause others to misrepresent, the uses for which Fortesta was safe and effective and useful; (d) actively concealing, and causing others to conceal, information about the safety, efficacy, and usefulness of Fortesta to treat conditions for which it had not been approved by the FDA; and (e) actively concealing, and causing others to conceal, Defendant Endo's involvement in the Fortesta Publication Enterprise.

1358. Defendant Endo's scheme and the above described racketeering activities amounted to a common course of conduct intended to cause Plaintiff MMO and the TPP Class Members to pay for excessive amounts of Fortesta. Each such racketeering activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiff MMO and the TPP Class Members. Defendant Endo's fraudulent activities are part of its ongoing business and constitute a continuing threat to Plaintiff MMO and the TPP Class Members' property.

1359. The pattern of racketeering activities alleged herein and the Fortesta Publication Enterprise are separate and distinct from each other. Defendant Endo engaged in a pattern of racketeering activities alleged herein for the purpose of conducting the affairs of the Fortesta Publication Enterprise.

1360. Plaintiff MMO and the TPP Class Members have been injured in their property by reason of these violations in that Plaintiff MMO and the TPP Class Members have made millions

of dollars in payments for Fortesta that they otherwise would not have made had Defendant Endo not engaged in its pattern of racketeering activities. Plaintiff MMO and the TPP Class Members suffered direct consequential and concrete financial loss flowing from the injury to their property by having overpaid for Fortesta, having received a product or prescription (Fortesta) that was worth less than what they paid for it, and thereby suffered out-of-pocket losses. And but for the predicate acts committed or caused to be committed by the Defendant Endo, Plaintiff MMO and the TPP Class Members would not have suffered their RICO injuries.

1361. Plaintiff MMO's and the TPP Class Members' injuries were directly and proximately caused by Defendant Endo's racketeering activity, as described above. Plaintiff MMO's and the TPP Class Members' injuries were directly caused by the predicate acts and are not attributable to any independent or intervening factors; their injuries were a foreseeable and natural consequence of the Defendant Endo's scheme; there is no difficulty posed by having to apportion damages among Plaintiff MMO and the TPP Class Members with different standing or different levels of injury because there are no other injured parties besides Plaintiff MMO and the TPP Class Members in this case, who are the parties directly injured by the Defendant Endo's RICO violations; and there are no others, more directly injured, that could vindicate the Plaintiff MMO's and the TPP Class Members' claims.

1362. By virtue of these violations of 18 U.S.C. § 1962(c), Defendant Endo is jointly and severally liable to Plaintiff MMO and the TPP Class Members for three times the damages Plaintiff MMO and the TPP Class Members have sustained, punitive damages, plus the cost of this lawsuit, including reasonable attorney fees.

## SIXTEENTH CLAIM FOR RELIEF
### Violation of 18 U.S.C. § 1962(c)
### (The AndroGel DTC Enterprise – Against the AbbVie Defendants)

1363.   Plaintiff MMO incorporates by reference all preceding paragraphs, as if fully set forth herein.

1364.   The AbbVie Defendants participated in the conduct of the affairs of the AndroGel DTC Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

1365.   The AndroGel DTC Enterprise is an association-in-fact within the meaning of 18 U.S.C. § 1961(4), consisting of the AbbVie Defendants, including their employees and agents, the marketing firms and publication firms that Defendants associated with to market AndroGel directly to patients, and the web designers who created websites to promote unfounded uses directly to consumers.

1366.   The AbbVie Defendants are RICO "persons" distinct from the AndroGel DTC Enterprise.

1367.   The AbbVie Defendants used the AndroGel DTC Enterprise to carry out their scheme to obtain money by means of false and fraudulent pretenses, representations, and omissions.

1368.   The AndroGel DTC Enterprise is an ongoing organization that functions as a continuing unit.

1369.   The AbbVie Defendants and the other members of the AndroGel DTC Enterprise created and maintained systematic links for the common purpose of gaining revenue from marketing AndroGel for on- and unapproved and unsafe uses. Each of the members of the AndroGel DTC Enterprise received substantial revenue from marketing AndroGel. Such revenue was exponentially greater than it would have been if AndroGel had been marketed appropriately.

1370. The AndroGel DTC Enterprise has a hub and spoke organizational, decision-making structure, with the AbbVie Defendants serving as the hub.

1371. All members of the AndroGel DTC Enterprise were aware of the AbbVie Defendants' control over its activities. Furthermore, each member of the AndroGel DTC Enterprise benefited from the existence of the other members.

1372. The AndroGel DTC Enterprise engaged in and affected interstate commerce, because, *inter alia*, it marketed, distributed, sold, and provided AndroGel to thousands of individuals and entities throughout the United States.

1373. The AbbVie Defendants have exerted control over the AndroGel DTC Enterprise and have managed its affairs through a pattern of racketeering activity that includes acts indictable under 18 U.S.C. § 1341 (mail fraud), § 1343 (wire fraud), and § 1952 (use of interstate facilities to conduct false and misleading activity).

1374. The AbbVie Defendants' use of, or causation of the use of, the mails and wires to perpetrate their fraud through the AndroGel DTC Enterprise involved hundreds of communications including, but not limited to: (a) marketing materials and advertisements aimed at patients that misrepresented that AndroGel was safe and effective for unapproved and unsafe uses for which the drug was not legitimately proven safe and effective; (b) communications with Plaintiff MMO and the TPP Class Members, inducing payments for AndroGel to be made based on misrepresentations concerning the risks and benefits of AndroGel; and (c) receiving the proceeds of their improper scheme. The false and misleading predicate acts of racketeering activity committed, or caused to be committed, by the AbbVie Defendants throughout the Class Period consisted of at least two of the predicate acts within a ten year period.

1375.  In addition, the AbbVie Defendants' corporate headquarters have communicated by United States mail, telephone, and facsimile with various local district managers, medical liaisons, and sales representatives in order to use the AndroGel DTC Enterprise to carry out their schemes to obtain money by means of false and fraudulent pretenses, representations, and omissions.

1376.  Further, the AbbVie Defendants have traveled in interstate or foreign commerce or used the mail and facilities in interstate or foreign commerce, with the intent to distribute the proceeds of the false and misleading activity described above or otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on of the false and misleading activity described above.

1377.  The AbbVie Defendants' racketeering activities related to the AndroGel DTC Enterprise amounted to a common course of conduct intended to deceive and harm Plaintiff MMO and the TPP Class Members. Each racketeering activity was related, had similar purposes, involved the same or similar members and methods of commission, and had similar results affecting similar victims, including Plaintiff MMO and the TPP Class Members. The AbbVie Defendants' racketeering activities are part of their ongoing businesses and constitute a continuing threat to the property of Plaintiff MMO and the TPP Class Members.

1378.  The AbbVie Defendants' repeated use of the AndroGel DTC Enterprise to implement and carry out the fraudulent schemes constitutes a "pattern of racketeering activity" within the meaning of 18 U.S.C. §§ 1961(5) and 1962(c).  Through that pattern of racketeering activity, the AbbVie Defendants conducted and participated in the conduct of the affairs of the AndroGel DTC Enterprise.

1379. Plaintiff MMO and the TPP Class Members have been directly injured in their business and property by reason of the AbbVie Defendants' violations of 18 U.S.C. § 1962(c) in that the pattern of racketeering activity that they used to conduct the affairs of the AndroGel DTC Enterprise directly and proximately caused Plaintiff MMO and the TPP Class Members to spend excessive, ascertainable sums of money for the purchase, payment, or reimbursement of AndroGel prescriptions that would not have been purchased, paid, or reimbursed if the AbbVie Defendants had not conducted or participated in the conduct of the affairs of the AndroGel DTC Enterprise through a pattern of racketeering activity. Plaintiff MMO and the TPP Class Members suffered direct consequential and concrete financial loss flowing from the injury to their property by having overpaid for AndroGel, having received a product or prescription (AndroGel) that was worth less than what they paid for it, and thereby suffered out-of-pocket losses.

1380. Plaintiff MMO and the TPP Class Members have also been directly injured in their business and property by reason of the AbbVie Defendants' violations of 18 U.S.C. § 1962(c) in that the pattern of racketeering activity that the AbbVie Defendants used to conduct the affairs of the AndroGel DTC Enterprise directly and proximately caused Plaintiff MMO and the TPP Class Members to spend excessive, ascertainable sums of money for the purchase or reimbursement of AndroGel sold at a falsely inflated price that would have been significantly lower if the AbbVie Defendants had not conducted or participated in the conduct of the affairs of the AndroGel DTC Enterprise through a pattern of racketeering activity.

