IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re Testosterone Replacement Therapy Products Liability Litigation Coordinated Pretrial Proceedings | ) ) ) ) | No. 14 C 1748 MDL No. 2545 |
| _____ | ) | _____ |
| MEDICAL MUTUAL OF OHIO, Plaintiff, v. ABBVIE INC., ABBOTT LABORATORIES, ABBOTT PRODUCTS, INC., SOLVAY PHARMACEUTICALS, INC., UNIMED PHARMACEUTICALS, LLC, AUXILIUM, INC., GLAXOSMITHKLINE LLC, OSCIENT PHARMACEUTICALS, INC., ELI LILLY AND COMPANY, LILLY USA, INC., ACRUX COMMERCIAL PARTY LTD., ACRUX DDS PARTY LTD., ACTAVIS PLC, ACTAVIS, INC., ACTAVIS PHARMA, INC., WATSON PHARMACEUTICALS, INC., WATSON LABORATORIES, INC., ANDA, INC., and ENDO PHARMACEUTICALS, INC., Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | No. 14 C 8857 |

## **MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY, District Judge:

On February 4, 2016, the Court issued a memorandum opinion and order dismissing many of the claims asserted in plaintiff Medical Mutual of Ohio's second amended complaint. *See In re Testosterone Replacement Therapy Products Liab. Litig. Coordinated Pretrial Proceedings* ("*In re TRT*"), No. 14 C 1748, 2016 WL 427553, at *20 (N.D. Ill. Feb. 3, 2016) (corrected February 5, 2016). In that complaint, Medical Mutual

had alleged that defendants, which are pharmaceutical companies, had engaged in a fraudulent scheme to induce Medical Mutual, an insurance company, and other third-party payors (TPPs) to reimburse their insureds for defendants' allegedly unsafe and ineffective testosterone replacement therapy (TRT) drugs.  The Court concluded that the general scheme Medical Mutual alleged could support a civil RICO claim under 18 U.S.C. § 1962(c) based on defendants' alleged mail and wire fraud.  The Court nonetheless concluded that Medical Mutual's RICO claims were deficient because it had not alleged the circumstances of defendants' alleged fraud with the particularity required by Federal Rule of Civil Procedure 9(b).  The Court dismissed Medical Mutual's state-law claims for common law fraud and unjust enrichment, which were also subject to Rule 9(b)'s pleading requirements, for the same reason.  The Court allowed Medical Mutual's common law claims for negligent misrepresentation and its RICO conspiracy claims brought under 18 U.S.C. § 1962(d) to proceed after concluding those claims did not implicate Rule 9(b).  In addition to the federal RICO claims and the state common law claims, the Court also considered the propriety of Medical Mutual's state statutory claims.  After determining that Ohio law governed all of Medical Mutual's state-law claims, the court dismissed all of its state statutory claims because none were based on Ohio statute.

The Court granted Medical Mutual leave to file a third amended complaint, and Medical Mutual did so on April 7, 2016.  For the sake of simplicity, the Court will refer to the third amended complaint as the "complaint."  In the complaint, Medical Mutual has dropped the common law fraud, unjust enrichment, and state statutory claims, but it has added new details about the operation of defendants' alleged scheme.  With the

2

addition of these details, Medical Mutual maintains that it has sufficiently alleged the fraud elements of its RICO claims with the particularity Rule 9(b) requires. Defendants deny that Medical Mutual has cured the deficiencies the Court identified in its prior ruling, and they have filed another motion to dismiss. They also ask the Court to reconsider its rulings on the RICO conspiracy claims and the negligent misrepresentation claims, arguing that those claims are also subject to Rule 9(b)'s requirements. Finally, defendants contend that all of Medical Mutual's claims are deficient because its assertion that it was injured by defendant's misrepresentations is belied by its failure to allege that it stopped paying for defendant's drugs once it became aware of the misrepresentations. For the reasons stated below, the Court dismisses Medical Mutual's negligent misrepresentation and substantive RICO claims against the Actavis defendants (Actavis)[1] and GlaxoSmithKline LLC (GSK) but otherwise denies defendants' motion to dismiss.

