# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| IN RE: TESTOSTERONE REPLACEMENT THERAPY PRODUCTS LIABILITY LITIGATION | MDL No. 2545 |
| This Document Relates to: | Master Docket Case No. 1:14-cv-01748 |
| *Medical Mutual of Ohio v. AbbVie, Inc., et al.* | Honorable Matthew F. Kennelly |
| Case No.: No. 1:14-cv-8857 | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF MEDICAL MUTUAL OF OHIO'S EXPEDITED MOTION TO COMPEL DISCOVERY FROM DEFENDANTS**

Plaintiff Medical Mutual of Ohio ("Plaintiff" or "MMO") respectfully submits this Memorandum of Law in Support of its Expedited Motion to Compel Discovery from Defendants. The following discovery disputes have arisen:

- AbbVie has not produced call notes – information created by its sales personnel who call upon putative class members – which is centrally maintained in databases;

- AbbVie, and to a large if not total extent, Eli Lilly, have unilaterally imposed some unspecified date in 2015 as a self-selected discovery end date for their own productions;

- Defendants have not produced pricing and sales data for their TRT drugs at issue in this case; and

- AbbVie has failed to produce any relevant documents from two other non-custodial departments or sources.

The above is discoverable and highly relevant to MMO's and other class members' claims and damages and all of it should have been produced by now. MMO has made timely efforts to resolve these issues through the meet and confer process to have the documents and data produced well before the November 6, 2017 deadline for Plaintiff's Motion for Class Certification, but Defendants' inertia has left MMO with no choice but to file this Motion. Accordingly, MMO respectfully requests that the Court order as follows:

- AbbVie be ordered to produce all call notes or call lists as to MMO and the putative class members, or PBMs, from any call notes database by October 11, 2017;

- AbbVie and Eli Lilly be ordered to produce documents through February 17, 2017 (the date the parties agreed on search terms) by October 11, 2017;

- All Defendants be ordered to produce the requested pricing and sales data by October 11, 2017; and

- AbbVie be ordered to produce documents and information from two discrete, non-custodial sources that only came to light after MMO's recent depositions of AbbVie witnesses, by October 11, 2017.

## I. BACKGROUND

### A. Call Notes (Defendant AbbVie Only)

Pharmaceutical companies' representatives typically create "call notes" reflecting when a representative met with a customer, and what was discussed. Each individual representative's "call notes" are routinely compiled into a master list – "call lists" – for managerial review.

In a case involving the fraudulent promotion of a drug to Third-Party Payors ("TPPs") and Pharmacy Benefits Managers ("PBMs"), call notes are a highly relevant and discoverable source of information. To that end, MMO's first set of documents requests, served on October 18, 2016, explicitly asked AbbVie (and every other Defendant) to produce these types of documents. Request No. 12 asked for "[a]ll documents that consist of, relate to, refer to, or memorialize communications, negotiations, contracts or agreements between AbbVie and MMO, other TPPs, and PBMs . . . regarding AndroGel." *See* Ex. A. Request No. 13 was even more explicit, calling for "all call lists, which detail meetings between employees of AbbVie and employees at MMO, other TPPs and PBMs[.]" *Id.* AbbVie responded on November 23, 2016: "…AbbVie will produce non-privileged documents responsive to this request that relate specifically to Androgel to the extent they exist and can be located through a reasonable search of an appropriate and proportional set of custodial and non-custodial sources." *See* Ex. O.

Now AbbVie admits that it did not produce these documents and simply ignores MMO's specific October 2016 requests, re-characterizing its delay as part of the "iterative process [of] how discovery works in any complex litigation." *See* Ex. C (9/11/17 J. Knobler Ltr.). At no point during the ensuing meet and confer process did AbbVie take the position contrary to its discovery answers that call notes stored in centralized databases *would not* be part of AbbVie's document collection efforts.

