IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| IN RE: TESTOSTERONE REPLACEMENT THERAPY PRODUCTS LIABILITY LITIGATION | MDL No. 2545 <br><br> Master Docket Case No. 1:14-cv-01748 <br><br> Hon. Judge Matthew F. Kennelly |
| This document relates to: <br><br> MEDICAL MUTUAL OF OHIO, <br><br>         Plaintiff, <br><br> v. <br><br> ABBVIE INC., ABBOTT LABORATORIES, ABBOTT PRODUCTS, INC., SOLVAY PHARMACEUTICALS, INC., UNIMED PHARMACEUTICALS, LLC, AUXILIUM, INC., GLAXOSMITHKLINE LLC, OSCIENT PHARMACEUTICALS, INC., ELI LILLY AND COMPANY, LILLY USA, INC., ACRUX COMMERCIAL PARTY LTD., ACRUX DDS PARTY LTD., ACTAVIS PLC, ACTAVIS, INC., ACTAVIS PHARMA, INC., WATSON PHARMACEUTICALS, INC., WATSON LABORATORIES, INC., ANDA, INC., and ENDO PHARMACEUTICALS, INC., <br><br>         Defendants. | No. 1:14-cv-08857 |

**ABBVIE DEFENDANTS' OPPOSITION TO PLAINTIFF'S EXPEDITED
MOTION TO COMPEL DISCOVERY FROM DEFENDANTS**

## **TABLE OF CONTENTS**

Page

INTRODUCTION ...................................................................................................................1

FACTUAL BACKGROUND ..................................................................................................3

    A.  MMO's Demand For Pricing Data .............................................................................3

    B.  MMO's Remaining Demands ....................................................................................4

ARGUMENT ............................................................................................................................5

I.  MMO VIOLATED L.R. 37.2 BY FILING ITS MOTION PREMATURELY ....................5

II.  MMO'S MOTION TO COMPEL FAILS ON ITS MERITS ..............................................6

    A.  MMO's Demand For Across-The-Board Document Discovery Through 2017 .........6

    B.  iRep Data ..................................................................................................................11

    C.  Pricing Data .............................................................................................................11

    D.  OEC Documents ......................................................................................................12

    E.  RELAY Models .......................................................................................................13

CONCLUSION ......................................................................................................................15

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ...................................................................................................................8

*In re Broiler Chicken Antitrust Litig.*,
   2017 U.S. Dist. LEXIS 73219 (N.D. Ill. Apr. 21, 2017) ............................................................6

*Clymore v. Fed. R.R. Admin.*,
   2015 U.S. Dist. LEXIS 162529 (E.D. Cal. Dec. 2, 2015) ..........................................................6

*United States ex rel. Duxbury v. Ortho Biotech Prods., L.P.*,
   719 F.3d 31 (1st Cir. 2013) ........................................................................................................8

*Falat v. County of Hunterdon*,
   2014 U.S. Dist. LEXIS 163280 (D.N.J. Nov. 21, 2014) ............................................................8

*United States ex rel. Jacobs v. CDS, P.A.*,
   2016 U.S. Dist. LEXIS 102123 (D. Idaho Aug. 3, 2016) ........................................................10

*United States ex rel. King v. Solvay*,
   2013 U.S. Dist. LEXIS 30752 (S.D. Tex. Mar. 5, 2013) ...........................................................9

*Lone Star-Cardinal Motorcycle Ventures VIII, LLC v. BFC Worldwide Holdings, Inc.*,
   2016 U.S. Dist. LEXIS 89248 (N.D. Ill. July 11, 2016) ............................................................9

*Prohias v. Pfizer, Inc.*,
   485 F. Supp. 2d 1329 (S.D. Fla. 2007) ....................................................................................11

*Simon v. Northwestern Univ.*,
   2017 U.S. Dist. LEXIS 15229 (N.D. Ill. Feb. 13, 2017) ...........................................................6