1381. Plaintiff MMO's and the TPP Class Members' injuries were directly caused by the predicate acts and are not attributable to any independent or intervening factors; their injuries were a foreseeable and natural consequence of the AbbVie Defendants' scheme; there is no difficulty posed by having to apportion damages among Class members with different standing

or different levels of injury because there are no other injured parties besides Plaintiff MMO and the TPP Class Members in this case, who are the parties directly injured by the AbbVie Defendants' RICO violations; and there are no others, more directly injured, that could vindicate the Plaintiff MMO's and the TPP Class Members' claims.

1382.  By virtue of these violations of 18 U.S.C. § 1962(c), the AbbVie Defendants are jointly and severally liable to Plaintiff MMO and the TPP Class Members for three times the damages they have sustained, plus the cost of this suit, punitive damages, including reasonable attorney's fees.

<div align="center">

**SEVENTEENTH CLAIM FOR RELIEF**
**Violation of 18 U.S.C. § 1962(c)**
**(The Testim and Testopel DTC Enterprise – Against Defendant Auxilium)**

</div>

1383.  Plaintiff MMO incorporates by reference all preceding paragraphs, as if fully set forth herein.

1384.  Defendant Auxilium participated in the conduct of the affairs of the Testim and Testopel DTC Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

1385.  The Testim and Testopel DTC Enterprise is an association-in-fact within the meaning of 18 U.S.C. § 1961(4), consisting of Defendant Auxilium, including its employees and agents, the marketing firms and publication firms that Defendant Auxilium associated with to market Testim and Testopel directly to patients, and the web designers who created websites to promote unfounded uses directly to consumers.

1386.  Defendant Auxilium is a RICO "person" distinct from the Testim and Testopel DTC Enterprise.

1387.   Defendant Auxilium used the Testim and Testopel DTC Enterprise to carry out its scheme to obtain money by means of false and fraudulent pretenses, misrepresentations, and omissions.

1388.   The Testim and Testopel DTC Enterprise is an ongoing organization that functions as a continuing unit.

1389.   Defendant Auxilium and the other members of the Testim and Testopel DTC Enterprise created and maintained systematic links for the common purpose of gaining revenue from marketing Testim and Testopel for on- and unapproved and unsafe uses. Each of the members of the Testim and Testopel DTC Enterprise received substantial revenue from marketing Testim and Testopel. Such revenue was exponentially greater than it would have been if Testim and Testopel were marketed appropriately.

1390.   The Testim and Testopel DTC Enterprise has a hub and spoke organizational, decision-making structure, with Defendant Auxilium serving as the hub.

1391.   All members of the Testim and Testopel DTC Enterprise were aware of Defendant Auxilium's control over the activities of the Testim and Testopel DTC Enterprise. Furthermore, each member of the Testim and Testopel DTC Enterprise benefited from the existence of the other members.

1392.   The Testim and Testopel DTC Enterprise engaged in and affected interstate commerce, because, *inter alia*, it marketed, distributed, sold, and provided Testim and Testopel to thousands of individuals and entities throughout the United States.

1393.   Defendant Auxilium has exerted control over the Testim and Testopel DTC Enterprise and has managed its affairs through a pattern of racketeering activity that includes acts

indictable under 18 U.S.C. § 1341 (mail fraud), § 1343 (wire fraud), and § 1952 (use of interstate facilities to conduct false and misleading activity).

1394. Defendant Auxilium's use of, or causation of the use of, the mails and wires to perpetrate its fraud through the Testim and Testopel DTC Enterprise involved hundreds of communications including, but not limited to: (a) marketing materials and advertisements aimed at patients that misrepresented that Testim and Testopel were safe and effective for unapproved and unsafe uses for which the drug was not legitimately proven safe and effective; (b) communications with patients including Plaintiff MMO's and the TPP Class Members' participants and their dependents, inducing payments for Testim and Testopel to be made based on misrepresentations concerning its risks and benefits; and (c) receiving the proceeds of its improper scheme. The false and misleading predicate acts of racketeering activity committed, or caused to be committed, by the Defendant Auxilium throughout the Class Period consisted of at least two of the predicate acts within a ten year period.

1395. In addition, Defendant Auxilium's corporate headquarters have communicated by United States mail, telephone, and facsimile with various local district managers, medical liaisons, and sales representatives in order to use the Testim and Testopel DTC Enterprise to carry out its schemes to obtain money by means of false and fraudulent pretenses, representations, and omissions.

1396. Further, Defendant Auxilium has traveled in interstate or foreign commerce or used the mail and facilities in interstate or foreign commerce, with the intent to distribute the proceeds of the false and misleading activity described above or otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on of the false and misleading activity described above.

1397.   Defendant Auxilium's racketeering activities related to the Testim and Testopel DTC Enterprise amounted to a common course of conduct intended to deceive and harm Plaintiff MMO and the TPP Class Members. Each racketeering activity was related, had similar purposes, involved the same or similar members and methods of commission, and had similar results affecting similar victims, including Plaintiff MMO and the TPP Class Members. Defendant Auxilium's racketeering activities are part of its ongoing businesses and constitute a continuing threat to the property of Plaintiff MMO and the TPP Class Members.

1398.   Defendant Auxilium's repeated use of the Testim and Testopel DTC Enterprise to implement and carry out the fraudulent schemes constitutes a "pattern of racketeering activity" within the meaning of 18 U.S.C. §§ 1961(5) and 1962(c).  Through that pattern of racketeering activity, Defendant Auxilium conducted and participated in the conduct of the affairs of the Testim and Testopel DTC Enterprise.

1399.   Plaintiff MMO and the TPP Class Members have been directly injured in their business and property by reason of Defendant Auxilium's violations of 18 U.S.C. § 1962(c) in that the pattern of racketeering activity that Defendant Auxilium used to conduct the affairs of the Testim and Testopel DTC Enterprise directly and proximately caused them to spend excessive, ascertainable sums of money for the purchase, payment, or reimbursement of Testim and Testopel prescriptions that would not have been purchased, paid, or reimbursed if Defendant Auxilium had not conducted or participated in the conduct of the affairs of the Testim and Testopel DTC Enterprise through a pattern of racketeering activity.  Plaintiff MMO and the TPP Class Members suffered direct consequential and concrete financial loss flowing from the injury to their property by having overpaid for Testim and Testopel, having received a product or

prescription (Testim and/or Testopel) that was worth less than what they paid for it, and thereby suffered out-of-pocket losses.

1400.  Plaintiff MMO and the TPP Class Members have also been directly injured in their business and property by reason of Defendant Auxilium's violations of 18 U.S.C. § 1962(c) in that the pattern of racketeering activity that it used to conduct the affairs of the Testim and Testopel DTC Enterprise directly and proximately caused Plaintiff MMO and the TPP Class Members to spend excessive, ascertainable sums of money for the purchase or reimbursement of Testim and Testopel sold at a falsely inflated price that would have been significantly lower if Defendant Auxilium had not conducted or participated in the conduct of the affairs of the Testim and Testopel DTC Enterprise through a pattern of racketeering activity.

1401.  Plaintiff MMO's and the TPP Class Members' injuries were directly caused by the predicate acts and are not attributable to any independent or intervening factors; their injuries were a foreseeable and natural consequence of the Defendant Auxilium's scheme; there is no difficulty posed by having to apportion damages among Plaintiff MMO and the TPP Class Members with different standing or different levels of injury because there are no other injured parties besides Plaintiff MMO and the TPP Class Members in this case, who are the parties directly injured by the Defendant Auxilium's RICO violations; and there are no others, more directly injured, that could vindicate Plaintiff MMO's and the TPP Class Members' claims.

1402.  By virtue of these violations of 18 U.S.C. § 1962(c), Defendant Auxilium is jointly and severally liable to Plaintiff MMO and the TPP Class Members for three times the damages they have sustained, plus the cost of this suit, punitive damages, including reasonable attorney's fees.