## Discussion

**1. Section 1962(c) claims**

In its February 4 decision, after reviewing the body of case law concerning RICO claims brought by TPPs against drug manufacturers for fraudulent off-label marketing, the Court concluded that whether a TPP could satisfy RICO's proximate cause element largely depended on whether the drug manufacturer's alleged fraudulent marketing included the communication of misrepresentations directly to the TPP. *In re TRT*, 2016 WL 427553, at *13. In a subsequent decision, another court in this district agreed, after "carefully reviewing the case law," that the "distinguishing characteristic" in such cases

---

[1] The Actavis defendants include Actavis plc, Actavis Pharma, Inc., Actavis, Inc., Watson Pharmaceuticals, Inc., Watson Laboratories, Inc., and Anda, Inc.

is "whether the drug manufacturer directly made misrepresentations to the TPP." *Sidney Hillman Health Ctr. of Rochester v. Abbott Labs.*, No. 13 C 5865, 2016 WL 3538808, at *5 (N.D. Ill. June 29, 2016). Though Medical Mutual alleged that defendants made direct misrepresentations that induced it to place defendants' TRT drugs on its formulary for coverage, it did not provide much detail about the circumstances of these alleged misrepresentations. Because allegations of fraud in a civil RICO claim are subject to Rule 9(b)'s pleading requirements, the Court concluded that Medical Mutual's lack of detailed allegations regarding that aspect of defendants' scheme warranted dismissal. *See In re TRT*, 2016 WL 427553, at *16.

In dismissing Medical Mutual's RICO claims on Rule 9(b) grounds, the Court recognized that Rule 9(b) may be applied with some flexibility and that courts often require less particularity where specific information lies outside a plaintiff's control. *Id.* at *15. The Court pointed out, however, that one would expect Medical Mutual to have knowledge about communications it received directly, and that in its response to the motion to dismiss, Medical Mutual failed to offer any explanation for why it lacked such information. *Id.* In addition, the Court noted that although Medical Mutual provided some specific details about misrepresentations made to other TPPs, it did not explain how these misrepresentations were relevant to claims based on misrepresentations defendants made *to Medical Mutual*. *Id.*

Having reviewed the enhanced allegations in the current version of the complaint, the Court now concludes that Medical Mutual has provided sufficiently particularized allegations to support RICO claims against the AbbVie defendants

4

(AbbVie),[2] Auxilium Pharmaceuticals, Inc. (Auxilium), the Eli Lilly defendants (Lilly),[3] and Endo Pharmaceuticals, Inc. (Endo).  The Court reaches this conclusion in part because, as discussed below, Medical Mutual has injected the complaint with enough new details regarding those defendants' alleged misrepresentations to Medical Mutual and its own formulary procedures to satisfy Rule 9(b).  But the Court also reaches this outcome because Medical Mutual has provided a better explanation this time around for why the complaint lacks certain details and for why certain seemingly extraneous details are actually relevant.

In its response to defendants' motion to dismiss, for example, Medical Mutual offers new reasons to explain its lack of complete information about the misrepresentations it allegedly received.  It notes that Rule 9(b)'s pleading requirements are usually relaxed with regard to matters "peculiarly within the adverse party's knowledge or where the issues are complex, or the transactions involved cover a long period of time." *PharMerica Chicago, Inc. v. Meisels*, 772 F. Supp. 2d 938, 962 (N.D. Ill. 2011) (quoting *Bridon Am. Corp. v. Mitsui & Co., Inc.*, No. 83-1234, 1983 WL 1897, at *5 (D.D.C. Nov. 7, 1983)).  In the same vein, Medical Mutual points to the explanation by another court in this district that "where a defendant is more likely to have information regarding names of agents who had contact with a plaintiff and dates of communications with plaintiff, courts will typically not dismiss a plaintiff's claim for fraud for lack of particularity when the plaintiff can obtain these details through discovery." *Vega v. Contract Cleaning Maint., Inc.*, No. 03 C 9130, 2004 WL 2358274, at *10 (N.D.