During the deposition of AbbVie's Jed Cicak, who called on TPPs and PBMs, on August 30 (the earliest date provided by AbbVie), it quickly became apparent that (i) AbbVie (and its predecessor entities) maintained call notes databases, (ii) AbbVie personnel regularly use call notes databases, and (iii) AbbVie had not produced calls notes from any database. *See* Ex. D (9/5/17 S. Simmer Ltr.).[1] More recently, Mr. Cicak has even served on an "iRep Task Force" to assess and improve its functionality. *Id.* Mr. Cicak also testified that he and his colleagues or predecessors used similar call note recording systems at the two pertinent legacy AbbVie entities, Abbott Laboratories and Solvay. *Id.* Another AbbVie account manager who calls on TPPs (including MMO), Mr. Mark Hollinden, was deposed a week later on September 8.[2] He testified about his use (and testing of) the iRep call notes database. *See* Ex. R.

MMO promptly reiterated its request for all call notes. *See* Ex. D. AbbVie responded candidly that it "had not produced iRep notes," or notes in legacy Abbott or Solvay database, because they are not maintained in custodial files but rather in non-custodial "centralized database[s]." *See* Ex. C. AbbVie also claimed that MMO had never requested call notes, *see id.*,

---

[1] Mr. Cicak's deposition was fraught with issues, beginning with substantial gaps in his production. *See* Ex. W (8/25/17 S. Simmer Ltr.). AbbVie disputed this, *see* Ex. V (8/27/17 J. Knobler Ltr.). It was later learned that, *inter alia*, Mr. Cicak's hard-copy documents which he personally kept for years were not collected, *see* Ex. D (9/5/17 S. Simmer Ltr.), or produced.
[2] Mr. Holliden's deposition had been initially scheduled for August 9, but had to be postponed almost a month due to AbbVie's failure to produce a single email from Mr. Hollinden, despite previously certifying his custodial file production as complete.

in spite of MMO's first set of document requests propounded nearly a year earlier that explicitly asked for "call lists" and similar documents and AbbVie's response that a search would be made.

After additional follow-up by MMO, *see* Ex. E, AbbVie's only explanation for why it had not searched and produced its call notes databases was that the Plaintiffs' Steering Committee ("PSC") in the MDL had been aware of the iRep database. *See* Ex. F. AbbVie further implied that, if MMO wanted iRep call notes, then MMO should have asked for those by the name "iRep." *Id.* To date, AbbVie has refused to specify what data exists in its iRep and other legacy call notes databases, and by when it may produce this data. *See id.* (claiming AbbVie was still "researching" and assessing "burden," in spite of admitting it produced data from iRep database in the MDL).

### B. Temporal Scope of Discovery (Defendants AbbVie and Eli Lilly)

In deposing AbbVie witnesses starting in mid-July through September, it became apparent that AbbVie had not produced a single document post-dating 2015. AbbVie has made rolling productions on a custodial basis, so the entirety of this issue was not fully known by MMO until it had received and reviewed documents for multiple AbbVie custodians.

After Mr. Cicak's deposition, AbbVie confirmed that it had indeed produced documents only through mid to late 2015 (AbbVie has not identified a date certain). *See* Ex. C (9/11/17 J. Knobler Ltr.); Ex. F (9/18/17 J. Knobler Ltr.) ( "an actual, concrete dispute" exists on the "end date of AbbVie's document production"). AbbVie claims post-2015 documents are irrelevant because the class was "on notice" of their claims "no later" than "2014 and/or 2015." Ex. F.

Since this revelation, MMO has analyzed other Defendants' document productions. None of them save Eli Lilly appear to have adopted AbbVie's self-selected discovery cut-off themselves. Actavis appears to have produced documents from as recently as November 2016. Auxilium has produced some emails from January 2017. Endo has produced some emails from May 2016. Other Defendants' post-2015 documents contain the exact sort of relevant information MMO seeks from

AbbVie and Eli Lilly.  Given the varied positions taken by Defendants, in the interest of efficiency, MMO asks that a ruling as to the "end date" for AbbVie's production apply to all Defendants.