*United States ex rel. Spay v. CVS Caremark Corp.*,
   2013 U.S. Dist. LEXIS 121554 (E.D. Pa. Aug. 27, 2013) .....................................................8, 9

*Teamsters Local 237 Welfare Fund v. AstraZeneca Pharms. LP*,
   136 A.3d 688 (Del. 2016) ........................................................................................................10

**Other Authorities**

Fed. R. Civ. P. 34 .......................................................................................................................2, 13

Local Rule 37.2 ......................................................................................................................1, 5, 6

The AbbVie Defendants respectfully file this memorandum in opposition to Plaintiff Medical Mutual of Ohio ("MMO")'s Expedited Motion to Compel Discovery from Defendants dated September 22, 2017 ("Mot.").

## INTRODUCTION

After waiting over six months to produce a single complete custodial file of its own, MMO now asks the Court to compel "expedited" production of several categories of documents from AbbVie. MMO filed its motion precipitously, without warning and without meeting and conferring in conformance with Local Rule 37.2. The motion should be denied for that reason alone. But that is hardly its only deficiency:

- MMO's demand for an across-the-board production update through 2017 is unwarranted and not proportionate to the legitimate needs of the case. The Court has already recognized as much: in main-MDL discovery, it cut off AbbVie's production obligations as of December 31, 2015, and it refused the PSC's request to push that deadline forward. Nothing about this single case justifies different treatment: December 31, 2015 is almost fourteen months after MMO filed suit, and long after the last wrongful act alleged in MMO's complaint.

- MMO's demand for data from AbbVie's iRep database is moot. MMO called for production of iRep data for the first time just a few weeks ago. Thereafter, AbbVie told MMO twice that it was investigating the issue and also offered to schedule a call with MMO to discuss the results of that investigation. Rather than awaiting the conclusion of that investigation, or even asking for a status update, MMO filed this motion. In the meantime, AbbVie has completed its investigation and expects to produce iRep data by the end of this week.

- MMO's demand for "pricing data" is also moot. As MMO recognizes in its motion, AbbVie *agreed* (without conceding relevance) to provide most of the data that MMO requested.

1

Indeed, it produced much of that data months ago. Yet, rather than approach AbbVie to ask about the timing for the remainder of its production, MMO simply moved to compel. AbbVie has since produced the remaining "pricing data" that MMO agreed would be sufficient.

- MMO's request to compel documents concerning hypothetical complaints made to AbbVie's Office of Ethics and Compliance ("OEC") is grossly premature. MMO never served a request for production that encompasses these documents, as Rule 34 requires. MMO called for OEC documents for the very first time just three weeks before filing this motion, in an oral request at a deposition. It then moved to compel production before the 30-day window for AbbVie to object had even elapsed—let alone before the parties had met and conferred. In any event, AbbVie's investigation to date has found no relevant documents to produce.

- MMO's demand for models generated by AbbVie's RELAY system lacks any valid basis. MMO hardly bothers to explain what RELAY is, let alone how RELAY models will help prove its case. In reality, those models—which estimate *hypothetical* sales performance under *hypothetical* contract scenarios—have no relevance. AbbVie has already produced its *actual* contracts and documentation of its *actual* sales performance under those contracts. Moreover, most of AbbVie's contracts are not with third-party payors ("TPPs") at all, but with pharmacy benefit managers ("PBMs"), which MMO has expressly excluded from the putative class.

MMO understandably seeks to distract the Court from its own discovery deficiencies. But there is no comparison between the parties when it comes to their respective compliance with discovery obligations. In this case alone, AbbVie has produced millions of pages' worth of documents and five witnesses for deposition—plus millions more documents and dozens more witnesses in main-MDL discovery. On the other hand, as of several weeks ago, MMO still had

2

not produced a single complete custodial file, and even now, it has not produced a single witness for deposition. Against that backdrop, MMO's present complaints ring hollow.