**EIGHTEENTH CLAIM FOR RELIEF**
**Violation of 18 U.S.C. § 1962(c)**
**(The Axiron DTC Enterprise – Against Defendant Eli Lilly)**

1403.   Plaintiff MMO incorporates by reference all preceding paragraphs, as if fully set forth herein.

1404.   Defendant Eli Lilly participated in the conduct of the affairs of the Axiron DTC Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

1405.   The Axiron DTC Enterprise is an association-in-fact within the meaning of 18 U.S.C. § 1961(4), consisting of Defendant Eli Lilly, including its employees and agents, the marketing firms and publication firms that Defendant Eli Lilly associated with to market Axiron directly to patients, and the web designers who created websites to promote unfounded uses directly to consumers.

1406.   Defendant Eli Lilly is a RICO "person" distinct from the Axiron DTC Enterprise.

1407.   Defendant Eli Lilly used the Axiron DTC Enterprise to carry out its scheme to obtain money by means of false and fraudulent pretenses, representations, and omissions.

1408.   The Axiron DTC Enterprise is an ongoing organization that functions as a continuing unit.

1409.   Defendant Eli Lilly and the other members of the Axiron DTC Enterprise created and maintained systematic links for the common purpose of gaining revenue from marketing Axiron for on- and unapproved and unsafe uses. Each of the members of the Axiron DTC Enterprise received substantial revenue from marketing Axiron. Such revenue was exponentially greater than it would have been if Axiron were marketed appropriately.

1410.   The Axiron DTC Enterprise has a hub and spoke organizational, decision-making structure, with Defendant Eli Lilly serving as the hub.

1411. All members of the Axiron DTC Enterprise were aware of Defendant Eli Lilly's control over the activities of the Axiron DTC Enterprise. Furthermore, each member of the Axiron DTC Enterprise benefited from the existence of the other members.

1412. The Axiron DTC Enterprise engaged in and affected interstate commerce, because, *inter alia*, it marketed, distributed, sold, and provided Axiron to thousands of individuals and entities throughout the United States.

1413. Defendant Eli Lilly has exerted control over the Axiron DTC Enterprise and has managed its affairs through a pattern of racketeering activity that includes acts indictable under 18 U.S.C. § 1341 (mail fraud), § 1343 (wire fraud), and § 1952 (use of interstate facilities to conduct false and misleading activity).

1414. Defendant Eli Lilly's use of, or causation of the use of, the mails and wires to perpetrate its fraud through the Axiron DTC Enterprise involved hundreds of communications including, but not limited to: (a) marketing materials and advertisements aimed at patients that misrepresented that Axiron was safe and effective for unapproved and unsafe uses for which the drug was not legitimately proven safe and effective; (b) communications with patients including Plaintiff MMO's and the TPP Class Members' participants and their dependents, inducing payments for Axiron to be made based on misrepresentations concerning its risks and benefits; and (c) receiving the proceeds of its improper scheme. The false and misleading predicate acts of racketeering activity committed, or caused to be committed, by the Defendant Eli Lilly throughout the Class Period consisted of at least two of the predicate acts within a ten year period.

1415. In addition, Defendant Eli Lilly's corporate headquarters have communicated by United States mail, telephone, and facsimile with various local district managers, medical

liaisons, and sales representatives in order to use the Axiron DTC Enterprise to carry out its schemes to obtain money by means of false and fraudulent pretenses, representations, and omissions.

1416. Further, Defendant Eli Lilly has traveled in interstate or foreign commerce or used the mail and facilities in interstate or foreign commerce, with the intent to distribute the proceeds of the false and misleading activity described above or otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on of the false and misleading activity described above.

1417. Defendant Eli Lilly's racketeering activities related to the Axiron DTC Enterprise amounted to a common course of conduct intended to deceive and harm Plaintiff MMO and the TPP Class Members. Each racketeering activity was related, had similar purposes, involved the same or similar members and methods of commission, and had similar results affecting similar victims, including Plaintiff MMO and the TPP Class Members. Defendant Eli Lilly's racketeering activities are part of its ongoing businesses and constitute a continuing threat to the property of Plaintiff MMO and the TPP Class Members.

1418. Defendant Eli Lilly's repeated use of the Axiron DTC Enterprise to implement and carry out the fraudulent schemes constitutes a "pattern of racketeering activity" within the meaning of 18 U.S.C. §§ 1961(5) and 1962(c). Through that pattern of racketeering activity, Defendant Eli Lilly conducted and participated in the conduct of the affairs of the Axiron DTC Enterprise.

1419. Plaintiff MMO and the TPP Class Members have been directly injured in their business and property by reason of Defendant Eli Lilly's violations of 18 U.S.C. § 1962(c) in that the pattern of racketeering activity that Defendant Eli Lilly used to conduct the affairs of the

Axiron DTC Enterprise directly and proximately caused them to spend excessive, ascertainable sums of money for the purchase, payment, or reimbursement of Axiron prescriptions that would not have been purchased, paid, or reimbursed if Defendant Eli Lilly had not conducted or participated in the conduct of the affairs of the Axiron DTC Enterprise through a pattern of racketeering activity. Plaintiff MMO and the TPP Class Members suffered direct consequential and concrete financial loss flowing from the injury to their property by having overpaid for Axiron, having received a product or prescription (Axiron) that was worth less than what they paid for it, and thereby suffered out-of-pocket losses.

1420. Plaintiff MMO and the TPP Class Members have also been directly injured in their business and property by reason of Defendant Eli Lilly's violations of 18 U.S.C. § 1962(c) in that the pattern of racketeering activity that it used to conduct the affairs of the Axiron DTC Enterprise directly and proximately caused Plaintiff MMO and the TPP Class Members to spend excessive, ascertainable sums of money for the purchase or reimbursement of Axiron sold at a falsely inflated price that would have been significantly lower if Defendant Eli Lilly had not conducted or participated in the conduct of the affairs of the Axiron DTC Enterprise through a pattern of racketeering activity.

1421. Plaintiff MMO's and the TPP Class Members' injuries were directly caused by the predicate acts and are not attributable to any independent or intervening factors; their injuries were a foreseeable and natural consequence of the Defendant Eli Lilly's scheme; there is no difficulty posed by having to apportion damages among Plaintiff MMO and the TPP Class Members with different standing or different levels of injury because there are no other injured parties besides the Plaintiff MMO and the TPP Class Members in this case, who are the parties

directly injured by the Defendant Eli Lilly's RICO violations; and there are no others, more directly injured, that could vindicate Plaintiff MMO's and the TPP Class Members' claims.

1422.   By virtue of these violations of 18 U.S.C. § 1962(c), Defendant Eli Lilly is jointly and severally liable to Plaintiff MMO and the TPP Class Members for three times the damages they have sustained, punitive damages, plus the cost of this suit, including reasonable attorney's fees.

## NINETEENTH CLAIM FOR RELIEF
### Violation of 18 U.S.C. § 1962(c)
### (The Androderm DTC Enterprise – Against Defendant Actavis)

1423.   Plaintiff MMO incorporates by reference all preceding paragraphs, as if fully set forth herein.

1424.   Defendant Actavis participated in the conduct of the affairs of the Androderm DTC Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

1425.   The Androderm DTC Enterprise is an association-in-fact within the meaning of 18 U.S.C. § 1961(4), consisting of Defendant Actavis, including its employees and agents, the marketing firms and publication firms that Defendant Actavis associated with to market Androderm directly to patients, and the web designers who created websites to promote unfounded uses directly to consumers.

1426.   Defendant Actavis is a RICO "person" distinct from the Androderm DTC Enterprise.

1427.   Defendant Actavis used the Androderm DTC Enterprise to carry out its scheme to obtain money by means of false and fraudulent pretenses, representations, and omissions.

1428.   The Androderm DTC Enterprise is an ongoing organization that functions as a continuing unit.

1429. Defendant Actavis and the other members of the Androderm DTC Enterprise created and maintained systematic links for the common purpose of gaining revenue from marketing Androderm for on- and unapproved and unsafe uses. Each of the members of the Androderm DTC Enterprise received substantial revenue from marketing Androderm. Such revenue was exponentially greater than it would have been if Androderm were marketed appropriately.

1430. The Androderm DTC Enterprise has a hub and spoke organizational, decision-making structure, with Defendant Actavis serving as the hub.

1431. All members of the Androderm DTC Enterprise were aware of Defendant Actavis' control over the activities of the Androderm DTC Enterprise. Furthermore, each member of the Androderm DTC Enterprise benefited from the existence of the other members.