---

[2] The AbbVie defendants include AbbVie Inc., Abbot Laboratories, Abbott Products, Inc., Solvay Pharmaceuticals, and Unimed Pharmaceuticals, LLC.

[3] The Eli Lilly defendants include Eli Lilly and Company, Lilly USA, Inc., Acrux Commercial Pty Ltd., and Acrux DDS Pty Ltd.

Ill. Oct. 18, 2004). Indeed, the Seventh Circuit has recognized that Rule 9(b)'s requirements are appropriately relaxed where circumstances do not allow a plaintiff to access the information necessary to detail a claim. *See, e.g.*, *Corley v. Rosewood Care Ctr., Inc.*, 142 F.3d 1041, 1051 (7th Cir. 1998); *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 446 (7th Cir. 2011) (citing *Corley* with approval); *Arenson v. Whitehall Convalescent & Nursing Home, Inc.*, 880 F. Supp. 1202, 1208 (N.D. Ill. 1995).

Medical Mutual's allegations about defendants' scheme as a whole suggest that an overly strict application of Rule 9(b) may be inappropriate in this case, even regarding the misrepresentations defendants allegedly made directly to Medical Mutual. According to the allegations in the complaint, defendants' fraudulent marketing scheme dates back over fifteen years, and each defendant has been a part of the scheme for at least the past five years. Over that time, Medical Mutual alleges, defendants made misrepresentations to it on numerous occasions, using a variety of different means, including face-to-face meetings, emails, telephone calls, mailed periodicals, and sponsored conferences. And during the period when Medical Mutual was receiving these communications from defendants, it was also making periodic decisions about whether defendants' TRT drugs, as well as thousands of other drugs, should be placed on—and/or remain on—its formulary. Given the length of the time the scheme is alleged to have been ongoing, as well as its complexity and the complexity of Medical Mutual's task in making formulary decisions, it may have been unrealistic for the Court to "expect plaintiff to have [complete] knowledge about the time, place, and content of [defendants'] communications made directly to it." *In re TRT*, 2016 WL 427553.

6

Take, for example, a hypothetical meeting between one of Medical Mutual's employees and one of defendant's sales representatives. After listening to the representative's (allegedly false) assurances about a TRT drug's safety and efficacy, Medical Mutual's employee may be convinced that placing the defendant's TRT drug on formulary (or maintaining its formulary status) is the appropriate course. If, as Medical Mutual alleges happened in this case, it learns only years later that the information it received from the defendant was false, it would be understandable if it no longer had ready access to details concerning the meeting that had taken place years earlier. Medical Mutual asserts that defendants, by contrast, closely monitored TPP formulary statuses, as well as the operation of their alleged TPP formulary access enterprise. Based on the allegations in the complaint, therefore, there is a reasonable basis to believe that defendants are at least equally likely to have records and information concerning their past communications with Medical Mutual, information that Medical Mutual can obtain through discovery. *See Vega*, 2004 WL 2358274, at *10.

Recognizing that the circumstances of this case warrant a more flexible application of Rule 9(b), and viewing the complaint in light of the rule's underlying objectives, the Court concludes that Medical Mutual's current allegations regarding the direct misrepresentations made by most of the defendants are sufficient to meet the rule's requirements. As the Seventh Circuit has explained, the purpose of Rule 9(b)'s particularity requirement is "to force the plaintiff to do more than the usual investigation before filing [its] complaint." *Ackmeran v. Nw. Mut. Life Ins. Co.*, 172 F.3d 467, 469 (7th Cir. 1999). The Federal Rules require greater pre-complaint investigation of fraud claims "to assure that the charge of fraud is responsible and supported, rather than

7

defamatory and extortionate." *Id.* It is difficult to read the nearly 500 pages of the current version of the complaint and conclude that Medical Mutual has failed to conduct an adequate pre-complaint investigation. To be sure, if a plaintiff's fraud allegations are based on second-hand information, "all the detail in the world" will not be enough if the plaintiff does not offer grounds for its suspicions to make the allegations supporting its claim plausible. *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust*, 631 F.3d at 442–43. But Medical Mutual's allegations in the complaint do provide the type of detail to make plausible the assertion that a number of the defendants made direct misrepresentations about their TRT drugs to Medical Mutual, which caused it to add their drugs to its formulary or to maintain the drugs' formulary status.