### C.  Pricing/Sales Data (All Defendants)

As reported in August, on May 25, 2017, MMO served its second set of document requests on all Defendants.  Among these were two requests asking for data about Defendants' TRT products (i.e., transactional sales / invoicing data), as well as industry-standard average pricing and related metrics.  The pertinent requests read as follows:

> **Request No. 4:**  Documents and data sufficient to show the monthly and yearly gross and net prices for Your TRT Products, including wholesale acquisition cost, average wholesale price, average manufacturer price, best price, 340B price, discounts, and rebates.

Request No. 5 asked for the same data for other TRT products.  Defendants took varying positions in their respective written objections to these requests.  AbbVie stated it "will produce non-privileged responsive documents and/or data sufficient to show pricing of AndroGel," but has yet to do so.  *See* Ex. X.  Eli Lilly stated it had produced some documents (not data) that *might* contain *some* of the requested pricing data for Axiron.  *See* Ex. G.  Actavis claimed it had or will produce responsive documents as to Androderm – though it has yet to do so.  *See* Ex. H.  And at the time of its written responses and objections, Auxilium and Endo refused to search for or produce any responsive documents or data.  *See* Exs. I-J.  The Defendants further stated that they would not produce responsive data for each other's TRT drugs.

Concerned, on July 14, 2017, MMO served its First Set of Interrogatories on all Defendants. These included an interrogatory that identified the pricing and sales data requested in Request No. 4 above.  The interrogatory read:

> **Interrogatory No. 1:**  Identify the monthly and yearly gross and net prices for each of your TRT Products on the most disaggregated level available including information concerning product or package size; strength; NDC#; customer name or identifier; unit sales; cost; margin; profit; wholesale acquisition cost; average wholesale price; average manufacturer price; best price; 340B price; gross sales price; net sales price; discounts; rebates; and any other relevant price metric or price adjustment.

Defendants' objections mirrored those of the corresponding document requests, including specious objections claiming that certain industry and accounting terms – such as "net sales price," "gross sales price," "NDC#," or "average wholesale price" – were unintelligible. *See* Exs. B, K-N.

MMO had a meet and confer with all Defendants on July 21, 2017, during which all Defendants committed to confirming what non-custodial data existed. Subsequently, however, nearly all Defendants rebuffed MMO's repeated attempts to meet and confer again throughout the entire month of August. *See, e.g.*, Ex. P (8/18/17 D. Stanoch Ltr.). Defendants Auxilium and Endo are the only ones to produce some (incomplete) data. Even they have yet to commit to what other data exist, let alone when they might produce it. *See* Ex. Q (9/14/17 I. Sprie Email).

However, AbbVie has now thrice said it would produce data, but has yet to do so. MMO last met and conferred with AbbVie on September 6, at which time AbbVie stated it needed to investigate further. It has yet to revert with any information or production.

Actavis, after initially stating that it would produce data, reversed its position during preparation of the August 2017 CMC Statement. Once Actavis finally agreed to meet and confer on September 5, Actavis first claimed that its pricing /sales data is not relevant, based on the already-rejected argument that it is differently situated from other Defendants given that the only remaining counts against Actavis are the conspiracy claims.[3] *See* Ex. R (9/12/2017 D. Stanoch Ltr.). Actavis also claims, incredibly, that its pricing and sales data is irrelevant, *id.*, notwithstanding such data being highly relevant to damages at class certification.

---

[3] When Actavis last attempted to limit its production on this basis, this Court ruled: "[B]ecause plaintiff has stated a viable RICO conspiracy claim against Actavis, discovery on that claim need not be limited to the specific aspects of the claim that were alleged with particularity in the complaint. And even if the RICO conspiracy claim *were* limited to the AndroGel conspiracy, Actavis's TRT sales and marketing concerning Androderm properly would be subject to discovery on a theory that the company's Androderm marketing was part of an effort to grow TRT sales generally, thereby boosting AbbVie's AndroGel sales." D.E. 208. The same should hold true here.