## FACTUAL BACKGROUND

### A. MMO's Demand For Pricing Data

In May of this year, MMO served its Second Set of Requests for Production ("RFPs"), which called for "[d]ocuments and data sufficient to show" various measures of pricing for AndroGel (including "wholesale acquisition cost," "best price," and the like), in addition to information about "rebates." (Declaration of Amy N. Vegari ("Vegari Decl."), Ex. 1 at 8 (RFP No. 4).) MMO also called for AbbVie to produce analogous pricing data for *all of the other Defendants'* TRT products. (*Id.* Ex. 1 at 9 (RFP No. 5).) Notably, at that time, AbbVie had already produced copious documentation of sales and rebates, including an enormous spreadsheet detailing the prescriptions dispensed and rebates paid under all of its contracts with managed-care entities. (*Id.* ¶ 9.)

On June 26, AbbVie timely served its Objections and Responses to MMO's Second Set of RFPs. (*Id.* ¶ 2 & Ex. 1.) Without conceding relevance, AbbVie agreed to produce "documents and/or data sufficient to show pricing of AndroGel, to the extent such documents and/or data exist and can be located through a reasonable search." (*Id.*) On the other hand, AbbVie refused to produce pricing data for *the other Defendants'* TRT products, since MMO had already asked each of the other Defendants for pricing data for their own products, rendering MMO's request duplicative. (*Id.* Ex. 1 at 9.)

Thereafter, MMO and Defendants held two telephonic meet-and-confers on the subject of MMO's Second Set of RFPs. Those calls took place on July 21 and September 7. On both calls, AbbVie told MMO what it intended to produce in the way of "pricing data": specifically,

3

documents sufficient to show each of the pricing measures enumerated in MMO's RFP No. 4 for AndroGel only, with the exception of "average wholesale price," which AbbVie does not maintain and which is publicly available. (*Id.* ¶¶ 4, 7.) MMO's counsel voiced no objection to AbbVie's stated plan on either occasion—or at any subsequent time. (*Id.* ¶¶ 5, 8, 10.)

AbbVie thereafter set out to assemble the requested data. Then, on September 22—without any further communications on the subject—MMO moved to compel. At the time MMO filed its motion, AbbVie was finalizing the pricing data for production. Two business days later, on September 26, AbbVie produced that data. (*Id.* ¶ 9.)

### B. MMO's Remaining Demands

The rest of the documents at issue were requested following the August 30, 2017 deposition of AbbVie employee Jed Cicak. In his testimony, Mr. Cicak referred to the iRep database, the RELAY system, and AbbVie's OEC. (Declaration of Jonah M. Knobler ("Knobler Decl.") ¶ 6.) At the conclusion of the deposition, MMO's counsel called orally for production of data from these non-custodial sources. Three business days later, on September 5, MMO followed up with a letter demanding that AbbVie produce these documents "immediately" and accusing AbbVie of bad faith for not having anticipated MMO's demands. (*Id.* ¶ 8 & Ex. 3.)

AbbVie responded in writing on September 11. It stated that it was "investigating the iRep database to understand what records may be available that pertain to interactions with managed-care entities" and would "set up a call … to discuss potential production" as soon as that investigation was complete. (*Id.* ¶ 9 & Ex. 4 at 2.) AbbVie explained to MMO why it believed RELAY models were neither "relevant … [nor] proportional" and asked MMO to "articulate … why" it thought otherwise. (*Id.* Ex. 4 at 2–3.) And it informed MMO that it would respond to MMO's request for OEC investigative records—which did not fall within any

4

document request that MMO had previously propounded—"within the 30-day time frame prescribed by the Federal Rules of Civil Procedure." (*Id.* at 3.)

On September 14, MMO replied, incorrectly claiming that AbbVie had "refuse[d]" to produce iRep data. (*Id.* ¶ 10 & Ex. 5 at 2.) MMO also took issue with the December 31, 2015 cutoff that AbbVie had employed in its document productions. (*Id.*) MMO's letter did not refer to any of the other documents at issue in this motion.