1432. The Androderm DTC Enterprise engaged in and affected interstate commerce, because, *inter alia*, it marketed, distributed, sold, and provided Androderm to thousands of individuals and entities throughout the United States.

1433. Defendant Actavis has exerted control over the Androderm DTC Enterprise and has managed its affairs through a pattern of racketeering activity that includes acts indictable under 18 U.S.C. § 1341 (mail fraud), § 1343 (wire fraud), and § 1952 (use of interstate facilities to conduct false and misleading activity).

1434. Defendant Actavis' use of, or causation of the use of, the mails and wires to perpetrate its fraud through the Androderm DTC Enterprise involved hundreds of communications including, but not limited to: (a) marketing materials and advertisements aimed at patients that misrepresented that Androderm was safe and effective for unapproved and unsafe uses for which the drug was not legitimately proven safe and effective; (b) communications with

patients including Plaintiff MMO's and the TPP Class Members' participants and their dependents, inducing payments for Androderm to be made based on misrepresentations concerning its risks and benefits; and (c) receiving the proceeds of its improper scheme. The false and misleading predicate acts of racketeering activity committed, or caused to be committed, by the Defendant Actavis throughout the Class Period consisted of at least two of the predicate acts within a ten year period.

1435.  In addition, Defendant Actavis' corporate headquarters have communicated by United States mail, telephone, and facsimile with various local district managers, medical liaisons, and sales representatives in order to use the Androderm DTC Enterprise to carry out its schemes to obtain money by means of false and fraudulent pretenses, representations, and omissions.

1436.  Further, Defendant Actavis has traveled in interstate or foreign commerce or used the mail and facilities in interstate or foreign commerce, with the intent to distribute the proceeds of the false and misleading activity described above or otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on of the false and misleading activity described above.

1437.  Defendant Actavis' racketeering activities related to the Androderm DTC Enterprise amounted to a common course of conduct intended to deceive and harm Plaintiff MMO and the TPP Class Members. Each racketeering activity was related, had similar purposes, involved the same or similar members and methods of commission, and had similar results affecting similar victims, including Plaintiff MMO and the TPP Class Members. Defendant Actavis' racketeering activities are part of its ongoing businesses and constitute a continuing threat to the property of Plaintiff MMO and the TPP Class Members.

470

1438.  Defendant Actavis' repeated use of the Androderm DTC Enterprise to implement and carry out the fraudulent schemes constitutes a "pattern of racketeering activity" within the meaning of 18 U.S.C. §§ 1961(5) and 1962(c). Through that pattern of racketeering activity, Defendant Actavis conducted and participated in the conduct of the affairs of the Androderm DTC Enterprise.

1439.  Plaintiff MMO and the TPP Class Members have been directly injured in their business and property by reason of Defendant Actavis' violations of 18 U.S.C. § 1962(c) in that the pattern of racketeering activity that Defendant Actavis used to conduct the affairs of the Androderm DTC Enterprise directly and proximately caused them to spend excessive, ascertainable sums of money for the purchase, payment, or reimbursement of Androderm prescriptions that would not have been purchased, paid, or reimbursed if Defendant Actavis had not conducted or participated in the conduct of the affairs of the Androderm DTC Enterprise through a pattern of racketeering activity.  Plaintiff MMO and the TPP Class Members suffered direct consequential and concrete financial loss flowing from the injury to their property by having overpaid for Androderm, having received a product or prescription (Androderm) that was worth less than what they paid for it, and thereby suffered out-of-pocket losses.

1440.  Plaintiff MMO and the TPP Class Members have also been directly injured in their business and property by reason of Defendant Actavis' violations of 18 U.S.C. § 1962(c) in that the pattern of racketeering activity that it used to conduct the affairs of the Androderm DTC Enterprise directly and proximately caused Plaintiff MMO and the TPP Class Members to spend excessive, ascertainable sums of money for the purchase or reimbursement of Androderm sold at a falsely inflated price that would have been significantly lower if Defendant Actavis had not

conducted or participated in the conduct of the affairs of the Androderm DTC Enterprise through a pattern of racketeering activity.

1441.  Plaintiff MMO's and the TPP Class Members' injuries were directly caused by the predicate acts and are not attributable to any independent or intervening factors; their injuries were a foreseeable and natural consequence of the Defendant Actavis' scheme; there is no difficulty posed by having to apportion damages among Plaintiff MMO and the TPP Class Members with different standing or different levels of injury because there are no other injured parties besides Plaintiff MMO and the TPP Class Members in this case, who are the parties directly injured by the Defendant Actavis' RICO violations; and there are no others, more directly injured, that could vindicate Plaintiff MMO's and the TPP Class Members' claims.

1442.  By virtue of these violations of 18 U.S.C. § 1962(c), Defendant Actavis is jointly and severally liable to Plaintiff MMO and the TPP Class Members for three times the damages they have sustained, punitive damages, plus the cost of this suit, including reasonable attorney's fees.

### TWENTIETH CLAIM FOR RELIEF
### Violation of 18 U.S.C. § 1962(c)
### (The Fortesta DTC Enterprise – Against Defendant Endo)

1443.  Plaintiff MMO incorporates by reference all preceding paragraphs, as if fully set forth herein.

1444.  Defendant Endo participated in the conduct of the affairs of the Fortesta DTC Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

1445.  The Fortesta DTC Enterprise is an association-in-fact within the meaning of 18 U.S.C. § 1961(4), consisting of Defendant Endo, including its employees and agents, the marketing firms and publication firms that Defendant Endo associated with to market Fortesta

directly to patients, and the web designers who created websites to promote unfounded uses directly to consumers.

1446.   Defendant Endo is a RICO "person" distinct from the Fortesta DTC Enterprise.

1447.   Defendant Endo used the Fortesta DTC Enterprise to carry out its scheme to obtain money by means of false and fraudulent pretenses, representations, and omissions.

1448.   The Fortesta DTC Enterprise is an ongoing organization that functions as a continuing unit.

1449.   Defendant Endo and the other members of the Fortesta DTC Enterprise created and maintained systematic links for the common purpose of gaining revenue from marketing Fortesta for on- and unapproved and unsafe uses. Each of the members of the Fortesta DTC Enterprise received substantial revenue from marketing Fortesta. Such revenue was exponentially greater than it would have been if Fortesta were marketed appropriately.

1450.   The Fortesta DTC Enterprise has a hub and spoke organizational, decision-making structure, with Defendant Endo serving as the hub.

1451.   All members of the Fortesta DTC Enterprise were aware of Defendant Endo's control over the activities of the Fortesta DTC Enterprise. Furthermore, each member of the Fortesta DTC Enterprise benefited from the existence of the other members.

1452.   The Fortesta DTC Enterprise engaged in and affected interstate commerce, because, *inter alia*, it marketed, distributed, sold, and provided Fortesta to thousands of individuals and entities throughout the United States.

1453.   Defendant Endo has exerted control over the Fortesta DTC Enterprise and has managed its affairs through a pattern of racketeering activity that includes acts indictable under

18 U.S.C. § 1341 (mail fraud), § 1343 (wire fraud), and § 1952 (use of interstate facilities to conduct false and misleading activity).

1454. Defendant Endo's use of, or causation of the use of, the mails and wires to perpetrate its fraud through the Fortesta DTC Enterprise involved hundreds of communications including, but not limited to: (a) marketing materials and advertisements aimed at patients that misrepresented that Fortesta was safe and effective for unapproved and unsafe uses for which the drug was not legitimately proven safe and effective; (b) communications with patients including Plaintiff's and Class Members' participants and their dependents, inducing payments for Fortesta to be made based on misrepresentations concerning its risks and benefits; and (c) receiving the proceeds of its improper scheme. The false and misleading predicate acts of racketeering activity committed, or caused to be committed, by the Defendant Endo throughout the Class Period consisted of at least two of the predicate acts within a ten year period.

1455. In addition, Defendant Endo's corporate headquarters have communicated by United States mail, telephone, and facsimile with various local district managers, medical liaisons, and sales representatives in order to use the Fortesta DTC Enterprise to carry out its schemes to obtain money by means of false and fraudulent pretenses, representations, and omissions.

1456. Further, Defendant Endo has traveled in interstate or foreign commerce or used the mail and facilities in interstate or foreign commerce, with the intent to distribute the proceeds of the false and misleading activity described above or otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on of the false and misleading activity described above.