As the following examples illustrate, rather than being "defamatory and extortionate," Medical Mutual's charge that AbbVie, Auxilium, Lilly, and Endo made direct, fraudulent misrepresentations is supported by plausible allegations and reasonable inferences. *Ackerman*, 172 F.3d at 469. Medical Mutual provides the date and time, for example, that an AbbVie representative met with the insurer's "Manager of Pharmacy Services and Pharmacy Strategy Specialist" and stated that AbbVie's TRT drug was safe and was effective for improving mood, energy, sexual function, and body composition—claims that Medical Mutual asserts are false. *See, e.g.*, Pl.'s 3d Am. Compl. ¶¶ 374–76. Though defendants point out that this alleged meeting took place many years after Medical Mutual allegedly placed AbbVie's TRT drug on its formulary, the details of the meeting at least support a claim that AbbVie made misrepresentations to Medical Mutual that caused it to refrain from taking steps to change the drug's formulary status. Those details also serve as an illustrative example of the types of

communications AbbVie regularly had with Medical Mutual and may have had prior to its initial formulary decision.

Regarding Auxilium's alleged misrepresentations, Medical Mutual offers specific examples of the company's communications to physicians, encouraging them to submit inaccurate diagnosis codes to Medical Mutual and other TPPs to conceal from the TPPs that Auxilium's TRT drug was being prescribed off-label. In addition, Medical Mutual provides an approximate date of one of the meetings between its representative(s) and an Auxilium representative, as well as representations Auxilium made in a dossier provided to Medical Mutual. The dossier states that Auxilium's TRT drug improves muscle mass, decreases fat mass, and improves sexual function, among other things, and does so "with few side effects." *Id.* ¶ 535. In addition to this specific meeting and the specific statements that Medical Mutual alleges are false, it provides details about misrepresentations allegedly made to other TPPs. Though these allegations do not by themselves support Medical Mutual's own claim against Auxilium, they do suggest a pattern and scheme of misrepresentation, which in turn supports the plausible inference that Auxilium made similar misrepresentations in its other communications with Medical Mutual, about which it has provided varying degrees of detail in the complaint.

As with Auxilium and AbbVie, Medical Mutual now provides specific details about Lilly's pattern of marketing its TRT drug directly to TPPs. These details include specific examples of statements from Lilly representatives to TPPs explaining that Lilly's TRT drug was not only safe, but safer than other TRT drugs, as well as a presentation used to convince TPPs that "low testosterone" is a disease that Lilly's TRT drug could address by improving "fatigue, mood and libido." *Id.* ¶ 708. Like Medical Mutual's

allegations concerning Auxilium and AbbVie, its allegations concerning Lilly suggest that it had a pattern of making representations to TPPs about its TRT drug's safety and efficacy, representations that Medical Mutual alleges are false.  Thus it is plausible to infer that Lilly made similar misrepresentations to Medical Mutual.  Medical Mutual cites to an e-mail, for example, in which a Lilly representative explained to other Lilly employees that Medical Mutual had upgraded the formulary status of Lilly's TRT drug and thanked the employees for their "help and coaching throughout [his] work with [Medical Mutual's clinical director]," suggesting that Lilly had successfully implemented the alleged scheme of misrepresentation vis-a-vis Medical Mutual.  *Id.* ¶ 717.