Finally, Eli Lilly has not produced responsive data. Instead, it cited a handful of stray documents, pulled from custodial files previously produced, claiming that these discharged its production obligations. Ex. S (8/25/17 J. Kwuon Ltr.). These documents only relate to analyses of prospective offers to certain TPPs at certain discrete periods of time. *See* Ex. T (8/25/17 D. Stanoch Email); Ex. U (9/12/17 D. Stanoch Ltr.). They certainly do not reflect holistic, monthly pricing or transactional data. Eli Lilly has also suggested MMO should somehow identify relevant data sources in Eli Lilly' *own possession*, instead of Eli Lilly doing this itself.

### D. Miscellaneous Non-Custodial Data Sources (Defendant AbbVie Only)

Recent depositions of AbbVie witnesses have also revealed two other non-custodial sources of relevant information that AbbVie has failed to produce. The first is AbbVie's RELAY system, which is used by AbbVie managed care executives to model contracting proposals for AndroGel. *See* Ex. D (9/5/17 S. Simmer Ltr.). The second source is AbbVie's (and predecessor entities') internal Office of Ethics and Compliance ("OEC"), to whom employees could report incidents about misleading promotion of drugs. *Id.* AbbVie has not produced information from either, claiming (i) the RELAY system is irrelevant because it does not contain "statements made to payors about the safety or efficacy or AndroGel," and that (ii) OEC records were not explicitly requested by formal name in MMO's document requests. *See* Ex. C (9/11/17 J. Knobler Ltr.).

## II. LEGAL STANDARD

"A party seeking discovery may move for an order compelling an answer, designation, production, or inspection" to written discovery requests. Fed. Rule Civ. P. 37(a). "[A]n evasive or incomplete disclosure, answer, or response must be treated as a failure to disclose, answer, or respond." *Id.* Permissible discovery includes any "nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case[.]" Fed. R. Civ. P. 26. Information "need not be admissible in evidence to be discoverable." *Id.* The 2015 Amendment

to Rule 26 merely clarified longstanding practice and did "not change the existing responsibilities of the court and the parties to consider proportionality." Fed. R. Civ. 26(b), 2015 Advisory Comm. Cmt. ("[I]f the parties continue to disagree, the discovery dispute could be brought before the court and the parties' responsibilities would remain as they have been since 1983."). Thus, both before and after the 2015 Amendment, "[i]n ruling on motions to compel discovery, courts have consistently adopted a liberal interpretation of the discovery rules." *Resicom Custom Painting & Maintenance, Inc. v. Prof'l Retail Servs., Inc.*, No. 14-CV-09190, 2017 WL 3951603, at *1 (N.D. Ill. Sept. 8, 2017) (internal quotations omitted). The "burden rests upon the objecting party to show why a particular discovery request is improper." *Id.* (internal quotations omitted). A party cannot discharge its burden with "a reflexive invocation of the same baseless, often abused litany that the requested discovery is vague, ambiguous, overly broad, unduly burdensome or that it is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence." *Hudson v. ArcelorMittal Burns Harbor, LLC.*, No. 2:16-cv-41, 2017 WL 344187, at *2 (N.D. Ind. Jan. 24, 2017) (internal quotations omitted).

### III. ARGUMENT

#### A. Call Notes (Defendant AbbVie Only)

The call notes reflecting communications that AbbVie's personnel had with TPPs and PBMs about AndroGel or "Low T" are highly relevant and discoverable in a case which challenges AbbVie's fraudulent promotion of AndroGel and the "Low T" disease state. Courts have long recognized the discoverability and evidentiary value of call notes– including, those maintained by AbbVie's predecessor entity, Abbott, albeit in the context of "calling" on doctors, not TPPs or PBMs. *Jirak v. Abott Labs. Inc.*, 716 F. Supp. 2d 740, 742 (N.D. Ill. 2010) (referencing Abbott "call notes" and "call lists" in discovery record), *rev'd, Schaefer-LaRose v. Eli Lilly & Co.*, 769

F.3d 560, 562-63 (7th Cir. 2012) (noting sales representatives, including Abbott's and Eli Lilly's, "spend the majority of their time preparing for, making and documenting sales calls . . . .").