On September 18, AbbVie responded, explaining that, contrary to MMO's letter, it had "never 'tak[en] the position that [data from iRep] would not be produced.'" (*Id.* ¶ 12 & Ex. 7 at 2.) In fact, it was "making progress" in its investigation into the iRep data "and expect[ed] to have an answer for [MMO] in the coming days." (*Id.*) It also justified its use of a December 31, 2015 cutoff for document production. (*Id.* ¶ 12 & Ex. 7 at 2–4.)

MMO never responded to this letter, either in writing or by telephone. It never asked AbbVie about the status of its investigation into the iRep data. It never answered AbbVie's question about the relevance of RELAY models. And it never pointed to a previous document request that encompassed records from the OEC. Instead, on September 22, without any advance notice, MMO filed this motion to compel. (*Id.* ¶ 13.)

## ARGUMENT

### I. MMO VIOLATED L.R. 37.2 BY FILING ITS MOTION PREMATURELY

Local Rule 37.2 of this District states that this Court "shall … refuse to hear any and all motions for discovery" unless the movant certifies "that after consultation *in person or by telephone* and *good faith attempts to resolve differences*," the parties are "unable to reach an accord" (emphasis added). This Court's individual rules require the movant to "state with

5

specificity when and how the movant complied with Local Rule 37.2" and cautions that "[t]he exchange of correspondence [alone] ordinarily will not be sufficient."

MMO has failed to comply with these commands. As discussed above, the only issue in this motion that the parties ever discussed telephonically was pricing data—and on both calls where pricing data was discussed, MMO's counsel did not suggest that it had any grievance with AbbVie. As for the remaining issues, the parties have discussed them only by letter—and, aside from the temporal cutoff for document discovery, MMO has never provided AbbVie with any reasoned explanation of its position. MMO's motion should be denied on this ground alone. *See Simon v. Northwestern Univ.*, 2017 U.S. Dist. LEXIS 15229, at *21–23 (N.D. Ill. Feb. 13, 2017).

## II. MMO'S MOTION TO COMPEL FAILS ON ITS MERITS

"To succeed on a motion to compel, the moving party bears the burden of demonstrating that it is entitled to the requested discovery and has satisfied the proportionality and other requirements of Rule 26." *Clymore v. Fed. R.R. Admin.*, 2015 U.S. Dist. LEXIS 162529, at *5–6 (E.D. Cal. Dec. 2, 2015); *see In re Broiler Chicken Antitrust Litig.*, 2017 U.S. Dist. LEXIS 73219, at *29 (N.D. Ill. Apr. 21, 2017) (denying motion to compel because moving party "ha[d] not carried [its] burden to show that the [requested discovery was] proportional to the needs of the case"). Here, to the extent MMO's demands are not already moot, MMO has failed to meet its burden of showing that the documents at issue are both relevant and proportional to the genuine needs of this litigation—especially given the massive amount of information that AbbVie has already produced in this case and in this MDL more generally.

### A. MMO's Demand For Across-The-Board Document Discovery Through 2017

MMO's motion repeatedly states that AbbVie "ha[s] yet to specify the end date [it is] using" for its document productions. (Mot. at 1, 4, 13.) That is simply wrong. For example, in

its September 15 letter to MMO, AbbVie stated: "you are correct that AbbVie has limited its custodial productions to documents created *on or before December 31, 2015*." (Knobler Decl. Ex. 6 at 1 (emphasis added).) Likewise, in its September 18 letter to MMO, AbbVie said that it has done "precisely what" this Court "ordered AbbVie" to do in main-MDL discovery: namely, "produce documents created *through the end of 2015*." (*Id.* Ex. 7 at 4 (emphasis added).)