1457.   Defendant Endo's racketeering activities related to the Fortesta DTC Enterprise amounted to a common course of conduct intended to deceive and harm Plaintiff MMO and the TPP Class Members.  Each racketeering activity was related, had similar purposes, involved the same or similar members and methods of commission, and had similar results affecting similar victims, including Plaintiff MMO and the TPP Class Members. Defendant Endo's racketeering activities are part of its ongoing businesses and constitute a continuing threat to the property of Plaintiff MMO and the TPP Class Members.

1458.   Defendant Endo's repeated use of the Fortesta DTC Enterprise to implement and carry out the fraudulent schemes constitutes a "pattern of racketeering activity" within the meaning of 18 U.S.C. §§ 1961(5) and 1962(c). Through that pattern of racketeering activity, Defendant Endo conducted and participated in the conduct of the affairs of the Fortesta DTC Enterprise.

1459.   Plaintiff MMO and the TPP Class Members have been directly injured in their business and property by reason of Defendant Endo's violations of 18 U.S.C. § 1962(c) in that the pattern of racketeering activity that Defendant Endo used to conduct the affairs of the Fortesta DTC Enterprise directly and proximately caused them to spend excessive, ascertainable sums of money for the purchase, payment, or reimbursement of Fortesta prescriptions that would not have been purchased, paid, or reimbursed if Defendant Endo had not conducted or participated in the conduct of the affairs of the Fortesta DTC Enterprise through a pattern of racketeering activity.  Plaintiff MMO and the TPP Class Members suffered direct consequential and concrete financial loss flowing from the injury to their property by having overpaid for Fortesta, having received a product or prescription (Fortesta) that was worth less than what they paid for it, and thereby suffered out-of-pocket losses.

1460.  Plaintiff MMO and the TPP Class Members have also been directly injured in their business and property by reason of Defendant Endo's violations of 18 U.S.C. § 1962(c) in that the pattern of racketeering activity that it used to conduct the affairs of the Fortesta DTC Enterprise directly and proximately caused Plaintiff MMO and the TPP Class Members to spend excessive, ascertainable sums of money for the purchase or reimbursement of Fortesta sold at a falsely inflated price that would have been significantly lower if Defendant Endo had not conducted or participated in the conduct of the affairs of the Fortesta DTC Enterprise through a pattern of racketeering activity.

1461.  Plaintiff MMO's and the TPP Class Members' injuries were directly caused by the predicate acts and are not attributable to any independent or intervening factors; their injuries were a foreseeable and natural consequence of the Defendant Endo's scheme; there is no difficulty posed by having to apportion damages among Class members with different standing or different levels of injury because there are no other injured parties besides the Plaintiff MMO and the TPP Class Members in this case, who are the parties directly injured by the Defendant Endo's RICO violations; and there are no others, more directly injured, that could vindicate the Plaintiff MMO's and the TPP Class Members' claims.

1462.  By virtue of these violations of 18 U.S.C. § 1962(c), Defendant Endo is jointly and severally liable to Plaintiff MMO and the TPP Class Members for three times the damages they have sustained, punitive damages, plus the cost of this suit, including reasonable attorney's fees.

## TWENTY-FIRST CLAIM FOR RELIEF
### Violation of 18 U.S.C. § 1962(d)
### Conspiring to Violate 18 U.S.C. § 1962(c)
### (Civil RICO Conspiracy Against the AbbVie Defendants)

1463.   Plaintiff MMO incorporates by reference all preceding paragraphs, as if fully set forth herein.

1464.   Section 1962(d) of RICO provides that it "shall be unlawful for any person to conspire to violate any of the provision of subsection (a), (b), or (c) of this section."

1465.   The AbbVie Defendants have violated § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c). The object of this conspiracy has been and is to conduct or participate in, directly or indirectly, the conduct of the affairs of the AndroGel Peer Selling Enterprise, the AndroGel Publication Enterprise, and the AndroGel DTC Enterprise described previously through a pattern of racketeering activity that directly caused injuries to the Plaintiff's and Class members' business or property within the meaning 18 U.S.C. § 1964(c). The corporate Defendants conspired with, *inter alia,* publicists, sales representatives, medical professionals, academics and other intermediaries to promote AndroGel and suppress information about the harms known to result from AndroGel use.

1466.   The AbbVie Defendants' co-conspirators have engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy, including material misrepresentations and omissions designed to defraud Plaintiff MMO and the TPP Class Members of money.

1467.   The nature of the above-described AbbVie Defendants' co-conspirators' acts, material misrepresentations, and omissions in furtherance of the conspiracies gives rise to an inference that they not only agreed to the objective of an 18 U.S.C.§ 1962(d) violation of RICO by conspiring to violate 18 U.S.C. § 1962(c), but they were aware that their ongoing fraudulent

and extortionate acts have been and are part of an overall pattern of racketeering activity. In other words, the AbbVie Defendants adopted the goal of furthering or facilitating the conspiracy, and were aware of the essential nature and scope of the Enterprise and intended to participate in it.

1468.   As a direct and proximate result of Defendants' overt acts and predicate acts in furtherance of violating 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c), Plaintiff MMO and the TPP Class Members have been and are continuing to be injured in their business or property as set forth more fully above.

1469.   The AbbVie Defendants sought to and have engaged in the commission of and continue to commit overt acts, including the following unlawful racketeering predicate acts: a) multiple instances of mail and wire fraud violations of 18 U.S.C. §§ 1341 and 1342; b) multiple instances of mail fraud violation of 18 U.S.C §§ 1341 and 1346; c) multiple instances of wire fraud violations of 18 U.S.C. §§ 1341 and 1346; and d) multiple instances of unlawful activity in violation of 18 U.S.C. § 1952.

1470.   The AbbVie Defendants' violations of the above federal laws and the effects thereof detailed above are continuing and will continue.

1471.   Plaintiff MMO and the TPP Class Members have been injured in their property by reason of these violations in that Plaintiff MMO and the TPP Class Members have paid hundreds of millions of dollars for AndroGel that they would not have paid had the AbbVie Defendants not conspired to violate 18 U.S.C. § 1962(c).

1472.   Injuries suffered by Plaintiff MMO and the TPP Class Members were directly and proximately caused by the AbbVie Defendants' racketeering activity as described above. As also set forth above, these injuries would not have occurred but for the AbbVie Defendants' RICO

predicate act violations, and they involved concrete financial losses to the Plaintiff MMO and the TPP Class Members.

1473.   Plaintiff MMO and the TPP Class Members directly relied on the racketeering activities of the AbbVie Defendants' and the AndroGel Peer Selling Enterprise, the AndroGel Publication Enterprise, and the AndroGel DTC Enterprise. Plaintiff MMO and the TPP Class Members, both directly and indirectly, relied on the representations as to the efficacy and safety of AndroGel as promoted by the AbbVie Defendants. Because the AbbVie Defendants controlled all knowledge of the tests upon which the claims of AndroGel's efficacy and safety were based, all Class Members, as well as other members of the medical and consuming public were obligated to rely on the AbbVie Defendants' representations about AndroGel. Further, the AbbVie Defendants perpetuated this reliance by taking the steps itemized above to suppress the dissemination of any critical information about AndroGel.

1474.   By virtue of these violations of 18 U.S.C. § 1962(d), the AbbVie Defendants are liable to Plaintiff MMO and the TPP Class Members for three times the damages Plaintiff MMO and the TPP Class Members have sustained, plus the cost of this suit, including reasonable attorneys' fees.

1475.   By reason of the foregoing, and as a direct and proximate result of the AbbVie Defendants' fraudulent misrepresentations, Plaintiff MMO and the TPP Class Members have suffered damages. Plaintiff MMO and the TPP Class Members are entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs and reasonable attorneys' fees.

1476.  By reason of the foregoing, Plaintiff MMO and the TPP Class Members have been damaged as against the AbbVie Defendants in a sum that exceeds the jurisdiction of all lower courts.

<div style="text-align:center">

**TWENTY-SECOND CLAIM FOR RELIEF**
**Violation of 18 U.S.C. § 1962(d)**
**Conspiring to Violate 18 U.S.C. § 1962(c)**
**(Civil RICO Conspiracy Against Defendant Auxilium)**

</div>

1477.  Plaintiff MMO incorporates by reference all preceding paragraphs, as if fully set forth herein.

1478.  Section 1962(d) of RICO provides that it "shall be unlawful for any person to conspire to violate any of the provision of subsection (a), (b), or (c) of this section."