In Endo's case, Medical Mutual provides specific examples of internal communications suggesting that Endo was concerned that TPPs would give Endo's TRT drug a formulary status inferior to that of AbbVie's and Auxilium's drugs.  Thus, according to Medical Mutual, Endo's strategy was to convince TPPs that its drug was safer and more effective than those companies' drugs because of the way in which it was administered.  Medical Mutual alleges that these assertions were false.  Medical Mutual provides a specific date and location for a meeting between an Endo representative and Medical Mutual's "Pharmacy Strategy Specialist," at which the representative allegedly gave a sales pitch consistent with the misrepresentations it made to other TPPs.  *Id.* ¶ 828.  Specifically, Medical Mutual asserts that Endo misleadingly claimed that its TRT drug was safe and effective for the treatment of hypogonadism without revealing that it was unsure about the safety or effectiveness of the off-label treatments for which it marketed the drug. As in the case of AbbVie, Auxilium, and Lilly, Medical Mutual's allegations concerning Endo are sufficiently

detailed to make plausible the assertion that Endo made misrepresentations directly to Medical Mutual that caused it to grant (or maintain) Endo's favorable formulary status.

Even under a flexible application of Rule 9(b), however, Medical Mutual's allegations related to Actavis and GSK are inadequate to support an assertion that either defendant made fraudulent misrepresentations directly to Medical Mutual. Regarding GSK, Medical Mutual effectively admits that it has not alleged any direct communication from GSK. Medical Mutual argues that because GSK entered into an agreement with Auxilium to promote Auxilium's drug, the sufficiency of the allegations against GSK "is largely tied to the strength of [its] allegations against Auxilium" and that the Court need not "parse between Auxilium's conduct and GSK's conduct." Pl.'s Resp. to Defs.' Mot. to Dismiss at 22. The Court disagrees. Though a plaintiff may be excused at this stage of the proceedings from specifying the precise role that individual corporate affiliates played in a scheme, this does not mean that a plaintiff may state a claim against one company by making allegations about an unrelated company's conduct.[4]

Medical Mutual's allegations against Actavis are similarly inadequate. As the Court explained above, the circumstances of this case warrant a somewhat flexible application of Rule 9(b), and Medical Mutual does allege generally that Actavis made direct misrepresentations concerning Actavis' TRT drug. Those allegations, however, are not only general but also conclusory. In the cases of AbbVie, Auxilium, Lilly, and

---

[4] In addition, Medical Mutual has removed the section 1962(c) claim against GSK from this version of its complaint. Arguments in Medical Mutual's response to the motion to dismiss suggest that it still believes a section 1962(c) claim against GSK is viable, so the Court is unsure whether this omission was intentional. In any event, for the reasons just discussed, such a claim would be deficient as currently alleged in the complaint.

Endo, Medical Mutual provided at least some specific details regarding the time, location, communicators, and content of the alleged misrepresentations to show that its allegations were "responsible and supported." *Ackerman*, 172 F.3d at 469. Its allegations relating to Actavis, on the other hand, do not include such details. Medical Mutual provides the name of the Actavis representative who was allegedly responsible for communicating with the insurer, as well as the names of other Actavis personnel. And it provides an excerpt from Actavis' "communication plan," which shows the means by which Actavis planned to communicate its marketing message. But Medical Mutual has not offered any example of a communication that it asserts is false or any time and location of any communication from Actavis. Indeed, Medical Mutual does not even explain why, or in what sense, any alleged direct representations were false. Based on these allegations, Medical Mutual has not provided grounds to make plausible its general allegation, based on second-hand information that Actavis made fraudulent representations directly to Medical Mutual.

Without a plausible allegation that GSK or Actavis made direct misrepresentations to Medical Mutual, it cannot state a claim against these defendants under 18 U.S.C. § 1962(c), as the Court explained in greater depth in its prior ruling. *See In re TRT*, 2016 WL 427553, at *12–*16.

**2.     Section 1962(d) claims**

Defendants argue that Rule 9(b) also applies to the RICO conspiracy claims that Medical Mutual asserts under 18 U.S.C. § 1962(d), and they argue that Medical Mutual has failed to adequately allege a conspiracy among the defendants or among defendants and their third-party co-promoters in accordance with the requirements of