AbbVie admits that call notes in its current iRep database, and its corresponding legacy Abbott and Solvay call notes databases, are discoverable, insofar as AbbVie admits it produced call notes in the MDL for its sales representatives that called on doctors. *See* Ex. F. The relevance argument applies with more force when the call notes reflect direct communications between Defendants and MMO and other putative class members. While AbbVie pays lip-service to the potential "burden" of producing call notes here, *see id.*, it has neither articulated the nature of that burden with requisite particularity nor explained how it was able to produce call notes in the MDL but cannot do so in this case. Further, given the testimony of AbbVie witnesses on the accessibility and functionality of the iRep database – e.g., the database is easily accessed and contains information populated through drop-down menus, sortable by date, customer, and drug – AbbVie's burden argument lacks credibility because it would be extremely easy for AbbVie to immediately identify the notes pertaining to payor customers and AndroGel.

MMO has been prejudiced by AbbVie's unilateral decision to withhold information contained in iRep and similar legacy systems. Despite explicitly requesting this very type of information in October 2016, AbbVie's agreement to produce them in response, AbbVie witnesses confirmed the exact call notes used with TPPs. After weeks of back and forth between counsel, AbbVie has yet to agree to produce *any* call notes data, let alone in time for MMO to make use of this information in its forthcoming motion for class certification due on November 6. Given the pressing deadlines of the existing schedule, AbbVie should be ordered to produce all call notes information contained in iRep or any other call notes database by October 11, 2017.

AbbVie cannot insulate itself by faulting MMO for not specifically requesting "iRep call notes" earlier. *See* Ex. F (insinuating MMO had imputed knowledge of the iRep database vis-à-

vis MDL plaintiffs' counsel). MMO specifically called for "call lists" and documents concerning communications with TPPs and PBMs. The withheld data in the iRep and other legacy call notes databases is exactly that. AbbVie cannot feign ignorance of its own internal nomenclature and systems to skirt its Rule 34 obligations. Indeed, while AbbVie touts that it produced documents from "at least twelve non-custodial sources," *see id.*, AbbVie provides no explanation for how none of its call notes databases were among those twelve self-selected, non-custodial sources.[4]

### B. End Date of Discovery (Defendants AbbVie and Eli Lilly)

A producing party "may not unilaterally take it upon [itself] to limit the scope of discovery." *Clarke v. Epco, Inc.,* No. CIV.A. 208CV103KSMTP, 2009 WL 1259460, at *1 (S.D. Miss. May 1, 2009); *see, e.g.*, *Molex v. San Francisco*, No. C-4:11-1282-YGR KAW, 2012 WL 1965607, at *4 (N.D. Cal. May 31, 2012) (producing party's "attempt to unilaterally limit the scope of discovery . . . is improper."). Yet, this is exactly what AbbVie has admittedly done, and what Eli Lilly appears to have done, by imposing their own temporal end date for discovery.

AbbVie's only basis for withholding documents post-dating some unspecified date in 2015 is that such documents are not relevant because MMO and other putative class members were aware of the alleged fraud in 2014 or 2015. AbbVie's position is incorrect regardless of AbbVie's self-serving pronouncement about when the class was on notice of AbbVie's fraud. Case after case in RICO and similar contexts repeatedly hold that documents post-dating events are nonetheless discoverable for multiple reasons, all of which are directly applicable here.

*First*, this Third Amended Complaint explicitly alleges ongoing, continuing schemes and a conspiracy to fraudulently promote each Defendant's TRT drug and "Low T."[5] Each overt act

---

[4] It appears some other Defendants might not have produced information from their own call notes databases, either. MMO believes a ruling as to AbbVie's obligation to produce call notes will be instructive as to the other Defendants.