Contrary to MMO's claim, this was not merely a "self-selected" date. (Mot. at 1.) In fact, the Court previously agreed to that cutoff date for AbbVie discovery in this MDL. And the Court rebuffed the PSC's attempts to push that cutoff date forward into 2016—let alone 2017. Specifically, in February of this year, the PSC asked the Court to compel AbbVie to "supplement[] … *certain* custodial files ([just] six out of a total of 74 requested [custodial] files) for information generated beyond December 2015." Joint Status Report for Feb. 16, 2017 CMC (Dkt. No. 1717) at 1 (emphasis added). In response, AbbVie noted that post-2015 discovery was neither "relevant [n]or proportional" because "[t]he allegations in this litigation concern the labeling and marketing of AndroGel that long predate 2016." *Id.* at 4. And even if isolated post-2015 documents might be relevant, AbbVie noted that "wholesale [updates] of custodial files" were "certainly … not justif[ied]." *Id.* at 5.

In response to these arguments, the PSC retrenched, stating that they "d[id] not want" a "wholesale update of the[] six custodial files," and that they desired only those portions of the six custodial files "relat[ing] to [a specific] clinical trial" that was then ongoing. Tr. of Feb. 16, 2017 CMC at 10:14–11:17. The Court rejected even that narrowed demand, concluding that AbbVie's burden arguments "ma[de] sense." *Id.* at 19:5–8. Instead, the Court required AbbVie to produce only the draft protocol for the clinical study in question, and any correspondence with the FDA about that protocol. *Id.* at 19:9–17. Crucially, the reason why the Court required even

7

this targeted post-2015 production was because the clinical study was likely to be the subject of expert testimony at trial. *Id.* at 15:19, 16:1–8, 17:24–18:14.

Nothing justifies a different result here. Discovery in this single case was meant to be a subject-matter-specific supplement (*i.e.*, managed-care marketing) to MDL-wide discovery, and not the tail that wags the dog. *See* Original CMO 1 (Dkt. No. 174), ¶ 3. If the collective claims of thousands of product liability plaintiffs did not justify the burden of forcing AbbVie to update a handful of custodial files *through 2016* on the subject of *one specific clinical trial*, there is no legitimate basis for MMO's demand for an across-the-board discovery update through 2017.

MMO retorts that this case is unique because the complaint "alleges ongoing, continuing schemes." (Mot. at 10, 12.) Tellingly, however, MMO does not point to a single example of wrongdoing in 2016 or 2017 alleged in the complaint—because there is none. In the parties' correspondence, MMO has pointed to verbiage such as "ongoing organization," "continuing unit," and the like. (Knobler Decl. Ex. 5 at 3.) But the Federal Rules "do[] not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009); *see, e.g.*, *Falat v. Cnty of Hunterdon*, 2014 U.S. Dist. LEXIS 163280, at *27–28 (D.N.J. Nov. 21, 2014) (allegation that "Defendants' acts [were] 'ongoing'" was "a legal conclusion that the Court must disregard").

In particular, courts routinely hold that conclusory allegations of "continuing" violations do not justify the burden of extending the discovery period forward beyond the time frame of the complaint's well-pled allegations of misconduct. *See, e.g.*, *United States ex rel. Duxbury v. Ortho Biotech Prods., L.P.*, 719 F.3d 31, 39 (1st Cir. 2013) ("The district court was not required to expand the scope of discovery based upon the amended complaint's bald assertions that the purported kickback scheme continued [to the present]…." (citing *Iqbal*, 556 U.S. at 678–79));

8

*United States ex rel. Spay v. CVS Caremark Corp.*, 2013 U.S. Dist. LEXIS 121554, at *6–8, *11 (E.D. Pa. Aug. 27, 2013) ("[t]he simple inclusion of a cursory allegation that the Defendants' conduct is ongoing" did not "entitle Plaintiff to obtain expansive discovery to the present"); *United States ex rel. King v. Solvay*, 2013 U.S. Dist. LEXIS 30752, at *10–15 (S.D. Tex. Mar. 5, 2013) ("A few generalized allegations that conduct continued 'to the present' in a 267-page complaint … do[] not justify the burden and expense associated with unfettered discovery 'to the present' in a case in which discovery is already going to be incredibly expensive and time-consuming.").