1479.  Defendant Auxilium has violated § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c). The object of this conspiracy has been and is to conduct or participate in, directly or indirectly, the conduct of the affairs of the Testim and Testopel Peer Selling Enterprise, the Testim and Testopel Publication Enterprise, and the Testim and Testopel DTC Enterprise described previously through a pattern of racketeering activity that directly caused injuries to Plaintiff MMO's and the TPP Class Members' business or property within the meaning 18 U.S.C. § 1964(c).  The corporate Defendants conspired with, *inter alia,* publicists, sales representatives, medical professionals, academics and other intermediaries to promote Testim and Testopel and suppress information about the harms known to result from Testim and Testopel use.

1480.  Defendant Auxilium's co-conspirators have engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy, including material misrepresentations and omissions designed to defraud Plaintiff MMO and the TPP Class Members of money.

<div style="text-align:center">480</div>

1481.  The nature of the above-described Defendant Auxilium and its co-conspirators' acts, material misrepresentations, and omissions in furtherance of the conspiracies gives rise to an inference that they not only agreed to the objective of an 18 U.S.C.§ 1962(d) violation of RICO by conspiring to violate 18 U.S.C. § 1962(c), but they were aware that their ongoing fraudulent and extortionate acts have been and are part of an overall pattern of racketeering activity. In other words, the Defendant Auxilium adopted the goal of furthering or facilitating the conspiracy, and was aware of the essential nature and scope of the Enterprise and intended to participate in it.

1482.  As a direct and proximate result of Defendant Auxilium and its co-conspirator's overt acts and predicate acts in furtherance of violating 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c), Plaintiff MMO and the TPP Class Members have been and are continuing to be injured in their business or property as set forth more fully above.

1483.  Defendant Auxilium and its co-conspirators sought to and have engaged in the commission of and continue to commit overt acts, including the following unlawful racketeering predicate acts: a) multiple instances of mail and wire fraud violations of 18 U.S.C. §§ 1341 and 1342; b) multiple instances of mail fraud violation of 18 U.S.C §§ 1341 and 1346; c) multiple instances of wire fraud violations of 18 U.S.C. §§ 1341 and 1346; and d) multiple instances of unlawful activity in violation of 18 U.S.C. § 1952.

1484.  The violations by Defendant Auxilium and its co-conspirators of the above federal laws and the effects thereof detailed above are continuing and will continue.  Plaintiff MMO and the TPP Class Members have been injured in their property by reason of these violations in that Plaintiff MMO and the TPP Class Members have paid hundreds of millions of

dollars for Testim and Testopel that they would not have made had Defendant Auxilium and its co-conspirators not conspired to violate 18 U.S.C. § 1962(c).

1485.   Injuries suffered by Plaintiff MMO and the TPP Class Members were directly and proximately caused by Defendant Auxilium's racketeering activity as described above. As also set forth above, these injuries would not have occurred but for the Defendant Auxilium's RICO predicate act violations, and they involved concrete financial losses to the Plaintiff MMO and the TPP Class Members.

1486.   Plaintiff MMO and the TPP Class Members directly relied on the racketeering activities of Defendant Auxilium and the Testim and Testopel Peer Selling Enterprise, the Testim and Testopel Publication Enterprise, and the Testim and Testopel DTC Enterprise. Plaintiff MMO and the TPP Class Members, both directly and indirectly, relied on the representations as to the efficacy and safety of Testim and Testopel as promoted by Defendant Auxilium. Because Defendant Auxilium controlled all knowledge of the tests upon which the claims of Testim's and Testopel's efficacy and safety were based, Plaintiff MMO and the TPP Class Members, as well as other members of the medical and consuming public were obligated to rely on Defendant Auxilium's representations about Testim and Testopel. Further, Defendant Auxilium perpetuated this reliance by taking the steps itemized above to suppress the dissemination of any critical information about Testim and Testopel.

1487.  By virtue of these violations of 18 U.S.C. § 1962(d), Defendant Auxilium is jointly and severally liable to Plaintiff MMO and the TPP Class Members for three times the damages Plaintiff MMO and the TPP Class Members have sustained, plus the cost of this suit, including reasonable attorneys' fees.

1488.  By reason of the foregoing, and as a direct and proximate result of Defendant Auxilium's fraudulent misrepresentations, Plaintiff MMO and the TPP Class Members have suffered damages. Plaintiff MMO and the TPP Class Members are entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs and reasonable attorneys' fees.

1489.  By reason of the foregoing, Plaintiff MMO and the TPP Class Members have been damaged as against Defendant Auxilium in a sum that exceeds the jurisdiction of all lower courts.

### TWENTY-THIRD CLAIM FOR RELIEF
### Violation of 18 U.S.C. § 1962(d)
### Conspiring to Violate 18 U.S.C. § 1962(c)
### (Civil RICO Conspiracy Against Defendant Eli Lilly)

1490.  Plaintiff MMO incorporates by reference all preceding paragraphs, as if fully set forth herein.

1491.  Section 1962(d) of RICO provides that it "shall be unlawful for any person to conspire to violate any of the provision of subsection (a), (b), or (c) of this section."

1492.  Defendant Eli Lilly has violated § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c). The object of this conspiracy has been and is to conduct or participate in, directly or indirectly, the conduct of the affairs of the Axiron Peer Selling Enterprise, the Axiron Publication Enterprise, and the Axiron DTC Enterprise described previously through a pattern of racketeering activity that directly caused injuries to the Plaintiff MMO's and the TPP Class Members business or property within the meaning 18 U.S.C. § 1964(c). The corporate Defendants conspired with, *inter alia*, publicists, sales representatives, medical professionals, academics and other intermediaries to promote Axiron and suppress information about the harms known to result from Axiron use.

1493.   Defendant Eli Lilly's co-conspirators have engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy, including material misrepresentations and omissions designed to defraud Plaintiff MMO and the TPP Class Members of money.

1494.   The nature of the above-described Defendant Eli Lilly and its co-conspirators' acts, material misrepresentations, and omissions in furtherance of the conspiracies gives rise to an inference that they not only agreed to the objective of an 18 U.S.C.§ 1962(d) violation of RICO by conspiring to violate 18 U.S.C. § 1962(c), but they were aware that their ongoing fraudulent and extortionate acts have been and are part of an overall pattern of racketeering activity.  In other words, the Defendant Eli Lilly adopted the goal of furthering or facilitating the conspiracy, and was aware of the essential nature and scope of the Enterprise and intended to participate in it.

1495.   As a direct and proximate result of Defendant Eli Lilly's and its co-conspirator's overt acts and predicate acts in furtherance of violating 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c), Plaintiff MMO and the TPP Class Members have been and are continuing to be injured in their business or property as set forth more fully above.

1496.   Defendant Eli Lilly and its co-conspirators sought to and have engaged in the commission of and continue to commit overt acts, including the following unlawful racketeering predicate acts: a) multiple instances of mail and wire fraud violations of 18 U.S.C. §§ 1341 and 1342; b) multiple instances of mail fraud violation of 18 U.S.C §§ 1341 and 1346; c) multiple instances of wire fraud violations of 18 U.S.C. §§ 1341 and 1346; and d) multiple instances of unlawful activity in violation of 18 U.S.C. § 1952.

1497. The violations by Defendant Eli Lilly and its co-conspirators of the above federal laws and the effects thereof detailed above are continuing and will continue. Plaintiff and members of the Class have been injured in their property by reason of these violations in that Plaintiff MMO and the TPP Class Members have paid hundreds of millions of dollars for Axiron that they would not have paid had Defendant Eli Lilly and its co-conspirators not conspired to violate 18 U.S.C. § 1962(c).

1498. Injuries suffered by Plaintiff MMO and the TPP Class Members were directly and proximately caused by Defendant Eli Lilly's racketeering activity as described above. As also set forth above, these injuries would not have occurred but for the Defendant Eli Lilly's RICO predicate act violations, and they involved concrete financial losses to the Plaintiff MMO and the TPP Class Members.