either Rule 9(b) or Rule 8(a). At the outset, the Court notes that its prior ruling that Medical Mutual's section 1962(d) claims could survive in the absence of viable section 1962(c) claims was most likely incorrect. *See In re TRT*, 2016 WL 427553, at *16–*17. The Court based that ruling on the assumption that a successful RICO conspiracy claim could stand on its own and did not require the commission of a RICO predicate act by any of the allegedly conspiring defendants. *See id.* at *16 (citing *Slaney v. The Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 600 (7th Cir. 2001)). But although that may be true in a criminal RICO case, it is not true in civil RICO cases. In order to have standing to assert a RICO conspiracy claim, a civil RICO plaintiff must have suffered an injury caused by an overt act that violates the RICO statute. *See Beck v. Prupis*, 529 U.S. 494, 507 (2000). Now that the Court has concluded that Medical Mutual *has* stated a section 1962(c) claim against AbbVie, Auxilium, Lilly, and Endo, however, this point is moot with regard to the section 1962(d) claims asserted against them.

Defendants also contend that the Court erred in concluding that Rule 8(a), rather than Rule 9(b), supplies the applicable pleading standard for conspiracy claims. *See Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 509 (7th Cir. 2007) (applying Rule 9(b) to civil conspiracy allegations premised on a course of fraudulent conduct). The Court agrees with defendants that Rule 9(b) applies to the underlying fraudulent acts that defendants allegedly agreed to commit; the rule expressly applies to all "averments of fraud, not claims of fraud." *Id.* at 507 (internal quotation marks omitted). But to the extent defendants suggest that a plaintiff must provide specific details of an express agreement to state a RICO conspiracy claim, the Court disagrees. "Like all conspiracies, a RICO conspiracy 'does not require direct evidence of agreement; an

agreement can be inferred from the circumstances.'"  *Kostovetsky v. Ambit Energy Holdings, LLC*, No. 15 C 2553, 2016 WL 105980, at *7 (N.D. Ill. Jan. 8, 2016) (quoting *Gagan v. Am. Cablevision, Inc.*, 77 F.3d 951, 961 (7th Cir. 1996)).  In a decision subsequent to *Borsellino*, for example, the Seventh Circuit allowed a claim to proceed for conspiracy to commit tax fraud, even though allegations as to the existence of an agreement were "sparse," because the plaintiff's allegations supported the inference of an agreement.  *DeGuelle v. Camilli*, 664 F.3d 192, 206 (7th Cir. 2011).  And even if Rule 9(b) does require particularized allegations about the circumstances surrounding an agreement to commit fraud in a RICO conspiracy case, Medical Mutual is entitled to the same flexible application of Rule 9(b) to its conspiracy claims as it was for its substantive RICO claims.

    The Court thus concludes that Medical Mutual has sufficiently alleged facts to support the inference that defendants violated section 1962(d) by agreeing "to participate in an endeavor which, if completed, would a constitute [a RICO violation]." *Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 732 (7th Cir. 1998).  Though the complaint's current version asserts only a single RICO conspiracy count against each of AbbVie, Auxilium, Lilly, Endo, and Actavis (for a total of five conspiracy counts), Medical Mutual's allegations suggest that each defendant participated in three distinct though related conspiracies:  (1) a conspiracy among all defendants to advance their respective RICO enterprises through a fraudulent "unbranded" marketing campaign for TRTs generally and to raise awareness for the allegedly fictitious "Low T" disease, (2) a conspiracy between each defendant and its various third-party co-promoters to fraudulently promote their respective products to physicians and other healthcare

14

practitioners, and (3) a conspiracy between each defendant and the various third-party marketing partners who helped to plan and implement defendants' fraudulent marketing schemes. As the Court indicated in its February 4 ruling, it need not decide whether Medical Mutual has successfully stated a section 1962(d) claim under each "theory" or "part" of the claim asserted in the complaint. *In re TRT*, 2016 WL 427553, at *17. Such parsing of claims is a task better reserved for summary judgment. *Id.* Rather, the Court need only to determine whether Medical Mutual has alleged facts that state a plausible section 1962(d) claim against each defendant.