[5] *See, e.g.*, TAC ¶ 1156 ("The AndoGel Formulary Access Enterprise is an ongoing organization that functions as a continuing unit."); ¶ 1162 ("The AbbVie Defendants' fraudulent activities are

- 10 -

in furtherance of a continuing violation give rise to a new cause of action. *See Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997). A defendant is also liable as a co-conspirator for a continuing RICO conspiracy until it withdraws from the scheme. *See, e.g.*, *United States v. Eppolito*, 543 F.3d 25, 47 (2d Cir. 2008). Even if now were the appropriate time for AbbVie to proffer evidence about its participation in or repudiation from the alleged conspiracy, AbbVie has failed to do so.

AbbVie cannot discount the Third Amended Complaint's explicit allegations of an ongoing and continuing wrongful conduct as "mere labels and conclusions." *See* Ex. F. The Court already found these allegations sufficient at the Rule 12(b)(6) stage. This alone distinguishes AbbVie's citation to *Ashcroft v. Iqbal*, 555 U.S. 662 (2009) and its other Rule 12(b)(6) stage cases. *See id.*

*Second*, AbbVie mistakenly suggests that post-2015 documents are irrelevant, because "MMO and all other putative class members" were aware of the fraud by "in 2014 and/or 2015." *See* Ex. F. When MMO or any other putative class member may have knew of AbbVie's fraud is a fact question to be *informed by* discovery; it cannot be a basis to *limit* discovery. What AbbVie and other Defendants told putative class members, and when, remains discoverable, even if AbbVie believes "the truth" was known by an unspecified date "in 2014 and/or 2015." *Id.*

*Third*, even if AbbVie were correct that liability cannot attach after 2014 or 2015 (and it is not), it is well settled that documents post-dating the relevant time period are nonetheless discoverable. Whether AbbVie and other Defendants promoted their TRT drugs differently after 2014 or 2015 (e.g., in response to FDA-mandated class labeling changes) is probative of what they did before then. In addition, documents after 2015 are independently relevant to establish the existence, scope, and duration of the alleged RICO conspiracy: "'post-conspiracy industry

---

part of their ongoing business and constitute a continuing threat…"); ¶ 1226 ("The AndroGel Peer Selling Enterprise is an ongoing organization…"); ¶ 1468 ("Plaintiff MMO and the TPP Class Members have been and are continuing to be injured [by the alleged conspiracy]."); ¶ 1470 ("The AbbVie Defendants' violations…detailed above are continuing and will continue.").

information is relevant to the determination of the existence of the alleged conspiracy, the termination of the alleged conspiracy, and the determination of damages.'" *Arrowpac Inc. v. Sea Star Line, LLC*, No. 3:12-cv-1180, 2014 WL 12617575, at *3 (M.D. Fla. Sept. 11, 2014) (quoting *In re Folding Carton Antitrust Litig.*, 83 F.R.D. 251, 255 (N.D. Ill. 1978)); *see also, e.g.*, *In re Morgan Stanley Mortgage Pass-Through Certificates Litig.*, No. 09-cv-02137, 2013 WL 4838796, at *3 (S.D.N.Y. Sept. 11, 2013) ("Like other courts, I conclude that the post-closing period can prove to be fertile ground for relevant discovery."); *P.V. ex rel. Valentin v. Sch. Dist. of Phila.*, No. 2:11-CV-04027, 2012 WL 676993, at *3 (E.D. Pa. Mar. 1, 2012) ("relevant information may be remote in time from the events that actually precipitated the suit in question").

So too, here. For instance, defense documents post-dating the FDA Advisory Board Committee Meeting in September 2014, or the class label changes in early 2015, contain insights about how Defendants' labeling and promotion departed from past practices *and why*. Backward-looking documents offer direct, material insights into Defendants' own beliefs about the appropriateness of their prior promotional activities.

Further, AbbVie's (and potentially Eli Lilly's) insistence on a 2015 discovery cut-off is undercut by its own discovery of MMO ("through the present") and the productions of other Defendants. It would be unfair and incongruent for AbbVie (and potentially Eli Lilly) to engage in asymmetrical discovery based on the unilateral selection of a unique discovery cut-off date.