But not only is the complaint silent about post-2015 wrongdoing; it *affirmatively concedes* that AbbVie's alleged fraud was exposed to MMO, putative class members, and the world by 2014, or at latest, March 2015. *See* Original Complaint ¶ 599 ("Plaintiff and the Class Members were … alerted to the existence and scope of this industry-wide fraud and were [thus put] on notice of their potential claims … shortly prior to the [November 2014] filing of this Complaint"); Third Amended Complaint ¶¶ 1105–07 ("[T]he FDA['s] [September 2014 Advisory Committee proceedings and March 2015 label change] … [put] Plaintiff MMO and the TPP Class Members … on notice that the vast majority of TRT drug prescribing … should never have occurred."). It is simply not plausible that the alleged scheme "continued" long after America's third-party payers (including large and sophisticated insurers) were concededly "alerted to [its] existence." Moreover, given payers' conceded awareness of the alleged scheme, any hypothetical post-2015 wrongdoing cannot possibly have injured them—so it is irrelevant.[1]

---

[1] MMO argues that the date "[w]hen MMO or any other putative class member may have knew [sic] of AbbVie's [alleged] fraud is a fact question to be *informed* by discovery" and not "a basis to *limit* discovery." (Mot. at 11.) This ignores the binding "judicial admissions" in MMO's own complaint concerning the dates when MMO and payers were put on notice of the alleged fraud, which MMO "cannot now contradict." *Lone Star-Cardinal Motorcycle Ventures VIII, LLC v. BFC Worldwide Holdings, Inc.*, 2016 U.S. Dist. LEXIS 89248, at *13 (N.D. Ill. July 11, 2016).

MMO counters that "documents post-dating the FDA Advisory Board [sic] Committee Meeting in September 2014, or the [TRT] class label changes in early 2015," may contain unspecified "insights about how Defendants' labeling and promotion departed from past practices" or "insights into Defendants' own beliefs about the appropriateness of their prior promotional activities." (Mot. at 12.) That is rank speculation. *Cf. United States ex rel. Jacobs v. CDS, P.A.*, 2016 U.S. Dist. LEXIS 102123, at *7–8 (D. Idaho Aug. 3, 2016) (rejecting argument that plaintiff was entitled to discovery from outside the period of alleged wrongdoing "to help demonstrate 'knowledge and intent'" because that argument was "not specific enough to be persuasive"). In any event, the December 31, 2015 cutoff that AbbVie has employed already gave MMO a period of *fifteen months* after the Advisory Committee meeting and *ten months* after the class label change to scour for such "insights." It has yet to point to any.

MMO's final argument is that it would be "asymmetrical" if AbbVie is not required to produce post-2015 documents, because Defendants have asked MMO for certain information extending "through the present." (Mot. at 12.) But the Federal Rules require proportionality to the actual "needs of the case," not superficial "symmetry." And here, MMO's post-2015 actions and decisions are vastly more important than AbbVie's.

In particular, MMO claims that, if it had known between 2000 and 2014 what it knows today, it would not have added AndroGel to its formulary (or would have imposed tighter restrictions). Few things could be more probative of this claim than what MMO *actually does today* now that it has full knowledge. *See Teamsters Local 237 Welfare Fund v. AstraZeneca Pharms. LP*, 136 A.3d 688, 695–98 (Del. 2016) ("TPPs who claim that false advertising injured them, but [willingly] continue to cover the allegedly falsely advertised drug on their formularies … cannot, as a matter of law, establish that they were 'injured by reason of' … the false

10

advertising.").[2] For exactly this reason, the Court has recognized that the "current … status" of TRTs on MMO's formulary may ultimately be dispositive. Order on Mot. to Dismiss (Dkt. No. 170) at 18–20. *Defendants'* present-day conduct has no analogous relationship to the central theory of liability in this case.