1499. Plaintiff MMO and the TPP Class Members directly relied on the racketeering activities of Defendant Eli Lilly and the Axiron Peer Selling Enterprise, the Axiron Publication Enterprise, and the Axiron DTC Enterprise. Plaintiff MMO and the TPP Class Members, both directly and indirectly, relied on the representations as to the efficacy and safety of Axiron as promoted by Defendant Eli Lilly. Because Defendant Eli Lilly controlled all knowledge of the tests upon which the claims of Axiron's efficacy and safety were based, Plaintiff MMO and the TPP Class Members, as well as other members of the medical and consuming public were obligated to rely on Defendant Eli Lilly's representations about Axiron. Further, Defendant Eli Lilly perpetuated this reliance by taking the steps itemized above to suppress the dissemination of any critical information about Axiron.

1500. By virtue of these violations of 18 U.S.C. § 1962(d), Defendant Eli Lilly is jointly and severally liable to Plaintiff MMO and the TPP Class Members for three times the damages

Plaintiff MMO and the TPP Class Members have sustained, plus the cost of this suit, including reasonable attorneys' fees.

1501.  By reason of the foregoing, and as a direct and proximate result of Defendant Eli Lilly's fraudulent misrepresentations, Plaintiff MMO and the TPP Class Members have suffered damages. Plaintiff MMO and the TPP Class Members are entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs and reasonable attorneys' fees.

1502.  By reason of the foregoing, Plaintiff MMO and the TPP Class Members have been damaged as against Defendant Eli Lilly in a sum that exceeds the jurisdiction of all lower courts.

<div style="text-align:center">

**TWENTY-FOURTH CLAIM FOR RELIEF**
**Violation of 18 U.S.C. § 1962(d)**
**Conspiring to Violate 18 U.S.C. § 1962(c)**
**(Civil RICO Conspiracy Against Defendant Actavis)**

</div>

1503.  Plaintiff MMO incorporates by reference all preceding paragraphs, as if fully set forth herein.

1504.  Section 1962(d) of RICO provides that it "shall be unlawful for any person to conspire to violate any of the provision of subsection (a), (b), or (c) of this section."

1505.  Defendant Actavis has violated § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c). The object of this conspiracy has been and is to conduct or participate in, directly or indirectly, the conduct of the affairs of the Androderm Peer Selling Enterprise, the Androderm Publication Enterprise, and the Androderm DTC Enterprise described previously through a pattern of racketeering activity that directly caused injuries to the Plaintiff's and Class members' business or property within the meaning 18 U.S.C. § 1964(c).  The corporate Defendants conspired with, *inter alia*, publicists, sales representatives, medical professionals, academics and

<div style="text-align:center">486</div>

other intermediaries to promote Androderm and suppress information about the harms known to result from Androderm use.

1506.  Defendant Actavis' co-conspirators have engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy, including material misrepresentations and omissions designed to defraud Plaintiff MMO and the TPP Class Members of money.

1507.  The nature of the above-described Defendant Actavis and its co-conspirators' acts, material misrepresentations, and omissions in furtherance of the conspiracies gives rise to an inference that they not only agreed to the objective of an 18 U.S.C.§ 1962(d) violation of RICO by conspiring to violate 18 U.S.C. § 1962(c), but they were aware that their ongoing fraudulent and extortionate acts have been and are part of an overall pattern of racketeering activity.  In other words, the Defendant Actavis adopted the goal of furthering or facilitating the conspiracy, and was aware of the essential nature and scope of the Enterprise and intended to participate in it.

1508.  As a direct and proximate result of Defendant Actavis and its co-conspirator's overt acts and predicate acts in furtherance of violating 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c), Plaintiff MMO and the TPP Class Members have been and are continuing to be injured in their business or property as set forth more fully above.

1509.  Defendant Actavis and its co-conspirators sought to and have engaged in the commission of and continue to commit overt acts, including the following unlawful racketeering predicate acts: a) multiple instances of mail and wire fraud violations of 18 U.S.C. §§ 1341 and 1342; b) multiple instances of mail fraud violation of 18 U.S.C §§ 1341 and 1346; c) multiple

instances of wire fraud violations of 18 U.S.C. §§ 1341 and 1346; and d) multiple instances of unlawful activity in violation of 18 U.S.C. § 1952.

1510. The violations by Defendant Actavis and its co-conspirators of the above federal laws and the effects thereof detailed above are continuing and will continue. Plaintiff MMO and the TPP Class Members have been injured in their property by reason of these violations in that Plaintiff MMO and the TPP Class Members have paid hundreds of millions of dollars for Androderm that they would not have paid had Defendant Actavis and its co-conspirators not conspired to violate 18 U.S.C. § 1962(c).

1511. Injuries suffered by Plaintiff MMO and the TPP Class Members were directly and proximately caused by Defendant Actavis' racketeering activity as described above. As also set forth above, these injuries would not have occurred but for the Defendant Actavis' RICO predicate act violations, and they involved concrete financial losses to the Plaintiff MMO and the TPP Class Members.

1512. Plaintiff MMO and the TPP Class Members directly relied on the racketeering activities of Defendant Actavis and the Androderm Peer Selling Enterprise, the Androderm Publication Enterprise, and the Androderm DTC Enterprise. Plaintiff MMO and the TPP Class Members, both directly and indirectly, relied on the representations as to the efficacy and safety of Androderm as promoted by Defendant Actavis. Because Defendant Actavis controlled all knowledge of the tests upon which the claims of Androderm's efficacy and safety were based, Plaintiff MMO and the TPP Class Members, as well as other members of the medical and consuming public were obligated to rely on Defendant Actavis' representations about Androderm. Further, Defendant Actavis perpetuated this reliance by taking the steps itemized above to suppress the dissemination of any critical information about Androderm.

1513.  By virtue of these violations of 18 U.S.C. § 1962(d), Defendant Actavis is jointly and severally liable to Plaintiff MMO and the TPP Class Members for three times the damages Plaintiff MMO and the TPP Class Members have sustained, plus the cost of this suit, including reasonable attorneys' fees.

1514.  By reason of the foregoing, and as a direct and proximate result of Defendant Actavis' fraudulent misrepresentations, Plaintiff MMO and the TPP Class Members have suffered damages. Plaintiff MMO and the TPP Class Members are entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs and reasonable attorneys' fees.

1515.  By reason of the foregoing, Plaintiff MMO and the TPP Class Members have been damaged as against Defendant Actavis in a sum that exceeds the jurisdiction of all lower courts.

<div align="center">

**TWENTY-FIFTH CLAIM FOR RELIEF**
**Violation of 18 U.S.C. § 1962(d)Conspiring to Violate 18 U.S.C. § 1962(c)**
**(Civil RICO Conspiracy Against Defendant Endo)**

</div>

1516.  Plaintiff MMO incorporates by reference all preceding paragraphs, as if fully set forth herein.

1517.  Section 1962(d) of RICO provides that it "shall be unlawful for any person to conspire to violate any of the provision of subsection (a), (b), or (c) of this section."

1518.  Defendant Endo has violated § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c). The object of this conspiracy has been and is to conduct or participate in, directly or indirectly, the conduct of the affairs of the Fortesta Peer Selling Enterprise, the Fortesta Publication Enterprise, and the Fortesta DTC Enterprise described previously through a pattern of racketeering activity that directly caused injuries to Plaintiff MMO's and the TPP Class

Members' business or property within the meaning 18 U.S.C. § 1964(c). The corporate Defendants conspired with, *inter alia*, publicists, sales representatives, medical professionals, academics and other intermediaries to promote Fortesta and suppress information about the harms known to result from Fortesta use.

1519.   Defendant Endo's co-conspirators have engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy, including material misrepresentations and omissions designed to defraud Plaintiff MMO and the TPP Class Members of money.

1520.   The nature of the above-described Defendant Endo and its co-conspirators' acts, material misrepresentations, and omissions in furtherance of the conspiracies gives rise to an inference that they not only agreed to the objective of an 18 U.S.C. § 1962(d) violation of RICO by conspiring to violate 18 U.S.C. § 1962(c), but they were aware that their ongoing fraudulent and extortionate acts have been and are part of an overall pattern of racketeering activity.  In other words, the Defendant Endo adopted the goal of furthering or facilitating the conspiracy, and was aware of the essential nature and scope of the Enterprise and intended to participate in it.

1521.   As a direct and proximate result of Defendant Endo and its co-conspirator's overt acts and predicate acts in furtherance of violating 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c), Plaintiff MMO and the TPP Class Members have been and are continuing to be injured in their business or property as set forth more fully above.