The Court is satisfied that Medical Mutual has adequately alleged facts to support a RICO conspiracy charge against defendants arising from their alleged agreement to engage in an unbranded marketing campaign. Medical Mutual has provided specific details from which an agreement may be inferred. For example, it alleges that defendants promoted the use of TRT drugs generally (rather than promoting their own specific drugs) as safe and effective for the treatment of "Low T," a disease that Medical Mutual alleges is entirely fictitious. The purpose of such an "unbranded" campaign, it alleges, was to grow the TRT market and benefit all sellers of TRT drugs. Medical Mutual asserts that defendants' agreement to conduct such a campaign can be inferred from, among other things, their use of similar tactics. Indeed, Medical Mutual alleges that AbbVie, Auxilium, Endo, GSK, and Lilly conspired with and jointly funded the same "AstroTurf" organizations[5] to promote awareness of TRT drugs, directed consumers to the same generic TRT websites and Low T questionnaires, and

---

[5] According to Medical Mutual, an "AstroTurf" organization will advocate for an issue while masking the sponsors of the message in order to give the impression that the issue "originates from and is supported by grassroots participant(s)." Pl.'s 3d Am. Compl. ¶ 911.

15

paid the same physicians consulting and promotional fees in connection with their TRT drugs.

Defendants argue that the alleged campaign is merely an example of parallel conduct. They say that entities selling similar products, governed by the same regulations, intended for similar patient populations, and prescribed by the same community of practitioners, are bound to have "some similarities in message and strategy." Defs.' Jt. Mem. in Supp. of Mot. to Dismiss at 14. As defendants argue, more than parallel conduct is required to support an inference of an agreement; without any "parallel plus" behavior, Medical Mutual's conspiracy claims are deficient. *See In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628 (7th Cir. 2010). The Court disagrees, however, that Medical Mutual has alleged mere parallel conduct. Parallel behavior of the sort "that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties" may be interpreted as collusive. *Id.* (quoting *Twombly*, 550 U.S. at 557 n.4 (2007)). The Court agrees with defendants that it might be rational for any one defendant acting alone to decide that an unbranded marketing campaign to "grow the pie" would be in its self-interest. But once one defendant has already begun such an unbranded campaign, from which all defendants benefit, what incentive would other defendants have to join the campaign and fund the same AstroTurf organization and physicians instead of free-riding on one or more of the other defendants? It would be unusual for each of the other defendants to assist in the unbranded endeavor without any "advance understanding among the parties." *Id.* Thus, given this seemingly anomalous behavior, as well as other aspects of industry

structure and practices that might facilitate collusion (such as the relatively small number of defendants and their regular joint attendance at industry conferences), the Court concludes that an agreement to engage in a fraudulent marketing campaign can be reasonably inferred. *Id.* at 627–28.

Medical Mutual asserts that GSK took part in the alleged unbranded campaign and used many of the same tactics as the other defendants. Thus, even though Medical Mutual has not adequately alleged a substantive RICO claim against GSK, it could plausibly allege that GSK conspired with the other defendants to grow the TRT market and to make fraudulent misrepresentations to further the other defendants' alleged schemes. In this version of the complaint, however, Medical Mutual does not assert a section 1962(d) claim against GSK, and so the Court need not decide whether such a claim could stand in the absence of a substantive RICO claim.

Notably, most of Medical Mutual's allegations concerning defendant's unbranded campaign do not involve Actavis. Medical Mutual does, however, allege that an Actavis entity entered into an agreement with the AbbVie defendants to promote AbbVie's TRT drug AndroGel and that an AbbVie defendant trained the Actavis entity to participate in its fraudulent marketing scheme, including through the unbranded Low T awareness campaign. And indeed, Medical Mutual alleges that Actavis operates its own unbranded Low T website. Whether or not this is sufficient to support an inference that Actavis agreed to take part in the larger unbranded campaign conspiracy, these allegations are certainly adequate to support the claim that Actavis agreed with AbbVie that it would "knowingly facilitate the activities" of the operators of AbbVie's RICO enterprise and that it would commit a number of predicate acts of fraud to do so, in

17

violation of section 1962(d).  *Brouwer v. Raffensperger, Hughes & Co.*, 199 F.3d 961, 967 (7th Cir. 2000).