*Finally*, post-relevant time period information is relevant to damages. *See, e.g.*, *Arrowpac*, 2014 WL 12617575, at *3. MMO is entitled to discovery of the "before and after" of AbbVie's and other Defendants' fraud, and what impact the fraud had on total prescriptions, pricing, and sales after the fraud was, according to AbbVie, revealed to the world in 2014 or 2015. *Id.*

AbbVie's allusion to the MDL plaintiffs' decision not to seek documents post-dating 2015 except for one discrete study protocol (*see* Ex. F) is inapposite. The individual plaintiffs' claims

in the MDL are personal injury claims that will substantially turn on different proofs as of the time of their physical injuries. By contrast, the claims alleged here relate to an ongoing, continuing course of fraudulent conduct. The prejudice to MMO is compounded by the fact that AbbVie and Eli Lilly have yet to specify the end date they are using. AbbVie (and Eli Lilly) should be ordered to produce responsive documents through 2/17/17, the date the parties agreed upon search terms.

### C. Pricing / Sales Data (All Defendants)

Defendants' pricing and sales data is relevant for at least two reasons. *First*, parallel price movements, in both frequency and magnitude, are probative of coordinated conduct because it demonstrates a lack of vigorous price competition consistent with collusive behavior. *See, e.g.*, *Standard Iron Works v. ArecelorMittal*, 639 F. Supp. 2d 877, 896 (N.D. Ill. 2009). The operative Complaint alleges a RICO conspiracy. Lack of vigorous price competition, and closely coordinated price movements, tend to show the existence and duration of the alleged conspiracy. Defendants may dispute whether such pricing patterns demonstrate collusion or not, but that is a fact question, not a basis to preclude MMO from discovering this data at all.

*Second*, Defendants' pricing and sales data is highly relevant for damages. The timing and extent of the impact of Defendants' fraud goes to the existence and quantification of the economic impact to MMO and the putative class. Using Defendants' own pricing and sales data to measure economic impact is commonplace. *See, e.g.*, *Mednick v. Precor, Inc.*, -- F.R.D. --, 2017 WL 1021994, at *14-15 (N.D. Ill. Mar. 16, 2017) (finding class damages susceptible to classwide damages modeling based on price differential data analysis); *In re Steel Antitrust Litig.*, No. 08 C 5214, 2015 WL 5304629, at *7-8 (N.D. Ill. Sept. 9, 2015) (finding analysis of pricing data may show common impact and damages). To the extent MMO has requested non-transactional average price metrics such as Average Wholesale Price ("AWP"), Wholesale Acquisition Cost ("WAC"), or Average Manufacturer Price ("AMP"), these metrics are not only derived from actual

- 13 -

transactional prices, but they often serve as benchmarks or lists prices for transactional prices. *See, e.g.*, *In re Pharm, Indus. Avg. Wholesale Price Litig.*, 252 F.R.D. 83, 87 (D. Mass. 2008) ("Throughout the class period, AWP was the pricing benchmark relied on by . . . most TPPs.").

Most Defendants tacitly concede the data's discoverability. Two (Auxilium and Endo) have at least produced some (albeit incomplete) data. AbbVie claims it will produce some data, but cannot say what or by when. The remaining two (Actavis and Eli Lilly) are still "investigating" whether they *might* produce some data. Defendants' suggestions that they might not have their own data (*see, e.g.*, Ex. U) is specious at best. And while Defendants do not believe they possess each other's pricing or sales data (called for by Request No. 5), they have yet to confirm this and their documents suggest otherwise.

Thus, the issue once again is not truly one of discoverability, but sufficiency and timing. Defendants have had MMO's requests for several months at this point. The data should be maintained in central databases – no Defendant has said otherwise – which does not pose an undue burden. The requested pricing and sales data should be produced by October 11.