### B.     iRep Data

MMO asks the Court to compel AbbVie to produce data from its iRep database "and similar legacy systems" to the extent any exists for its selected managed-care custodians. (Mot. at 9.) But there does not appear to be any present dispute on this subject. In the run-up to this motion, AbbVie told MMO twice that it was investigating what iRep data is available for the managed-care custodians MMO has identified. AbbVie was in the process of collecting that data when MMO abruptly filed this motion, and it expects to produce data by the end of this week. Meanwhile, AbbVie is investigating whether there was any "legacy system" from the Solvay era (*i.e.*, 2000–2010) that recorded interactions with managed-care accounts, and if so, whether AbbVie still has access to it today. Because any such system (if it existed) has been defunct for years, this investigation is considerably more challenging. If it turns out that AbbVie does have reasonable access to such a system, it will produce analogous data from that system.[3]

### C.     Pricing Data

MMO's demand for "pricing data" is also moot. As discussed above, AbbVie produced voluminous data about rebates many months ago. Thereafter, in response to MMO's Second Set

---

[2] *See also Prohias v. Pfizer, Inc.*, 485 F. Supp. 2d 1329, 1335 (S.D. Fla. 2007) (dismissing claims of plaintiffs who "continue[d] to purchase Lipitor even though they [were] purportedly now aware of the 'truth' regarding its alleged lack of coronary benefits," because they could not plausibly claim that "they would not have paid [for Lipitor] had they known the truth").

[3] MMO's motion also refers to a "legacy" call-note database from the "Abbott" era. (Mot. at 9.) However, the undisputed testimony has been that managed-care marketers' interactions with managed-care accounts were not electronically recorded during that time period, and that no such database exists.

11

of RFPs, and without conceding their relevance, AbbVie agreed to provide other specified categories of pricing data for AndroGel. MMO never voiced any objection to AbbVie's proposal at any time. AbbVie was preparing to produce that data when, without warning, MMO filed this motion. It has now been produced, and the issue is therefore resolved.[4]

If MMO now changes its mind and claims that it is entitled to *additional* information on "pricing" or "sales" of AndroGel beyond what it twice agreed to accept from AbbVie without complaint, such a reversal should be rejected—both as a matter of procedure and, for the reasons set forth in the other Defendants' briefs, as a matter of substance. Likewise, to the extent MMO now maintains that Defendants should all be compelled to produce "*each other's* pricing or sales data" in addition to their own (Mot. at 14 (emphasis added)), that demand is duplicative on its face, and MMO has made no argument as to why it is necessary.

### D. OEC Documents

As discussed above, during his August 30, 2017 deposition, AbbVie employee Jed Cicak testified that the company's OEC investigates internal compliance complaints. After the deposition, MMO called orally for the production of any OEC documents that might concern the marketing of AndroGel to managed-care entities. (There was no testimony that any such documents exist or that any relevant OEC investigations actually occurred.) MMO sent a letter on September 5 to the same effect. AbbVie responded six days later, stating that it would treat MMO's letter as a formal document request and would "respond to it within the 30-day time frame prescribed by the Federal Rules of Civil Procedure." (Knobler Decl. ¶ 9 & Ex. 4 at 4); *see*

---

[4] MMO's motion asserts that AbbVie "c[ould] not say what" data it was willing to produce. (Mot. at 14.) That is demonstrably untrue. During two separate meet-and-confer calls, AbbVie told MMO *exactly* which categories of pricing data it intended to produce, and which it did not. (Vegari Decl. ¶¶ 4, 7.)

*also* Fed. R. Civ. P. 34(b)(2)(A). Eleven days later, without further communication, MMO moved to compel.

Tellingly, MMO does not point to any request for production ever served in this case that calls for OEC documents (or documents pertaining to compliance investigations more generally)—let alone any request that does so "with reasonable particularity," as the Federal Rules require. Fed. R. Civ. P. 34(b)(1)(A). That is because there was never any such request. MMO may feel that the procedures prescribed by Rule 34 for document discovery are "frivolous" (Mot. at 14), but it is bound by them just the same.