1522.   Defendant Endo and its co-conspirators sought to and have engaged in the commission of and continue to commit overt acts, including the following unlawful racketeering predicate acts: a) multiple instances of mail and wire fraud violations of 18 U.S.C. §§ 1341 and 1342; b) multiple instances of mail fraud violation of 18 U.S.C §§ 1341 and 1346; c) multiple

instances of wire fraud violations of 18 U.S.C. §§ 1341 and 1346; and d) multiple instances of unlawful activity in violation of 18 U.S.C. § 1952.

1523.   The violations by Defendant Endo and its co-conspirators of the above federal laws and the effects thereof detailed above are continuing and will continue. Plaintiff MMO and the TPP Class Members have been injured in their property by reason of these violations in that Plaintiff MMO and the TPP Class Members have paid hundreds of millions of dollars for Fortesta that they would not have made had Defendant Endo and its co-conspirators not conspired to violate 18 U.S.C. § 1962(c).

1524.   Injuries suffered by Plaintiff MMO and the TPP Class Members were directly and proximately caused by Defendant Endo's racketeering activity as described above. As also set forth above, these injuries would not have occurred but for the Defendant Endo's RICO predicate act violations, and they involved concrete financial losses to the Plaintiff MMO and the TPP Class Members.

1525.   Plaintiff MMO and the TPP Class Members directly relied on the racketeering activities of Defendant Endo and the Fortesta Peer Selling Enterprise, the Fortesta Publication Enterprise, and the Fortesta DTC Enterprise. Plaintiff MMO and the TPP Class Members, both directly and indirectly, relied on the representations as to the efficacy and safety of Fortesta as promoted by Defendant Endo. Because Defendant Endo controlled all knowledge of the tests upon which the claims of Fortesta's efficacy and safety were based, Plaintiff MMO and the TPP Class Members, as well as other members of the medical and consuming public were obligated to rely on Defendant Endo's representations about Fortesta. Further, Defendant Endo perpetuated this reliance by taking the steps itemized above to suppress the dissemination of any critical information about Fortesta.

1526.  By virtue of these violations of 18 U.S.C. § 1962(d), Defendant Endo is jointly and severally liable to Plaintiff MMO and the TPP Class Members for three times the damages Plaintiff MMO and the TPP Class Members have sustained, plus the cost of this suit, including reasonable attorneys' fees.

1527.  By reason of the foregoing, and as a direct and proximate result of Defendant Endo's fraudulent misrepresentations, Plaintiff MMO and the TPP Class Members have suffered damages. Plaintiff MMO and the TPP Class Members are entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs and reasonable attorneys' fees.

1528.  By reason of the foregoing, Plaintiff MMO and the TPP Class Members have been damaged as against Defendant Endo in a sum that exceeds the jurisdiction of all lower courts.

## TWENTY-SIXTH CLAIM FOR RELIEF
### Negligent Misrepresentation (All Defendants)

1529.  Plaintiff MMO incorporates by reference all preceding paragraphs as if fully set forth herein.

1530.  Plaintiff MMO and the TPP Class Members are persons for whose benefit and guidance each Defendant supplied information concerning AndroGel, Testim and Testopel, Axiron, Androderm, and Fortesta, respectively, with the intent that Plaintiff MMO and the TPP Class Members utilize that information in their business transactions and decisions concerning AndroGel, Testim and Testopel, Axiron, Androderm, and Fortesta, respectively.

1531.  Each Defendant, in the course of its respective businesses, supplied and continues to supply false information for the guidance of Plaintiff MMO and the TPP Class Members in their business transactions.

1532.  Each Defendant intended that the false information supplied by each Defendant concerning AndroGel, Testim and Testopel, Axiron, Androderm, and Fortesta, respectively, influence the business transaction decision-making of Plaintiff MMO and the TPP Class Members, as well as other substantially similar transactions, or knew that Plaintiff MMO and the TPP Class Members intended to use said false information in business transactions.

1533.  As detailed above, Plaintiff MMO and the TPP Class Members, through P&T committees and  make formulary and reimbursement decisions regarding AndroGel, Testim and Testopel, Axiron, Androderm, and Fortesta, relying extensively on information supplied directly and indirectly by Defendants.

1534.  The information supplied by each Defendant concerning AndroGel, Testim and Testopel, Axiron, Androderm, and Fortesta, and justifiably relied upon by Plaintiff MMO and the TPP Class Members, was false, and each Defendant failed to exercise reasonable care or competence in obtaining or communicating the information to Plaintiff MMO and the TPP Class Members.

1535.  Plaintiff MMO and the TPP Class Members suffered pecuniary loss proximately caused by each Defendant's negligent misrepresentations to Plaintiff MMO and the TPP Class Members concerning AndroGel, Testim and Testopel, Axiron, Androderm, and Fortesta.

1536.  Defendants' negligent misrepresentations concerning AndroGel, Testim and Testopel, Axiron, Androderm, and Fortesta, respectively, set forth in detail above, constitute actionable negligent misrepresentation under the laws of all fifty (50) states, the District of Columbia, and Puerto Rico.

1537.  Plaintiff MMO and the TPP Class Members were injured as a proximate result of each Defendant's fraud, and are entitled to all damages allowable by law under the laws of each

jurisdiction, costs and attorney's fees, and any other relief the Court deems necessary and appropriate.

## XIX.   DEMAND FOR RELIEF

WHEREFORE, Plaintiff MMO and the TPP Class Members demand judgment against Defendants, jointly and severally, as follows:

a) On Plaintiff's First, Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, Tenth, Eleventh, Twelfth, Thirteenth, Fourteenth, Fifteenth, Sixteenth, Seventeenth, Eighteenth, Nineteenth, Twentieth, Twenty-First, Twenty-Second, Twenty-Third, Twenty-Fourth, and Twenty-Fifth Claims for Relief, three times the damages each Plaintiff and Class Member has sustained as a result of each Defendant's conduct, plus Plaintiff's costs in this suit, including reasonable attorney fees;

b) On Plaintiff's Twenty-Sixth Claims for Relief, an award to Plaintiff MMO and each TPP Class Member of the maximum allowable damages under such statute(s) or laws;

c) An award of prejudgment interest in the maximum amount allowable by law;

d) An award to Plaintiff MMO of their costs and expenses in this litigation and reasonable attorney fees and expert fees and expenses; and,

e) An award to Plaintiff MMO and the TPP Class Members of such other and further relief as may be just and proper under the circumstances.

## <u>DEMAND FOR JURY TRIAL</u>

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff MMO demands a trial by jury on all issues so triable.

Dated this 7th day of April, 2016.

Respectfully submitted,

**KANNER & WHITELEY, LLC**
/s/ Conlee S. Whiteley
Allan Kanner, Esq. (LA Bar No. 20580)
Conlee S. Whiteley, Esq. (LA Bar No. 22678)
Luke A. Hasskamp, Esq. (CA Bar No. 280872)
701 Camp Street
New Orleans, Louisiana 70130
Tel: (504) 524-5777
Fax: (504) 524-5763

*and*

**THE SIMMER LAW GROUP**
W. Scott Simmer, Esq. (D.C. Bar No. 460726)
Thomas J. Poulin, Esq. (D.C. Bar No. 475115)
The Watergate
Suite 10-A
Washington, DC 20037
Tel: (202) 333-4562
Fax: (202) 337-1039

*Attorneys for Plaintiff Medical Mutual of Ohio*

**SEEGER WEISS LLP**
Christopher A. Seeger, Esq. (NY Bar No. 2425304)
Stephen A. Weiss, Esq. (NY Bar No. 2413342)
77 Water Street
New York, NY 10005
Tel: (212) 584-0700

**SIMMONS HANLY CONROY**
Trent B. Miracle, Esq. (IL Bar No. 6281491)
Brendan A. Smith, Esq. (IL Bar No. 65190)
One Court Street
Alton, IL 62002
Tel: (618) 259-2222
Fax: (618) 259-2251

*and*

**SCHACHTER HENDY & JOHNSON PSC**
Ronald E. Johnson, Jr., Esq. (KY Bar No. 88302)
Sarah N. Lynch, Esq. (KY Bar No. 94261)
909 Wright's Summit Parkway
Suite #210
Ft. Wright, KY 41011

495

Tel: (859) 578-4444
Fax: (859) 578-4440

*MDL Co-Lead Counsel*