As discussed, the Court's conclusion that Medical Mutual's allegations are sufficient to support an inter-defendant conspiracy means that it has sufficiently alleged its section 1962(d) claims.  For the sake of completeness, however, the Court also notes that, for the reasons outlined in its February 4 opinion, Medical Mutual's allegations of conspiracies between defendants and the third-party participants in their respective enterprises are also adequate to support their section 1962(d) claims at this stage.  *See In re TRT*, 2016 WL 427553, at *17.

3. **Negligent misrepresentation claims**

The briefing on the motion to dismiss Medical Mutual's prior complaint operated under the assumption that the same causation principles that applied to its RICO claims would apply to its common law claims, and the parties have not argued otherwise in their most recent submissions.  Thus because the Court has concluded that Medical Mutual has failed to provide plausible support for its allegations that GSK and Actavis made direct misrepresentations to Medical Mutual, its negligent misrepresentation claims against them are deficient for the same reason the section 1962(c) claims are deficient.  Because the negligent misrepresentation claims against those defendants would fail under either Rule 9(b) or Rule 8(a), the Court need not revisit its conclusion that Rule 9(b) is inapplicable to such claims.

4. **The current formulary status of defendants' TRT drugs**

Defendants fault Medical Mutual for failing to allege whether or how it changed its coverage of TRT prescriptions once it learned about defendants' alleged fraud.  Without

such allegations, they argue, Medical Mutual cannot plausibly claim that it was defendants' fraudulent marketing that caused it to pay for their TRT drugs, thus undermining all of Medical Mutual's claims. They cite a recent ruling from the Delaware Supreme Court in support of this argument. *See Teamsters Local 237 Welfare Fund v. AstraZeneca Pharm. LP*, 136 A.3d 688 (Del. 2016). In that case, the Delaware Supreme Court affirmed the dismissal of a false advertising lawsuit brought by TPPs against a pharmaceutical manufacturer because "TPPs who continue to pay or reimburse for [the defendant's drug], while claiming they were harmed by allegedly false advertising, are neither 'victims' of the allegedly false advertising nor were they injured by reason of or as a result of it." *Id.* at 696. By continuing to pay for the drug once they were aware that defendant's representations about the drug were false, the court concluded, the TPPs "were injured by their own conduct," not by the defendant's. *Id.*

In *Teamsters Local 237*, however, the court knew that the TPPs continued to pay for the drug at issue once they learned of the defendant's fraud because the TPPs admitted as much at oral argument. *See id.* at 696 n.13. The court specifically distinguished that case from the Third Circuit's decision in *In re Avandia Marketing, Sales Practices & Product Liability Litigation*, 804 F.3d 633 (2015). In *Avandia*, the Third Circuit declined to "assume, in the absence of contrary allegations, that plaintiffs did not change their coverage of [the drug at issue]" once they learned of the defendant's alleged fraud. *Id.* at 644. The court in *Avandia* did so because at the motion to dismiss stage, it did not know whether defendant's assertion was true. *Id.* This case is more like *Avandia* than *Teamsters Local*. A review of the current version of the complaint does not give the Court any information about whether Medical Mutual

19

changed its coverage of TRT drugs after learning about defendants' fraud, but it need not include such information in its complaint to state a claim. Medical Mutual has adequately alleged it relied on defendants' false representations about their TRT drugs' safety and efficacy when it granted those drugs favorable formulary status. For this reason, the Court need not consider whether it agrees with *Teamsters Local 237* or whether that decision governs a claim under Ohio law.

**Conclusion**

For the reasons stated above, the Court dismisses Medical Mutual's claims in its third amended complaint against Actavis and GSK under 18 U.S.C. § 1962(c) (counts four, nine, fourteen, and nineteen), as well as the negligent misrepresentation claims asserted against Actavis and GSK in count twenty-six. The Court otherwise denies defendants' motion to dismiss [dkt. no. 160]. Defendants are directed to answer the remaining claims by no later than August 31, 2016. The parties are directed to discuss and attempt to agree upon a discovery schedule and are to be prepared to discuss this at the upcoming August case management conference.

_____
                    MATTHEW F. KENNELLY
                    United States District Judge

Date: August 2, 2016