### D. Miscellaneous (Defendant AbbVie Only)

Whether an AbbVie employee has made an internal complaint to the OEC about the fraudulent promotion of AndroGel or Low T is indisputably relevant. AbbVie's assertion that MMO never explicitly requested OEC files before (*see* Ex. C) is borderline frivolous. MMO need not identify, by formal name, every department within AbbVie and explicitly request it be searched. AbbVie's insistence that MMO's request for OEC files be treated as a new "formal request" that restarts the "30-day" response time under Rule 34 is a transparent attempt to delay and obstruct MMO's discovery efforts in this case. AbbVie should be ordered to produce OEC documents responsive to the parties' agreed-upon search terms on or before October 11.

AbbVie should be ordered to produce information from its RELAY system on or before October 11 as well. Information on how AbbVie analyzed the value of different contract offers it planned to make or not make to putative class members concerning AndroGel are akin to drafts. Such documents bear on the actual offers made, and will reveal AbbVie's motives and intent in how it constructed final offers. *See, e.g.*, *Broadrock Gas Servs., LLC v. AIG Specialty Ins. Co.*, No. 14-cv-3927, 2015 WL 916464, at *7 (S.D.N.Y. Mar. 2, 2015) ("The short answer is that the drafts are potentially relevant insofar as they may contain admissions that were then deleted in the process of editing."). That AbbVie projected different scenarios when making AndroGel offers to TPPs or PBMs will shed light on AbbVie's rationales for the offers it did make.

## IV. CONCLUSION

For the foregoing reasons, the Court should order Defendants to produce documents and date as set forth in the introduction of this motion. *See* Stanoch Decl. (meet and confer certification). MMO is learning of and working through numerous discovery issues on a near-daily basis. Other ripe or soon-to-be ripe issues exist, but MMO has confined this Motion to the most pressing issues described herein.

Respectfully submitted,

s/ W. Scott Simmer
W. Scott Simmer, Esq. (D.C. Bar No. 460726)
Thomas J. Poulin, Esq. (D.C. Bar No. 475115)
**THE SIMMER LAW GROUP**
The Watergate
Suite 10-A
Washington, DC 20037
Tel: (202) 333-4562
Fax: (202) 337-1039

Allan Kanner, Esq. (LA Bar No. 20580)
Conlee S. Whiteley, Esq. (LA Bar No. 22678)
Layne C. Hilton, Esq. (LA Bar No. 36990)
Marshall L. Perkins (LA Bar No. 36979)

**KANNER & WHITELEY, LLC**
701 Camp Street
New Orleans, Louisiana 70130
Tel: (504) 524-5777
Fax: (504) 524-5763

Ruben Honik (PA Bar No. 33109)
David J. Stanoch (PA Bar No. 91342)
**GOLOMB & HONIK P.C.**
1515 Market Street, Suite 1100
Philadelphia, PA 19102
Tel: (215) 985-9177

*Attorneys for Plaintiff Medical Mutual of Ohio*


Stephen A. Weiss, Esq. (NY Bar No. 2413342)
Christopher A. Seeger, Esq. (NY Bar No. 2425304)
**SEEGER WEISS LLP**
77 Water Street
New York, NY 10005
Tel: (212) 584-0700

Trent B. Miracle, Esq. (IL Bar No. 6281491)
Brendan A. Smith, Esq. (IL Bar No. 65190)
**SIMMONS HANLY CONROY**
One Court Street
Alton, IL 62002
Tel: (618) 259-2222
Fax: (618) 259-2251

Ronald E. Johnson, Jr., Esq. (KY Bar No. 88302)
Sarah N. Lynch, Esq. (KY Bar No. 94261)
**SCHACHTER HENDY & JOHNSON PSC**
909 Wright's Summit Parkway
Suite #210
Ft. Wright, KY 41011
Tel: (859) 578-4444
Fax: (859) 578-4440

*MDL Co-Lead Counsel*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 22nd day of September, 2017, a true and correct copy of the foregoing was filed and served upon all counsel of record via the CM/ECF system of the United States District for the Northern District of Illinois.

*/s/ David J. Stanoch*
David J. Stanoch