AbbVie will respond to MMO's demand consistent with its obligations under Rule 34, and if necessary, will meet and confer with MMO on the subject. Until then, there is nothing for the Court to decide. That said, AbbVie has recently completed its investigation of OEC materials from the AbbVie era and has confirmed that there were no complaints or investigations related to the marketing of AndroGel to managed-care entities—and thus, that there are no documents to produce. AbbVie's investigation of the pre-AbbVie era is ongoing.

### E. RELAY Models

Finally, MMO asks the Court to compel AbbVie to produce unspecified "information from its RELAY system." RELAY is a process that AbbVie uses to forecast the financial impact of potential contract terms during the contract-negotiation process. (Declaration of Ryan Wehrspann ("Wehrspann Decl.") ¶ 3.) The raw data fed into the RELAY system is the same historical sales and rebate data that AbbVie has already produced to MMO in this litigation. (*Id.* ¶¶ 4–5.) RELAY uses that historical data to project how changes to the terms of a contract (*e.g.*, a grant of preferential formulary status to AndroGel vis-à-vis competing TRTs, or the loss of exclusivity on a formulary) would affect AbbVie's revenues. (*Id.*)

RELAY models are irrelevant or disproportionate to the needs of the case for at least two reasons. First, AbbVie has already produced hundreds of *actual* contracts with managed-care entities and its *actual* sales and rebate data pursuant to those contracts. (*Id.*) RELAY models, by contrast, are merely *projections* of performance under *hypothetical* contract terms, many of which never came into force.

MMO speculates that these models "will reveal AbbVie's motives and intent in how it constructed final [contract] offers." (Mot. at 15.) That is conclusory, and it makes no sense. RELAY models do not contain any narrative discussion of contracting, business, or marketing strategy. (Wehrspann Decl. ¶¶ 7–8.) Nor do they contain any information about representations made to managed-care entities concerning the safety, efficacy, or any other properties of AndroGel. (*Id.* ¶ 9.) All that RELAY models might "reveal" is that AbbVie sometimes evaluated the financial impact of alternate contract terms and chose not to pursue them. That has nothing to do with the disputed issues in this case. Notably, MMO already possesses a number of RELAY models because they are sometimes found in the custodial files of AbbVie's witnesses (*e.g.*, as attachments to emails). (Knobler Decl. ¶ 9.) Yet, tellingly, MMO has not pointed to a single instance in which its review of those models "reveal[ed]" anything significant about "AbbVie's motives and intent."

Second, most of AbbVie's contracts are not with TPPs, but instead with PBMs, whom MMO has expressly carved out of the class. (Wehrspann Decl. ¶ 6.) Those PBMs negotiate their own contracts with TPP class members; AbbVie is not a party to those discussions. Even if AbbVie's models of hypothetical contract terms with *class members* were relevant and proportional—and they are not—AbbVie's models of hypothetical contract terms with *non-class members* are even further removed from MMO's allegations in this case.

14

**CONCLUSION**

For the foregoing reasons, MMO's motion to compel should be denied.

Dated: October 3, 2017

Respectfully submitted,

*/s/ William F. Cavanaugh, Jr.*
William F. Cavanaugh, Jr.
Jonah M. Knobler (*pro hac vice*)
**PATTERSON BELKNAP WEBB & TYLER LLP**
1133 Avenue of the Americas
New York, NY 10036
Tel: (212) 336-2000
Fax: (212) 336-2222
wfcavanaugh@pbwt.com

*Attorneys for Defendants AbbVie Inc., Abbott Laboratories, Abbott Products, Inc., Solvay Pharmaceuticals, Inc., and Unimed Pharmaceuticals, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on October 3, 2017, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which sent notification of such filing to all registered attorneys of record.

/s/ William F. Cavanaugh, Jr.
William F. Cavanaugh, Jr.

*Attorney for Defendants AbbVie Inc., Abbott Laboratories, Abbott Products, Inc., Solvay Pharmaceuticals, Inc., and Unimed Pharmaceuticals, LLC*